**STRIS & MAHER LLP**
PETER K. STRIS
peter.stris@strismaher.com
BRENDAN S. MAHER
brendan.maher@strismaher.com
RACHANA A. PATHAK
radha.pathak@strismaher.com
DANA BERKOWITZ
dana.berkowitz@strismaher.com
JOHN STOKES
john.stokes@strismaher.com
725 S. Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
Emily and Malcolm Fairbairn

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>　　　　　Defendant. | Case No. 3:18-cv-4881<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.     Private charitable giving is critically important to funding public and social goods in the United States.[1] Over the last decade, a new vehicle for making these charitable contributions has come to prominence: the commercial donor advised fund or "DAF."

2.     Commercial DAFs are a special type of financial account that individual donors open at a 501(c)(3) nonprofit organization that has been created by a for-profit financial institution. When donors contribute assets to their DAF account, the nonprofit organization takes legal title to the assets, but donors choose how funds are invested and ultimately distributed to charitable organizations. The National Philanthropic Trust describes DAFs as a kind of "charitable savings account."

3.     As of 2016, DAF accounts held more than $85 billion in assets. The nation's largest sponsor, Defendant Fidelity Investments Charitable Gift Fund ("Fidelity Charitable"), has more than $16 billion under management. It receives more donations than any charity—DAF or otherwise.

4.     Although commercial DAFs may help advance important charitable purposes, they also generate enormous profits for the financial institutions that are affiliated with them. The nonprofit organizations that sponsor DAFs charge donors a management fee for maintaining an account, and the sponsors in turn pay significant fees to their affiliated financial institutions for a broad range of services. Moreover, DAF assets are generally held in proprietary funds from which the financial institutions generate additional profits.

5.     To fuel their growth, commercial DAFs have increasingly targeted wealthy donors with complex assets. This has led to intense competition among the largest commercial DAFs. To succeed, DAF sponsors must convince individuals

---

[1]     As some leading commentators have explained: "In other countries, it is common for universities, hospitals, art museums, symphonies, and social safety nets to be funded by governments. In the US, charitable organizations, supported by tax-favored private foundations, carry out many of the same social functions." Lewis B. Cullman *et al.*, *The Undermining of the American Charity*, N.Y. Review of Books (July 14, 2016).

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

considering a donation of complex, non-cash assets that they have the sophistication and personalized service to implement the donation in a manner and on terms that advance the donor's objectives.

6.    This case is about Fidelity Charitable making false promises to secure a $100 million donation from Plaintiffs Emily and Malcolm Fairbairn in late December 2017—and then outrageously mishandling the donation, costing the Fairbairns millions of dollars and severely impairing their ability to support important charitable causes.

7.    Like many wealthy donors, the Fairbairns made their donation using a combination of cash and other assets—including 1.93 million shares in a publicly traded company called Energous. The Fairbairns were angel investors in the company, and they remain sizeable stakeholders today.

8.    The Fairbairns could have made their donation to JP Morgan, with whom they had long enjoyed a positive relationship and where they had already established a $20 million DAF. JP Morgan allows donors to "[a]dvise on the timing and rate at which the donated securities are liquidated." JP Morgan Charitable, *Introducing the J.P. Morgan Charitable Giving Fund* at 2 (2017).

9.    But Fidelity Charitable aggressively promoted itself as the best choice for the Fairbairns' charitable giving in 2017. With respect to the Energous stock in particular, Fidelity Charitable made a number of personalized promises: (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock, (2) it would not trade more than 10% of the daily trading volume of Energous shares, (3) it would allow the Fairbairns to advise on a price limit (i.e., a point below which it would not sell without first consulting the Fairbairns), and (4) it would not liquidate any shares until the beginning of 2018.

10.    But after the Fairbairns donated the 1.93 million shares, Fidelity Charitable promptly—and egregiously—broke each of its promises. It (1) liquidated the entire block of shares in a three-hour window on December 29, (2) accounting for 16% of the day's exchange-traded volume and an incredible *35%* of the volume over

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

the three-hour trading window, (3) using inappropriate methodologies that caused its own trades to compete against each other and drive the share price down still further, (4) without even telling the Fairbairns it was happening, let alone allowing them to advise on a price limit.

11.    The catastrophic result was a 30% run-down of the stock's value—leaving the Fairbairns with tens of millions less to direct to charitable causes, and reducing the size of their tax deduction by millions more.

12.    To make matters worse, in stark contrast to its pre-donation solicitousness, Fidelity Charitable has refused to provide the Fairbairns even a basic explanation or documentation of what went wrong. The Fairbairns have sought information about the liquidation, relevant internal policies, and the compensation that Fidelity Charitable, its affiliated companies, and its employees received from this transaction. But Fidelity Charitable has stonewalled them completely.

13.    Perhaps that is because Fidelity Charitable believes it is too large and powerful to be held to account. Alternatively, perhaps divulging this information would reveal systemic undermining of donors' and charities' interests for the benefit of Fidelity Charitable and its affiliated companies. Indeed, given the deep conflict of interest and the immense incentives Fidelity Charitable faced to immediately liquidate the Energous shares at whatever cost to the Fairbairns, the misconduct in this case likely goes far beyond mere incompetence.

14.    Whatever the explanation, the Fairbairns bring this lawsuit to uncover it, and to obtain appropriate relief.

**JURISDICTION AND VENUE**

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

16.    This Court has jurisdiction over Defendant Fidelity Charitable because it conducts significant business operations in the State of California, and nearly all of the

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

1  actions giving rise to this case took place in the State of California. Fidelity Charitable
2  accordingly has sufficient minimum contacts with this forum arising out of the actions
3  that injured the Fairbairns to warrant this Court's exercise of jurisdiction.

