David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Alan E. Schoenfeld (*pro hac vice*)
Alan.Schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294
Facsimile: +1 212 230 8888

*Attorneys for Defendant*
FIDELITY INVESTMENTS CHARITABLE
GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>Defendant. | Case No. 3:18-cv-04881-JSC<br><br>**DEFENDANT FIDELITY INVESTMENTS CHARITABLE GIFT FUND'S NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>HEARING DATE: November 15, 2018<br>TIME: 9:00 a.m.<br>COURTROOM: F<br>JUDGE: Hon. Jacqueline Scott Corley |

1

**TABLE OF CONTENTS**

2   I.   INTRODUCTION .................................................................................. 1

3   II.   STATEMENT OF ISSUES TO BE DECIDED ................................... 3

4   III.   FACTUAL BACKGROUND ............................................................... 4

5       A.   Donor-Advised Funds ............................................................... 4

6       B.   Fidelity Charitable ................................................................... 6

7       C.   Plaintiffs Decide To Donate Shares Of Energous To Fidelity
        Charitable ................................................................................. 7

8

    D.   Plaintiffs Donate Energous Shares To Fidelity Charitable ................... 9

9

  IV.   SUMMARY OF ARGUMENT ......................................................... 10

10
  V.   ARGUMENT ..................................................................................... 11

11

12       A.   Plaintiffs' Claims For Mismanagement Of Their Charitable
        Contribution—Namely, Their Negligence Claim And Their Claims
        Premised On Promise One—Should Be Dismissed ........................... 12

13

14           1.   Plaintiffs Lack Standing To Sue For The Alleged
            Mismanagement Of Their Donated Shares ............................... 13

15           2.   Plaintiffs' Negligence Claim Also Fails For Lack Of Duty
            And For Lack Of Independence From Their Contract Claim ................... 18

16

17           3.   Promise One Cannot Sustain Any Cause Of Action ............................ 19

18       B.   All Of Plaintiffs' Claims Premised On Promise Two Fail Because
        Fidelity Charitable's Statement—If Made—Was Not False ............... 21

19       C.   Plaintiffs' Non-Negligence Claims Fail For Failure To Plead With
        The Specificity Required By Rule 9(b) ........................................ 22

20
  VI.   CONCLUSION ................................................................................... 25

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anunziato v. eMachines, Inc.*,
 402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...................................................................20

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..................................................................................................11

*Binder v. Gillespie*,
 184 F.3d 1059 (9th Cir. 1999) ..................................................................................21

*Bly-Magee v. California*,
 236 F.3d 1014 (9th Cir. 2001) ..................................................................................12

*Brothers v. Hewlett-Packard Co.*,
 No. C-06-02254, 2006 WL 3093685 (N.D. Cal. October 31, 2006) ........................21

*Brown v. Electronic Arts, Inc.*,
 724 F.3d 1235 (9th Cir. 2013) ..................................................................................11

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
 637 F.3d 1047 (9th Cir. 2011) ..................................................................................12

*Corales v. Bennett*,
 567 F.3d 554 (9th Cir. 2009) ....................................................................................19

*Davidson v. Apple, Inc.*,
 No. 16-cv-4942, 2017 WL 3149305 (N.D. Cal. July 25, 2017) ...............................22

*Deschaine v. IndyMac Mortg. Servs.*,
 617 F. App'x 690, 693 (9th Cir. 2015) .....................................................................24

*Edwards v. Marin Park, Inc.*,
 356 F.3d 1058 (9th Cir. 2004) ..................................................................................24

*Exec. Comm. Representing Signing Petitioners of Archdiocese of W. U.S. v.
 Kaplan*, No. CV 03-8947, 2004 WL 6084228 (C.D. Cal. Sept. 17, 2004).............13

*Finney v. Ford Motor Co.*,
 No. 17-cv-06183, 2018 WL 2552266 (N.D. Cal. June 4, 2018)...............................20

*Kearns v. Ford Motor Co.*,
 567 F.3d 1120 (9th Cir. 2009) ..................................................................................22

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) .................................................................................4, 7

*Marolda v. Symantec Corp.*,
    672 F. Supp. 2d 992 (N.D. Cal. 2009) ...................................................................23

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ............................................................................11

*McGehee v. Coe Newnes/McGehee ULC*,
    No. C 03-5145, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004) ...........................19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................................22

*Nat'l Found., Inc. v. United States*,
    13 Cl. Ct. 486 (Ct. Cl. 1987) ................................................................................6

*New Dynamics Found. v. United States*,
    70 Fed. Cl. 782 (2006) ..........................................................................................6

*Northstar Fin. Advisors Inc. v. Schwab Investments*,
    779 F.3d 1036 (9th Cir. 2015) ............................................................................18

*O'Connell v. CAE-Link Corp.*,
    57 F.3d 1077 (9th Cir. 1995) ..............................................................................20

*Rettek v. Ellis Hosp.*,
    No. 1:08-cv-844, 2009 U.S. Dist. LEXIS 1607 (N.D.N.Y. Jan. 12, 2009),
    *aff'd*, 2010 U.S. App. LEXIS 1863 (Jan. 27, 2010) ...........................................18

*State of Cal. ex rel. RoNo, LLC v. Altus Finance, S.A.*,
    No. CV01-8587, 2002 WL 1008251 (C.D. Cal. May 8, 2002) ...........................18

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ..............................................................................23

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ...........................................................21, 22

*In re Seagate Technology LLC Litigation*,
    233 F. Supp. 3d 776 (N.D. Cal. 2017) ................................................................20

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................11

*Stewart v. Electrolux Home Products, Inc.*,
    304 F.Supp.3d 894 (E.D. Cal. 2018) ..................................................................23

*Stuart v. Cadbury Adams USA, LLC*,
    458 F. App'x 689 (9th Cir. 2011) ........................................................................22

Case No. 3:18-cv-04881-JSC                           DEFENDANT'S NOTICE OF MOTION, MOTION TO
                                                      DISMISS, AND MEMORANDUM OF LAW

*Toomer v. United States*,
  615 F.3d 1233 (9th Cir. 2010) ........................................................................18

*Verde Media Corp. v. Levi*,
  No. 14-cv-00891, 2015 U.S. Dist. LEXIS 9920 (N.D. Cal. Jan. 28, 2015)..........................23

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ...................................................................22, 23

*Viralam v. C.I.R.*,
  136 T.C. 151 (2011).......................................................................................6

*Winans by and through Moulton v. Emeritus Corporation*,
  No. 13-cv-03962, 2014 WL 970177 (N.D. Cal. Mar. 5, 2014) ...............................20

*Wishnev v. Nw. Mutual Life Ins. Co.*,
  162 F. Supp. 3d 930 (N.D. Cal. 2016) ..............................................................11

**State Cases**

*Ames v. Attorney Gen.*,
  124 N.E.2d 511 (Mass. 1955) ...............................................................14, 15, 17

*Burbank v. Burbank*,
  25 N.E. 427 (Mass. 1890) ..............................................................................14

*Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*,
  699 A.2d 995 (Conn. 1997) ............................................................................17

*Consumer Advocates v. Echostar Satellite Corp.*,
  113 Cal.App.4th 1351 (Cal. Ct. App. 2003) .......................................................21

*Dillaway v. Burton*,
  153 N.E. 13 (Mass. 1926) ..............................................................................14

*Erlich v. Menezes*,
  21 Cal. 4th 543 (Cal. 1999) ............................................................................19

*Garland v. Beverly Hospital Corp.*,
  720 N.E.2d 838 (Mass. App. Ct. 1999) ..............................................................15

*Hardman v. Feinstein*,
  240 Cal. Rptr. 483 (Cal. Ct. App. 1987) ............................................................18

*Harvard Climate Justice Coalition v. President & Fellows of Harvard College*,
  No. SUCV201403620H, 2015 WL 1519036 (Mass. Super. Mar. 17, 2015),
  *aff'd* 60 N.E.3d 380 (Mass. App. Ct. 2016).......................................................14

*Holt v. Coll. of Osteopathic Physicians & Surgeons*,
  394 P.2d 932 (Cal. 1964) ...............................................................................13

iv

*J.L. v. Children's Inst., Inc.,*
    99 Cal. Rptr. 3d 5 (Cal. Ct. App. 2009) ................................................................18

*Klein v. Anaheim Mem'l Hosp. Ass'n,*
    No. G040829, 2009 WL 3233914 (Cal. Ct. App. Oct. 8, 2009) ........................13, 18

*L.B. Research & Educ. Found. v. UCLA Found.,*
    29 Cal. Rptr. 3d 710 (Cal. Ct. App. 2005) ............................................................13

*Lopez v. Medford Community Ctr., Inc.,*
    424 N.E.2d 229 (Mass. 1981) ........................................................................14, 16

*Maffei v. Roman Catholic Archbishop of Boston,*
    867 N.E.2d 300 (Mass. 2007) ..............................................................................16

