**STRIS & MAHER LLP**
PETER K. STRIS
peter.stris@strismaher.com
BRENDAN S. MAHER
brendan.maher@strismaher.com
BRIDGET ASAY (*pro hac vice*)
bridget.asay@strismaher.com
RACHANA A. PATHAK
radha.pathak@strismaher.com
DANA BERKOWITZ
dana.berkowitz@strismaher.com
JOHN STOKES
john.stokes@strismaher.com
725 S. Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
Emily and Malcom Fairbairn

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>                Plaintiffs,<br><br>        v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>                Defendant. | Case No. 3:18-cv-04881-JSC<br><br>[Hon. Jacqueline Scott Corley]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: November 16, 2018<br>Time: 9:00 a.m.<br>Courtroom: F |

1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL STANDARD.............................................................................................1

FACTUAL BACKGROUND ..................................................................................2

    I.    Fidelity Charitable is a commercial donor-advised fund that solicits business by promoting its tax advantages, its expertise in handling donations of complex assets, and donors' robust advisory rights over their donations.............................................................2

    II.    Fidelity Charitable solicits the Fairbairns' $100 million donation by making specific promises about how it will liquidate their 1.93 million shares of stock in a single company ...........................................................................4

    III.    Fidelity breaks its promises and liquidates the Energous shares in three hours, crashing the stock ......................7

STATEMENT OF THE ISSUES ............................................................................9

ARGUMENT ..........................................................................................................9

    I.    Fidelity makes no serious argument for dismissal of the Fairbairns' misrepresentation, contract, estoppel, and UCL claims (Counts I-III and V) ..............................10

        A.    Fidelity concedes the Fairbairns have standing to assert Counts I-III and V ..................................10

        B.    The Fairbairns have plausibly alleged a claim for misrepresentation (Count I) ...................................12

            1.    Fidelity's Rule 9(b) argument is baseless .........................12

            2.    Fidelity's attack on two of the four misrepresentations is also meritless ...................14

        C.    The Fairbairns have stated plausible claims for breach of contract (Count II) and estoppel (Count III) based on Fidelity's failure to honor its promises .........................16

        D.    The Fairbairns have pled a plausible UCL claim (Count V) .....................................................17

    II.    The Fairbairns' negligence claim (Count IV) should not be dismissed ...................................................17

        A.    The Fairbairns have alleged injury-in-fact sufficient for Article III standing .....................................18

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017
S T R I S | M A H E R

i

B.      The so-called "donor standing" cases cited by
        Fidelity Charitable are not relevant and in any event
        support the Fairbairns' ability to pursue a negligence
        claim here .........................................................................................................20

C.      The Fairbairns have stated a claim for negligence ...........................................24

CONCLUSION ...............................................................................................................25

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

1

# TABLE OF AUTHORITIES

**Page(s)**

2 **Cases**

3 *Anunziato v. eMachines, Inc.*,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...................................................14
4
*Ashcroft v. Iqbal*,
5    556 U.S. 662 (2009)............................................................................2

6 *Bly-Magee v. California*,
    236 F.3d 1014 (9th Cir.2001) ...............................................................12
7
*Camp St. Mary's Ass'n of W. Ohio Conference of the United Methodist Church, Inc.*
8    *v. Otterbein Homes*,
    889 N.E.2d 1066 (Ohio 2008)..............................................................11
9
*Chiron Recovery Ctr., LLC v. AmeriHealth Hmo of New Jersey, Inc.*,
10    No. 9:16-CV-82043, 2017 WL 4390169 (S.D. Fla. Oct. 3, 2017) .................16

11 *Cincinnati Life Ins. Co. v. Beyrer*,
    722 F.3d 939 (7th Cir. 2013) ...............................................................16
12
*Consumer Advocates v. Echostar Satellite Corp.*,
13    113 Cal. App. 4th 1351 (2003) .............................................................15

14 *Council of Ins. Agents & Brokers v. Molasky-Arman*,
    522 F.3d 925 (9th Cir. 2008) ...............................................................10
15
*Dolin v. Facebook, Inc.*,
16    No. C 18-0950 SBA, 2018 WL 2047766 (N.D. Cal. May 2, 2018) ...............24

17 *Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ..............................................................13
18
*Eichenberger v. ESPN, Inc.*,
19    876 F.3d 979 (9th Cir. 2017) ...............................................................19

20 *Exec. Comm. Representing Signing Petitioners of Archdiocese of W. U.S. v. Kaplan*,
    No. CV 03-8947 FMC MANX, 2004 WL 6084228 (C.D. Cal. Sept. 17, 2004) ...........11
21
*Fed. Election Comm'n v. Akins*,
22    524 U.S. 11 (1998)............................................................................19

23 *Finney v. Ford Motor Co.*,
    No. 17-CV-06183-JST, 2018 WL 2552266 (N.D. Cal. June 4, 2018) ...............14
24
*In re Francis Edward McGillick Found.*,
25    642 A.2d 467 (Pa. 1994) ....................................................................23

26 *Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) .....................................................18
27
*Holt v. College of Osteopathic Physicians & Surgeons*,
28    394 P.2d 932 (Cal. 1964) .............................................................21, 23

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ...................................................................................12

*Klein v. Anaheim Mem'l Hosp. Ass'n*,
   No. G040829, 2009 WL 3233914 (Cal. Ct. App. Oct. 8, 2009)...................................23

*L.B. Research & Educ. Found. v. UCLA Found.*,
   130 Cal. App. 4th 171 (2005) ....................................................................................23

*Maffei v. Roman Catholic Archbishop of Boston*,
   867 N.E.2d 300 (Mass. 2007) ..............................................................................11, 20

*Marolda v. Symantec Corp.*,
   672 F. Supp. 2d 992 (N.D. Cal. 2009) ........................................................................16

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ............................................................11, 17, 18, 19

*McGehee v. Coe Newnes/McGehee ULC*,
   No. C 03-5145 MJJ, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004)............................24

*Nghiem v. Dick's Sporting Goods, Inc.*,
   222 F. Supp. 3d 805 (C.D. Cal. 2016) ........................................................................20

*Northstar Fin. Advisors Inc. v. Schwab Investments*,
   779 F.3d 1036 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc*
   (Apr. 28, 2015)...........................................................................................................18

*Pemberton v. Nationstar Mortg. LLC*,
   No. 14-CV-1024-BAS-WVG, 2017 WL 4759018 (S.D. Cal. Oct. 20, 2017) .............19

*Pinnacle Armor, Inc. v. United States*,
   648 F.3d 708 (9th Cir. 2011) .......................................................................................2

*Pride v. Correa*,
   719 F.3d 1130 (9th Cir. 2013) .....................................................................................2

*Resnik v. Woertz*,
   774 F. Supp. 2d 614 (D. Del. 2011).............................................................................19

*Rockridge Tr. v. Wells Fargo, N.A.*,
   985 F. Supp. 2d 1110 (N.D. Cal. 2013) ......................................................................24

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) .....................................................................................13

*Schmidt v. Catholic Diocese of Biloxi*,
   18 So.3d 814 (Miss. 2009)..........................................................................................11

*In re Seagate Tech. LLC Litigation*,
   233 F. Supp. 3d 776 (N.D. Cal. 2017) ........................................................................14

*Siebach v. Brigham Young Univ.*,
   361 P.3d 130 (Utah 2015)...........................................................................................11

STRIS | 725 S. FIGUEROA ST, STE 1830
MAHER | LOS ANGELES, CA 90017

iv

*Silva v. DiVittorio*,
    658 F.3d 1090 (9th Cir. 2011) ............................................................................................. 2

*Smith v. Bank of Am., N.A.*,
    679 F. App'x 549 (9th Cir. 2017) ....................................................................................... 19

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017) ............................................................................................ 19

*Weaver v. Wood*,
    680 N.E.2d 918 (Mass. 1997) ............................................................................................ 20

*Wheeler v. Assurant Specialty Prop.*,
    125 F. Supp. 3d 834 (N.D. Ill. August 28, 2015) ............................................................. 16

