David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294

*Attorneys for Defendant*
FIDELITY INVESTMENTS CHARITABLE
GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN, | Case No. 3:18-cv-04881-JSC |
| Plaintiffs, | **DEFENDANT FIDELITY INVESTMENTS CHARITABLE GIFT FUND'S REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| FIDELITY INVESTMENTS CHARITABLE GIFT FUND, | HEARING DATE: November 16, 2018 TIME: 9:00 a.m. COURTROOM: F |
| Defendant. | JUDGE: Hon. Jacqueline Scott Corley |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.      PLAINTIFFS' NEGLIGENCE AND PROMISE ONE-BASED CLAIMS MUST BE DISMISSED ............................................................................................................. 2

     A.     Plaintiffs Lack Standing To Bring Their Negligence Claim And Any Promise One-Based Claim .................................................................................. 2

     B.     Plaintiffs' Negligence Claim Fails For Lack Of An Actionable Duty ................. 9

     C.     Promise One Cannot Sustain Any Cause Of Action ........................................... 10

II.     THE FAIRBAIRNS CANNOT REWRITE PROMISE TWO TO SAVE IT ................. 11

III.    PLAINTIFFS' NON-NEGLIGENCE CLAIMS FAIL UNDER RULE 9(B) ................ 12

     A.     The Complaint Fails To Allege Critical Details Of The Alleged Misrepresentations, And Is Inconsistent About Others ....................................... 12

     B.     Plaintiffs' Contract And Estoppel Claims Are Part Of A Unified Theory Of Fraud And So Are Subject To Rule 9(b) ....................................................... 14

CONCLUSION ........................................................................................................................ 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................6

5

6

*Brothers v. Hewlett-Packard Co.*,
    No. C-06-02254, 2006 WL 3093685 (N.D. Cal. Oct. 31, 2006) .............................11

7

*Dolin v. Facebook, Inc.*,
    No. C 18-0950, 2018 WL 2047766 (N.D. Cal. May 2, 2018) ...................................9

8

9

*Dugan v. Lloyds TSB Bank, PLC*,
    No. C 12-02549, 2012 WL 3860798 (N.D. Cal. Sept. 5, 2012) .............................13

10

11

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ................................................................................14

12

13

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ....................................................................................9

14

*Exec. Comm. Rep. Signing Petitioners of Archdiocese of W. U.S. v. Kaplan*,
    No. CV 03-8947, 2004 WL 6084228 (C.D. Cal. Sept. 17, 2004).............................3

15

16

*Finney v. Ford Motor Co.*,
    No. 17-cv-06183, 2018 WL 2552266 (N.D. Cal. June 4, 2018)..............................10

17

*Fund for Anonymous Gifts v. IRS*,
    No. Civ. A. 95-1629, 1997 WL 198108 (D.D.C. 1997) ...........................................7

18

19

*JH Capital Grp., LLC v. Wind Hawk Energy, Inc.*,
    No. CV 12-9077, 2013 WL 12323916 (C.D. Cal. Jan. 14, 2013) ..........................13

20

21

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ..........................................................................14, 15

22

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
    139 F. Supp. 3d 1141 (E.D. Cal. 2015).................................................................13

23

24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................9

25

26

*Marolda v. Symantec Corp.*,
    672 F. Supp. 2d 992 (N.D. Cal. 2009) ...................................................................15

27

*McGehee v. Coe Newnes/McGehee ULC*,
    No. C 03-5145, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004) ................................9

28

*MH Pillars Ltd. v. Realini*,
   277 F. Supp. 3d 1077 (N.D. Cal. 2017) ...................................................12

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................10

*R Power Biofuels, LLC v. Chemex LLC*,
   No. 16-CV-00716, 2016 WL 6663002 (N.D. Cal. Nov. 11, 2016) ..........13

*Rockridge Tr. v. Wells Fargo, N.A.*,
   985 F. Supp. 2d 1110 (N.D. Cal. 2013) ....................................................9

*Sanchez v. Aurora Loan Servs., LLC*,
   No. CV 13-08846, 2014 WL 12589659 (C.D. Cal. Mar. 11, 2014) ........13

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) .......................................................1, 12, 13

*In re Seagate Tech. LLC Litig.*,
   233 F. Supp. 3d 776 (N.D. Cal. 2017) .....................................................10

*Shroyer v. New Cingular Wireless Servs., Inc.*,
   622 F.3d 1035 (9th Cir. 2010) .................................................................10

*Stewart v. Electrolux Home Prods., Inc.*,
   304 F. Supp. 3d 894 (E.D. Cal. 2018).......................................................13

*Van Patten v. Vertical Fitness Grp., LLC*,
   847 F.3d 1037 (9th Cir. 2017) ...................................................................9

*Verde Media Corp. v. Levi*,
   No. 14-cv-00891, 2015 WL 374934 (N.D. Cal. Jan. 28, 2015)................15

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...........................................................12, 15

*WCVB-TV v. Boston Athletic Ass'n*,
   1990 WL 159930 (D. Mass. Oct. 9, 1990)...................................................4

*Winans by and through Moulton v. Emeritus Corp.*,
   No. 13-cv-03962, 2014 WL 970177 (N.D. Cal. Mar. 5, 2014) ...............11

**State Cases**

*Am. Ctr. for Educ., Inc. v. Cavnar*,
   145 Cal. Rptr. 736 (Cal. Ct. App. 1978)......................................................2

*Ames v. Att'y Gen.*,
   124 N.E.2d 511 (Mass. 1955)..............................................................2, 5, 8

*Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*,
    699 A.2d 995 (Conn. 1997) ...........................................................................................9

*Consumer Advocates v. Echostar Satellite Corp.*,
    8 Cal. Rptr. 3d 22 (Cal. Ct. App. 2003) .....................................................................11

*Dillaway v. Burton*,
    153 N.E. 13 (Mass. 1926) .............................................................................................2

*Hardman v. Feinstein*,
    240 Cal. Rptr. 483 (Cal. Ct. App. 1987) ......................................................................9

