UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY FAIRBAIRN, ET AL., <br> Plaintiffs, <br> v. <br> FIDELITY INVESTMENTS CHARITABLE GIFT FUND, <br> Defendant. | Case No.18-cv-04881-JSC <br><br> **ORDER RE: MOTION TO DISMISS** <br> Re: Dkt. No. 21 |

Emily and Malcolm Fairbairn sue Fidelity Investments Charitable Gift Fund ("Fidelity Charitable") alleging contract and tort claims based on the Fairbairns' $100 million donation to Fidelity Charitable through a donor advised fund. Fidelity Charitable's motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6) is now pending before the Court.[1] (Dkt. No. 21.) Having considered the parties' briefs and having had the benefit of oral argument on November 16, 2018, the Court DENIES the motion to dismiss. Drawing all reasonable inferences in Plaintiffs' favor, they have standing to pursue their negligence claim and their other claims are adequately pled.

**BACKGROUND**

**A. Complaint Allegations**

Emily and Malcolm Fairbairn run Ascend Capital, a San Francisco based registered investment advisor, which manages billions of dollars' worth of investment accounts for a range of clients including pension funds and university endowments. (Complaint at ¶ 40.) In 2017, "the Fairbairns were facing a substantial tax payment." (*Id*. at ¶ 42.) They therefore decided to donate

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 11 & 18.)

$100 million to charity—the bulk of which would be directed at fighting Lyme disease. (*Id.* at ¶ 43.) The Fairbairns had previously used commercial donor advised funds ("DAFs") to make charitable donations through both Fidelity Charitable and JP Morgan. (*Id*. at ¶¶ 41, 45.)

Commercial DAFs "are a special type of financial account that individual donors open at a 501(c)(3) nonprofit organization that has been created by a for-profit financial institution." (*Id*. at ¶ 2.) When donors contribute to their DAF account, "the nonprofit organization takes legal title to the assets, but donors choose how funds are invested and ultimately distribute to charitable organizations." (*Id*.) DAFs are required to give donors "advisory privileges with respect to the distribution or investment of amounts" held in their DAF. (*Id*. at ¶ 27 (quoting 26 U.S.C. § 4966(d)(2).) "Fidelity Charitable gives account holders particularly robust advisory rights" over their funds including:

- holding the funds in a dedicated account and donating them to the charitable organization in the donor's name;
- giving the donor exclusive advisory rights over the funds; and
- Fidelity Charitable cannot make grants or otherwise take money out of an account without action from the donor—it only has veto power if the donor attempts to use the funds for an improper or non-charitable purpose.

(*Id*. at ¶ 29.)

On December 12, 2017, Fidelity Charitable reached out to the Fairbairns regarding whether they had "any bitcoin or 'other securities' they would like to contribute to their DAF in 2017." (*Id*. at ¶ 49(a).) The Fairbairns contact with Fidelity Charitable was managed by the Fidelity Family Office Services, which works with the "ultra wealthy community," and in particular, Justin Kunz. (*Id*. at ¶¶ 47; 49(a).) Mr. Kunz "aggressively pitched Fidelity Charitable as a superior option to JP Morgan and Vanguard" which also have DAF accounts. (*Id*. at ¶ 50.) Mr. Kunz repeatedly boasted of Fidelity Charitable's sophistication and "superior ability to handle complex assets." (*Id.* at ¶¶ 52-53.)

The Fairbairns decided to structure their donation using their holdings in Energous, a publicly traded company whose core technology was approved by the Federal Communications

Commission on December 26, 2017, causing the company's stock to "skyrocket 39% over the course of December 27." (*Id.* at ¶ 56.) Because the Fairbairns' "average cost basis in the stock was substantially lower than its current, post-jump value [] they would face enormous capital gains tax if they eventually sold the shares for their own benefit." (*Id.* at ¶ 58.) However, if they donated the shares, then "their full liquidation value could go to the charity tax free" which would mean "far more money to fight Lyme disease, *and* a smaller tax bill for the Fairbairns." (*Id.* (emphasis in original).)

