David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
Nicholas G. Purcell (SBN 313632)
nick.purcell@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Alan E. Schoenfeld (*admitted pro hac vice*)
alan.schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: +1 212 230 8800
Facsimile: +1 212 230 8888

*Attorneys for Defendant*
FIDELITY INVESTMENTS CHARITABLE
GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

EMILY FAIRBAIRN and
MALCOLM FAIRBAIRN,

    Plaintiffs,

    v.

FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

    Defendant.

Case No. 3:18-cv-04881-JSC

**DEFENDANT FIDELITY INVESTMENTS CHARITABLE GIFT FUND'S ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant Fidelity Investments Charitable Gift Fund ("Fidelity Charitable"), by and through its undersigned counsel, hereby answers and responds as follows to the Complaint for misrepresentation, breach of contract, estoppel, negligence, and violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* ("Complaint") filed by Plaintiffs Malcolm Fairbairn and Emily Fairbairn ("Plaintiffs") in the above-captioned action ("Action").

Fidelity Charitable denies each and every allegation in the Complaint, including without limitation allegations appearing in headings, subheadings, and footnotes, except as expressly admitted herein, and specifically denies that Plaintiffs are entitled to the relief sought in their Prayer for Relief.  Fidelity Charitable reserves the right to amend and/or supplement this Answer.

## ANSWER TO SPECIFIC ALLEGATIONS

**COMPLAINT ¶ 1:**

Private charitable giving is critically important to funding public and social goods in the United States.  Over the last decade, a new vehicle for making these charitable contributions has come to prominence: the commercial donor advised fund or "DAF."

**ANSWER TO COMPLAINT ¶ 1:**

No response is required to Paragraph 1, which purports to describe private charitable giving and its role in society, as well as the purported "commercial" donor advised fund ("DAF").  To the extent a response is required, Fidelity Charitable admits that a DAF is a vehicle for public charitable giving.  Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis. Fidelity Charitable specifically denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial" DAF.

**COMPLAINT ¶ 2:**

Commercial DAFs are a special type of financial account that individual donors open at a 501(c)(3) nonprofit organization that has been created by a for-profit financial institution. When donors contribute assets to their DAF account, the nonprofit organization takes legal title to the assets, but donors choose how funds are invested and ultimately distributed to charitable

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   organizations. The National Philanthropic Trust describes DAFs as a kind of "charitable savings

2   account."

3   **ANSWER TO COMPLAINT ¶ 2:**

4         No response is required to Paragraph 2, which purports to describe DAFs.  To the extent a

5   response is required, Fidelity Charitable admits that a DAF is a type of charitable account whereby

6   a nonprofit organization takes title to assets donated by a donor.  Such a donation to Fidelity

7   Charitable is irrevocable and the assets are owned and controlled by Fidelity Charitable after the

8   donation.  Fidelity Charitable further admits that donors can advise how the funds in a DAF account

9   are invested from among a variety of options and that donors may advise as to the distribution of

10  funds in a DAF account to appropriate charitable organizations.  Fidelity Charitable specifically

11  denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial"

12  DAF.

13  **COMPLAINT ¶ 3:**

14        As of 2016, DAF accounts held more than $85 billion in assets. The nation's largest sponsor,

15  Defendant Fidelity Investments Charitable Gift Fund ("Fidelity Charitable"), has more than $16

16  billion under management. It receives more donations than any charity—DAF or otherwise.

17  **ANSWER TO COMPLAINT ¶ 3:**

18        No response is required to Paragraph 3, which purports to provide statistics on DAF

19  accounts.  To the extent a response is required, Fidelity Charitable admits that it had more than $16

20  billion in net assets at the beginning of the fiscal year ended June 30, 2017.  Fidelity Charitable

21  lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to

22  form a belief as to their truth and therefore denies them on that basis.

23  **COMPLAINT ¶ 4:**

24        Although commercial DAFs may help advance important charitable purposes, they also

25  generate enormous profits for the financial institutions that are affiliated with them. The nonprofit

26  organizations that sponsor DAFs charge donors a management fee for maintaining an account, and

27  the sponsors in turn pay significant fees to their affiliated financial institutions for a broad range of

28  services. Moreover, DAF assets are generally held in proprietary funds from which the financial

1    institutions generate additional profits.

2    **ANSWER TO COMPLAINT ¶ 4:**

3           No response is required to Paragraph 4, which purports to describe DAFs generally and their

4    purpose for the financial institutions that are affiliated with them.  To the extent a response is

5    required, the allegations in this Paragraph pertain to unspecified DAFs and financial institutions,

6    and Fidelity Charitable therefore lacks sufficient knowledge or information regarding the

7    allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

8    Fidelity Charitable denies that it charges donors a management fee.  Fidelity Charitable specifically

9    denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial"

10   DAF.

11   **COMPLAINT ¶ 5:**

12          To fuel their growth, commercial DAFs have increasingly targeted wealthy donors with

13   complex assets. This has led to intense competition among the largest commercial DAFs. To

14   succeed, DAF sponsors must convince individuals considering a donation of complex, non-cash

15   assets that they have the sophistication and personalized service to implement the donation in a

16   manner and on terms that advance the donor's objectives.

17   **ANSWER TO COMPLAINT ¶ 5:**

18          No response is required to Paragraph 5, which purports to describe competition among and

19   motivations of unspecified DAF sponsors.  To the extent a response is required, Fidelity Charitable

20   lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a

21   belief as to their truth and therefore denies them on that basis.  Fidelity Charitable specifically

22   denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial"

23   DAF.

24   **COMPLAINT ¶ 6:**

25          This case is about Fidelity Charitable making false promises to secure a $100 million

26   donation from Plaintiffs Emily and Malcolm Fairbairn in late December 2017—and then

27   outrageously mishandling the donation, costing the Fairbairns millions of dollars and severely

28   impairing their ability to support important charitable causes.

DEFENDANT'S ANSWER TO
                                                                                 PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 6:**

Fidelity Charitable denies the allegations in Paragraph 6.

**COMPLAINT ¶ 7:**

Like many wealthy donors, the Fairbairns made their donation using a combination of cash and other assets—including 1.93 million shares in a publicly traded company called Energous. The Fairbairns were angel investors in the company, and they remain sizeable stakeholders today.

**ANSWER TO COMPLAINT ¶ 7:**

Fidelity Charitable admits that the Fairbairns donated cash and other assets, including approximately 1.93 million shares in a publicly traded company called Energous.   Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 8:**

The Fairbairns could have made their donation to JP Morgan, with whom they had long enjoyed a positive relationship and where they had already established a $20 million DAF. JP Morgan allows donors to "[a]dvise on the timing and rate at which the donated securities are liquidated." JP Morgan Charitable, *Introducing the J.P. Morgan Charitable Giving Fund* at 2 (2017).

**ANSWER TO COMPLAINT ¶ 8:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 9:**

But Fidelity Charitable aggressively promoted itself as the best choice for the Fairbairns' charitable giving in 2017. With respect to the Energous stock in particular, Fidelity Charitable made a number of personalized promises: (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock, (2) it would not trade more than 10% of the daily trading volume of Energous shares, (3) it would allow the Fairbairns to advise on a price limit (i.e., a point below which it would not sell without first consulting the Fairbairns), and (4) it would not liquidate any shares until the beginning of 2018.

**ANSWER TO COMPLAINT ¶ 9:**

Fidelity Charitable denies the allegations in Paragraph 9.

**COMPLAINT ¶ 10:**

But after the Fairbairns donated the 1.93 million shares, Fidelity Charitable promptly—and egregiously—broke each of its promises. It (1) liquidated the entire block of shares in a three-hour window on December 29, (2) accounting for 16% of the day's exchange-traded volume and an incredible 35% of the volume over the three-hour trading window, (3) using inappropriate methodologies that caused its own trades to compete against each other and drive the share price down still further, (4) without even telling the Fairbairns it was happening, let alone allowing them to advise on a price limit.

**ANSWER TO COMPLAINT ¶ 10:**

Fidelity Charitable admits that on December 29, 2017, it sold 1,931,985 shares of Energous stock irrevocably donated by plaintiffs to Fidelity Charitable, as Fidelity Charitable was entitled to do, and denies the remaining allegations in Paragraph 10.

**COMPLAINT ¶ 11:**

The catastrophic result was a 30% run-down of the stock's value—leaving the Fairbairns with tens of millions less to direct to charitable causes, and reducing the size of their tax deduction by millions more.

**ANSWER TO COMPLAINT ¶ 11:**

Fidelity Charitable denies the allegations in Paragraph 11.

**COMPLAINT ¶ 12:**

To make matters worse, in stark contrast to its pre-donation solicitousness, Fidelity Charitable has refused to provide the Fairbairns even a basic explanation or documentation of what went wrong. The Fairbairns have sought information about the liquidation, relevant internal policies, and the compensation that Fidelity Charitable, its affiliated companies, and its employees received from this transaction. But Fidelity Charitable has stonewalled them completely.

**ANSWER TO COMPLAINT ¶ 12:**

Fidelity Charitable denies the allegations in Paragraph 12.

**COMPLAINT ¶ 13:**

Perhaps that is because Fidelity Charitable believes it is too large and powerful to be held to account. Alternatively, perhaps divulging this information would reveal systemic undermining of donors' and charities' interests for the benefit of Fidelity Charitable and its affiliated companies. Indeed, given the deep conflict of interest and the immense incentives Fidelity Charitable faced to immediately liquidate the Energous shares at whatever cost to the Fairbairns, the misconduct in this case likely goes far beyond mere incompetence.

**ANSWER TO COMPLAINT ¶ 13:**

Fidelity Charitable denies the allegations in Paragraph 13.

**COMPLAINT ¶ 14:**

Whatever the explanation, the Fairbairns bring this lawsuit to uncover it, and to obtain appropriate relief.

**ANSWER TO COMPLAINT ¶ 14:**

No response is required to Paragraph 14, which purports to identify the motivations of Plaintiffs in bringing this lawsuit.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 14.

<strong>JURISDICTION AND VENUE</strong>

**COMPLAINT ¶ 15:**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

**ANSWER TO COMPLAINT ¶ 15:**

No response is required to Paragraph 15, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable admits the Court has jurisdiction over this matter.

**COMPLAINT ¶ 16:**

This Court has jurisdiction over Defendant Fidelity Charitable because it conducts significant business operations in the State of California, and nearly all of the actions giving rise to this case took place in the State of California. Fidelity Charitable accordingly has sufficient

1   minimum contacts with this forum arising out of the actions that injured the Fairbairns to warrant

2   this Court's exercise of jurisdiction.

3   **ANSWER TO COMPLAINT ¶ 16:**

4          No response is required to Paragraph 16, which consists of conclusions of law.  To the extent

5   a response is required, Fidelity Charitable admits the Court has personal jurisdiction over Fidelity

6   Charitable.

7   **COMPLAINT ¶ 17:**

8          Venue is proper in this district under 28 U.S.C. § 1391 because Fidelity Charitable resides

9   there and a substantial part of the events and omissions giving rise to this action occurred in this

10  district.

11  **ANSWER TO COMPLAINT ¶ 17:**

12         No response is required to Paragraph 17, which consists of conclusions of law.  To the extent

13  a response is required, Fidelity Charitable admits the propriety of venue.

