David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
Nicholas G. Purcell (SBN 313630)
nick.purcell@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Andrew Dulberg (*admitted pro hac vice*)
andrew.dulberg@wilmerhale.com
Sarah R. Frazier (*admitted pro hac vice*)
sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

*Attorneys for Defendant*
FIDELITY INVESTMENTS CHARITABLE
GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN, <br><br> Plaintiffs, <br><br> v. <br><br> FIDELITY INVESTMENTS CHARITABLE GIFT FUND, <br><br> Defendant. | Case No. 3:18-cv-04881-JSC <br><br> **DEFENDANT FIDELITY INVESTMENTS CHARITABLE GIFT FUND'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> TRIAL DATE: October 19, 2020 <br> COURTROOM: F <br> JUDGE: Hon. Jacqueline Scott Corley |

1

## <u>**TABLE OF CONTENTS**</u>

**Page**

I.      INTRODUCTION ............................................................................................1

II.     FINDINGS OF FACT.....................................................................................3

        A.      Parties and Relevant Entities ...................................................3

                1.      Fidelity Charitable .......................................................3

                2.      Fidelity Family Office Services...................................6

                3.      Fidelity Capital Markets ..............................................7

                4.      The Fairbairns ..............................................................8

                5.      Energous Corporation ..................................................8

        B.      The Fairbairns' Donation of Their Energous Shares in December 2017................9

                1.      Plaintiffs' Decision to Donate Stock...........................9

                2.      Details of the Donation ..............................................11

                3.      Sale of Energous Stock ..............................................15

        C.      Aftermath of the Donation and Sale ......................................17

        D.      Plaintiffs' Claims Against Fidelity Charitable.......................18

                1.      Promises......................................................................18

                2.      Trading........................................................................25

III.    CONCLUSIONS OF LAW ...........................................................................29

        A.      Plaintiffs Cannot Satisfy Their Burden of Proof....................29

        B.      Plaintiffs' Misrepresentation Claim Fails ..............................30

        C.      Fidelity Charitable Did Not Breach Any Contract with the Fairbairns ................33

        D.      Plaintiffs Cannot Prove Their Promissory Estoppel Claim ....................37

        E.      Fidelity Charitable Was Not Negligent in Its Liquidation of Energous
                Stock ......................................................................................39

                1.      Fidelity Charitable Did Not Owe a Duty to Plaintiffs .............................39

                2.      Fidelity Charitable Satisfied Any Applicable Standard of Care...............41

                3.      Plaintiffs Were Not Harmed by Fidelity Charitable's Actions.................42

                4.      Plaintiffs' Recovery for Negligence Should Be Reduced by the
                        Percentage of Their Responsibility for Their Harm .......................43

        F.      Plaintiffs Cannot Prove Their California Unfair Competition Law Claim...........44

        G.      Plaintiffs Are Not Entitled to Recover Damages for Alleged Loss to the
                DAF.........................................................................................47

- i -

| | H. | Any Damages for Misrepresentation, Promissory Estoppel, and/or Negligence Are Limited to $20,000 Per Claim ......................................................48 |
| | I. | The Doctrine of Judicial Estoppel Bars Plaintiffs' Claims ....................................56 |
| | J. | Plaintiffs Are Not Entitled to Prejudgment Interest on Any Damages Award.........................................................................................................................58 |
| | K. | Plaintiffs Are Not Entitled to Recover Attorneys' Fees ........................................59 |
| IV. | CONCLUSION.............................................................................................................62 |

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aguilar v. Atl. Richfield Co.*,
5
    25 Cal. 4th 826, 24 P.3d 493 (2001) ......................................................... 30

6

*Allied Properties v. John A. Blume & Associates*,
    25 Cal. App. 3d 848 (1972) ......................................................................... 42

7

*Am. Student Fin. Grp., Inc. v. Aequitas Capital Mgmt., Inc.*,
8
    2015 WL 11237638 (S.D. Cal. Feb. 12, 2015) ............................................ 33

9

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
10
    571 U.S. 49 (2013) ...................................................................................... 49

11

*Barajas v. Carriage Servs., Inc.*,
    2019 WL 6699737 (N.D. Cal. Dec. 9, 2019) .............................................. 35

12

*Bayer v. Neiman Marcus Grp., Inc.*,
13
    861 F.3d 853 (9th Cir. 2017) ...................................................................... 47

14

*Blauvelt v. AFSCME Council 93, Local 1703*,
15
    910 N.E.2d 956 (Mass. 2009) ..................................................................... 53

16

*Boschma v. Home Loan Center, Inc.*,
    198 Cal. App. 4th 230 (2011) ..................................................................... 45

17

*In re Boston Reg'l Med. Ctr., Inc.*,
18
    328 F. Supp. 2d 130 (D. Mass. 2004) ........................................................ 51

19

*Bradley v. Perrodin*,
20
    106 Cal. App. 4th 1153 (2003) ................................................................... 60

21

*Budd v. Nixen*,
    6 Cal.3d 195 (1971) .................................................................................... 41

22

*Bullis v. Security Pac. Nat. Bank*,
23
    21 Cal.3d 801 (1978) .................................................................................. 41

24

*C & K Eng'g Contractors v. Amber Steel Co.*,
    23 Cal. 3d 1 (1978) ............................................................................... 37, 38

25

*Cameron v. Cameron*,
26
    88 Cal. App. 2d 585 (1948) ........................................................................ 32

27

*Cansino v. Bank of America*
28
    224 Cal. App. 4th 1462 (2014) ................................................................... 33

- iii -

*Carpet Supermarket, Inc. v. Nat'l Fire Ins. Co. of Hartford*,
  2009 WL 10675718 (C.D. Cal. Sept. 17, 2009) ....................................................57

*Charlebois v. Angels Baseball LP*,
  993 F. Supp. 2d 1109 (C.D. Cal. 2012) .................................................................61

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith*,
  68 Cal. App. 4th 445 (1998) ..................................................................................30

*Conners v. Northeast Hosp. Corp.*,
  439 Mass. 469 (2003) .....................................................................................53, 55

*Conrad v. Bank of America*,
  45 Cal. App. 4th 133 (1996) ..................................................................................30

*Corona v. Sony Pictures Entm't, Inc.*,
  No. 14-CV-09600 RGK EX, 2015 WL 3916744 (C.D. Cal. June 15, 2015) .......................48

*Coyle v. Historic Mission Inn Corp.*,
  24 Cal. App. 5th 627, 643 (2018) ....................................................................39, 43

*In re De Laveaga's Estate*,
  50 Cal. 2d 480 (1958) ............................................................................................47

*Doe v. United States Youth Soccer Assn., Inc.*,
  8 Cal. App. 5th 1118, 1128 (2017) ........................................................................39

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) .................................................................................48

*Engalla v. Permanente Medical Group, Inc.*,
  15 Cal.4th 951 (1997) ................................................................................30, 31, 32

*English v. New England Med. Ctr., Inc.*,
  541 N.E.2d 329 (Mass. 1989) ................................................................................50

*Forouzan v. BMW of N. Am., LLC*,
  No. CV173875DMGGJSX, 2019 WL 856395 (C.D. Cal. Jan. 11, 2019) .............................58

*Gagne v. Bertran*,
  43 Cal.2d 481 (1954) .............................................................................................42

*Galante Vineyards v. Monterey Peninsula Water Management Dist.*,
  60 Cal. App. 4th 1109 (1997) ................................................................................61

*Gilbert v. Seton Hall Univ.*,
  332 F.3d 105 (2d Cir. 2003)...................................................................................52

*Goldstein v. Commissioner*,
  89 T.C. 535 (1987)............................................................................................4, 32

DEFENDANT'S PROPOSED FINDINGS OF FACT/LAW

*Gookin v. United States*,
    707 F. Supp. 1156 (N.D. Cal. 1988) ................................................................. 32

*Greater Westchester Homeowners Assn. v. City of Los Angeles*,
    26 Cal.3d 86 (1979) ........................................................................................... 59

*Halvorsen v. Aramark Uniform Services, Inc.*,
    65 Cal. App. 4th 1383 (1998) ............................................................................ 35

*Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.*,
    218 Cal. App. 4th 272 (2013) ............................................................................ 34

*Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
    487 Fed.Appx 362 (9th Cir. 2012) .................................................................... 46

*Jasmine Networks, Inc. v. Superior Court*,
    180 Cal. App. 4th 980 (2009) ............................................................................ 47

*Kathryn P. v. City of Philadelphia*,
    No. CIV. A. 97-6710, 1999 WL 391492 (E.D. Pa. May 27, 1999) ...................... 52

*Kaui Scuba Ctr., Inc. v. PADI Americas, Inc.*,
    2011 WL 13225132 (C.D. Cal. Mar. 15, 2011) .................................................. 33

*Keene v. Brigham & Women's Hosp., Inc.*,
    786 N.E.2d 824 (Mass. 2003) ........................................................................... 50

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal.4th 1134 (2003) ..................................................................................... 46

*Kurtz v. Kripalu Ctr. for Yoga & Health, Inc.*,
    2019 WL 454594 (D. Mass. Feb. 5, 2019) ................................................. 50, 55

*Kwikset Corp. v. Superior Court*,
    51 Cal.4th 310 (2011) ....................................................................................... 46

*Ky. Fried Chicken of Cal. v. Superior Court*,
    14 Cal.4th 814 (1997) ....................................................................................... 39

*Ladas v. California State Automobile Assn.*,
    19 Cal. App. 4th 761 (1993) ....................................................................... 34, 36

*Ladd v. County of San Mateo*,
    12 Cal.4th 913 (1996) ....................................................................................... 39

*Lederer v. Gursey Schneider LLP*,
    22 Cal. App. 5th 508 (2018) ............................................................................. 48

*Linkage Corp. v. Trustees of Boston Univ.*,
    679 N.E.2d 191 (Mass. 1997) ........................................................................... 54

*Lippitt v. Raymond James Fin. Servs., Inc.*,
   340 F.3d 1033 (9th Cir. 2003) ..............................................................44

*Lugtu v. California Highway Patrol*,
   26 Cal.4th 703 (2001) ...............................................................41, 42

*Malloy v. Fong*,
   37 Cal.2d 356 (1951) ...........................................................50, 51, 52

*Martin v. Kelley*,
   No. 02684, 2004 WL 1895116 (Mass. Super. Aug. 12, 2004) .................51

*Mason v. S. New England Conference Ass'n of Seventh-Day Adventists of Town of
   S. Lancaster, Com. of Massachusetts*,
   696 F.2d 135 (1st Cir. 1982).....................................................50, 55

*Mazzone v. Boston Univ.*,
   352 F. Supp. 3d 141 (D. Mass. 2019) .......................................50, 55

*Millview County Water Dist. v. State Water Resources Control Bd.*,
   4 Cal. App. 5th 759, 768 (2016) ..................................................61

*Nat'l Heritage Found. Inc. v. Behrmann*,
   2013 WL 1390822 (E.D. Va. Apr. 3, 2013) ...............................47, 56

*New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist.*,
   187 Cal. App. 4th 831 (2010) ................................................60, 61

*Offshore Rental Co. v. Continental Oil Co.*,
   22 Cal.3d 157 (1978) ...................................................................50

*Peredia v. HR Mobile Servs., Inc.*,
   25 Cal. App. 5th 680 (2018) ........................................................48

*Pfeifer v. John Crane, Inc.*,
   220 Cal. App. 4th 1270 (2013) ....................................................43

*Pirozzi v. Apple, Inc.*,
   966 F. Supp. 2d 909 (N.D. Cal. 2013) ......................................45, 46

*Regents of University of California v. Superior Court*,
   29 Cal. App. 5th 890, 902–03 (2018) ...........................................39

*Richman v. Hartley*,
   224 Cal. App. 4th 1182 (2014) .....................................................34

*Roberts v. UBS AG*,
   2013 WL 1499341 (E.D. Cal. Apr. 11, 2013).................................32

- vi -

*Roybal v. Governing Bd. of Salinas City Elementary School Dist.*,
   159 Cal. App. 4th 1143 (2008) .................................................................................62

*RSB Vineyards, LLC v. Orsi*,
   15 Cal. App. 5th 1089, 1102 (2017) .......................................................................31

*Saunders v. Superior Court*,
   27 Cal. App. 4th 832 (1994) ...................................................................................45

*Segura v. McBride*,
   5 Cal. App. 4th 1028 (1992) ...................................................................................58

*Shapiro v. Wells Fargo Realty Advisors*,
   152 Cal. App. 3d 467 (1984) ...........................................................................31, 37

*Sierra Nat. Bank v. Brown*,
   18 Cal. App. 3d 98 (1971) ......................................................................................29

*Silva v. Providence Hosp. of Oakland*,
   14 Cal.2d 762 (1939) ..............................................................................................50

*Simar Shipping Ltd. v. Global Fishing, Inc.*,
   540 Fed. App'x 565 (9th Cir. 2013) .......................................................................34

*St. Clair v. Trustees of Bos. Univ.*,
   25 Mass. App. Ct. 662 (1988) ................................................................................51

*Stockton Mortg., Inc. v. Tope*,
   233 Cal. App. 4th 437 (2014) .................................................................................33

*Tep v. Southcoast Hosps. Grp., Inc.*,
   No. CV 13-11887-LTS, 2014 WL 12573547 (D. Mass. Sept. 22, 2014) ...............54

*Tint v. Sanborn*,
   259 Cal. Rptr. 902 (Cal. Ct. App. 1989) ................................................................44

*Toomer v. United States*,
   615 F.3d 1233 (9th Cir. 2010) ................................................................................39

*Troyk v. Farmers Group, Inc.*,
   171 Cal. App. 4th 1305 (2009) ...............................................................................34

*Tunkl v. Regents of Univ. of Cal.*,
   60 Cal.2d 92 (1963) ................................................................................................51

*U.S. Ecology, Inc. v. State of California*,
   129 Cal. App. 4th 887 (2005) .................................................................................34

*Washington Mut. Bank, FA v. Superior Court*,
   24 Cal.4th 906 (Cal. 2001) ...............................................................................49, 53

*Weddington Prods., Inc v. Flick.*,
   60 Cal. App. 4th 793 (1998) ..................................................................................35

*Conservatorship of Whitley*,
   50 Cal.4th 1206, 241 P.3d 840 (2010) ...................................................................61

*Williamson v. Gen. Dynamics Corp.*,
   208 F.3d 1144 (9th Cir. 2000) ...............................................................................48

*Wisper Corp. v. California Commerce Bank*,
   49 Cal. App. 4th 948 (1996) ..................................................................................58

*Yale v. Bowne*,
   215 Cal. Rptr. 3d 266 (Cal. Ct. App. 2017) ...........................................................44

*Zierolf v. Wachovia Mortg.*,
   2012 WL 6161352 (N.D. Cal. Dec. 11, 2012) ...............................................37, 38

**Statutes**

26 U.S.C. § 170(f)(18)(B) ...............................................................................4, 32, 56, 57

26 U.S.C. § 457A .....................................................................................................10

26 U.S.C. § 501(c)(3) ...........................................................................................3, 6

26 U.S.C. § 4966(d)(1), (d)(2) ...........................................................................3, 4, 47, 56

26 U.S.C. § 6065 .....................................................................................................57

Cal. Bus. & Prof. Code § 17200 *et seq.* ...............................................................1, 18, 44

Cal. Bus. & Prof. Code, § 17204 ...........................................................................45, 46

Cal. Civ. Proc. Code § 1021.5 ...............................................................................59, 60, 61

Cal. Evid. Code § 115 ...........................................................................................30

California Civil Code Section 3287 ...........................................................................58

California Civil Code Section 3288 ...........................................................................59

Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII ...........................4, 56

Mass. Gen. Laws Ann. ch. 231, § 85K ...................................................................49, 53, 54, 55

**Other Authorities**

CACI No. 303 ...........................................................................................................30

CACI No. 400 ...................................................................................................30, 42

CACI No. 405 ................................................................................................................44

CACI No. 600 ................................................................................................................41

CACI No. 1900 ..............................................................................................................29

# I.   INTRODUCTION

Emily Fairbairn and Malcolm Fairbairn (collectively, "Plaintiffs") donated 1.9 million shares of Energous Corporation ("Energous" or "WATT") stock to Fidelity Charitable—a public charity—and took a deduction in the amount of $52 million on their 2017 federal tax returns as a result.  They claim in this lawsuit that they were induced to make that donation by a series of promises that gave them legally enforceable control over the time and manner of liquidation of the donated shares—promises, they say, that Fidelity Charitable breached.  On the basis of those alleged promises, they have brought claims for breach of contract, misrepresentation, estoppel, and violation of California's Unfair Competition Law ("Promise Claims").  Plaintiffs also allege that Fidelity Charitable's sale of the Energous stock was performed negligently.  However, for the reasons stated below, Plaintiffs cannot satisfy their burden to prove any of their claims by a preponderance of the evidence, and judgment must be awarded in favor of Fidelity Charitable.

Plaintiffs' Promise Claims fail for a multitude of reasons.  First and foremost, there is no evidence, beyond Plaintiffs' own vague and inconsistent recollections, of the promises that Plaintiffs now allege.  Justin Kunz, an employee of Fidelity Family Office Services who Plaintiffs now accuse of making these promises on behalf of Fidelity Charitable, vehemently denies making any promises to Plaintiffs regarding how Fidelity Charitable would sell the Energous stock, and instead will testify that he informed Plaintiffs that their gift of stock was irrevocable and that it would be sold by Fidelity Charitable at its own discretion.  Further undermining their claims, Plaintiffs did not accuse Mr. Kunz of being the person who made these promises until they filed their Complaint in August 2018, and they continued to work with him for months after the donation and sale.  And there are no contemporary writings from December 2017 describing or memorializing any such promises despite Plaintiffs having memorialized other conversations relating to the donation.

The Promise Claims fail for additional reasons.  For example, even accepting Plaintiffs' version of events, their recollection of the conversations with Mr. Kunz is too vague and unclear to establish any misrepresentations or agreed-upon contract.  Plaintiffs also cannot demonstrate that they relied on the alleged promises, as they were determined to make this donation in

December 2017 and did not speak with any other sponsoring organizations of donor-advised funds ("DAFs") about doing so. Indeed, Plaintiffs had already decided to make a donation to Fidelity Charitable before hearing the alleged promises. And even if Plaintiffs now claim to have relied on the promises in making their donation, such reliance was unreasonable because the alleged promises contradicted the publicly-stated policies of Fidelity Charitable as described in its Program Circular, which Malcolm Fairbairn acknowledged in writing that he read and accepted before making the donation. The alleged promises also are inconsistent with the operation of DAFs as mandated by the relevant tax laws, which were known to Plaintiffs. Further, even if Plaintiffs could get past all of the above (they cannot), at least two of the promises in question (that Fidelity Charitable's sales would constitute less than 10% of the daily trading volume and that it would use sophisticated, state-of-the art methods to sell the shares) were in fact not broken. Finally, Plaintiffs were not harmed by Fidelity Charitable's alleged promises because Plaintiffs would have been worse off if Fidelity Charitable had followed them, and there is no evidence that any other DAF could have sold the Energous stock for a better price. And even if Plaintiffs were able to create a theory by which they were damaged by Fidelity Charitable's violation of these promises, the amount of damages is so speculative that they cannot be awarded.