4   17. Venue is proper in this district under 28 U.S.C. § 1391 because Fidelity
5  Charitable resides there and a substantial part of the events and omissions giving rise
6  to this action occurred in this district.

7  <div align="center">**PARTIES**</div>

8   18. Plaintiffs Emily and Malcolm Fairbairn are residents of California.
9  Through two of their entities, the Fairbairns were owners of the 1.93 million shares of
10  Energous Corporation that are the subject of this lawsuit.

11   19. Defendant Fidelity Charitable is a Massachusetts 501(c)(3) non-profit
12  corporation with its principal place of business in Massachusetts. Fidelity Charitable is
13  the nation's largest DAF sponsor. Of the approximately $85 billion in total assets held
14  in DAF accounts, Fidelity Charitable holds $16 billion (nearly 20%).

15  <div align="center">**FACTUAL ALLEGATIONS**</div>

16  **A. Commercial DAFs Like Fidelity Charitable Have Become A Major Vehicle**
17  **For Private Charitable Giving.**

18   20. In recent years, commercial DAFs have become an increasingly popular
19  vehicle for charitable giving, largely because they fill a gap in the otherwise stark
20  landscape of philanthropic vehicles. Outside of DAFs, donors have two basic, and very
21  different, options to accomplish their philanthropic goals. They can either engage in
22  private philanthropy, exemplified by the creation of a private foundation, or they can
23  give directly to a public charity that is already in existence.

24   21. Private foundations give donors complete control over their charitable
25  giving—donors can contribute assets at any time (and thus receive an immediate
26  personal tax benefit), but then spread the distribution of those assets to charitable
27  causes over a longer period.

28

<div align="center">4
COMPLAINT</div>

22.     But private foundations are expensive to set up and maintain. Moreover, given the lack of oversight—and the resulting potential for abuse by individuals hoping to avoid taxes—Congress has imposed limits on the tax benefits available for donations to private foundations. For example, whereas a donor may deduct the full fair market value of an appreciated stock when that stock is given directly to an existing public charity, the donor may deduct only her cost basis in the stock (i.e., the amount she originally paid) if she gives it to a private foundation.

23.     Instead of setting up a private foundation, donors can give directly to existing public charities. This has the obvious advantage of immediately benefiting social goods that depend on philanthropy to function. Additionally, as noted, direct donations receive favorable tax treatment compared to donations into private foundations.

24.     But giving directly to public charities eliminates the donor's ability to control the timing of donations relative to the donor's broader financial and philanthropic objectives. For example, some public charities are unable or unwilling to accept a donation of appreciated stock or an even more complex asset. Or a donor may wish to ensure that her large donation is used over time, but the charity may lack the ability or willingness to accommodate that desire. At the simplest level, it may be tax-efficient for a donor to make a large donation at one particular point in time, but the donor may not yet know where that money will do the most good.

25.     DAFs have come to prominence because they hit a sweet spot between private giving via the paradigmatic vehicle of a private foundation and direct giving to an already-existing public charity.

26.     DAFs have existed in some form since the 1930s, but for decades were little utilized. As recently as 1995, DAF accounts held only around $2.4 billion in assets, compared to $85 billion in 2016. In recent years, however, for-profit financial institutions like the ones affiliated with Fidelity Charitable have learned to leverage DAFs' unique characteristics to bridge the gap between private foundations and direct

S T R I S
M A H E R    725 S. FIGUEROA ST. STE 1830    LOS ANGELES, CA 90017

giving. And once these financial institutions recognized the opportunity this presented, "a number of [them] . . . formed charitable corporations for the principal purpose of offering donor advised funds, sometimes referred to as 'commercial' donor advised funds." H.R. Rep. No. 109-455, at 180 (2006).

27.    In a nutshell, commercial DAFs work as follows. Donors create an account with a sponsoring organization, here Fidelity Charitable, formed by a financial institution. When donors contribute assets to fund their DAF account, the sponsoring organization takes legal title to the assets, but it guarantees donors a right to choose how the DAF account's funds are invested and a robust right to "advise" about how the funds will ultimately be distributed to existing public charities. Federal law requires DAFs to give donors "advisory privileges with respect to the distribution or investment of amounts" held in the account. 26 U.S.C. § 4966(d)(2).

28.    The IRS Guidesheet on DAFs sets the baseline for donors' advisory rights as "the right of a donor to provide noncompulsory recommendations, suggestions or consultative advice" about the disposition or investment of funds in the donor's account. Internal Revenue Service, *Donor-Advised Funds Guide Sheet Explanation* at 8 (July 31, 2008).

29.    But a sponsoring organization has latitude to offer donors stronger advisory rights, short of allowing them to retain legal title to the funds. Fidelity Charitable gives account holders particularly robust advisory rights over the funds they contribute.

a.    Fidelity Charitable holds funds in a dedicated account—and ultimately donates them to charitable organizations—in the donor's name.

b.    The donor has exclusive advisory rights over the funds—Fidelity Charitable cannot allow anyone else to dictate where they are donated.

c.    Nor can Fidelity Charitable *itself* even make grants or otherwise take money out of an account without action from the donor.

d.    Fidelity Charitable retains only a veto power over a donor's

S T R I S
M A H E R    725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

6

1  decisions, which it will exercise only when the donor attempts to use the money for an
2  improper or non-charitable purpose.

3       30.    Thus, although Fidelity Charitable holds title to the money and serves as
4  a genuine check to make sure donors give to proper organizations, donors' rights are
5  strikingly broad.