*Rockwell v. Trustees of Berkshire Museum,*
    No. 1776cv00253, 2017 WL 6940932 (Mass. Super. Ct. Nov. 7, 2017), *appeal
    pending* No. 2017-P-1556 (Mass. App. Ct.) ................................................14, 15, 16

*Rogers v. Roman Catholic Archbishop of Boston,*
    893 N.E.2d 802 (Mass. Ct. App. 2008) ................................................................15

*US Ecology, Inc. v. California,*
    28 Cal. Rptr. 3d 894 (Cal. Ct. App. 2005) ............................................................25

*Weaver v. Wood,*
    680 N.E.2d 918 (Mass. 1997) ..............................................................................14

**Federal Statutes**

26 U.S.C. § 170(c)(1) ....................................................................................................5

26 U.S.C. § 170(f)(18)(B) .............................................................................................6

26 U.S.C. § 4966(d)(1) .................................................................................................5

26 U.S.C. § 4966(d)(2)(A) ............................................................................................5

Pension Protection Act of 2006, Pub. L. No. 109-280 ..................................................5

**State Statutes**

Cal. Gov't Code § 12598(a) ........................................................................................13

Mass. Gen. Laws Ann. Chapter 12, § 8 .....................................................................7, 13

**Rules**

Fed. R. Civ. P. 9(b) ...........................................................................................*passim*

Fed. R. Civ. P. 12(b)(1)...........................................................................................1, 11

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 11

**Regulations**

Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII: Provisions
     Relating to Tax Exempt Organizations, 2006 WL 4791686 (2006).........................6

**Other Authorities**

H.R. Rep. No. 109-455 (2006)......................................................................................5

Case No. 3:18-cv-04881-JSC

DEFENDANT'S NOTICE OF MOTION, MOTION TO
DISMISS, AND MEMORANDUM OF LAW

1   **NOTICE OF MOTION AND MOTION TO DISMISS**

2       PLEASE TAKE NOTICE that on November 15, 2018, at 9:00 a.m. in Courtroom F of the

3   United States District Court located at 450 Golden Gate Avenue, San Francisco, CA 94102, before

4   the Honorable Jacqueline Scott Corley, Defendant Fidelity Investments Charitable Gift Fund

5   ("Fidelity Charitable") will and hereby does respectfully move to dismiss the complaint of

6   Plaintiffs Malcolm Fairbairn and Emily Fairbairn ("Plaintiffs") pursuant to Rule 12(b)(1) and

7   12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on this Notice of Motion

8   and Motion and the accompanying Memorandum of Points and Authorities, and such other

9   authorities and argument as may be submitted in any reply at or before the hearing.

10   **STATEMENT OF RELIEF REQUESTED**

11       Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Fidelity Charitable

12   hereby moves to dismiss Plaintiffs' complaint in its entirety.

13   **MEMORANDUM OF POINTS AND AUTHORITIES**

14   **I.    INTRODUCTION**

15       At the end of December 2017, Emily Fairbairn and Malcolm Fairbairn—sophisticated

16   hedge fund managers—confronted a massive tax bill on management fees from their off-shore

17   funds.  Seeking to shield those gains from taxation, the Fairbairns investigated their charitable

18   giving options and comparison shopped among charities that sponsor donor advised funds

19   ("DAFs").  As blessed by the Internal Revenue Service, a DAF sponsoring organization ("DAF

20   Charity") is a public charity that maintains accounts reflecting the donations of each donor.

21   Because the DAF Charity is itself a public charity, donors to a DAF Charity receive an immediate

22   tax benefit when they contribute.  While they relinquish all legal rights and control over the assets

23   they have donated, they may advise the DAF Charity regarding the other charities to which the

24   donated assets should be contributed.

25       Ultimately, the Fairbairns chose to contribute stock in a company called Energous—which

26   had recently experienced a dramatic but short-lived spike in value—to Fidelity Charitable, a

27   leading DAF Charity.  Consistent with its written policies, Fidelity Charitable promptly sold the

28   Energous shares and credited the proceeds towards the Fairbairns' DAF account to be used for

charitable purposes.  Fidelity Charitable, as noted, is a charity:  the Fairbairns' donation to Fidelity Charitable was irrevocable, and had the legal effect of divesting the Fairbairns of all legal ownership and control of the donated shares, thereby making the donation eligible for deduction on the Fairbairns' tax returns.

The Fairbairns do not dispute that, once the shares were donated, Fidelity Charitable owned them and was entitled to sell them.  And the Fairbairns concede that they fully understood and expected that the shares would be sold.  Rather, their sole complaint is about the manner of the sale.  Plaintiffs challenge Fidelity Charitable's judgment as to when the shares should be sold, and cavil with the detailed mechanics of the sales themselves.

The Complaint stakes two different sets of claims on the Fairbairns' disagreement with how the trades were managed.  First, the Complaint alleges that the sale was performed in a negligent manner (Count IV).  But the Fairbairns lack standing to complain about a charity's purported mismanagement of assets that the charity owns.  A line of cases dating from the nineteenth century to the present establishes that a donor does not have standing to complain about a charity's management of donated assets.  Rather, as enshrined in statute and confirmed by the case law, the Attorney General of the responsible state (here, Massachusetts) has *exclusive* jurisdiction to bring claims for purported mismanagement of charitable assets.

In an apparent effort to avoid this limitation on their standing to sue, the Fairbairns add a second set of claims, alleging that an "agent" of Fidelity Charitable made four promises to them about the manner in which the shares would be sold, including promises regarding the timing of the sale and the amount to be sold at any one time (the "Four Promises").  Compl. ¶ 65.  As an initial matter, their Four Promises story is incomprehensible.  For example, the fourth promise and the heart of the Complaint—that Fidelity would not sell the shares until the new year—is premised on the allegation that December 29, 2017, the date of the sale, was "perhaps the year's single slowest trading period."  *Id*. ¶ 70(a).  But NASDAQ records show Energous's trading volume that day was the third-highest of the year, and over 92 times the volume of the same day the prior week.  Energous shares never experienced volumes like that before year-end 2017, and never did again, including in January 2018, when the Complaint inexplicably contends Fidelity Charitable should

DEFENDANT'S NOTICE OF MOTION, MOTION TO
DISMISS, AND MEMORANDUM OF LAW

1    have sold the shares.

2        Undaunted by such facts, the Fairbairns claim that Fidelity Charitable breached the Four

3    Promises, and they assert claims for misrepresentation, breach of contract, estoppel, and violation

4    of the Unfair Competition Law for those alleged breaches.  The claims based on these alleged

5    promises suffer from numerous fatal flaws.

6        For example, the first promise—that Fidelity Charitable would employ "sophisticated,

7    state-of-the-art" methods to sell the shares—is a patent (and futile) effort to end-run the Attorney

8    General's  exclusive  jurisdiction  by  alleging  that  Plaintiffs  have  standing  to  address

9    mismanagement  because  the  charity  promised  that  the  assets  would  be  well  managed.   If

10   assurances to prospective donors of good management were enough to divest the Attorney General

11   of exclusive jurisdiction, she would have no jurisdiction left, as such assurances are no doubt

12   routine.   Moreover,  a  promise  to  use  "sophisticated"  methods  is  like  a  promise  to  paint  a

13   "beautiful"  painting—precisely  the  type  of  vague,  subjective  statement  that  courts  routinely

14   dismiss as inactionable under any theory.  As to the second promise—that Fidelity Charitable

15   would  not  trade  more  than  10%  of  the  daily  trading  volume  of  Energous  shares—NASDAQ

16   records subject to judicial notice establish that the total trading volume on the date of sale was over

17   28.3 million shares.  The 1.93 million shares sold by Fidelity Charitable is less than 10% of that

18   total trading volume.  Misrepresentation and breach of contract claims are subject to dismissal

19   where the alleged representation is true and the promise was kept.  And, as to all Four Promises,

20   the lack of particularity subjects the claims to dismissal under Rule 9(b).

21       In short, Plaintiffs' lawsuit seeks to recover substantial damages from a charitable fund for

22   losses to property Plaintiffs did not own or control, based on a vague and incoherent narrative of

23   fraud.  All their claims fail.  The Court should dismiss the Complaint with prejudice.

24   **II.    STATEMENT OF ISSUES TO BE DECIDED**

25       A.    Whether  Plaintiffs'  negligence  claim  (Count  IV)  must  be  dismissed  because

26   Plaintiffs lack standing to sue for mismanagement of charitable assets, and because there was no

27   duty owed Plaintiffs.

28       B.    Whether  all  claims  based  on  "Promise  One"—the  alleged  promise  to  employ

3

sophisticated trading strategies (misrepresentation, breach of contract, estoppel, and UCL claims—Counts I, II, III, and V—to the extent based on Promise One)—must be dismissed for the same lack of standing as the negligence claim, and because the alleged promise, if made, is too vague to enforce.

C.   Whether all claims based on "Promise Two"—the alleged promise not to trade more than 10% of daily volume (misrepresentation, breach of contract, estoppel, and UCL claims—Counts I, II, III, and V—to the extent they are based on Promise Two)—must be dismissed because that promise, if made, was not false or misleading and the promise was not breached.