*Winans by & through Moulton v. Emeritus Corp.*,
    No. 13-CV-03962-SC, 2014 WL 970177 (N.D. Cal. Mar. 5, 2014) ................................. 14

**Statutes**

26 U.S.C. § 4966 ........................................................................................................................ 3

Cal. Civ. Code § 1708 .............................................................................................................. 24

Cal. Govt. Code § 12598 .......................................................................................................... 18

Mass. Gen. Laws Ann. ch. 12, § 8 ........................................................................................... 17

**Other Authorities**

Fed. R. Civ. P. 9(b) ................................................................................................... 9, 12, 13, 16

Fed. R. Civ. P. 12(b)(1) .............................................................................................................. 1

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 1, 17

Restatement (3d) of Trusts .................................................................................................. 22, 23

725 S. FIGUEROA ST, STE 1830
LOS ANGELES, CA 90017
S T R I S | M A H E R

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

**INTRODUCTION**

Fidelity Investments Charitable Gift Fund ("Fidelity Charitable" or "Fidelity") spends most of its motion to dismiss explaining why a traditional charity cannot be sued for mismanagement of donated funds. It ignores the uncomfortable reality that this is not a case about mismanagement; it is a case about Emily and Malcolm Fairbairn being tricked into handing over $100 million in cash and stock to Fidelity.

Fidelity also ignores a second uncomfortable reality—that it is not a traditional charity. Instead, it allows donors to open "charitable investment accounts" over which donors exercise ongoing (albeit not unfettered) discretion. These accounts undoubtedly serve charitable goals, but they also generate profits for Fidelity's affiliated entities, and so Fidelity (like other commercial donor-advised funds (DAFs)) is intensely interested in attracting new money to manage. This is why Fidelity courted the Fairbairns in late 2017 to place their planned $100 million charitable donation with Fidelity.

Fidelity knew the Fairbairns' donation would include 1.93 million shares of appreciated stock in a single company called Energous (ticker symbol WATT). The Fairbairns made clear to Fidelity that they wanted the WATT stock to be liquidated carefully—*in the new year*—to preserve its value and maximize their 2017 tax deduction. And Fidelity knew, for that reason, the Fairbairns were inclined to make their donation through a donor-advised fund they maintained with JP Morgan. Therefore, to secure the $100 million donation, Fidelity gave the Fairbairns specific assurances regarding the timing and methods that Fidelity would use to liquidate the WATT stock.

Fidelity breached every one of its promises. It received the WATT donation on December 28 and 29, 2017. Then, after nearly two-thirds of the trading day had passed on December 29, Fidelity liquidated the entire position—crashing the stock. While that almost certainly enriched individuals associated with Fidelity, it cost the Fairbairns and their DAF account tens of millions of dollars. Amazingly, Fidelity now says that its assurances were worthless and the Fairbairns have no standing to complain. That would be a convenient outcome for Fidelity. But it is not the law.

**LEGAL STANDARD**

Fidelity moves to dismiss plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff simply has to "allege 'sufficient

factual matter . . . to state a claim to relief that is plausible on its face.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). For both 12(b)(6) and 12(b)(1) (where, as here, the challenge to subject-matter jurisdiction is facial), a court must accept the well-pleaded factual allegations of the complaint as true, construe them in the light most favorable to plaintiffs, and draw all reasonable inferences in favor of plaintiffs. *Pinnacle Armor*, 648 F.3d at 721; *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). "[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Silva v. DiVittorio*, 658 F.3d 1090, 1105 (9th Cir. 2011), *overruled on other grounds as recognized by Almy v. Davis*, 726 F. App'x 553 (2018).

## FACTUAL BACKGROUND

Fidelity misled the Fairbairns and breached its obligations in handling their donation of 1.93 million shares of appreciated stock. To convince the Fairbairns to place their $100 million donation with Fidelity, it promised them that it would liquidate their stock carefully, in the new year, without trading more than 10% of the daily volume, and with the Fairbairns' advice. But upon receiving the full donation, Fidelity promptly broke each of its promises: it rapidly sold all 1.93 million shares in less than three hours on December 29. Fidelity now insists that, even though it induced the Fairbairns' donation through specific promises of how and when it would liquidate the stock, it had no enforceable obligations whatsoever. The facts show otherwise.

**I.   Fidelity Charitable is a commercial donor-advised fund that solicits business by promoting its tax advantages, its expertise in handling donations of complex assets, and donors' robust advisory rights over their donations.**

Fidelity Charitable is a commercial donor-advised fund, or DAF. Although organized as a nonprofit, it works with and generates enormous revenues for its for-profit affiliates. Compl. ¶¶ 4, 32-33. It does not engage in traditional charitable activities: it does not run schools or health clinics, shelters or food pantries. Rather, it (like other commercial DAFs) acts as a "charitable savings

S T R I S | 725 S. FIGUEROA ST., STE 1830
M A H E R | LOS ANGELES, CA 90017

account": donors give money or assets to Fidelity and take an immediate tax deduction, while retaining the right to invest those funds and later direct them to charities that the donors support. Compl. ¶¶ 2, 27-29; *see* 26 U.S.C. § 4966 (definition of donor-advised fund, specifying that donor has "advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor").

Donors to Fidelity may immediately begin directing contributions out of their DAF accounts, or may leave the funds (growing through investment) for years or even for the next generation. Compl. ¶¶ 21, 27, 29. *See also* Marcus Dec., Ex. B, at 6, 26-28 (explaining successor options).[1] Fidelity Charitable itself describes its DAF as being "like a charitable investment account." Declaration of Nick Migliori ("Migliori Dec."), Ex. A. And it markets its DAF as "fill[ing] a critical gap in the landscape of philanthropic giving by offering donors the ability to defer decisions about the ultimate beneficiaries of their charitable giving while obtaining an immediate tax benefit." Fidelity Br. 4.

Fidelity Charitable particularly trumpets the tax advantages for donors seeking to contribute complex assets such as appreciated stock, real estate, or even cryptocurrency. Compl. ¶ 36. Whereas many charities are unable to accept donations of such assets, sophisticated DAFs like Fidelity Charitable can. And they have made complex assets a central focus of their business: over 60% of the 2017 contributions to Fidelity Charitable were non-cash assets. Compl. ¶ 34.

Along with the tax advantages of funneling contributions through a DAF, Fidelity Charitable also aggressively promotes its donors' continuing rights to direct contributions to charity. Indeed, although all DAF donors retain "advisory privileges" over their DAF accounts, 26 U.S.C. § 4966, donors to Fidelity Charitable retain especially robust rights. The funds are held in a dedicated account and ultimately contributed to charity in the donor's name. Only the donor has the right to direct how the funds will be distributed to charities. Fidelity Charitable cannot make grants or take money out of the account without action from the donor; its role is merely a veto power, to prevent funds from being used for a non-charitable purpose. Compl. ¶¶ 29-31.

---

[1]   Plaintiffs do not object to the incorporation by reference of Exhibits A and B to the Declaration of David Marcus ("Marcus Dec."). However, the Complaint does not extensively reference Exhibit C, and it does mention or rely on Exhibit D, so incorporation of those documents is inappropriate.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

This is no accident: allowing donors to retain this remarkable degree of discretion is critical to Fidelity Charitable's marketing efforts. Compl. ¶¶ 30-31. Donors would not give their money to Fidelity Charitable but for its promise of robust advisory rights. That is precisely why Fidelity Charitable likens its DAF to a personalized "charitable investment account," and precisely why it stresses "[y]ou can use your Giving Account to support all the same charities you do today." Migliori Dec., Ex. A.

Fidelity Charitable has marketed this unique combination—tax efficiency, the ability to handle complex assets, and ongoing discretion—with particular force to ultra-wealthy individuals. Compl. ¶ 36. It competes intensely with other commercial DAF sponsors to prove it offers such individuals the sophistication and personalized service to handle their complex financial picture and carry out their charitable wishes accordingly. In this regard, Fidelity Charitable has aggressively promoted the services of its Complex Assets group. Compl. ¶ 38.