*Harvard Climate Justice Coal. v. President & Fellows of Harvard Coll.*,
    No. SUCV201403620H, 2015 WL 1519036 (Mass. Super. Mar. 17, 2015),
    *aff'd* 60 N.E.3d 380 (Mass. Ct. App. 2016) ...............................................................4

*Holt v. Coll. of Osteopathic Physicians & Surgeons*,
    394 P.2d 932 (Cal. 1964) ..........................................................................................3, 8

*L.B. Research & Educ. Found. v. UCLA Found.*,
    29 Cal. Rptr. 3d 710 (Cal. Ct. App. 2005) ...................................................................3

*Washington Mut. Bank, FA v. Super. Ct. of Orange Cty.*,
    15 P.3d 1071 (Cal. 2001) ..............................................................................................2

*Weaver v. Wood*,
    680 N.E.2d 918 (Mass. 1997) .......................................................................................2

**Statutes, Rules, and Regulations**

26 U.S.C. § 170(f)(18)(B) ...................................................................................................6

26 U.S.C. §4966(d)(1) ........................................................................................................6

26 U.S.C. § 4966(d)(2)(A)(ii) .............................................................................................6

26 U.S.C. § 4966(d)(2)(A)(iii) ............................................................................................5

Fed. R. Civ. P. 9(b) ..........................................................................................1, 12, 13, 14, 15

Fed. R. Civ. P. 12(b)(6) ...............................................................................................12, 15

Mass. Gen. Laws Ann. ch. 12, § 8 ..................................................................................2, 4

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat 780 (2006) ....................4

**Other Authorities**

IRS, *Donor-Advised Funds Guide Sheet* (July 31, 2008) ................................................6

Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII: Provisions
    Relating to Tax Exempt Organizations, 2006 WL 4791686 (2006)..........................................6

JP Morgan Charitable, *Introducing the J.P. Morgan Charitable Giving Fund*
    (2017)...........................................................................................................................................7

Stanford University, *Planned Giving: Donor Advised Funds*,
    http://giving.stanford.edu/planned-giving/giving-options/donor-advised-funds......................5

UCLA Foundation, *UCLA Donor Advised Fund*, https://www.uclafoundation.org/ .....................5

### INTRODUCTION

The Fairbairns weave a story of false promises and charitable mismanagement, but their tale unravels at the slightest tug.  The Complaint alleges that Fidelity Charitable was negligent in trading the donated Energous shares because the date of the trade—December 29, 2017—was "perhaps the year's single slowest trading period."  Compl. ¶¶ 70, 74.  Confronted with the indisputable fact that December 29, 2017 saw nearly the *highest-ever* trading volume for Energous stock, Def. Br. 2, 10 & 22 n.10, the Fairbairns abandon that once-central claim, leaving their fundamental complaint about the December 29 trade date completely inexplicable.  Indeed, the Complaint itself recognizes that the price of Energous stock "skyrocket[ed]" to record levels at the end of December 2017, Compl. ¶ 56—levels that, for all Fidelity Charitable knew, might never be seen again (and which, as public records reflect, rapidly declined in the new year).

Stripped of that key narrative thread, the Fairbairns are reduced to complaining about the detailed mechanics of how the trades were executed: they disagree with the manner that Fidelity Charitable utilized trading algorithms and its choice of specific trading venues.  Pl. Br. 7, 15.

As a standalone negligence claim (that is, the Count IV negligent trading claim that is independent of the alleged Promises) about the mechanics of how Fidelity Charitable traded securities that it—and not the Fairbairns—owned is a core mismanagement claim the Fairbairns lack standing to assert.  Indeed, the virtue of vesting in the Attorney General exclusive jurisdiction to superintend the management of charitable assets is demonstrated by this very lawsuit, which claims that Fidelity Charitable should have made its trading decision based on what was best for the Fairbairns' "sizeable" continued holdings, Compl. ¶ 7, and on what would maximize the Fairbairns' tax deduction, rather than seizing on the "skyrocket[ed]" price of late December, Compl. ¶ 56, to maximize the assets available for charity.

As for the alleged Promises, the Opposition only highlights the need for application of Rule 9(b).  Confronted with the Ninth Circuit's directly on-point ruling in *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010), Plaintiffs still refuse to be pinned down on which promise was purportedly made to whom.  If Fidelity Charitable made any of the promises Plaintiffs allege, the question of *to whom each was made* would not be a difficult one for the Fairbairns to answer.

Finally, the Opposition's shifting stories on the supposed content of the Promises demonstrates the need to pin down just what the Fairbairns now claim that they were promised.

## ARGUMENT

I.    **Plaintiffs' Negligence And Promise One-Based Claims Must Be Dismissed[1]**

A.    **Plaintiffs Lack Standing To Bring Their Negligence Claim And Any Promise One-Based Claim**

*1.*    The Fairbairns concede that the exclusive-standing rule seeks to "safeguard[] charitable assets by limiting costly litigation" and that Massachusetts and California ordinarily prohibit such "suits by donors," and instead give the state attorney general exclusive standing to bring these claims.  Pl. Br. 20, 22; *see also Weaver v. Wood*, 680 N.E.2d 918, 922 (Mass. 1997).[2] That rule plainly applies to Count IV, which is a standalone claim—independent of the alleged Promises—that asserts that Fidelity Charitable owed a tort duty running *to the Fairbairns* with respect to the manner in which it traded assets post-donation.  Plaintiffs' efforts to justify their standing by relying on the Promises cannot save Count IV, which alleges a general duty to them as donors, not as promisees.  Accordingly, the question presented with respect to standing is whether the Fairbairns can sue for mismanagement in the trading of charitable assets in the absence

---

[1] Capitalized terms have the same meaning as used in Fidelity Charitable's opening brief. Plaintiffs' Promise One is the alleged representation that Fidelity Charitable would "employ sophisticated, state-of-the-art methods for liquidating large blocks of stock."  Compl. ¶ 65.