The Fairbairns were nonetheless concerned about donating the stock to Fidelity Charitable given its policy of liquidating stock "at the earliest date possible." (*Id.* at ¶ 62 (quoting the "Fidelity Charitable Policy Guidelines: Program Circular").) If Fidelity Charitable did that with the Energous stock, the stock's value could crash. (*Id.* at ¶¶ 60-63.) To convince the Fairbairns to use its services,

> Fidelity Charitable made four critical representations about how it would handle the liquidation: (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock; (2) it would not trade more than 10% of the daily trading volume of Energous shares; (3) it would allow the Fairbairns to advise on a price limit (i.e., a point below which Fidelity would not sell shares without first consulting the Fairbairns, and (4) it would not liquidate any shares until the new year.

(*Id.* at ¶ 65.) Mr. Kunz made these representations as Fidelity Charitable's agent. (*Id.* at ¶ 66.)

Based on these representations, on December 27, the Fairbairns decided to donate 1.93 million shares of Energous stock to Fidelity Charitable's DAF. (*Id.* at ¶ 68.) On December 28, the Fairbairns transferred 700,000 shares and then transferred another 1.2 million the following day. (*Id.* at ¶ 69.) Upon receipt of the final shares, "Fidelity Charitable immediately began liquidating the entire 1.93 million-share block." (*Id.* at ¶ 70.) Indeed, Fidelity Charitable liquidated the entire 1.93 million shares in a matter of hours on the last business day which was "perhaps the year's single slowest trading period." (*Id.* at ¶ 70(a).) During this three-hour trading window, Fidelity Charitable traded approximately 16% of the daily volume rather than the 10% promised. (*Id.* at ¶ 70(b).) In doing so, Fidelity Charitable used incompetent and inappropriate methods—not the sophisticated and state-of-the-art trading strategies promised. (*Id.* at ¶ 70(c).) Fidelity Charitable also failed to allow the Fairbairns to advise on a price limit. (*Id.* at ¶ 70(d).)

As a result of Fidelity Charitable's handling of the liquidation, the "Energous shares were liquidated for tens of millions of dollars less than they would have been and the Fairbairns were able to deduct millions less from their taxes." (*Id.* at ¶ 71.)

The Fairbairns did not even discover that this had occurred until two weeks later. (*Id.* at ¶ 76.) Fidelity Charitable has not been forthcoming with specific information regarding what happened and why. (*Id.* at ¶¶ 76-82.)

### B. Procedural Background

The Fairbairns filed this action in August 2018 alleging five claims for relief: (1) misrepresentation; (2) breach of contract; (3) estoppel; (4) negligence; and (5) violation of California's Unfair Competition law, Cal. Bus. & Prof. Code § 17200. (Dkt. No. 1.) Fidelity Charitable responded by filing the now pending motion to dismiss which is fully briefed and came before the Court for a hearing on November 16, 2018.

## DISCUSSION

### A. The Misrepresentation Claims

Fidelity Charitable moves to dismiss Plaintiffs' claims for misrepresentation, breach of contract, estoppel, and violation of the UCL for failing to satisfy the pleading requirements of Rule 9(b). Fidelity Charitable also insists that the first and second promises outlined in Plaintiff's complaint cannot sustain any claim for relief.

#### 1. Rule 9(b)

Causes of action grounded in fraud are subject to Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under this heightened pleading standard, "the circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks and citation omitted). Thus, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* (internal quotation marks and citation omitted). In other words, when alleging fraudulent statements or omissions of material fact, a plaintiff must not only identify the statements or omissions, but also "set forth an explanation as to why the statement or omission

4

complained of was false or misleading.*" In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed. R. Civ. P. 9(b).

Plaintiffs allege that Fidelity Charitable made the following four promises to induce Plaintiffs to donate the Energous shares: (1) that "it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock," (2) that "it would not trade more than 10% of the daily trading volume of Energous shares," (3) that "it would allow the Fairbairns to advise on a price limit (i.e., a point below which it would not sell without first consulting the Fairbairns)," and (4) that "it would not liquidate any shares until the beginning of 2018." (Complaint at ¶ 91.) Further, Plaintiffs allege that Fidelity Charitable knew when it made these promises that it had no intention of keeping them, or alternatively, that it negligently and recklessly failed to honor these promises. (*Id*. at ¶ 95.) According to Plaintiffs, Fidelity Charitable violated each of these promises by

> (1) liquidat[ing] the entire block of shares on December 29, (2) accounting for around 16% of the day's trading volume (and 35% of volume over the three-hour trading window), (3) using inappropriate trading methodologies, in a way that caused Fidelity's own trades to compete against each other, (4) without even telling the Fairbairns it was happening, let alone allowing them to advise on a price limit.