14                                              **PARTIES**

15  **COMPLAINT ¶ 18:**

16         Plaintiffs Emily and Malcolm Fairbairn are residents of California. Through two of their

17  entities, the Fairbairns were owners of the 1.93 million shares of Energous Corporation that are the

18  subject of this lawsuit.

19  **ANSWER TO COMPLAINT ¶ 18:**

20         Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

21  Paragraph 18 to form a belief as to their truth and therefore denies them on that basis.

22  **COMPLAINT ¶ 19:**

23         Defendant Fidelity Charitable is a Massachusetts 501(c)(3) non-profit corporation with its

24  principal place of business in Massachusetts. Fidelity Charitable is the nation's largest DAF

25  sponsor. Of the approximately $85 billion in total assets held in DAF accounts, Fidelity Charitable

26  holds $16 billion (nearly 20%).

27  **ANSWER TO COMPLAINT ¶ 19:**

28         Fidelity Charitable admits that it is a Massachusetts 501(c)(3) non-profit corporation.

                                                    8

DEFENDANT'S ANSWER TO
                                                                    PLAINTIFFS' COMPLAINT

1  Fidelity Charitable further admits that it is the nation's largest DAF sponsor and had net assets at

2  the beginning of the fiscal year ended June 30, 2017 of approximately $16 billion.   Fidelity

3  Charitable denies that its principal place of business is in Massachusetts.  Fidelity Charitable lacks

4  sufficient knowledge or information regarding the remaining allegations in this Paragraph to form

5  a belief as to their truth and therefore denies them on that basis.

6  **FACTUAL ALLEGATIONS**

7  **SUBHEADING A**

8        Commercial DAFs Like Fidelity Charitable Have Become A Major Vehicle For Private

9  Charitable Giving

10  **ANSWER TO SUBHEADING A**

11        No response is required to Subheading A, which purports to describe the role of commercial

12  DAFs in private charitable giving.  Fidelity Charitable specifically denies there is any legal

13  significance to Plaintiffs' characterization of a DAF as a "commercial" DAF.

14  **COMPLAINT ¶ 20:**

15        In recent years, commercial DAFs have become an increasingly popular vehicle for

16  charitable giving, largely because they fill a gap in the otherwise stark landscape of philanthropic

17  vehicles. Outside of DAFs, donors have two basic, and very different, options to accomplish their

18  philanthropic goals. They can either engage in private philanthropy, exemplified by the creation of

19  a private foundation, or they can give directly to a public charity that is already in existence.

20  **ANSWER TO COMPLAINT ¶ 20:**

21        No response is required to Paragraph 20, which purports to describe the role of

22  "commercial" DAFs in charitable giving.  To the extent a response is required, Fidelity Charitable

23  lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a

24  belief as to their truth and therefore denies them on that basis.   Fidelity Charitable specifically

25  denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial"

26  DAF.

27  **COMPLAINT ¶ 21:**

28        Private foundations give donors complete control over their charitable giving—donors can

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  contribute assets at any time (and thus receive an immediate personal tax benefit), but then spread

2  the distribution of those assets to charitable causes over a longer period.

3  **ANSWER TO COMPLAINT ¶ 21:**

4      No response is required to Paragraph 21, which purports to describe the functioning of

5  unnamed private foundations.  To the extent a response is required, Fidelity Charitable lacks

6  sufficient knowledge or information regarding the remaining allegations in this Paragraph to form

7  a belief as to their truth and therefore denies them on that basis.  Fidelity Charitable further denies

8  the allegations in this Paragraph to the extent they assert legal conclusions.

9  **COMPLAINT ¶ 22:**

10     But private foundations are expensive to set up and maintain. Moreover, given the lack of

11  oversight—and the resulting potential for abuse by individuals hoping to avoid taxes—Congress

12  has imposed limits on the tax benefits available for donations to private foundations. For example,

13  whereas a donor may deduct the full fair market value of an appreciated stock when that stock is

14  given directly to an existing public charity, the donor may deduct only her cost basis in the stock

15  (i.e., the amount she originally paid) if she gives it to a private foundation.

16  **ANSWER TO COMPLAINT ¶ 22:**

17     No response is required to Paragraph 22, which purports to describe the functioning of

18  unnamed private foundations, their regulation by Congress, and the application of tax law to such

19  unnamed entities.  Accordingly, Fidelity Charitable lacks sufficient knowledge or information

20  regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies

21  them on that basis.  Fidelity Charitable further denies the allegations in this Paragraph to the extent

22  they assert legal conclusions.

23  **COMPLAINT ¶ 23:**

24     Instead of setting up a private foundation, donors can give directly to existing public

25  charities. This has the obvious advantage of immediately benefiting social goods that depend on

26  philanthropy to function. Additionally, as noted, direct donations receive favorable tax treatment

27  compared to donations into private foundations.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 23:**

No response is required to Paragraph 22, which purports to describe the role and functioning of unnamed public charities generally.  Accordingly, to the extent a response is required, Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.  Fidelity Charitable further denies the allegations in this Paragraph to the extent they assert legal conclusions.

**COMPLAINT ¶ 24:**

But giving directly to public charities eliminates the donor's ability to control the timing of donations relative to the donor's broader financial and philanthropic objectives. For example, some public charities are unable or unwilling to accept a donation of appreciated stock or an even more complex asset. Or a donor may wish to ensure that her large donation is used over time, but the charity may lack the ability or willingness to accommodate that desire. At the simplest level, it may be tax-efficient for a donor to make a large donation at one particular point in time, but the donor may not yet know where that money will do the most good.

**ANSWER TO COMPLAINT ¶ 24:**

No response is required to Paragraph 24, which purports to describe the disadvantages of donating to public charities and describes hypothetical situations.  To the extent a response is required, Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.  Fidelity Charitable further denies the allegations in this Paragraph to the extent they assert legal conclusions.

**COMPLAINT ¶ 25:**

DAFs have come to prominence because they hit a sweet spot between private giving via the paradigmatic vehicle of a private foundation and direct giving to an already-existing public charity.

**ANSWER TO COMPLAINT ¶ 25:**

No response is required to Paragraph 25, which purports to compare DAFs to private foundations and public charities.  To the extent a response is required, Fidelity Charitable lacks the knowledge or information regarding the allegations in this Paragraph sufficient to form a belief as

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  to their truth and therefore denies them on that basis.   Fidelity Charitable further denies the

2  allegations in this Paragraph to the extent they assert legal conclusions and are vague and

3  ambiguous, including Plaintiffs' allegation regarding a "sweet spot."

4  **COMPLAINT ¶ 26:**

5    DAFs have existed in some form since the 1930s, but for decades were little utilized. As

6  recently as 1995, DAF accounts held only around $2.4 billion in assets, compared to $85 billion in

7  2016. In recent years, however, for-profit financial institutions like the ones affiliated with Fidelity

8  Charitable have learned to leverage DAFs' unique characteristics to bridge the gap between private

9  foundations and direct giving. And once these financial institutions recognized the opportunity this

10  presented, "a number of [them] . . . formed charitable corporations for the principal purpose of

11  offering donor advised funds, sometimes referred to as 'commercial' donor advised funds." H.R.

12  Rep. No. 109-455, at 180 (2006).

13  **ANSWER TO COMPLAINT ¶ 26:**

14    No response is required to Paragraph 26, which purports to describe the history of DAF

15  accounts generally.   To the extent a response is required, Fidelity Charitable admits that DAFs have

16  existed for decades, and that there has been significant growth in the amount of donated assets held

17  by DAFs.   Fidelity Charitable further answers that it lacks sufficient knowledge or information

18  regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore

19  denies them on that basis.

20  **COMPLAINT ¶ 27:**

21    In a nutshell, commercial DAFs work as follows. Donors create an account with a

22  sponsoring organization, here Fidelity Charitable, formed by a financial institution. When donors

23  contribute assets to fund their DAF account, the sponsoring organization takes legal title to the

24  assets, but it guarantees donors a right to choose how the DAF account's funds are invested and a

25  robust right to "advise" about how the funds will ultimately be distributed to existing public

26  charities. Federal law requires DAFs to give donors "advisory privileges with respect to the

27  distribution or investment of amounts" held in the account. 26 U.S.C. § 4966(d)(2).

28

Case No. 3:18-cv-04881-JSC           DEFENDANT'S ANSWER TO
                          PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 27:**

No response is required to Paragraph 27, which consists of conclusions of law and purports to describe the functioning of unnamed DAF accounts generally.  To the extent a response is required, Fidelity Charitable admits that donors to Fidelity Charitable may advise on the investment of donated assets among a variety of options and that donors may advise Fidelity Charitable on the distribution of those funds to appropriate charities.  Fidelity Charitable further denies the allegations in this Paragraph to the extent they assert such advisory rights are "robust," which term is vague and ambiguous.   Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis. Fidelity Charitable specifically denies there is any legal significance to Plaintiffs' characterization of a DAF as a "commercial" DAF.

**COMPLAINT ¶ 28:**

The IRS Guidesheet on DAFs sets the baseline for donors' advisory rights as "the right of a donor to provide noncompulsory recommendations, suggestions or consultative advice" about the disposition or investment of funds in the donor's account. Internal Revenue Service, *Donor-Advised Funds Guide Sheet Explanation* at 8 (July 31, 2008).

**ANSWER TO COMPLAINT ¶ 28:**

No response is required to Paragraph 28, which purports to describe the IRS Guide Sheet's statement on DAF accounts.  To the extent a response is required, Fidelity Charitable denies Plaintiffs' characterization of the advisory rights as "baseline," which term is vague and ambiguous. Fidelity Charitable further answers that, to the extent that the allegations in Paragraph 28 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.

**COMPLAINT ¶ 29:**

But a sponsoring organization has latitude to offer donors stronger advisory rights, short of allowing them to retain legal title to the funds. Fidelity Charitable gives account holders particularly robust advisory rights over the funds they contribute.

    a.      Fidelity Charitable holds funds in a dedicated account—and ultimately donates them

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1    to charitable organizations—in the donor's name.

2          b.       The donor has exclusive advisory rights over the funds—Fidelity Charitable cannot

3    allow anyone else to dictate where they are donated.

4          c.       Nor can Fidelity Charitable itself even make grants or otherwise take money out of

5    an account without action from the donor.

6          d.       Fidelity Charitable retains only a veto power over a donor's decisions, which it will

7    exercise only when the donor attempts to use the money for an improper or non-charitable purpose.

8    **ANSWER TO COMPLAINT ¶ 29:**

9          No response is required to Paragraph 29, which consists of conclusions of law.  To the extent

10   a response is required, Fidelity Charitable denies that it gives account holders "particularly robust"

11   advisory rights over the funds they contribute as that term is vague and ambiguous.   Fidelity

12   Charitable further admits that the funds in Fidelity Charitable DAF accounts are owned and

13   controlled by Fidelity Charitable, not by a donor; a donor to a Fidelity Charitable DAF has certain

14   advisory rights regarding the investment and distribution of the funds.  Fidelity Charitable denies

15   the remaining allegations in Paragraph 29.

16   **COMPLAINT ¶ 30:**

17         Thus, although Fidelity Charitable holds title to the money and serves as a genuine check to

18   make sure donors give to proper organizations, donors' rights are strikingly broad.