Plaintiffs' negligence claim similarly fails. First, once Plaintiffs donated the Energous stock, it was owned by Fidelity Charitable, and the charity had no duty to Plaintiffs regarding how it sold the stock. If there is no duty, there can be no negligence. Second, even if Fidelity Charitable did somehow owe a duty to Plaintiffs regarding the sale of the stock, Fidelity Charitable satisfied the applicable standard of care. It acted consistent with both its own policy to sell donated stock as quickly as possible and the general policies and practices of other DAFs. The policy to sell as quickly as possible protects both the charity and donors from market risk and fluctuation. Third, expert testimony will establish that Fidelity Charitable sold the stock competently and that there is no evidence of a negative impact on Energous's stock price resulting from Fidelity Charitable's selling. Because there is no evidence of a price impact, Plaintiffs cannot establish that Fidelity Charitable reduced their tax deduction. Similarly, the expert testimony will establish that the alternative selling scenarios available to Fidelity Charitable would have resulted in fewer proceeds

2

directed to Plaintiffs' giving account, meaning that Fidelity Charitable's method of selling actually benefitted Plaintiffs rather than harmed them.

Finally, even assuming that Plaintiffs could meet their burden on any of their claims despite the many dispositive issues listed above, additional obstacles preclude the recovery they seek. For example, they are not entitled to recover any damages for the alleged loss in proceeds to the DAF account. Once they made their donation, the stock and resulting proceeds were owned by Fidelity Charitable, and they cannot seek damages to property that they did not own. Additionally, Plaintiffs' tort claims for misrepresentation and negligence are limited to $20,000 per claim under controlling Massachusetts law governing the cap on charitable damages. Plaintiffs' claims are further barred by the doctrine of judicial estoppel because in taking a deduction for their donation of Energous stock Plaintiffs acknowledged that they relinquished all legal control over the stock. Finally, Plaintiffs are entitled to neither prejudgment interest nor attorneys' fees under the relevant California law and facts of this case.

Upon review of the full record to be developed at trial and the application of clear and controlling law, this Court must deny Plaintiffs' claims in full and enter judgment in favor of Fidelity Charitable.

## II.   FINDINGS OF FACT

### A.   Parties and Relevant Entities

#### 1.   Fidelity Charitable

##### a)   *Organization*

Fidelity Investments Charitable Gift Fund ("Fidelity Charitable") is the nation's largest sponsoring organization of a donor advised fund (DAF), a type of philanthropic giving instrument that has existed for decades. Fidelity Charitable is a charitable trust incorporated in Massachusetts and a nonprofit organization afforded tax-exempt status by the Internal Revenue Service under 26 U.S.C. § 501(c)(3). In 2019 alone, Fidelity Charitable distributed more than $7 billion to other charities around the world.

Donors can give assets to a DAF that is owned and controlled by a sponsoring organization and take a tax deduction when they do so. 26 U.S.C. § 4966(d)(1), (d)(2)(A)(ii). If the donation

complies with certain legal requirements, the donor is entitled to take a tax deduction based on the fair market value of the assets at the time they were donated. *Id.* § 170(f)(18). For a donor to lawfully claim a tax deduction for a gift to a DAF, the DAF account must be "owned and controlled" by the sponsoring organization, *id.* § 4966(d)(2)(A), and the donor must "obtain[] a contemporaneous written acknowledgment … from the sponsoring organization … that such organization has exclusive legal control over the assets contributed," *id.* § 170(f)(18)(B).

Donors to a DAF retain "advisory privileges with respect to the distribution or investment of amounts held in such fund or account[.]" 26 U.S.C. § 4966(d)(2)(A). Such advisory privileges permit the donor to make "nonbinding recommendations concerning the distribution or investment of assets." H.R. Rep. No. 109-455, at 179-80 (2006) (Conf. Rep.). "Advisory privileges are distinct from a legal right or obligation," and a donor who secures "enforceable rights … with respect to a gift … will not be treated as having 'advisory privileges.'" Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII: Provisions Relating to Tax Exempt Organizations, 2006 WL 4791686, at *67 (Aug. 3, 2006). These provisions are in accord with federal tax rules generally, which permit charitable deductions only where the donor has divested himself of "control" of the gift. *See Goldstein v. Commissioner*, 89 T.C. 535, 541 (1987).

b)    *Donations of Assets*

Fidelity Charitable accepts donations of many different types of assets, including cash and cash equivalents, publicly-traded stock, and complex assets. Complex assets include, among other things, non-publicly traded stock, real estate, cryptocurrency such as Bitcoin, and oil and gas interests.

Non-cash contributions to Fidelity Charitable are liquidated, meaning they are sold for cash. The Fidelity Charitable Program Circular, which donors must acknowledge reading and accepting prior to making donations, describes Fidelity Charitable's policies with respect to such asset liquidation. It also tells donors that contributions are irrevocable and are owned and controlled by the Trustees once Fidelity Charitable accepts the donation. As the Program Circular describes, "Fidelity Charitable processes contributions periodically throughout the day and will liquidate contributions as quickly as possible after all the requisite paperwork has been received."

The Program Circular further details how it processes donations of publicly traded securities specifically.  It states, "Upon receiving the appropriate paperwork and the donated securities in good order, Fidelity Charitable will generally sell the securities at the earliest date possible, but reserves the right to sell at any time."  "Good order" refers to stock that is free and clear to be sold without any restrictions.

In the context of selling public securities, when it is "possible" to sell is determined by the volume at which the stock is trading, otherwise known as its "liquidity."  In general, the higher the total shares traded by the market on a given day, the more shares it is possible to sell.  For example, some stocks are "thinly traded," meaning that they have such low daily trading volumes that generally only small amounts of stock can be sold on a given day.  The Investments team at Fidelity Charitable, which is the team responsible for deciding how quickly it is possible to liquidate donated shares, does the actual selling of donated shares on behalf of Fidelity Charitable and in conjunction with the professional traders at Fidelity Capital Markets.

As described in its Program Circular, Fidelity Charitable's policy is to generally sell donated public securities at the earliest date possible.  This policy reduces market risk by protecting the charity from unexpected fluctuations in the stock price.  This policy is especially important given that donors gift many different types of stocks to Fidelity Charitable, including speculative and volatile stocks.  Fidelity Charitable's core service is liquidating and distributing donations of money to charity, not speculating on whether the market price of individual securities will rise or fall.  Therefore, Fidelity Charitable does not consider the price of a donated stock or whether it will increase or decrease when deciding how many shares to sell, although the Investments team is often aware of the stock price while they are selling.  Instead, the Investments team focuses on the number of shares that were donated and the total volume of shares of that stock being traded that day to determine how many shares to sell.

c)      *Giving Account Investments and Grantmaking*

Once Fidelity Charitable has sold the donated stock, the resulting proceeds are placed in the donor's giving account.  The donor can then select from a pre-approved menu of investment options in which to place the proceeds depending on how fast donors would like the proceeds to

grow and the donor's appetite for risk.  Because these investment options have been vetted by Fidelity Charitable and, to the extent they include equity exposure, are well diversified, they are less risky than the unanalyzed stock that donors contribute.  For instance, one option is the "money market" investment option, which yields only 1.2% growth but poses essentially no risk that the proceeds in a giving account directed to the money market pool will decrease.

Once the proceeds have settled in the donor's giving account, the donor can then recommend grants to specific charities from those proceeds.  As described above, donors retain advisory privileges over the investment vehicle in which the cash proceeds are invested and the charities to which those proceeds are ultimately donated.  These advisory privileges allow donors to make "nonbinding recommendations concerning the distribution or investment of assets."  Such is the benefit of a DAF as compared to other types of charitable giving – a donor can make a completed donation, take an immediate tax deduction, but then have the flexibility to recommend grants to specific charities over time.  The donated assets also have the potential to grow over time, thus making it possible that more money is available to charity.  These features distinguish DAFs from direct donations to charity, which force the donor to select the specific charity at the time of the donation and do not allow the proceeds to appreciate, and charitable foundations, which do not allow for immediate tax deductions.

Fidelity Charitable must approve any grant before it is executed, and ensures that grants are made to 501(c)(3) organizations and do not confer any inappropriate benefit to the donor.  After Fidelity Charitable has approved the donor's grant request, it transfers the money to the chosen charity.  Because donors are able to take a tax deduction for their gifts at the time of their donation to Fidelity Charitable, grants have no effect on the tax deductions of donors.

## 2.    Fidelity Family Office Services

FMR LLC is the parent company of a variety of businesses, many of which operate under the "Fidelity Investments" trade name.[1]  Fidelity Family Office Services, also known as "FFOS"

---

[1] Fidelity Charitable is not an affiliate or subsidiary of FMR LLC and is, rather, a freestanding charitable trust recognized as a public charity under section 501(c)(3) of the Internal Revenue Code, as noted above.

or "Family Office," is part of an FMR LLC business unit called Fidelity Institutional. Family Office caters to ultra-high net-worth individuals, providing custody, brokerage, and investment services such as executing stock transactions and wire transfers. Family Office clients often donate to Fidelity Charitable.

Plaintiffs became clients of Family Office in September of 2016, and Mr. Kunz became their relationship manager. Mr. Kunz has been an employee of Fidelity for approximately 13 years, and has worked as a relationship manager at Family Office since 2014. As a relationship manager, Mr. Kunz coordinates between his clients and other service providers at Fidelity, ensuring that his clients' financial needs are met and that they have access to the various resources provided by Fidelity. Mr. Kunz's role as relationship manager often includes assisting FFOS clients who wish to contribute to Fidelity Charitable. This has given Mr. Kunz familiarity with Fidelity Charitable, DAFs, and the process of making donations. Mr. Kunz also has a personal giving account at Fidelity Charitable, giving him first-hand knowledge of the operation of DAFs from a donor's perspective, including the rules and regulations involved in donating to a DAF.

### 3. Fidelity Capital Markets

Fidelity Capital Markets is a business unit within National Financial Services LLC, a subsidiary of FMR LLC. Among other things, Fidelity Capital Markets traders trade stock on behalf of institutional clients. Fidelity Charitable is one of Fidelity Capital Markets' many clients. Accordingly, Fidelity Capital Markets traders will sometimes execute trades on behalf of Fidelity Charitable.

When a large amount of stock is donated to Fidelity Charitable, the Investments team at Fidelity Charitable works with the traders at Fidelity Capital Markets to sell the shares. The blocks of shares are transferred to the Fidelity Capital Markets desk, at which point a member of the Fidelity Charitable Investments team communicates with the trader at Fidelity Capital Markets to discuss the liquidation and how fast the shares can be sold.

In the case of the Fairbairns' December 2017 donation of Energous stock, Mike McLean, a member of the Fidelity Charitable Investments team, communicated with Gerald Celano, a trader on the Fidelity Capital Markets institutional trading desk with decades of trading experience. The

Fidelity Charitable Investments team and Fidelity Capital Markets keep in frequent contact during the execution of a trade, including through an instant message chat. Fidelity Charitable communicates the number of shares to be sold, while Fidelity Capital Markets provides updates regarding the status of the liquidation. Fidelity Capital Markets executes the trade according to Fidelity Charitable's instructions.

### 4. The Fairbairns

Plaintiffs are career investors who, until recently, operated a hedge fund called Ascend Capital, which held billions of dollars of assets under management.

In addition to being sophisticated investors, Plaintiffs established multiple donor advised funds well before December 2017. Specifically, Plaintiffs have had a giving account at JP Morgan's DAF since at least 2013, and opened a Fidelity Charitable giving account on December 31, 2014.

In September 2016, Plaintiffs became clients of Fidelity Family Office Services. Plaintiffs held several different accounts with Family Office, including corporate accounts, retirement accounts, and accounts established for their children. Many of these accounts held Energous stock.

Plaintiffs generated revenues for themselves from their Family Office accounts by lending out the public stock they held in those accounts, including shares of Energous, to borrowers. (Typically, short sellers, who are betting that the price of a company's stock will decline, need to borrow stock in order to make their short sales. They sell the borrowed shares to market participants at prevailing prices and seek to buy back the shares at a lower price, profiting from the decline, while paying fees to borrow the shares in the first place.) Plaintiffs collected fees from loaning their stock. However, once the stock was loaned out, the shares were not immediately accessible to Plaintiffs and could not be sold or transferred until they were recalled from borrowers. The process of recalling and returning borrowed stock usually takes two or three days to complete.

### 5. Energous Corporation

Energous Corporation (traded under the stock ticker symbol "WATT") is a publicly traded corporation that seeks to develop and commercialize wireless charging technology. Plaintiffs were early investors in Energous and built up a large investment in the company, often using entities

they owned and controlled to buy the Energous stock.  Between 2013 and 2016, the Fairbairns purchased 2,281,918 shares of Energous stock at prices ranging from $2.85 per share to $12.23 per share.[2]  They were one of the largest, if not the largest, individual shareholders in Energous during this time, and owned over 10% of the company until just before the time of the donation to Fidelity Charitable.  In 2013, Plaintiffs used Valley High Limited Partnership to purchase 175,462 Energous shares at $2.85 per share.  Then, in 2014, Plaintiffs again used Valley High to purchase another 140,000 Energous shares at $6 per share. The Valley High shares were held at FFOS.  In 2016, Plaintiffs used Ascend Legend Master Fund to purchase 1,618,123 Energous shares for $12.23 per share.  The Ascend shares were held at Morgan Stanley.

Founded in 2012, Energous' public filings disclose that the company has never generated any meaningful revenue and, by the end of 2018, had accumulated a deficit of $225 million. During that time, its stock price has been volatile.  It has repeatedly failed to meet product delivery deadlines and has only produced a single minor product that uses a charging pad, not the wireless charging technology that it has long promised.  In public filings, Energous warned investors "you may lose all of your investment," "our stock price is likely to continue to be volatile," and that the company "may never achieve or maintain profitability."  Throughout 2017, Energous pursued FCC approval of certain elements of its technology.

**B.    The Fairbairns' Donation of Their Energous Shares in December 2017**

1.    Plaintiffs' Decision to Donate Stock

Between December 2008 and January 2018, hedge fund managers, including the Fairbairns, were able to avoid paying income taxes on compensation "earned overseas" by directing money to offshore entities.  The Fairbairns earned significant offshore compensation in the years leading up to 2017 because their hedge fund was based in the Cayman Islands.  A change in the tax code effectively required such accumulated offshore income to be "repatriated" and

---

[2] The Fairbairns also owned warrants for an additional 1,632,012 shares that were issuable upon the exercise of the warrants.  The warrants gave the Fairbairns the option of purchasing additional shares of Energous at a pre-determined price, most of which could be purchased by the Fairbairns at a price of $0.125 per share after the warrants were exercised.

taxed by the end of 2017.  *See* 26 U.S.C. § 457A.  Hence, the Fairbairns had an extraordinary amount of income subject to tax in 2017.  Accordingly, and on the advice of their accountant, the Fairbairns decided to make a substantial charitable donation before the end of 2017, which would offset the $280 million of income they expected for the year.

On December 19, 2017, Emily Fairbairn spoke to Justin Kunz about making a tax-deductible donation to Fidelity Charitable.  During this conversation, Ms. Fairbairn and Mr. Kunz spoke about a donation of cash and potentially carried interest (the share of any profits that the general partners of private equity and hedge funds receive as compensation) or publicly traded stock.  In a follow-up email sent the same day, Mr. Kunz presented Ms. Fairbairn with details relating to a potential donation to Fidelity Charitable, including the fee structure that would apply to a giving account balance of $100 million or more, telling her that he was able to get her the "absolute lowest rate available."  After the donation was complete, Ms. Fairbairn wrote to Mr. Kunz to tell him to "make sure" the giving account would be charged that lower rate.

On December 20, 2017, Emily Fairbairn learned from Energous CEO Stephen Rizzone that Energous' wireless charging technology had been approved by the FCC.  After hearing that news, the Fairbairns decided that their donation to Fidelity Charitable would include Energous stock.  On December 22, 2017, Mr. Kunz and Ms. Fairbairn exchanged emails about a possible donation and the deadline for making donations to Fidelity Charitable to qualify for a 2017 tax deduction, though Ms. Fairbairn did not identify Energous as a stock she had in mind and, at the time, the FCC approval was not known to the public.  A few minutes later, Ms. Fairbairn wrote an email to herself titled, "We need transfer stock to fidelity," with the body of the email stating that it would take two business days to transfer stock from another bank to Fidelity via DTC.  DTC stands for Depository Trust Company, which is one of the largest depositories for securities and can be used to electronically transfer stock.

At that time, many of the Energous shares owned by Plaintiffs' entities were out on loan, including shares held in Plaintiffs' Valley High account at Fidelity Family Office and in their Ascend account at Morgan Stanley.  Plaintiffs continued to profit from loaning these shares to

borrowers and did not request the shares to be returned from loan until after the market had closed on December 26, 2017.

On the evening of December 26, after the market closed, Energous publicly announced the FCC's approval of its technological applications.

On December 26, 2017, the opening price of Energous stock was $8.75, and the closing price of Energous stock was $8.84. The total daily volume of shares traded was 1,047,804 shares. Prior to December 26, Energous's average trading volume was far below one million shares traded per day.

After the announcement of the FCC approval, both the price and trading volume of Energous stock increased significantly in the following days. On December 27, 2017, Energous stock opened at $17.35 and closed at $23.70, with a total daily trading volume of 42,030,720 shares. On December 28, 2017, Energous stock opened at $28.58 and closed at $31.57, with a total daily trading volume of 44,445,616 shares. Then, on December 29, 2017, and the days following, the price and volume began to fall back down from their historic levels. On December 29, 2017, the last trading day of the year, Energous opened at $30.50 and closed at $19.45, with a total daily trading volume of 28,413,632 shares. On January 2, 2018, which was the first trading day of the new year and fell on the Tuesday of the following week, Energous opened at $21.86 and closed at $22.34, with a total daily trading volume of 16,894,588 shares. The price of Energous shares has slowly and steadily declined ever since; today the stock trades at approximately $3 per share.

2.    Details of the Donation

After Energous's FCC announcement, Plaintiffs proceeded with their plan to donate the shares of Energous stock to Fidelity Charitable. Because they were donating appreciated stock, the donation would have a double financial benefit: not only would they be able to take a deduction on their large tax bill, but Plaintiffs would also be able to avoid paying taxes on the substantial capital gains that would otherwise be associated with the sale of the stock.

On the evening of December 26, Ms. Fairbairn called Dan Hooper at Fidelity Family Office. She told Mr. Hooper that the stock was up 50% in aftermarket trading and then instructed

1   him to recall all Energous shares that had been loaned out to short sellers.  Ms. Fairbairn told Mr.

2   Hooper that she understood that that process could not begin until the following day after the

3   market opened, which Mr. Hooper confirmed.  Ms. Fairbairn also expressed her opinion that the

4   Energous stock price would double as the result of the FCC's announcement.

5   Despite also having a DAF giving account with JP Morgan Charitable, Plaintiffs never

6   contacted their JP Morgan relationship manager in December 2017 about making a donation to

7   their giving account.  Plaintiffs took no other steps to prepare for making a donation of Energous

8   shares to their JP Morgan giving account (or to any other giving account other than Fidelity

9   Charitable) in December 2017.

10   By the afternoon of December 27, 2017, Ms. Fairbairn told Ryan Boland, a representative

11   of Fidelity Charitable, that she planned to donate shares of Energous stock to Fidelity Charitable.