6       31.    But at the same time, because Fidelity Charitable and other DAF sponsors
7  are required to ensure that funds are ultimately distributed to legitimate charitable
8  organizations, donors who give to a DAF receive the same tax benefit they would for
9  giving directly to an existing public charity in the first instance.

10 **B.     Fidelity Charitable Has Dominated The DAF Market—And Generated**
11 **Enormous Profits For Its Associated Financial Institution—By Convincing**
12 **Donors Like the Fairbairns To Donate Complex Assets.**

13      32.    Commercial DAFs do more than help facilitate charitable giving by
14 donors, however. They also generate incredible profits for their associated financial
15 institutions. As one commentator has put it: "To be sure, *Fidelity's* interest in Fidelity
16 Charitable is not wholly charitable. While your funds sit in a DAF waiting to be
17 disbursed, they're invested in the market. And if they're in Fidelity's DAF, they'll be
18 invested in Fidelity's funds." Felix Salmon, *The Disrupter: How Fidelity and its donor-*
19 *advised fund are shaking up charitable giving for the better*, Slate (May 5, 2018).

20      33.    No DAF sponsor has proved as lucrative to its associated financial
21 institution as Fidelity Charitable.

22      Fidelity Charitable, which was founded in 1991, had an absolutely
23      astonishing $5.4 billion of revenue in 2015, the vast majority of which
24      came from its $4.6 billion in fresh contributions. That is twice the size
25      of the Red Cross, and more than 14 times as much as the Museum of
26      Modern Art. More impressively, revenues rose 23 percent, or more than
27      $1 billion, from the $4.4 billion in 2014 revenues. Go back to 2011, and
28      the amount was just $1.9 billion; in 2005, Fidelity Charitable's revenues

STRIS  MAHER | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

7

were below $1 billion. In terms of sheer growth, no other institution comes close.

*Id.*

34.     Fidelity Charitable has generated its astonishing growth by focusing on more than just cash donations. Fidelity Charitable, *Fidelity Charitable 2018 Giving Report* at 2 (2018) ("Sixty one percent of 2017 contributions to Fidelity Charitable were non-cash assets.").

35.     Like its major competitors, Fidelity Charitable broadly promotes its ability to increase the tax efficiency of charitable giving by accepting and liquidating complex assets. *See, e.g.*, Ana Swanson, *Wall Street is sitting on billions meant for charities in "donor-advised funds,"* Chicago Tribune (June 22, 2016) ("Matt Nash, a senior vice president of donor engagement at Fidelity Charitable, said that donor-advised funds allow more money to go to charity, in part because they allow people to donate complex assets, such as property, a share in a business or stock.").

36.     And it has marketed this ability with particular force in targeting ultra-wealthy individuals with complex finances—for whom DAFs offer a unique opportunity to (1) donate large amounts of complex, appreciated assets, (2) with the full tax deduction of direct giving, while (3) also retaining ongoing control over their donations. Abby Schultz, *Donor-Advised Funds Become Popular Philanthropic Tools*, Barrons (Feb. 15, 2018) ("One reason donor-advised funds have exploded in popularity for the philanthropically inclined is the ability of some major funds to take in complex assets like restricted stock, real estate or even cryptocurrency.").

37.     The competition for these relatively few "big fish" is intense, with each institution touting its own expertise as superior to the next. Indeed, this is the crux of the competition: which organization can prove it offers the sophistication and personalized service to handle a high-wealth individual's complex financial picture and carry out the individual's charitable wishes accordingly.

38.     In this regard, Fidelity Charitable has aggressively promoted the services

S T R I S  725 S. FIGUEROA ST. STE 1830
M A H E R  LOS ANGELES, CA 90017

of its dedicated Complex Assets group, led by attorneys Ryan Boland and Karla Valas. *See* Ryan Boland and Karla Valas, *Charitable contributions: Looking beyond cash for the right asset to give*, Fidelity Charitable (Jan. 2, 2018) (promoting the group's work, including tax modeling, with private equity and other entrepreneurial donors and their professional advisers to develop strategies that fit with the donor's objectives).

39.     In 2017, Fidelity Charitable set its sights on Plaintiffs Emily and Malcolm Fairbairn. It promised sophistication and white glove service in order to secure a $100 million donation, and then flagrantly broke each of its promises, costing the Fairbairns millions of dollars and severely impairing their ability to support important charitable causes.

## C.     In December 2017, The Fairbairns Decide To Donate $100 Million To Fight Lyme Disease.

40.     Emily and Malcolm Fairbairn run a San Francisco-based registered investment advisor called Ascend Capital. Through Ascend, the Fairbairns manage billions of dollars for a range of clients that include pension funds and university endowments. They have successfully run Ascend for more than two decades.

41.     Over the last decade, the Fairbairns have dedicated more than $65 million to charity: in 2010, they placed $25 million in a charitable remainder trust; in 2013, they placed $20 million in a JP Morgan DAF account; and in 2014, they placed $20 million in a Fidelity Charitable DAF account. They have also made numerous direct donations to a wide range of organizations and causes. Most importantly, they have been inspired by Warren Buffet to personally resolve that they will donate the majority of their wealth during their lifetimes.

42.     Like anyone who makes charitable donations, the Fairbairns have received a personal financial benefit in return for their philanthropic efforts: a

S T R I S
M A H E R | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

9

deduction on their taxes.[2] In 2017, changes in the tax laws meant certain deferred income could no longer be deferred. Given Ascend's success, the Fairbairns were facing a substantial tax payment.