D.   Whether the misrepresentation, breach of contract, estoppel, and UCL claims (Counts I, II, III, and V) must be dismissed for failure to adequately plead a misrepresentation under Rule 9(b).

### III.   FACTUAL BACKGROUND

#### A.   Donor-Advised Funds

Donor-advised funds fill a critical gap in the landscape of philanthropic giving by offering donors the ability to defer decisions about the ultimate beneficiaries of their charitable giving while obtaining an immediate tax benefit.  Declaration of David Marcus ("Marcus Decl."), Ex. A, Salmon, Slate, *The Disrupter: How Fidelity and its donor-advised fund are shaking up charitable giving for the better*, at 3 (May 5, 2018) (cited Compl. ¶¶ 32-33) ("*The Disruptor*").[1]  A donor to a DAF Charity retains the right to advise the DAF Charity about which charities should receive the funds that the donor has contributed.  In other words, donors to a DAF Charity can give now, when they have the resources and the need for a tax deduction, and decide later to which charities they would like to advise the DAF Charity to direct their donation.  *See* Compl. ¶¶ 24-27, 31.  This structure recognizes that individuals who have capacity to give may not be at a stage in their lives

---

[1] Because the Complaint cites and relies heavily on Fidelity Charitable's Giving Report and Program Circular and the *Slate* article, the full contents of those documents are accordingly incorporated by reference.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1005 (9th Cir. 2018) (full content of cited articles relevant to elements of fraud claim could be incorporated by reference).

when they have the time to investigate the causes that matter to them, and to select among the many organizations that serve those causes.  If that investigation and selection process is too daunting for the busy but well-intentioned donor, charitable giving will be discouraged.  If, on the other hand, the giving and investigation/selection process can be decoupled, it stands to reason that charitable giving should expand.  And so it has:  DAFs have facilitated the contribution of billions of dollars to charity in the United States.  *The Disruptor* at 2.  Recognizing the benefit DAFs provide, the Internal Revenue Service ("IRS") granted a tax exemption to DAF Charities and Congress codified the treatment of such organizations as public charities.  *See* Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat 780 (2006).

The basic structure of a DAF, regardless of the identity of the sponsoring organization, is simple and includes several safeguards to ensure DAFs are not exploited to abuse the associated charitable deduction.  Because the DAF Charity is itself a public charity, ordinary charitable trust and tax principles apply:  a donor wishing to take a tax deduction for her contribution must irrevocably commit her contribution to charitable purposes.  The Internal Revenue Code defines a "donor advised fund" as a "fund or account (i) which is separately identified by reference to contributions of a donor or donors, (ii) which is *owned and controlled* by a sponsoring organization, and (iii) with respect to which a donor … has … *advisory* privileges with respect to the *distribution or investment* of amounts held in such fund or account by reason of the donor's status as a donor."  26 U.S.C. § 4966(d)(2)(A) (emphases added).[2]  "Investment" refers to the allocation of donated funds (or the proceeds from the sale of donated assets) to an investment pool with other donated funds; "distribution" refers to the disbursement of funds from the investment pool to charitable organizations.  *See* Marcus Decl., Ex. B, Fidelity Charitable, *Fidelity Charitable Policy Guidelines: Program Circular* at 10-11, 18 (2017) ("Program Circular") (cited Compl. ¶ 62).  Thus, while donors retain the ability to make advisory or "nonbinding recommendations concerning the distribution or investment of assets," H.R. Rep. No. 109-455, at 179-80 (2006) (Conf. Rep.), the DAF Charity must have "*exclusive legal control* over the assets contributed," 26

---

[2] A "sponsoring organization" is the entity that maintains the fund.  26 U.S.C. §§ 170(c)(1), 4966(d)(1).

1   U.S.C. § 170(f)(18)(B) (emphasis added); *see also* Joint Comm. on Taxation, Pension Protection

2   Act of 2006, Title XII: Provisions Relating to Tax Exempt Organizations, 2006 WL 4791686, at

3   *67 (2006) ("Joint Committee Report") ("Advisory privileges are distinct from a legal right or

4   obligation. … [I]f a donor executes a gift agreement with a sponsoring organization that specifies

5   certain enforceable rights of the donor with respect to a gift, the donor will not be treated as having

6   'advisory privileges' due to such enforceable rights for purposes of the donor advised fund

7   definition.").

8        Donors irrevocably transfer title to and control over assets when they contribute those

9   assets to a DAF Charity, and the IRS requires the DAF Charity in turn to require donors to

10  "relinquish all ownership and custody of the donated funds or property," *Nat'l Found., Inc. v.*

11  *United States*, 13 Cl. Ct. 486, 493 (Ct. Cl. 1987), and to "exercise[] effective control to ensure that

12  distributions … [are] for charitable, not personal, purposes," *Viralam v. C.I.R.*, 136 T.C. 151, 167

13  (2011); *see also* Internal Revenue Service, *Donor-Advised Funds Guide Sheet Explanation* at 11

14  (July 31, 2008) (cited at Compl. ¶ 28) (a sponsoring organization must "specifically inform donors

15  that they may not impose restrictions or conditions on the assets in their account").  These

16  safeguards ensure that taxpayers do not simultaneously obtain a deduction and yet retain the ability

17  to benefit personally from the purportedly donated property.  *See New Dynamics Found. v. United*

18  *States*, 70 Fed. Cl. 782, 802-03 (2006) (denying tax exemption to sponsoring organization that

19  allowed donors to retain private benefit through control of donations); Joint Committee Report,

20  2006 WL 4791686, at *73 (explaining that donors whose advice regarding DAF distribution results

21  in a "more than incidental benefit" to donor are subject to 125% excise tax).

22      **B.**    **Fidelity Charitable**

23       Fidelity Charitable is the largest DAF Charity in the country, Compl. ¶ 3, disbursing over

24  $4.5 billion to 127,000 charitable organizations last year, Marcus Decl., Ex. C, Fidelity Charitable,

25  Fidelity Charitable 2018 Giving Report at 2 (2018) (cited Compl. ¶ 34).  Most contributions that

26  Fidelity Charitable facilitated in 2017 came from modest-sized accounts of under $25,000.  *Id.* at

27  5.  Fidelity Charitable is a Massachusetts 501(c)(3) non-profit corporation with its principal place

28  of business in Massachusetts, Compl. ¶ 19, and as such is subject to the jurisdiction of the

1   Massachusetts Attorney General, which has exclusive standing to enforce breach of trust claims

2   against Massachusetts charities, *see* Mass. Gen. Laws Ann. ch. 12, § 8.

3         As required by federal tax law, Fidelity Charitable's policies restrict donor control over

4   donated assets. Fidelity Charitable's Contribution Form and Letter of Instruction ("Contribution

5   Form")—which Malcolm Fairbairn executed when he donated the Energous shares—makes clear

6   that donors "irrevocabl[y]" cede control over the assets to Fidelity Charitable. Marcus Decl., Ex.

7   D, Contribution Form at 4.[3] The Contribution Form affirms that the donor has read and agreed to

8   Fidelity Charitable's Program Circular, *id.*, which likewise states that any contribution is

9   "irrevocable" and that Fidelity Charitable would then "own[] and control[]" and "have exclusive

10   legal control over [the] assets," Program Circular at 4.

11         The Program Circular, which, as noted, is incorporated in the Contribution Form, advises

12   accountholders repeatedly that Fidelity Charitable liquidates all non-cash donations "at the earliest

13   date possible." Compl. ¶ 62 (quoting Program Circular at 6); *see also* Program Circular at 5

14   ("Fidelity Charitable will … liquidate contributions as quickly as possible … after the assets have

15   been received."); *id.* at 6 ("Contributions of stock … will generally be processed on the Business

16   Day on which the assets are received by Fidelity Charitable,"); *id.* at 14 ("Fidelity Charitable seeks

17   to sell contributed property promptly and allocate the net proceeds of the sale to the Giving

18   Account once they are received.").

19     **C.**    **Plaintiffs Decide To Donate Shares Of Energous To Fidelity Charitable**

20         The Fairbairns have for more than twenty years managed Ascend Capital, an investment

21   adviser to three eponymous hedge funds domiciled in off-shore tax havens and with billions of

22   dollars under management. *See* Marcus Decl., Ex. E, In the Matter of Ascend Capital, LLC, et al.,

23   Exchange Act Release No. 48,188, Investment Advisers Act Release No. 2150 ¶¶ 1-3 (Order

24

25

26

27

28

---

[3] The Fairbairns' Contribution Form (which Mr. Fairbairn executed to contribute the Energous shares to Fidelity Charitable), although not attached to the Complaint, is incorporated by reference because it "forms the basis of the [Fairbairns'] claim[s]." *Khoja*, 899 F.3d at 1002 (internal citation omitted). The Contribution Form also incorporates the terms and conditions of the Program Circular, which Plaintiffs concede was the basis for their decision to allegedly seek oral representations regarding the manner in which Fidelity Charitable would liquidate the Energous shares. Compl. ¶ 62.