This approach has reaped extraordinary benefits for Fidelity Charitable and its associated financial institutions. Fidelity Charitable dominates the DAF market, with over $16 billion under management, and it receives more donations than any other charity, DAF or otherwise. Although Fidelity Charitable itself is a 501(c)(3) organization, it is a nonprofit only in the strictest sense of the word—the commercial DAF structure is not an altruistic undertaking. Fidelity Charitable charges donors management fees for its accounts and ensures that most of its assets are invested in Fidelity products. Compl. ¶¶ 4, 32-33. That means Fidelity Charitable generates enormous revenues for other Fidelity entities—and the more money it has under management, the higher those revenues are. Compl. ¶¶ 4, 32-33.

## II.   Fidelity Charitable solicits the Fairbairns' $100 million donation by making specific promises about how it will liquidate their 1.93 million shares of stock in a single company.

Plaintiffs Emily and Malcolm Fairbairn, who run an investment firm called Ascend Capital, have in the past dedicated more than $65 million to charity, including contributions to both JP Morgan and Fidelity Charitable DAFs. They are committed to donating most of their wealth to charity during their lifetimes. Compl. ¶¶ 41-42. And in 2017, in light of changes in the tax laws that left them facing a substantial tax bill, they decided to take their philanthropy to another level. They would donate $100

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

4

million, most of which they planned to use to fight Lyme disease—a serious tick-borne illness that has stricken the entire Fairbairn family and is rapidly spreading worldwide. Compl. ¶¶ 43-44.

The Fairbairns were familiar with DAFs and had longstanding relationships with both JP Morgan and Fidelity. Compl. ¶ 45. In 2013, catalyzed by their ten-year relationship with a wealth manager named Dennis Hearst, they had established a $20 million DAF account with JP Morgan. Compl. ¶ 48. The next year the Fairbairns had placed another $20 million in a Fidelity Charitable DAF. Compl. ¶ 46. This prompted extensive additional courting from Fidelity. And in 2016, Fidelity persuaded the Fairbairns to move over tens of millions more in investments to become customers of the Fidelity Family Office Services, a division of Fidelity that advertises "a dedicated and exclusive focus on the ultra wealthy." Compl. ¶ 47 (quoting the Family Office website).

Although both institutions contacted the Fairbairns in December 2017 about potential DAF contributions before year's-end, Fidelity made a particularly hard sell. Compl. ¶ 49. Justin Kunz, the Fairbairns' personal contact with the Fidelity Family Office, aggressively pitched Fidelity Charitable as a superior option to JP Morgan and Vanguard (another Fidelity Charitable competitor). He promoted Fidelity Charitable as more sophisticated and better able to handle donations of complex assets. He even introduced the Fairbairns to the head of Fidelity Charitable's Complex Assets Group, Ryan Boland, who further advised the Fairbairns about Fidelity Charitable's facility with complex assets. Compl. ¶¶ 50-54.

As the Fairbairns considered how to structure their 2017 donation, they were presented with a unique opportunity. They were angel investors and major stockholders in a technology company called Energous (which trades as WATT). Following a key regulatory approval in late December, the value of WATT skyrocketed, climbing an incredible 39% on December 27. The Fairbairns immediately recognized the upside of donating their WATT shares. Because their basis in the stock was far lower than its current value, they would pay substantial capital gains if they sold the stock. But if they donated the stock to charity, the charity would receive the full liquidated value, and the Fairbairns

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

could claim a substantial tax deduction based on the current fair market value. Compl. ¶¶ 55-59.[2]

But the Fairbairns had concerns about donating 1.93 million shares of WATT. They knew that Fidelity Charitable would liquidate the stock after the donation. And selling a large block of stock is a delicate process. If not handled properly—particularly with respect to the timing and rate of sales—it can cause the stock's value to crash. Those concerns influenced the Fairbairns' assessment of their options. JP Morgan's DAF rules would allow the Fairbairns to direct the timing and rate at which the stock was liquidated, and they knew Dennis Hearst would work closely with them in managing the process. Fidelity Charitable's guidelines, on the other hand, said only that it would liquidate stock "at the earliest date possible"—hardly the sophisticated approach the Fairbairns needed. Compl. ¶¶ 59-62. That left the Fairbairns with three principal concerns about channeling the donation through Fidelity Charitable:

- if Fidelity botched the liquidation, the Fairbairns would have less money to direct to Lyme disease research;

- if Fidelity liquidated the stock on the same day it was donated, that could significantly reduce the size of the Fairbairns' tax donation, which would be based on the average stock price on the day of the donation; and

- because of their relationship with and substantial continued holdings in Energous, the Fairbairns did not want a botched liquidation to damage the company going forward.

Compl. ¶ 63.

These concerns led the Fairbairns to strongly consider making their donation through JP Morgan. They discussed their concerns in a series of conversations with Justin Kunz at Fidelity, beginning on the afternoon of December 27, 2017. Compl. ¶ 64.

In response to the Fairbairns' concerns, and to convince the Fairbairns to donate the stock to Fidelity, Kunz assured the Fairbairns that Fidelity would treat the Energous stock "gently." Compl. ¶¶ 67, 77. Fidelity promised that it would handle the liquidation of the Energous stock with a high

---

[2]   Given the Fairbairns' large investment in Energous, their dedicated team at Fidelity had closely followed the stock since well before any discussions about the donation began. So when the stock spiked, it did not go unnoticed by Fidelity. Compl. ¶ 58.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

STRIS | 725 S. FIGUEROA ST., STE 1830
MAHER | LOS ANGELES, CA 90017

level of sophistication and care, and it agreed to allow the Fairbairns input into the liquidation process. *Id.* More specifically, Fidelity promised:

- it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock;

- it would not trade more than 10% of the daily trading volume of Energous shares;

- it would allow the Fairbairns to advise on a price limit (*i.e.*, a point below which Fidelity would not sell shares without first consulting the Fairbairns); and

- it would not liquidate *any* shares until the new year.

Compl. ¶¶ 65, 66. Fidelity made these promises knowing the Fairbairns' objectives: to maximize the amount of money available to donate to fight Lyme disease while also securing a tax deduction for themselves and ensuring the continued well-being of Energous. Compl. ¶¶ 63, 64. Indeed, the promises were carefully and specifically tailored to persuade the Fairbairns that Fidelity, rather than JP Morgan, was the right choice to achieve these goals. *Id.*

Relying on these promises, the Fairbairns decided to donate the Energous shares to Fidelity. Malcolm Fairbairn informed Fidelity on December 27 that they would transfer 1.93 million shares of Energous stock to their Fidelity DAF account. Fidelity received 700,000 shares of Energous stock on December 28 and 1.2 million shares on December 29. Compl. ¶¶ 68-69.

## III. Fidelity breaks its promises and liquidates the Energous shares in three hours, crashing the stock.

Fidelity did not keep any of the promises it made to the Fairbairns. Instead of waiting for the new year, it sold off all of the Energous shares in less than three hours on December 29, the last afternoon of the last business day of the year—a traditionally slow trading period. Those sales represented 16% of the on-exchange trading volume (the only market in which Fidelity sought to sell the shares), and an absolutely astonishing 35% of the volume over the three-hour trading window. Instead of using sophisticated, state-of-the-art trading strategies, Fidelity executed the liquidation using utterly inappropriate methods. It did not try to sell shares in large blocks or off-exchange trading pools and it badly misused standard trading algorithms—in plain English, Fidelity essentially instructed its sales orders to compete *with each other*. And Fidelity's traders did not change course even when it was evident the trades were moving the market. Compl. ¶¶ 72-75. Finally, instead of

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

allowing the Fairbairns to advise on a price limit, Fidelity did not even tell them about the December 29 liquidation. Indeed, the Fairbairns did not realize for almost two weeks that the wild trading in Energous stock on December 29 involved the complete liquidation of their stock. Compl. ¶¶ 70, 76.