[2] Plaintiffs complain about Fidelity Charitable's choice-of-law analysis (Pl. Br. 18 n.8), but do not point to any difference between Massachusetts and California law that would warrant an inquiry.  In any event, California applies the Restatement's three-step "governmental interest analysis," under which, if two states' laws conflict—here, they do not—the court must determine the laws' purpose and "the relative commitment of the respective states to the laws involved." *Washington Mut. Bank, FA v. Super. Ct. of Orange Cty.*, 15 P.3d 1071, 1080-81 (Cal. 2001).  Both Massachusetts and California grant their Attorney General exclusive standing to sue for mismanagement of charitable assets.  *See* Def. Br. n.5.  To the extent there is a conflict, Massachusetts law should apply; it has statutory jurisdiction over Fidelity Charitable, Mass. Gen. Laws Ann. ch. 12, § 8, which is the largest charity incorporated and administered in Massachusetts, Compl. ¶ 19.  *See Am. Ctr. for Educ., Inc. v. Cavnar*, 145 Cal. Rptr. 736, 743 (Cal. Ct. App. 1978) ("Charitable trusts are usually governed by the laws of the state in which the trust is administered.").  And the Commonwealth has a longstanding policy of protecting public charities from suits for mismanagement of charitable assets brought by private plaintiffs.  *E.g., Dillaway v. Burton*, 153 N.E. 13, 16 (Mass. 1926); *Ames v. Att'y Gen.*, 124 N.E.2d 511, 515 (Mass. 1955).

1    of any promises.  If not, Count IV fails, and with it, Promise One, which is, as alleged, just a

2    representation that Fidelity Charitable would competently manage Plaintiffs' donation.[3]

3         *2.*        Plaintiffs do not even attempt to argue that they would have standing to make this

4    negligent trading claim against what they refer to as a "traditional" charity.  While they offer a

5    fleeting argument to that effect at the tail end of their brief, Pl. Br. 22-23, neither of the California

6    cases on which they rely recognizes the right of a donor to sue a charity for mismanagement absent

7    a reversionary interest in the gift.[4]  Rather, their argument is that, notwithstanding the law

8    applicable to "traditional" charities, DAFs are different.  But the standing rules that unquestionably

9    apply to traditional charities also apply to DAFs: DAFs *are* charities, and Plaintiffs have identified

10   nothing meaningful that differentiates them from "traditional charities."

11        *a.*        As an initial matter, the distinction is one that Plaintiffs draw from thin air.

12   Plaintiffs point to no case law, statute, or regulation that defines a "traditional" charity or

---

13

14        [3] Plaintiffs try to confuse the issue by pointing out that fraud claims are exempt from the
general rule of exclusive Attorney General standing.  Pl Br. 20-21.  But, again, Fidelity
15   Charitable's standing argument is explicitly limited to Plaintiffs' negligence claim and other
claims to the extent they seek to enforce an alleged promise to manage charitable assets in a
16   "sophisticated" manner.  Def. Br. 13-18.

17        [4] In *Holt v. College of Osteopathic Physicians & Surgeons*, the California Supreme Court
explained that "the Attorney General has been empowered to oversee charities *as the*
18   *representative of the public*."  394 P.2d 1162, 935 (Cal. 1964) (emphasis added).  Plaintiffs
misleadingly quote *Holt*'s statement that "the Attorney General does not have exclusive power to
19   enforce a charitable trust and … a trustee or other person having a sufficient special interest may
also bring an action for this purpose," but omit the sentence's beginning: "The prevailing view *of*
20   *other jurisdictions* is that … "  *Id.* at 934 (emphasis added).  In California, however, apart from
the Attorney General, the rule is narrower: only "a trustee, or a cestui, or [those with] some
21   reversionary interest in the trust property" has standing.  *Id.* at 935.  The court explained that,
because the Attorney General may not always "be in a position to become aware of wrongful
22   conduct," a charity's minority trustees could also sue to correct mismanagement.  *Id.*  *L.B.*
*Research & Educational Foundation v. UCLA Foundation* reiterated "the Attorney General's
23   power to enforce charitable trusts" but held that a donor could sue to vindicate the *charitable*
*purpose* of the trust he created and in which he had secured a "reversionary interest" if the donee
24   failed to observe that purpose.  29 Cal. Rptr. 3d 710, 716 (Cal. Ct. Appl. 2005) (emphasis added).
Plaintiffs retained no such interest and seek to vindicate their private pecuniary interest in the
25   timing of liquidation, not their charitable intent to fund Lyme disease research (which they do not
claim Fidelity Charitable has dishonored).  Plaintiffs also ignore a key California case that
26   dismissed donors' claims because enforcement of a charitable trust is "a prerogative left solely to
the Attorney General."  *Exec. Comm. Representing Signing Petitioners of Archdiocese of W. U.S.*
27   *v. Kaplan*, No. CV 03-8947, 2004 WL 6084228, at *8 (C.D. Cal. Sept. 17, 2004).

28

differentiates it from a DAF—much less any authority that suggests lawsuits against a DAF are somehow excepted from the rule, applicable to all charities, that the attorney general has exclusive standing to bring suit.  No such authority exists.  Fidelity Charitable, like virtually all charities subject to the exclusive standing rule, is recognized by the IRS as a 501(c)(3) tax-exempt non-profit organization and is incorporated under applicable state law (here, Massachusetts law) as a charitable trust.  *See* Compl. ¶ 19; Pl. Br. 4; Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat 780 (2006).  That is all that is required to trigger the Attorney General's exclusive obligation and authority to supervise the handling of trust assets.  *See* Mass. Gen. Laws Ann. ch. 12, § 8 (Attorney General "shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the[ir] administration").