(*Id*. at ¶ 94.)

Fidelity Charitable insists that these allegations are insufficient because Plaintiffs do not specify to whom these promises were made or what exactly was promised. Neither argument is availing.

First, Plaintiffs allege that "they" had a "series of frank conversations beginning on the afternoon of December 27" with Mr. Kunz wherein he made the four representations which form the basis of their misrepresentation claim. (Complaint at ¶¶ 64-66.) These allegations are sufficient to satisfy the "who" for purposes of Rule 9(b). Fidelity Charitable's reliance on *Sanford v. MemberWorks, Inc*., 625 F.3d 550, 558 (9th Cir. 2010), is unpersuasive. There, the plaintiffs had "failed to allege which of them made any of the telephone calls to purchase the various bait products and, thus, who was a party to the alleged misrepresentations." Here, in contrast,

5

Plaintiffs allege that "they" had series of conversations with Mr. Kunz wherein he made these representations. While the language of the Complaint could be clearer, it does not support an inference that these representations were made to an agent or third-party as Fidelity Charitable seems to suggest. The Court thus concludes that Plaintiffs have adequately alleged the "who" for purposes of Rule 9(b).

Second, there is no ambiguity regarding what Mr. Kunz allegedly promised Plaintiffs. As Fidelity Charitable concedes, paragraph 65 of the Complaint lays out the promises that were made. Fidelity Charitable nonetheless argues that a later paragraph summarizing an email that Mr. Fairbairn sent to Mr. Kunz two weeks after the stock liquidation "leaves ambiguous whether Mr. Kunz said that Fidelity Charitable would limit sales to 10% of the trading volume, or whether his 'promise' was only to be 'gentle' which Mr. Fairbairn construed as a 10% limit." (Dkt. No. 21 at 31:7-10 (citing Complaint at ¶ 77).) This email does not make the prior allegations regarding the representations lack the requisite particularity. Fidelity Charitable's arguments go to the merits of Plaintiffs' claims and not whether they have adequately alleged facts sufficient to put it on "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Accordingly, Fidelity Charitable's motion to dismiss based on Rule 9(b) is denied. Given this conclusion, the Court need not consider Plaintiffs' argument that their contract and estoppel claims are pled in the alternative. Fidelity Charitable only moved to dismiss these claims based on Rule 9(b).[2]

### 2. The First and Second Promises Support a Claim for Relief

Next, Fidelity Charitable insists that the first and second promises outlined in Plaintiff's

---

[2] Fidelity Charitable's footnote argument on the final page of its brief suggests that the promissory estoppel claim fails because it contradicts Plaintiffs' express contract claim. The Court disagrees: that that the claims are mutually exclusive does not mean they cannot be pled in the alternative as Plaintiffs have done here. *See Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 243 (2012) (describing contract and promissory estoppel claims as "not only [ ] distinct or alternative theories of recovery but also as mutually exclusive."); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

complaint cannot sustain any claim for relief. With respect to the first promise—"to employ sophisticated, state-of-the art methods for liquidating large blocks of stock"—Fidelity Charitable argues the claim is so vague that it cannot support any claim. It also argues that the second promise—that it would not trade more than 10% of the daily trading volume of Energous shares, Complaint ¶ 65—cannot support relief because it was not false. Neither argument is availing.

Unlike the "puffery" cases upon which Fidelity Charitable relies, the promise to use "sophisticated, state-of-the art methods" was not a generic promise that Fidelity Charitable allegedly made to solicit all donors. *See In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 793 (N.D. Cal. 2017) ("Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable."). Rather, it arose in the context of a series of promises that Fidelity Charitable allegedly made—including promises about trading volume, price limits, and timing—directly to Plaintiffs in light of their expressed concerns regarding the timing of the liquidation of this stock. *See id.* (noting that in contrast to puffery allegations, those based on "specific or measurable facts about the drives' characteristics" constitute representations on which a reasonable consumer could rely). The allegation must also be read in the context of other allegations regarding industry trading and liquidation practices that Fidelity Charitable allegedly did not employ. (Complaint at ¶ 74.) Under these circumstances, Plaintiffs' allegations are sufficiently specific to survive a motion to dismiss.