19   **ANSWER TO COMPLAINT ¶ 30:**

20         No response is required to Paragraph 30, which consists of conclusions of law.  To the extent

21   a response is required, Fidelity Charitable admits that it holds title to the assets in the Fidelity

22   Charitable DAFs.  Fidelity Charitable denies Plaintiffs' characterization of Fidelity Charitable's

23   role with respect to donors and denies Plaintiffs' characterization of donors' rights as "strikingly

24   broad," as that term is vague and ambiguous.

25   **COMPLAINT ¶ 31:**

26         But at the same time, because Fidelity Charitable and other DAF sponsors are required to

27   ensure that funds are ultimately distributed to legitimate charitable organizations, donors who give

28   to a DAF receive the same tax benefit they would for giving directly to an existing public charity

1  in the first instance.

2  **ANSWER TO COMPLAINT ¶ 31:**

3      No response is required to Paragraph 31, which consists of conclusions of law.  To the extent

4  a response is required, Fidelity Charitable admits that donors who make a completed gift to a DAF

5  and satisfy other legal requirements may receive tax deductions for their donations but lacks

6  information and belief regarding whether such alleged benefits would be "the same" as other

7  benefits and therefore deny the allegations in Paragraph 31 on that basis.

8  **SUBHEADING B**

9      Fidelity Charitable Has Dominated The DAF Market—And Generated Enormous Profits

10  For Its Associated Financial Institution—By Convincing Donors Like the Fairbairns To Donate

11  Complex Assets.

12  **ANSWER TO SUBHEADING B**

13      Fidelity Charitable admits that donors have donated complex assets to Fidelity Charitable.

14  Fidelity Charitable denies the remaining allegations in Subheading B.

15  **COMPLAINT ¶ 32:**

16      Commercial DAFs do more than help facilitate charitable giving by donors, however. They

17  also generate incredible profits for their associated financial institutions. As one commentator has

18  put it: "To be sure, Fidelity's interest in Fidelity Charitable is not wholly charitable. While your

19  funds sit in a DAF waiting to be disbursed, they're invested in the market. And if they're in

20  Fidelity's DAF, they'll be invested in Fidelity's funds." Felix Salmon, *The Disrupter: How Fidelity*

21  *and its donor-advised fund are shaking up charitable giving for the better*, Slate (May 5, 2018).

22  **ANSWER TO COMPLAINT ¶ 32:**

23      No response is required to Paragraph 32, which purports to describe how purported

24  "commercial" DAFs are managed.  To the extent a response is required, Fidelity Charitable denies

25  Plaintiffs' characterization of DAFs and otherwise denies the remaining allegations of Paragraph

26  32.  Fidelity Charitable further answers that, to the extent that the allegations in Paragraph 32 are

27  based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations

28  accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity

1  Charitable specifically denies there is any legal significance to Plaintiffs' characterization of a DAF

2  as a "commercial" DAF.

3  **COMPLAINT ¶ 33:**

4      No DAF sponsor has proved as lucrative to its associated financial institution as Fidelity

5  Charitable.

6      Fidelity Charitable, which was founded in 1991, had an absolutely astonishing $5.4

7      billion of revenue in 2015, the vast majority of which came from its $4.6 billion in

8      fresh contributions. That is twice the size of the Red Cross, and more than 14 times

9      as much as the Museum of Modern Art. More impressively, revenues rose 23

10     percent, or more than $1 billion, from the $4.4 billion in 2014 revenues. Go back to

11     2011, and the amount was just $1.9 billion; in 2005, Fidelity Charitable's revenues

12     were below $1 billion. In terms of sheer growth, no other institution comes close.

13     *Id.*

14  **ANSWER TO COMPLAINT ¶ 33:**

15     Fidelity Charitable answers that, to the extent that the allegations in Paragraph 33 are based

16  on the text of a written document, Fidelity Charitable admits that, to the extent such allegations

17  accurately quote the text of the document, such text exists.  Fidelity Charitable further answers that

18  it lacks sufficient knowledge or information regarding the Paragraph's comparisons of Fidelity

19  Charitable to other unnamed "DAF sponsor[s]" and "financial institution[s]" to form a belief as to

20  their truth and therefore denies them on that basis.

21  **COMPLAINT ¶ 34:**

22     Fidelity Charitable has generated its astonishing growth by focusing on more than just cash

23  donations. Fidelity Charitable, Fidelity Charitable 2018 Giving Report at 2 (2018) ("Sixty one

24  percent of 2017 contributions to Fidelity Charitable were non-cash assets.").

25  **ANSWER TO COMPLAINT ¶ 34:**

26     Fidelity Charitable admits that sixty one percent of 2017 contributions to Fidelity Charitable

27  were non-cash assets.  Fidelity Charitable denies Plaintiffs' characterization of its growth as

28  "astonishing."

Case No. 3:18-cv-04881-JSC                                    DEFENDANT'S ANSWER TO
                                                             PLAINTIFFS' COMPLAINT

**COMPLAINT ¶ 35:**

Like its major competitors, Fidelity Charitable broadly promotes its ability to increase the tax efficiency of charitable giving by accepting and liquidating complex assets. *See, e.g.*, Ana Swanson, *Wall Street is sitting on billions meant for charities in "donor-advised funds,"* Chicago Tribune (June 22, 2016) ("Matt Nash, a senior vice president of donor engagement at Fidelity Charitable, said that donor-advised funds allow more money to go to charity, in part because they allow people to donate complex assets, such as property, a share in a business or stock.").

**ANSWER TO COMPLAINT ¶ 35:**

Fidelity Charitable admits that it promotes its ability to accept complex assets, including by increasing tax efficiency.  Fidelity Charitable further answers that, to the extent that the allegations in Paragraph 35 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 36:**

And it has marketed this ability with particular force in targeting ultra-wealthy individuals with complex finances—for whom DAFs offer a unique opportunity to (1) donate large amounts of complex, appreciated assets, (2) with the full tax deduction of direct giving, while (3) also retaining ongoing control over their donations. Abby Schultz, *Donor-Advised Funds Become Popular Philanthropic Tools*, Barrons (Feb. 15, 2018) ("One reason donor-advised funds have exploded in popularity for the philanthropically inclined is the ability of some major funds to take in complex assets like restricted stock, real estate or even cryptocurrency.").

**ANSWER TO COMPLAINT ¶ 36:**

Fidelity Charitable admits that DAFs offer donors an opportunity to donate complex assets, to take a tax deduction, and to retain some advisory rights over their donations.  Fidelity Charitable denies Plaintiffs' characterization of its marketing activities, and denies the allegations in this Paragraph to the extent they suggest that publicly-traded securities are "complex assets."  Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 37:**

The competition for these relatively few "big fish" is intense, with each institution touting its own expertise as superior to the next. Indeed, this is the crux of the competition: which organization can prove it offers the sophistication and personalized service to handle a high-wealth individual's complex financial picture and carry out the individual's charitable wishes accordingly.

**ANSWER TO COMPLAINT ¶ 37:**

Fidelity Charitable denies the allegations in this Paragraph to the extent they assert legal conclusions and are vague and ambiguous, including Plaintiffs' allegations regarding the "crux of the competition" and "big fish," which terms are vague and ambiguous. Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 38:**

In this regard, Fidelity Charitable has aggressively promoted the services of its dedicated Complex Assets group, led by attorneys Ryan Boland and Karla Valas. *See* Ryan Boland and Karla Valas, *Charitable contributions: Looking beyond cash for the right asset to give*, Fidelity Charitable (Jan. 2, 2018) (promoting the group's work, including tax modeling, with private equity and other entrepreneurial donors and their professional advisers to develop strategies that fit with the donor's objectives).

**ANSWER TO COMPLAINT ¶ 38:**

Fidelity Charitable admits that it has promoted the services of its Complex Assets group. Fidelity Charitable denies Plaintiffs' characterization of its promotional activities as "aggressive."

**COMPLAINT ¶ 39:**

In 2017, Fidelity Charitable set its sights on Plaintiffs Emily and Malcolm Fairbairn. It promised sophistication and white glove service in order to secure a $100 million donation, and then flagrantly broke each of its promises, costing the Fairbairns millions of dollars and severely impairing their ability to support important charitable causes.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1    **ANSWER TO COMPLAINT ¶ 39:**

2        Fidelity Charitable denies the allegations in Paragraph 39.

3    **SUBHEADING C**

4        In December 2017, The Fairbairns Decide To Donate $100 Million To Fight Lyme Disease.

5    **ANSWER TO SUBHEADING C**

6        Fidelity Charitable lacks sufficient knowledge or information regarding the statements in

7    Subheading C to form a belief as to their truth and therefore denies them on that basis.

8    **COMPLAINT ¶ 40:**

9        Emily and Malcolm Fairbairn run a San Francisco-based registered investment advisor

10   called Ascend Capital. Through Ascend, the Fairbairns manage billions of dollars for a range of

11   clients that include pension funds and university endowments. They have successfully run Ascend

12   for more than two decades.

13   **ANSWER TO COMPLAINT ¶ 40:**

14       Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

15   this Paragraph to form a belief as to their truth and therefore denies them on that basis.

16   **COMPLAINT ¶ 41:**

17       Over the last decade, the Fairbairns have dedicated more than $65 million to charity: in

18   2010, they placed $25 million in a charitable remainder trust; in 2013, they placed $20 million in a

19   JP Morgan DAF account; and in 2014, they placed $20 million in a Fidelity Charitable DAF

20   account. They have also made numerous direct donations to a wide range of organizations and

21   causes. Most importantly, they have been inspired by Warren Buffet to personally resolve that they

22   will donate the majority of their wealth during their lifetimes.

23   **ANSWER TO COMPLAINT ¶ 41:**

24       Fidelity Charitable admits that Plaintiffs donated $20 million to Fidelity Charitable in 2014.

25   Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations

26   in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

27   **COMPLAINT ¶ 42:**

28       Like anyone who makes charitable donations, the Fairbairns have received a personal

DEFENDANT'S ANSWER TO
                                                     PLAINTIFFS' COMPLAINT

1  financial benefit in return for their philanthropic efforts: a deduction on their taxes. In 2017, changes

2  in the tax laws meant certain deferred income could no longer be deferred. Given Ascend's success,

3  the Fairbairns were facing a substantial tax payment.

4  **ANSWER TO COMPLAINT ¶ 42:**

5       No response is required to Plaintiffs' statement regarding the changes in the tax laws in

6  2017, which consists of a conclusion of law.  Fidelity Charitable lacks sufficient knowledge or

7  information regarding the remaining allegations in this Paragraph to form a belief as to their truth

8  and therefore denies them on that basis.

9  **COMPLAINT ¶ 43:**

10       It was therefore the right time for the Fairbairns to take their philanthropy to another level.

11  They would donate $100 million, much of which would be dedicated to fighting Lyme disease—a

12  disease that had recently stricken their entire family, and which has become a silent, rapidly

13  spreading, worldwide pandemic. *See, e.g.*, Donald G. McNeil Jr., *Tick and Mosquito Infections*

14  *Spreading Rapidly, C.D.C. Finds*, N.Y. Times (May 1, 2018).

15  **ANSWER TO COMPLAINT ¶ 43:**

16       Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

17  this Paragraph to form a belief as to their truth and therefore denies them on that basis.

18  **COMPLAINT ¶ 44:**

19       Their donation would benefit a cause in desperate need of funding, about which the

20  Fairbairns care deeply. And doing so specifically in 2017 made personal financial sense for the

21  Fairbairns. Given these dual benefits, the only remaining question was how best to accomplish the

22  donation.