12   She also had a call with Mr. Kunz that afternoon to discuss a possible donation of Energous shares.

13   During this time, Ms. Fairbairn also spoke with her accountant, Kevin McAuliffe, about the tax

14   benefits of making a charitable contribution.  On December 27, 2017, Mr. McAuliffe confirmed

15   the tax savings associated with making a $100 million charitable contribution.  Ms. Fairbairn then

16   emailed Mr. Slavet, the CEO of their hedge fund, to summarize the plans for the $100 million

17   donation.  As evidenced by these conversations, by the end of the day on December 27, the

18   Fairbairns had committed to making a $100 million donation of cash and Energous shares to

19   Fidelity Charitable (their eventual donation would total $99.8 million).

20   Mr. Kunz spoke with Plaintiffs over the phone and over email, both individually and

21   together, several times on December 27 and 28 about the donation.  During these discussions, Mr.

22   Kunz told Plaintiffs that the donation of shares would be irrevocable once it was completed and

23   that Fidelity Charitable would sell them at its discretion.  Mr. Fairbairn recalls Mr. Kunz telling

24   him about the irrevocability of the donation.  Mr. Kunz made no promises to Plaintiffs about how

25   Fidelity Charitable would sell the shares, as detailed more specifically below.

26   Many of the Energous shares in both the Family Office and Morgan Stanley accounts were

27   still out on loan to borrowers on December 26, 2017.  In addition to having Mr. Hooper recall the

28   shares held at Family Office, Plaintiffs requested Morgan Stanley to begin recalling the shares out

on loan on December 27. The shares out on loan needed to be first recalled (from borrowers) and then returned (to Family Office and Morgan Stanley) before they could be donated to Fidelity Charitable. Representatives of both Morgan Stanley and Family Office spent much time on December 27-29 getting all of those shares returned.

The timing of the transfer of shares from Morgan Stanley to Fidelity Charitable was entirely dependent on Plaintiffs and Morgan Stanley. At first, there was uncertainty regarding whether the more than 1.6 million shares of Energous held at Morgan Stanley could be transferred to Fidelity Charitable by December 29, 2017 because of the time associated with recalling and returning the shares that were out on loan.

In response to this uncertainty, Malcolm Fairbairn had Mr. Kunz and others at Family Office and Fidelity Charitable work on a plan that would lend from Fidelity Charitable to Morgan Stanley Energous shares that were already free and clear to transfer. Theoretically, those shares could first be donated to Fidelity Charitable, then Fidelity Charitable would lend those shares back to Morgan Stanley to cover the shares that were out on loan. Morgan Stanley would then replace the shares that were out on loan with the stock that had been loaned by Fidelity Charitable, facilitating a quicker return of stock from the borrowers. That plan ultimately did not work because Fidelity Charitable determined that it would run afoul of rules relating to donor control of donated property. Ultimately, Morgan Stanley was able to coordinate the recall and return of all the Energous shares before the end of December 29, 2017, and transferred all of the shares to Fidelity Charitable on that day.

On December 28, 2017, Mr. Fairbairn signed a Fidelity Charitable Contribution Form and Letter of Instruction directing the donation of the 313,862 Energous shares held at Fidelity Family Office. In signing the form, Mr. Fairbairn confirmed that he had read the Fidelity Charitable Program Circular and agreed to its terms. As discussed above, the Program Circular explicitly stated that contributions are irrevocable and are owned and controlled by the Trustees once Fidelity Charitable accepts the donation, and that for donations of public securities, once they are received in good order, "Fidelity Charitable will generally sell the securities at the earliest date possible, but reserves the right to sell at any time." Ms. Fairbairn acknowledges that she could have had the

shares held at Family Office donated to Fidelity Charitable on December 28, but instead purposely chose to wait until December 29 to have them transferred because she thought Energous' stock price would continue to climb higher on that day.

Fidelity Charitable ultimately received the Energous shares in four separate transfers, each referred to as a "tranche." Three tranches arrived from Morgan Stanley; one came from Fidelity Family Office. Neither Fidelity Charitable nor Fidelity Family Office controlled when any of the tranches were ultimately donated. The timing of the donation of the three Morgan Stanley tranches was the product of when Plaintiffs and Morgan Stanley decided to transfer the shares after first getting the shares that were out on loan returned. The timing of the donation of the Family Office shares was dependent on Ms. Fairbairn's decision to wait until December 29 to initiate the transfer.

The first tranche of shares consisted of 700,000 shares transferred from Morgan Stanley to Fidelity Charitable on the afternoon of December 28.

The second tranche of shares consisted of 575,000 shares transferred from Morgan Stanley to Fidelity Charitable at 11:35 am ET on December 29.

The third tranche of shares consisted of 313,862 shares transferred from Fidelity Family Office to Fidelity Charitable at around 3:05 pm ET on December 29.

The fourth tranche of shares consisted of 343,123 shares transferred from Morgan Stanley to Fidelity Charitable at around 3:05 pm ET on December 29.

These four tranches constituted Plaintiffs' entire donation of Energous shares (1600 shares were also donated to Fidelity Charitable but were not processed and sold until the following week and thus are not relevant to the current dispute). In sum, the donation included 700,000 shares of Energous stock donated on December 28 (from Morgan Stanley) and 1,231,985 shares donated on December 29 (from both Morgan Stanley and Fidelity Family Office), for a total of 1,931,985 shares. In addition to the Energous shares, Plaintiffs donated shares of two other stocks as well as $45 million in cash, yielding a total donation to Fidelity Charitable of approximately $100 million.

3.     Sale of Energous Stock

Once the shares were transferred to Fidelity Charitable, they were owned in full by the Trustees of Fidelity Charitable.  Given the size of the Fairbairns' donation, Fidelity Charitable worked with Fidelity Capital Markets to sell the donated Energous shares.

After receiving the first tranche of Energous shares on the afternoon of December 28, 2017, the Fidelity Charitable team engaged the Restricted Stock Services team to determine whether they were allowed to sell the shares.  Restricted Stock Services is a team of National Financial Services employees that determines whether potentially restricted stock (such as a donation of a company's stock from a control person of the company) is free and clear to begin selling.  The Fidelity Charitable team decided this was the prudent decision because when the Fairbairns first opened their Valley High account at Family Office (and transferred Energous stock into the account), Mr. Fairbairn indicated that he was an insider or control person at Energous.  And days before the donation, SEC filings confirmed that the Fairbairns controlled more than 10% of Energous's stock, which could potentially trigger the application of securities laws related to the sale of stock by corporate insiders.  Therefore, once Plaintiffs transferred the first tranche of Energous shares to Fidelity Charitable, the Fidelity Charitable team engaged Restricted Stock Services in order to determine whether Mr. Fairbairn's insider status would prevent Fidelity Charitable from legally selling the stock.

The process of determining whether the donated shares were free and clear to sell was not simple.  On the morning of December 29, Alex Bozovic at Restricted Stock Services was unable to contact company counsel.  For this reason, as an alternative, the Fairbairns gave Ms. Bozovic the contact information of Mr. Rizzone, the Energous CEO.  At approximately 12:35 pm ET on December 29, Mr. Rizzone confirmed that the shares were free and clear to begin selling.  Ms. Bozovic informed Fidelity Charitable that it could begin selling the shares shortly thereafter.

Once Fidelity Charitable received clearance from Mr. Rizzone, it began the process of liquidating the shares.  The first tranche of 700,000 shares was transferred to Fidelity Capital Markets a little after 1:00 pm ET on December 29, 2017, and Fidelity Capital Markets began selling the shares shortly thereafter.  The second tranche of 575,00 shares, which had been received

1   at 11:35 am ET that morning, was transferred a few minutes later, and Fidelity Capital Markets

2   began selling those shares as well.  Throughout the selling process, Mike McLean of the Fidelity

3   Charitable Investments team and Gerald Celano at Fidelity Capital Markets were in

4   communication through an instant message chat.  Mr. McLean directed Mr. Celano to complete

5   the sale of the WATT shares on December 29.

6       When Fidelity Charitable received the third tranche of 313,862 shares from Fidelity Family

7   Office a few minutes after 3:00 pm ET, it transferred those shares to Fidelity Capital Markets,

8   which began selling those shares.  When Fidelity Charitable received the final tranche of 343,123

9   shares from Morgan Stanley a few minutes after 3:00 pm ET, it transferred those shares to Fidelity

10  Capital Markets.

11      In sum, the overwhelming majority of the WATT shares were sold using four separate

12  algorithms.  Fidelity Capital Markets sometimes uses these algorithms to sell larger orders.  The

13  algorithms break up the larger block orders into smaller individual orders, which are then sold into

14  the marketplace.  This procedure hides the presence of a large seller from the market.

15  Approximately 51,000 shares were also sold at the closing bell through a separate process.

16      Fidelity Capital Markets completed selling the 1,931,985 shares at 4:00 pm ET on

17  December 29.  The total number of shares sold in the market on December 29 was 28,413,632,

18  meaning that Fidelity Charitable sold less than 6.8% of the daily trading volume.  Fidelity

19  Charitable sold the donated Energous shares at an average price of $22.82, which was significantly

20  higher than Energous's recent stock price, which had hovered around $8 or $9 per share until the

21  public announcement of the FCC approval on December 26, 2017.  Mr. McLean's decision to sell

22  all of the shares on December 29 was reasonable and consistent with the policy of the charity and

23  its goal to reduce the market risk associated with owning an extremely volatile stock and the

24  significant volume of Energous shares being traded in the market that day.

25      Plaintiffs claimed a charitable deduction for their DAF donation of Energous stock totaling

26  $52,217,625 on their 2017 federal income tax return.  The average of the high price and low price

27  for the shares donated on December 28 (which constituted the fair market value used to determine

28  the proper deduction of those shares) was $30.54, while the average of the high price and low price

for the shares donated on December 29 was $25.00.  Plaintiffs executed their tax return filing under penalty of perjury and filed it with the IRS.  The sale of the Energous shares generated $44,103,404 in proceeds for Plaintiffs' giving account.

## C.    Post-Donation Developments

In January 2018, the Fairbairns began asking Mr. Kunz questions about the sale of the donated Energous stock and requested additional trading data.  When requesting the additional information about the trading, Plaintiffs made no mention of any alleged promises to them.

Mr. Kunz sent Plaintiffs additional trading information in mid-January.  When Plaintiffs received the trade data, their first email exchange with each other complained about the trading but made no mention of any promises that they believed Fidelity Charitable had made, never mind violated.  On January 15, Plaintiffs complained via email about the sales of the Energous stock to Mr. Kunz, and for the first time alleged that they had been made certain promises that had not been kept.  However, despite the fact that they were communicating with Mr. Kunz, Plaintiffs never once alleged that Mr. Kunz was the one that made the promises.  Instead, Ms. Fairbairn said that "the DAF people" made the promises while Mr. Fairbairn said he "was told" that the shares would be traded in a certain way.  In these same communications, the Fairbairns praised Mr. Kunz's work ethic and integrity throughout the post-trade discussions.

After Plaintiffs made the allegations regarding the promises, individuals at both Fidelity Charitable and Family Office began discussing those allegations.  Mr. Kunz acknowledged that he had told Plaintiffs that Fidelity Charitable "typically" trades below 10% of the daily trading volume of a stock (which he had learned from a representative of Fidelity Charitable), but denied making any other representations regarding how Fidelity Charitable would trade the stock.  Nobody else involved in the donation had any firsthand (or any other) knowledge of any promises that had been made to Plaintiffs.

Stefan Podvojsky, the head of the Investments team at Fidelity Charitable, looked into whether any promises had been made to Plaintiffs and determined that none had been made.  As part of that process, Mr. Podvojsky spoke with Edward Brown, Mr. Kunz's boss, about whether anyone at FFOS had made the alleged promises.  Although he did not ask Mr. Kunz whether Mr.

Kunz had made the promises, he conducted his fact-finding many months before the Fairbairns identified Mr. Kunz as the source of the misrepresentations. Mr. Podvojsky also evaluated the Fairbairns' concerns regarding the sale of the Energous shares, and concluded that the sale accorded with Fidelity Charitable's policies and practices.

Despite levelling serious accusations against Fidelity Charitable in January 2018, Plaintiffs continued to work with Fidelity Charitable, Family Office, and Mr. Kunz for the next four months after the donation and sale. Mr. Fairbairn personally met with representatives of Family Office and Fidelity Charitable to discuss whether Fidelity Charitable would be interested in making Ascend, Plaintiffs' hedge fund, an investment option for Fidelity Charitable donors' giving accounts. These discussions continued until Ms. Fairbairn threatened Fidelity Charitable with litigation in April 2018. Plaintiffs eventually filed the Complaint in this case in August 2018, where for the first time they alleged that Mr. Kunz had been the one to make them promises regarding how the donated Energous shares would be traded.

### D.      Plaintiffs' Claims Against Fidelity Charitable

#### 1.      Promises

Plaintiffs now allege that Justin Kunz made four promises to them regarding how Fidelity Charitable would sell the Energous stock, but that Fidelity Charitable did not honor those promises. The making and breaking of those promises form the basis for four of Plaintiffs' five causes of action: misrepresentation, breach of contract, promissory estoppel, and violation of California's Unfair Competition Law.

The evidence does not show that either Mr. Kunz or Fidelity Charitable made any promises to Plaintiffs regarding how Fidelity Charitable would liquidate the donated stock. Mr. Kunz categorically denies making any such promises. Mr. Kunz also acknowledges that he is familiar with the rules prohibiting donor control over assets contributed to DAFs and asserts that he would not make promises that would run afoul of those rules, both because Fidelity Charitable would not be allowed to keep such promises and because they would jeopardize the donor's tax deduction. There is no written evidence from December 2017 that references any promises whatsoever, despite Mr. Kunz and Plaintiffs exchanging numerous emails during that time regarding the

Plaintiffs' donation to Fidelity Charitable.  And the first writing to accuse Mr. Kunz of making the promises was the Complaint filed in this case in August 2018.  The only evidence that any promises occurred is Plaintiffs' own testimony.

Additionally, even if the promises were made, Plaintiffs did not rely on them in choosing to make their donation to Fidelity Charitable, and therefore the promises were not a substantial factor in causing harm to Plaintiffs.  The evidence shows that Plaintiffs would have donated the Energous stock to Fidelity Charitable regardless of any promises.  On December 22, 2017—days before the alleged promises were made—Ms. Fairbairn wrote an email to herself with the subject line "We need transfer [sic] stock to Fidelity" indicating that it would take two days to transfer public stock from another bank to Fidelity Charitable.  (In fact, it did take Morgan Stanley two days to transfer the WATT shares to Fidelity Charitable.)  Plaintiffs never contacted their relationship manager at JP Morgan about a potential donation, and Plaintiffs have never claimed that they considered donating to any other DAF other than JP Morgan Charitable.[3]  There is no evidence of Plaintiffs reconsidering donating to Fidelity Charitable, and Plaintiffs readily admit that Fidelity Charitable needed to receive the donated assets in the 2017 calendar year in order to qualify for a 2017 tax deduction and therefore offset their repatriated income.  This deadline left Plaintiffs with no time to investigate other donation options.  Throughout the donation process, Plaintiffs' main focus was completing the donation in 2017 in order to accomplish their 2017 tax deduction.  The questions and concerns Plaintiffs expressed to Mr. Kunz focused on how to complete the donation in time, not about how or when the stock would be sold once the donation was complete.  There is no credible evidence that any representations by Mr. Kunz convinced Plaintiffs to make a donation they otherwise would not have made.

---

[3] Moreover, had the Fairbairns opted to sell the shares themselves and donate the resulting cash to Fidelity Charitable or another charity before year-end 2017, they would have had to sell in the midst of the same volatile market for Energous that they now contend Fidelity Charitable ought to have avoided by waiting until 2018.  Stock sales settle (*i.e.*, cash and shares must be delivered to seller and buyer respectively) two business days after the trade is executed.  In this case, if the Fairbairns had instructed Fidelity Family Office and Morgan Stanley to sell their Energous shares in after-hours trading on December 26 or on December 27, they would have received cash from those sales on December 28 or 29.  And rather than having the full proceeds to donate to charity, they would have to pay capital gains taxes.

Case No. 3:18-cv-04881-JSC                    DEFENDANT'S PROPOSED FINDINGS OF FACT/LAW

Further, there is no evidence that Fidelity Charitable's actions caused any harm to Plaintiffs. Both of Fidelity Charitable's trading experts will testify that there is no evidence that Fidelity Charitable's trading caused any negative impact on Energous's stock price. Professor Hendershott's and Mr. Zarcu's opinions regarding price impact are discussed more thoroughly below. Without a showing of price impact, Plaintiffs cannot show that Fidelity Charitable caused any harm to their tax deduction, which is calculated by taking the average of the high and the low prices of Energous stock on the day it was donated. Additionally, the alternative trading scenarios run by Professor Hendershott show that honoring the promises now alleged by Plaintiffs would had yielded *fewer* proceeds in Plaintiffs' giving account. And even if Fidelity Charitable did have an impact on Energous's stock price, Plaintiffs cannot present any evidence that they *detrimentally* relied on Fidelity Charitable's promises because they cannot show that a reasonable DAF would have traded the Energous shares any differently.

Finally, for all of the above reasons, there is no injustice that would be avoided by enforcing the promises. Fidelity Charitable sold the Energous stock in the exact manner it tells donors it will – as quickly as possible. Plaintiffs received a $52 million tax deduction and over $44 million in their giving account that could be gifted to charities as the result of the donation. Put simply, the process worked as it was designed to work, and Plaintiffs reaped significant benefits.

Each individual alleged promise is further addressed below:

a) *That Fidelity Charitable Would Employ Sophisticated, State-of-the Art Methods for Liquidating Large Blocks of Stock*

*First*, neither Mr. Kunz nor anyone else at Family Office or Fidelity Charitable promised that Fidelity Charitable would employ sophisticated, state-of-the-art methods for liquidating stock. Neither Ms. nor Mr. Fairbairn remember Mr. Kunz using the words "sophisticated" or "state-of-the-art" at all. Instead, they have used a variety of words to describe this promise, none of which correspond with language in the Complaint. At different times Plaintiffs have described this promise as a promise that Fidelity Charitable would be "gentle," "very gentle," "careful," "very careful," "knowledgeable [and] expert," and/or "use best-proven practices" when liquidating the donated stock. Therefore, even under Plaintiffs' versions of events, the two sides never came to

an agreement regarding exactly what Fidelity Charitable was promising to do.

*Second*, Fidelity Charitable did in fact employ sophisticated, state-of-the-art methods for liquidating large blocks of stock. Both lay and expert testimony will demonstrate that Fidelity Charitable indeed used such methods. Each tranche of stock was sold using sophisticated algorithms called time-weighted average price (or TWAP) and volume-weighted average price (or VWAP). TWAPs and VWAPs function by dividing large block orders (such as each tranche of Energous stock) into much smaller orders (called "child orders") that can then be sold in the marketplace without alerting the market to the presence of a big seller, which can sometimes affect the stock price.