43.     It was therefore the right time for the Fairbairns to take their philanthropy to another level. They would donate $100 million, much of which would be dedicated to fighting Lyme disease—a disease that had recently stricken their entire family, and which has become a silent, rapidly spreading, worldwide pandemic. *See, e.g.*, Donald G. McNeil Jr., *Tick and Mosquito Infections Spreading Rapidly, C.D.C. Finds*, N.Y. Times (May 1, 2018).

44.     Their donation would benefit a cause in desperate need of funding, about which the Fairbairns care deeply. And doing so specifically in 2017 made personal financial sense for the Fairbairns. Given these dual benefits, the only remaining question was how best to accomplish the donation.

**D.     In December 2017, Fidelity Charitable Convinces The Fairbairns To Make The $100 Million Donation Through Their Fidelity DAF.**

45.     The Fairbairns were familiar with DAFs well before December 2017, having established DAF accounts with both Fidelity Charitable and JP Morgan years earlier. And both organizations knew the Fairbairns were precisely the sort of high-wealth, complex-asset individuals critical to their business.

46.     The Fairbairns' relationship with Fidelity stretches back to 1998. In 2014, the Fairbairns placed $20 million in a Fidelity Charitable DAF.

47.     And in 2016—after extensive courting—Fidelity finally succeeded in persuading the Fairbairns to become customers of their Fidelity Family Office Services. The Family Office is a division of Fidelity that advertises "a dedicated and exclusive focus on the ultra wealthy community and a deep understanding of their

---

    [2]   This of course is the very incentive Congress implemented to induce charitable giving. Lewis B. Cullman *et al.*, *The Undermining of the American Charity*, N.Y. Review of Books (July 14, 2016) ("In the US, charitable organizations, supported by tax-favored private foundations, carry out many of the same social functions.").

S T R I S   |   725 S. FIGUEROA ST. STE 1830
M A H E R   |   LOS ANGELES, CA 90017

sophisticated needs." Fidelity Investments, *Family Office Services: Focused on the ultra wealthy* (2018). Joining the Family Office required the Fairbairns to move tens of millions in additional investments to Fidelity. But doing so, as advertised by Fidelity, gave them a "dedicated relationship team serv[ing] as [their] single point of contact" for all interactions with any Fidelity entity going forward, along with "[a]ccess to a dedicated Investment Analyst who can execute complex trading strategies by leveraging Fidelity's institutional capital markets capabilities." *Id.*

48.     The Fairbairns also had a longstanding relationship with JP Morgan, and in particular with a wealth manager named Dennis Hearst. The Fairbairns had interacted with and been impressed by Dennis for many years when he worked at Goldman Sachs. In the course of these interactions, Dennis proved to be both reliable and sophisticated. The Fairbairns were thus excited to work with him when he joined JP Morgan's private banking group. This relationship was indeed the catalyst for the Fairbairns establishing a $20 million DAF account with JP Morgan in 2013.

49.     Before they even knew the Fairbairns were considering a $100 million donation in 2017, both institutions reached out to the Fairbairns about making additional DAF contributions before year's end.

        a.     Fidelity Charitable moved first. On December 12, 2017, Justin Kunz—the Fairbairns' dedicated point of contact within the Family Office—emailed them to ask whether they had any bitcoin or "other securities" they would like to contribute to their DAF in 2017.

        b.     Dennis from JP Morgan reached out the very next day. He sent the Fairbairns a message similarly asking them about contributing "appreciated securities," "restricted stock," or even "limited partnerships" to their JP Morgan DAF account.

50.     In the following days, the Fairbairns had a series of conversations and email exchanges with Justin, in which he aggressively pitched Fidelity Charitable as a superior option to JP Morgan and Vanguard (which also sponsors a DAF).

51.     On December 19, for example, Justin sent the Fairbairns an email saying that

the Charitable team and I went up the ladder and got you the absolute
lowest rate available.

- Administrative fee would be **0.08%**... JPM is typically 0.20%
- Investment fees- index funds are lower than JP Morgan AND
  Vanguard… for example Fidelity Total Markets is only
  0.015%.
- Other investment options are available but our index funds
  match or are lower than Vanguard's.

(ellipses in original).

52.     Even more importantly, Justin's email continued to position Fidelity as more sophisticated and more capable of meeting the Fairbairns' needs than its competitors. Justin said, for example, that Fidelity Charitable would likely be able to "hold Ascend HF," meaning the Fairbairns could potentially accomplish their donation by donating shares in Ascend. Justin also boasted of "**the Intangibles**" that Fidelity Charitable could provide in helping the Fairbairns achieve their philanthropic goals.

53.     Several days later, Justin again touted Fidelity Charitable's superior ability to handle complex assets. He asked the Fairbairns if they "would like to grant [their] carried interest [i.e., the portion of Ascend's profits the Fairbairns received based on the company's investment success, which had not yet been realized for tax purposes] into the donor advised fund. Vanguard can't do this but we do it frequently ☺."

54.     Justin even introduced the Fairbairns to the head of Fidelity Charitable's Complex Assets Group, Ryan Boland, who gave the Fairbairns further information about Fidelity Charitable's ability to accept donations of complex assets.

**E.   The Discussion Changes When One Of The Fairbairns' Major Stock Holdings Spikes In Value.**

55.   As the Fairbairns were considering how to most effectively structure their donation, they were presented with a unique opportunity.

56.   On December 26, the Federal Communications Commission (FCC) approved the core technology behind a publicly-traded company called Energous, in which the Fairbairns were (and are) major stakeholders. Energous trades under the ticker symbol "WATT." This announcement caused Energous's stock price to skyrocket 39% over the course of December 27.