Instituting Cease-and-Desist Proceedings) (July 17, 2003); Compl. ¶ 40. They are intimately familiar with the workings of DAFs, having donated large sums to DAF Charities since 2013, Compl. ¶ 41, and having established a DAF account at Fidelity Charitable "years" before the contribution at issue in this case, to which they donated $20 million in 2014, *id.* ¶¶ 45-46.

In December 2017, the sunset of an Internal Revenue Code provision—one that had allowed the Fairbairns to defer income from management fees on their hedge funds—suddenly confronted them with a "substantial tax payment" due at the end the year. Compl. ¶ 42. In order to avoid that significant additional tax liability, the Fairbairns decided to donate $100 million before year end. *Id.* ¶¶ 43-44. Since the end of 2017 was fast approaching—and with it, their ability to reap a tax deduction rather than bear a heavier tax burden—the Fairbairns resolved to donate the funds to a DAF Charity, which, unlike the other options they considered, would allow them to both maximize their tax deduction and remove the deferred income from their books in 2017. *See id.* ¶ 58.

The Fairbairns' decision to contribute to Fidelity Charitable in 2017 coincided with a dramatic rise in the stock price of Energous. *See* Compl. ¶ 56. The Fairbairns were—and remain— "major stakeholders" in the company. *Id.*; *see also id.* ¶¶ 7, 56, 63.[4] On December 27, 2017, Energous's share price on NASDAQ (where it trades under the WATT ticker symbol) rose significantly, *id.* ¶ 56: From a closing price the previous day of $8.84, WATT opened December 27 at $17.35 and rose to close the day at $23.70, Marcus Decl., Ex. G, Energous Corporation Common Stock Historical Stock Prices for 2 Years, From 21-SEP-2016 TO 21-SEP-2018 ("Energous Hist. Stock Prices"), at 5. The Fairbairns then decided to make their donation in the form of Energous shares. Compl. ¶ 58. The highs experienced by Energous shares at the very end of 2017 proved to be short-lived: Energous's share price has experienced a downward trajectory in 2018 and, as of this writing, closed most recently at $10.43. Energous Hist. Stock Prices at 1.

As recounted in detail in the Complaint, in December 2017 the Fairbairns communicated

---

[4] Plaintiffs retained 6.8% of Energous common stock as of August 2018, which is more than 1.74 million of the 25,619,735 outstanding shares. *See* Ex. F, Energous Corp. 10-Q at 34 (Aug. 9, 2018).

DEFENDANT'S NOTICE OF MOTION, MOTION TO
                                                     DISMISS, AND MEMORANDUM OF LAW

extensively via email about donating to Fidelity Charitable with Justin Kunz, their contact in Fidelity Family Office Services.  Compl. ¶ 49.  The Complaint concedes that the Fairbairns were fully aware of the Fidelity Charitable policy of immediately liquidating contributions.  *Id.* ¶ 62. Plaintiffs allege that on December 27, they also had "a series of frank conversations" with Mr. Kunz (Compl. ¶ 64), and that he "made four … representations" concerning liquidation of the Energous shares (*id.* ¶ 65)—none of which, in contrast to their prior discussions, Plaintiffs documented.  In particular, the Fairbairns assert that Mr. Kunz made four oral promises that induced their subsequent contribution of stock to Fidelity Charitable:  that Fidelity Charitable (1) would "employ sophisticated, state-of-the-art methods for liquidating large blocks of stock" ("Promise One"); (2) "would not trade more than 10% of the daily trading volume of Energous shares" ("Promise Two"); (3) would allow Plaintiffs "to advise on … a [price] point below which Fidelity would not sell shares" without consulting Plaintiffs ("Promise Three"); and (4) would not sell any shares until 2018 ("Promise Four").  *Id.*

Plaintiffs do not say whether Mr. Kunz made the statements to Malcolm Fairbairn, Emily Fairbairn, or to someone else who recounted the statements to them.  Nor do they offer any explanation of whether or how Mr. Kunz squared these representations with the clear terms of the Contribution Form and the Program Circular governing their Fidelity Charitable account.  The Fairbairns—sophisticated people for whom managing investments and executing trades is part of their daily business—do not explain why they purportedly made such a consequential decision based on allegedly determinative oral promises that contradicted the express written terms of the program documents they agreed to.

## D. Plaintiffs Donate Energous Shares To Fidelity Charitable

According to the Complaint, on December 27, 2017, based on the alleged oral promises, Plaintiffs selected Fidelity Charitable for their donation.  Compl. ¶ 68.  On December 28, 2017 at 3:53 PM, Mr. Fairbairn executed the Contribution Form, which required him to affirm that he had read and agreed to the terms of the Program Circular—necessarily including its terms providing for immediate liquidation of contributed stock.  Contribution Form at 7.  Plaintiffs transferred a total of 1.93 million Energous shares to Fidelity Charitable on December 28 and 29, 2017.  Compl.

9

¶¶ 68-69.

Consistent with the policies disclosed in the Program Circular, Fidelity Charitable sold the Energous shares on December 29, 2017, for a volume weighted average price of $22.82 per share. Compl. ¶ 79 & n.3. Plaintiffs allege that the liquidation was "botched," primarily because that day was "perhaps the year's single slowest trading period." *Id.* at 70. Official NASDAQ figures, however, show that the total trading volume in Energous shares on December 29 was 28,317,620, which was the third-highest daily volume in 2017. Energous Hist. Stock Prices at 5. Plaintiffs also take issue with the details of how Fidelity Charitable chose to execute the trades, such as the manner in which Fidelity Charitable used certain trading algorithms and its alleged decision not to use "off-exchange trading pools." Compl. ¶ 74.

Two weeks later, Plaintiffs began to question Fidelity Charitable's execution of the liquidation, claiming for the first time that Fidelity Charitable had promised to sell the stock in a manner that directly contradicted its written policies, including by allowing Plaintiffs to control the timing and price. On January 15, 2018, Mr. Fairbairn emailed Mr. Kunz, asserting that Fidelity Charitable had promised "that the selling would begin after the first of the year, [Fidelity] would be gentle with the stock (less than 10% of trading volume) and we could advise on a price limit if necessary." Compl. ¶ 77. Mr. Kunz offered to discuss those concerns, and subsequently shared detailed information about Fidelity Charitable's sale of the Energous shares with Plaintiffs. *Id.* ¶¶ 78-79.

Apparently unsatisfied, Plaintiffs commenced this lawsuit on August 24, 2018.

## IV.    SUMMARY OF ARGUMENT

The Fairbairns assert four claims that stem from Fidelity Charitable's supposed failure to fulfill the Four Promises: misrepresentation, pleaded as intentional and, in the alternative, negligent (Count I), Compl. ¶¶ 91, 95; breach of contract (Count II), *id.* ¶ 102; promissory estoppel (Count III), *id.* ¶ 113; and violation of the UCL (Count V), ¶ *id.* 124. Independent of the Four Promises, Plaintiffs also assert a negligence claim (Count IV) for Fidelity Charitable's alleged failure to exercise reasonable care in liquidating the Energous shares, *id.* ¶ 117.

All of the Fairbairns' claims should be dismissed. Negligence (Count IV) fails in its

entirety—as do all other claims to the extent they are premised on Promise One—because those claims allege mismanagement of charitable assets, and the Attorney General has exclusive standing to press such claims. Those claims must be dismissed under Rule 12(b)(1) and 12(b)(6). All claims based on Promise One must be dismissed on the further ground that Promise One, if made, is inactionably vague and subjective.

The Fairbairns' misrepresentation, breach of contract, promissory estoppel, and UCL claims also must be dismissed to the extent they are based on Promise Two. Facts subject to judicial notice demonstrate that that promise—if made—was kept, and thus all claims arising from that alleged promise fail to state a claim.

Finally, the Fairbairns' misrepresentation, contract, promissory estoppel, and UCL claims—all of which sound in fraud—should be dismissed in their entirety for failure to allege the specific circumstances of the misrepresentations with sufficient particularity under Rule 9(b).

## V.   ARGUMENT

Plaintiffs bear the burden of establishing their standing to sue. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where a plaintiff lacks standing, the complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) (Article III standing) or Fed. R. Civ. P. 12(b)(6) (statutory standing). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead facts sufficient to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although well-pleaded allegations must be accepted as true, the Court need not "accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations." *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013). In testing the truth or reasonableness of factual allegations, the Court may consider material outside the four corners of the complaint if that material is "attached to or incorporated by reference into the complaint." *Wishnev v. Nw. Mutual Life Ins. Co.*, 162 F. Supp. 3d 930, 935 (N.D. Cal. 2016).