Predictably, this reckless trading crashed the stock price more than 30%. The Energous stock sold for tens of millions less than it should have—far less than it was valued on the morning of December 29. That cost the Fairbairns dearly, in two ways:

- because Fidelity's trading drove the stock price down on the day of the donation, the Fairbairns' tax deduction was millions less than it should have been.

- because the Energous stock sold for tens of millions less than it should have, the Fairbairns have far less money available to direct to the causes they support.

Compl. ¶¶ 71, 73, 75, 83. These, of course, were the precise concerns that Fidelity's promises had been designed to assuage.

When the Fairbairns realized what had happened, Malcolm Fairbairn reached out to Justin Kunz to question why the stock had been liquidated on December 29, contravening Kunz's own representations. Kunz did not dispute that Fidelity had made those promises; indeed, in a subsequent phone call he reiterated that it had. Compl. ¶¶ 77-79. Nonetheless, despite the Fairbairns' persistent requests for information about the trades and an explanation for Fidelity's conduct, Fidelity stonewalled their inquiries. It provided only basic information about the December 29 trades.

In flagrantly disregarding its promises, Fidelity either acted with egregious incompetence or worse, was motivated by improper self-interest—the desire to get as much money as possible under Fidelity management by year's end. Indeed, given the sophisticated resources available to Fidelity Charitable, its conduct is difficult to explain by incompetence alone. Compl. ¶ 14. It had significant incentives to liquidate the shares as quickly as possible. Fidelity Charitable generates revenues for its affiliate companies by placing DAF contributions in Fidelity investment products and charging account and management fees. The sooner the stock was sold, the sooner those revenues would start. Plaintiffs also have reason to believe that Fidelity Charitable measures its success and its employees' compensation based on the amount of funds under Fidelity management as of year's end. Compl. ¶ 75.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

S T R I S | 725 S. FIGUEROA ST., STE 1830
M A H E R | LOS ANGELES, CA 90017

725 S. FIGUEROA ST, STE 1830
LOS ANGELES, CA 90017

S T R I S
M A H E R

1    That would give Fidelity Charitable's employees every incentive to sell the stock and move it into

2    other investments before the end of 2017—no matter the cost to the Fairbairns.

3        The Fairbairns filed suit against Fidelity in August 2018, alleging misrepresentation, breach of

4    contract, estoppel, negligence, and violation of California's unfair competition law.

## STATEMENT OF THE ISSUES

6    1.  Whether the Fairbairns have met Rule 9(b)'s requirements for pleading misrepresentation and

7        otherwise alleged plausible claims for misrepresentation (Count I), breach of contract

8        (Count II), estoppel (Count III), and violation of the UCL (Count V).

9    2.  Whether the Fairbairns have standing to sue, and have stated a claim, for negligence

10       (Count IV).

## ARGUMENT

12       Fidelity's motion is perhaps most notable for what it does *not* argue. It only seriously contends

13   that one of the Fairbairns' five claims (Count IV, negligence) can be dismissed in its entirety. Fidelity

14   begins with this claim and devotes the bulk of its brief to it. That is telling. It is also wrong.

15       Fidelity offers no serious reason to dismiss Count I (misrepresentation), II (breach of contract),

16   III (estoppel), or V (violation of California's UCL) of the Fairbairns' complaint. Each of those claims

17   is based on four specific promises that Fidelity made *to the Fairbairns* to secure their $100 million

18   donation. In its motion, Fidelity concedes that the Fairbairns have standing to assert these claims (at

19   least based on two of Fidelity's promises). Fidelity Br. 3-4, 10-11. Indeed, Fidelity's *only* argument

20   for dismissal of Counts I-III or V is the assertion that the complaint lacks sufficient particularity to

21   satisfy Rule 9(b). Fidelity Br. 3-4, 10-11. But that argument borders on frivolous: the Fairbairns have

22   alleged precisely *who* made the representations (Justin Kunz); *what* they were (in shorthand:

23   sophistication; 10% of volume; not selling before January 1, 2018; and price limit); *when*, *where*, *how*,

24   and *to whom* they were made (in communications with Emily and Malcolm Fairbairn on December

25   27, 2017); and even *why* Fidelity made them (to allay the Fairbairns' concerns about the WATT

26   liquidation and convince them to choose Fidelity over JP Morgan). *E.g.*, Compl. ¶¶ 64-68. It is hard

27   to imagine how the Fairbairns could allege Fidelity's misrepresentations with more particularity. And

28   the idea that the complaint is too vague to permit Fidelity to prepare a defense is hard to take seriously.

9

Fidelity's core argument (that Count IV, negligence, should be dismissed) fares no better. According to Fidelity, its donors have no interest in their DAF accounts distinct from the general public and thus suffer no personalized injury when their account is impaired. That is simply wrong. All donors to Fidelity retain robust, exclusive, and ongoing advisory rights over their DAF account. In Fidelity's own words, it offers donors a personalized "charitable investment account" that can be used to support "virtually any charity" the donor wants. It even likens DAF accounts to a family heirloom that can be passed down through generations.

In its motion to dismiss, Fidelity says those rights are actually worthless—that a donor's interest in her DAF is so insubstantial and so meaningless as to be less than the "identifiable trifle" necessary to establish a judicially cognizable injury. *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008). That is an astonishing and brazen about-face. More importantly, Fidelity has no explanation for *why* the Fairbairns' advisory rights are inadequate—either under Article III or under foundational California and Massachusetts cases that permit suit against a charity to vindicate personal interests distinct from the interests of the general public. It is beyond cavil that the Fairbairns retain meaningful, exclusive, ongoing rights over their DAF account. The Fairbairns accordingly have a sufficient personalized interest to assert a negligence claim.

## I.   Fidelity makes no serious argument for dismissal of the Fairbairns' misrepresentation, contract, estoppel, and UCL claims (Counts I-III and V).

The Fairbairns' misrepresentation, contract, estoppel, and UCL claims are distinct from the negligence claim to which Fidelity devotes so much of its brief, and they are based on the specific promises Fidelity made to induce the Fairbairns' donation. Fidelity concedes the Fairbairns have standing to bring claims derived from (at least some of) these promises. And it all but recognizes that these claims are not suitable for resolution on a motion to dismiss. Fidelity's motion must be denied.

### A.   Fidelity concedes the Fairbairns have standing to assert Counts I-III and V.

Fidelity contends the Fairbairns lack standing only to the extent their claims are premised on Fidelity's mismanagement of the Fairbairns' DAF account, and it specifically directs its standing arguments to the Fairbairns' negligence claim (Count IV) and to the remaining claims *only* to the extent they are premised on the promise of sophistication. But Fidelity does not dispute the Fairbairns'

10

S T R I S |
M A H E R |
725 S. FIGUEROA ST., STE 1830
LOS ANGELES, CA 90017

standing to pursue their misrepresentation, contract, estoppel, and UCL claims based on its promises about timing, volume, and price limit. Nor could it.

It is obvious that the Fairbairns suffered Article III injury when Fidelity's false representations wrongfully induced them to donate $100 million. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). And courts universally recognize a donor's ability to pursue claims against a charity in such circumstances. *See, e.g.*, *Maffei v. Roman Catholic Archbishop of Boston*, 867 N.E.2d 300, 311 (Mass. 2007) (permitting a donor to pursue a misrepresentation claim against a charity); *Exec. Comm. Representing Signing Petitioners of Archdiocese of W. U.S. v. Kaplan*, No. CV 03-8947 FMC MANX, 2004 WL 6084228, at *3 (C.D. Cal. Sept. 17, 2004) (plaintiffs alleged injury to their property where "but for Defendants' allegedly false representations regarding the use of the money, Plaintiffs would not have donated the money"); *Schmidt v. Catholic Diocese of Biloxi*, 18 So.3d 814, 831-32 (Miss. 2009) (allowing fraud claim against church where plaintiff alleged that minister knew church would be closed, but continued telling potential donors it would be rebuilt); *Camp St. Mary's Ass'n of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 889 N.E.2d 1066, 1075-76 (Ohio 2008) (plaintiffs had standing to sue for promissory estoppel, where plaintiff had made gift of land and money based on organization's representations that it would maintain certain policies); *Siebach v. Brigham Young Univ.*, 361 P.3d 130, 139 (Utah 2015) (plaintiffs could sue university for alleged misrepresentations to induce their donations). The Utah Supreme Court recognized in *Siebach* that "courts around the country have recognized the standing of donors to allege the fraudulent or negligent inducement of their donations." *Id.*