  *b.* Plaintiffs first try to distinguish DAFs from a Platonic "traditional" charity—as if such a thing exists—because Fidelity Charitable avidly solicits donors.  Pl. Br. 4.[5] As if traditional charities did not.  Any financially successful graduate of a college or law school, or anyone who has bought season tickets to the symphony, knows that these charitable institutions are tenacious in soliciting donations from well-heeled alumni and patrons.  If that were disqualifying, the exclusive standing rule would not apply to, for example, Harvard—but it does, *Harvard Climate Justice Coalition v. President & Fellows of Harvard College*, No. SUCV201403620H, 2015 WL 1519036, at *3 (Mass. Super. Mar. 17, 2015), *aff'd* 60 N.E.3d 380 (Mass. Ct. App. 2016).

  Nor does it matter that Fidelity Charitable collects fees for its management of charitable assets (or, as Plaintiffs would have it, is "commercial").  Pl. Br. 4.  Even where profitable commercial arrangements are at issue, the Attorney General has the exclusive right to sue a charity for mismanagement.  *See, e.g.*, *WCVB-TV v. Boston Athletic Ass'n*, 1990 WL 159930, at *2, *5 (D. Mass. Oct. 9, 1990) (applying rule in challenge to bidding process for lucrative broadcasting rights for Boston Marathon).

  *c.* Plaintiffs next contend that Fidelity Charitable (and all DAFs) are somehow

---

[5] Despite Plaintiffs' references throughout their brief to the alleged conduct of "Fidelity," they have *only* sued Fidelity Charitable, not any for-profit Fidelity entity.

distinct from "traditional" charities because they allow donors to make contributions that are set aside in distinct sub-accounts so that donors can advise as to their distinct pool of contributed funds.  *See* Pl. Br. 21.  But "traditional" charities routinely set aside donated funds and permit advisory oversight by donors or their delegates—but that does not confer standing on those people to sue.  *See, e.g.*, *Ames*, 124 N.E.2d at 513 (members of committee charged with providing "information and advice" about funds earmarked for maintenance of Harvard arboretum lack standing to sue).

There is no doubt that had the Fairbairns offered to donate their $100 million directly to Harvard Medical School to fund Lyme disease research, Harvard would have been happy to set up a "Fairbairn Fund," and given them (and their successors) "advisory" privileges over that pool of assets to the very outer limits of Harvard's ability to do so.  And, if the manager of the Harvard endowment had "mismanaged" the liquidation of the Energous shares, the consequence would be identical to what Plaintiffs now allege: a smaller pool of money as to which the Fairbairns could advise, and a lower tax deduction for the Fairbairns.  Indeed, the willingness of traditional charities to take donor advice as to specific pools of donated assets has been formalized by any number of traditional charities via their creation of their own DAFs.  *See., e.g.*, Stanford University, *Planned Giving: Donor Advised Funds*, http://giving.stanford.edu/planned-giving/giving-options/donor-advised-funds; UCLA Foundation, *UCLA Donor Advised Fund*, https://www.uclafoundation.org/docs/Donor_Advised_Fund.pdf.  The difference between a DAF and a "traditional" charity like Harvard is not that the former gives donors advisory privileges but the latter does not; the difference is that whereas only large benefactors get those privileges from "traditional" charities, Fidelity Charitable has democratized giving and empowered even smaller donors to exercise the advisory privileges traditionally reserved only for the wealthy.

    *d.*    Plaintiffs' final effort to differentiate DAFs is to assert that DAFs allow donors rights to control the assets they have donated.  Pl. Br. 18.[6]  That is emphatically wrong

---

[6] As the Fairbairns themselves explain, under federal tax law donors to a DAF have "advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor."  Pl. Br. 3 (quoting 26 U.S.C. § 4966(d)(2)(A)(iii)).  There is no allegation in this case that they were deprived of the opportunity

1   under settled federal tax law.  And this Court need not credit those factual allegations, because the

2   extent of any privilege or "right" the Fairbairns maintain as donors to a DAF is a *legal* question.

3   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4        Under federal tax law, the assets of a DAF—including contributed stock—are "*owned and

5   controlled* by a sponsoring organization."   26 U.S.C. § 4966(d)(2)(A)(ii) (emphases added).[7]

6   Indeed, to obtain a tax deduction, donors must obtain "contemporaneous written acknowledgment"

7   that the sponsoring organization retains "*exclusive legal control* over the assets contributed."  *Id.*

8   § 170(f)(18)(B) (emphasis added).  In other words, donors have no legally enforceable right to

9   control the disposition of donated assets: A DAF donor's "[a]dvisory privileges are *distinct from

10   a legal right or obligation*," and a gift agreement that specifies "enforceable rights of the donor

11   with respect to a gift" will disentitle it to status as a DAF donation (and corresponding

12   deductibility).  Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII: Provisions

13   Relating to Tax Exempt Organizations, 2006 WL 4791686, at *67 (2006) (emphasis added).  The

14   IRS guidance document Plaintiffs rely on in their Complaint likewise confirms that, "[a]lthough

15   donors or their advisors may provide *advice or recommendations* with regard to fund distributions

16   and investments, to be consistent with exemption under section 501(c)(3), the charities maintaining

17   the funds must have the *ultimate authority* over how the assets in the funds are invested and

18   distributed."  IRS, *Donor-Advised Funds Guide Sheet*, at 6 (July 31, 2008) (cited at Compl. ¶ 28)

19   (emphasis added).  Indeed, by conceding that they are taking a tax deduction for the Energous

20   donation, the Fairbairns concede that they did not retain any legally enforceable rights over those

21   shares.[8]

22

23   to advise on how the proceeds of the sale of Energous stock were invested, or where those proceeds
were donated.

24        [7] A "sponsoring organization" is the entity that maintains the fund. 26 U.S.C. § 4966(d)(1).

25        [8] The agreements Plaintiffs entered into with Fidelity Charitable are all consistent on this

26   point.  The Contribution Form Malcolm Fairbairn executed when he donated the Energous shares
states that by contributing, the Fairbairns would "irrevocabl[y] cede control over their assets to
Fidelity Charitable.  Contribution Form at 4 (Marcus Decl., Ex. D).  In executing the Form, Mr.