Fidelity Charitable's argument about the second promise fares no better as it is predicated on the Court resolving disputed factual questions, which is not appropriate at the pleading stage.[3]

Accordingly, the Court denies Fidelity Charitable's motion with respect to the first and second promises, without prejudice to renewal at the appropriate stage of the proceedings.

---

[3] The Court declines to take judicial notice of the NASDAQ trading volume for Energous shares for December 29, 2017. (Dkt. No. 23, Ex. G.) Plaintiffs dispute the relevance of the document to the complaint allegations and what inferences can be drawn from it. (Dkt. No. 31.) "It is improper to judicially notice a [document] when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (internal citation and quotation marks omitted). Fidelity Charitable's argument is premised on the Court drawing reasonable inferences in its favor. This the Court cannot do.

7

### B. Standing to Pursue Negligence Claim

Fidelity Charitable also insists that Plaintiffs lack standing to bring any claim based on the mismanagement of their donation because state law generally vests the state Attorney General with the exclusive authority to bring any claims regarding mismanagement of charitable assets.

#### 1. Choice of Law

As a threshold matter, there is the question of which state law governs Plaintiff's negligence claim: Massachusetts where Fidelity Charitable is incorporated or California because Plaintiffs' claims are brought under California law and the actions giving rise to this action all arose in California.

Generally, a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Mortensen v. Bresnan Comm'cns, LLC*, 722 F.3d 1151, 1161 (9th Cir. 2013). Where, as here, there is no advance agreement between the parties regarding applicable law, courts apply the three-step governmental interest test, "analyz[ing] the governmental interests of the various jurisdictions involved to select the appropriate law." *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 915 (2001). "[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event [that party] must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Id.* at 919 (internal citation and quotation marks omitted; alterations in original). At the first step, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from California law. *Id.* If there are no differences, then the court applies California law. *Id.* at 920. If, however, there is a difference the court "must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case." *Id.* "Only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied." *Id.*

### 2. Plaintiffs Have Alleged Standing Under California Law

Under California law, "[t]he primary responsibility for supervising charitable trusts in California, for ensuring compliance with trusts and articles of incorporation, and for protection of assets held by charitable trusts and public benefit corporations, resides in the Attorney General." Cal. Gov't Code § 12598(a). Fidelity Charitable thus argues that the Attorney General alone can sue it for mismanaging the liquidation of Plaintiffs' stock donation. In *Holt v. Coll. of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 753 (1964), however, the California Supreme Court noted that "[t]he prevailing view of other jurisdictions is that the Attorney General does not have exclusive power to enforce a charitable trust and that a trustee or other person having a sufficient special interest may also bring an action for this purpose." *Id*. at 753 (noting that "[t]his position is adopted by the American Law Institute (Rest.2d Trusts, s 391) and is supported by many legal scholars." (citations omitted). The court observed that the statutes vesting the Attorney General with jurisdiction "were enacted in recognition of the problem of providing adequate supervision and enforcement of charitable trusts. Beneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in their own behalf." *Id*. at 754. Without anyone "willing to assume the burdens of a legal action, or who could properly represent the interests of the trust or the public, the Attorney General has been empowered to oversee charities as the representative of the public, a practice having its origin in the early common law." *Id*.

"In addition to the public interest, however, there is the interest of donors who have directed that their contributions be used for certain charitable purposes." *Id.* at 754. "Moreover, part of the problem of enforcement is to bring to light conduct detrimental to a charitable trust so that remedial action may be taken. The Attorney General may not be in a position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact, and the various responsibilities of his office may also tend to make it burdensome for him to institute legal actions except in situations of serious public detriment." *Id.* at 754-55. Thus, [a]lthough the Attorney General has primary responsibility for the enforcement of charitable trusts, the need for adequate enforcement is not wholly fulfilled by the authority given to him.

9

United States District Court
Northern District of California

1 The protection of charities from harassing litigation does not require that only the Attorney General be permitted to bring legal actions in their behalf." *Id.* at 756. As a result, "[t]here is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity*." Id.* The court accordingly held that minority trustees of a charitable trust had standing to sue to enjoin a threatened breach of the trust. *Id.* at 757; *see also San Diego etc. Boy Scouts of America v. City of Escondido*, 14 Cal.App.3d 189, 195 (1971) ("But the right of the Attorney General to sue to enforce a charitable trust is not exclusive: other responsible individuals may be permitted to sue on behalf of the charity"). Similarly, in *L.B. Research & Educ. Found. v. UCLA Found*., 130 Cal. App. 4th 17, 180-81 (2005), the court, relying on the above language in *Holt*, reached a similar conclusion regarding a donor's standing to sue where the charitable gift came with a condition, which if not satisfied, would mandate that the gift go to a different institution. There the donation specified if certain conditions were not met by UCLA, then the donation should be transferred to the University of California at San Francisco. *Id.* at 175-76.