23  **ANSWER TO COMPLAINT ¶ 44:**

24       Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

25  this Paragraph to form a belief as to their truth and therefore denies them on that basis.

26  **SUBHEADING D**

27       In December 2017, Fidelity Charitable Convinces The Fairbairns To Make The $100

28  Million Donation Through Their Fidelity DAF.

Case No. 3:18-cv-04881-JSC                        DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**ANSWER TO SUBHEADING D**

Fidelity Charitable admits that Plaintiffs made a donation to Fidelity Charitable's DAF in December 2017.  Fidelity Charitable denies the remaining statements in Subheading D.

**COMPLAINT ¶ 45:**

The Fairbairns were familiar with DAFs well before December 2017, having established DAF accounts with both Fidelity Charitable and JP Morgan years earlier. And both organizations knew the Fairbairns were precisely the sort of high-wealth, complex-asset individuals critical to their business.

**ANSWER TO COMPLAINT ¶ 45:**

Fidelity Charitable admits that Plaintiffs had established a DAF account with Fidelity Charitable prior to December 2017.  Fidelity Charitable denies Plaintiffs' characterization of its knowledge about Plaintiffs.   Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 46:**

The Fairbairns' relationship with Fidelity stretches back to 1998. In 2014, the Fairbairns placed $20 million in a Fidelity Charitable DAF.

**ANSWER TO COMPLAINT ¶ 46:**

Fidelity Charitable admits that, in 2014, the Fairbairns donated $20 million to Fidelity Charitable.

**COMPLAINT ¶ 47:**

And in 2016—after extensive courting—Fidelity finally succeeded in persuading the Fairbairns to become customers of their Fidelity Family Office Services. The Family Office is a division of Fidelity that advertises "a dedicated and exclusive focus on the ultra wealthy community and a deep understanding of their sophisticated needs." Fidelity Investments, *Family Office Services: Focused on the ultra wealthy* (2018). Joining the Family Office required the Fairbairns to move tens of millions in additional investments to Fidelity. But doing so, as advertised by Fidelity, gave them a "dedicated relationship team serv[ing] as [their] single point of contact" for all

21

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

interactions with any Fidelity entity going forward, along with "[a]ccess to a dedicated Investment Analyst who can execute complex trading strategies by leveraging Fidelity's institutional capital markets capabilities." *Id.*

**ANSWER TO COMPLAINT ¶ 47:**

Fidelity Charitable admits that Plaintiffs became customers of Fidelity Family Office Services in 2016.  Fidelity Charitable admits that Fidelity Family Office Services is a division of Fidelity that focuses on high net worth customers.   Fidelity Charitable denies Plaintiffs' characterization of Fidelity's "courting" of Plaintiffs.  Fidelity Charitable further answers that, to the extent the allegations in Paragraph 47 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.

**COMPLAINT ¶ 48:**

The Fairbairns also had a longstanding relationship with JP Morgan, and in particular with a wealth manager named Dennis Hearst. The Fairbairns had interacted with and been impressed by Dennis for many years when he worked at Goldman Sachs. In the course of these interactions, Dennis proved to be both reliable and sophisticated. The Fairbairns were thus excited to work with him when he joined JP Morgan's private banking group. This relationship was indeed the catalyst for the Fairbairns establishing a $20 million DAF account with JP Morgan in 2013.

**ANSWER TO COMPLAINT ¶ 48:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 49:**

Before they even knew the Fairbairns were considering a $100 million donation in 2017, both institutions reached out to the Fairbairns about making additional DAF contributions before year's end.

a.   Fidelity Charitable moved first. On December 12, 2017, Justin Kunz—the Fairbairns' dedicated point of contact within the Family Office—emailed them to ask whether they had any bitcoin or "other securities" they would like to contribute to their DAF in 2017.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1         b.     Dennis from JP Morgan reached out the very next day. He sent the Fairbairns a

2    message similarly asking them about contributing "appreciated securities," "restricted stock," or

3    even "limited partnerships" to their JP Morgan DAF account.

4    **ANSWER TO COMPLAINT ¶ 49:**

5         Fidelity Charitable admits that Justin Kunz was Plaintiffs' point of contact with Fidelity

6    Family Office Services and asked Plaintiffs whether they were contemplating a contribution to their

7    DAF in 2017.   Fidelity Charitable lacks sufficient knowledge or information regarding the

8    remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them

9    on that basis.

10   **COMPLAINT ¶ 50:**

11        In the following days, the Fairbairns had a series of conversations and email exchanges with

12   Justin, in which he aggressively pitched Fidelity Charitable as a superior option to JP Morgan and

13   Vanguard (which also sponsors a DAF).

14   **ANSWER TO COMPLAINT ¶ 50:**

15        Fidelity Charitable admits that there were communications between Plaintiffs and Mr. Kunz

16   in December, 2017.   Fidelity Charitable denies Plaintiffs' characterizations of those

17   communications. Fidelity Charitable answers further that it lacks sufficient knowledge or

18   information regarding the remaining allegations in this Paragraph to form a belief as to their truth

19   and therefore denies them on that basis.

20   **COMPLAINT ¶ 51:**

21        On December 19, for example, Justin sent the Fairbairns an email saying that

22        the Charitable team and I went up the ladder and got you the absolute lowest rate

23        available.

24        •    Administrative fee would be 0.08%... JPM is typically 0.20%

25        •    Investment fees- index funds are lower than JP Morgan AND Vanguard…

26            for example Fidelity Total Markets is only 0.015%.

27        •    Other investment options are available but our index funds match or are

28            lower than Vanguard's.

Case No. 3:18-cv-04881-JSC                              DEFENDANT'S ANSWER TO

                                                   PLAINTIFFS' COMPLAINT

1    (ellipses in original).

2    **ANSWER TO COMPLAINT ¶ 51:**

3         Fidelity Charitable answers that, to the extent that the allegations in Paragraph 51 are based

4    on the text of written documents, Fidelity Charitable admits that, to the extent such allegations

5    accurately quote the text of the documents, such text exists, and otherwise denies them.

6    **COMPLAINT ¶ 52:**

7         Even more importantly, Justin's email continued to position Fidelity as more sophisticated

8    and more capable of meeting the Fairbairns' needs than its competitors. Justin said, for example,

9    that Fidelity Charitable would likely be able to "hold Ascend HF," meaning the Fairbairns could

10   potentially accomplish their donation by donating shares in Ascend. Justin also boasted of "the

11   Intangibles" that Fidelity Charitable could provide in helping the Fairbairns achieve their

12   philanthropic goals.

13   **ANSWER TO COMPLAINT ¶ 52:**

14        Fidelity Charitable answers that, to the extent that the allegations in Paragraph 52 are based

15   on the text of written documents, Fidelity Charitable admits that, to the extent such allegations

16   accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity

17   Charitable further denies Plaintiffs' characterization of Mr. Kunz's alleged email.

18   **COMPLAINT ¶ 53:**

19        Several days later, Justin again touted Fidelity Charitable's superior ability to handle

20   complex assets. He asked the Fairbairns if they "would like to grant [their] carried interest [i.e., the

21   portion of Ascend's profits the Fairbairns received based on the company's investment success,

22   which had not yet been realized for tax purposes] into the donor advised fund. Vanguard can't do

23   this but we do it frequently ☺."

24   **ANSWER TO COMPLAINT ¶ 53:**

25        Fidelity Charitable answers that, to the extent that the allegations in Paragraph 53 are based

26   on the text of written documents, Fidelity Charitable admits that, to the extent such allegations

27   accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity

28   Charitable further denies Plaintiffs' characterization of Mr. Kunz's alleged statement.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  **COMPLAINT ¶ 54:**

2  Justin even introduced the Fairbairns to the head of Fidelity Charitable's Complex Assets

3  Group, Ryan Boland, who gave the Fairbairns further information about Fidelity Charitable's

4  ability to accept donations of complex assets.

5  **ANSWER TO COMPLAINT ¶ 54:**

6  Fidelity Charitable admits that Justin Kunz gave Emily Fairbairn Ryan Boland's contact

7  information and copied Mr. Boland on an email with Emily Fairbairn.  Fidelity Charitable admits

8  that Mr. Boland gave Plaintiffs information regarding Fidelity Charitable's ability to accept certain

9  donations.  Fidelity Charitable denies the remaining allegations in Paragraph 54.

10  **SUBHEADING E**

11  The Discussion Changes When One Of The Fairbairns' Major Stock Holdings Spikes In

12  Value.

13  **ANSWER TO SUBHEADING E**

14  Fidelity Charitable denies the statements in Subheading E.

15  **COMPLAINT ¶ 55:**

16  As the Fairbairns were considering how to most effectively structure their donation, they

17  were presented with a unique opportunity.

18  **ANSWER TO COMPLAINT ¶ 55:**

19  Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

20  this Paragraph to form a belief as to their truth and therefore denies them on that basis.

21  **COMPLAINT ¶ 56:**

22  On December 26, the Federal Communications Commission (FCC) approved the core

23  technology behind a publicly-traded company called Energous, in which the Fairbairns were (and

24  are) major stakeholders. Energous trades under the ticker symbol "WATT." This announcement

25  caused Energous's stock price to skyrocket 39% over the course of December 27.

26  **ANSWER TO COMPLAINT ¶ 56:**

27  Fidelity Charitable admits that Energous trades under the ticker symbol "WATT" and that

28  Energous's stock price rose over the course of December 27.  Fidelity Charitable lacks sufficient

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   knowledge or information regarding the remaining allegations in this Paragraph to form a belief as

2   to their truth and therefore denies them on that basis.

3   **COMPLAINT ¶ 57:**

4         The Fairbairns' dedicated team at Fidelity had closely followed Energous since well before

5   any discussions about the donation began. For example, as part of their ongoing discussions about

6   the company, the Fairbairns sent Justin a slide deck about its core technology—and investment

7   upside—in November 2016.  In response, Justin mentioned having on multiple previous occasions

8   "floated [the company] around the Family Office." And when the stock had a particularly good day

9   in early 2017, a trader on their Fidelity team sent an unprompted email congratulating them on the

10   "[n]ice move in WATT today!"

11   **ANSWER TO COMPLAINT ¶ 57:**

12         Fidelity Charitable answers that, to the extent that the allegations in Paragraph 57 are based

13   on the text of written documents, Fidelity Charitable admits that, to the extent such allegations

14   accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity

15   Charitable denies Plaintiffs' characterization of the alleged documents.

16   **COMPLAINT ¶ 58:**

17         Accordingly, Energous's spike in value did not go unnoticed by Fidelity. And the Fairbairns

18   immediately recognized the potential upside of donating the Energous holdings. Their average cost

19   basis in the stock was substantially lower than its current, post-jump value. That meant they would

20   face enormous capital gains tax if they eventually sold the shares for their own benefit. But if the

21   Fairbairns instead donated the shares, their full liquidation value could go to charity tax free.

22   Moreover, by donating the shares to a DAF, the Fairbairns could deduct the shares' full fair market

23   value. That would mean both far more money to fight Lyme disease, and a smaller tax bill for the

24   Fairbairns.

25   **ANSWER TO COMPLAINT ¶ 58:**

26         Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in

27   this Paragraph to form a belief as to their truth and therefore denies them on that basis.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**COMPLAINT ¶ 59:**

But the Fairbairns also had some concerns. They would be donating just under 10% of the company's outstanding stock, and they knew that Fidelity Charitable would liquidate the stock after the donation.