Defendant's experts Terrence Hendershott and Cristian Zarcu will testify that these algorithms are common in the trading industry and are both sophisticated and state-of-the-art. They will also testify that there is nothing wrong or unsophisticated with running multiple algorithms at once, as the algorithms will still break up the larger blocks into smaller child orders. This minimizes execution risk and can disguise the presence of a large seller because it makes the smaller child orders indistinguishable from other small orders in the market. Even Plaintiffs' trading expert, Lawrence Harris, conceded that the algorithms used by Fidelity Charitable disguise large orders and therefore prevent the market from detecting the presence of a large block of shares being sold. Finally, Mr. Zarcu will testify that there is nothing inherently wrong or unsophisticated with even a 20% participation rate,[4] which is greater than the participation rate associated with Fidelity Charitable's sale of Energous stock during the period of time it sold the Energous stock.

To the extent Plaintiffs contend that a promise regarding sophisticated, state-of-the-art methods was the natural extension of Mr. Kunz's assurance that Fidelity Charitable uses Fidelity Capital Markets to liquidate stock, there can be no dispute that Fidelity Charitable *did* use Fidelity Capital Markets to liquidate the stock, as the shares were sold by Gerald Celano, a trader at Fidelity Capital Markets.

---

[4] A "participation rate" is a trade's percentage of the total shares traded during the trading window, as compared to the percentage of the daily trading volume, which is a trade's percentage of the total shares traded during the entire day the trade was made.

*Third*, even if the Court determines that Mr. Kunz made the promise and it was false, Mr. Kunz did not know that the representation was false, and did not make it recklessly and without regard for its truth.  Mr. Kunz believed that Fidelity Capital Markets would sell the shares on behalf of Fidelity Charitable, and he believed that the trader would use sophisticated methods to sell the shares.  Therefore, there is no evidence to suggest that Mr. Kunz knowingly made a false representation or made the representation recklessly and without regard for its truth.

> b) *That Fidelity Charitable Would Not Trade More Than 10% of the Daily Trading Volume of Energous Shares*

*First*, neither Mr. Kunz nor anyone else at Family Office or Fidelity Charitable promised that Fidelity Charitable would not trade more than 10% of the daily trading volume of Energous shares.  Instead, Mr. Kunz has consistently maintained that he told Plaintiffs that Fidelity Charitable *typically* trades less than 10% of the daily trading volume.  Mr. Kunz's testimony is credible and corroborated by documentary evidence.  Specifically, this statement about how Fidelity Charitable typically trades (as opposed to a promise of how Fidelity Charitable would trade these particular shares) is consistent with what Fidelity Charitable and Fidelity Family Office told Ms. Fairbairn in February 2017 over email.  It is also consistent with what Fidelity Charitable told Mr. Kunz, as reflected in Mr. Kunz's handwritten notes.  The evidence demonstrates that Mr. Kunz did not promise or guarantee that Fidelity Charitable would trade below 10% of the daily trading volume.

*Second*, Fidelity Charitable did in fact trade less than 10% of the daily trading volume of Energous on December 29, 2017.  The phrase "daily trading volume" refers to the number of shares of a given stock that is traded over the course of a full trading day, as demonstrated by the plain meaning of the phrase, testimony from Defendant's trading expert Cristian Zarcu, and testimony from Ms. Fairbairn regarding her understanding of the phrase.  On December 29, Fidelity Charitable traded 1,931,985 shares of Energous stock, while 28,413,632 total Energous shares were traded that day.  Therefore, Fidelity Charitable sold just below 6.8% of Energous' daily trading volume for December 29, well below the 10% of the daily trading volume that was allegedly promised.

*Third*, even if the promise was made and was false (which would require accepting Plaintiffs' argument that "daily trading volume" really means "participation rate"), Mr. Kunz did not know it to be false when he made it. Fidelity Charitable told Mr. Kunz that they typically trade below 10% of the daily trading volume, and he had no reason to suspect that that would not be the case with Plaintiffs' donation. Additionally, there is no evidence that Mr. Kunz ever considered that "daily trading volume" might mean anything other than the number of shares traded over the course of an entire trading day, which is the ordinary and natural import of the phrase. Mr. Kunz is not a trader and had no way of knowing that there might be another specialized definition of that term within the trading industry (even if one were to exist). Therefore, there is no evidence that Mr. Kunz ever understood the phrase "daily trading volume" to have the meaning Plaintiffs now contend it has.

*Fourth*, it would not have been reasonable for Plaintiffs to rely on a promise that Fidelity Charitable would trade less than 10% of the daily trading volume. Such a promise would effectively prevent Fidelity Charitable from exercising discretion over how to trade the shares despite its legal ownership of the shares post-donation. However, the Program Circular, which Mr. Fairbairn acknowledged reading prior to the donation, clearly stated that all donations are irrevocable and that Fidelity Charitable will sell donated securities at the earliest date possible but reserved the right to sell donated assets at any time. It was especially unreasonable to rely on an alleged oral promise contradicted by a written agreement without reducing that promise to writing in any form. Additionally, when Plaintiffs took their tax deduction for the year 2017, they had to acknowledge they no longer had any control over the Energous shares. Retaining control of how to trade the shares would have made their 2017 tax deduction improper. It would not have been reasonable for Plaintiffs to rely on an oral promise that was contrary to the terms of the Program Circular and the requirements of the tax laws.

        c)    *That Fidelity Charitable Would Allow Plaintiffs to Advise on a "Price Limit"*

*First*, neither Mr. Kunz nor anyone else at Family Office or Fidelity Charitable promised that Fidelity Charitable would allow Plaintiffs to advise on a price limit below which Fidelity

Charitable would not sell the Energous shares.  Even Plaintiffs do not recall hearing a promise that included the phrase "price limit."  Ms. Fairbairn never heard anything at all regarding this promise, and Mr. Fairbairn only remembers Mr. Kunz telling him that he would be "kept in the loop." However, Mr. Fairbairn admits that there was no discussion about what being "kept in the loop" would mean, and there was no discussion about using a "price limit."  Mr. Fairbairn also concedes that Fidelity Charitable was free to ignore any advice it received from him, that the donation was irrevocable, and that Fidelity Charitable controlled the donated assets after the donation.  Thus, at the very least, there was no agreement between Mr. Kunz and Mr. Fairbairn regarding this promise.

*Second*, Plaintiffs were not harmed by the breaking of this promise.  Mr. Fairbairn admits that there was no promise that Fidelity Charitable would have to follow his advice if he had given it, and there is no indication that Mr. Kunz promised that Fidelity Charitable would even *consider* his advice.  Therefore, there is no evidence that Fidelity Charitable's trading would have been executed any differently even if this alleged promise had been kept, meaning the breaking of the promise did not cause any harm to Plaintiffs.

d)      *That Fidelity Charitable Would Not Liquidate Any Shares Until the New Year*

*First*, neither Mr. Kunz nor anyone else at Family Office or Fidelity Charitable promised that Fidelity Charitable would not liquidate any shares until 2018.

*Second*, it would not have been reasonable for Plaintiffs to rely on a promise that Fidelity Charitable would not sell any Energous shares until 2018 because it would explicitly dictate when Fidelity Charitable could trade.  However, the Program Circular, which Mr. Fairbairn acknowledged reading prior to the donation, clearly stated that donations are irrevocable and that Fidelity Charitable reserved the right to sell donated assets at any time.  It was especially unreasonable to rely on an alleged oral promise contradicted by a written agreement without reducing that promise to writing in any form.  Additionally, when Plaintiffs took their tax deduction for the year 2017, they had to acknowledge they no longer had any control over the Energous shares.  This promise would have let the Fairbairns continue to exert control over the donated assets by preventing Fidelity Charitable from immediately selling the stock, meaning that

24

1   taking a donation on their 2017 taxes would have been improper.  It would not have been

2   reasonable for Plaintiffs to rely on an oral promise that was contrary to the terms of the Program

3   Circular and the requirements of the tax laws.

4         *Third*, Plaintiffs were not harmed by the breaking of this promise even if it were made.

5   Defendant's expert Terrence Hendershott found no evidence that Fidelity Charitable's trading had

6   an impact on Energous's stock price, meaning that waiting until 2018 to sell would not have

7   impacted the size of Plaintiffs' tax deduction (which is calculated by averaging the low and high

8   stock prices on the day of the donation).  Professor Hendershott also ran various damages scenarios

9   to calculate what the proceeds in the giving account would have been if Fidelity Charitable had

10   traded at different times using different participation rates.  In both scenarios that involved Fidelity

11   Charitable not trading any shares until 2018, Professor Hendershott found that the amount of

12   proceeds in Plaintiffs' giving account would have been less than the actual proceeds obtained by

13   Fidelity Charitable.  Thus, breaking this alleged promise did not cause any harm to Plaintiffs.

14             2.   Trading

15         Plaintiffs also allege that Fidelity Charitable's trading constituted negligence.

16             a)   *Standard of Care*

17         If Fidelity Charitable owed a duty to Plaintiffs (which it did not, as discussed further in the

18   Conclusions of Law), Fidelity Charitable's actions satisfied the relevant standard of care.  Fidelity

19   Charitable acted in a manner consistent with its stated policy to sell donated assets as quickly as

20   possible and to sell donated stock on the "earliest date possible."  This policy is reasonable and

21   prudent, as it protects the charity by reducing the market risk involved with potentially volatile

22   stocks.  Fidelity Charitable's aim is liquidating donated assets and investing those proceeds in pre-

23   approved investment vehicles, which safely allow for potential growth, thus allowing more funds

24   to be donated to charity.  It does not speculate on individual stocks, and therefore its policy to sell

25   as quickly as possible allows it to focus on its central purpose of ensuring proceeds are available

26   to donate to other charities.

27         Fidelity Charitable's donor-advised fund expert, Ben Pierce, will testify that Fidelity

28   Charitable followed the general approach of other sponsoring organizations of donor-advised

funds, including by selling the stock as quickly as possible, thus using the skill and care that a reasonably careful DAF sponsoring organization would have used in similar circumstances.  Mr. Pierce will testify that many DAF sponsoring organizations, including large national charities like Vanguard Charitable (sometimes called national DAFs), which Mr. Pierce himself ran for 17 years, have the same policy of selling donated stock as quickly as possible, and for the same reason (to reduce market risk to the charity).  Therefore, Fidelity Charitable acted consistent with a policy that the majority of national DAFs have decided is a prudent safeguard when dealing with donations of publicly traded stock.

Fidelity Charitable also satisfied the relevant standard of care because there is no evidence that Fidelity Charitable's trading had any negative effect on Energous's stock price.  Energous was a speculative and volatile stock that ultimately experienced a long-term price decline in the weeks and months after the donation.  Energous's stock price began to decline in the afternoon of December 29, 2017 four minutes *before* Fidelity Charitable began selling the Energous shares but exactly when the NASDAQ web site reposted a tweet from market observer Citron Research that sharply criticized Energous and predicted precisely such a price decline.

Professor Hendershott will also testify that a variety of facts, data, and calculations support the conclusion that Fidelity Charitable did not impact Energous's stock price, including:

- The algorithms used by Fidelity Charitable to sell the Energous stock were standard and widely accepted in the trading industry and that they functioned as designed, meaning that the algorithms broke the large tranches into smaller child orders in order to prevent the market from detecting a large sale was occurring.

- Fidelity Charitable made extensive use of hidden orders and dark pools in order to further disguise its selling.

- The price of Energous shares continued to decline in after-hours trading—after Fidelity Charitable stopped selling—so that there was no price reversal after Fidelity Charitable exited the market, suggesting that it was not Fidelity Charitable's trades that were pushing down Energous's stock price.

- Fidelity Charitable traded passively rather than aggressively, meaning that it sold

stock at the prevailing price rather than selling at lower prices. Fidelity Charitable's passive selling is a telling measure because other sellers' aggressive selling correlates strongly with the price decline of Energous's stock price on December 29.

Professor Hendershott also will testify that he ran calculations of alternative selling scenarios determining what the proceeds in the giving account would have been if Fidelity Charitable had started trading later and/or using a lower participation rate. Out of all the scenarios Professor Hendershott tested, only one resulted in higher proceeds from the sale of Energous stock, and even then by only around $525,000, while the others all resulted in fewer proceeds in the giving account. And Fidelity Charitable had no way of knowing before the trading started exactly which selling pattern would produce moderately higher proceeds. Put differently, even in hindsight, Fidelity Charitable's sale was reasonable.

Mr. Zarcu will also testify that Fidelity Charitable's selling had no impact on Energous's stock price. He will concur that Fidelity Charitable's use of multiple algorithms was both reasonable and successful, and that Fidelity Charitable's participation rate was reasonable. Mr. Zarcu will also confirm that Fidelity Charitable did not trade aggressively, and that its passive trades had no impact on Energous's stock price. In fact, comparing Fidelity Charitable's trades to a common benchmark in the trading industry known as interval-VWAP (or iVWAP), Mr. Zarcu concludes that Fidelity Charitable's trades actually produced over $500,000 *more* in proceeds than would have been expected for a well-executed liquidation.

On the other hand, the conclusions of Plaintiffs' experts are unreliable. Plaintiffs' expert Lawrence Harris's use of multiple models and his selection of the model that produced the greater damages calculation are arbitrary and not scientifically justified. Professor Harris also utilized a price adjustment to find Fidelity Charitable created a price impact, but the adjustment is not properly rooted in any scientific method or reasoning. In fact, Professor Harris opined that Fidelity Charitable's trading drove the price of the stock down by more than the price's total decline during the time Fidelity Charitable was trading, meaning that Fidelity Charitable somehow caused a greater decline in the price of WATT shares than was actually observed in the market. This

1   conclusion is not credible or realistic given the aggressive selling of non-Fidelity Charitable traders

2   on December 29, and the fact that these other sellers comprised the overwhelming volume of sales

3   on that day, including during the time that Fidelity Charitable sold its Energous stock.  Similarly,

4   Plaintiffs' expert Ian Domowitz's conclusions are unreliable because they are based on a historical

5   analysis of stocks and do not account for the unique market conditions of Energous stock on

6   December 29.  Consequently, Plaintiffs' experts do not demonstrate that Fidelity Charitable's

7   selling negatively impacted Energous's stock price.

8                               b)      *Damages*

9          Fidelity Charitable's trading did not result in any harm to Plaintiffs.  *First*, as discussed

10  immediately above, Fidelity Charitable did not negatively impact Energous's stock price.  With

11  no showing of price impact, Plaintiffs cannot show that Fidelity Charitable damaged Plaintiffs' tax

12  deduction (which is based on Energous's stock price).  *Second*, the alternative trading scenarios

13  presented by Fidelity Charitable's trading experts demonstrate that other selling options available

14  to Fidelity Charitable would have in fact resulted in *fewer* proceeds in Plaintiffs' giving account.

15  And *third*, there is no evidence that other national DAFs could have sold the Energous stock in a

16  way that would have led to a greater tax deduction or charitable proceeds, especially considering

17  that many national DAFs have the same policy as Fidelity Charitable to sell as quickly as possible.

18  Without a showing that a reasonably careful national DAF would have sold the Energous stock in

19  a different manner that would have resulted in a higher tax deduction and greater proceeds in their

20  giving account, Plaintiffs cannot demonstrate that Fidelity Charitable's actions harmed them.

21                               c)      *Plaintiffs' Responsibility for the Delay in Donating and Selling*

22         Although Plaintiffs object that Fidelity Charitable did not wait until 2018 before selling the

23  Energous shares, they also complain that if Fidelity Charitable was going to sell the shares in

24  December 2017, it should have sold them sooner.  But Plaintiffs themselves were a substantial

25  factor in any delay in Fidelity Charitable's sale of Energous stock.  *First*, Plaintiffs loaned out their

26  Energous shares to borrowers and did not request that their shares be recalled until the evening of

27  December 26 (FFOS shares) and the morning of December 27 (Morgan Stanley shares) despite

28  knowing days earlier that they would be donating those shares to Fidelity Charitable.  Plaintiffs'

decision to continue lending out the shares through December 26 caused a two-day delay in the donation of the shares and ensured that the majority of the shares could not be transferred to Fidelity Charitable until December 29. *Second*, Mr. Fairbairn devised a plan that would theoretically expedite the donation by lending shares from Fidelity Charitable to Morgan Stanley. The idea was that Fidelity Charitable's shares could then be used to cover the other shares that were being lent out by Morgan Stanley, allowing them to be returned and ultimately donated faster. Mr. Fairbairn had Mr. Kunz investigate the feasibility of this plan from December 27 into the morning of December 29. However, Fidelity Charitable ultimately determined that it could not lend the shares to Morgan Stanley due to the provisions of the tax laws prohibiting donor control over donated assets. The shares were eventually transferred with no strings attached. *Third*, Ms. Fairbairn admits that she had the opportunity to donate the 313,862 Energous shares held at Fidelity Family Office on December 28 but instead chose to donate them on December 29 because she thought the stock price would continue to rise. If Ms. Fairbairn had instead elected to donate those shares on December 28, the tax deduction associated with those shares (like the tax deduction of the 700,000 shares Fidelity Charitable received from Morgan Stanley on December 28) would have been larger than it was. All of these actions delayed Fidelity Charitable's sales of the Energous shares.

## III.   CONCLUSIONS OF LAW[5]

### A.   Plaintiffs Cannot Satisfy Their Burden of Proof

Plaintiffs bear the burden of proving each and every one of their claims by a preponderance of the evidence. *See* Judicial Council of California Civil Jury Instructions (2020 edition), CACI ("CACI") No. 1900 (stating that to establish a claim for intentional misrepresentation, Plaintiffs must prove the stated elements); *Sierra Nat. Bank v. Brown*, 18 Cal. App. 3d 98, 105 (1971) (stating that the burden of proof in a fraud case is a preponderance of the evidence); CACI 303

---

[5] For the reasons stated in its motion to dismiss briefing, Fidelity Charitable contends that Plaintiffs lack standing to sue Fidelity Charitable at all and that the state Attorney General has exclusive jurisdiction to bring claims against a public charity for the mismanagement of charitable assets. *See* ECF No. 21. However, because the Court has previously rejected that argument, *see* ECF No. 39, Fidelity Charitable does not repeat it here.

1   (stating that to recover damages for breach of contract, Plaintiffs must prove the stated elements);

2   CACI 400 (stating that to establish a claim for negligence, Plaintiffs must prove the stated

3   elements); *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 875, 24 P.3d 493, 521 (2001), as modified

4   (July 11, 2001) (stating that the plaintiff bears the burden of proof by a preponderance of the

5   evidence as to her unfair competition law cause of action); Cal. Evid. Code § 115 (stating that

6   except as otherwise provided by law, the burden of proof requires proof by a preponderance of the

7   evidence). Proving a claim by a preponderance of the evidence requires showing that each element

8   of the claim is more likely than not to have been satisfied. *See Aguilar*, 25 Cal.4th at 852. Each

9   of Plaintiffs' claims fail because they have failed to carry their burden on multiple elements

10  required to prove each of their claims.