57.   The Fairbairns' dedicated team at Fidelity had closely followed Energous since well before any discussions about the donation began. For example, as part of their ongoing discussions about the company, the Fairbairns sent Justin a slide deck about its core technology—and investment upside—in November 2016. In response, Justin mentioned having on multiple previous occasions "floated [the company] around the Family Office." And when the stock had a particularly good day in early 2017, a trader on their Fidelity team sent an unprompted email congratulating them on the "[n]ice move in WATT today!"

58.   Accordingly, Energous's spike in value did not go unnoticed by Fidelity. And the Fairbairns immediately recognized the potential upside of donating the Energous holdings. Their average cost basis in the stock was substantially lower than its current, post-jump value. That meant they would face enormous capital gains tax if they eventually sold the shares for their own benefit. But if the Fairbairns instead donated the shares, their full liquidation value could go to charity tax free. Moreover, by donating the shares to a DAF, the Fairbairns could deduct the shares' full fair market value. That would mean both far more money to fight Lyme disease, *and* a smaller tax bill for the Fairbairns.

59.   But the Fairbairns also had some concerns. They would be donating just under 10% of the company's outstanding stock, and they knew that Fidelity Charitable

would liquidate the stock after the donation.

60.     This gave the Fairbairns pause. Liquidating a large block of stock can be a delicate process; if not executed according to best practices, it can cause the stock's value to crash. Among the most important considerations in a stock liquidation are the timing and rate at which shares are sold off.

61.     JP Morgan addresses these issues by simply giving donors control over them. Donors can specify "the timing and rate at which the donated securities are liquidated." JP Morgan Charitable, *Introducing the J.P. Morgan Charitable Giving Fund* at 2 (2017). Indeed, the Fairbairns' experience with Dennis was that he would work closely with them in managing all aspects of their DAF account and its associated investments.

62.     Fidelity Charitable has no such policy; its guidelines simply say it will liquidate stock "at the earliest date possible." Fidelity Charitable, *Fidelity Charitable Policy Guidelines: Program Circular* at 6 (2017).

63.     Given the lack of built-in protections for circumstances requiring a liquidation strategy more sophisticated than "the earliest date possible," the Fairbairns had three principal concerns about Fidelity Charitable handling the WATT liquidation.

a.     First, a botched liquidation would mean they had less money to direct to the fight against Lyme disease;

b.     Second, if the "earliest date possible" for liquidation was the same day the stock was donated, it could significantly reduce the size of the Fairbairns' own tax deduction. That is because the size of the deduction for donated stocks turns on the stock's fair market value on the day the charitable organization receives it. And fair market value is calculated by averaging the daily high and low prices for the stock. Thus, a botched liquidation that happened on the same day as the donation could have significant tax consequences; and

S T R I S
M A H E R | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

c.    Third, as angel investors and continued stakeholders in Energous, the Fairbairns were concerned that a botched liquidation would damage the company going forward.

**F.    Fidelity Charitable Makes Representations To Assuage The Fairbairns' Concerns And Convince Them To Stick With Fidelity Charitable.**

64.    These concerns caused the Fairbairns to reconsider making their donation through Fidelity Charitable. They instead strongly considered using JP Morgan, where they knew they could work with Dennis to execute a sophisticated, careful liquidation strategy that would maximize the shares' value. They told Justin this in a series of frank conversations beginning on the afternoon of December 27.

65.    Thus, to convince the Fairbairns to stick with Fidelity Charitable, Fidelity Charitable made four critical representations about how it would handle the liquidation: (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock, (2) it would not trade more than 10% of the daily trading volume of Energous shares, (3) it would allow the Fairbairns to advise on a price limit (i.e., a point below which Fidelity would not sell shares without first consulting the Fairbairns), and (4) it would not liquidate *any* shares until the new year.

66.    Justin made these representations on behalf of Fidelity Charitable, acting as its agent. On information and belief, Justin was communicating with other agents of Fidelity Charitable, and he reported the substance of those communications to the Fairbairns.

67.    In short, Fidelity Charitable promised the Fairbairns it had the sophistication, would apply the necessary safeguards, and would give them the necessary input, to make sure it treated the Energous stock "gently" (to use Fidelity Charitable's word).

68.    Relying on these promises, the Fairbairns decided Fidelity Charitable was indeed their best option. Malcolm Fairbairn informed Fidelity Charitable on December 27 that the Fairbairns would transfer 1.93 million shares of Energous stock to their

STRIS MAHER | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

Fidelity Charitable DAF account.

69.     Fidelity Charitable received 700,000 Energous shares on December 28, and the remaining 1.2 million on December 29.

**G.     Fidelity Charitable Breaks Each Of Its Promises To The Fairbairns, To Disastrous Effect.**

70.     What the Fairbairns did not know was that—even as the final shares landed in their DAF account—Fidelity Charitable immediately began liquidating the entire 1.93 million-share block, and in the process egregiously breaking each of its promises to the Fairbairns.

a.     Rather than wait for the new year as it had promised to do, Fidelity Charitable liquidated the entire 1.93 million shares in a matter of hours on the last afternoon of the last business day of the year—perhaps the year's single slowest trading period.

b.     Rather than trade only 10% of the daily volume as it had promised to do, Fidelity Charitable traded approximately 16% of the daily volume and a gobsmacking 35% of the volume over the three-hour trading window.

c.     Rather than using sophisticated, state-of-the-art trading strategies, Fidelity Charitable executed the liquidation using incompetent and inappropriate methods.

d.     And rather than allow the Fairbairns to advise on a price limit, Fidelity Charitable did these things without even telling the Fairbairns they were happening.