Where, as here, a plaintiff's claims sound in fraud, a higher pleading standard applies. "Rule 9(b) demands that the circumstances constituting the alleged fraud be 'specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge

1   and not just deny that they have done anything wrong.'" *Bly-Magee v. California*, 236 F.3d 1014,

2   1019 (9th Cir. 2001).  Averments of fraud "must identify 'the who, what, when, where, and how

3   of the misconduct charged,' as well as 'what is false or misleading about [the purportedly

4   fraudulent] statement, and why it is false.'"  *United States ex rel. Cafasso, v. Gen. Dynamics C4*

5   *Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

6       **A.**    **Plaintiffs' Claims For Mismanagement Of Their Charitable Contribution—**

7           **Namely, Their Negligence Claim And Their Claims Premised On Promise**

8           **One—Should Be Dismissed**

9          The gravamen of the Fairbairns' Complaint is that Fidelity Charitable "mishandl[ed]" the

10  liquidation of the donated Energous shares.  Compl. ¶ 6.  According to the Fairbairns, Fidelity

11  Charitable promised it "would employ sophisticated, state-of-the-art methods for liquidating large

12  blocks of stock" (Promise One), but instead "botched" the transaction by selling the shares too

13  quickly and failing to use certain trading algorithms and trading pools in the manner that the

14  Fairbairns would have preferred.  *Id.* ¶¶ 10, 74.  These allegations form the basis of the Fairbairns'

15  negligence claim (Count IV) and their claim for breach of Promise One, which is asserted (along

16  with the three other promises) as the basis for their misrepresentation (Count I), breach of contract

17  (Count II), estoppel (Count III), and UCL (Count V) claims.  *See id.* ¶¶ 74-75; *see also id.* ¶ 120.

18  The negligent trading claims fail because black-letter principles of the law governing charitable

19  organizations like Fidelity Charitable foreclose the Fairbairns' standing to pursue them.  And even

20  if the Fairbairns had standing, they could not sue on Fidelity Charitable's alleged promise to use

21  "sophisticated" liquidation methods, because such a promise is not actionably concrete; it is

22  precisely the sort of vague and standardless representation that courts routinely find inadequate to

23  support any duty in contract or tort.  Finally, the negligence claim fails because, having surrendered

24  exclusive legal control over the shares to Fidelity Charitable, the Fairbairns cannot claim that

25  Fidelity Charitable had any duty *to them* in connection with its management of the sale of those

26  shares; further, having claimed that the Four Promises formed part of the parties' contract, the

27  Fairbairns cannot separately sue on them in tort.

28

        DEFENDANT'S NOTICE OF MOTION, MOTION TO
DISMISS, AND MEMORANDUM OF LAW

1.      **Plaintiffs Lack Standing To Sue For The Alleged Mismanagement Of Their Donated Shares**

It is hornbook law that donors lack standing to sue for mismanagement of charitable assets: Having ceded their contribution to the public good, donors have no enforceable individual interest in how charitable assets are managed.  Instead, state law entrusts exclusive authority to the attorney general to pursue claims concerning the alleged mismanagement of charitable assets.  That exclusive authority deprives donors—like the Fairbairns—of standing to sue.

This is the law in Massachusetts, where Fidelity Charitable is incorporated.[5]  State statute provides that the Attorney General alone "shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof."  Mass. Gen. Laws Ann. ch. 12, § 8.  Interpreting that statute and the common law on which it is based, the Massachusetts Supreme Judicial Court has "consistently … held"—in cases dating back more than a century—that the Massachusetts Attorney General has

---

[5] Because Fidelity Charitable is organized under the laws of Massachusetts, *see* Compl. ¶ 19, Massachusetts law governs the statutory standing inquiry.  It does not matter, however, as the same result would obtain under California law.  California, like Massachusetts, generally gives the Attorney General exclusive standing to sue to protect assets held by a charitable organization. *See Holt v. Coll. of Osteopathic Physicians & Surgeons*, 394 P.2d 932, 934-35 (Cal. 1964); *see also* Cal. Gov't Code § 12598(a) ("The primary responsibility for supervising charitable trusts in California, for ensuring compliance with trusts and articles of incorporation, and for protection of assets held by charitable trusts and public benefit corporations, resides in the Attorney General."); *Exec. Comm. Representing Signing Petitioners of Archdiocese of W. U.S. v. Kaplan*, No. CV 03-8947, 2004 WL 6084228, at *8 (C.D. Cal. Sept. 17, 2004) (dismissing charity donors' claim to enforce charitable trust, "a prerogative left solely to the Attorney General").  The California Supreme Court recognizes an exception for parties with "sufficient special interest" in charitable property—but has expressly limited that category to "a trustee, or a *cestui*, or [a person with] some reversionary interest in the trust property."  *Holt*, 394 P.2d at 935 (emphasis added).  Plaintiffs are not among the *cestui* (beneficiaries) of the fund; Fidelity Charitable's Declaration of Trust defines "Qualified Beneficiaries" to include only certain tax-exempt organizations, not donors.  Marcus Decl., Ex. H, Declaration of Trust, Art. 1.2(l).  And they have no "reversionary interest" or "continuing property interest" in their donated property, *Klein v. Anaheim Mem'l Hosp. Ass'n*, No. G040829, 2009 WL 3233914, at *7-8 (Cal. Ct. App. Oct. 8, 2009) (citing *Holt*, 394 P.2d at 934), as they donated the shares "irrevocabl[y]," *see supra* 7.  Plaintiffs thus have no "special interest in the management of the affairs of [the Fidelity Charitable fund] apart from [their] interest as … member[s] of the public."  *Klein*, 2009 WL 3233914, at *8; *compare L.B. Research & Educ. Found. v. UCLA Found.*, 29 Cal. Rptr. 3d 710, 717 (Cal. Ct. App. 2005) (plaintiff donor had special standing because trust instrument provided that, if donee failed to use funds for designated purposes, they would revert to a substituted donee).

---

Case No. 3:18-cv-04881-JSC                                          DEFENDANT'S NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF LAW

1    exclusive standing to "bring an action alleging the misuse of charitable assets" or to ensure that a

2    charity's funds "are used in accordance with the donor's wishes." *Weaver v. Wood*, 680 N.E.2d

3    918, 922 (Mass. 1997).[6]

4         The area reserved to the Attorney General's exclusive jurisdiction has been variously

5    described as concerning, among other things, "mismanagement of … charitable funds," *Harvard*

6    *Climate Justice Coalition v. President & Fellows of Harvard College*, No. SUCV201403620H,

7    2015 WL 1519036, at *3 (Mass. Super. Mar. 17, 2015), *aff'd* 60 N.E.3d 380 (Mass. Ct. App. 2016),

8    "corporate mismanagement," *Lopez v. Medford Community Ctr., Inc.*, 424 N.E.2d 229, 232 (Mass.

9    1981), and "abuses in the administration of a public charity," *Ames v. Attorney Gen.*, 124 N.E.2d

10   511, 514 (Mass. 1955).  The Attorney General's remit thus encompasses the full range of criticism

11   about how a charity conducts its affairs and manages its assets.  The Fairbairns' complaint about

12   Fidelity Charitable's supposed "botched trading" is the paradigmatic example of this type of

13   mismanagement claim.  The Fairbairns think they know better than Fidelity Charitable about how

14   Fidelity Charitable should trade assets that it owns—including when trades should be made and

15   which trading algorithms and trading pools should be used.  *See* Compl. ¶ 74.  But they lack

16   standing to bring that claim.

17        The Massachusetts courts have directly addressed whether a donor has standing to sue for

18   mismanagement, and have unequivocally said no—even with respect to the management of the

19   precise assets donated by the donor herself.  In *Rockwell v. Trustees of Berkshire Museum*, for

20   example, the plaintiffs complained that the museum defendant was misusing charitable assets in

21   seeking to sell certain paintings by Norman Rockwell.  The court explained that "the claim, as

22   presented, … only seeks to enforce Mr. Rockwell's intent regarding the permanent domain of his

23

24        [6] *See also Dillaway v. Burton*, 153 N.E. 13, 16 (Mass. 1926) (It is "the exclusive function
     of the Attorney General to correct abuses in the administration of a public charity by the institution
25   of proper proceedings.  It is his duty to see that the public interests are protected and to proceed in
     the prosecution or to decline so to proceed as those interests may require."); *Burbank v. Burbank*,
26   25 N.E. 427, 428 (Mass. 1890) ("[T]he law has provided a suitable officer to represent those
     entitled to the beneficial interest in a public charity.  It has not left it to individuals to assume this
27   duty, or even to the court to select a person for its performance.  Nor can it be doubted that such a
     duty can be more satisfactorily performed by one acting under official responsibility than by
28   individuals, however honorable their character and motives may be.").