The Fairbairns accordingly may pursue their claims for misrepresentation, breach of contract, estoppel, and violation of the unfair competition law. As noted, that is undisputed with respect to Fidelity's promises regarding timing, volume, and price limit. But it is no less true with respect to Fidelity's assurance that it would use "sophisticated, state-of-the-art techniques" to liquidate the Energous stock. Compl. ¶ 65. Fidelity contends that a claim based on this representation is essentially a claim that Fidelity mismanaged its assets. Fidelity Br. 17. Not so. This was a specific representation made by Fidelity to induce the Fairbairns' donation of the Energous stock. The Fairbairns were donating *1.93 million shares* in appreciated stock: they were understandably and reasonably concerned

11

with preserving the value of that donation and maximizing their potential tax deduction. With other options available to them, the Fairbairns would not have risked donating the stock to Fidelity absent assurances about the timing and method of the sale.

Given the position Fidelity takes in this lawsuit—that it "cannot dance to an infinite number of fiddlers" (*id.*)—it should have told the Fairbairns that the manner of liquidating the stock would be entirely up to Fidelity, that the Fairbairns could not control it, and Fidelity could provide no assurances about when or how the stock would be sold. Had Fidelity said that, of course, the Fairbairns would have taken their business to JP Morgan, which allows donors to control the timing and rate at which donated securities are liquidated. Compl. ¶¶ 61, 64. Instead, Fidelity solicited the Fairbairns' donation with concrete promises regarding the process and timing for liquidating the stock. Compl. ¶ 65. The Fairbairns can seek redress for each one of Fidelity's false promises.

**B.     The Fairbairns have plausibly alleged a claim for misrepresentation (Count I).**

Fidelity seeks dismissal of Count I on two grounds: that the allegations do not satisfy Rule 9(b) and that two of the four alleged misrepresentations cannot form the basis of a misrepresentation claim. Both of these arguments are easily rejected.

**1.     Fidelity's Rule 9(b) argument is baseless.**

The complaint's detailed allegations satisfy the requirement that a complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). The pleading must therefore provide "'the who, what, when, where, and how' of the misconduct charged." *Id.* The Fairbairns have done just that: the complaint describes in detail the specific representations made by Justin Kunz to the Fairbairns on December 27, 2017. Compl. ¶¶ 64-67.

Contrary to Fidelity Charitable's contention, these are not "barebones" allegations. Fidelity Br. 23. Fidelity Charitable says it is not clear to whom Kunz made these representations, suggesting it might have been "some agent or third party." *Id.* No such person is mentioned in the complaint, which

12

STRIS
MAHER

725 S. FIGUEROA ST, STE 1830
LOS ANGELES, CA 90017

describes *the Fairbairns* having a "series of frank conversations" with Kunz. Compl. ¶ 64. Nor is this case similar to *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010), where husband-and-wife plaintiffs did not allege who was the target of an allegedly fraudulent marketing class. Here, the Fairbairns have alleged that they communicated with Kunz. Compl. ¶ 64. And even if there were some question whether both Emily and Malcolm were party to each and every communication, this is not a telemarketing case like *Sanford*, where the identity of a single defrauded person is critical; here, it is legally irrelevant (Fidelity does not contend otherwise) whether Kunz relayed the promises to one, the other, or both Fairbairns. The Fairbairns made this donation to their jointly owned DAF account and have identified the person who made the false representations to them and when. That is more than enough to give Fidelity Charitable sufficient notice to defend against the Fairbairns' claims.[3]

The content of the misrepresentations is also pled with specificity. Indeed, Fidelity Charitable does not dispute that ¶ 65 of the Complaint provides sufficient detail to satisfy Rule 9(b). Instead, it claims that a subsequent email from Malcolm Fairbairn (also quoted in the complaint) creates ambiguity about what Mr. Kunz promised the Fairbairns. In fact, Malcolm Fairbairn's January 15, 2018 email corroborates the Fairbairns' specific claims: it references the agreement that selling would begin after the new year, the 10% trading-volume limit, and the opportunity to advise on a price limit. Compl. ¶ 77. Fidelity Charitable insists that Malcolm's use of a parenthetical and one or two different words in his email makes the fraud allegations vague. That argument verges on frivolous. Rule 9(b) requires particularity; it does not insist on perfect recall of every single word. *Cf. Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (allegations insufficient where complaint did not "contain a word of the notices' specific content"). And the fact that the email does not also recount Fidelity's representation that it would use sophisticated, state-of-the-art trading methods to liquidate the stock is irrelevant. The Fairbairns have alleged that representation with specificity. Fidelity Charitable may dispute that the representation was made, but the Fairbairns' allegations must be taken as true for purposes of this motion.

---

[3]   If the court finds any of the alleged misrepresentations to be pled with insufficient detail, the Fairbairns request leave to amend the complaint.

STRIS
MAHER

725 S. FIGUEROA ST., STE 1830
LOS ANGELES, CA 90017

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

2.     **Fidelity's attack on two of the four misrepresentations is also meritless.**

Fidelity also purports to seek dismissal of the misrepresentation claim because, in its view, two of the four promises it made cannot form the basis of such a claim. Fidelity is wrong.

As an initial matter, it bears mention that Fidelity says *nothing* about its promise to forbear trading until 2018 or its promise to let the Fairbairns advise on a price limit. Each of those misrepresentations is critical and independently provides a sufficient basis for Count I. If Fidelity had told the Fairbairns either that it would liquidate before the new year, or that the Fairbairns could not advise on a price limit, they would have taken their donation elsewhere.

In any event, Fidelity's attack on the other two misrepresentations is meritless.

***First***, Fidelity Charitable's promise to use sophisticated, state-of-the-art methods to liquidate the stock is not too vague to enforce. Taking the terms "sophisticated" and "state-of-the-art" out of context, Fidelity suggests they are mere "puffery." Fidelity Br. 20. But the Fairbairns do not allege that Fidelity Charitable generally described itself or its services as sophisticated and state-of-the-art. Their allegation is much more specific: that Fidelity promised, in handling the liquidation of the Energous stock, to "employ sophisticated, state-of-the-art methods for liquidating large blocks of stock." Compl. ¶ 65. Instead, Fidelity failed to follow basic industry standards to prevent its trades from moving the market. Compl. ¶ 74. Fidelity's representation, made directly to the Fairbairns to solicit their donation, is concrete and actionable.

The false-advertising cases cited by Fidelity do not hold otherwise. Those cases involve generic product claims, not a specific representation made to solicit a specific transaction. *See, e.g.*, *In re Seagate Tech. LLC Litigation*, 233 F. Supp. 3d 776, 793 (N.D. Cal. 2017) (general, non-specific assertions about reliability and performance not sufficient basis for false advertising claim); *Winans by & through Moulton v. Emeritus Corp*., No. 13-CV-03962-SC, 2014 WL 970177, at *9 (N.D. Cal. Mar. 5, 2014) (general description of health services as "state of the art" and "high quality" were puffery, but representation that facilities had enough staff was actionable); *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1140 (C.D. Cal. 2005) (general description of laptop's "quality, reliability, and performance" was puffery); *Finney v. Ford Motor Co*., No. 17-CV-06183-JST, 2018 WL 2552266, at *8 (N.D. Cal. June 4, 2018) (descriptions of truck as "built Ford tough" and "best in class"

14

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

were puffery). A court may not be able to assess whether a television picture is "crystal clear," *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003), but it can certainly assess whether a trader eschewed the most basic principles and safeguards in liquidating a large block of stock.