27   Fairbairn affirmed that he had read and agreed to the Program Circular, *id.*, which likewise states
that any contribution is "irrevocable" and that Fidelity Charitable would then "own[] and control[]"

28   and "have exclusive legal control over [the] assets," Program Circular at 4 (Marcus Decl., Ex. B).

6

1    Contrary to Plaintiffs' allegations, JPMorgan's Charitable Giving Fund could no more

2    offer them "control" over their shares post-donation than could Fidelity Charitable.[9]   While

3    Plaintiffs assert that the JPMorgan DAF allows donors to "control" the "timing and rate at which

4    the stock was liquidated," Compl. 61; Pl. Br. 6, the purported evidence for that point, the JPMorgan

5    DAF circular, says that donors can "*[a]dvise* on the timing and rate" of liquidations (a statement

6    correctly cited in a more candid moment in Compl. ¶ 8), and cautions donors that "[a]s with all

7    donor-advised funds, the charity responsible for the funds … has the ultimate legal authority over

8    how the funds are invested," JP Morgan Charitable, *Introducing the J.P. Morgan Charitable*

9    *Giving Fund* at 2 (2017).  In other words, the JPMorgan DAF adheres to the same rules as Fidelity

10   Charitable—as it must—or risks being denied status as a qualifying charitable organization.  *See,*

11   *e.g.*, *Fund for Anonymous Gifts v. IRS*, No. Civ. A. 95-1629, 1997 WL 198108, at *4-5 (D.D.C.

12   1997) (denying Section 501(c)(3) status to organization that allowed donors to contribute cash or

13   securities on the condition that the donation be invested as directed by the donor before donation).

14   By enforcing the lines established by the IRS, Fidelity Charitable protects donors, the charity, and

15   the public (which after all is subsidizing the donors' charitable deduction).  Donors are ill-served

16   if a DAF allows them to flout the IRS's restrictions, only to have a charitable deduction

17   disallowed.[10]  The same features of Fidelity Charitable that made the Fairbairns eligible for the

18   substantial tax deduction that motivated their donation in the first place—the IRS's recognition of

19   DAFs as 501(c)(3) nonprofit organizations and Massachusetts' treatment of Fidelity Charitable as

20   a charitable trust—are the ones that confer exclusive standing on the Attorney General to sue for

21   mismanagement.  In short, the Fairbairns cannot have their cake and eat it too.

22       *3.*      These standing rules serve at least two critical purposes.  First, they reflect a

---

23

24   [9] The assertion that JPMorgan could offer such "control" allegedly prompted the Fairbairns to extract the promises from Fidelity Charitable.  Compl. ¶¶61-68.  The fallacy of the "control"

25   allegation thus undermines a central premise of the Fairbairns' story, including any claim of reasonable reliance on the promises.

26   [10] The Fairbairns concede that, in their capacity as continued investors in Energous, they had an interest that may have diverged from Fidelity Charitable's.  Pl Br. 5; *see also id.* 21-22.  As

27   a result, the charity's interest in obtaining a high sale price—which was available on December 29, 2017 but was highly anomalous and might never recur—may have been different from the

28   Fairbairns' interests in looking out for the best interests of their ongoing position in Energous.

1   deliberate policy choice to ensure that charities focus on funding philanthropic causes rather than

2   serving the interests of individual wealthy donors like the Fairbairns.  *See Holt*, 394 P.2d at 935

3   (To ensure "the *interests of the trust or the public*" are "properly represent[ed,] … the Attorney

4   General has been empowered to oversee charities *as the representative of the public*." (emphases

5   added)).  As if to demonstrate that danger, Plaintiffs openly assert that Fidelity Charitable's duty

6   was to "liquidate the stock in a way that would maximize the Fairbairns' tax deduction."  Pl. Br.

7   24.  If the Attorney General brings suit, it will be to protect the public interest.  If suits by private

8   donors are permitted, they are likely to veer off in precisely the direction sought by the Fairbairns:

9   to vindicate the donor's interests in using the management of charitable assets to serve their private

10  interests.  Having taken a deduction for a contribution to the public good, the Fairbairns can no

11  longer demand that those same assets be managed to maximize their private interests.

12          The second purpose brings us back to the distinction between a suit over a promise and a

13  suit claiming general mismanagement in the absence of a promise (the latter being the sole focus

14  of Fidelity Charitable's standing argument).  Under Count IV, Plaintiffs seek to challenge as

15  "negligent" the specific trading mechanics that Fidelity Charitable used.  As hedge fund managers,

16  Plaintiffs no doubt have views on optimal trading mechanics.  But so do many other DAF donors

17  who are finance professionals—and their views may diverge.  A public charity would indeed be

18  subject to "attack from all sides," *Ames*, 124 N.E.2d at 515, if every donor could sue to enforce

19  her view as to how a charity should manage its assets.  Vesting exclusive jurisdiction in the

20  Attorney General allows genuine mismanagement claims to be pursued, while protecting charities

21  from the costs and burdens of litigation from the many donors who have different views as to how

22  charities should manage their assets and their affairs.  The fact that the Fairbairns allege that they

23  were individually *harmed*—by losing a portion of their tax deduction and having less money in

24  their DAF account to advise on—does nothing to diminish the fact that that the *conduct* that

25  supposedly caused that harm was Fidelity Charitable's trading—an aspect of its management of

26  charitable assets, which they lack standing to challenge.[11]

27  _____

28          [11] The Fairbairns also lack Article III standing to sue over the management of their donated
    shares.  Plaintiffs claim the loss of funds in their DAF account constituted "concrete and