Drawing all inferences in Plaintiffs' favor, they have alleged a special relationship sufficient to confer standing to sue regarding the disposition of their donation. *See Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013) ("all factual allegations in [the] complaint are taken as true and all reasonable inferences are drawn in his favor" when considering a 12(b)(6) motion or a facial attack under 12(b)(1)). As did the plaintiffs in *L.B. Research*, they retained certain future rights to the donation:

   a. Fidelity Charitable holds funds in a dedicated account—and ultimately donates them to charitable organizations—in the donor's name.

   b. The donor has exclusive advisory rights over the funds—Fidelity Charitable cannot allow anyone else to dictate where they are donated.

   c. Nor can Fidelity Charitable *itself* even make grants or otherwise take money out of an account without action from the donor.

   d. Fidelity Charitable retains only a veto power over a donor's decisions, which it will exercise only when the donor attempts to use the money for an improper or non-charitable purpose.

(Complaint at ¶ 29.) Plaintiffs allege that their special right was impaired by Fidelity Charitable's

negligent liquidation of the shares. (*Id.*). Plaintiffs are thus not in the same position as any donor to a charitable trust; they bring suit regarding their particular donation which is maintained in their name and in which—according to the Complaint's allegations—they have retained future rights. No California court has held that a plaintiff with similar rights does not have standing to sue.[4]

Fidelity Charitable's insistence that Plaintiffs' allegations are wrong (Dkt. No. 23 at 11-12) is a summary judgment argument, not an inferential leap that the Court can make on a facial challenge to standing. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) ("The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor."). Plaintiffs allege that a DAF can offer a donor stronger rights than those set forth in IRS guidance. (Complaint at ¶ 29 ("But a sponsoring organization has latitude to offer donors stronger advisory rights, short of allowing them to retain legal title to the funds. Fidelity Charitable gives account holders particularly robust advisory rights over the funds they contribute."). The Court must accept this allegation as true.

### 3. Plaintiffs Have Alleged Standing Under Massachusetts Law

Although on reply Fidelity Charitable argued that California law and Massachusetts law are the same regarding Plaintiffs' standing, its briefs focus almost exclusively on Massachusetts law. The Court has thus reviewed Massachusetts law and concludes that the result would be same. While the general rule in Massachusetts is that "[t]he duty of taking action to protect public charitable trusts and to enforce proper application of their funds rests solely upon the Attorney General as the representative of the public interests," *Ames v. Attorney Gen.*, 332 Mass. 246, 250 (1955); *see also* Mass. Gen. Laws Ann. ch. 12, § 8 ("The attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof."), the Massachusetts Supreme Judicial Court has carved out an exception just as the California Supreme Court did in *Holt*.

In *Lopez v. Medford Cmty. Ctr., Inc.*, 384 Mass. 163, 167 (1981), the Massachusetts

---

[4] In light of this conclusion, the Court need not decide at this stage in the proceedings whether the Plaintiffs' allegations regarding the reduction in their tax deduction also gives them standing.

Supreme Judicial Court held that "[n]otwithstanding the Attorney General's exclusive and discretionary role as protector of the public interest in the efficient and lawful operation of charitable corporations, a private plaintiff possesses standing to assert interests in such organizations which are distinct from those of the general public." Because the plaintiffs there had paid the $2.00 required to become members of the Medford Community Center, they had standing to sue the board of directors for mismanagement when they were denied their right to become members and argue that the directors were violating the bylaws. *Id.* at 168; *see also Jessie v. Boynton*, 372 Mass. 293, 305 (1977) (holding that although members of a charitable corporation had no property interest in their right to vote, because they had paid dues to become a member of the hospital, they "had a vote concerning the operation of the hospital to the extent the by-laws provided" which "should not be taken away except in accordance with lawful procedures and practices.").