**ANSWER TO COMPLAINT ¶ 59:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 60:**

This gave the Fairbairns pause. Liquidating a large block of stock can be a delicate process; if not executed according to best practices, it can cause the stock's value to crash. Among the most important considerations in a stock liquidation are the timing and rate at which shares are sold off.

**ANSWER TO COMPLAINT ¶ 60:**

No response is required to Paragraph 60, which purports to describe the process of liquidating a large block of stock and its effect on the stock's value. Fidelity Charitable denies the allegations in this Paragraph to the extent they assert legal conclusions, are vague and ambiguous (including but not limited to "large block" and "delicate"), and make factual allegations generally without context or specificity. Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 61:**

JP Morgan addresses these issues by simply giving donors control over them. Donors can specify "the timing and rate at which the donated securities are liquidated." JP Morgan Charitable, *Introducing the J.P. Morgan Charitable Giving Fund* at 2 (2017). Indeed, the Fairbairns' experience with Dennis was that he would work closely with them in managing all aspects of their DAF account and its associated investments.

**ANSWER TO COMPLAINT ¶ 61:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.  Fidelity

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

Charitable further answers that, to the extent that the allegations in Paragraph 61 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.

**COMPLAINT ¶ 62:**

Fidelity Charitable has no such policy; its guidelines simply say it will liquidate stock "at the earliest date possible." Fidelity Charitable, *Fidelity Charitable Policy Guidelines: Program Circular* at 6 (2017).

**ANSWER TO COMPLAINT ¶ 62:**

Fidelity Charitable answers that, to the extent that the allegations in Paragraph 62 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.

**COMPLAINT ¶ 63:**

Given the lack of built-in protections for circumstances requiring a liquidation strategy more sophisticated than "the earliest date possible," the Fairbairns had three principal concerns about Fidelity Charitable handling the WATT liquidation.

a.      First, a botched liquidation would mean they had less money to direct to the fight against Lyme disease;

b.      Second, if the "earliest date possible" for liquidation was the same day the stock was donated, it could significantly reduce the size of the Fairbairns' own tax deduction. That is because the size of the deduction for donated stocks turns on the stock's fair market value on the day the charitable organization receives it. And fair market value is calculated by averaging the daily high and low prices for the stock. Thus, a botched liquidation that happened on the same day as the donation could have significant tax consequences; and

c.      Third, as angel investors and continued stakeholders in Energous, the Fairbairns were concerned that a botched liquidation would damage the company going forward.

**ANSWER TO COMPLAINT ¶ 63:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**SUBHEADING F**

Fidelity Charitable Makes Representations To Assuage The Fairbairns' Concerns And Convince Them To Stick With Fidelity Charitable.

**ANSWER TO SUBHEADING F**

Fidelity Charitable denies the statements in Subheading F.

**COMPLAINT ¶ 64:**

These concerns caused the Fairbairns to reconsider making their donation through Fidelity Charitable. They instead strongly considered using JP Morgan, where they knew they could work with Dennis to execute a sophisticated, careful liquidation strategy that would maximize the shares' value.  They told Justin this in a series of frank conversations beginning on the afternoon of December 27.

**ANSWER TO COMPLAINT ¶ 64:**

Fidelity Charitable admits that Plaintiffs spoke with Justin Kunz over the phone on December 27.  Fidelity Charitable denies Plaintiffs' characterization of these conversations. Fidelity Charitable lacks sufficient knowledge or information regarding the remaining allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 65:**

Thus, to convince the Fairbairns to stick with Fidelity Charitable, Fidelity Charitable made four critical representations about how it would handle the liquidation: (1) it would employ sophisticated, state-of-the-art methods for liquidating large blocks of stock, (2) it would not trade more than 10% of the daily trading volume of Energous shares, (3) it would allow the Fairbairns to advise on a price limit (i.e., a point below which Fidelity would not sell shares without first consulting the Fairbairns), and (4) it would not liquidate any shares until the new year.

**ANSWER TO COMPLAINT ¶ 65:**

Fidelity Charitable denies the allegations in Paragraph 65.

**COMPLAINT ¶ 66:**

Justin made these representations on behalf of Fidelity Charitable, acting as its agent. On information and belief, Justin was communicating with other agents of Fidelity Charitable, and he

1    reported the substance of those communications to the Fairbairns.

2    **ANSWER TO COMPLAINT ¶ 66:**

3         Fidelity Charitable denies the allegations in Paragraph 66.

4    **COMPLAINT ¶ 67:**

5         In short, Fidelity Charitable promised the Fairbairns it had the sophistication, would apply

6    the necessary safeguards, and would give them the necessary input, to make sure it treated the

7    Energous stock "gently" (to use Fidelity Charitable's word).

8    **ANSWER TO COMPLAINT ¶ 67:**

9         Fidelity Charitable denies the allegations in Paragraph 67.

10   **COMPLAINT ¶ 68:**

11        Relying on these promises, the Fairbairns decided Fidelity Charitable was indeed their best

12   option.  Malcolm Fairbairn informed Fidelity Charitable on December 27 that the Fairbairns would

13   transfer 1.93 million shares of Energous stock to their Fidelity Charitable DAF account.

14   **ANSWER TO COMPLAINT ¶ 68:**

15        Fidelity Charitable admits that Plaintiffs communicated on December 27 that shares of

16   Energous stock would be donated to Fidelity Charitable, and denies the remaining allegations of

17   Paragraph 68.

18   **COMPLAINT ¶ 69:**

19        Fidelity Charitable received 700,000 Energous shares on December 28, and the remaining

20   1.2 million on December 29.

21   **ANSWER TO COMPLAINT ¶ 69:**

22        Fidelity Charitable admits that it received 700,000 Energous shares on December 28, 2017.

23   Fidelity Charitable further admits that it received 1,233,585 shares of Energous shares on December

24   29, 2017.

25   **SUBHEADING G**

26        Fidelity Charitable Breaks Each Of Its Promises To The Fairbairns, To Disastrous Effect.

27   **ANSWER TO SUBHEADING G**

28        Fidelity Charitable denies the statements in Subheading G.

Case No. 3:18-cv-04881-JSC                                    DEFENDANT'S ANSWER TO
                                                             PLAINTIFFS' COMPLAINT

**COMPLAINT ¶ 70:**

What the Fairbairns did not know was that—even as the final shares landed in their DAF account—Fidelity Charitable immediately began liquidating the entire 1.93 million-share block, and in the process egregiously breaking each of its promises to the Fairbairns.

a.      Rather than wait for the new year as it had promised to do, Fidelity Charitable liquidated the entire 1.93 million shares in a matter of hours on the last afternoon of the last business day of the year—perhaps the year's single slowest trading period.

b.      Rather than trade only 10% of the daily volume as it had promised to do, Fidelity Charitable traded approximately 16% of the daily volume and a gobsmacking 35% of the volume over the three-hour trading window.

c.      Rather than using sophisticated, state-of-the-art trading strategies, Fidelity Charitable executed the liquidation using incompetent and inappropriate methods.

d.      And rather than allow the Fairbairns to advise on a price limit, Fidelity Charitable did these things without even telling the Fairbairns they were happening.

**ANSWER TO COMPLAINT ¶ 70:**

Fidelity Charitable admits that it sold 1,931,985 shares of Energous stock on December 29, 2017, as it was entitled to do.  Fidelity Charitable further admits that December 29, 2017 was the last trading day of the year.  Fidelity Charitable denies Plaintiffs' characterization of December 29, 2017, and the remaining allegations in Paragraph 70.

**COMPLAINT ¶ 71:**

Put simply: Fidelity Charitable violated each of its representations to the Fairbairns, and the predictable result was the very outcome the Fairbairns had feared—the very reason they went with Fidelity Charitable only once it made those promises:

a.      The Energous shares were liquidated for tens of millions of dollars less than they would have been had Fidelity Charitable honored its promises to the Fairbairns.

b.      And because Fidelity Charitable's actions drastically reduced the stock's fair market value on the same day the Fairbairns made their donation, the Fairbairns were able to deduct millions less from their taxes than they would have been able to had Fidelity Charitable not broken

1   its promises.

2   **ANSWER TO COMPLAINT ¶ 71:**

3       Fidelity Charitable denies the allegations in Paragraph 71.

4   **SUBHEADING H**

5       Fidelity Charitable Entirely Botched The WATT Liquidation.

6   **ANSWER TO SUBHEADING H**

7       Fidelity Charitable denies the statements in Subheading H.

8   **COMPLAINT ¶ 72:**

9       At least two of the promises Fidelity Charitable broke—the 10% limit on daily volume and

10  the Fairbairns' ability to advise on a price limit—were designed to ensure that Fidelity Charitable's

11  liquidation of the stock did not cause the stock's value to plummet. But as noted, Fidelity

12  Charitable's liquidation violated both of those promises. And in so doing, Fidelity Charitable

13  botched the trade entirely.

14  **ANSWER TO COMPLAINT ¶ 72:**

15      Fidelity Charitable denies the allegations in Paragraph 72.

16  **COMPLAINT ¶ 73:**

17      The easiest way to understand why is to look at the outcome of the liquidation. A large trade

18  executed responsibly would affect the stock price to a limited extent. But here, Fidelity Charitable's

19  trading crashed the stock, driving the share price down more than 30%.

20  **ANSWER TO COMPLAINT ¶ 73:**

21      Fidelity Charitable denies the allegations in Paragraph 73.

22  **COMPLAINT ¶ 74:**

23      The process by which Fidelity Charitable liquidated the shares was also indefensible. For

24  example:

25      a.      To liquidate a large block of stock without driving down the price, traders must

26  appropriately spread out the sale so that the market may absorb it. Fidelity Charitable, however,

27  liquidated the entire position over the course of three hours on the last afternoon of the last business

28  day of the year—likely the single worst time period in the entire year to do so.

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1    b.      It did so, moreover, without even attempting to find ways to mitigate its outsized

2    trading volume over this period—for example by seeking to sell shares in large blocks (rather than

3    individually) or by looking for additional liquidity in readily available off-exchange trading pools.

4    c.      Additionally, trading algorithms are generally a central feature of large stock

5    liquidations. Fidelity Charitable flagrantly misused them here. It deployed multiple algorithms

6    simultaneously, in a way that caused the algorithms to compete against each other in the market

7    and further drive down the share price.

8    d.      Finally, even when traders otherwise follow stock liquidation best practices, it is

9    critically important that they impose safeguards that permit reassessment in the event the trader's

10   strategies begin moving the market more than expected. In fact, virtually all automated trading

11   machines have such safeguards built into the platform, and Fidelity has established generally

12   applicable internal safeguards that should have triggered a reassessment here. But Fidelity

13   Charitable either disregarded, disabled, or failed altogether to impose any safeguards here.

14   **ANSWER TO COMPLAINT ¶ 74:**

15   Fidelity Charitable admits that it sold 1,931,985 shares of Energous stock on December 29,

16   2017, as it was entitled to do.  Fidelity Charitable admits that it deployed algorithms in connection

17   with the sale of Energous stock.  Fidelity Charitable denies Plaintiffs' characterization of the

18   liquidation and the remaining allegations in Paragraph 74.