11  ## B.   Plaintiffs' Misrepresentation Claim Fails

12          Plaintiffs' misrepresentation claim fails because they have failed to prove most of the

13  required elements. "The elements of fraud that will give rise to a tort action for deceit are: "(a)

14  misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity

15  (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting

16  damage." *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 974 (1997) (internal

17  quotation marks omitted). "Fraud is an intentional tort; it is the element of fraudulent intent, or

18  intent to deceive, that distinguishes it from actionable negligent misrepresentation and from

19  nonactionable innocent misrepresentation. It is the element of intent which makes fraud

20  actionable, irrespective of any contractual or fiduciary duty one party might owe to the other."

21  *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith*, 68 Cal. App. 4th 445, 482 (1998)

22  (internal citations omitted).

23          Plaintiffs' vague recollections are insufficient to establish that a representation was made.

24  *See Conrad v. Bank of America*, 45 Cal. App. 4th 133, 156 (1996) (finding no "misrepresentation"

25  where "[t]he alleged promise was oral and, other than [plaintiff], there were no witnesses and no

26  documentary evidence to establish such a promise," and plaintiff's "testimony with respect to the

27  promise was vague"). There is no contemporaneous written evidence that supports that the

28  misrepresentations were made. Plaintiffs rely only on their own testimony that the promises were

1    made, and their own accounts of what exactly was said between them and Mr. Kunz is not

2    consistent.   And Plaintiffs' concession that two of the promises made to them (that Fidelity

3    Charitable would use sophisticated, state-of-the-art methods for liquidating large blocks of stock

4    and that Fidelity Charitable would allow Plaintiffs to advise on a price limit) were not actually

5    stated by Justin Kunz in that manner but rather were implied by Mr. Kunz's words is plainly

6    insufficient to establish that any misrepresentations were made.  *See RSB Vineyards, LLC v. Orsi*,

7    15 Cal. App. 5th 1089, 1102 (2017) ("[A] cause of action for misrepresentation requires an

8    affirmative statement, not an implied assertion.").   Plaintiffs' inability to satisfy their burden that

9    Fidelity Charitable made any misrepresentations dooms this cause of action from the start.

10   However, even were such representations made, Plaintiffs' claim would still fail as a matter

11   of law for a variety of reasons.  *First*, for the reasons stated in the above Findings of Fact, Plaintiffs

12   cannot show that two of the promises they now allege (that Fidelity Charitable would use

13   sophisticated, state-of-the-art methods for liquidating large blocks of stock and that Fidelity

14   Charitable would sell no more than 10% of Energous's daily trading volume) were false or that

15   Mr. Kunz knew that they were false or made them recklessly and without regard for their truth.   A

16   false representation and knowledge of that falsity are required elements for a claim for intentional

17   representation.   *Engalla*, 15 Cal.4th at 974.   Therefore, by failing to satisfy their burden with

18   respect to those elements, Plaintiffs' claim based on those promises must fail.

19   *Second*, Plaintiffs are unable to satisfy their burden of proving that they justifiably relied

20   on Mr. Kunz's alleged promises.   Even if Plaintiffs had actually relied on the alleged promises

21   (which they did not, for the reasons stated in the above Findings of Fact), any such reliance was

22   per se unreasonable because the promises were contradicted by the Program Circular, a written

23   agreement between the parties.  *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal. App. 3d 467,

24   482 (1984) ("[Plaintiff] could not have reasonably relied on any implied promise by Wells Fargo

25   which contradicted the express provisions of the written Stock Option Agreement which he

26   signed.") (disapproved of on other grounds).

27   Plaintiffs' reliance on the alleged promises that would allow them to control the liquidation

28   was also per se unreasonable because they would not have been entitled to a deduction for the tax

1    year 2017 if they retained control over the donation. The Internal Revenue Code states that

2    Plaintiffs could only take a donation if they had ceded to Fidelity Charitable "*exclusive* legal

3    control over the assets contributed." 26 U.S.C. § 170(f)(18)(B) (emphasis added). The Tax Court

4    has explained that in order to take a charitable deduction, a donor must have "a clear and

5    unmistakable intention … to absolutely … divest himself of … control of the subject matter of the

6    gift," and must effect "the irrevocable transfer of … dominion and control of the entire gift to the

7    donee, so that the donor can exercise no further act of dominion or control over it." *Goldstein v.*

8    *Commissioner*, 89 T.C. 535, 541 (1987); *see also Gookin v. United States*, 707 F. Supp. 1156,

9    1158 (N.D. Cal. 1988) ("[T]he subject matter of the gift must have been placed beyond the

10   dominion and control of the donor." (quoting *Pauley v. United States*, 459 F.2d 624, 626 (9th Cir.

11   1972))). Yet despite taking a deduction for the gift of the Energous shares on their 2017 tax returns,

12   Plaintiffs now claim that they retained a legal right to control how their donation of Energous stock

13   was liquidated in 2018. Retaining such control over a donation while also taking a deduction is

14   expressly forbidden by the tax laws. Therefore, even if Plaintiffs did rely on the alleged

15   misrepresentations, their reliance was not reasonable because their desired and actual deduction

16   would have been prohibited by the tax laws. *Roberts v. UBS AG*, 2013 WL 1499341, at *10 (E.D.

17   Cal. Apr. 11, 2013) (finding that plaintiffs could not have justifiably relied on representations that

18   contradicted the IRS's tax disclosure requirements). At the very least, Mr. Kunz's alleged oral

19   promises contradicted the Program Circular and the requirements of the tax code, and hence

20   required Plaintiffs to investigate whether such promises were enforceable before allegedly relying

21   on them. *See, e.g., Cameron v. Cameron*, 88 Cal. App. 2d 585, 594 (1948) ("If [one] becomes

22   aware of facts that tend to arouse his suspicion, or if he has reason to believe that any

23   representations made to him are false or only half true, it is his legal duty to complete his

24   investigation and he has no right to rely on statements of the other contracting party."). Without

25   proof of justifiable reliance, Plaintiffs' misrepresentation claim must fail. *Engalla*, 15 Cal.4th at

26   974.

27         *Third*, Plaintiffs' misrepresentation claim fails because no damages resulted from Fidelity

28   Charitable's actions. For the reasons stated in the above Findings of Fact, Fidelity Charitable's

1    trading did not affect Energous's stock price, meaning that it could not have had a negative effect

2    on Plaintiffs' tax deduction.   And because the alternative liquidation approaches proposed by

3    Plaintiffs would have netted *fewer* dollars for their giving account than the approach actually used

4    by Fidelity Charitable, Fidelity Charitable's actions could not have negatively impacted the

5    proceeds in Plaintiffs' giving account either.   Further, Plaintiffs have failed to provide a theory of

6    damages that rises above the level of pure speculation, which cannot form the basis for a finding

7    of intentional misrepresentation.   *Kaui Scuba Ctr., Inc. v. PADI Americas, Inc.*, 2011 WL

8    13225132, at *2 (C.D. Cal. Mar. 15, 2011) (dismissing intentional misrepresentation claim because

9    the allegations did not "rise beyond the level of pure speculation"); *Am. Student Fin. Grp., Inc. v.*

10   *Aequitas Capital Mgmt., Inc.*, 2015 WL 11237638, at *6 (S.D. Cal. Feb. 12, 2015) (granting

11   summary judgment on fraud claim based on intentional misrepresentations where "plaintiffs'

12   theory is too speculative to support the damages element of a fraud claim").

13           Finally, Plaintiffs' negligent misrepresentation claim fails as a matter of law.   "Although a

14   false promise to perform in the future can support an *intentional* misrepresentation claim, it does

15   *not* support a claim for *negligent* misrepresentation."   *Stockton Mortg., Inc. v. Tope*, 233 Cal. App.

16   4th 437, 458 (2014).   "The law is well established that actionable misrepresentations must pertain

17   to past or existing material facts.   Statements or predictions regarding future events are deemed to

18   be mere opinions which are not actionable."   *Cansino v. Bank of America* 224 Cal. App. 4th 1462,

19   1469 (2014) (internal citations omitted).   But the only misrepresentations the Complaint alleges

20   are promises that Fidelity Charitable would take certain actions in the future.   *See* Compl. ¶ 91

21   ("Fidelity Charitable promised that (1) it *would* employ sophisticated, state-of-the-art methods for

22   liquidating large blocks of stock, (2) it *would not* trade more 10% of the daily trading volume of

23   Energous shares, (3) it *would* allow the Fairbairns to advise on a price limit (i.e., a point below

24   which it would not sell without first consulting the Fairbairns), and (4) it *would not* liquidate any

25   shares until the beginning of 2018." (emphases added)).   Accordingly, the only misrepresentations

26   Plaintiffs have alleged do not support a claim for negligent misrepresentation.

27           **C.       Fidelity Charitable Did Not Breach Any Contract with the Fairbairns**

28           Plaintiffs' breach of contract claim similarly fails.   "To prevail on a cause of action for

33

breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014). "Whether parties have reached a contractual agreement and on what terms are questions for the fact finder when conflicting versions of the parties' negotiations require a determination of credibility." *Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.*, 218 Cal. App. 4th 272, 283 (2013). "Whether a contract is sufficiently definite to be enforceable is a question of law for the court." *Ladas v. California State Automobile Assn.*, 19 Cal. App. 4th 761, 770 n. 2 (1993). "Implicit in the element of damage is that the defendant's breach caused the plaintiff's damage." *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1352 (2009). "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage." *U.S. Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 909 (2005) (internal citations omitted). Plaintiffs' contract claim fails because they fail to meet their burden on several necessary elements.

*First*, Plaintiffs cannot establish that a contract including the terms of the four promises was ever established. As with their misrepresentation claim, Plaintiffs' breach of contract claim fails immediately because there is no reliable evidence that Mr. Kunz ever made the four promises, and therefore no reliable evidence that they formed the basis of a contract. Additionally, even if conversations similar to the ones Plaintiffs allege occurred, they do not establish the formation of a contract because the law requires a meeting of the minds in order for a valid contract to form. *Simar Shipping Ltd. v. Global Fishing, Inc.*, 540 Fed. App'x 565, 657 (9th Cir. 2013) ("[T]he legal principle that a valid contract requires a meeting of the minds on essential terms [is] a proposition finding ample support . . . at common law.") (citation and punctuation omitted). No such meeting of the minds occurred here. Mr. Kunz disputes that he made any promises or guarantees to Plaintiffs, and even Plaintiffs' account of the conversations does not support the existence of a meeting of the minds. For instance, Plaintiffs do not allege that they ever discussed the meaning of "daily trading volume" with Mr. Kunz, meaning that there is no evidence that the parties could

1   have agreed that that phrase actually meant "participation rate," as Plaintiffs now claim.  They do

2   not allege that Mr. Kunz ever used the phrases "price limit" or "sophisticated, state-of-the-art

3   methods," meaning there is no evidence that such phrases became incorporated into the terms of a

4   contract between the parties.  Mr. Fairbairn will testify that he made assumptions about what Mr.

5   Kunz meant because of his experience in the trading industry.  But one party's assumptions do not

6   prove a meeting of the minds.  Therefore, the vague and one-sided testimony from Plaintiffs is not

7   sufficient to show an agreement between the parties to enter into a binding contract, and thus

8   Plaintiffs cannot succeed on their breach of contract claim when they cannot show a contract

9   existed in the first place.

10       *Second*, for the reasons stated above as to two of the promises, Fidelity Charitable did all

11   of the things required of that contract, meaning no breach occurred.  It used sophisticated, state-

12   of-the-art methods to liquidate Plaintiffs' stock and traded far below 10% of the daily trading

13   volume of Energous's stock.  Even if Plaintiffs and Mr. Kunz entered into a binding oral contract,

14   Plaintiffs have not met their burden to prove that a breach occurred with respect to those two

15   promises.

16       *Third*, even if Plaintiffs meet their burden to show there was a meeting of the minds

17   between themselves and Mr. Kunz, the resulting terms of that contract were not clear enough that

18   the parties could understand what each was required to do.  *Weddington Prods., Inc v. Flick.*, 60

19   Cal. App. 4th 793, 811 (1998).  "If, by contrast, a supposed 'contract' does not provide a basis for

20   determining what obligations the parties have agreed to, and hence does not make possible a

21   determination of whether those agreed obligations have been breached, there is no contract."   *Id.*;

22   s*ee also Halvorsen v. Aramark Uniform Services, Inc.*, 65 Cal. App. 4th 1383, 1389 (1998) ("An

23   alleged oral contract with vague and uncertain terms is not binding."); *Barajas v. Carriage Servs.,*

24   *Inc.*, 2019 WL 6699737, at *6 (N.D. Cal. Dec. 9, 2019) ("in order to support [the] position that a

25   binding oral contract was … created, … it must appear from the evidence that the essential terms

26   of the contract were sufficiently definite[.]'") (quoting *Jaffe v. Albertson Co.*, 243 Cal. App. 2d

27

28

1    592, 600 (1966)).[6]  There is no reliable evidence to show what the parties meant by "sophisticated,

2    state-of-the-art methods" of trading large blocks of stock, or what would be required of Fidelity

3    Charitable as the result of such a promise.  There is no reliable evidence of what the parties meant

4    by allowing the Plaintiffs to advise on a price limit, or alternatively what it would entail to keep

5    Plaintiffs "in the loop."  Thus, with no reliable testimony regarding what Fidelity Charitable

6    actually was obligated to do, no enforceable contract between the parties existed.

7         *Fourth*, the speculative nature of any harm flowing from Fidelity Charitable's alleged

8    breach of contract defeats any claim on that basis.  "To be enforceable, a promise must be definite

9    enough that a court can determine the scope of the duty and the limits of performance must be

10   sufficiently defined to provide a rational basis for the assessment of damages."  *Ladas v. California*

11   *State Automobile Association*, 19 Cal. App. 4th 761, 770 (1993).  None of the promises alleged by

12   Plaintiffs provides the Court with a rational basis for assessing damages, as Plaintiffs cannot

13   demonstrate that Fidelity Charitable's alleged breach of contract negatively impacted either their

14   tax deduction or giving account.  This is particularly true of Fidelity Charitable's supposed promise

15   to allow Plaintiffs to advise on a price limit, as there is no evidence regarding what limit Plaintiffs

16   would have advised or whether Fidelity Charitable would have heeded the hypothetical advice.

17   "[A]n amorphous promise" that obligates the promisor to "consider" something is unenforceable

18   when the contract does not establish what that consideration must entail.  *Id.* at 771.[7]  Even Mr.

19   Fairbairn admits that Fidelity Charitable would not have been obligated to follow his advice.

20   Requiring the Court to now speculate on what Plaintiffs' tax deduction or giving account proceeds

21   would have been if Fidelity Charitable had kept the four allegedly broken promises is simply too

22

23   [6] Fidelity Charitable recognizes that the Court rejected this argument at summary judgment after "drawing all inferences in the Fairbairns' favor."  ECF No. 171 at 6.  The Fairbairns are not
24   entitled to any inferences at trial, and instead will bear the burden of proof.  Fidelity Charitable anticipates that after the close of Plaintiffs' case-in-chief, the Court will not be able to conclude
25   that the promises more likely than not were made, let alone that the resulting contract was "sufficiently definite" as a matter of law.

26   [7] Fidelity Charitable recognizes that the Court rejected this argument at summary judgment on the basis of "a genuine dispute as to whether Fidelity Charitable would have followed the Fairbairns'
27   advice had it been sought."  ECF No. 171 at 6.  Fidelity Charitable expects that after the close of
28   Plaintiffs' case-in-chief, the Court will be able to resolve this legal question in favor of Fidelity Charitable.

1  speculative a task to be permitted under California law.

2       **D.**     **Plaintiffs Cannot Prove Their Promissory Estoppel Claim**

3       Plaintiffs cannot meet their burden of proving the elements of their promissory estoppel

4  claim.  In California, promissory estoppel is defined by the following elements:  "A promise which

5  the promisor should reasonably expect to induce action or forbearance of a definite and substantial

6  character on the part of the promisee and which does induce such action or forbearance is binding

7  if injustice can be avoided only by enforcement of the promise."  *C & K Eng'g Contractors v.*

8  *Amber Steel Co*., 23 Cal. 3d 1, 6 (1978).  Because Plaintiffs cannot establish any of these elements

9  at trial, their promissory estoppel claim fails.

10       *First*, as discussed above, the evidence shows that Mr. Kunz did not make any promises

11  to the Fairbairns.

12       *Second*, also as discussed above, even assuming the promises were made, Plaintiffs could

13  not have reasonably been induced to donate the Energous stock based on representations that

14  were inconsistent with their understanding of the operation of DAFs, the applicable tax laws, and

15  the Program Circular, which was the written agreement between the parties.  As a matter of law,

16  it is not reasonable to rely on oral promises if they are contradicted by the provisions of a written

17  agreement signed by the parties.  *See, e.g.*, *Shapiro*, 152 Cal. App. 3d at 482.  Therefore, it would

18  not have been reasonable for Plaintiffs to rely on the promises they allege, even if they had been

19  made.

20       Moreover, the evidence demonstrates that no promises were needed to "induce" Plaintiffs

21  to make their donation.  The Fairbairns were determined to make a donation by year's end to a

22  DAF in order to offset their $280 million income, and as of December 2017 when the alleged

23  promises were supposedly made, Fidelity Charitable was the *only* DAF they were considering.

24  There is no evidence that Plaintiffs ever considered donating their Energous shares to any other

25  charity, and thus no evidence that the alleged promises induced a donation that Plaintiffs

26  otherwise would not have made.

27       Nor does the evidence show that Plaintiffs relied on any alleged promises to their

28  detriment.  "[D]etrimental reliance is an essential feature of promissory estoppel."  *Zierolf v.*

      DEFENDANT'S PROPOSED FINDINGS OF FACT/LAW

1   *Wachovia Mortg.*, 2012 WL 6161352, at *8 (N.D. Cal. Dec. 11, 2012) (quoting *Youngman v.*

2   *Nevada Irr. Dist.*, 70 Cal. 2d 240, 249–50 (1969)).  Plaintiffs cannot prove that they

3   *detrimentally* relied on any alleged promises because expert testimony will conclusively

4   demonstrate that Fidelity Charitable's traders sold the Energous stock competently and achieved

5   among the highest prices Energous ever recorded.  Indeed, Fidelity Charitable's liquidation

6   provided Plaintiffs with over $44 million in proceeds to their DAF account, and their gift

7   allowed them to take a tax deduction of over $52 million.  Without proof that Fidelity

8   Charitable's actions left them in a worse position, Plaintiffs cannot show that they detrimentally

9   relied on Fidelity Charitable's promises, and therefore their promissory estoppel claim must fail.

10   *See Zierolf*, 2012 WL 6161352, at *8 (dismissing plaintiff's promissory estoppel claim for

11   failing to allege detrimental reliance).