71.     Put simply: Fidelity Charitable violated each of its representations to the Fairbairns, and the predictable result was the very outcome the Fairbairns had feared—the very reason they went with Fidelity Charitable only once it made those promises:

a.     The Energous shares were liquidated for tens of millions of dollars less than they would have been had Fidelity Charitable honored its promises to the Fairbairns.

COMPLAINT

1      b.    And because Fidelity Charitable's actions drastically reduced the

2  stock's fair market value on the same day the Fairbairns made their donation, the

3  Fairbairns were able to deduct millions less from their taxes than they would have been

4  able to had Fidelity Charitable not broken its promises.

5  **H.    Fidelity Charitable Entirely Botched The WATT Liquidation.**

6      72.    At least two of the promises Fidelity Charitable broke—the 10% limit on

7  daily volume and the Fairbairns' ability to advise on a price limit—were designed to

8  ensure that Fidelity Charitable's liquidation of the stock did not cause the stock's value

9  to plummet. But as noted, Fidelity Charitable's liquidation violated both of those

10  promises. And in so doing, Fidelity Charitable botched the trade entirely.

11      73.    The easiest way to understand why is to look at the outcome of the

12  liquidation. A large trade executed responsibly would affect the stock price to a limited

13  extent. But here, Fidelity Charitable's trading crashed the stock, driving the share price

14  down *more than 30%.*

15      74.    The process by which Fidelity Charitable liquidated the shares was also

16  indefensible. For example:

17      a.    To liquidate a large block of stock without driving down the price,

18  traders must appropriately spread out the sale so that the market may absorb it. Fidelity

19  Charitable, however, liquidated the *entire position* over the course of three hours on

20  the last afternoon of the last business day of the year—likely the single worst time

21  period in the entire year to do so.

22      b.    It did so, moreover, without even *attempting* to find ways to

23  mitigate its outsized trading volume over this period—for example by seeking to sell

24  shares in large blocks (rather than individually) or by looking for additional liquidity

25  in readily available off-exchange trading pools.

26      c.    Additionally, trading algorithms are generally a central feature of

27  large stock liquidations. Fidelity Charitable flagrantly misused them here. It deployed

28  multiple algorithms simultaneously, in a way that caused the algorithms to compete

STRIS MAHER | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

against each other in the market and further drive down the share price.

> d.    Finally, even when traders otherwise follow stock liquidation best practices, it is critically important that they impose safeguards that permit reassessment in the event the trader's strategies begin moving the market more than expected. In fact, virtually all automated trading machines have such safeguards built into the platform, and Fidelity has established generally applicable internal safeguards that should have triggered a reassessment here. But Fidelity Charitable either disregarded, disabled, or failed altogether to impose any safeguards here.

75.    Put simply, Fidelity Charitable acted, at best, with egregious incompetence in liquidating the WATT shares. At worst, its outrageous conduct was motivated by improper self-interest—the desire to get as much money as possible under management by year's end, no matter the cost to the Fairbairns. *See infra* ¶ 83. Either way, the result was the shares yielding tens of millions of dollars less than they should have.

# I.    The Fairbairns Confront Fidelity About The Botched Liquidation But Are Stonewalled.

76.    In light of Fidelity Charitable's promise that it would not liquidate the WATT shares until the new year, two weeks passed before the Fairbairns realized the wild trading in WATT on December 29 had in fact been the complete liquidation of their donated shares.

77.    On January 15, Malcolm Fairbairn emailed Justin from the Family Office:

Hi Justin.

Could you provide a recap of the transactions involving our donated shares for all securities. To me it seems aggressive to liquidate 9.9 percent of a company's shares in a half day of trading. Please include number of shares and orders given and at what times.

I was told that the selling would begin after the first of the year, you guys would be gentle with the stock (less than 10% of trading volume) and we

STRIS
MAHER

725 S. FIGUEROA ST, STE 1830
LOS ANGELES, CA 90017

1  could advise on a price limit if necessary. So I was surprised to hear that it

2  was liquidated on the last day of December.

3  Best Regards

4  Malcolm

5      78.    Justin did not dispute that Fidelity Charitable had made any of the

6  promises set out in Malcolm's email. He simply responded (incorrectly) that "[t]he

7  trading desk within our Charitable Group stuck to under the 10% of the volume," and

8  that he could set up a phone call to discuss.

9      79.    After a week of back and forth, Justin finally shared a chart showing only

10 basic information about the trade executions.[3] At no point did he ever dispute that

11 Fidelity Charitable had made the promises about how and when it would liquidate the

12 shares. In fact, on a subsequent phone call with the Fairbairns and other Fidelity

13 employees, Justin himself reiterated that Fidelity Charitable had made those promises.

14     80.    After Justin shared the original chart, the Fairbairns sought additional,

15 specific information about the trades, Fidelity Charitable's trading policies, the

16 commissions or other compensation that Fidelity Charitable and its employees

17 received, and other basic details about their DAF account and Fidelity Charitable's

18

19

20

---

21 [3]   Here is the chart Justin provided:

| Tranche | Time Order Began | Price at time tranche began | Strategy | Price at time tranche completed | Our Average Price | Participation Rate |
|---------|------------------|------------------------------|----------|----------------------------------|-------------------|---------------------|
| 700,000 | 1:17 | $ 28.00 | TWAP until 3:45 | $ 20.52 | $ 24.5302 | 6.90% |
| 575,000 | 1:31 | $ 27.30 | TWAP until 3:45 | $ 20.52 | $ 23.7837 | 5.93% |
| 313,862 | 3:30 | $ 22.15 | VWAP until 4:00 | $ 19.45 | $ 20.4140 | 7.72% |
| 343,123 | 3:45 | $ 20.61 | VWAP until 4:00 | $ 19.45 | $ 19.9268 | 15.73% |

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

actions. The Fairbairns also repeatedly asked for any kind of explanation for Fidelity Charitable's astonishing and inexplicable conduct.