1   two works." No. 1776cv00253, 2017 WL 6940932, at *5 (Mass. Super. Ct. Nov. 7, 2017), *appeal*

2   *pending* No. 2017-P-1556 (Mass. Ct. App.).   Applying the "general rule of [the] Attorney

3   General's exclusive standing," the court held that "the Rockwell plaintiffs do not have standing to

4   enforce any promise made … that would bind a public charity." *Id.*  Rather, a donor's interests in

5   the donated assets terminate when the donor makes the gift, and the right to superintend proper

6   management of those assets from that point forward belongs to the Attorney General alone.  *See*

7   *id.*; *see also, e.g.*, *Ames*, 124 N.E.2d at 515 (contributors to Arnold Arboretum lacked standing to

8   sue Harvard College or to challenge decision of Attorney General not to sue Harvard); *Garland v.*

9   *Beverly Hospital Corp.*, 720 N.E.2d 838, 839-40 (Mass. App. Ct. 1999) (donor's claim that

10  charitable assets were "diverted … to purposes other than those for which they were intended"

11  belongs "only [to] the Attorney General, on behalf of the general public").

12          Nor does the fact that Plaintiffs claim to have been personally injured by Fidelity

13  Charitable's alleged mismanagement give them standing.  In *WCVB-TV v. Boston Athletic*

14  *Association*, for example, the plaintiff network lost a bid to broadcast the Boston Marathon, which

15  the defendant charitable organization managed.  1990 WL 159930, at *2 (D. Mass. Oct. 9, 1990).

16  The network filed suit, alleging that the defendant was "required to hold an open and fair bidding

17  procedure for awarding such exclusive telecast rights … to obtain the bid most likely to enhance

18  the financial status of the BAA and enable the organization to fulfill its charitable function." *Id.*

19  at *2.  Discussing the Massachusetts Supreme Judicial Court's long line of cases respecting the

20  Attorney General's exclusive authority to sue on claims of "corporate mismanagement" of a

21  charitable corporation's assets, the court dismissed the network's claims for lack of standing.  *Id*.

22  *5.  The fact that the plaintiff network was itself injured as a result of the allegedly mismanaged

23  process was irrelevant, since its interest in a well-managed bidding process conferred "no legal

24  interest over and above those of the general public."  *Id.*; *see also Rogers v. Roman Catholic*

25  *Archbishop of Boston*, 893 N.E.2d 802, 806 (Mass. App. Ct. 2008) (claim that charity engaged in

26  illegal actions that "directly affected [plaintiffs] as individuals" did not suffice to confer standing).

27          This does not mean that a donor never has standing to sue a charity.  But those suits are

28  narrowly confined to contexts in which the donor is suing to enforce a right that is personal to him

15

1    and so could not be asserted by the Attorney General.  *Lopez v. Medford Community Center, Inc.*,

2    424 N.E.2d 229 (Mass. 1981), provides an apt illustration.  Five putative members of a charitable

3    organization alleged that the board had "mismanaged and neglected the affairs of the corporation,"

4    including by misappropriating funds, *id.* at 231, and that they were wrongfully denied membership

5    in the organization.  *Id.*  The Massachusetts Supreme Judicial Court held that the plaintiffs had

6    standing to pursue the latter claim, but not the former.  As to their membership claim, the court

7    explained that "a private plaintiff possesses standing to assert interests in such organizations which

8    are distinct from those of the general public," a rule that encompassed the plaintiffs' claim that

9    their right to join the organization "should not be taken away except in accordance with lawful

10   procedures and practices."  *Id.* at 232.  The plaintiffs lacked standing, however, to pursue their

11   mismanagement claim in view of "the general rule that it is the *exclusive* function of the Attorney

12   General to correct abuses in the administration of a public charity."  *Id.* (emphasis added) (internal

13   quotation marks omitted).

14          Likewise here, the Fairbairns' interests in maximizing the value of their donation is

15   enforceable by the Attorney General alone because, rather than "exist[ing] apart from any broader

16   community interest," *Maffei v. Roman Catholic Archbishop of Boston*, 867 N.E.2d 300, 311 (Mass.

17   2007), it is co-extensive with the public's interest in having as large a pool of assets as possible

18   devoted to charitable purposes.  *See also Rockwell*, 2017 WL 6940932, at *3, 5-6 ("Since 'the

19   Legislature has determined that the Attorney General is responsible for ensuring that … charitable

20   funds are used in accordance with the donor's wishes,' it is difficult to see why a donor should also

21   have standing to seek the same end.").  Moreover, to the extent the Fairbairns have an interest apart

22   from maximizing the value of funds held by Fidelity Charitable, such as maintaining the price of

23   the substantial Energous holdings that they retain, Compl. ¶¶ 7, 63, the Attorney General's

24   exclusive jurisdiction protects the public interest from the possibility that it would be subordinated

25   to private, conflicting goals.[7]

26   _____

27          [7] Plaintiffs' claim that Fidelity Charitable "specifically promis[ed] to handle the WATT
     liquidation in a way that would maximize the Fairbairns' tax deduction, … thereby incurring a
28   duty to act reasonably with respect to the Fairbairns' deduction," Compl. ¶ 120, illustrates the
     necessity of this rule.  To the extent that the interest of Fidelity Charitable in maximizing the value

1    Plaintiffs have attempted to end-run the Attorney General's exclusive jurisdiction over

2    mismanagement claims by making identical negligent trading claims based on a purported promise

3    to "employ sophisticated, state-of-the-art methods" in liquidating the Energous shares they

4    donated (Promise One). Compl. ¶ 65. But allowing that gambit would eviscerate the exclusive

5    standing of the Attorney General. Every charitable organization assures prospective donors that it

6    will manage donated funds prudently, avoid waste, and devote funds singularly in the charity's

7    mission. Each of the foregoing cases brought by a donor and dismissed for lack of standing could

8    have been recast as a claim for breach of a "promise" to employ good management techniques.

9    Prospective donors routinely seek such assurances, and development officers routinely give them

10   (no doubt in utmost good faith). But litigation over such a "promise" would be litigation over

11   whether the charity did or did not exercise prudent management—exactly what is committed to

12   the exclusive jurisdiction of the Attorney General. If a plaintiff could sue for breach of that type

13   of "promise"—however particularized it may be—then the narrow exception for individual

14   standing to sue a charitable organization would swallow the general rule giving the Attorney

15   General exclusive standing to bring claims for mismanagement. *See Carl J. Herzog Found., Inc.*

16   *v. Univ. of Bridgeport*, 699 A.2d 995, 1002 (Conn. 1997) (declining to expand standing to donors

17   who did not reserve a property interest in charitable gift because such an expansion was likely to

18   "establish[] standing for a new class of litigants, donors," who would, thus, pose a risk of "lengthy

19   and complicated litigation").

20   The purpose of the Attorney General's exclusive jurisdiction is to protect charities from

21   the costs and burdens of such "attack from all sides." *Ames*, 124 N.E.2d at 515. Other donors to

22   Fidelity Charitable may have different views as to the best mechanisms for trading, and Fidelity

23   Charitable cannot dance to an infinite number of fiddlers. The Massachusetts (and California)

24   legislatures have wisely chosen to trust their Attorneys General to determine which instances of

25

26   of the shares is the same as the Fairbairns' interest in maximizing the amount of their tax deduction,
     the Attorney General is authorized to address those co-extensive interests. To the extent that the

27   Fairbairns have a private interest that is in conflict with the public interest served by the Attorney
     General, the investiture of exclusive jurisdiction in the Attorney General protects the public from

28   such conflicts. *See supra* 8.

1   alleged mismanagement of charitable assets warrant imposing the costs of litigation on funds that

2   would otherwise be used for public purposes.  *Cf. Klein*, 2009 WL 3233914, at *7 ("[C]onferring

3   standing on the Attorney General protects charitable trusts from harassing litigation. … [A]ny rule

4   giving ordinary donors standing to sue a charitable entity every time they disagreed with how the

5   organization carried out its charitable purposes could bring charitable activities to a screeching

6   halt."); *Hardman v. Feinstein*, 240 Cal. Rptr. 483, 485 (Cal. Ct. App. 1987) ("Th[e] limitation on

7   standing [in lawsuits alleging mismanagement of a charitable trust] arises from the need to protect

8   the trustee from vexatious litigation, possibly based on an inadequate investigation, by a large,

9   changing, and uncertain class of the public to be benefited.").  Allowing these claims to proceed

10   any further would thwart that legislative intent.