**Second**, contrary to Fidelity's contention, the Court cannot decide on a motion to dismiss that Fidelity fulfilled its 10%-of-volume promise. That is one of the central, disputed fact questions in the case—and a question far more complicated than Fidelity presents. Like the rest of the misrepresentation claim, it is not suitable for resolution on a motion to dismiss.

The Complaint states that Fidelity's liquidation accounted for "16% of the day's exchange-traded volume and an incredible *35%* of the volume over the three-hour trading window." Compl. ¶ 10. These allegations were included because Fidelity's promise was not simply to avoid selling more than 10% of the total volume traded both on- and off-exchange, and regardless of timing. Rather, the volume promise was made in the context of treating the Energous stock "gently." Compl. ¶¶ 67, 77. Thus, the period of time in which the stock was sold must be taken into account when understanding the scope of the promise (and how egregiously Fidelity violated it). The on-exchange volume is also highly significant, given that Fidelity *only* sought to sell on-exchange: if Fidelity did not attempt to make use of the off-exchange volume, that volume is irrelevant to whether it kept its promise.

The Fairbairns are entitled to prove—with evidence gathered from lay and expert witnesses—that Fidelity's promise to stay under 10% encompassed at minimum a promise to avoid selling 1.93 million shares of stock, on-exchange only, in less than three hours on December 29. Thus, even if the Court takes judicial notice of NASDAQ's reported trading volume, that figure is entirely irrelevant to this motion to dismiss. That NASDAQ volume figure represents one calculation of *all* trades, both on- and off-exchange, over the course of the entire day. This says little about the volume that was traded on-exchange, or the volume that was traded in the short window of time in which Fidelity dumped all of the WATT stock in its possession.[4]

---

[4] As further addressed in the Fairbairns' opposition to Fidelity's request for judicial notice, the NASDAQ volume figures are not a proper subject for judicial notice here. Fidelity's authority in support of its request arises in the context of a well-accepted "market efficiency" test that is relevant

## C.     The Fairbairns have stated plausible claims for breach of contract (Count II) and estoppel (Count III) based on Fidelity's failure to honor its promises.

Fidelity does not dispute that the Fairbairns have adequately pled the elements of breach of contract and estoppel. Indeed, the motion to dismiss barely discusses those two claims. Fidelity merely notes them in passing in making the two arguments discussed above.

As explained above (at 12-13), the complaint's detailed allegations satisfy Rule 9(b). But Rule 9(b)'s particularity requirement *does not even apply* to Counts II and III. These claims are pled in the alternative and do not sound in fraud. *See, e.g.*, *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 998 (N.D. Cal. 2009) (where claims are pled in the alternative, Rule 9(b)'s heightened pleading standard does not necessarily apply to other claims). For Counts II and III, it is enough that Fidelity made the representations and breached them; to prevail, the Fairbairns do not have to show that the representations were fraudulent when made. *See, e.g.*, *Wheeler v. Assurant Specialty Prop.*, 125 F. Supp. 3d 834, 840 (N.D. Ill. 2015) (where plaintiff alleged contract and fraud claims, Rule 9(b) did not apply to contract claim, which was independent of allegations of fraud or deception); *Chiron Recovery Ctr., LLC v. AmeriHealth Hmo of New Jersey, Inc.*, No. 9:16-CV-82043, 2017 WL 4390169, at *3 (S.D. Fla. Oct. 3, 2017) (promissory estoppel claim did not sound in fraud); *but see, e.g.*, *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (application of Rule 9(b) depends on the case and may apply to promissory estoppel claim that sounds in fraud).[5]

Moreover, as explained above (at 14-15), the two representations challenged by Fidelity must be addressed on the merits, not a motion to dismiss. And regardless, Fidelity does not dispute that its two other representations—that Fidelity would not liquidate until 2018 and would allow the Fairbairns

---

to a very specific type of securities law action. *See* Fidelity Br. 21-22 (citing, *e.g.*, *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (approving use of trading volume figures for market efficiency test)). There is no similar well-settled body of law governing the interpretation of a promise not to trade more than a certain volume of stock. Indeed, the parties dispute how volume should be calculated, and in such circumstances, judicial notice is inappropriate. Opp. to Request for Judicial Notice 2-3.

[5]    Breach of contract and estoppel claims are not inconsistent and are commonly pled in the alternative. *See* Fidelity Br. 25 n.11. To the extent Fidelity Charitable suggests that the Fairbairns' allegations regarding Fidelity's representations conflict with the terms of a purported "express" contract, that is a merits question.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

S T R I S
M A H E R

725 S. FIGUEROA ST., STE 1830
LOS ANGELES, CA 90017

S T R I S  |  725 S. FIGUEROA ST., STE 1830
M A H E R  |  LOS ANGELES, CA 90017

to advise on a price limit—are each an independent and sufficient basis for Count II and III. That alone is enough to sustain the contract and estoppel claims.

### D.    The Fairbairns have pled a plausible UCL claim (Count V).

Finally, Fidelity Charitable has not identified any basis for dismissing the Fairbairns' claim under Cal. Bus. & Prof. Code § 17200. Its motion barely discusses this claim and does not dispute that the complaint adequately alleges the requisite elements. The complaint's detailed allegations are more than sufficient to state a UCL claim.

## II.    The Fairbairns' negligence claim (Count IV) should not be dismissed.

As noted, Fidelity devotes the vast majority of its brief to the fourth count of the Fairbairns' complaint—the negligence claim. Fidelity contends the Fairbairns lack a sufficient personalized interest in their DAF account to pursue this claim. But Fidelity's arguments cannot be squared with either the facts or the law.[6]

The Fairbairns' negligence claim, like their other claims, rests on concrete and personal injuries caused by Fidelity and thus easily satisfies the constitutional requirements for standing. Indeed, Fidelity barely disputes that the Fairbairns have Article III standing to pursue this claim. Fidelity Br. 18 n.8. Instead, it advances what it calls a "statutory standing" argument, *id.*, contending that under Massachusetts law, only the Massachusetts Attorney General may sue Fidelity Charitable for mismanaging its assets. *See* Fidelity Br. 13-14 (citing Mass. Gen. Laws Ann. ch. 12, § 8).[7]

But the Fairbairns are not suing Fidelity for general financial mismanagement. Their negligence claim seeks redress for harm that Fidelity's actions caused *them*, namely, reducing their

---

[6]    Fidelity also argues that, to the extent the Fairbairns' other claims are based on its promise to use sophisticated trading methods in liquidating the stock, they are essentially equivalent to the negligence claim. The Fairbairns have explained above why the promise to use sophisticated methods is a specific, actionable misrepresentation for which they may sue—one that is entirely separate from a claim of negligence. But in any event, to the extent Fidelity is correct to equate the sophistication promise with negligence, the Fairbairns' arguments for why they may pursue their negligence claim (Count IV) apply with equal force to their ability to pursue claims based on the promise of sophistication.

[7]    The term "statutory standing" is a misnomer, because Fidelity's argument is directed at the Fairbairns' common-law claims, but Fidelity appears to concede that this so-called standing argument is not jurisdictional. *See, e.g.*, *Maya*, 658 F.3d at 1067 (statutory standing is analyzed under Rule 12(b)(6)).