**B.    Plaintiffs' Negligence Claim Fails For Lack Of An Actionable Duty**

Even if Plaintiffs had standing to sue for negligence, the claim should be dismissed because Plaintiffs fail to plausibly plead that Fidelity Charitable owed *them* any tort duty.  *See* Def. Br. 18-19.  In response, Plaintiffs say that, even in the absence of any "promises," Fidelity Charitable owed them, as donors, a duty to maximize their tax deduction.  Pl. Br. 24.  That position is directly at odds with the irrevocability of the donation and the Fairbairns' cession to Fidelity Charitable of all legal rights to the stock.  Plaintiffs also argue that Fidelity Charitable incurred a duty to them from its alleged promises, and that they can plead tort and contract in the alternative.  But that is not alternative pleading: if the sole basis on which the Fairbairns claim that there is a duty to them is because of the alleged contract, there is *no* duty to them that can be the basis of a tort.  *See, e.g.*, *McGehee v. Coe Newnes/McGehee ULC*, No. C 03-5145, 2004 WL 2452855, at *2 (N.D. Cal. Feb. 10, 2004) ("'[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission to perform a legal duty.'").[12]

---

particularized harm," but cite in support cases in which plaintiffs alleged non-economic "intangible harms" like invaded privacy.  *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).  Plaintiffs, in contrast, allege only economic harm (fewer-than-hoped-for proceeds from sale of the Energous shares) that they did not themselves suffer, because they had already irrevocably relinquished title to the shares.  *See* Def. Br. 6; *supra* 6-7.  As to their purported diminished tax writeoff, Plaintiffs allege only that Fidelity Charitable mismanaged the sale of property that no longer belonged to them.  Their allegedly reduced tax deduction is accordingly not "fairly ... trace[able]" to that "challenged action of [Fidelity Charitable]."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

[12] Plaintiffs also suggest that, even absent the promises they allege and even though they voluntarily transferred control and title of their stock in exchange for a tax deduction, Fidelity Charitable incurred a continuing negligence duty (Pl. Br. 24) merely by agreeing to liquidate their donated property prior to investment and disposition.  Such a duty on the part of charities that accept donations of noncash assets would be limitless.  It would permit any donor to sue when dissatisfied with a charity's management of its finances, eviscerating the exclusive standing rule and exposing charities to precisely the type of "vexatious litigation" it is meant to protect against.  *Hardman v. Feinstein*, 240 Cal. Rptr. 483, 485 (Cal. Ct. App. 1987); *see also* Def. Br. 17-18.  *Cf. Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*, 699 A.2d 995, 1002 (Conn. 1997) (declining to "establish[] standing for a new class of litigants, donors," who would, thus, pose a risk of "lengthy and complicated litigation").  The cases Plaintiffs cite for the proposition that tort duties can have many sources are not to the contrary.  *See Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1162 (N.D. Cal. 2013) (dismissing negligence claims against lender related to loan modification for lack of duty of care); *Dolin v. Facebook, Inc.*, No. C 18-0950, 2018 WL 2047766,

9

### C.      Promise One Cannot Sustain Any Cause Of Action

In addition to lacking standing to sue on any of their four claims premised on Promise One, Plaintiffs fail to rebut Fidelity Charitable's argument that Promise One is not actionable because a promise to employ "sophisticated, state-of-the-art" trading methods provides no ascertainable standard for judging whether Fidelity Charitable breached its promise, and because parties deciding whether to contribute to a DAF cannot as a matter of law rely on such a vague, unspecific promise. *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1043 (9th Cir. 2010).

Courts routinely hold that optimistic claims about a defendant's goods or services are not actionable because factfinders cannot reliably or predictably decide whether statements are false or misleading where the statements are not conducive to specific or measurable standards.  *See* Def. Br. 20; *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (statement was puffery where it made "general assertions" about "low cost[ and] flexibility," rather than "quantifiable claim [that] describe[s] (or misdescribe[s]) any specific or absolute characteristic of [defendant's] service").  As the raft of cases dismissing claims premised on statements about products' "sophistication" or "state of the art" show, no fair or non-arbitrary standards exist to judge the truth or falsity of Promise One, if it was made.

The Fairbairns dismiss the cited cases holding identical language non-actionable as "generic product claims," but do not explain why that distinction is relevant.  The promises rejected in those cases were indistinguishable from Promise One.  Promising to employ "sophisticated" or "state-of-the-art" trading methods, like promising that a product is built using "the most sophisticated manufacturing process in the industry," constitutes puffery not because of the subject of the promise, but because it provides no "specific or measurable facts" on which *any* reasonable person could rely.  *In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 793 (N.D. Cal. 2017) (dismissing UCL claim); *see also, e.g.*, *Finney v. Ford Motor Co.*, No. 17-cv-06183, 2018 WL 2552266, at *8 (N.D. Cal. June 4, 2018) (holding that "[v]ague or highly subjective claims about product superiority amount to non-actionable puffery," and citing "statement that car's engineering

---

at *6 (N.D. Cal. May 2, 2018) (explaining that Facebook user provided "no contractual or legal basis for the claim that Facebook had a legal duty to respond to [his messages]").

was 'state of the art'" as an example); *Brothers v. Hewlett-Packard Co.*, No. C-06-02254, 2006 WL 3093685, at \*5 (N.D. Cal. Oct. 31, 2006) (assertion of "sophisticated design" and that product was "top of the line" merely statements of opinion about superiority of product).

Unable to cite a *single case* holding similar language sufficiently definite in any context, Plaintiffs say Promise One amounts to a representation that Fidelity Charitable would comport with "basic industry standards." Pl. Br. 14. But the Complaint does not allege a promise to comply with any identifiable industry standard. More to the point, it is irrelevant; there are undoubtedly "industry standards" for all of the products that were the subject of fatally vague promises in the cases cited, from television screens, *see Consumer Advocates v. Echostar Satellite Corp.*, 8 Cal. Rptr. 3d 22, 29-30 (Cal Ct. App. 2003), to geriatric care, *Winans by and through Moulton v. Emeritus Corp.*, No. 13-cv-03962, 2014 WL 970177, at \*9 (N.D. Cal. Mar. 5, 2014), but they cannot convert a subjective, vague statement into an enforceable promise. Otherwise, the rule holding puffery non-actionable would cease to apply in nearly *every* industry. To the extent Plaintiffs try to salvage Promise One by falling back on the *timing* of the trades, that only demonstrates the vagueness of the alleged promise of "sophisticat[ion]." In short, although they protest that Promise One is sufficiently definite to enforce, Plaintiffs shed light no light on what that promise could have entailed apart from a vague, indefinite pledge of "sophistication."