Here, Plaintiffs allege that Fidelity Charitable has given them greater rights than donors might ordinarily have including "exclusive advisory rights over the funds—Fidelity Charitable cannot allow anyone else to dictate where they are donated" and that Fidelity Charitable cannot "even make grants or otherwise take money out of an account without action from the donor." (Complaint at ¶ 29.) Just as in *Lopez*, Plaintiffs here gave Fidelity Charitable something—their donation to create a DAF—and Fidelity Charitable in return gave them "robust" rights to control the disbursements under the DAF which Plaintiffs allege are greater than those rights generally held by DAF donors. These allegations are sufficient to confer standing on Plaintiffs to challenge Fidelity Charitable's mismanagement of their specific donation thus impairing their rights to control disbursement of the donation.

In *Rockwell v. Trustees of Berkshire Museum, No.* 1776CV00253, 2017 WL 6940932, at *6 (Mass. Super. Nov. 7, 2017), on which Fidelity Charitable heavily relied at oral argument, the court concluded that "[t]he donors in this case have failed to explain how their interest in enforcing the terms of their gifts is any different from the general public's right to have those terms enforced." The opposite is true here—Plaintiffs have set forth detailed allegations as to how Fidelity Charitable vested them with a unique right—to exclusively control the disbursements

12

under their DAF and to authorize any grants or actions on the account. Plaintiffs' claim is not a general claim that Fidelity Charitable mismanages its DAF accounts, but rather that Fidelity Charitable negligently mismanaged *their* account in which they had specific and unique future rights. *See Maffei v. Roman Catholic Archbishop of Boston*, 449 Mass. 235, 245 (2007) ("a plaintiff who asserts an individual interest in the charitable organization distinct from that of the general public has standing to pursue her individual claims.").

\*\*\*

Because Plaintiffs have alleged facts sufficient to withstand Fidelity Charitable's facial standing attack under either California or Massachusetts law, the Court's choice of law analysis ends with the first step. *See Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 920 (Cal. 2001) ("if the relevant laws of each state are identical, there is no problem and the trial court may find California law applicable to class claims"). Fidelity Charitable's motion to dismiss Plaintiffs' negligence claim for lack of standing is denied.

### C. Plaintiffs have Adequately Pled a Negligence Claim

Finally, Fidelity Charitable makes a cursory argument that even if Plaintiffs have standing to pursue a negligence claim, the claim fails because (1) it owed Plaintiffs no duty of care, and (2) any negligence claim is inconsistent with their breach of contract claim. Neither argument is persuasive.

First, a duty of care "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984-85 (1993). Plaintiff alleges that Fidelity Charitable actively solicited their business by offering them lower administrative and investment fees, touting its expertise in handling complex assets, and providing Plaintiffs "stronger advisory rights" than are generally available for DAF accounts. (Complaint at ¶¶ 29, 51-52.) Further, Fidelity Charitable is alleged to have made specific representations regarding the liquidation of the assets in Plaintiff's DAF account and Plaintiffs' control thereof. (*Id*. at ¶¶ 52-52, 65.) These allegations are sufficient to plausibly allege a duty of care under California law. *See Joffe v. United California Bank*, 141 Cal.App.3d 541, 556 (1983) (holding that a bank owed a customer a duty of care when it deposited a check into an account

different from the one specified on the check); *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 695 (1978) (holding that a bank has a general duty and obligation, based on foreseeability of risk to a customer, to exercise reasonable care).

Second, "[a] contractual obligation may create a legal duty and the breach of that duty may support an action in tort" where the conduct "also violates a duty independent of the contract arising from principles of tort law." *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999). The Court cannot say at this stage that Plaintiffs allegations do not support a duty of care that is actionable both in tort and contract. Further, Plaintiffs have pled the claims in the alternative which is proper under Rule 8. *See McCalden v. California Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990).

Accordingly, Fidelity Charitable's motion to dismiss Plaintiffs' negligence claim is denied.

## CONCLUSION

For the reasons stated above, the motion to dismiss is DENIED. (Dkt. No. 21.)

Fidelity Charitable's answer is due in 21 days.

The Initial Case Management Conference remains calendared for December 20, 2018 at 1:30 p.m. in Courtroom F, 450 Golden Gate Ave., San Francisco, California. The Joint Case Management Conference Statement is due December 13, 2018.

**IT IS SO ORDERED.**

Dated: November 28, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

14