19   **COMPLAINT ¶ 75:**

20   Put simply, Fidelity Charitable acted, at best, with egregious incompetence in liquidating

21   the WATT shares. At worst, its outrageous conduct was motivated by improper self-interest—the

22   desire to get as much money as possible under management by year's end, no matter the cost to the

23   Fairbairns. *See infra* ¶ 83. Either way, the result was the shares yielding tens of millions of dollars

24   less than they should have.

25   **ANSWER TO COMPLAINT ¶ 75:**

26   Fidelity Charitable denies the allegations in Paragraph 75.

27   **SUBHEADING I**

28   The Fairbairns Confront Fidelity About The Botched Liquidation But Are Stonewalled.

1    **ANSWER TO SUBHEADING I**

2        Fidelity Charitable denies the statements in Subheading I.

3    **COMPLAINT ¶ 76:**

4        In light of Fidelity Charitable's promise that it would not liquidate the WATT shares until

5    the new year, two weeks passed before the Fairbairns realized the wild trading in WATT on

6    December 29 had in fact been the complete liquidation of their donated shares.

7    **ANSWER TO COMPLAINT ¶ 76:**

8        Fidelity Charitable denies the allegations in Paragraph 76.

9    **COMPLAINT ¶ 77:**

10       On January 15, Malcolm Fairbairn emailed Justin from the Family Office:

11       Hi Justin.

12       Could you provide a recap of the transactions involving our donated shares for all

13       securities. To me it seems aggressive to liquidate 9.9 percent of a company's shares

14       in a half day of trading. Please include number of shares and orders given and at

15       what times.

16       I was told that the selling would begin after the first of the year, you guys would be

17       gentle with the stock (less than 10% of trading volume) and we could advise on a

18       price limit if necessary. So I was surprised to hear that it was liquidated on the last

19       day of December.

20       Best Regards

21       Malcolm

22   **ANSWER TO COMPLAINT ¶ 77:**

23       Fidelity Charitable answers that to the extent the allegations in Paragraph 77 are based on

24   the text of a written document Fidelity Charitable admits that, to the extent such allegations

25   accurately quote the text of the document, such text exists, and otherwise denies them.

26   **COMPLAINT ¶ 78:**

27       Justin did not dispute that Fidelity Charitable had made any of the promises set out in

28   Malcolm's email. He simply responded (incorrectly) that "[t]he trading desk within our Charitable

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   Group stuck to under the 10% of the volume," and that he could set up a phone call to discuss.

2   **ANSWER TO COMPLAINT ¶ 78:**

3       Fidelity Charitable answers that to the extent the allegations in Paragraph 78 are based on

4   the text of a written document Fidelity Charitable admits that, to the extent such allegations

5   accurately quote the text of the document, such text exists.  Fidelity Charitable denies Plaintiffs'

6   characterization of Mr. Kunz's alleged statement as a failure to dispute any alleged promises.

7   Fidelity Charitable denies the remaining allegations in Paragraph 78.

8   **COMPLAINT ¶ 79:**

9       After a week of back and forth, Justin finally shared a chart showing only basic information

10  about the trade executions. At no point did he ever dispute that Fidelity Charitable had made the

11  promises about how and when it would liquidate the shares. In fact, on a subsequent phone call with

12  the Fairbairns and other Fidelity employees, Justin himself reiterated that Fidelity Charitable had

13  made those promises.

14  **ANSWER TO COMPLAINT ¶ 79:**

15      Fidelity Charitable admits that Justin Kunz provided information to Plaintiffs showing

16  information about the trade executions.    To the extent the allegations in Paragraph 79 are an

17  accurate representation of that information and that it constitutes a "chart," Fidelity Charitable

18  admits that such a "chart" exists.  Fidelity Charitable denies Plaintiffs' characterization of the

19  information as "basic" and denies Plaintiffs' characterization of Mr. Kunz's response as a failure

20  to dispute that promises had been made.  Fidelity Charitable denies the remaining allegations in

21  Paragraph 79.

22  **COMPLAINT ¶ 80:**

23      After Justin shared the original chart, the Fairbairns sought additional, specific information

24  about the trades, Fidelity Charitable's trading policies, the commissions or other compensation that

25  Fidelity Charitable and its employees received, and other basic details about their DAF account and

26  Fidelity Charitable's actions. The Fairbairns also repeatedly asked for any kind of explanation for

27  Fidelity Charitable's astonishing and inexplicable conduct.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 80:**

Fidelity Charitable admits that Plaintiffs asked for information about trades of Energous shares.    Fidelity Charitable denies Plaintiffs' characterization of those questions and characterization of Fidelity Charitable's conduct and denies the remaining allegations in Paragraph 80.

**COMPLAINT ¶ 81:**

In stark contrast to its pre-donation solicitousness, however, Fidelity Charitable completely stonewalled the Fairbairns, refusing even to tell them how much money it (or its affiliated financial institution) charged them to make the trades, and eventually simply saying it was "comfortable" with the level of information it had provided and would provide no more.

**ANSWER TO COMPLAINT ¶ 81:**

Fidelity Charitable answers that, to the extent that the allegations in Paragraph 81 are based on the text of written documents, Fidelity Charitable admits that, to the extent such allegations accurately quote the text of the documents, such text exists, and otherwise denies them.  Fidelity Charitable denies the remaining allegations in Paragraph 81.

**COMPLAINT ¶ 82:**

The basis for this refusal is unclear. Perhaps Fidelity Charitable believes it is simply too large and powerful to be held accountable for its actions. Alternatively, perhaps it has refused to provide the information because doing so would reveal systemic undermining of donors' and charities' interests in favor of Fidelity's own bottom line.

**ANSWER TO COMPLAINT ¶ 82:**

No response is required to Paragraph 82, as it consists of argument and speculation.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 82.

**COMPLAINT ¶ 83:**

And indeed, incompetence alone cannot explain Fidelity Charitable's outrageous actions in this case. Given the significant incentives it faced to liquidate the Energous shares immediately, at whatever cost to the Fairbairns, it is beyond likely that Fidelity Charitable acted based on improper, self-interested motivations.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   a. As an initial matter, Fidelity Charitable generates massive profits for its parent and

2 sister companies by placing virtually all DAF contributions in Fidelity investment products. Thus,

3 the sooner it liquidated the Energous shares, the sooner that money could start generating profits.

4   b. What's more, Plaintiffs have reason to believe that the success of Fidelity Charitable

5 and its employees—and the resulting compensation those employees earn—is tied to the amount of

6 assets under management (i.e., held in Fidelity investment products) as of year's end. Thus, the

7 agents of Fidelity Charitable responsible for the liquidation had every incentive to liquidate the

8 shares immediately. And given the possibility that the Fairbairns would make donations out of their

9 DAF account over the coming year, there was no guarantee those assets would remain under

10 Fidelity's management at the end of 2018. Fidelity Charitable and its agents accordingly stood to

11 benefit from immediate liquidation *even if it meant a significant reduction in the shares' liquidation*

12 *value*.

13 **ANSWER TO COMPLAINT ¶ 83:**

14   Fidelity Charitable denies the allegations in Paragraph 83.

15 **SUBHEADING J**

16   To Mitigate The Harm Of Its Botched Liquidation, Fidelity Charitable Offers To Help The

17 Fairbairns Cheat On Their Taxes.

18 **ANSWER TO SUBHEADING J**

19   Fidelity Charitable denies the statements in Subheading J.

20 **COMPLAINT ¶ 84:**

21   In addition to its prevarications and stonewalling with regard to the trades, Fidelity

22 Charitable attempted to mitigate the harm of its botched liquidation by suggesting that the

23 Fairbairns claim December 28, rather than December 29, as the date for the entire Energous

24 donation.

25 **ANSWER TO COMPLAINT ¶ 84:**

26   Fidelity Charitable denies the allegations in Paragraph 84.

27 **COMPLAINT ¶ 85:**

28   Measuring the stock's fair market value as of December 28 would result in a far larger

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  deduction for the Fairbairns.

2  **ANSWER TO COMPLAINT ¶ 85:**

3    Fidelity Charitable admits that the average of the high and low prices of Energous stock on

4  December 28, 2017 was higher than the average of the high and low prices on December 29, 2017.

5  Fidelity Charitable otherwise denies the allegations in Paragraph 85.

6  **COMPLAINT ¶ 86:**

7    But there was only one problem: Fidelity Charitable received only part of the donation on

8  December 28. The rest of the shares were received on December 29. It would thus be tax fraud to

9  claim December 29 as the date for the entire donation.

10  **ANSWER TO COMPLAINT ¶ 86:**

11    Fidelity Charitable admits that it received 700,000 shares of Energous stock on December

12  28, 2019 and 1,233,585 shares of Energous stock on December 29, 2017.  Fidelity Charitable denies

13  the remaining allegations in Paragraph 86, including to the extent they assert legal conclusions.

14  **COMPLAINT ¶ 87:**

15    This did not deter Fidelity Charitable. It told the Fairbairns it would send a letter saying the

16  stock was donated in "December 2017," and "you and your CPA can decide how to interpret which

17  day it came in."  The Fairbairns understood Fidelity Charitable to be suggesting that it would help

18  them skirt the law.

19  **ANSWER TO COMPLAINT ¶ 87:**

20    Fidelity Charitable denies any motivation or intent to "help [plaintiffs] skirt the law," denies

21  the characterization of Fidelity Charitable's intent, and further denies the allegations in this

22  paragraph to the extent they assert legal conclusions.  Fidelity Charitable admits it sent a letter to

23  Plaintiffs stating that they made a donation to Fidelity Charitable in December 2017.  Fidelity

24  Charitable lacks sufficient knowledge or information regarding the remaining allegations in

25  Paragraph 87 and therefore denies them on that basis.

26  **COMPLAINT ¶ 88:**

27    Over Emily Fairbairn's protest that she was unwilling to break the law, Fidelity Charitable

28  sent the letter. (The Fairbairns have not claimed December 29 as the date for the entire donation.)

DEFENDANT'S ANSWER TO
                                                      PLAINTIFFS' COMPLAINT

1    **ANSWER TO COMPLAINT ¶ 88:**

2        Fidelity Charitable admits that it sent a letter to Plaintiffs stating that they made a donation

3 to Fidelity Charitable in December 2017.  Fidelity Charitable denies Plaintiffs' characterization of

4 that letter and Mrs. Fairbairn's alleged "protest."  Fidelity Charitable lacks sufficient knowledge or

5 information regarding the remaining allegations in this Paragraph to form a belief as to their truth

6 and therefore denies them on that basis.

7                                **COUNT ONE**

8                                *Misrepresentation*

9    **COMPLAINT ¶ 89:**

10        Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

11    **ANSWER TO COMPLAINT ¶ 89:**

12        Fidelity Charitable responds to each preceding paragraph in its answer as if fully set forth

13 herein.

14    **COMPLAINT ¶ 90:**

15        The Fairbairns would not have donated the WATT stock to Fidelity Charitable but for its

16 promises about how it would handle their donation. They would either not have donated the stock

17 at all, or would have done so through JP Morgan.