12       *Finally*, even if Plaintiffs were able to satisfy the other elements of promissory estoppel

13   (they cannot), their claim would still fail because there is no evidence that "injustice can be avoided

14   only by enforcement of the promise."  *C & K Eng'g Contractors*, 23 Cal.3d at 6.  Promissory

15   estoppel is an equitable doctrine, and therefore it is only appropriately applied if it is necessary to

16   prevent injustice.  *Id.*  Such is not the case here.  For one, Plaintiffs cannot prove that two of the

17   promises they now allege were false, as Fidelity Charitable did use sophisticated, state-of-the-art

18   methods to liquidate the Energous stock and they did sell below 10% of Energous's daily trading

19   volume.  Second, Plaintiffs cannot prove that they have been damaged by Fidelity Charitable's

20   actions for the same reason they cannot prove detrimental reliance: Fidelity Charitable proficiently

21   sold the Energous shares and received a historically high sale price.  There is no credible evidence

22   to suggest an alternative liquidation approach could have yielded a better result.  And in fact,

23   because Fidelity Charitable's liquidation of the Energous stock not only did not harm Plaintiffs

24   but enabled them to grant more than $44 million to charity and to reduce their 2017 tax obligations,

25   there is no injustice that applying the doctrine of promissory estoppel could serve to avoid.  Further,

26   Plaintiffs' breach of contract and misrepresentation claims will both be decided on the same

27   grounds as their promissory estoppel claims – whether Fidelity Charitable in fact made the oral

28   representations alleged by Plaintiffs, whether Plaintiffs reasonably relied on those representations,

1   and whether Fidelity Charitable's actions harmed Plaintiffs.  Plaintiffs cannot explain why also

2   prevailing on a promissory estoppel claim will avoid an injustice they would otherwise suffer.

3   Therefore, regardless of the factual determinations made at trial, Plaintiffs' promissory estoppel

4   claim fails.

### E.   Fidelity Charitable Was Not Negligent in Its Liquidation of Energous Stock

6          Plaintiffs cannot satisfy their burden of proving that Fidelity Charitable was negligent in

7   its trading of Energous stock.  "The elements of a cause of action for negligence are well

8   established.  They are (a) a legal duty to use due care; (b) a breach of such legal duty; and (c) the

9   breach as the proximate or legal cause of the resulting injury."  *Ladd v. County of San Mateo*, 12

10  Cal.4th 913, 917 (1996) (internal quotation marks and emphasis omitted).  "Breach is the failure

11  to meet the standard of care."  *Coyle v. Historic Mission Inn Corp.*, 24 Cal. App. 5th 627, 643

12  (2018).  "The formulation of the standard of care is a question of law for the court.  Once the court

13  has formulated the standard, its application to the facts of the case is a task for the trier of fact if

14  reasonable minds might differ as to whether the defendant's conduct has conformed to the

15  standard."  *Regents of University of California v. Superior Court*, 29 Cal. App. 5th 890, 902–03

16  (2018) (internal citations omitted).  "In most cases, courts have fixed no standard of care for tort

17  liability more precise than that of a reasonably prudent person under like circumstances. This is

18  because each case presents different conditions and situations. What would be ordinary care in one

19  case might be negligence in another."  *Coyle*, 24 Cal. App. 5th at 639–40 (internal citation

20  omitted).  "The element of causation requires there to be a connection between the defendant's

21  breach and the plaintiff's injury."  *Id.* at 645.

### 1.   Fidelity Charitable Did Not Owe a Duty to Plaintiffs

23         Fidelity Charitable did not owe a duty to Plaintiffs and therefore could not have been

24  negligent.  *See, e.g., Toomer v. United States*, 615 F.3d 1233, 1237 (9th Cir. 2010) ("Where there

25  is no duty, there can be no negligence.").  "[T]he existence of a duty is a question of law for the

26  court."  *Ky. Fried Chicken of Cal. v. Superior Court*, 14 Cal.4th 814, 819 (1997).  "The first

27  element, duty, may be imposed by law, be assumed by the defendant, or exist by virtue of a special

28  relationship."  *Doe v. United States Youth Soccer Assn., Inc.*, 8 Cal. App. 5th 1118, 1128 (2017)

(internal quotation marks omitted).

Fidelity Charitable owed no generalized duty *to Plaintiffs* regarding how it would sell the Energous shares because at the time of the trading, the Energous shares had been irrevocably donated and were owned solely by Fidelity Charitable.  To the extent Fidelity Charitable assumed any duty to the Fairbairns regarding the donation of the Energous stock, that duty was set forth in the written agreement between the parties as memorialized in the Program Circular, which Fidelity Charitable provided to the Fairbairns, and the Fairbairns acknowledged they understood and agreed to be bound by its terms.  For instance, in the Program Circular, Fidelity Charitable agreed to provide certain tax forms and confirmations after the donation, agreed that the net proceeds from the sale of donated securities would be allocated to the donor's giving account, and provided information regarding where and how liquidated assets could be invested in pre-approved pools.  However, the Program Circular notably did not establish a duty with respect to how or over what period of time Fidelity Charitable would sell the Energous shares, as the Circular made clear that Fidelity Charitable reserved the right to sell the shares "at any time" and stated that the information provided regarding the liquidation of securities "should serve as general guidelines."  Even so, Fidelity Charitable complied with its policy with respect to how it typically sells donated assets, as represented to the Fairbairns (and to the rest of the world), and sold the Energous stock "as quickly as possible" (although it was under no legal obligation to do so).

Because no duty was imposed on Fidelity Charitable by law, no special relationship existed between Plaintiffs and Fidelity Charitable, and the Program Circular did not impose a duty with respect to the details of the liquidation, the question becomes whether Fidelity Charitable assumed a duty with respect to how it would trade the Energous shares through specific representations made by Mr. Kunz.  *See* ECF No. 39 at 13-14 (providing the Court's ruling on Fidelity Charitable's Motion to Dismiss that Plaintiffs' allegations of specific representations regarding the liquidation of the shares are "sufficient to plausibly allege a duty of care under California law").  In other words, Plaintiffs' negligence claim rises and falls with its claim for misrepresentation.  If no misrepresentations were made, there can be no negligence.  And as discussed above, the evidence shows that Mr. Kunz did not make the alleged representations, so no duty existed as a result of the

1  alleged promises.  Therefore, Fidelity Charitable's duty was simply to follow the terms of the

2  agreement set forth in the Program Circular (such as allocating the proceeds of the sale of Energous

3  shares to Plaintiffs' giving account).  Fidelity Charitable owed no further duty to Plaintiffs

4  regarding the details of the liquidation and therefore was not negligent in its selling of the Energous

5  shares.

6  　　　　　　　　　2.  　Fidelity Charitable Satisfied Any Applicable Standard of Care

7  　　　　　Even if Fidelity Charitable did owe a duty to Plaintiffs to sell the Energous shares in a

8  specific way (it did not), Fidelity Charitable was not negligent in its liquidation of Energous stock

9  because it satisfied any applicable standard of care.  Plaintiffs' theory of negligence is one of

10  professional negligence.  "The elements of a cause of action in tort for professional negligence are

11  (1) the duty of the professional to use such skill, prudence, and diligence as other members of his

12  profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal

13  connection between the negligent conduct and the resulting injury; and (4) actual loss or damage

14  resulting from the professional's negligence."  *Budd v. Nixen*, 6 Cal.3d 195, 200 (1971).  "With

15  respect to professionals, their specialized education and training do not serve to impose an

16  increased duty of care but rather are considered additional 'circumstances' relevant to an overall

17  assessment of what constitutes 'ordinary prudence' in a particular situation."  *LAOSD Asbestos*

18  *Cases*, 5 Cal. App. 5th 1022, 1050 (2016) (internal quotation marks and citation omitted).  Thus,

19  a professional can only be liable for negligence if he or she "fails to use the skill and care that a

20  reasonably careful" professional in his or her industry "would have used in similar circumstances."

21  *See* CACI No. 600.

22  　　　　　Although internal policies cannot establish a legal duty or standard of care, which can only

23  be established by law, *see Lugtu v. California Highway Patrol*, 26 Cal.4th 703, 720-21 (2001)

24  (finding that the California Highway Patrol's safety manual "may not properly be viewed as

25  *establishing* the applicable standard of care") (emphasis in original), compliance with both internal

26  organizational policies and practices within the applicable industry is relevant evidence that the

27  organization complied with the standard of care.  *See Bullis v. Security Pac. Nat. Bank*, 21 Cal.3d

28  801, 809 (1978) (trial court properly considered defendant's procedures, as stated in its operations

1  manual, and customs and practices of the banking industry in evaluating whether bank's actions

2  complied with appropriate standard of care); *see also Lugtu*, 26 Cal.4th at 720-21 (finding that the

3  safety manual was still relevant evidence on the question of negligence despite not establishing

4  the applicable standard of care).  As discussed in the Findings of Fact, Fidelity Charitable complied

5  with both its own internal policy to sell the stock as quickly as possible in order to reduce market

6  risk and with the general practices of other DAFs to do the same, as Ben Pierce will testify to.

7  Therefore, Fidelity Charitable acted with the same skill and care a reasonably careful national DAF

8  would have and did not act negligently.

9       Additionally, to the extent Plaintiffs contend that Fidelity Charitable was negligent because

10  it did not get the best possible price in selling the Energous stock, such a conclusion is not

11  consistent with California law.  Fidelity Charitable was not required to get the best possible price

12  for the Energous stock, and was not even required to have no impact on Energous's stock price

13  (although there is no reliable evidence that Fidelity Charitable did have a price impact).  "The

14  services of experts are sought because of their special skill. They have a duty to exercise the

15  ordinary skill and competence of members of their profession, and a failure to discharge that duty

16  will subject them to liability for negligence. Those who hire such persons are not justified in

17  expecting infallibility, but can expect only reasonable care and competence. They purchase

18  service, not insurance."  *Gagne v. Bertran*, 43 Cal.2d 481, 489 (1954); *see also Allied Properties*

19  *v. John A. Blume & Associates*, 25 Cal. App. 3d 848, 856 (1972) ("This rule [of *Gagne v. Bertran*]

20  has been consistently followed in this state with respect to professional services…."). In other

21  words, Plaintiffs are only entitled to the ordinary skill and competence of a national DAF.  And

22  national DAFs specialize in liquidating donations of stock as quickly as possible in order to

23  minimize market risk, not speculating on individual stocks.  Fidelity Charitable did exactly that

24  with its sale of the Energous stock, as its trading was reasonable in light of the policies and

25  practices of other national DAFs.  Fidelity Charitable thus cannot be liable for negligence.

26       3.   Plaintiffs Were Not Harmed by Fidelity Charitable's Actions

27       Plaintiffs' inability to prove that Fidelity Charitable was a substantial factor in Plaintiffs'

28  harm further dooms Plaintiffs' negligence claim.  *See* CACI No. 400 (stating that to establish a

1    claim for negligence, a plaintiff must prove that the defendant was negligent, that the plaintiff was

2    harmed, and that the defendant's negligence was a substantial factor in causing the plaintiff's

3    harm). "The element of causation requires there to be a connection between the defendant's breach

4    and the plaintiff's injury." *Coyle*, 24 Cal. App. 5th at 645.

5        Plaintiffs cannot establish that they suffered any harm at all. For the reasons stated above,

6    expert testimony will demonstrate that there is no reliable evidence that Fidelity Charitable

7    negatively impacted Energous's stock price. Plaintiffs cannot adequately explain why only

8    Fidelity Charitable, and not any of the other traders in the market at the same time selling millions

9    more shares of Energous stock than Fidelity Charitable, caused Energous's stock price to decline.

10   Without proof of a negative price impact specifically attributed to Fidelity Charitable, Plaintiffs

11   cannot establish that Fidelity Charitable caused any damages to their tax deduction. Further, any

12   alternative liquidation scenarios that a national DAF might have considered would have resulted

13   in fewer dollars to Plaintiffs' giving account. Thus, the evidence does not show that Fidelity

14   Charitable was a substantial factor in any theoretical harm experienced by Plaintiffs.

15           4.    Plaintiffs' Recovery for Negligence Should Be Reduced by the Percentage

16                 of Their Responsibility for Their Harm

17       Because Plaintiffs bear some responsibility for any harm they may have suffered, their

18   ultimate recovery must be reduced by the percentage of their responsibility for that harm. "The

19   comparative fault doctrine is designed to permit the trier of fact to consider all relevant criteria in

20   apportioning liability. The doctrine is a flexible, commonsense concept, under which a jury

21   properly may consider and evaluate the relative responsibility of various parties for an injury

22   (whether their responsibility for the injury rests on negligence, strict liability, or other theories of

23   responsibility), in order to arrive at an equitable apportionment or allocation of loss." *Pfeifer v.*

24   *John Crane, Inc.*, 220 Cal. App. 4th 1270, 1285 (2013) (internal quotation marks and citation

25   omitted). "Generally, a defendant has the burden of establishing that some nonzero percentage of

26   fault is properly attributed to the plaintiff, other defendants, or nonparties to the action." *Id.*

27   Negligence and the comparative negligence of a plaintiff are assessed differently. Whereas

28   "[n]egligence requires a duty, an obligation of conduct to another person," comparative negligence

1   "involves no duty" to another and is "conduct which involves an undue risk of harm to the actor

2   himself." *Yale v. Bowne*, 215 Cal. Rptr. 3d 266, 273 (Cal. Ct. App. 2017).   If a client of

3   professional services is sophisticated and has the ability to understand the matter but fails to

4   exercise due care, the client may be comparatively negligent.  *Id.* at 272.

5      For the reasons stated in the above Findings of Fact, Plaintiffs contributed to any potential

6   harm they may have suffered.  Plaintiffs contributed significantly to any delay in the selling of the

7   Energous stock because (1) they had loaned out the Energous shares held in their Morgan Stanley

8   account and refused to recall them until the morning of December 27 despite knowing that they

9   would be donating the shares to Fidelity Charitable; (2) Mr. Fairbairn devised a farfetched plan to

10  loan shares from Fidelity Charitable to Morgan Stanley to facilitate the donation that ultimately

11  failed and wasted valuable resources; and (3) Ms. Fairbairn acknowledges that she had the

12  opportunity to donate shares on December 28 but instead waited until December 29 because she

13  thought Energous's stock price would continue to rise.  Plaintiffs are sophisticated investors who

14  have significant experience in the lending, transferring, and donation of stock.  They understood

15  that there would be a delay in recalling the loaned shares and transferring them to Fidelity

16  Charitable.  Contributing to a delay that forms the basis of a negligence claim can form the proper

17  basis of a comparative negligence finding.  *See Tint v. Sanborn*, 259 Cal. Rptr. 902, 903 (Cal. Ct.

18  App. 1989) (finding that though a neighbor was liable for negligence in causing a nuisance that

19  delayed the sale of a landowner's property, the landowner may properly be found comparatively

20  negligent for his own delay in seeking an abatement of that nuisance).  Therefore, to the extent

21  that Plaintiffs now premise their negligence claim on Fidelity Charitable's delay in selling the

22  shares, their recovery must be reduced by the percentage of their responsibility for that delay.  *See*

23  CACI No. 405.

24      **F.    Plaintiffs Cannot Prove Their California Unfair Competition Law Claim**

25      Plaintiffs' claim for a violation of California's Unfair Competition Law ("UCL") fares no

26  better than the rest of their claims.  To bring a UCL claim under Cal. Bus. & Prof. Code § 17200

27  *et seq.*, a plaintiff must show either (1) unlawful, unfair, or fraudulent business acts or practices,

28  or (2) unfair, deceptive, untrue, or misleading advertising.  *Lippitt v. Raymond James Fin. Servs.,*

1    *Inc.*, 340 F.3d 1033 (9th Cir. 2003) (citing Cal. Bus. & Prof. Code § 17200).  Fraud under the UCL

2    requires different elements than common law fraud.  *See Boschma v. Home Loan Center, Inc.*, 198

3    Cal. App. 4th 230, 252 (2011).  "This distinction reflects the UCL's focus on the defendant's

4    conduct, rather than the plaintiff's damages."  *Id.*  Plaintiffs proceeding under the fraudulent prong

5    of the UCL must ultimately produce evidence showing that reasonably prudent customers

6    exercising ordinary care would be likely to be deceived by the alleged fraudulent conduct.  *Pirozzi*

7    *v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (*quoting Clemens v. DaimlerChrysler*

8    *Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008)).

9        Although Plaintiffs' Complaint does not specify which prong of the UCL they are

10   proceeding under and instead just states that Fidelity Charitable violated the UCL "by making false

11   promises that wrongfully induced the Fairbairns to donate the WATT shares," ECF No. 1,

12   Complaint, at ¶ 124, Plaintiffs' claim must fail under any of the three prongs.

13       Plaintiffs cannot prove that Fidelity Charitable acted unfairly, fraudulently, or unlawfully.

14   "Unfair simply means any practice whose harm to the victim outweighs its benefits.  Fraudulent

15   ... requires a showing [that] members of the public are likely to be deceived."  *Saunders v. Superior*

16   *Court*, 27 Cal. App. 4th 832, 839 (1994).  Fidelity Charitable's actions do not meet either standard.

17   For the reasons stated above, Mr. Kunz did not make any false promises to Plaintiffs about how

18   the Energous stock would be traded.  Instead, Fidelity Charitable traded the Energous stock

19   consistent with its stated written policy, which Mr. Fairbairn acknowledged and accepted before

20   donating, and consistent with the practices of its peers.  There is nothing unfair or fraudulent about

21   acting consistent with an explicitly stated policy that is common among other national DAFs.

22   Plaintiffs' UCL claim rests exclusively on their allegations regarding Mr. Kunz's false promises,

23   which for all the reasons above do not pass muster.  Nor did Fidelity Charitable act unlawfully, as

24   each of Plaintiffs' remaining claims fail for the reasons stated above.  Thus, Plaintiffs cannot

25   demonstrate a UCL claim under any of the three potentially relevant prongs.

26       Plaintiffs' UCL claim also fails because Plaintiffs cannot show that their economic injury,

27   if any, resulted from Fidelity Charitable's conduct.  "[S]ince the UCL requires that a plaintiff's

28   economic injuries come 'as a result of' the fraudulent conduct, Cal. Bus. & Prof. Code, § 17204,

1    the plaintiff must allege 'a causal connection or reliance on the alleged misrepresentation.'"

2    *Pirozzi*, 966 F. Supp. 2d at 920 (citing *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 855 (2008)).  This

3    requirement applies no matter what prong of the UCL Plaintiffs choose to proceed under.  *See* Cal.

4    Bus. & Prof. Code, § 17204 (stating that a private individual may only bring a claim under the

5    UCL if he or she "has suffered an injury in fact and has lost money or property *as a result of* the

6    unfair competition."  Cal. Bus. & Prof. Code, § 17204 (emphasis added).  Because Fidelity

7    Charitable did not negatively impact Energous's stock price or the proceeds in Plaintiffs' giving

8    account, Plaintiffs cannot show that they lost money as the result of Fidelity Charitable's conduct.