81.   In stark contrast to its pre-donation solicitousness, however, Fidelity Charitable completely stonewalled the Fairbairns, refusing even to tell them how much money it (or its affiliated financial institution) charged them to make the trades, and eventually simply saying it was "comfortable" with the level of information it had provided and would provide no more.

82.   The basis for this refusal is unclear. Perhaps Fidelity Charitable believes it is simply too large and powerful to be held accountable for its actions. Alternatively, perhaps it has refused to provide the information because doing so would reveal systemic undermining of donors' and charities' interests in favor of Fidelity's own bottom line.

83.   And indeed, incompetence alone cannot explain Fidelity Charitable's outrageous actions in this case. Given the significant incentives it faced to liquidate the Energous shares immediately, at whatever cost to the Fairbairns, it is beyond likely that Fidelity Charitable acted based on improper, self-interested motivations.

a.   As an initial matter, Fidelity Charitable generates massive profits for its parent and sister companies by placing virtually all DAF contributions in Fidelity investment products. Thus, the sooner it liquidated the Energous shares, the sooner that money could start generating profits.

b.   What's more, Plaintiffs have reason to believe that the success of Fidelity Charitable and its employees—and the resulting compensation those employees earn—is tied to the amount of assets under management (i.e., held in Fidelity investment products) *as of year's end*. Thus, the agents of Fidelity Charitable responsible for the liquidation had every incentive to liquidate the shares immediately. And given the possibility that the Fairbairns would make donations out of their DAF account over the coming year, there was no guarantee those assets would remain under Fidelity's management at the end of 2018. Fidelity Charitable and its agents

accordingly stood to benefit from immediate liquidation *even if it meant a significant reduction in the shares' liquidation value.*

**J.      To Mitigate The Harm Of Its Botched Liquidation, Fidelity Charitable Offers To Help The Fairbairns Cheat On Their Taxes.**

84.      In addition to its prevarications and stonewalling with regard to the trades, Fidelity Charitable attempted to mitigate the harm of its botched liquidation by suggesting that the Fairbairns claim December 28, rather than December 29, as the date for the entire Energous donation.

85.      Measuring the stock's fair market value as of December 28 would result in a far larger deduction for the Fairbairns.

86.      But there was only one problem: Fidelity Charitable received only part of the donation on December 28. The rest of the shares were received on December 29. It would thus be tax fraud to claim December 29 as the date for the entire donation.

87.      This did not deter Fidelity Charitable. It told the Fairbairns it would send a letter saying the stock was donated in "December 2017," and "you and your CPA can decide how to interpret which day it came in." The Fairbairns understood Fidelity Charitable to be suggesting that it would help them skirt the law.

88.      Over Emily Fairbairn's protest that she was unwilling to break the law, Fidelity Charitable sent the letter. (The Fairbairns have not claimed December 29 as the date for the entire donation.)

### COUNT ONE

*Misrepresentation*

89.      Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

90.      The Fairbairns would not have donated the WATT stock to Fidelity Charitable but for its promises about how it would handle their donation. They would either not have donated the stock at all, or would have done so through JP Morgan.

91.       Fidelity Charitable promised that (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock, (2) it would not trade

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

1   more than 10% of the daily trading volume of Energous shares, (3) it would allow the

2   Fairbairns to advise on a price limit (i.e., a point below which it would not sell without

3   first consulting the Fairbairns), and (4) it would not liquidate any shares until the

4   beginning of 2018.

5       92.   Fidelity Charitable made each of these promises for the purpose of

6   inducing the Fairbairns to donate the WATT shares. It did so not just to assuage the

7   Fairbairns' concerns about the price it would achieve in liquidating the stock, but also

8   specifically to address the Fairbairns' concerns about how the liquidation might affect

9   their tax deduction.

10      93.   The Fairbairns had no reason not to take Fidelity at its word.

11      94.   Fidelity Charitable, however, flagrantly violated each of these promises.

12   It (1) liquidated the entire block of shares on December 29, (2) accounting for around

13   16% of the day's trading volume (and 35% of volume over the three-hour trading

14   window), (3) using inappropriate trading methodologies, in a way that caused

15   Fidelity's own trades to compete against each other, (4) without even telling the

16   Fairbairns it was happening, let alone allowing them to advise on a price limit.

17      95.   Fidelity Charitable knew when it made these promises that it had no

18   intention of keeping them. In the alternative, the Fidelity Charitable made the promises

19   intending to honor them but then negligently and recklessly failed to do so.

20      96.   As a result, the WATT shares were liquidated for far less than they would

21   have been, and the Fairbairns' tax deduction was smaller than it would have been, had

22   Fidelity Charitable honored its promises.

23      97.   This Court should therefore order Fidelity Charitable to make the

24   Fairbairns whole with respect to their tax deduction—i.e., pay the Fairbairns the

25   difference between their actual deduction and the deduction they would have received

26   had Fidelity Charitable honored its promises.

27      98.   This Court should also order Fidelity Charitable to make the Fairbairns

28   whole with respect to their donation—i.e., restore to the Fairbairns' DAF account the

S T R I S   725 S. FIGUEROA ST. STE 1830
M A H E R   LOS ANGELES, CA 90017

amount of money that a reasonably competent liquidation (adhering to the promises made) would have yielded.