11          Accordingly, the negligence claim should be dismissed, as should all claims to the extent

12   they are based on Promise One (misrepresentation (Count I), breach of contract (Count II),

13   estoppel (Count III), and UCL (Count V)).[8]

14          **2.     Plaintiffs' Negligence Claim Also Fails For Lack Of Duty And For**

15          **Lack Of Independence From Their Contract Claim**

16          Even if Plaintiffs had standing to assert their negligence claim, it fails on the merits.

17          It is axiomatic that "[w]here there is no duty, there can be no negligence."  *Toomer v.*

18   *United States*, 615 F.3d 1233, 1237 (9th Cir. 2010).  Absent a duty of care, "injury is an injury

19   without actionable wrong. …  If there is no duty, there can be no liability[.]"  *J.L. v. Children's*

20

21          [8] The court should dismiss Plaintiffs' claims on state statutory standing grounds, as federal
     district courts routinely do.  *See, e.g.*, *Rettek v. Ellis Hosp.*, No. 1:08-cv-844, 2009 U.S. Dist.
22   LEXIS 1607 (N.D.N.Y. Jan. 12, 2009), *aff'd*, 2010 U.S. App. LEXIS 1863 (Jan. 27, 2010); *State*
     *of Cal. ex rel. RoNo, LLC v. Altus Finance, S.A.*, 2002 WL 1008251, at *8, 11 (C.D. Cal. May 8,
23   2002); *WCVB-TV*, 1990 WL 159930, at *5.  For many of the same reasons just discussed, however,
     the Fairbairns also lack Article III standing to sue over the management of their donated shares.
24   Because the Fairbairns transferred "legal title to, or a proprietary interest in," the Energous shares
     that serve as the basis of their suit (*see supra* 5-7), they cannot demonstrate "the minimum
25   requirement for injury-in-fact."  *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d
     1036, 1043 (9th Cir. 2015) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549
26   F.3d 100, 108 (2d Cir. 2008)).  Having irrevocably ceded any interest in, or control over, the assets
     to Fidelity Charitable, the Fairbairns have no cognizable injury to complain about; any injury from
27   Fidelity Charitable's alleged "mishandling" of the Energous stock was felt by Fidelity Charitable
     itself, not by the Fairbairns personally, and so they lack Article III standing to sue.
28

*Inst., Inc.*, 99 Cal. Rptr. 3d 5, 10-11 (Cal. Ct. App. 2009) (internal quotation marks omitted). The Fairbairns contributed their stock irrevocably, abandoning all title to and control over the shares. *Supra* 5-7. Plaintiffs do not claim that they retained any interest in the donated shares; indeed, they could not make any such claim without also conceding that they are not entitled to a tax deduction for the donation. *See* 26 U.S.C. § 170(f)(3)(B); 26 C.F.R. § 1.170A-7 (charitable deduction permitted only if the rights retained by the donor, if any, are insubstantial). Fidelity Charitable owed *Plaintiffs* no duty to liquidate the Energous shares in any particular manner. Compl. ¶ 117. Because Plaintiffs fail to plead any tort duty owed to them, *supra* 7, their negligence claim fails. *See Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009).

To the extent Plaintiffs contend that the alleged duty arises from the Four Promises, any claim predicated on such a duty would fail because the alleged promises are, by definition, contractual in nature, and a negligence claim based on such promises would thus not be independent of the alleged contract. *See, e.g.*, *McGehee v. Coe Newnes/McGehee ULC*, No. C 03-5145, 2004 WL 2452855, at *2 (N.D. Cal. Feb. 10, 2004) ("In other words, 'an omission to perform a contract obligation is never a tort, unless that omission is also an omission to perform a legal duty.' … Such independent duty is required for a tort action because contract and tort actions are distinct: while a contract action aims to protect the interest in having private promises between parties performed, the goal of a tort action is to protect some general public policy interest not directly tied to the contract's purposes."); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. Ct. App. 1994) ("[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law."). A negligence cause of action that amounts to no more than "a claim for negligent breach of a contract … is not sufficient to support tortious damages for violation of an independent tort duty." *Erlich v. Menezes*, 21 Cal. 4th 543, 554 (Cal. 1999).

### 3.    Promise One Cannot Sustain Any Cause Of Action

Even if the Fairbairns had standing to assert their negligent trading allegations (they do not), the Fairbairns' claims stemming from Promise One—that Fidelity Charitable "would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock"—fail on the merits.

Courts have held that this precise language amounts to the sort of non-actionable statement that cannot support any of the claims premised on it. *In re Seagate Technology LLC Litigation*, 233 F. Supp. 3d 776, 793 (N.D. Cal. 2017) (dismissing UCL claim based on statement that defendant used "the most sophisticated manufacturing process in the industry"); *Winans by and through Moulton v. Emeritus Corporation*, No. 13–cv–03962, 2014 WL 970177, at *9 (N.D. Cal. Mar. 5, 2014) (dismissing statutory misrepresentation claim to the extent it alleged defendant called method of caring for senior citizens "state of the art").

"Generalized, vague, and unspecified assertions" cannot support any cause of action that requires a showing of harm—as each of Plaintiffs' claims do—because they are incapable of being proven true or false, and no one could reasonably rely on them in the absence of "specific or measurable facts." *See In re Seagate Technology LLC Litigation*, 233 F. Supp. 3d at 793; *see also Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005) ("reliable" is a non-actionable term because it is "incapable of objective verification and not expected to induce reasonable consumer reliance"); *O'Connell v. CAE-Link Corp.*, 57 F.3d 1077 (9th Cir. 1995) (table) (court could not have found breach of contract because the alleged promise to "consider" transferring plaintiff was "so amorphous as to provide 'no rational method for determining breach or computing damages'"). Fidelity Charitable's alleged promise to employ "the most sophisticated, state-of-the-art methods" is just that sort of "vague and subjective assertion[.]" *In re Seagate Technology LLC Litigation*, 233 F. Supp. 3d at 793; *see also Finney v. Ford Motor Co.*, No. 17-cv-06183, 2018 WL 2552266, at *8 (N.D. Cal. June 4, 2018) (holding that "[v]ague or highly subjective claims about product superiority amount to non-actionable puffery," and citing "statement that car's engineering was 'state of the art'" as an example).

Plaintiffs' effort to demonstrate Promise One was false only illustrates the impossibility of litigating the claim. The Fairbairns claim that Fidelity Charitable should have spread out the liquidation over a longer period, sold shares in larger blocks, "look[ed] for additional liquidity" in "off-exchange trading pools," and employed trading algorithms differently. Compl. ¶ 74. Had Fidelity Charitable actually promised to follow any of those practices, its failure to do so might give rise to a claim. But Promise One, according to Plaintiffs' telling, was only to be

DEFENDANT'S NOTICE OF MOTION, MOTION TO
                                                                    DISMISS, AND MEMORANDUM OF LAW

1   "sophisticated" and "state-of-the-art"—terms that are so subjective and general they cannot

2   possibly be shown as a factual matter to require any particular trading technique. *See Brothers v.*

3   *Hewlett-Packard Co.*, No. C-06-02254, 2006 WL 3093685, at *5 (N.D. Cal. October 31, 2006)

4   (assertion of "sophisticated design" and that product was "top of the line" were merely statements

5   of opinion about superiority of product); *Consumer Advocates v. Echostar Satellite Corp.*, 113

6   Cal.App.4th 1351, 1361 (Cal. Ct. App. 2003) (explaining that court could not evaluate promise

7   that television picture would be "crystal clear": "After all, how clear is any given crystal?").

8       In sum, Plaintiffs' negligence claim and its analogue—the misrepresentation, contract,

9   estoppel, and UCL claims premised on a promise identical to Fidelity Charitable's supposed tort

10  duty—all fail.

11  **B.      All Of Plaintiffs' Claims Premised On Promise Two Fail Because Fidelity**

12  **Charitable's Statement—If Made—Was Not False**

13      For the reasons just discussed, Plaintiffs cannot pursue any claim based on Promise One.

14  Nor can they sue on Promise Two—that Fidelity Charitable "would not trade more than 10% of

15  the daily trading volume of Energous shares"—because that statement, if made, was true.  As a

16  matter of simple arithmetic, the liquidation of the Energous stock comprised significantly less than

17  10% of the daily trading volume.

18      The Fairbairns assert that Fidelity Charitable's sale of their shares accounted for 16% of

19  the trading volume on December 29, 2017.  Compl. ¶¶ 10, 70.  But that is not an allegation this

20  Court must accept on a motion to dismiss.  *See, e.g.*, *ScripsAmerica, Inc. v. Ironridge Glob. LLC*,

21  119 F. Supp. 3d 1213, 1253-54 (C.D. Cal. 2015) (dismissing securities fraud claim as "not

22  plausible" based on trading volume figures).  "Trading volume" is a defined term with an accepted

23  meaning, which courts regularly apply.  *See, e.g.*, *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th

24  Cir. 1999) (approving test for market efficiency that looked to trading volume); *ScripsAmerica*,

25  119 F. Supp. 3d at 1253.  NASDAQ's published figures, of which this Court can take notice, show

26  the volume of Energous shares traded that day was 28,317,620.  Energous Historical Stock Prices,

27

28

Case No. 3:18-cv-04881-JSC          DEFENDANT'S NOTICE OF MOTION, MOTION TO
                                    DISMISS, AND MEMORANDUM OF LAW

1   at 4.[9]  The sale of Plaintiffs' 1.93 million shares therefore comprised only 6.8% of trading volume

2   that day.