---

17

tax deduction and reducing the amount of money available for the Fairbairns to direct to the charities they support. Even if Massachusetts law applied—and it does not—the cases cited by Fidelity in no way limit the Fairbairns' ability to press this claim against Fidelity Charitable.[8]

### A. The Fairbairns have alleged injury-in-fact sufficient for Article III standing.

The Fairbairns' negligence claim easily satisfies the familiar standing requirements of Article III. The Fairbairns must show that: (1) they have suffered "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury is fairly traceable to Fidelity's actions; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Maya*, 658 F.3d at 1067. Fidelity does not dispute that the second and third requirements are satisfied here. In its footnoted argument, Fidelity contends that the Fairbairns have no "cognizable injury" because they "ceded" control of the stock to Fidelity upon making the donation. Fidelity Br. 18, n. 8. But the conclusory assertion that any injury was "felt" only by Fidelity Charitable is simply not true.[9]

Fidelity Charitable is designed to provide donors with the tax advantages that flow from the DAF model and to give donors exclusive rights to invest and direct their donated funds to charities of the donors' choosing. Compl. ¶¶ 36-39. Having aggressively promoted the tax benefits of DAF giving, Fidelity cannot possibly dispute that its donors have an interest in receiving their expected tax deductions. And having promoted its DAF as allowing donors to direct the investment of the funds in

---

8   The Fairbairns assert their claims under California law. Fidelity does not dispute that California law governs—except for its bare assertion that because Fidelity Charitable "is organized under the laws of Massachusetts . . . Massachusetts law governs the standing inquiry." Fidelity Br. 13 n.5. Fidelity Charitable does not offer any choice-of-law analysis or attempt to explain why Massachusetts law would govern standing but California law would govern the merits. And it does not dispute that the actions giving rise to this case took place in California. *See* Compl. ¶ 17. Its motion is insufficient to overcome the presumption that California law governs this dispute. *See, e.g.*, *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1008 (N.D. Cal. 2014) (under California choice-of-law rules, "burden is on the party opposing the presumption that California law applies to show that foreign law should govern the case"). Nor does it explain why Fidelity is not subject to the authority of the California Attorney General. Cal. Govt. Code § 12598.

9   The single Article III standing case cited by Fidelity merely notes that an investment advisor needed assignments from investors to assert claims against a mutual fund. *See Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015). That case is not relevant here, where the Fairbairns are pursuing their own claims.

S T R I S   725 S. FIGUEROA ST., STE 1830
M A H E R   LOS ANGELES, CA 90017

their DAF accounts and to direct contributions to charities they choose, it likewise cannot credibly claim that its clients have no cognizable interest in the size of their DAF accounts. The Fairbairns have alleged injury in fact based on their lost tax deduction and the loss of funds to direct to charities they support.

**Tax loss.** Fidelity's ill-considered decision to rapidly sell off millions of shares of Energous stock on the day it was donated drove down the stock price and, in turn, substantially reduced the value of the Fairbairns' tax deduction. "Economic injury is clearly a sufficient basis for standing." *Maya*, 658 F.3d at 1069. There is no serious question that the Fairbairns' concrete financial loss, in the form of a lost tax deduction, is an injury in fact. *See, e.g.*, *Pemberton v. Nationstar Mortg. LLC*, No. 14-CV-1024-BAS-WVG, 2017 WL 4759018, at *4 (S.D. Cal. Oct. 20, 2017) ("tax deduction allegations establish an economic injury that also satisfies Article III"); *Resnik v. Woertz*, 774 F. Supp. 2d 614, 628 (D. Del. 2011) (plaintiffs' injuries "include the non-tax-deductability of the compensation and the loss of tax benefits"); *cf. Smith v. Bank of Am., N.A.*, 679 F. App'x 549, 550 (9th Cir. 2017) (allegations regarding bank's improper tax form insufficient for standing, where plaintiffs did not allege that they "received a smaller tax deduction as a result").

**Lost value for future charitable donations.** Fidelity's actions also reduced the value of the Fairbairns' account—funds over which the Fairbairns retained robust advisory rights for investment and future charitable donations. Compl. ¶ 29. The loss of money that the Fairbairns could have directed to the causes they support is a concrete and particularized harm. Compl. ¶¶ 11, 39, 71. Standing is not limited to plaintiffs who have legal ownership over the assets that are the subject of the lawsuit. The "intangible harms a plaintiff alleges can satisfy the injury-in-fact requirement." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017). As donors, the Fairbairns had the exclusive right to direct the investment and disposition of their DAF. Fidelity retains only the right to veto a donation that is for an improper or non-charitable purpose. Compl. ¶ 11, 29-31. The Fairbairns' rights with respect to the disposition of their DAF are certainly as substantial and concrete as other interests found sufficient for standing. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (plaintiffs' "inability to obtain information" from campaign finance records sufficient for injury in fact); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) (disclosure of personal

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC

information); *Nghiem v. Dick's Sporting Goods, Inc.*, 222 F. Supp. 3d 805, 811 (C.D. Cal. 2016) (invasion of privacy from unwanted text messages).

The Fairbairns have Article III standing to pursue their negligence claim. Fidelity Charitable has not cited any conceivable basis for dismissing this case for lack of subject-matter jurisdiction. And as explained next, its donor-standing argument is likewise unpersuasive.

**B.      The so-called "donor standing" cases cited by Fidelity Charitable are not relevant and in any event support the Fairbairns' ability to pursue a negligence claim here.**

Nothing in Massachusetts law (or California law, for that matter) bars the Fairbairns from suing Fidelity Charitable for its negligence. Fidelity's "statutory standing" argument proceeds like this: it first equates the Fairbairns' negligence claim and their claim that Fidelity breached its promise to use sophisticated, state-of-the-art trading methods with generalized claims of financial mismanagement. Then it argues that only the state attorney general may sue a charity for financial or corporate mismanagement. Thus, Fidelity concludes, the Fairbairns have no "standing" to assert their negligence claim or claims premised on the promise of sophistication.

Fidelity is wrong. It relies on cases that place certain limits on private lawsuits against traditional charities (including suits by donors) that allege financial or corporate mismanagement or misuse of funds. As discussed above, those cases obviously have no relevance to four of the Fairbairns' five claims: Count I (misrepresentation), Count II (breach of contract), Count III (estoppel), and Count V (unfair business practices). But those cases also don't govern the Fairbairns' negligence claim (Count IV) because, in that claim, the Fairbairns assert their distinct personal interest—including their lost tax deduction—not a generalized public interest. And, in any event, the Fairbairns' interest in their DAF account meets the standard required by those cases in order to permit a donor negligence claim.

1. Although Fidelity Charitable tries to shield itself from liability by asserting that any claim of negligence can be brought only by a state attorney general, it is ultimately forced to recognize that this rule is far from absolute. Where a donor asserts a *personal* right, distinct from any rights or interest held by the general public, she may bring suit against the charity. *See* Fidelity Br. 15-16; *e.g.*, *Maffei*, 867 N.E.2d at 311 (donor may sue based on interests "exist[ing] apart from any broader community interest"); *Weaver v. Wood*, 680 N.E.2d 918, 923 (Mass. 1997) (donor may sue "where the plaintiff

20

asserts interests in such organizations which are distinct from those of the general public"); *Holt v. College of Osteopathic Physicians & Surgeons*, 394 P.2d 932, 934-35 (Cal. 1964) (holding that the Attorney General's jurisdiction is not exclusive where the plaintiff asserts a personal interest).

In arguing that the Fairbairns lack a sufficient personalized interest in their DAF account to sue for negligence, Fidelity barely acknowledges its status as a donor-advised fund. Astonishingly, Fidelity asserts that the Fairbairns' rights in their DAF account—an account for which they have exclusive investment and contribution rights—are merely "co-extensive with the public's interest." Fidelity Br. 16. Fidelity insists that the Fairbairns' interests terminated as soon as they agreed to donate their Energous stock to Fidelity. But that position cannot possibly be reconciled with the Fairbairns' ongoing personal rights over their DAF account. Compl. ¶ 29.

Fidelity itself calls DAF accounts personalized "charitable investment account[s]" that can be used to support "virtually any charity" the donor wants. Fidelity even boasts that DAF advisory rights are a valuable asset that can be passed down through generations. Doing so, according to Fidelity, "is the simplest way to continue the legacy of your Giving Account in your absence." Migliori Dec. Ex. B; Marcus Dec. Ex. B at 6, 26-28 (explaining successor options). It takes a breathtaking degree of chutzpah for Fidelity now to say that the Fairbairns' interest in their DAF account is actually so meaningless as to be indistinguishable from that of the general public.