## II.     The Fairbairns Cannot Rewrite Promise Two To Save It

As alleged in the Complaint, Promise Two entailed a representation that Fidelity Charitable "would not trade more than 10% of the *daily* trading volume of Energous shares." Compl. ¶ 65 (emphasis added). Confronted with clear evidence from NASDAQ's official figures that Fidelity Charitable did not violate that promise, and that its trades comprised only 6.8% of daily trading volume on December 29, 2017, Def. Br. 21-22, Plaintiffs do not even attempt to assert that the promise as alleged was violated.[13] To the contrary, they attempt to use their brief to rewrite the

---

[13] In their Opposition to Fidelity Charitable's Request for Judicial Notice, the Fairbairns object to admission of NASDAQ's trading volume data based on their newfound interpretation of "daily" as "three hours," which they contend renders the full day's volume irrelevant. Dkt. 31, at 2-3. But the data for which Fidelity Charitable has requested judicial notice is plainly relevant to determining "daily trading volume," and the Fairbairns do not question its accuracy. The

allegation.  Now, they insist that the promise was actually a generalized concern to trade the shares "gently," that "daily" might actually refer to a "three-hour trading window," and that the promise might have only referred to "on-exchange" trading.  Pl. Br. 15.

If the claim is addressed as pled, it must be dismissed under Rule 12(b)(6), because there is no dispute on the basis of the promise *as pled* that its terms were fulfilled.  If, on the other hand, Plaintiffs' position is that the promise to sell less than 10% of "daily trading volume" was really a promise to hew to some other restriction, Promise Two claims must be dismissed under Rule 9(b).

Moreover, even setting aside Plaintiffs' obfuscation, their Complaint and briefing still fail to "set forth what is false or misleading about [Promise Two], and *why it is false*."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis added); *see also MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1105-06 (N.D. Cal. 2017) (dismissing under Rule 9(b) for failure to "plead particularized facts showing how the statements … were intentionally false").  Plaintiffs' assurance that an expert witness will do so later, Pl. Br. 15, is insufficient.  What will that expert testify: That "daily" really means three hours?  To the extent Plaintiffs' claims (Counts I, II, III, and V) are premised on this supposedly breached promise, they must be dismissed.

## III.  Plaintiffs' Non-Negligence Claims Fail Under Rule 9(b)

### A.  The Complaint Fails To Allege Critical Details Of The Alleged Misrepresentations, And Is Inconsistent About Others

The Complaint omits key details about the alleged misrepresentations: They do not say *to whom* Mr. Kunz made the alleged promises "and, thus, who was a party to the alleged misrepresentations."  *Sanford*, 625 F.3d at 558.

Tellingly, Plaintiffs *still* will not say which of them was on the phone when each of these alleged promises were made.  Instead, they say that "even if there were some question whether both Emily and Malcolm were party to each and every communication," it "is legally irrelevant."  Pl. Br. 13.  But *Sanford* is the law in the Ninth Circuit, and its holding is directly to the contrary.  In *Sanford*, a husband and wife's claim they were defrauded when they purchased products sold

---

selections from Fidelity Charitable's website that Plaintiffs ask the Court to consider in their own Request for Judicial Notice, Dkt. 30, are too peripheral to Plaintiffs' claims to warrant discussion.

Case No. 3:18-cv-04881-JSC                    DEFENDANT'S REPLY IN SUPPORT OF MOTION
                                                         TO DISMISS

over the phone was dismissed because they "failed to allege which of them made any of the telephone calls … and, thus, who was a party to the alleged misrepresentations." *Sanford*, 625 F.3d at 558. The relevance of this omission can be simply stated: it is the law in this Circuit that plaintiffs asserting claims sounding in fraud must provide this information in their complaint. Unsurprisingly, district courts in this Circuit have applied this holding across a range of factual circumstances. *See R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716, 2016 WL 6663002, at *13-14 (N.D. Cal. Nov. 11, 2016); *Dugan v. Lloyds TSB Bank, PLC*, No. C 12-02549, 2012 WL 3860798, at *6 (N.D. Cal. Sept. 5, 2012). Likewise, in *Lennar Mare Island, LLC v. Steadfast Insurance Co.*, the court dismissed a counterclaim that failed to "clarify … to whom the false statement was made." 139 F. Supp. 3d 1141, 1167 (E.D. Cal. 2015). If the conversations the Fairbairns allege did indeed occur, that detail is in their possession, so their failure to provide any more detail at this stage is striking. *See JH Capital Grp., LLC v. Wind Hawk Energy, Inc.*, No. CV 12-9077, 2013 WL 12323916, at *4 (C.D. Cal. Jan. 14, 2013) (on claim subject to Rule 9(b), plaintiff must "explain[] why the dates, places and specific misrepresentations presumably made to it are not also known to it").

Plaintiffs' effort to salvage their inconsistent allegations regarding Fidelity Charitable's alleged Third Promise fares no better. Plaintiffs plainly allege that Fidelity Charitable represented "it would allow the Fairbairns to advise on a price limit (i.e., a point below which Fidelity would not sell shares without first consulting the Fairbairns)." Compl. ¶ 65. Yet they later introduce confusion by quoting an email in which Malcolm Fairbairn allegedly told Mr. Kunz he "was told" that Fidelity Charitable "could advise on a price limit *if necessary*." *Id.* ¶ 77 (emphasis added).