18    **ANSWER TO COMPLAINT ¶ 90:**

19        Fidelity Charitable denies that it made promises about how it would handle Plaintiffs'

20 donation.  Fidelity Charitable lacks sufficient knowledge or information regarding the remaining

21 allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

22    **COMPLAINT ¶ 91:**

23        Fidelity Charitable promised that (1) it would employ sophisticated, state-of-the-art

24 methods for liquidating large blocks of stock, (2) it would not trade more than 10% of the daily

25 trading volume of Energous shares, (3) it would allow the Fairbairns to advise on a price limit (i.e.,

26 a point below which it would not sell without first consulting the Fairbairns), and (4) it would not

27 liquidate any shares until the beginning of 2018.

28

Case No. 3:18-cv-04881-JSC                            DEFENDANT'S ANSWER TO
                                                       PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 91:**

Fidelity Charitable denies the allegations in Paragraph 91.

**COMPLAINT ¶ 92:**

Fidelity Charitable made each of these promises for the purpose of inducing the Fairbairns to donate the WATT shares. It did so not just to assuage the Fairbairns' concerns about the price it would achieve in liquidating the stock, but also specifically to address the Fairbairns' concerns about how the liquidation might affect their tax deduction.

**ANSWER TO COMPLAINT ¶ 92:**

Fidelity Charitable denies the allegations in Paragraph 92.

**COMPLAINT ¶ 93:**

The Fairbairns had no reason not to take Fidelity at its word.

**ANSWER TO COMPLAINT ¶ 93:**

Fidelity Charitable lacks sufficient knowledge or information regarding the allegations in this Paragraph to form a belief as to their truth and therefore denies them on that basis.

**COMPLAINT ¶ 94:**

Fidelity Charitable, however, flagrantly violated each of these promises. It (1) liquidated the entire block of shares on December 29, (2) accounting for around 16% of the day's trading volume (and 35% of volume over the three-hour trading window), (3) using inappropriate trading methodologies, in a way that caused Fidelity's own trades to compete against each other, (4) without even telling the Fairbairns it was happening, let alone allowing them to advise on a price limit.

**ANSWER TO COMPLAINT ¶ 94:**

Fidelity Charitable admits that it sold 1,931,985 shares of Energous stock on December 29, 2017, as it was entitled to do.  Fidelity Charitable denies the remaining allegations in Paragraph 94.

**COMPLAINT ¶ 95:**

Fidelity Charitable knew when it made these promises that it had no intention of keeping them. In the alternative, the Fidelity Charitable made the promises intending to honor them but then negligently and recklessly failed to do so.

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  **ANSWER TO COMPLAINT ¶ 95:**

2       Fidelity Charitable denies the allegations in Paragraph 95.

3  **COMPLAINT ¶ 96:**

4       As a result, the WATT shares were liquidated for far less than they would have been, and

5  the Fairbairns' tax deduction was smaller than it would have been, had Fidelity Charitable honored

6  its promises.

7  **ANSWER TO COMPLAINT ¶ 96:**

8       Fidelity Charitable denies the allegations in Paragraph 96.

9  **COMPLAINT ¶ 97:**

10       This Court should therefore order Fidelity Charitable to make the Fairbairns whole with

11  respect to their tax deduction—i.e., pay the Fairbairns the difference between their actual deduction

12  and the deduction they would have received had Fidelity Charitable honored its promises.

13  **ANSWER TO COMPLAINT ¶ 97:**

14       No response is required to Paragraph 97, which consists of conclusions of law.  To the extent

15  a response is required, Fidelity Charitable denies the allegations in Paragraph 97.

16  **COMPLAINT ¶ 98:**

17       This Court should also order Fidelity Charitable to make the Fairbairns whole with respect

18  to their donation—i.e., restore to the Fairbairns' DAF account the amount of money that a

19  reasonably competent liquidation (adhering to the promises made) would have yielded.

20  **ANSWER TO COMPLAINT ¶ 98:**

21       No response is required to Paragraph 98, which consists of conclusions of law.  To the extent

22  a response is required, Fidelity Charitable denies the allegations in Paragraph 98.

23  **COMPLAINT ¶ 99:**

24       In the alternative, this Court should order rescission of the donation.

25  **ANSWER TO COMPLAINT ¶ 99:**

26       No response is required to Paragraph 99, which consists of conclusions of law.  To the extent

27  a response is required, Fidelity Charitable denies the allegations in Paragraph 99.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1

**COUNT TWO**

2

*Breach of Contract*

3

**COMPLAINT ¶ 100:**

4

Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

5

**ANSWER TO COMPLAINT ¶ 100:**

6

Fidelity Charitable responds to each preceding paragraph in its answer as if fully set forth

7

herein.

8

**COMPLAINT ¶ 101:**

9

Fidelity Charitable's conduct also breached an enforceable agreement between the parties

10

about how Fidelity Charitable would treat the Fairbairns' donation.

11

**ANSWER TO COMPLAINT ¶ 101:**

12

No response is required to Paragraph 101, which consists of conclusions of law.  To the

13

extent a response is required, Fidelity Charitable denies the allegations in Paragraph 101.

14

**COMPLAINT ¶ 102:**

15

In consideration for the Fairbairns donating the 1.93 million WATT shares, Fidelity

16

Charitable agreed (1) it would employ sophisticated methods in liquidating those shares, (2) it

17

would not trade more than 10% of the daily trading volume, (3) it would allow the Fairbairns to

18

advise on a price limit, and (4) it would not liquidate any shares until 2018.

19

**ANSWER TO COMPLAINT ¶ 102:**

20

Fidelity Charitable denies the allegations in Paragraph 102.

21

**COMPLAINT ¶ 103:**

22

The Fairbairns performed their obligation under the agreement by donating the 1.93 million

23

shares.

24

**ANSWER TO COMPLAINT ¶ 103:**

25

No response is required to Paragraph 103, which consists of conclusions of law.  To the

26

extent a response is required, Fidelity Charitable admits that Plaintiffs donated 1,933,585 shares of

27

Energous stock to Fidelity Charitable, and denies the remaining allegations in Paragraph 103.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  **COMPLAINT ¶ 104:**

2      Fidelity Charitable, however, breached by (1) liquidating the entire block of shares on

3  December 29, (2) accounting for around 16% of the day's trading volume (and 35% of volume over

4  the three-hour trading window), (3) using inappropriate trading methodologies, in a way that caused

5  Fidelity's own trades to compete against each other, (4) without allowing the Fairbairns to advise

6  on a price limit.

7  **ANSWER TO COMPLAINT ¶ 104:**

8      No response is required to Paragraph 104, which consists of conclusions of law.  To the

9  extent a response is required, Fidelity Charitable denies the allegations in Paragraph 104.

10  **COMPLAINT ¶ 105:**

11      As a result, the Fairbairns' tax deduction was smaller than it would have been in the absence

12  of Fidelity Charitable's breach, and the Fairbairns were left with far less money to direct to

13  charitable causes through their DAF account than they would have been absent Fidelity Charitable's

14  breach.

15  **ANSWER TO COMPLAINT ¶ 105:**

16      Fidelity Charitable denies the allegations in Paragraph 105.

17  **COMPLAINT ¶ 106:**

18      At a minimum, Fidelity Charitable's conduct violated the implied covenant of good faith

19  and fair dealing present in every contract.

20  **ANSWER TO COMPLAINT ¶ 106:**

21      No response is required to Paragraph 106, which consists of conclusions of law.  To the

22  extent a response is required, Fidelity Charitable denies the allegations in Paragraph 106.

23  **COMPLAINT ¶ 107:**

24      This Court should therefore order Fidelity Charitable to make the Fairbairns whole with

25  respect to their tax deduction. This Court should also order Fidelity Charitable to make the

26  Fairbairns whole with respect to their donation.

27  **ANSWER TO COMPLAINT ¶ 107:**

28      No response is required to Paragraph 107, which consists of conclusions of law.  To the

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  extent a response is required, Fidelity Charitable denies the allegations in Paragraph 107.

2  **COMPLAINT ¶ 108:**

3    In the alternative, this Court should order rescission of the donation.

4  **ANSWER TO COMPLAINT ¶ 108:**

5    No response is required to Paragraph 108, which consists of conclusions of law.  To the

6  extent a response is required, Fidelity Charitable denies the allegations in Paragraph 108.

7                              **COUNT THREE**

8                              *Estoppel*

9  **COMPLAINT ¶ 109:**

10    Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

11  **ANSWER TO COMPLAINT ¶ 109:**

12    Fidelity Charitable responds to each preceding paragraph in its answer as if fully set forth

13  herein.

14  **COMPLAINT ¶ 110:**

15    The doctrine of estoppel holds a party to what it promised when those promises reasonably

16  induced another party to act.

17  **ANSWER TO COMPLAINT ¶ 110:**

18    No response is required to Paragraph 110, which consists of conclusions of law.

19  **COMPLAINT ¶ 111:**

20    Fidelity Charitable's promises about how it would handle the Fairbairns' donation induced

21  the Fairbairns to donate the Energous shares.

22  **ANSWER TO COMPLAINT ¶ 111:**

23    Fidelity Charitable denies the allegations in Paragraph 111.

24  **COMPLAINT ¶ 112:**

25    Fidelity Charitable should reasonably have expected its promises to induce the Fairbairns'

26  donation—indeed, that was the very reason it made the promises.

27  **ANSWER TO COMPLAINT ¶ 112:**

28    Fidelity Charitable denies the allegations in Paragraph 112.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**COMPLAINT ¶ 113:**

This Court should therefore hold Fidelity Charitable to its word and order Fidelity Charitable to place the Fairbairns where they would be had it not broken its promises.

**ANSWER TO COMPLAINT ¶ 113:**

No response is required to Paragraph 113, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 113.

**COMPLAINT ¶ 114:**

Accordingly, the Court should order Fidelity Charitable to restore to the Fairbairns' DAF account all losses attributable to Fidelity Charitable's wrongdoing, and also to repay the Fairbairns for the tax loss attributable to this wrongdoing.

**ANSWER TO COMPLAINT ¶ 114:**

No response is required to Paragraph 114, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 114.

**COMPLAINT ¶ 115:**

In the alternative, this Court should order rescission of the donation.

**ANSWER TO COMPLAINT ¶ 115:**

No response is required to Paragraph 115, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 115.

**COUNT FOUR**

*Negligence*

**COMPLAINT ¶ 116:**

Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

**ANSWER TO COMPLAINT ¶ 116:**

Fidelity Charitable responds to each preceding paragraph in its answer as if fully set forth herein.

**COMPLAINT ¶ 117:**

Fidelity Charitable's liquidation of the WATT shares utterly failed to meet even baseline standards of competence or reasonableness. Its actions are little different than if the Fairbairns had

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  sent it a briefcase full of stock certificates, and it thought "liquidating" them meant throwing them

2  in the ocean.

3  **ANSWER TO COMPLAINT ¶ 117:**

4      Fidelity Charitable denies the allegations in Paragraph 117.

5  **COMPLAINT ¶ 118:**

6      In so doing, Fidelity Charitable deprived the Fairbairns of the ability to direct money to fight

7  Lyme disease, and also significantly reduced the size of the tax deduction the Fairbairns were able

8  to take.