9        Similarly, because Fidelity Charitable owned the Energous shares in question at the time

10   they were sold, the UCL does not allow for the type of recovery that Plaintiffs seek.  The UCL "is

11   equitable in nature; damages cannot be recovered."  *Korea Supply Co. v. Lockheed Martin Corp.*,

12   29 Cal.4th 1134 (2003).  Remedies are "generally limited to injunctive relief and restitution."  *Id.*

13   (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163 (1999)).  "A restitution

14   order against a defendant … requires both that money or property have been lost by a plaintiff, on

15   the one hand, and that it have been acquired by a defendant, on the other."  *Kwikset Corp. v.*

16   *Superior Court*, 51 Cal.4th 310, 336 (2011).  But Plaintiffs cannot show that Fidelity Charitable

17   improperly retained any money or property belonging to Plaintiffs, as the stock became the

18   property of Fidelity Charitable when it was donated, meaning that it was already owned by the

19   charity at the time it was sold.  Additionally, the proceeds of the sale were directed into Plaintiffs'

20   giving account.  Plaintiffs cannot identify any funds that the charity retained that actually belonged

21   to Plaintiffs; rather, Plaintiffs allege that their tax deduction and giving account proceeds were

22   harmed by Fidelity Charitable's negligent trading of its own stock.  In other words, Plaintiffs

23   exclusively seek damages from Fidelity Charitable, not restitution, and damages are not available

24   under the UCL.  *See Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream,*

25   *Inc.*, 487 Fed.Appx 362, 363 (9th Cir. 2012) ("The indirect connection between [Plaintiff's] losses

26   and [Defendant's] gains would entitle [Plaintiff], at best, to damages, which are simply not

27   available under the UCL.  [Plaintiff's] nominal request for restitution in its prayer for relief is

28   insufficient to plead entitlement [to restitution].").  Thus, Plaintiffs' UCL claim must fail.

1

G.     **Plaintiffs Are Not Entitled to Recover Damages for Alleged Loss to the DAF**

2

Plaintiffs cannot seek damages for any alleged loss to the DAF because they cannot

3

obtain damages for injury to Fidelity Charitable—the sole owner of the Energous stock when it

4

was liquidated and the only party that could have suffered any loss resulting from the sale of that

5

stock.  Once Plaintiffs donated the shares of Energous to Fidelity Charitable, those shares

6

became the exclusive property of Fidelity Charitable.  The Fairbairns "relinquish[ed] all right,

7

title, and interest in the assets, in exchange for [the] 100% dollar for dollar tax deduction" they

8

claimed.  *Nat'l Heritage Found. Inc. v. Behrmann*, 2013 WL 1390822, at *1 (E.D. Va. Apr. 3,

9

2013); *see also* 26 U.S.C. § 4966(d)(2) (defining DAF as an account "owned and controlled by a

10

sponsoring organization").  As Fidelity Charitable's Program Circular explained to the

11

Fairbairns, "[o]nce Fidelity Charitable accepts a contribution, it is irrevocable and is owned and

12

controlled by the Trustees.  The Trustees have exclusive legal control over all contributed

13

assets."

14

Fidelity Charitable's subsequent sale of the Energous stock was thus a sale of Fidelity

15

Charitable's own property.  Any alleged harm to the DAF from that sale was harm to Fidelity

16

Charitable—the owner of that stock and the proceeds from its sale.  Plaintiffs have no claim for

17

"damages" to the DAF under California's "long-standing rule that one who is not the owner of

18

the property and was not damaged cannot sue for injury to property."  *Jasmine Networks, Inc. v.*

19

*Superior Court*, 180 Cal. App. 4th 980, 994 (2009) (*quoting Vaughn v. Dame Constr. Co.*, 223

20

Cal. App. 3d 144, 147, 272 Cal. Rptr. 261, 262 (1990), *modified* (Aug. 23, 1990)).

21

Indeed, it is a requisite element of every cause of action on which the Fairbairns seek a

22

damages award that they were injured, not a third party, and certainly not the very party from

23

which they seek damages.  As the California Supreme Court has explained, "[t]he primary object

24

of an award of damages in a civil action, and the fundamental principle or theory on which it is

25

based, is just compensation or indemnity for the loss or injury sustained *by complainant*, and no

26

more."  *See In re De Laveaga's Estate*, 50 Cal. 2d 480, 488 (1958) (emphasis added); *see also*

27

*Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017) ("'[C]ompensatory damages

28

are measured by the harm the defendant has caused the plaintiff.'").  Thus, contract damages are

1    designed to compensate a plaintiff for the injury the *plaintiff* suffered.   Likewise, one of the

2    elements of a negligence claim is a showing of damages.  *Peredia v. HR Mobile Servs., Inc.*, 25

3    Cal. App. 5th 680, 687 (2018).  For purposes of establishing that element, "[i]t is fundamental that

4    a negligent act is not actionable unless it results in injury *to another*."  *Corona v. Sony Pictures*

5    *Entm't, Inc.*, No. 14-CV-09600 RGK EX, 2015 WL 3916744, at *3 (C.D. Cal. June 15, 2015)

6    (quoting *Fields v. Napa Milling Co.*, 164 Cal. App. 2d 442, 330 (1958)) (emphasis added); *see*

7    *also Lederer v. Gursey Schneider LLP*, 22 Cal. App. 5th 508, 521 (2018), *review denied* (July 11,

8    2018) ("[A]ctual harm is required before a [negligence] cause of action accrues: 'If the allegedly

9    negligent conduct does not cause damage, it generates no cause of action in tort.'" (quoting *Budd*

10   *v. Nixen*, 6 Cal. 3d 195, 200 (1971) (superseded by statute on other grounds)).  Misrepresentation

11   also requires a plaintiff to prove that, "as a result of relying on the [defendant's] representation,

12   *the plaintiff* must have sustained damages."  *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144,

13   1156 n.3 (9th Cir. 2000) (emphasis added).  Consequently, even if the sale of the Energous stock

14   resulted in damages to the giving account as the result of Fidelity Charitable's trading, Plaintiffs

15   would still not be entitled to damages because they did not own the property in question at the time

16   the injury occurred.[8]   Any claims for mismanagement of the assets after the donation was made

17   could still be brought by the state Attorney General, as with all claims for the mismanagement of

18   charitable assets.

19          **H.      Any Damages for Misrepresentation and/or Negligence Are Limited to $20,000**

20                    **Per Claim**

21          A  Massachusetts  statute  limits  damages  awards  for  tort  claims  against  charitable

22

---

23          [8] Plaintiffs do not purport to, and could not, bring a claim on Fidelity Charitable's behalf
24   to recover damages for injury to property they did not own.  "[A] party 'must assert his own legal
     rights' and 'cannot rest his claim to relief on the legal rights of third parties,'" subject to exception
25   only where "(1) the party asserting the right has a close relationship with the person who possesses
     the right and (2) there is a hindrance to the possessor's ability to protect his own interests."  *E. Bay*
26   *Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (quoting *Sessions v. Morales-*
     *Santana*, 137 S. Ct. 1678, 1689, 198 L. Ed. 2d 150 (2017)).  Any attempt by Plaintiffs to assert
27   third-party standing to sue on Fidelity Charitable's behalf would founder at the first prong, since
     Fidelity Charitable is the opposing party in their lawsuit.
28

1   organizations and trusts to $20,000 per claim.  *See* Mass. Gen. Laws Ann. ch. 231, § 85K.  Under

2   California choice-of-law rules, that provision (and not California substantive law) governs the

3   question of whether a damages award against Fidelity Charitable is subject to a cap.  Because the

4   Massachusetts  limitation applies to the Fairbairns' misrepresentation and negligence claims, their

5   recovery on each of those claims should be limited to $20,000.

6       A.   Massachusetts Law Governs the Question of Charitable Damages.

7       Massachusetts law governs the issue of charitably immunity and limitation on damages

8   awards against a charity.  Courts apply the choice-of-law rules of the forum state.  *Atl. Marine*

9   *Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 65 (2013) (citing *Klaxon Co. v.*

10  *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494-96 (1941)).  California follows the Second Restatement

11  of the Law, which, in the absence of an agreement with a choice-of-law clause, applies a

12  "governmental interests" test.  Under that three-step test, the Court must first ask if the legal

13  regimes of California and the foreign state are "materially different."  *Washington Mut. Bank, FA*

14  *v. Superior Court*, 24 Cal.4th 906, 920 (2001).  If they are not, the Court applies California law.

15  *Id.*  If the two states' laws are materially different, the Court must determine, second, whether both

16  states have an interest in applying their law to the dispute.  *Id.*  Third, if the Court determines that

17  both states have an interest in having their law applied, the Court must "select the law of the state

18  whose interests would be 'more impaired' if its law were not applied."  *Id.*  In conducting that

19  comparative impairment analysis, "the … court must determine 'the relative commitment of the

20  respective states to the laws involved' and consider 'the history and current status of the states'

21  laws' and 'the function and purpose of those laws.'"  *Id.* (quoting *Offshore Rental Co. v.*

22  *Continental Oil Co.*, 22 Cal.3d 157, 166 (1978)).

23      The first step is easily satisfied: the laws are materially different.  Whereas Massachusetts

24  limits damages for torts committed by charitable trusts to $20,000 per cause of action, Mass. Gen.

25  Laws Ann. ch. 231, § 85K, California has abrogated charitable immunity and has not limited

26  recovery against charities, *see Malloy v. Fong*, 37 Cal.2d 356, 366 (1951); *Silva v. Providence*

27  *Hosp. of Oakland*, 14 Cal.2d 762, 775 (1939).

28      With respect to the second step, both jurisdictions have some interest in applying their law

1   to this dispute.  Fidelity Charitable is incorporated in Massachusetts and its Declaration of Trust

2   subjects it to Massachusetts law.   Moreover, because the corpus of the trust resides in

3   Massachusetts, any alleged loss to the DAF itself that resulted from Fidelity Charitable's trading

4   was sited in Massachusetts.  On the other hand, Plaintiffs are California residents and suffered the

5   alleged injury to their tax deduction there.

6       As to the third step, however, it is clear that Massachusetts law must apply to the issue of

7   charitable immunity.  Massachusetts has a much greater commitment to its statutory charitable

8   damages limitation than California has to its judicial abrogation of charitable immunity, and

9   Massachusetts' interests would be more seriously harmed were California's law applied.

10      The Massachusetts Supreme Judicial Court has repeatedly—and recently—explained that

11  the Commonwealth's damages cap implements a robust legislative intent to "protect the funds of

12  charitable institutions so they may be devoted to charitable purposes."  *English v. New England*

13  *Med. Ctr., Inc.*, 541 N.E.2d 329, 333 (Mass. 1989); *see also Keene v. Brigham & Women's Hosp.,*

14  *Inc.*, 786 N.E.2d 824, 837 (Mass. 2003) (rejecting protest that application of cap was inequitable

15  based on state public policy); *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal.3d 157, 166 (1978)

16  (explaining that "the current status of a statute" and the frequency with which it is enforced may

17  demonstrate a strong state interest in policy choice).  The legislature considered the policy so

18  important it "adopted section 85K in order to preserve the contours of common law charitable

19  immunity in the face of a threat of judicial abolition."  *Mason v. S. New England Conference Ass'n*

20  *of Seventh-Day Adventists of Town of S. Lancaster, Com. of Massachusetts*, 696 F.2d 135, 138-39

21  (1st Cir. 1982).  Massachusetts courts routinely apply the damages limitation.  *See, e.g., Kurtz v.*

22  *Kripalu Ctr. for Yoga & Health, Inc.*, 2019 WL 454594, at *12-13 (D. Mass. Feb. 5, 2019) (capping

23  negligence damages against nonprofit yoga center for injuries student incurred while stacking

24  chairs after lesson); *Mazzone v. Boston Univ.*, 352 F. Supp. 3d 141, 144 (D. Mass. 2019) (limiting

25  recovery for slip and fall at university lacrosse stadium).

26      Indeed, Massachusetts is so committed to its protection of charities from limitless liability

27  that its charitable limitation applies to all torts regardless of the mental state element; as the

28  Massachusetts Appeals Court has reasoned, "[t]he effect on the charity's funds is the same whether

1    the … tort is negligent, reckless, wanton, or intentional." *St. Clair v. Trustees of Bos. Univ.*, 25

2    Mass. App. Ct. 662, 668 (1988); *see also Martin v. Kelley*, No. 02684, 2004 WL 1895116, at *4

3    (Mass. Super. Aug. 12, 2004).  Accordingly, even fraud and other intentional torts are subject to

4    the cap.  *See In re Boston Reg'l Med. Ctr., Inc*., 328 F. Supp. 2d 130, 154-55 (D. Mass. 2004).  In

5    short, Massachusetts has a broad and consistent policy of protecting charities from financial

6    exposure for torts.

7            In contrast, California's current policy abrogating charitable immunity was not enacted by

8    the State Legislature.  Instead, the California Supreme Court abrogated charitable immunity based

9    on its interpretation that state legislative policy reflected in the California statute codifying

10   negligence liability, which provides that "[e]veryone is responsible … for an injury occasioned to

11   another by his want of ordinary care or skill," *Malloy*, 37 Cal.2d at 366 (quoting Cal. Civ. Code

12   § 1714(a)), suggests that charities should not be exempt from liability.  The court reasoned that the

13   legislature's admonition "admits of no exception based upon the objectives, however laudable, of

14   the tortfeasor," and that to hold otherwise would force the plaintiff to effectively subsidize a

15   charitable defendant's operations.  *Id*.  A decade later, the court reaffirmed this rationale in

16   rejecting a research hospital's effort at exemption from negligence liability, which the hospital

17   claimed would reallocate funds that should be used for the "extension of medical knowledge."

18   *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 104 (1963).  But although California has not

19   abandoned that rule, there are few cases from recent decades discussing the State's abrogation of

20   charitable immunity—and none from the California Supreme Court.

21           Fidelity Charitable is a Massachusetts charity that was established against Massachusetts'

22   legal backdrop protecting charities from tort liability.  Applying California's rule of limitless

23   potential monetary damages in this case would thwart the Commonwealth's protectionist policy,

24   which was designed expressly to shield Massachusetts charities and their funds from attack by tort

25   plaintiffs like the Fairbairns.  Indeed, that is the conclusion other courts outside of Massachusetts

26   have reached when adjudicating claims against Massachusetts charities.  *See, e.g., Kathryn P. v.*

27   *City of Philadelphia*, No. CIV. A. 97-6710, 1999 WL 391492, at *7 (E.D. Pa. May 27, 1999)

28   (applying Massachusetts law to Pennsylvania residents' claims stemming from abuse of a

Pennsylvania ward of the State at a nonprofit school in Massachusetts, and explaining that the charitable damages cap "must be given the broad scope intended for it by the Massachusetts Legislature").

Likewise, courts in states that have abrogated charitable immunity routinely permit charities incorporated in states that have preserved immunity to invoke the doctrine. For instance, in *Schultz v. Boy Scouts of America*, the New York Court of Appeals extended New Jersey's charitable immunity to torts committed in New York, reasoning that New Jersey had "weighed the interests of charitable tort-feasors and their victims and decided to retain the defense of charitable immunity," whereas New York's abrogation was a mere loss-allocation rule relevant to transactions between New York residents. 480 N.E.2d 679, 686 (N.Y. 1985). Moreover, applying a state's charitable immunity or damages limitation in out-of-state disputes respects the parties' choice to avail themselves of that rule. As the Second Circuit has explained,

> Charitable immunity reduces the cost at which an institution can provide its services, and, because the institution has no profit motive, these savings are presumably passed on to some extent to the institution's beneficiaries; in return, individuals who choose to take advantage of the institution's services bear the risk that any injury they suffer due to the negligence of the charitable institution will not be compensated by the institution. By electing to attend an institution that is protected by and benefits from New Jersey charitable immunity laws, [plaintiff] has presumably obtained a better value for his (or his parents') money than he would have obtained if Seton Hall did not enjoy charitable immunity. Because Gilbert [plaintiff] has indirectly availed himself of the charitable law of New Jersey and benefitted from it, New Jersey has a strong interest in having him bear a related burden.

*Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 110 (2d Cir. 2003) (applying New Jersey charitable immunity to Connecticut resident's tort claim for injury at a sporting event in New York). California's abrogation of charitable immunity, though longstanding, is likewise a loss-allocation rule based on the State's determination that a tort victim should not be compelled to make a charitable donation in the amount of denied compensation. *See Malloy*, 37 Cal.2d at 366. *Malloy*'s holding forms the background rule between California parties, but Massachusetts charities like Fidelity Charitable are incorporated in the expectation that their assets would not be depleted by tort payouts. Thus, Massachusetts law applies to this case, because its interests would be "more

impaired," *Washington Mut. Bank*, 24 Cal.4th at 920, if the Court applied California law to claims against Fidelity Charitable than vice versa.

B.       The Charitable Damages Cap Applies to the Fairbairns' Claims

Given the application of Massachusetts law to the issue, the Massachusetts' damages limitation applies and, even if liability is found, recovery on two of the Fairbairns' five claims—misrepresentation and negligence—must be limited to $20,000 each.  Both of these claims fall squarely within the ambit of Massachusetts' statutory cap on charitable damages, which provides that:

> It shall not constitute a defense to any cause of action based on tort brought against a corporation, trustees of a trust, or members of an association that said corporation, trust, or association is or at the time the cause of action arose was a charity; provided, that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. … Notwithstanding any other provision of this section, the liability of charitable corporations, the trustees of charitable trusts, and the members of charitable associations shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.

Mass. Gen. Laws Ann. ch. 231, § 85K.  Under the two-step inquiry the statute sets forth, a charitable organization is entitled to application of the limitation if (1) it is a charity, and (2) "the injury … occurred in the course of activities that 'accomplish directly' its charitable purposes." *Blauvelt v. AFSCME Council 93, Local 1703*, 910 N.E.2d 956, 960 (Mass. 2009).

The first prong requires that "the dominant purpose of [Fidelity Charitable's] work is for the public good and [its work] is but the means adopted for this purpose." *Conners v. Northeast Hosp. Corp.*, 439 Mass. 469, 479 (2003).  That standard is easily satisfied here.  Fidelity Charitable is incorporated as a charitable trust in Massachusetts; it is a 501(c)(3) tax-exempt organization; and its Declaration of Trust provides that Fidelity Charitable was created "to raise funds from donors" in order to "support charitable activities" and to "afford donors the opportunity" to pool their contributions in funds that are efficiently managed and invested to grow the assets available for charitable purposes.  Thus, Fidelity Charitable is a charitable entity entitled to Section 85K's

protection. *See Tep v. Southcoast Hosps. Grp., Inc.*, No. CV 13-11887-LTS, 2014 WL 12573547, at *3-4 (D. Mass. Sept. 22, 2014) ("The Court simply may not, consistent with Massachusetts law, look beyond Southcoast's organizational documents and the charitable purposes set forth therein to determine whether its revenue renders it a commercial, rather than a charitable, enterprise. Accordingly, Southcoast is entitled to a finding that it is a charitable organization within the scope of § 85K, as a matter of law."). Although that is sufficient to satisfy the first prong of section 85K's test, Fidelity Charitable's Form 990s and annual giving reports also document billions of dollars in charitable grantmaking, and its giving reports demonstrate the services it offers to donors to recommend grants to a variety of philanthropic entities.