99.    In the alternative, this Court should order rescission of the donation.

## COUNT TWO

### *Breach of Contract*

100.    Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

101.    Fidelity Charitable's conduct also breached an enforceable agreement between the parties about how Fidelity Charitable would treat the Fairbairns' donation.

102.    In consideration for the Fairbairns donating the 1.93 million WATT shares, Fidelity Charitable agreed (1) it would employ sophisticated methods in liquidating those shares, (2) it would not trade more than 10% of the daily trading volume, (3) it would allow the Fairbairns to advise on a price limit, and (4) it would not liquidate *any* shares until 2018.

103.    The Fairbairns performed their obligation under the agreement by donating the 1.93 million shares.

104.    Fidelity Charitable, however, breached by (1) liquidating the entire block of shares on December 29, (2) accounting for around 16% of the day's trading volume (and 35% of volume over the three-hour trading window), (3) using inappropriate trading methodologies, in a way that caused Fidelity's own trades to compete against each other, (4) without allowing the Fairbairns to advise on a price limit.

105.    As a result, the Fairbairns' tax deduction was smaller than it would have been in the absence of Fidelity Charitable's breach, and the Fairbairns were left with far less money to direct to charitable causes through their DAF account than they would have been absent Fidelity Charitable's breach.

106.    At a minimum, Fidelity Charitable's conduct violated the implied covenant of good faith and fair dealing present in every contract.

107.    This Court should therefore order Fidelity Charitable to make the Fairbairns whole with respect to their tax deduction. This Court should also order

S T R I S
M A H E R | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

Fidelity Charitable to make the Fairbairns whole with respect to their donation.

108.   In the alternative, this Court should order rescission of the donation.

### COUNT THREE

*Estoppel*

109.   Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

110.   The doctrine of estoppel holds a party to what it promised when those promises reasonably induced another party to act.

111.   Fidelity Charitable's promises about how it would handle the Fairbairns' donation induced the Fairbairns to donate the Energous shares.

112.   Fidelity Charitable should reasonably have expected its promises to induce the Fairbairns' donation—indeed, that was the very reason it made the promises.

113.   This Court should therefore hold Fidelity Charitable to its word and order Fidelity Charitable to place the Fairbairns where they would be had it not broken its promises.

114.   Accordingly, the Court should order Fidelity Charitable to restore to the Fairbairns' DAF account all losses attributable to Fidelity Charitable's wrongdoing, and also to repay the Fairbairns for the tax loss attributable to this wrongdoing.

115.   In the alternative, this Court should order rescission of the donation.

### COUNT FOUR

*Negligence*

116.   Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

117.   Fidelity Charitable's liquidation of the WATT shares utterly failed to meet even baseline standards of competence or reasonableness. Its actions are little different than if the Fairbairns had sent it a briefcase full of stock certificates, and it thought "liquidating" them meant throwing them in the ocean.

118.   In so doing, Fidelity Charitable deprived the Fairbairns of the ability to direct money to fight Lyme disease, and also significantly reduced the size of the tax

STRIS
MAHER

725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

1   deduction the Fairbairns were able to take.

2      119.   The Fairbairns retain robust, exclusive advisory rights over the disposition

3   of funds held in their DAF account. Fidelity Charitable is obligated to abide by the

4   Fairbairns' directions as long as the Fairbairns direct the money to proper charitable

5   purposes. Thus, by negligently reducing the amount of money over which the

6   Fairbairns have advisory power, Fidelity Charitable has directly and materially

7   impaired the Fairbairns' rights.

8      120.   Additionally, after specifically promising to handle the WATT liquidation

9   in a way that would maximize the Fairbairns' tax deduction, and thereby incurring a

10  duty to act reasonably with respect to the Fairbairns' deduction, Fidelity Charitable's

11  negligence in fact significantly decreased the size of the tax deduction the Fairbairns

12  were able to take.

13     121.   This Court should therefore order Fidelity Charitable to restore to the

14  Fairbairns' DAF account the amount of money that a reasonably competent liquidation

15  of the Energous shares would have yielded, and to make the Fairbairns whole with

16  respect to their tax deduction.

17  <center>**COUNT FIVE**</center>

18  <center>*California Unfair Competition Law (UCL)*</center>

19     122.   Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

20     123.   California law prohibits "any unlawful, unfair or fraudulent business act

21  or practice." Cal. Bus. & Prof. Code § 17200.

22     124.   Here, Fidelity Charitable violated the UCL by making false promises that

23  wrongfully induced the Fairbairns to donate the WATT shares.

24     125.   This Court should accordingly order Fidelity Charitable to return to the

25  Fairbairns the value of those shares as of the time of the donation.

26  <center>**PRAYER FOR RELIEF**</center>

27     WHEREFORE, Plaintiffs pray for judgment against Fidelity Charitable as

28  follows:

STRIS MAHER | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

1.    For equitable relief and monetary relief, in an amount to be proven at trial, plus all applicable interest and costs;

2.    For all attorneys' fees and costs incurred in bringing this action, to the extent recoverable by law; and

3.    For all other relief the Court deems appropriate, proper, and just.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Respectfully submitted,

Dated: August 10, 2018            **STRIS & MAHER LLP**

/s/ Peter K. Stris
Peter K. Stris
Brendan S. Maher
Rachana A. Pathak
Dana Berkowitz
John Stokes

725 S. Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
Emily and Malcolm Fairbairn

COMPLAINT