3        In other words, if Promise Two was made, it was kept and true.[10]  Allegations sounding in

4   fraud must "set forth what is false or misleading about a statement, and *why it is false*."  *Vess v.*

5   *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis added).  Thus, to the extent

6   Plaintiffs' claims (Counts I, II, III, and V) are premised on this supposedly breached promise, they

7   must be dismissed.  *See, e.g.*, *Stuart v. Cadbury Adams USA, LLC*, 458 F. App'x 689, 691 (9th

8   Cir. 2011) (dismissing UCL and California common law fraud claims because alleged

9   misstatement was not false); *Davidson v. Apple, Inc.*, No. 16-CV-4942, 2017 WL 3149305, at *12

10  (N.D. Cal. July 25, 2017) (dismissing misrepresentation and UCL claims where plaintiffs could

11  not show that alleged statement was false).

12      ## C.   Plaintiffs' Non-Negligence Claims Fail For Failure To Plead With The

13           ## Specificity Required By Rule 9(b)

14       As discussed above, the Fairbairns lack standing to bring any claim premised on Promise

15  One (*see supra* 13-18), and Promise Two was not breached (*see supra* 21-22).  There is yet another

16  fundamental problem with Plaintiffs' claims premised on those two promises, as well as the other

17  two promises they allege:  None is pleaded with the specificity required by Rule 9(b).  Plaintiffs'

18  misrepresentation, breach of contract, estoppel, and UCL claims (Counts I, II, III, and V) all stem

19  from Fidelity Charitable's alleged "false promises" to the Fairbairns, Compl. ¶¶ 6, 124, and are

20  thus "grounded in fraud" and subject to Rule 9(b)'s requirement that Plaintiffs plead fraud with

21  particularity, whether or not the relevant cause of action bears a fraud element.  *Kearns v. Ford*

22  _____

23       [9] *See ScripsAmerica*, 119 F. Supp. 3d at 1231-32 (dismissing complaint based on judicially
    noticed published NASDAQ prices and trading volume contrary to alleged figures); *cf. Metzler*
24  *Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (upholding
    judicial notice of "publicly available financial documents").

25       [10] This is not the only instance where Plaintiffs make a demonstrably false claim about
    Fidelity Charitable's trading activity.  For instance, in an effort to show Fidelity Charitable's
26  supposed ineptness in trading, the Fairbairns claim that December 29, 2017—the day the stock
    was liquidated—was "perhaps the year's single slowest trading period." Compl. ¶ 70.  But that
27  day's trading volume in Energous shares was the third-highest of the year, and over 92 times the
    volume of the same day the prior week.  *See* Energous Historical Stock Prices, at 4.
28

1   *Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (UCL claim); *Verde Media Corp. v. Levi*, No. 14-

2   cv-00891, 2015 WL 374934, at *8 (N.D. Cal. Jan. 28, 2015) (breach of contract claim); *see also*

3   *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 997 (N.D. Cal. 2009).

4           Plaintiffs' misrepresentation-based claims turn on a series of four oral statements Mr. Kunz

5   allegedly made on December 27, 2017 "on behalf of Fidelity Charitable."  Compl. ¶¶ 65-66.  But

6   Plaintiffs omit the most basic elements of those promises:  precisely what Mr. Kunz said, and to

7   whom he spoke.  *See Vess*, 317 F.3d at 1106-07.  The sparsity of specific allegations stands in

8   stark contrast to an otherwise detailed complaint, which quotes liberally from the parties'

9   communications on other matters.  *See, e.g.*, Compl. ¶¶ 49-54, 57, 64.  Plaintiffs' barebones

10  allegations fail to apprise Fidelity Charitable of the circumstances constituting its alleged fraud

11  with the requisite specificity to allow it to "defend against the charge." *Sanford v. MemberWorks,*

12  *Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).

13          First, Plaintiffs do not even say *to whom* Mr. Kunz made the alleged promises—Emily

14  Fairbairn, Malcolm Fairbairn, or some agent or third party—"and, thus, who was a party to the

15  alleged misrepresentations." *Sanford*, 625 F.3d at 558.  Indeed, Plaintiffs go out of their way to

16  obfuscate who was on the alleged telephone call with Mr. Kunz, quoting an ambiguously-phrased

17  email in which Mr. Fairbairn claimed in passive voice that he "was told" of the supposed promises.

18  Compl. ¶ 77.  That does not suffice, as *Sanford* directly holds.  There, a husband and wife claimed

19  they were defrauded when they purchased "bait products" over the phone.  *Sanford*, 625 F.3d at

20  558.  Because their complaint "failed to allege which of them made any of the telephone calls to

21  purchase the various bait products and, thus, who was a party to the alleged misrepresentations,"

22  the Ninth Circuit affirmed dismissal under Rule 9(b).  *Id.*  Here, as in *Sanford*, the Fairbairns'

23  entire case hinges on an alleged conversation with Mr. Kunz, and so "it is not unreasonable to

24  expect the [Fairbairn] who placed the phone calls to have personal knowledge of the relevant facts"

25  and to plead that critical fact.  *Id.*

26          Second, the Complaint is fatally non-specific and inconsistent about *what* Mr. Kunz

27  supposedly promised.  *See Stewart v. Electrolux Home Products, Inc.*, 304 F. Supp. 3d 894, 906-

28  10 (E.D. Cal. 2018) (dismissing complaint for lack of requisite specificity and clarity where

1    "Plaintiffs' allegations about the nature of the [misrepresentation] are inconsistent"). The

2    Complaint implies that three of Mr. Kunz's four representations (other than the inactionably vague

3    Promise One), were relatively concrete. Compl. ¶ 65. But the Complaint itself demonstrates that

4    Paragraph 65 does not purport to actually or fully describe what was said.

5           Plaintiffs quote an email from Mr. Fairbairn to Mr. Kunz sent more than two weeks after

6    the shares were sold purportedly describing the same conversation, but in that email, Mr. Fairbairn

7    leaves ambiguous whether Mr. Kunz said that Fidelity Charitable would limit sales to 10% of the

8    trading volume, or whether his "promise" was only to be "gentle," which Mr. Fairbairn construed

9    as a 10% limit. *Id.* ¶ 77. And Promise Three—that the Fairbairns would be permitted to advise

10   on a price limit—as described in the email includes two critical additional words: "*if necessary.*"

11   (emphasis added). *Id.* The Complaint leaves Fidelity Charitable to guess as to whether Plaintiffs

12   claim that those significant words were allegedly said by Mr. Kunz, or added later. And, of course,

13   Promise One—to use "sophisticated" trading methods—is not mentioned in the email at all.

14          Rule 9(b) prohibits plaintiffs from hedging their bets on the specifics of exactly what was

15   said (much less to whom it was said) where they allege claims sounding in fraud. Fidelity

16   Charitable cannot defend against Plaintiffs' misrepresentation-based claims while Plaintiffs leave

17   ambiguous what those misrepresentations were. If Fidelity Charitable promised only to be

18   "gentle," for instance, Fidelity Charitable could defend on the ground that that alleged promise is

19   too vague to be actionable—especially because it contradicts Fidelity Charitable's much more

20   specific written statements. *E.g.*, *Deschaine v. IndyMac Mortg. Servs.,* 617 F. App'x 690, 693 (9th

21   Cir. 2015). And if Fidelity Charitable promised only to allow Plaintiffs to "advise" on price "if

22   necessary," that promise would suffer from the same vagueness deficiency in the absence of an

23   additional representation as to what circumstances would have rendered consulting with them

24   "necessary." Because the Fairbairns' allegations are so vague on those critical points, Fidelity

25   Charitable cannot credibly advance either defense. Absent the "specific content of the false

26   representations" they allege, Plaintiffs' fraud-based claims must fail. *Edwards v. Marin Park, Inc.*,

27   356 F.3d 1058, 1066 (9th Cir. 2004).

28          At the heart of Plaintiffs' misrepresentation-based claims is the assertion that they would

                                                    24

not have contributed their Energous shares to Fidelity Charitable absent specific promises that the stock would be sold according to their preferences.  Yet they fail to plead those promises consistent with Rule 9(b).  Their misrepresentation, breach of contract, estoppel, and UCL claims should be dismissed.[11]

## VI.   CONCLUSION

The Complaint should be dismissed in its entirety with prejudice.

DATED: September 24, 2018                      Respectfully submitted,

By: */s/ David C. Marcus*
DAVID C. MARCUS
CHRISTOPHER T. CASAMASSIMA
WILMER CUTLER PICKERING HALE
    AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

ALAN E. SCHOENFELD (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294
Facsimile: +1 212 230 8888

*Attorneys for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND

---

[11] Plaintiffs' promissory estoppel claim also fails because Plaintiffs cannot use promissory estoppel to countermand the express terms of their contract with Fidelity Charitable with respect to the donation of shares.  *See* Compl. ¶¶ 68-69.  Because promissory estoppel claims are "aimed solely at allowing recovery in equity where a contractual claim fails for a lack of consideration," *US Ecology, Inc. v. California*, 28 Cal. Rptr. 3d 894, 907 (Cal. Ct. App. 2005), Plaintiffs' acknowledgement that they entered a contract with Fidelity Charitable to contribute and invest their stock precludes this claim.