Under Fidelity's view of donors' DAF rights—despite its myriad promises of perpetual and exclusive advisory rights over which it will exercise only a veto power—it could erase a donor's account balance *entirely and immediately*, and the donor would have no recourse. (Imagine, for example, if Fidelity had simply thrown away all certificates of a donated stock.) According to Fidelity, only the Massachusetts Attorney General would be able to help the donor get her account balance back. That view cannot be squared with the reality of the business that Fidelity has set up. It has not arranged itself as a traditional charity. It has arranged itself as a business that provides personalized charitable investment accounts to individuals, over which those individuals have exclusive and ongoing rights. Fidelity cannot now pretend those rights do not exist.

Fidelity also suggests that the Fairbairns' interest in maximizing their tax deduction (the precise interest that DAFs are designed to serve) may "conflict" with the public interest. Fidelity Br.

21

S T R I S | 725 S. FIGUEROA ST., STE 1830
M A H E R | LOS ANGELES, CA 90017

16 n.7. But, again, Fidelity Charitable is an organization that solicits potential donors by promoting the tax advantages of a DAF contribution: "if you have long-term appreciated assets, such as stocks, bonds or real estate, you have an opportunity to further maximize your deduction." Migliori Dec., Ex. C. Its website trumpets the opportunity to "Maximize charitable giving by minimizing taxes." Migliori Dec., Ex. D. And it describes itself as "well equipped to accept donations of all types of financial assets, including stocks, mutual funds, real estate and more." *Id.*

Because Fidelity is a commercial DAF that promotes both its tax advantages and donors' ongoing advisory rights, the Fairbairns' negligence claim is not the same as a claim for breach of fiduciary duty or to enforce a charitable trust. As the Fairbairns have alleged—and is obvious from Fidelity's marketing materials—Fidelity has held itself out as the right option for donors who need expertise in handling complex assets and seek to maximize their charitable donations *and* their tax incentives. Compl. ¶¶ 47, 50-54, 63-68, 120. The Fairbairns' negligence claim is based on Fidelity's breach of its obligations not as a charity generally, but as a commercial DAF that undertakes obligations to its donors. Through its negligent conduct, Fidelity reduced the Fairbairns' tax deduction and undermined their philanthropic goals. Again, Fidelity does not cite any case that would preclude the Fairbairns from asserting these specific and personal interests, which are distinct from the general public's interest in management of charitable assets.

2. Even if the Court views the Fairbairns' negligence claim as akin to a claim for breach of fiduciary duty or to enforce a charitable trust, however, the Fairbairns have a sufficient personal interest in their DAF account to assert such a claim.

Fidelity insists that state attorney generals have "exclusive jurisdiction over mismanagement claims." Fidelity Br. 17. But it is black-letter law that persons with a "special interest in the enforcement of a trust" may sue to enforce a charitable trust. Restatement (3d) of Trusts, § 94(2). As explained in the Restatement, this rule balances competing policy concerns: it safeguards charitable assets by limiting costly litigation, but also promotes "society's interest in honoring reasonable expectations of settlors" and "enhancing enforcement of charitable trusts." *Id.*, cmt. on subsection 2. Individuals with a recognized special interest include donors with an interest in enforcing restrictions

STRIS
MAHER

725 S. FIGUEROA ST, STE 1830
LOS ANGELES, CA 90017

22

on donations and those (including donors) who retain "power[s] to control or *advise* the trustee." *Id.* (emphasis added). Fidelity's motion does not address this authority.

California law is aligned with the Restatement. Noting similar policy concerns, the California Supreme Court has recognized for decades that "the Attorney General does not have exclusive power to enforce charitable trusts and that a trustee or other person having a sufficient special interest may also bring an action for this purpose." *Holt*, 394 P.2d at 934 (1964); *see also L.B. Research & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 171, 180-82 (2005) (same).[10]

Thus, even if the Fairbairns' negligence claim is viewed as an attempt to enforce a charitable trust, the Fairbairns have "statutory standing." Their distinct, personal interests in their donor-advised fund, including their right to direct the disposition of that fund, are sufficient to give them a "special interest." The Pennsylvania Supreme Court found standing in similar circumstances, where a trust provided that a Catholic diocese select scholarship recipients and participate in establishing a school funded by the trust. Those advisory provisions, the court held, "create[d] an interest . . . which is immediate, direct, and substantial—certainly far greater than the abstract interest of all citizens in having others comply with the law." *In re Francis Edward McGillick Found.*, 642 A.2d 467, 469-70 (Pa. 1994); *see also L.B. Research*, 130 Cal. App. 4th at 180 (donor had standing because gift specified that if condition was not satisfied, donation went to a different institution; "Attorney General's power to enforce charitable trusts does not in this type of case deprive the donor of standing to enforce the terms of the trust it created").[11]

---

[10]   Fidelity Charitable relies on a noncitable decision, *Klein v. Anaheim Mem'l Hosp. Ass'n*, No. G040829, 2009 WL 3233914, at *8 (Cal. Ct. App. Oct. 8, 2009). *Klein* is readily distinguishable, because that plaintiff had no "special interest . . . apart from his interest as a member of the public." *Id.* He had donated money in the past but had no continuing interest in the donation and no claim that the donation was used improperly. *Id.* The Fairbairns, in contrast, have a substantial and ongoing interest in their DAF account.

[11]   Neither the Restatement nor *Holt* holds that a "reversionary" interest is necessary for a donor to have a sufficient interest to bring suit. Indeed, *Holt* recognizes the interest of donors "who have directed that their contributions be used for certain charitable purposes" and acknowledges that enforcement by the attorney general is not always "adequate." 394 P.2d at 935.

**C.     The Fairbairns have stated a claim for negligence.**

Fidelity devotes only two cursory paragraphs to the merits of the Fairbairns' negligence claim, arguing (1) it owed the Fairbairns no duty of care, and (2) the negligence claim is not sufficiently independent of the Fairbairns' contract claim. Fidelity Br. 18-19. These arguments are incorrect.

*First*, Fidelity's entire argument that it owed no duty rests on the fact that the Fairbairns ceded legal title to the Energous stock at the time of the donation. But the fact that Fidelity Charitable took title to the stock does not absolve it of the duty to act with reasonable care. Fidelity affirmatively solicited the Fairbairns' donation by holding itself out as having the expertise to handle the WATT liquidation, and it specifically undertook an obligation to liquidate the stock in a way that would maximize the Fairbairns' tax deduction. Compl. ¶¶ 34-39, 49-54, 118-120. Those facts are more than sufficient to show that Fidelity assumed a duty of care in its handling of the stock liquidation. *See, e.g.*, *Dolin v. Facebook, Inc.*, No. C 18-0950 SBA, 2018 WL 2047766, at *6 (N.D. Cal. May 2, 2018) ("A duty of care can arise from a statutory obligation, a contractual relationship, a special relationship between the parties, or because of the general character of the activity in question."); *see also Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1160 (N.D. Cal. 2013) (noting two general types of duties: "the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated" and "an affirmative duty where the person occupies a particular relationship to others"); Cal. Civ. Code § 1708 ("Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights.").

*Second*, Fidelity's suggestion that the Fairbairns' negligence claim is inconsistent with their contract claim is flawed and, in any event, premature. Tort and contract claims are not necessarily inconsistent; a contractual relationship may give rise to a duty of care, *see Dolin*, 2018 WL 2047766, at *6, and conduct that breaches a contract may also breach an independent tort duty, *see, e.g.*, *McGehee v. Coe Newnes/McGehee ULC*, No. C 03-5145 MJJ, 2004 WL 2452855, at *2 (N.D. Cal. Feb. 10, 2004). The Fairbairns are also entitled to plead tort and contract claims in the alternative. Their negligence claim cannot be dismissed on this basis.

S T R I S | 725 S. FIGUEROA ST, STE 1830
M A H E R | LOS ANGELES, CA 90017

**CONCLUSION**

For the reasons given, Fidelity's motion to dismiss should be denied.

Dated: October 26, 2018                    Respectfully submitted,

                                           /s/ Peter K. Stris
                                           Peter K. Stris
                                           Brendan S. Maher
                                           Rachana A. Pathak
                                           Dana Berkowitz
                                           John Stokes

                                           *Attorneys for Plaintiffs*
                                           Emily and Malcom Fairbairn

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-04881-JSC