A promise to let Plaintiffs advise on price, and a promise to let them advise on price only "if necessary," are two entirely different promises, not, as Plaintiffs suggest, a quibble. Pl. Br. 13. Inconsistency is also a basis on which courts dismiss under Rule 9(b). *See Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 906-10 (E.D. Cal. 2018) (dismissing complaint where "Plaintiffs' allegations about the nature of the [misrepresentation] are inconsistent"). *Sanchez v. Aurora Loan Services, LLC* is instructive. No. CV 13-08846, 2014 WL 12589659, at *13, 16 (C.D. Cal. Mar. 11, 2014). There, the court dismissed fraud and promissory estoppel claims

1  because the plaintiff—though he provided extensive detail about the defendant's alleged

2  misrepresentations—did not allege a clear and unambiguous promise. *Id.* at *13. Instead, he

3  inconsistently alleged that the defendant promised it would not foreclose if he paid a lump sum

4  settlement, and that it promised to modify plaintiff's loan if he paid additional arrears. *Id.* The

5  court explained that "these allegations … are not vague or general, [but] they are inconsistent,"

6  and it therefore could not ascertain "the scope of the duties and the limits of performance [the

7  plaintiff] is alleging" and what conduct by the defendant would incur liability. *Id.*

8       That is precisely the point. Fidelity Charitable cannot hope to defend against Plaintiffs'

9  claims—and the Court will have no standard to judge them—if they remain ambiguous. If Fidelity

10  Charitable promised only to allow Plaintiffs to "advise" on price "if necessary," Plaintiffs offer no

11  intimation what circumstances would have rendered consulting with them "necessary." Likewise,

12  if Fidelity Charitable promised only to trade the Energous shares "gentl[y]," Fidelity Charitable

13  could defend on the ground that that alleged promise is too vague to be actionable. *See, e.g.*, Def.

14  Br. 24. Plaintiffs—who know what they were promised—cannot remain coy. They must explain

15  the "specific content of the false representations" they allege. *Edwards v. Marin Park, Inc.*, 356

16  F.3d 1058, 1066 (9th Cir. 2004).

17      Far from demanding Plaintiffs have a "perfect recall" of events, Pl. Br. 13, that standard

18  demands only that they elucidate, in clear terms, the specific terms of the promises they claim

19  induced them to donate tens of millions of dollars. Fraud claims must "be 'specific enough to give

20  defendants notice of the particular misconduct … so that they can defend against the charge and

21  not just deny that they have done anything wrong,'" a rule intended to "'prohibit plaintiffs from

22  unilaterally imposing upon the court, the parties and society enormous social and economic costs

23  absent some factual basis.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009)

24  (brackets omitted). Plaintiffs must be held to Rule 9(b)'s requirements.

**B.    Plaintiffs' Contract And Estoppel Claims Are Part Of A Unified Theory Of**
**Fraud And So Are Subject To Rule 9(b)**

27      Plaintiffs declare that Fidelity Charitable fails to demonstrate a basis to dismiss their breach

28  of contract and estoppel claims, and assert badly that it offers no basis to dismiss their UCL claim.

1  Not so.  Plaintiffs' misrepresentation, breach of contract, estoppel, and UCL claims (Counts I, II,

2  III, and V) all turn on the same series of four oral statements Mr. Kunz allegedly made on

3  December 27, 2017 "on behalf of Fidelity Charitable."  Compl. ¶¶ 65-66.  Plaintiffs term all four

4  promises "false," *id.* ¶ 6, and allege that Fidelity Charitable knew when it made these

5  representations that they were false, or that it was negligent or reckless as to their veracity, *id.* ¶ 95.

6  Their claims are thus "grounded in fraud" and subject to Rule 9(b)'s requirement that Plaintiffs

7  plead fraud with particularity.  *Kearns*, 567 F.3d at 1125.

8      Plaintiffs now claim they pled their contract and estoppel claims "in the alternative," and

9  cite out-of-circuit district court cases to suggest those claims are "independent" and subject only

10  to the dictates of Rule 12(b)(6).  Pl. Br. 16.  But Ninth Circuit law is clear that even claims that do

11  not include falsity as an element can be subject to Rule 9(b)'s particularity requirement if alleged

12  as part of a "unified course of fraudulent conduct," where plaintiffs "rely entirely on that course

13  of conduct as the basis of that claim."  *Kearns*, 567 F.3d at 1125 (UCL); *see also Verde Media*

14  *Corp. v. Levi*, No. 14-cv-00891, 2015 WL 374934, at *8 (N.D. Cal. Jan. 28, 2015) (breach of

15  contract).

16      In contrast to claims supported by "allegations [that] describe non-fraudulent conduct,"

17  *Vess*, 317 F.3d at 1104, Plaintiffs allege *only* that the four promises were false when made.  The

18  Complaint is clear that, apart from a generalized claim that Fidelity Charitable mismanaged their

19  donation, *supra* 2-8, Plaintiffs tell a single story: Fidelity Charitable falsely made four promises

20  about how it would manage the liquidation of their Energous shares.  Plaintiffs' contract and

21  estoppel claims, tacked onto the end of their Complaint as though an afterthought, cannot save

22  their pleading.  Thus, "[b]ecause plaintiff's … causes of action largely rest on the same common

23  set of facts, an allegation of fraudulent conduct with respect to any one event will ripple through

24  all claims of which the event is an essential component."  *Marolda v. Symantec Corp.*, 672 F.

25  Supp. 2d 992, 998 (N.D. Cal. 2009) (applying Rule 9(b) standard to all eight causes of action,

26  including breach of contract, breach of covenant of good faith and fair dealing, and UCL claims).

27                                    **CONCLUSION**

28      The Complaint should be dismissed in its entirety with prejudice.

15

DATED: November 2, 2018

Respectfully submitted,

By: */s/ David C. Marcus*

DAVID C. MARCUS
CHRISTOPHER T. CASAMASSIMA
WILMER CUTLER PICKERING HALE
 AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

ALAN E. SCHOENFELD (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: +1 212 937 7294

*Attorneys for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND

Case No. 3:18-cv-04881-JSC

DEFENDANT'S REPLY IN SUPPORT OF MOTION
TO DISMISS