9  **ANSWER TO COMPLAINT ¶ 118:**

10     Fidelity Charitable denies the allegations in Paragraph 118.

11 **COMPLAINT ¶ 119:**

12     The Fairbairns retain robust, exclusive advisory rights over the disposition of funds held in

13 their DAF account. Fidelity Charitable is obligated to abide by the Fairbairns' directions as long as

14 the Fairbairns direct the money to proper charitable purposes. Thus, by negligently reducing the

15 amount of money over which the Fairbairns have advisory power, Fidelity Charitable has directly

16 and materially impaired the Fairbairns' rights.

17 **ANSWER TO COMPLAINT ¶ 119:**

18     No response is required to Paragraph 119, which consists of conclusions of law.  To the

19 extent a response is required, Fidelity Charitable denies the allegations in Paragraph 119.

20 **COMPLAINT ¶ 120:**

21     Additionally, after specifically promising to handle the WATT liquidation in a way that

22 would maximize the Fairbairns' tax deduction, and thereby incurring a duty to act reasonably with

23 respect to the Fairbairns' deduction, Fidelity Charitable's negligence in fact significantly decreased

24 the size of the tax deduction the Fairbairns were able to take.

25 **ANSWER TO COMPLAINT ¶ 120:**

26     No response is required to Paragraph 120, which consists of conclusions of law.  To the

27 extent a response is required, Fidelity Charitable denies the allegations in Paragraph 120.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**COMPLAINT ¶ 121:**

This Court should therefore order Fidelity Charitable to restore to the Fairbairns' DAF account the amount of money that a reasonably competent liquidation of the Energous shares would have yielded, and to make the Fairbairns whole with respect to their tax deduction.

**ANSWER TO COMPLAINT ¶ 121:**

No response is required to Paragraph 121, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 121.

**COUNT FIVE**

*California Unfair Competition Law (UCL)*

**COMPLAINT ¶ 122:**

Plaintiffs re-allege each preceding paragraph as if fully set forth herein.

**ANSWER TO COMPLAINT ¶ 122:**

Fidelity Charitable responds to each preceding paragraph in its answer as if fully set forth herein.

**COMPLAINT ¶ 123:**

California law prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

**ANSWER TO COMPLAINT ¶ 123:**

No response is required to Paragraph 123, which consists of conclusions of law.

**COMPLAINT ¶ 124:**

Here, Fidelity Charitable violated the UCL by making false promises that wrongfully induced the Fairbairns to donate the WATT shares.

**ANSWER TO COMPLAINT ¶ 124:**

No response is required to Paragraph 124, which consists of conclusions of law.  To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 124.

**COMPLAINT ¶ 125:**

This Court should accordingly order Fidelity Charitable to return to the Fairbairns the value of those shares as of the time of the donation.

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

**ANSWER TO COMPLAINT ¶ 125:**

No response is required to Paragraph 125, which consists of conclusions of law.   To the extent a response is required, Fidelity Charitable denies the allegations in Paragraph 125.

## **AFFIRMATIVE DEFENSES**

Fidelity Charitable asserts the following defenses and reserves the right to assert other defenses or claims when and if they become appropriate and/or available in this Action.   The statement of any defense herein does not assume the burden of proof for any issue, fact, or element of a claim to which the applicable law places the burden of proof on Plaintiffs.

### **First Affirmative Defense**

### **FAILURE TO STATE A CAUSE OF ACTION**

The Complaint, and each purported cause of action alleged therein, fails to state facts sufficient to constitute a cause of action against Fidelity Charitable.

### **Second Affirmative Defense**

### **LACK OF STANDING**

The Complaint is barred because Plaintiff lacks standing to sue Fidelity Charitable for the causes of action pled in the Complaint.

### **Third Affirmative Defense**

### **FEDERAL TAX LAW**

The Internal Revenue Code and/or Internal Revenue Service Regulations prohibit or foreclose the recovery Plaintiffs seek.

### **Fourth Affirmative Defense**

### **ESTOPPEL AND UNCLEAN HANDS**

The Complaint, and each purported cause of action alleged therein, is barred by the conduct, actions, and inactions of Plaintiffs, which amount to and constitute an estoppel of the causes of action and any relief sought thereby.

### **Fifth Affirmative Defense**

### **WAIVER**

The Complaint, and each purported cause of action alleged therein, is barred by the conduct,

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   actions and inactions of Plaintiffs, which amount to and constitute a waiver of any right or rights

2   that Plaintiffs may or might have in relation to the matters alleged in the Complaint.

3   <u>**Sixth Affirmative Defense**</u>

4   **GOOD FAITH**

5   With respect to the matters alleged in the Complaint, Fidelity Charitable at all times acted

6   in good faith and in accordance with reasonable commercial standards, thus precluding any

7   recovery by Plaintiffs.

8   <u>**Seventh Affirmative Defense**</u>

9   **NO BREACH OF DUTY**

10   Fidelity Charitable denies that it or any of its agents, principals, or representatives breached

11   any duty or obligations allegedly owed to Plaintiffs.

12   <u>**Eighth Affirmative Defense**</u>

13   **NO INJURY OR LOSS**

14   Plaintiffs' claims are barred because they have not suffered injury in fact or lost money or

15   property as a result of any alleged action of Fidelity Charitable.

16   <u>**Ninth Affirmative Defense**</u>

17   **DUTY TO READ**

18   The causes of action advanced in the Complaint are barred, in whole or in part, because the

19   alleged matters about which Plaintiffs complain were adequately disclosed to Plaintiffs, and/or

20   Plaintiffs failed to read the documents that were provided to them that disclosed such matters.

21   <u>**Tenth Affirmative Defense**</u>

22   **NO PROXIMATE CAUSATION**

23   Plaintiffs' claims are barred from any recovery because there is no causal connection

24   between the alleged wrongdoing and any harm to Plaintiffs.

25   <u>**Eleventh Affirmative Defense**</u>

26   **PROPORTIONATE REDUCTION OF RELIEF**

27   To the extent that other persons or entities, rather than Fidelity Charitable, are at fault with

28   respect to the matters complained of herein, and/or the alleged harm or damages suffered, any

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  recovery by Plaintiffs should be reduced by the proportion of such harm or damages, if any, caused

2  by said other persons or entities.

3  **Twelfth Affirmative Defense**

4  **NO ENTITLEMENT TO JURY TRIAL ON EQUITABLE CLAIMS**

5  Because jury trials are available for actions at law only, Plaintiffs are not entitled to a jury

6  trial on their equitable claims and any claims at law to the extent they seek equitable relief.

7  **Thirteenth Affirmative Defense**

8  **CONDUCT NOT DECEPTIVE**

9  Fidelity Charitable's business practices are and were not likely to mislead Plaintiffs because

10  substantial disclosure is and was made of all material facts and circumstances, including in the

11  donor application, contribution form and letter of intent, program circular and/or other agreements

12  and account documents.

13  **Fourteenth Affirmative Defense**

14  **NO RELIANCE**

15  Plaintiffs did not, or could not have, reasonably or justifiably relied on the alleged

16  representations made by Fidelity Charitable or its alleged agents or representatives.

17  **Fifteenth Affirmative Defense**

18  **NO LOSS CAUSATION**

19  Fidelity Charitable did not cause any alleged loss to Plaintiffs.

20  **Sixteenth Affirmative Defense**

21  **NO ENTITLEMENT TO DAMAGES**

22  The damages Plaintiffs seek for alleged misrepresentation are not recoverable under that

23  legal theory.

24  **Seventeenth Affirmative Defense**

25  **ADEQUATE REMEDIES AT LAW**

26  The Complaint's prayers for equitable relief are barred because Plaintiffs have adequate

27  remedies at law.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1

**Eighteenth Affirmative Defense**

2

**INTEGRATION AND MERGER; PAROL EVIDENCE RULE**

3  One or more of the causes of action advanced in the Complaint are barred by the terms and

4 conditions of the donor application, contribution form and letter of intent, program circular and/or

5 other agreements and account documents at issue.

6

**Nineteenth Affirmative Defense**

7

**FAILURE TO MITIGATE**

8  To the extent that Plaintiffs have suffered harm from Fidelity Charitable's alleged breach of

9 contract, Plaintiffs have failed to mitigate that harm.

10

**Twentieth Affirmative Defense**

11

**NO ESTOPPEL AVAILABLE BECAUSE OF CONTRACT**

12  To the extent that Plaintiffs demonstrate a valid contract between Plaintiffs and Fidelity

13 Charitable, their estoppel claim is barred.

14

**Twenty-First Affirmative Defense**

15

**ECONOMIC LOSS**

16  Plaintiffs' negligence claim is barred by the economic loss doctrine and their losses are

17 recoverable, if at all, in contract alone.

18

**Twenty-Second Affirmative Defense**

19

**CONTRIBUTORY/COMPARATIVE NEGLIGENCE**

20  Fidelity Charitable is not legally responsible with respect to any restitution and/or monetary

21 award that may be claimed by Plaintiffs in connection with the matters alleged in the Complaint.

22 However, if Fidelity Charitable is found to be legally responsible in any manner, then it alleges that

23 its legal responsibilities are not the sole and proximate cause of any harm to Plaintiffs, and the

24 restitution and/or monetary award, if any, is to be apportioned in accordance with the fault and legal

25 responsibility of all parties, persons and entities, or the agents, servants and employees of such

26 parties, persons and entities, who contributed to and/or caused said harm, according to proof

27 presented at the time of trial.

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1

**Twenty-Third Affirmative Defense**

2

**CONSENT/ASSUMPTION OF RISK**

3

By their own conduct, acts and omissions, Plaintiffs consented to and acquiesced in Fidelity

4

Charitable's conduct and have assumed the risk of any purportedly tortious conduct.

5

**Twenty-Fourth Affirmative Defense**

6

**CONDUCT NOT UNLAWFUL, UNFAIR OR FRAUDULENT**

7

Fidelity Charitable's business practices are not "unlawful," "unfair," or "fraudulent" within

8

the meaning of California Business and Professions Code Sections 17200, *et seq.* or 17500, *et seq.*

9

**Twenty-Fifth Affirmative Defense**

10

**CHARITABLE DAMAGES LIMITATION**

11

To the extent Plaintiffs' causes of action in tort succeed, Plaintiffs are limited in their

12

recovery by applicable laws, including a limitation of $20,000 in damages per claim.  *See* Mass.

13

Gen. Laws Ann. ch. 231, § 85K.

14

**Twenty-Sixth Affirmative Defense**

15

**OTHER DEFENSES**

16

Fidelity Charitable reserves the right to amend or supplement its affirmative defenses to

17

include any defenses of which it is not presently aware.

18

**PRAYER FOR RELIEF**

19

Wherefore, Fidelity Charitable respectfully requests that the Court enter an Order:

20

A.      Denying Plaintiffs' Prayer for Relief;

21

B.      Entering judgment against Plaintiffs and in favor of Fidelity Charitable;

22

C.      Dismissing the Complaint with prejudice;

23

D.      Awarding Fidelity Charitable its reasonable costs and expenses, including

24

reasonable attorney's fees, incurred in connection with this Action; and

25

E.      Granting Fidelity Charitable such other and further relief as this Court may deem

26

just and proper.

27

28

Case No. 3:18-cv-04881-JSC

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT

1

DATED: December 17, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By: */s/ David C. Marcus*

David C. Marcus
Christopher T. Casamassima
Alan E. Schoenfeld
WILMER CUTLER PICKERING
HALE AND DORR LLP

*Attorney for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND

53

DEFENDANT'S ANSWER TO
PLAINTIFFS' COMPLAINT