The second prong requires that the tort "was committed in the course of any activity carried on to accomplish directly the charitable purposes of ... [the] trust." Mass. Gen. Laws ch. 231, § 85K (emphasis added). Under that standard, Fidelity Charitable's sale of the donated Energous stock—its own property—to raise funds to be invested and distributed to charities plainly qualifies. That liquidation generated funds for Fidelity Charitable, and was tied to the trust's stated goal of "afford[ing] donors the opportunity" to pool assets designated for charity in managed funds. Likewise, Mr. Kunz's alleged promises to the Fairbairns, even if made, would be subject to the limitation on damages because, even crediting the Fairbairns' allegations, they were made in order to encourage the Fairbairns to make a charitable deduction.

Indeed, the only time the limitation does not apply to a charity's conduct is "if the tort was committed in the course of activities primarily commercial in character." Mass. Gen. Laws ch. 231, § 85K (emphasis added). For the "primarily commercial" exception to apply, an activity must be "entirely disconnected" from the defendant's charitable purpose. *Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 209 n.37 (Mass. 1997) (emphasis). Far from being "entirely disconnected" from Fidelity Charitable's charitable purpose, Mr. Kunz's communications with the Fairbairns supported the core purpose of the DAF "to raise funds from donors" in order to "support charitable activities." Fidelity Charitable's payment to a "Fidelity" entity to provide necessary services related to Plaintiffs' donation does not render Fidelity Charitable's motivation "*primarily* commercial*," Mass. Gen. Laws ch. 231, § 85K (emphasis added).

1     To the extent Plaintiffs argue that Fidelity Charitable's solicitation of charitable donations

2 (including Mr. Kunz's alleged statements to convince the Fairbairns to donate the shares to the

3 DAF) and liquidation of donated assets to generate funds for charitable giving are revenue-

4 generating for Fidelity Charitable's service providers, that is not enough to render Fidelity

5 Charitable's activities "primarily commercial" or overcome the cap.  Even if Fidelity Charitable's

6 fundraising efforts with the Fairbairns were considered revenue-generating, they are still subject

7 to the limitation on liability because the "critical question is whether the revenue-generating

8 activity is in conformity with the corporation's charitable corporate purposes." *Conners*, 789

9 N.E.2d at 137.  Mr. Kunz's alleged statements "accomplish[ed] directly [Fidelity Charitable's]

10 purpose" by helping facilitate the Fairbairns' stated desire to donate funds to charity, specifically

11 a donor advised fund.  *Id.*  Accordingly, "the activity, ipso facto, is subject to the limitation on

12 liability." *Id.* at 136.

13     Indeed, the Massachusetts Supreme Judicial Court has consistently applied the damages

14 limitation expansively and its exception narrowly, including with respect to activities that, unlike

15 the case here, are only tangentially related to a charity's mission.  In *Connors*, for instance, snow

16 removal on a nonprofit hospital's property that injured the plaintiff was subject to the cap, since it

17 still facilitated the charity's purpose of caring for the sick by enabling patient access.  798 N.E.2d

18 at 13796.  *See also, e.g.*, *Mason*, 696 F.2d at 140-41 (building and maintaining church facility falls

19 within the organization's charitable purpose).  Similarly, a recent Massachusetts district court case

20 capped claims for personal injury brought by a spectator to a paid university athletic event, because

21 "the university, consistent with its mission as a charitable organization, diligently endeavors to

22 operate its school-sponsored sporting events as part of that mission."  *See Mazzone*, 352 F. Supp.

23 3d at 143.  Another recent case explained that the limitation applied to an injury following a paid

24 yoga class, since the class was an "educational program[] … that directly accomplished

25 Defendant's stated charitable mission" and only "incidentally yield[ed] revenue." *Kurtz*, 2019 WL

26 454594, at *12 (citing *McKay v. Morgan Mem'l Co-op. Indus. & Stores, Inc.*, 172 N.E. 68, 69

27 (Mass. 1930)).  As those cases demonstrate, the actions Plaintiffs allege led to their pleaded injuries

28 are protected conduct for which Fidelity Charitable's liability must be capped.  Consequently, any

1 damages for Plaintiffs' misrepresentation and/or negligence claims are limited to $20,000 per

2 claim.

3      **I.**     **The Doctrine of Judicial Estoppel Bars Plaintiffs' Claims[9]**

4      Plaintiffs are estopped from arguing that they relied on Fidelity Charitable's supposed

5 promises to liquidate the shares in conformity with Plaintiffs' demands, which is inconsistent

6 with Plaintiffs' claim of a tax deduction that required they relinquish control over the shares.  At

7 a minimum, the Fairbairns' decision to claim a tax deduction for the full fair market value of

8 their donation to Fidelity Charitable undermines Plaintiffs' testimony that they believed and

9 reasonably relied on the alleged promises when deciding to make the donation.

10      Under federal statute, donors to a DAF are entitled to take a tax deduction only if they

11 "obtain[] a contemporaneous written acknowledgment … from the sponsoring organization …

12 that such organization has *exclusive legal control* over the assets contributed."  26 U.S.C.

13 § 170(f)(18)(B) (emphasis added).  Upon donation, donors may only retain (consistent with a tax

14 deduction) "advisory privileges with respect to the distribution or investment of amounts held in

15 such fund or account," *id.* § 4966(d)(2)(A), which "are distinct from a legal right or obligation."

16 Joint Comm. on Taxation, Pension Protection Act of 2006, Title XII: Provisions Relating to Tax

17 Exempt Organizations, 2006 WL 4791686, at *67 (Aug. 3, 2006).  A donor who secures

18 "enforceable rights … with respect to a gift … will not be treated as having 'advisory

19 privileges.'"  *Id.*  Thus, "[w]hen a donor contributes to a particular DAF, the donor must

20 relinquish all right, title, and interest in the assets, in exchange for a 100% dollar for dollar tax

21 deduction," but "may make non-binding recommendations with respect to the distribution or

22 investment of the amounts held in the DAF."  *Nat'l Heritage Found. Inc. v. Behrmann*, 2013 WL

23 1390822, at *1 (E.D. Va. Apr. 3, 2013) (emphasis added) (internal citations omitted).

24      By claiming a charitable contribution deduction, Plaintiffs thus affirmatively certified to

25 the IRS, under penalty of perjury, 26 U.S.C. § 6065, that they *relinquished* "exclusive legal

26

27

28

---

[9] Fidelity Charitable recognizes that the Court denied Fidelity Charitable summary judgment on that issue, but believes that at trial, upon a full showing of the facts and equities, estoppel should apply to bar the Fairbairns' claims.

control" over the Energous shares to Fidelity Charitable, *id.* § 170(f)(18)(B).  That representation

enabled the Fairbairns to take a $52 million tax deduction based on their Energous donation.

The alleged promises—under which Fidelity Charitable supposedly agreed to give the Fairbairns

control over when the stock could be sold after it was donated, how much could be sold in a day,

and the manner in which it could be sold—are irreconcilable with that representation.  If made,

those promises would have deprived Fidelity Charitable of the ability to exercise independent

judgment as to those aspects of the sale, which would violate Congress's requirement that a DAF

sponsoring organization obtain "exclusive legal control."  Under settled law in the Ninth Circuit,

the Fairbairns are "estopped from taking one position on [their] tax returns, gaining a benefit

from that tax return, and then seeking another benefit in court by taking a position incompatible

with that taken on the tax return."  *Carpet Supermarket, Inc. v. Nat'l Fire Ins. Co. of Hartford*,

2009 WL 10675718, at *1 (C.D. Cal. Sept. 17, 2009) (citing *Marks v. Am. Airlines, Inc.*, 313 F.

App'x 933, 934 (9th Cir. 2009) (affirming district court's grant of summary judgment on tax

estoppel grounds)).  Plaintiffs cannot obtain damages based on the breach of promises that

contradict what they told the IRS.

Additionally, even if their claims were not wholly barred through estoppel, Plaintiffs

cannot demonstrate that Fidelity Charitable's breaking of the alleged promises caused them any

harm.  For the reasons stated above, if Fidelity Charitable had indeed made the four promises

alleged by Plaintiffs, Plaintiffs would not have been entitled to a legal tax deduction based on

their donation because they would not have relinquished all legal control over their stock.

Therefore, if Fidelity Charitable had indeed made enforceable promises regarding how it would

liquidate the Energous stock, Plaintiffs' legal tax deduction in 2017 for the Energous stock

donation would have been *zero dollars*, far less than the over $52 million deduction they

eventually took.  The fact that Plaintiffs chose to take the deduction on their 2017 tax returns

necessarily prevents them from recovering further damages purportedly from their inability to

control the liquidation of the stock; if Plaintiffs had indeed had the ability to control the

liquidation of the stock, their deduction would have been prohibited under the tax laws.  Thus,

Plaintiffs cannot recover damages on any of their claims based on the alleged promises.

1

**J.      Plaintiffs Are Not Entitled to Prejudgment Interest on Any Damages Award**

2          Plaintiffs are not entitled to prejudgment interest on their breach of contract claim even

3    were they to prevail on it.  Prejudgment interest in breach of contract cases is governed by

4    Section 3287 of the California Civil Code.  Section 3287(a) provides for interest where damages

5    are "certain, or capable of being made certain by calculation."  As courts have made clear,

6    Section 3287(a) applies only "where there is essentially no dispute between the parties

7    concerning the basis of computation of damages if any are recoverable."  *Wisper Corp. v.*

8    *California Commerce Bank*, 49 Cal. App. 4th 948, 958 (1996).  Such is not the case here with

9    respect to Plaintiffs' alleged contractual damages (or any other category of damages), as the

10   parties contest the appropriate calculation of damages, if any.

11         Accordingly, the only remaining potential source for an award of prejudgment interest on

12   Plaintiffs' contract claim is Section 3287(b), which gives the court discretion to award

13   prejudgment interest on "damages based upon a cause of action in contract where the claim was

14   unliquidated," as is the case here.  *See Segura v. McBride*, 5 Cal. App. 4th 1028, 1040 (1992)

15   (damages are unliquidated when they need "to be ascertained and settled through the trial

16   process").[10]  When determining whether to award prejudgment interest under Section 3287(b),

17   courts consider, among other factors, "whether awarding interest will penalize the defendant for

18   litigating a bona fide dispute"—which is what Fidelity Charitable has done for the past two

19   years.  *Forouzan v. BMW of N. Am., LLC*, No. CV173875DMGGJSX, 2019 WL 856395, at *3

20   (C.D. Cal. Jan. 11, 2019) (denying prejudgment interest where the jury reached a verdict about

21   19 months after the Complaint was filed and the case involved multiple "legitimately contested

22   issues" similar to those in this case) (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d

23   473, 496-97 (1982)).  No amount of prejudgment interest would be appropriate even if Plaintiffs

24   prevailed.

25         Nor are Plaintiffs entitled to prejudgment interest on their tort claims.  Prejudgment

26   interest in tort cases is governed by Section 3288 of the California Civil Code.  Section 3288

27

28   _____
     [10] Section 3287(b) further provides that any interest award can be calculated from a date no
     "earlier than the date the action was filed."

1  provides for interest in tort cases "in the discretion of the jury."  However, the Supreme Court of

2  California has cautioned against granting prejudgment interest awards under Section 3288 when

3  damages are not readily subject to precise calculation.  *See Greater Westchester Homeowners*

4  *Assn. v. City of Los Angeles*, 26 Cal.3d 86, 103 (1979).  In such cases, "[t]he amount of damages

5  is necessarily left to the subjective discretion of the trier of fact.  Retroactive interest on such

6  damages add uncertain conjecture to speculation."  *Id.*  Such is the case here.  Even if Plaintiffs

7  could prove they were damaged by Fidelity Charitable's actions (they cannot), the *amount* of

8  those damages must be based on imagining a world in which Fidelity Charitable traded the

9  Energous stock consistently with four separate promises.  There is no reliable way to calculate

10 the quantity of any price impact Fidelity Charitable's trading might have had on Energous's

11 stock price, as is demonstrated by the fact that Fidelity Charitable's experts concluded that there

12 was no price impact while Plaintiffs' experts concluded Fidelity Charitable was responsible for

13 the entire decline of Energous's stock.  Given the speculation required to arrive at any damages

14 amount, it would be inappropriate for the Court to add "uncertain conjecture to speculation" in

15 granting prejudgment interest.  *Id.*

### K.    Plaintiffs Are Not Entitled to Recover Attorneys' Fees

16 Plaintiffs contend that they are entitled to recover attorneys' fees under California's

17 "Private Attorney General" doctrine.  This case is inappropriate for such an award.  California's

18

19 private attorney general statute provides that:

20 Upon motion, a court may award attorneys' fees to a successful party against one
   or more opposing parties in any action which has resulted in the enforcement of
21 an important right affecting the public interest if: (a) a significant benefit, whether
   pecuniary or nonpecuniary, has been conferred on the general public or a large
22 class of persons, (b) the necessity and financial burden of private enforcement, or
   of enforcement by one public entity against another public entity, are such as to
23 make the award appropriate, and (c) such fees should not in the interest of justice
   be paid out of the recovery, if any.
24

25 Cal. Civ. Proc. Code § 1021.5.  To determine whether a fee award is appropriate, courts look to

26 three factors: whether "(1) the litigation resulted in the enforcement of an important right

27 affecting the public interest; (2) a significant benefit has been conferred on the general public or

28 a large class of individuals; and (3) the necessity and financial burden of private enforcement

1    renders the award appropriate." *New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist*.,

2    187 Cal. App. 4th 831, 848–49 (2010).

3        Both the nature of Plaintiffs' claims and the relief they seek militate against an award of

4    attorneys' fees here.  *First*, the Fairbairns do not allege that Fidelity Charitable made any

5    misrepresentation or omission that broadly applies to charitable donations in Fidelity

6    Charitable's donation materials, such as the Program Circular.  Instead, Plaintiffs allege that

7    Justin Kunz made individual promises to them regarding the liquidation of their donation.  Those

8    alleged promises, if made, contradicted Fidelity Charitable's general statements to donors about

9    how it liquidates assets, and a finding of liability will therefore have no effect on the rights of

10   other Fidelity Charitable donors.  Indeed, in opposing Fidelity Charitable's standing argument at

11   the motion to dismiss stage, the Fairbairns emphasized that their claims were distinct from the

12   interest of the general public.  *See* ECF No. 29, Plaintiffs' Opposition to Defendant's Motion to

13   Dismiss, at 20 (arguing that Plaintiffs have statutory standing because "the Fairbairns assert their

14   distinct personal interest – including their lost tax deduction – not a generalized public interest");

15   *id.* (arguing that the general rule that a donor cannot sue a charity does not apply because

16   "[w]here a donor asserts a *personal* right, distinct from any rights or interest held by the general

17   public, she may bring suit against the charity").  Having asserted their standing to bring suit by

18   stating that they sought to vindicate a personal interest while expressly denying an assertion of a

19   generalized public interest, Plaintiffs cannot now seek attorneys' fees based on the public interest

20   they previously disclaimed.

21       Moreover, there are no allegations or evidence in this case that suggest Fidelity

22   Charitable mismanages the liquidation of donated assets generally.  But to recover under Section

23   1021.5, a plaintiff's litigation objective "must go beyond[, or] transcend[,] those things that

24   concretely, specifically and significantly affect the litigant."  *Bradley v. Perrodin*, 106 Cal. App.

25   4th 1153, 1165 (2003).  For instance, a California appellate court held it insufficiently beneficial

26   to the "general public" that a charter school prevailed in its lawsuit seeking to lease space from

27   the Los Angeles public school district under contract principles and state statute because it did

28   not enforce other charter schools' rights to lease space or "charter school students' rights to

district facilities in general." *New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist.*, 187 Cal. App. 4th at 850.  Likewise, even if Plaintiffs prevail, their suit will not benefit a "broad class of citizens." *Millview County Water Dist. v. State Water Resources Control Bd.*, 4 Cal. App. 5th 759, 768 (2016).

*Second,* the Fairbairns cannot obtain an attorneys' fees award as a private attorney general because they seek a multimillion-dollar financial recovery in the form of their allegedly reduced tax deduction, in addition to the "return" of funds to the DAF itself.[11]  Thus, their personal benefit should they prevail is certain, direct, and substantial.  But an award of attorney fees under Section 1021.5 is only appropriate "if the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his individual stake in the matter."  *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1114 (C.D. Cal. 2012) (holding that $18,000 damages for plaintiff to take on two-year litigation enforcing ADA wheelchair accessibility requirements justified award of attorneys' fees).  Thus, "Section 1021.5 is intended as a 'bounty' for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public.  … To encourage such suits, attorneys fees are awarded when a significant public benefit is conferred through litigation pursued by one whose personal stake is insufficient to otherwise encourage the action.'"  *Galante Vineyards v. Monterey Peninsula Water Management Dist.*, 60 Cal. App. 4th 1109, 1126-27 (1997) (citation omitted); *see also Conservatorship of Whitley*, 50 Cal.4th 1206, 1219, 241 P.3d 840, 849 (2010) ("[S]ection 1021.5 … address[es] … the problem of affordability of such lawsuits.  Because public interest litigation often yields nonpecuniary and intangible or widely diffused benefits, and because such litigation is often complex and therefore expensive, litigants will be unable either to afford to pay an attorney hourly fees or to entice an attorney to accept the case with the prospect of contingency fees, thereby often making public interest litigation 'as a practical matter … infeasible.'" (citation omitted)).  But Plaintiffs have a strong personal financial incentive (and

---

[11] Plaintiffs are, in fact, precluded from seeking the "return" of funds to their Fidelity Charitable account, as discussed above.

Case No. 3:18-cv-04881-JSC                    DEFENDANT'S PROPOSED FINDINGS OF FACT/LAW

the financial means) to litigate this action, and any alleged public benefit is entirely theoretical and, at best, "coincidental to the attainment of ... [the Fairbairns'] personal goals." *See Royal v. Governing Bd. of Salinas City Elementary School Dist.*, 159 Cal. App. 4th 1143, 1151 (2008) (citation omitted).

*Third*, the interests of justice require that any attorneys' fees should be paid out of Plaintiffs' recovery, if any.  As described above, Plaintiffs seek a multi-million-dollar financial recovery, which can and should be used to pay their attorneys' fees, as with any civil litigant. No public benefit will accrue as a result of the Fairbairns' attempt to secure compensation for their own allegedly diminished tax deduction.  Further, if Fidelity Charitable were forced to pay Plaintiffs' attorneys' fees, the money would be diverted from important charitable causes in order to pay Plaintiffs' personal legal expenses that they voluntarily incurred in pursuit of their personal claims.  Such a result cannot serve the interests of justice.

Because any benefit achieved in this case will flow to Plaintiffs directly and not the general public, Plaintiffs are not entitled to any award of attorneys' fees under California's Private Attorney General doctrine.

**IV.    CONCLUSION**

For all of the above reasons, Plaintiffs cannot recover on any of their claims.  Judgment should be entered in full for Fidelity Charitable.

DATED: September 11, 2020                     Respectfully submitted,

                                              By: */s/ David. C. Marcus*
                                              DAVID C. MARCUS
                                              CHRISTOPHER T. CASAMASSIMA
                                              NICHOLAS G. PURCELL
                                              WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                              350 South Grand Avenue, Suite 2100
                                              Los Angeles, CA 90071
                                              Telephone: +1 213 443 5300
                                              Facsimile: +1 213 443 5400

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDREW S. DULBERG (*pro hac vice*)
SARAH R. FRAZIER (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

*Attorneys for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND