**STRIS & MAHER LLP**
PETER K. STRIS
  peter.stris@strismaher.com
ELIZABETH BRANNEN
  elizabeth.brannen@strismaher.com
RACHANA A. PATHAK
  radha.pathak@strismaher.com
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017

BRIDGET ASAY (*pro hac vice*)
  bridget.asay@strismaher.com
28 Elm Street, Floor 2
Montpelier, VT 05602

T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
EMILY AND MALCOLM FAIRBAIRN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>    Plaintiffs,<br><br>    v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>    Defendant. | Case No. 3:18-cv-04881-JSC<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Date:        October 19, 2020<br>Time:        8:30 a.m.<br>Courtroom:        E<br><br>Hon. Jacqueline Scott Corley |

S T R I S | M A H E R    777 S FIGUEROA ST, STE 3850    LOS ANGELES, CA 90017

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTS THAT WILL BE PROVEN AT TRIAL ................................................................ 5

    I.    Fidelity Charitable's business model is built on promises to donors about tax advantages, sophisticated handling of complex assets, and robust advisory rights. (Proposed Findings ¶¶ 1-5) ................................................................... 5

    II.    After promoting its sophistication to the Fairbairns for years, Fidelity Charitable finally won a massive donation through multiple concrete promises. ............... 7

        A.    Fidelity Charitable begins its pursuit of the Fairbairns, competing against J.P. Morgan to win their business. (Proposed Findings ¶¶ 6-25) ................... 7

        B.    Throughout 2017, Fidelity Charitable addresses the Fairbairns' concerns about how any donated securities would be liquidated. (Proposed Findings ¶¶ 26-35) ................................................................................................. 8

        C.    In December 2017, the Fairbairns donate nearly $61 million of WATT stock relying on representations made by Mr. Kunz. (Proposed Findings ¶¶ 36-75) ................................................................................................. 9

    III.    Fidelity Charitable botched the liquidation and broke its promises, causing significant harm to the Fairbairns and their DAF account. .................................. 11

        A.    Fidelity's liquidation of the WATT stock was negligent ............................. 11

        B.    Fidelity Charitable failed to honor specific promises made by Mr. Kunz to the Fairbairns about how the WATT liquidation would proceed. ............... 19

        C.    Fidelity Charitable's misconduct caused millions in harm. ......................... 22

OVERARCHING ISSUES OF LAW ................................................................................ 23

    I.    The Fairbairns may sue for restoration of losses to their DAF account ........................... 23

        A.    The Court got the law on "donor standing" right. ....................................... 23

        B.    The allegations that previously supported the Fairbairns' standing cannot be seriously disputed. ................................................................................... 25

    II.    The Massachusetts charitable liability cap does not apply. ................................. 26

LEGAL STANDARDS APPLICABLE TO EACH CLAIM ............................................ 30

    I.    Negligence ............................................................................................................ 31

STRIS
MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

|   |   |   |   |
|---|---|---|---|
| | A. | Claim elements | 31 |
| | B. | Anticipated legal issues | 31 |
| | | 1. A professional standard of care applies. | 31 |
| | | 2. Fidelity Charitable owed both the DAF and the Fairbairns a duty of care in connection with the stock liquidation, independent of the four promises. | 32 |
| II. | Breach of contract | | 34 |
| | A. | Claim elements | 35 |
| | B. | Anticipated legal issues | 36 |
| III. | Promissory estoppel | | 36 |
| | A. | Claim elements | 36 |
| | B. | Anticipated legal issues | 37 |
| IV. | Misrepresentation | | 37 |
| | A. | Claim elements | 37 |
| | B. | Anticipated legal issues | 38 |
| | | 1. The Circular directed the Fairbairns to rely on Mr. Kunz, but reliance does not turn on the Circular in any event. | 39 |
| | | 2. The Fairbairns' negligent misrepresentation claim is legally sufficient. | 40 |
| V. | California Unfair Competition Law | | 41 |
| CONCLUSION | | | 43 |

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ctr. for Educ., Inc. v. Cavnar,*
  80 Cal. App. 3d 476 (1978) ...........................................................................28

*Anderson v. Deloitte & Touche,*
  56 Cal. App. 4th 1468 (1997) ..................................................................40, 41

*Assoc. Alumni v. Gen. Theological Seminary,*
  163 N.Y. 417 (1900) .....................................................................................25

*Bily v. Arthur Young & Co.,*
  3 Cal. 4th 370 (1992) ....................................................................................38

*Conners v. Ne. Hosp. Corp.,*
  789 N.E.2d 129 (Mass. 2003) ..................................................................29, 30

*Copenbarger v. Morris Cerullo World Evangelism, Inc.,*
  29 Cal. App. 5th 1 (2018) .............................................................................36

*CRST Van Expedited, Inc. v. Werner Ents. Inc.,*
  479 F.3d 1099 (9th Cir. 2007) ......................................................................42

*Gagne v. Bertran,*
  275 P.2d 15 (1954) .......................................................................................41

*Hatfield v. Halifax PLC,*
  563 F.3d 1177 (9th Cir. 2009) ......................................................................27

*JMP Secs. LLP v. Altair Nanotechnologies Inc.,*
  880 F. Supp. 2d 1029 (N.D. Cal. 2012) ...................................................26, 27

*Kwikset Corp. v. Sup. Ct.,*
  246 P.3d 877 (Cal. 2011) ..............................................................................41

*L.B. Research & Educ. Found. v. UCLA Found.,*
  130 Cal. App. 4th 17 (2005) .........................................................................24

*Ladd v. Cty. of San Mateo,*
  12 Cal. 4th 913 (1996) ..................................................................................31

*Lande v. S. Cal. Freight Lines,*
  85 Cal. App. 2d 416 (1948) ..........................................................................35

*LAOSD Asbestos Cases,* 5 Cal. App. 5th 1022 (2016) ....................................32, 33

iii

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
   235 Cal. App. 3d 1220 (1991) ................................................................38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ..........................................................................23

*Maffei v. Roman Catholic Archbishop of Boston*,
   449 Mass. 235 (2007) .......................................................................24

*Masterson v. Sine*,
   68 Cal. 2d 222 (1968) ...................................................................35, 40

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................27, 28

*McCann v. Foster Wheeler LLC*,
   225 P.3d 516 (Cal. 2010) ..................................................................27

*NASDAQ Stock Market, LLC v. Secs. & Exchange Comm.*,
   961 F.3d 421 (D.C. Cir. 2020) ...........................................................19

*Orozco v. WPV San Jose, LLC*,
   36 Cal. App. 5th 375 (2019) .............................................................40

*Pub. Emps' Ret. Sys. v. Moody's Inv'rs Serv., Inc.*,
   226 Cal. App. 4th 643 (2014) .......................................................40, 41

*S. Cal. Gas Leak Cases*, 441 P.3d 881 (Cal. 2019)...............................34

*Saunders v. Sup. Ct.*,
   27 Cal. App. 4th 832 (1994) .............................................................42

*Smithers v. St. Luke's-Roosevelt Hosp. Ctr.*,
   281 A.D.2d 127 (N.Y. App. Div. 2001) ............................................25

*State Farm Mut. Auto Ins. Co. v. Campbell*,
   538 U.S. 408 (2003).....................................................................27, 28

*In re Tobacco II Cases*,
   207 P.3d 20 (Cal. 2009) ...................................................................42

*U.S. Ecology, Inc. v. State of California*,
   129 Cal. App. 4th 887 (2005) .......................................................36, 37

*Union Oil Co. v. Oppen*,
   501 F.2d 558 (9th Cir. 1974) ............................................................34

*W. Oilfields Supply Co. v. Goodwin*,
   461 F. App'x 624 (9th Cir. 2011) .....................................................36

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

iv

*Conservatorship of Whitley*,
   241 P.3d 840 (Cal. 2010) ........................................................................42

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...........................................................1, 30, 35, 41

California Civil Code § 1708 ................................................................................33

Mass. Gen. Laws ch. 231, § 85K ...........................................................26, 28, 30

**Other Authorities**

CACI 302 ...............................................................................................................35

CACI 303 ...............................................................................................................35

CACI 304 ...............................................................................................................35

CACI 1900 .............................................................................................................37

CACI 1903 .........................................................................................................38, 39

CACI 1908 .............................................................................................................40

Restatement (2d) of Conflict of Laws ..............................................................28, 31

Restatement (2d) of Torts ....................................................................... *passim*

Restatement (3d) of Torts .....................................................................................32

*In re Secs. Indus. & Fin. Markets Ass'n*,
   Admin Proc. File No. 3-15350, S.E.C. Release No. 84432, 2018 WL 5023228
   (Oct. 16, 2018) ..................................................................................................18

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

**INTRODUCTION**

This case is about the liquidation of 1,931,985 shares of Energous Corporation stock ("WATT") donated by the Fairbairns to Fidelity Charitable. The following is indisputable:

- On the afternoon of 12/28/17, Plaintiffs signed papers donating 1,931,985 shares of WATT (8.6% of the small public company) to their DAF account at Fidelity Charitable.

- At 3:48 p.m. on 12/28/17, an email was circulated among the Fidelity Charitable investments team about liquidating the Fairbairns' WATT stock. It noted: "Upon receipt of shares by CGF, we would likely need to sell down over a few days due to liquidity." Tr. Ex. 0292.

- Nonetheless, at 1:26 p.m. on 12/29/17, a member of the Fidelity Charitable investments team ordered the sale of all 1,931,985 WATT shares over the next *154 minutes*. And 853,000 of those 1,931,985 shares were sold *in the final 30 minutes of that period*.

- During the 154 minutes that Fidelity Charitable was selling, WATT's stock price plunged by 30%. The resulting sale proceeds were $10+ million less than the value of the donated shares when Fidelity Charitable began selling at 1:26 p.m.



The Fairbairns maintain that the WATT liquidation was grossly incompetent and have sued for negligence. They also maintain that Fidelity Charitable failed to honor specific representations about how the liquidation would proceed and thus have brought promise-based claims (i.e., breach of contract, promissory estoppel, misrepresentation, and violation of Cal. Bus. & Prof. Code § 17200).

**1.** ***Negligence claim.*** Whether the WATT liquidation was negligent is not a close question. This is the rare, remarkable case where all signs point in the same direction. Indeed, numerous

representatives of Fidelity Charitable admitted in dozens of emails and instant messages that the liquidation was incompetent and caused the Fairbairns significant damages. For example:

- During the 12/29/17 liquidation itself, the Fidelity Charitable decisionmakers wrote messages admitting they were "flying blind" and "afraid to ask" how bad it had gotten. Tr. Ex. 0216. Those messages were exchanged after a colleague had emailed asking: "Seems like with this much- that is a big chunk of the volume on a pretty negative day, wonder how much of that negative is causal to our selling – are we trying to sell everything today?" Tr. Ex. 0320.

- In January 2018 (during an internal investigation of the liquidation), a senior Fidelity trader wrote a series of emails explaining that the employees who liquidated WATT (1) used competing algorithms, (2) failed to employ a basic limit to prevent selling too much volume, and (3) could not be trusted to liquidate donated stock going forward because they "were clearly just getting their arms around large, complex trading items." Tr. Ex. 0549.

- In February 2018, another Fidelity Charitable employee involved in the investigation wrote that the Fairbairns "might be looking to . . . recoup the $10M difference we lost due to how much volume we sold," admitting that "for some reason, we sold ~16% of the volume on a day that the stock was getting punished[,] which is well over our norm" and that "trading was bad, we had 4 separate VWOPs competing with one another on this asset." Tr. Exs. 0934, 0939.

Such admissions should come as no surprise: flooding the market with 8.6% of a small company's outstanding shares, like a going-out-of-business sale, will drive down the price. As the Fairbairns' experts will explain, this is basic supply-and-demand, and it is confirmed by standard analytic tools— all of which easily show the liquidation was incompetent and caused significant damages.

Unable to muster any serious defense of its incompetent liquidation, Fidelity Charitable's litigation strategy has focused on the utterly irrelevant "fact" that the price Fidelity Charitable received for WATT on 12/29/17 was near the stock's "historical high." Here is a chart from its expert:



Tr. Ex. 1355. Make no mistake: this is nothing more than a smokescreen. As Fidelity Charitable is aware, the price of WATT months after (or before) its liquidation has no conceivable bearing on

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

whether its liquidation was negligent. Indeed, Fidelity Charitable has repeatedly emphasized in this litigation that it (1) is not a hedge fund, (2) does no market research, and (3) forms no views on whether the future price of any stock will be higher or lower. It simply "liquidate[s] stock contributions as quickly as possible, in line with market volume at the time of the trading activity, in an effort to reduce financial risk and make funds available in the Giving Account." Tr. Ex. 0198.

As such, the only relevant question is this: did Defendant's 154-minute liquidation of WATT adversely impact the stock's price—i.e., drive the price down more than a competent liquidation would have. In fact, that is the standard set forth in Defendant's own policy documents. Tr. Ex. 0205 (Fidelity Charitable will "act responsibly in liquidations so as not to adversely affect the market price of the security"; "An efficient liquidation is one that liquidates stock as quickly as possible, without having a detrimental effect on the stock price."). And it is an obligation acknowledged by the employee who ordered the WATT liquidation. McLean Dep. 64:13-20 ("[Q.] When stock is donated to Fidelity Charitable, in your view, does Fidelity Charitable have an obligation to liquidate it in a manner that does not adversely affect the price? [Objection omitted] A. Yes.").

In late March of 2018, Fidelity Charitable's own executives attempted to answer this very question with a "full analysis and charting" of the WATT liquidation (chart below). Tr. Ex. 0997. The executives looked at the two weeks (not months) following their 12/29/17 WATT liquidation in an



PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

effort to find some explanation *other than their own negligence* for the 14.9% rebound of WATT's stock price on the trading day immediately following Fidelity Charitable's liquidation (1/2/18). They could not. Tr. Ex. 0997 ("Only news story on BBG is the CTO stepping down but that wouldn't explain an increase in price. S&P was up [only] 3% between 1/2-1/10"). The reason why is obvious: Fidelity Charitable's liquidation caused the 12/29/17 crash.

> **2.** ***Promise-based claims.*** The fire-sale liquidation of WATT was not only negligent, but also a breach of four specific representations made to the Fairbairns—namely that: (1) Fidelity Charitable would not sell the WATT stock until 2018; (2) Fidelity Charitable would not sell more than 10% of the trading volume of WATT; (3) Fidelity Charitable would keep Malcolm Fairbairn in the loop and allow him to advise on the liquidation, including price; and (4) Fidelity Charitable would use sophisticated, state-of-the-art methods for liquidating large blocks of stock.

The Fairbairns allege that each of those four representations were made to them by Justin Kunz in a series of phone conversations on 12/27/17 and 12/28/17. Mr. Kunz denies having made these representations. Indeed, Mr. Kunz insists that in material respects he said *the opposite* of what is alleged. *See, e.g.*, Kunz Dep. 251:13-21 ("Q. Do you recall providing Emily any information about how or when the Energous shares would be liquidated? A. *I mentioned to Emily that* typically inside of a Charitable account they don't trade more than ten percent of the daily volume of the stock in that given day, but that it's an irrevocable gift and *trading can ultimately begin immediately.*" (emphasis added)). The Court will have to decide who is telling the truth and who is not.

The evidence at trial will powerfully corroborate the Fairbairns' testimony. Numerous documents will show that the Fairbairns would never have made the donation if Mr. Kunz had told them what he now claims he did. Fidelity Charitable's interactions with a different donor about a stock called PZN will show that Fidelity Charitable does accept advice from large donors about stock liquidation. And still more documents will show that Mr. Kunz and the Fairbairns unquestionably had a shared understanding that Fidelity Charitable would not exceed a 10% participation rate in liquidating the WATT shares. The Fairbairns' testimony is buttressed by every piece of surrounding evidence.

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

The same cannot be said for Mr. Kunz. On the contrary, his own colleagues doubt his credibility. As two Fidelity Charitable fundraisers writing privately about the results of Fidelity Charitable's investigation put it, Mr. Kunz "must have been too loose lipped" with the Fairbairns, he "shoot[s] from the hip on these types of accounts," and they "can see him fluffing things where he shouldn't." Tr. Ex. 0939. *See also* Tr. Ex. 0707 (Fairbairns' Private Donor Group relationship manager writing privately after a call with Mr. Kunz about the Fairbairn solicitation in 2017: "he is a little smoke and mirrors"); Tr. Ex. 0549 (Mr. Kunz's colleague after investigating the facts: "As far as I can see a process was represented that doesn't appear to ever be followed.").

**3.** This trial brief proceeds as follows. The first section, Facts That Will Be Proven At Trial (pages 5-22), explains the Fairbairns' theory of the case and previews the evidence that will establish both liability and damages at trial. The next section, Overarching Issues Of Law (pages 22-29), analyzes several global legal issues that Fidelity Charitable has raised and said it will continue to press at trial. And the final section, Legal Standards Applicable To Each Claim (pages 29-41), addresses legal issues specific to each claim.

## FACTS THAT WILL BE PROVEN AT TRIAL

This section previews the facts of this case relating to both liability and damages. The Fairbairns' Proposed Findings of Fact ("Proposed Findings") offer significant additional detail beyond what has been described here, as well as citations to exhibits and deposition testimony that the Fairbairns will seek to have admitted at trial. Plaintiffs have thus included cross-references to the Proposed Findings to enable the Court to explore any section in which it would like further detail.

**I.    Fidelity Charitable's business model is built on promises to donors about tax advantages, sophisticated handling of complex assets, and robust advisory rights. (Proposed Findings ¶¶ 1-5)**

Fidelity Charitable is a commercial DAF with close ties to a for-profit investment company. Although organized as a nonprofit, Fidelity Charitable is run by and generates enormous revenues for its for-profit affiliates. Fidelity Charitable does not have a single "employee" of its own. Literally every part of its business is conducted by a for-profit Fidelity entity pursuant to a Master Services

Agreement ("MSA") between Fidelity Charitable and FMR, LLC (the parent for-profit Fidelity entity). In 2017, Fidelity Charitable generated administrative fees for FMR of $65 million. Yet that amount is dwarfed by the investment fees that its assets generate for Fidelity's for-profit entities. As of last year, Fidelity Charitable had over $31 billion in assets.

Fidelity Charitable promises potential donors the best of both its non-profit and for-profit sides. It bills itself as "fill[ing] a critical gap in the landscape of philanthropic giving by offering donors the ability to defer decisions about the ultimate beneficiaries of their charitable giving while obtaining an immediate tax benefit." Fidelity MTD, ECF No. 21 at 4. In other words, it operates like a "charitable savings account": donors give money or assets to Fidelity Charitable and take an immediate tax deduction, while retaining the right to invest and later direct their donation to charities they support.

To attract large donations from its wealthiest donors, Fidelity Charitable heavily promotes its expertise accepting donations of complex, non-cash assets, which must be sold before their value can be used to support charitable causes. When appreciated assets are donated and Fidelity Charitable does the selling (rather than donor herself), donors get more favorable tax treatment and maximize the dollars for charity. As one Fidelity Charitable advertisement, Tr. Ex. 1556, illustrates:

 

|  | Donate securities to DAF sponsor | Sell stock and donate cash proceeds to charity |
|---|---|---|
| Asset value | $1,000,000 | $1,000,000 |
| Capital gains | $950,000 | $950,000 |
| Capital gains taxes paid | $0 | $226,100[6] |
| Amount available for charity | $1,000,000 | $773,900 |
| Charitable tax deduction | $1,000,000 | $773,900 |

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

STRIS
MAHER | 777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

**II.     After promoting its sophistication to the Fairbairns for years, Fidelity Charitable finally won a massive donation through multiple concrete promises.**

In December 2017, a Fidelity Charitable representative named Justin Kunz convinced the Fairbairns to donate approximately $100 million to Fidelity Charitable (most of which was appreciated public stock) by making specific representations about how their donated stock would be sold. Those promises followed (1) a years-long campaign by Fidelity Charitable to win a massive donation from the Fairbairns and (2) key preliminary representations by Fidelity Charitable about how any liquidation of the Fairbairns' concentrated stock holdings would occur.

**A.     Fidelity Charitable begins its pursuit of the Fairbairns, competing against J.P. Morgan to win their business. (Proposed Findings ¶¶ 6-25)**

In 2014, the Fairbairns made a $20 million cash donation to a DAF at Fidelity Charitable. The year before, the Fairbairns made a $10 million cash donation to a DAF at J.P. Morgan, where they had a longstanding financial relationship through their hedge fund. In 2015, Fidelity Charitable sought another donation from the Fairbairns, but they added $10 million to their J.P. Morgan DAF instead.

In 2016, Fidelity Charitable realized that it would have to beat out J.P. Morgan to get more of the Fairbairns' business. So, it set out to get the Fairbairns to move their J.P. Morgan DAF to Fidelity Charitable by promising them "additional flexibility" and other benefits. Tr. Ex. 0018. This is when the Fairbairns first met Justin Kunz. Almost immediately, Mr. Kunz made it his mission to convince the Fairbairns to "consolidat[e] [their] DAF at JP Morgan" with Fidelity Charitable. *Id.* He repeatedly sought "competitive intelligence" on J.P. Morgan, looking for what he described as a "leg up" so that he could "win that biz." Tr. Exs. 0009, 1521, 0028.

Also in 2016, Fidelity Charitable began pitching the Fairbairns on donating appreciated assets. A provision of the tax code, Section 457A, required hedge fund managers to repatriate offshore funds by 2017. Because this would make 2017 a very large tax year for hedge fund managers, Fidelity Charitable developed a brochure pitching the repatriation requirement as an opportunity for tremendous charitable giving in 2017. The brochure reminded hedge fund managers that "donating

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

appreciated long-term securities can result in a greater tax benefit as well as more dollars to charity." Tr. Ex. 0661. By August 31, 2016, Fidelity Charitable had identified the Fairbairns as prime targets.

By October 2016, Fidelity had put together an internal research report on the Fairbairns. That report described the Fairbairns as offering "huge revenue potential." Tr. Ex. 1516. It said the Fairbairns were "very sophisticated investors" who "know exactly what they want," including access to "institutional trading/resources" not available at the retail Fidelity branch. *Id.* It noted that the Fairbairns "tend to make concentrated investments in fewer names." *Id.* It highlighted that "One of their largest positions is in Energous Group – Ticker WATT." *Id.* And it pointed out that the Fairbairns "have strong philanthropic interests (committed to giving away 1/3 of their estate to charity)," estimating their net worth at "~[$]500M." *Id.*

Thus, by the end of 2016, Fidelity Charitable had identified multiple fronts for seeking a massive charitable donation from the Fairbairns—and it knew that the repatriation requirement made 2017 an ideal year for such a donation. But it also knew that if the Fairbairns made a large donation in 2017, it might well go to J.P. Morgan or another of Fidelity Charitable's competitors.

**B. Throughout 2017, Fidelity Charitable addresses the Fairbairns' concerns about how any donated securities would be liquidated. (Proposed Findings ¶¶ 26-35)**

In 2017, Fidelity Charitable ramped up its prospecting efforts. In numerous communications, the Fairbairns emphasized that both high-level personalized service and trading sophistication would be central factors in deciding whether to put more assets in their Fidelity Charitable DAF.

As the owners of large blocks of stock in several promising companies, the Fairbairns were open to donating appreciated holdings, thereby securing favorable tax treatment and more money for charity. But selling a large block of stock is a delicate process. If not handled properly, the selling can flood the market and cause the stock's value to crash—reducing the value of the charitable contribution and potentially harming a business that the Fairbairns supported. Consequently, long before the donation at issue in this case, the Fairbairns sought assurances from Fidelity Charitable that it would handle any stock liquidation carefully and competently. To highlight one important example:

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

In February 2017, the Fairbairns' retail branch representative forwarded Mr. Kunz a question from Emily Fairbairn about how quickly Fidelity Charitable would sell down donated stock—because "[s]he's concerned about the DAF liquidating the stock and driving down her value in non donated shares" and "she does not want to immediately liquidate the shares." Tr. Ex. 0567. Responding to that question, Anna McKeon (the Fidelity Charitable relationship manager assigned to the Fairbairns) told Mr. Kunz that Fidelity Charitable "would never flood the market/drive down the share value. When it comes to thinly-traded or large block gifts, we work with capital markets to be sure that we never trade more than 10% of the daily trading volumes. There have been times when we've had sell down strategies that have run the course of several months." Tr. Ex. 0033.

Acting as the "single point of contact" between Fidelity Charitable and the Fairbairns, Tr. Ex. 0052, Mr. Kunz passed the Fairbairns this and other information in conversations throughout 2017 to assuage their concerns about donating their concentrated stock holdings. In particular:

- The Fairbairns were worried about who, exactly, would execute the trades if they donated a large block of appreciated stock. Mr. Kunz told them that the selling would be handled by some of Fidelity's most sophisticated traders—the same people who traded on behalf of Fidelity's mutual funds, using the same trading tools.

- The Fairbairns were also concerned that an aggressive liquidation would drive down the market price of the donated stock, harming the value of their non-donated shares. Mr. Fairbairn, a successful hedge fund manager, thus preferred that any liquidation not exceed a 5% participation rate. Mr. Kunz responded that Fidelity Charitable would keep it under 10%, be gentle—careful to avoid hurting the share price.

- Given the Fairbairns' expertise and their familiarity with the stocks they might be donating, Mr. Kunz told the Fairbairns that they could give input on the sell-down of any stock they ended up donating.

**C.    In December 2017, the Fairbairns donate nearly $61 million of WATT stock relying on representations made by Mr. Kunz. (Proposed Findings ¶¶ 36-75)**

By October 2017, Mr. Kunz had met with the Fairbairns at least four times. But they had not yet committed to making another donation to Fidelity Charitable. So in December 2017, Mr. Kunz moved his prospecting into overdrive, aggressively pitching Fidelity Charitable as a superior option to the Vanguard and JP Morgan DAFs, both with respect to the fees Fidelity Charitable would charge and, more importantly, with respect to its sophistication and "flexibility." *See, e.g.*, Tr. Ex. 1550

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

(internal email explaining that "one of the selling points is the possibility of additional flexibility within her [Ms. Fairbairns'] CGF account.").

In that same period, however, the Fairbairns also received solicitations from JP Morgan's DAF. On December 13, 2017, for example, their long-time relationship manager at JP Morgan, Dennis Hearst, sent an email attaching J.P. Morgan's policies surrounding the donation and liquidation of assets. Tr. Ex. 1669. That three-page policy document specifically stated that J.P. Morgan would give the Fairbairns "the flexibility to . . . [a]dvise on the timing and rate at which the donated securities are liquidated, particularly with less liquid, complex assets." Tr. Ex. 1671.

As year-end approached and the solicitations continued, the Fairbairns were presented with a unique opportunity. Among the companies in which they were early investors and large stockholders was a technology company that trades as WATT. Following a key regulatory approval in late December, the value of WATT stock skyrocketed. This created precisely the charitable opportunity the Fairbairns had previously discussed with Fidelity Charitable.

But the Fairbairns remained concerned. Because they owned nearly 1/10 of the company, there was a real risk that an improper liquidation could seriously damage the stock. That could harm the Fairbairns in ways they had previously expressed to Fidelity Charitable. And given the combination of WATT's fast-moving share price and the end-of-year time crunch, a new concern was introduced as well: the precise timing of the donation could have a major effect on the Fairbairns' tax deduction. As Ms. Fairbairn wrote to Mr. Kunz on December 27, 2017, "I would like some control as to when it gets priced. Meaning which date it hits within a 1-2 day window. But it means millions for us." Tr. Ex. 0718.

In multiple phone calls on December 27 and 28, the Fairbairns discussed these issues with Mr. Kunz, continuing their discussions from 2016 and 2017. During those conversations, Mr. Kunz both allayed the Fairbairns' new concern about timing and reiterated the points they had earlier discussed. To finally convince the Fairbairns to pull the trigger, Mr. Kunz made four explicit promises about how Fidelity Charitable would handle the Fairbairns' donated stock: (1) it would not sell the WATT stock until 2018; (2) it would not sell more than 10% of the trading volume of WATT; (3) it would keep

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

Malcolm Fairbairn in the loop and allow him to advise on the liquidation, including price; and (4) it would use sophisticated, state-of-the-art methods for liquidating large blocks of stock.

Relying on these promises, the Fairbairns made the final decision to donate the WATT shares to Fidelity Charitable on the afternoon of December 28, 2017. Around 2:00 p.m., Mr. Fairbairn began signing what would ultimately be three letters authorizing WATT shares custodied at Morgan Stanley to be transferred to the Fairbairns' Fidelity Charitable DAF. And in the evening he signed a Fidelity Charitable Contribution Form and Letter of Instruction authorizing the WATT shares custodied at Fidelity to be transferred to the Fairbairns' Fidelity Charitable DAF. As of market close on December 28, the Fairbairns' shares were worth about $61 million.

**III.     Fidelity Charitable botched the liquidation and broke its promises, causing significant harm to the Fairbairns and their DAF account.**

The day after the Fairbairns made the $61 million WATT stock donation, Fidelity Charitable commenced a fire-sale liquidation recovering only $44 million. Fidelity Charitable sold 8.6% of WATT's outstanding stock in the last 154 minutes of trading on December 29, 2017. It sold nearly half of those shares in the last 30 minutes of trading. And during the entire 154 minutes that Fidelity Charitable was selling, it accounted for over 15% of WATT's total trading volume.

Fidelity Charitable's WATT liquidation was staggeringly incompetent. Wholly apart from any promises, it is a textbook example of negligence. In addition, Fidelity Charitable violated each of the four promises made by Mr. Kunz to induce the Fairbairns' donation.

**A.     Fidelity's liquidation of the WATT stock was negligent.**

Fidelity Charitable was obligated to liquidate WATT without having an adverse or detrimental effect on its stock price. That indeed is Fidelity Charitable's written policy for liquidating donated stock. Tr. Ex. 0205 (Fidelity Charitable will "act responsibly in liquidations so as not to adversely affect the market price of the security"; "An efficient liquidation is one that liquidates stock as quickly as possible, without having a detrimental effect on the stock price."). And Michael McLean, who directed the WATT liquidation, confirmed as much under oath. McLean Dep. 64:14-20 ("When stock

is donated to Fidelity Charitable, in your view, does Fidelity Charitable have an obligation to liquidate it in a manner that does not adversely affect the price? [Objection omitted] A. Yes.").

No one disputes that liquidating large blocks of stock will almost always cause some price impact (defined as "the extent to which price is lower as a result of the trader"). Tr. Ex. 1745 ¶ 14. The question in any given situation is *how much* price impact should occur if liquidation is done competently. If a particular liquidation causes greater price impact than economic modeling indicates should have occurred, the negligent seller has adversely or detrimentally impacted the stock price.

As the evidence will overwhelmingly show, that is precisely what happened here:

**1.     Pre-December 29, 2017 documents (Proposed Findings ¶¶ 30-34, 76).** Documents written by the relevant Fidelity Charitable employees before the day of the liquidation show they understood that selling nearly 2 million shares in a company like WATT without causing adverse price impact would require a sophisticated sell-down strategy over an appropriate period of time:

- In an email titled "WATT shares ; MS" Mr. Bergschneider (the direct boss of Mr. McLean) wrote in the late afternoon on December 28: "Just wanted to give you an update from our call with Steve Brooks about those shares of WATT: . . . . Upon receipt of shares by CGF, we would likely need to sell down over a few days due to liquidity. Steve understood."). Tr. Ex. 0292.

- In an email from the Fairbairns' relationship manager at Fidelity Charitable forwarded to Justin Kunz in early 2017, Ms. Mckeon wrote: "When it comes to thinly-traded or large block gifts, we work with capital markets to be sure we never trade more than 10% of the daily trading volume. There have been times when we've had sell down strategies that have run the course of several months." Tr. Ex. 0033.

Far from sophisticated, Mr. McLean's sell-down "strategy" was simply to flood the market for 154 minutes with more than 15% of the WATT trading volume in an effort to sell every single donated WATT share by the close of trading on December 29.

**2.     December 29, 2017 documents (Proposed Findings ¶¶ 80-104).** Documents written by Fidelity Charitable on the day of the liquidation show that its own employees recognized its selling was adversely impacting WATT's stock price:

- Less than 30 minutes into his aggressive selling, Mr. Celano, the Fidelity Capital Markets trader who executed Mr. McLean's liquidation orders, texted Mr. McLean to warn "we may be pressuring a bit . . . The added [tranches] will not help." Tr. Ex. 0978.

- Less than 15 minutes later, Mr. Brooks, a colleague of Mr. McLean's at Fidelity Charitable involved in the donation, emailed Mr. McLean another warning (copying the entire investments team): "Seems like with this much – that is a big chunk of the volume on a pretty

S T R I S
M A H E R | 777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

negative day, wonder how much of that negative is causal to our selling – are we trying to sell everything today?"). Tr. Ex. 0320.

- Within an hour, the head of the investments team instructed that Mr. Brooks be removed from all further communications. Tr. Ex. 0993.

The first 1.25 million shares continued to be sold from 1:26 p.m. through 3:45 p.m.[1] And when the third and fourth tranches (656,985 shares) arrived (at 3:31 p.m. and 3:46 p.m.) things got even worse. At that point, the real-time chat transcripts show that Fidelity Charitable simply began blindly dumping the shares at any price:

| | | |
|---|---|---|
| **Celano:** | i have the 313,862 WATT | [3:31 p.m.] |
| **McLean:** | Can you sell them all into the bell? | [3:33 p.m.] |
| **Celano:** | yes sir. will do | [3:33 p.m.] |
| **McLean:** | Thank you | [3:33 p.m.] |
| **Celano:** | WATT got another 343,123? | [3:46 p.m.] |
| **McLean:** | Can we sell into the bell? | [3:47 p.m.] |
| **McLean:** | Is there volume | [3:47 p.m.] |
| **McLean:** | Hopefully we'll get a favorable pairing on the close | [3:47 p.m.] |
| **Celano:** | nasdaq… we're flying blind.<br>you want to put a chunk there anyway? | [3:48 p.m.] |
| **McLean:** | yes | [3:48 p.m.] |
| **Celano:** | 25k eac order? | [3:48 p.m.] |
| **McLean:** | That's fine | [3:48 p.m.] |
| **McLean:** | I'm afraid to ask for the WATT details<br>But we had to get it sold | [4:00 p.m.] |
| **Celano:** | ugly. . . . | [4:01 p.m.] |

Tr. Ex. 0216. Mr. McLean decided that he "had to get it sold," even if it meant the result was "ugly." There was no sell-down strategy designed to avoid adverse price impact. This was a fire-sale.

   3.   **Post-December 29, 2017 documents (Proposed Findings ¶¶ 116-198).** Documents written by Fidelity Charitable during its early 2018 investigation admit that its liquidation was incompetent and caused a significant adverse impact on WATT's stock price:

- When Justin Kunz learned how the trading had been conducted, he wrote to Mr. Brooks: "This is amateur hour. You can't have 4 separate vwaps going, they are all working against each

---

[1] All times referenced herein are in Eastern Time. The close of trading is at 4:00 p.m. Eastern Time.

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

other." Tr. Ex. 0144. Mr. Brooks responded: "Agreed. Can you ask why it was done that way because the client is going to ask. . . ." Tr. Ex. 0145.

- In response, Mr. Kunz emailed Eric Christesen, the Family Office's head trader, who was already in discussions with Mr. McLean and his investments team about the Fairbairns' WATT donation. After a series of follow up email exchanges with Mr. McLean, Mr. Christesen concluded (and told Mr. McLean) that Fidelity Charitable had used trading algorithms in a way that left the algorithms "competing with each other." Mr. McLean agreed but blamed Mr. Celano. Tr. Ex. 0595.

- When Mr. Kunz was bcced on these damning emails, he wrote to Mr. Christesen: "So Charitable botched the trades then." Tr. Ex. 0152.

- After a few additional days of investigation, Mr. Christesen emailed Mr. Kunz to say that Fidelity Charitable's investments team could no longer be trusted to liquidate donations from FFOS clients. Tr. Ex. 0549 ("They [Mr. McLean and his group] are clearly just starting to get their arms around large, complex trading items. I think I may recommend that we handle our client orders even after contribution [of donations], for the time being.").

- And the next month, Kyle Casserino, a Fidelity Charitable employee privy to the trading investigation, acknowledged that "for some reason, we sold ~16% of volume on a day that the stock was getting punished which is well over our norm"; he noted that the "trading was bad, we had 4 separate VWOPs competing with one another on this asset"; and he wrote that the Fairbairns might seek to "recoup the $10M difference we lost due to how much volume we sold." Tr. Ex. 0939.

The contemporaneous record is unequivocal in its acknowledgement of Fidelity Charitable's negligence. Now, however, Fidelity Charitable's employees have all made an about face.

Mr. Kunz says that when he wrote: "Charitable botched the trades *then*" (responding to Mr. Christesen's explanation), he was really expressing the Fairbairns' views, not his own. Kunz Dep. 338:12-339:23. Mr. Casserino likewise says that he was not actually expressing his own views when he acknowledged the trading errors and damages. Casserino Dep. 90:3-13, 96:11-15.

Mr. Brooks has no idea why he "agreed" that the liquidation was incompetent:

> Q.   Were you agreeing with the phrase "This is amateur hour"?
>
> A.   No.
>
> Q.   Were you agreeing with the phrase, "You can['t] have four separate VWAPs going"?
>
> A.   I would have no basis to know.
>
> Q.   Were you agreeing with the phrase, "They are all working against each other"?
>
> A.   I'd have no basis to know.
>
> Q.   So is there any phrase in Mr. Kunz's email that you were agreeing with?
>
> A.   No.

Brooks Dep. 307:15-308:7. The same is true for Mr. McLean. *See* McLean Dep. 253:13-254:20 ("I don't remember what I meant when I wrote that. I may have just been agreeing with Mr. Christesen."). And as for Mr. Christesen's scathing indictments of the liquidation, he explicitly testified that his position changed "[d]uring the -- the prep process with my attorneys." Christesen Dep. 229:1-22.

**4. Plaintiffs' Experts.** The Fairbairns' expert witnesses will confirm that Fidelity Charitable's employees were all right the first time: the WATT liquidation was incompetent.

The Fairbairns' principal liability expert is Dr. Ian Domowitz, a nationally recognized trading expert with dozens of peer-reviewed publications, nearly two decades in academia, and years of experience as CEO of a trading analytics company. The Fairbairns will also present the testimony of Dr. Larry Harris, the former Chief Economist for the SEC, and perhaps the leading global expert in this area of economics. As discussed below (*infra* 21-22), Dr. Harris will primarily focus on quantifying the damages caused by Fidelity Charitable's incompetent trading. But he will also echo Dr. Domowitz's opinions on liability.

Dr. Domowitz and Dr. Harris reviewed the liquidation of WATT. And like Fidelity Charitable's own employees, Dr. Domowitz and Dr. Harris identified several clear hallmarks of negligence. For example:

*First*, Fidelity Charitable's 15+% participation rate was far outside industry norms, strongly suggesting it harmed WATT's share price by selling too much too quickly. To illustrate just how much of an outlier Defendant's participation rate was: Dr. Domowitz's published work (including multiple studies analyzing millions of transactions) shows that the vast majority of algorithmic trading orders stay *below 5%*. Both his published research and his extensive industry experience confirm that exceeding even 10% volume is rare. Fidelity's participation rate blew away the industry standard. And as Dr. Harris will explain, that was a problem:

> The hasty execution of large orders impacts price. This conclusion flows from evidence obtained from essentially all markets from all time; it is consistent with theoretical models of the determinants of price; and it is shared by virtually all practitioners, academics, and regulators who are familiar with the market. Given the size of the Fund's trade and the short time during which it executed in the open markets, this prior information alone would be enough to conclude that the Fund had an impact on price even without any additional data. To deny it would be absurd. . . .

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

Tr. Ex. 1745 ¶¶ 211-212.

**Second**, although Mr. McLean claimed to be trading in line with volume to avoid market impact, his chosen trading strategy was simply not designed to accomplish that goal. There are various strategies a trader can use to manage participation rate for the purpose of avoiding adverse price impact, but (despite having them at its fingertips) Fidelity Charitable used none of them here. For example, as an internal Fidelity trading guide explains, a strategy called "Percent of Volume" can be used "[t]o trade in line with volume when you are unsure about the stock's short-term direction." Tr. Ex. 1563. *See also* Tr. Ex. 1745 ¶ 208 (Dr. Harris noting that Fidelity Charitable had "[v]olume participation algorithms" readily available if its goal was "[t]rading in line with volume"); Tr. Ex. 1717 ¶ 36 (Dr. Domowitz noting that "[a] volume participation algorithm, available through Fidelity Capital Markets' HELM system, would have accomplished that, but was not used. . . . HELM's algorithm is even labeled as POV, or percentage of volume."). Another alternative strategy, as Dr. Domowitz will explain, would have been "implementation shortfall." That strategy would have had the additional benefit of better calibrating for market volatility, a factor that Mr. McLean did not consider at all.

Here, Mr. McLean directed Mr. Celano to achieve "TWAP" for all 1.93 million WATT shares by the close of trading on December 29, 2017. Mr. Celano executed Mr. McLean's desired objective using a combination of TWAP and VWAP algorithms. The problem, however, is that neither of these algorithms necessarily limits the seller's participation rate. In other words, although both algorithms will divide up orders over the selling window attempting to hit a target *price*, they are designed to sell *every share* within the selling window, regardless of how much volume that accounts for. Thus, orders executed with these algorithms will have an adverse market impact when the algorithm is instructed to trade too much too quickly. Tr. Ex. 1744 ¶¶ 109, 110, 122. That is why it is particularly significant that Mr. McLean failed to specify any "Max Participation Rate" limit for his chosen strategy. Tr. Ex. 1563. Mr. Christesen recognized that obvious problem in an email to Mr. McLean in January 2018. Tr. Ex. 0534.

**Third**, even with the strategy he did choose, Mr. McLean chose not to combine all of the WATT trades into a single order, instead allowing two and sometimes even three separate orders to run at the

same time. As both of the Fairbairns' experts will explain, and as both Mr. Kunz and Mr. Christesen recognized, that was an elementary blunder. *E.g.*, Tr. Ex. 0144 ("This is amateur hour. You can't have 4 separate vwaps going, they are all working against each other.").

**Fourth**, on the very next trading day, WATT's share price rebounded 14.9%, further confirmation that Fidelity Charitable's trading harmed the share price. As Dr. Harris will explain:

> The defining characteristic of price impact caused by large uninformed traders is that price tends to reverse following the trade as traders willing to buy at the depressed prices come into the market. Price did indeed increase on January 2, 2018, when WATT opened at $20.86 and closed at $22.34 after reaching a high of $24.95. The close-to-close return (percentage change in price) was 14.9%, and the price rose an additional 4.6% on the following day. By the end of the first week in January, price closed at $23.44. This reversal provides further evidence that the Fund sold recklessly.

Tr. Ex. 1744 ¶ 127. That conclusion accords with an internal Fidelity Charitable analysis from March 2018, which recognized this price rebound and concluded that it could not be explained by any positive news about WATT or by a rise in the market at large (which was up only about 3%, compared to nearly 15% for WATT). Tr. Ex. 0997. The only plausible explanation was that the share price rebounded from Fidelity Charitable's price impact on December 29.

All of the above facts are clear hallmarks of negligence. But the Fairbairns' expert witnesses have buttressed their conclusions regarding Fidelity's trade execution with rigorous quantitative analyses. Dr. Domowitz conducted a transaction cost analysis (a standard analytic tool) to compare the cost of the WATT trades to typical costs achieved in the industry, using accepted industry-wide data for comparable microcap stocks. For a stock like WATT, the typical total cost would have ranged from 0.83% to 1.02% during the fourth quarter of 2017 (based on institutional trading). Dr. Domowitz's analysis found that Fidelity Charitable's WATT liquidation cost was 14.72%, almost 15 times the industry averages for the relevant time period and trading in micro-cap securities. Dr. Domowitz explained that although minor deviations from industry standards can be expected for a particular stock, this is no small deviation. The enormous magnitude of these costs confirmed Dr. Domowitz's conclusion that Fidelity's trading was incompetent and failed to meet the standard of care.

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

**5.** **Defendant's Experts.** Despite this enormous weight of evidence, Fidelity Charitable has found two experts, Dr. Terrence Hendershott and Cristian Zarcu, willing to say there is no evidence that Defendant's liquidation caused *any* adverse price impact. Dr. Hendershott even suggests that Fidelity's rapid sell-off of 8.6% of WATT's total stock might have increased the stock price. *E.g.*, Hendershott Report ¶ 80 ("This would suggest that the price impact associated with Fidelity's Maker sales was *positive*, not negative . . . ."); Hendershott Dep. 220:15-17 ("Fidelity maker trades are associated with an increase in price . . . ."). Their opinions are unsupportable.[2]

*Dr. Hendershott.* Begin with Dr. Hendershott, who arrived at this conclusion without conducting any analysis of the transaction cost of Fidelity Charitable's liquidation. *E.g.*, Hendershott Dep. 80:4-9 ("Q. Is there a place in your report where you provide a measure of transaction costs for the WATT trading on December 29th? A. Not that I recall. . . ."). His decision to eschew the industry standard transaction cost analysis speaks volumes. Dr. Hendershott conducts such analyses in his published work, where he also acknowledges that selling large amounts of stock impacts price. *E.g.*, Tr. Ex. 1058 (book chapter explaining that transaction cost analysis "allows an institutional investor to measure how much its own trading has" caused price impact and acknowledging "it is certainly possible that the selling pressure from this parent order caused the price to decline"). Yet in this case, where a transaction cost analysis easily demonstrates Fidelity Charitable's negligence, Dr. Hendershott conveniently decided not to conduct one at all.

Instead, Dr. Hendershott purports to evaluate price impact based on what is known as an "order imbalance model." As Dr. Harris will explain, however, this analysis is not a reliable tool for evaluating the price impact of an individual seller. Indeed, Dr. Hendershott's opinions have been discounted by at least one tribunal for comparing apples to oranges for a misleading result, and his work here is more of the same. Tr. Ex. 1056 (*In re Secs. Indus. & Fin. Markets Ass'n*, Admin Proc. File No. 3-15350, S.E.C. Release No. 84432, 2018 WL 5023228, at *19 (Oct. 16, 2018) ("Hendershott and Nevo's failure

---

[2] Both of Fidelity's experts also attempt to say that Fidelity did not cause a price impact by, in essence, arguing that at any given moment during Fidelity's trading, it got the price then prevailing in the market. That argument is specious, however, because it ignores the fact that *Fidelity's trading was the thing driving the price down in the first place.*

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

to conduct apples-to-apples comparisons of trading on traditional exchanges also significantly undermines the persuasive value of their analysis."), *vacated on other grounds by NASDAQ Stock Market, LLC v. Secs. & Exchange Comm.*, 961 F.3d 421 (D.C. Cir. 2020)). This Court should discount Dr. Hendershott's attempt to paper over Fidelity Charitable's negligence.

***Mr. Zarcu.*** Mr. Zarcu's analysis is equally untenable. He will claim that Fidelity Charitable's liquidation had zero adverse impact on the price of WATT stock. Zarcu Dep. 89:3-5 ("Q. And it's your position that it [Fidelity Charitable's trading] caused literally no price impact in this case? A. That is correct."). Mr. Zarcu's opinion is not backed up by any actual analysis.

Mr. Zarcu markets proprietary software that is specifically designed to analyze trade execution quality. *E.g.*, Zarcu Dep. 27:10-16 (noting that his product "[a]nalyzes trade quality, execution quality" by "[c]ompar[ing] executions of a particular client, potentially, versus the market overall"). Yet he did not do *any* analysis with that software here. *E.g.*, Zarcu Dep. 27:24-28:1 ("Q. Did you use any of these tools to analyze the quality of the trades at issue in this case? A. No."). The failure to check Fidelity Charitable's liquidation against his own benchmark speaks volumes.

Mr. Zarcu insists that it is simply not possible to conduct a transaction cost analysis where, as here, a stock's volume, price, and volatility on the relevant day are very different from the past. But as Dr. Harris and Dr. Domowitz will explain, that assertion has no conceivable basis. Indeed, conditions are often unusual for stocks like WATT. Mr. Zarcu "identifies no support for his view in the scholarly literature. To the contrary, as his statement acknowledges, there are accepted methods of [transaction] cost modeling," which the Fairbairns' experts employed here, and "Mr. Zarcu does not attempt to show that those methods are inapplicable to the conditions that obtained on 12/29/17." Tr. Ex. 1744 ¶ 199.

## B. Fidelity Charitable failed to honor specific promises made by Mr. Kunz to the Fairbairns about how the WATT liquidation would proceed.

The other piece of the liability case involves the promises that induced the Fairbairns' donation, which form the basis of the Fairbairns' breach of contract, promissory estoppel, misrepresentation, and statutory claims. Adjudication of those claims will turn largely on questions of credibility. And the Court will have to decide who is telling the truth: the Fairbairns or Justin Kunz.

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

The Fairbairns will testify at trial that in a series of phone calls on December 27 and 28, Mr. Kunz made the four specific promises at issue in this case. Aside from the 10% promise, Mr. Kunz will *not* testify that the Fairbairns misunderstood him, or that the subject matter of the promises did not come up. On the contrary, he will say he told the Fairbairns *the opposite* of what they now allege. For example, Mr. Kunz has already testified under oath that, far from promising the Fairbairns that no trading would occur until the new year, he told them that "trading can ultimately begin immediately" once the shares are received. Kunz Dep. 250:24-252:4.

After the evidence is presented, it will be clear that the Court should credit the Fairbairns' testimony and conclude that the promises were made. On this issue, the mountain of documentary and testimonial evidence is impossible to summarize. A few examples, however, illustrate the point:

**First**, the evidence will show that the Fairbairns would never have made the WATT donation if Mr. Kunz had actually told them what he now claims:

- The Fairbairns had long resisted donating stock to Fidelity Charitable out of concern that the DAF would quickly and incompetently liquidate a large position in a small public company. Mr. Kunz knew this. For example, he was forwarded a series of emails in February of 2017 in which his colleague wrote: "I'm guessing based on conversations I've had with Emily for the last two years[,] [s]he's concerned about the DAF liquidating the stock and driving down her value in non donated shares" and "I think the CGF rep might be missing the point that she does not want to immediately liquidate the shares." Tr. Ex. 0567.

- Mr. Kunz expressly recognized in December of 2017 that he was "competing for $30-100 [million] in CGF" donation from the Fairbairns (Tr. Ex. 1551) and that "one of the selling points [over JP Morgan] is the possibility of additional flexibility within her CGF account." Tr. Ex. 1550. *See also* Tr. Ex. 0721 (claiming that CGF fees are lower than JP Morgan's).

- J.P. Morgan's DAF expressly stated in a 3-page brochure provided to the Fairbairns in early December of 2017 that stock donors "have the flexibility to: . . . Advise on the timing and rate at which the donated securities are liquidated, particularly with less liquid, complex assets [like WATT]." Tr. Exs. 1669 (12/13/17 email attaching brochure), 1671 (brochure).

Given the Fairbairns' expressed concerns and the obvious alternatives, Mr. Kunz's testimony that he told Ms. Fairbairn that "trading can ultimately begin immediately" to which "there wasn't a strong objection" strains credulity. Kunz Dep. 251:13-252:4.

**Second**, the evidence will show that Fidelity Charitable does keep large stock donors in the loop and permit them to advise on liquidation including price limits:

- On the same day that Fidelity Charitable sold 8.6% of WATT in 154 minutes, its very same employees were also trading shares in a donated security known as PZN. Unlike the WATT liquidation, however, they took pains to abide by the PZN donor's wishes about how the stock

would be liquidated. Tr. Ex. 0213 ("this [PZN] donor likes the order to be worked so the I would price would be a very short haircut.").

- Documents produced in this litigation revealed the coordination between Fidelity Charitable and the PZN donor on the liquidation of his donated stock. As Ryan Boland (Defendant's head of complex assets who worked with Mr. Kunz to pitch Ms. Fairbairn) testified at his deposition: "Q. He was concerned that Fidelity Charitable was selling too much PZN, right? A. Yeah, selling too much—too many shares. Q. And then, after you received his email, you got an approval to only sell to the 10 percent right? A. . . . . yes." Boland Dep. 353:21-354:4.

Fidelity Charitable indeed regularly updated the PZN donor about its trading, even preparing spreadsheets for him that contained details of its PZN sales. Boland Dep. 344:6-14.

**Third**, the evidence will show that Mr. Kunz and the Fairbairns clearly had a shared expectation that Fidelity Charitable would sell no more than 10% of WATT's volume during its period of selling:

- Upon learning on 1/2/18 that Fidelity Charitable had sold all of the Fairbairn's WATT shares on 12/29/17, Mr. Kunz immediately responded: "I thought we didn't sell more than 10% trading volume." Tr. Ex. 0119. He did not write 10% *daily* volume even though he did not yet know if the WATT shares had been liquidated in fewer than all trading hours on 12/29/17.

- When Mr. Kunz finally disclosed what had occurred, Mr. Fairbairn emailed: "I was told that selling would begin after the first of the year, you guys would be gentle with the stock (less than 10% of trading volume) and we could advise on price limit if necessary. So I was surprised to hear that it was liquidated on the last day of December." Tr. Ex. 0128.

- When Mr. Kunz was then asked by Fidelity Charitable's head of West Coast fundraising: "Do you know who told Malcolm per his email below that selling wouldn't begin until new year and that he could have say in price limits or where 'gentle' on the stock came from?" (Tr. Ex. 0349), Mr. Kunz replied: "Nobody told him that and all I said is what you told me – 10% daily volume. Based on previous volume that probably would have been the case." Tr. Ex. 0136.

These emails (and many others) will powerfully corroborate the Fairbairns' position regarding the 10% promise, and they will undermine Mr. Kunz's current position—*i.e.*, that he was referring to 10% of the day's volume *even if* Fidelity Charitable only sold for 154 minutes.

**Fourth**, even Mr. Kunz's colleagues questioned his credibility in connection with his solicitation of the Fairbairns. As two Fidelity Charitable fundraisers wrote in February 2018, after Fidelity Charitable had investigated the Fairbairns' allegations, Mr. Kunz "must have been too loose lipped" with the Fairbairns, he "shoot[s] from the hip on these types of accounts," and they "can see him fluffing things where he shouldn't." Tr. Ex. 939. Similarly, the Fairbairns' Private Donor Group relationship manager wrote, after a call with Mr. Kunz about the Fairbairn solicitation in 2017: "he is

a little smoke and mirrors." Tr. Ex. 707. *See also* Tr. Ex. 0549 (Mr. Christesen: "As far as I can see a process was represented that doesn't appear to ever be followed.").

In short, the evidence at trial will show that Mr. Kunz made each of the four promises at issue here—promises that Fidelity Charitable promptly broke.

**C.      Fidelity Charitable's misconduct caused millions in harm.**

Plaintiffs' experts, Dr. Lawrence Harris and Professor Brian Galle, will explain at trial that Fidelity Charitable's misconduct caused nearly $13 million in harm to the Fairbairns—more than $11 million from its negligence alone. Dr. Harris has quantified the extent of Fidelity's dramatic underperformance in this case, and Professor Galle (a noted tax expert) has calculated the extent of the Fairbairns' tax losses.

Dr. Harris utilized a robust and highly respected model (the Kyle Obizhaeva model) to calculate the total price impact of Fidelity's trading, *i.e.*, how much more money the Fairbairns should have had in their donor-advised fund. In addition to the total price impact, Dr. Harris used well-established modeling to calculate the effect of Fidelity Charitable's trading on the average price of WATT on December 29, 2017. Based on that analysis, Professor Galle's unrebutted opinion explains the tax damages that flow from Fidelity Charitable's price impact on December 29, the same day the majority of the shares were donated.

All told, Fidelity Charitable's misconduct, including its incompetent trading and failure to wait until January 2, 2018, caused $12,831,585.71 in harm to the Fairbairns. Of that total amount, the Fairbairns are entitled to have $9,558,972.00 in losses restored to their charitable donor-advised fund account. And because the average price of WATT on December 29, 2017 would have been higher if Fidelity Charitable had refrained from trading that day, the Fairbairns are entitled to be awarded $3,272,613.71 in damages for their tax loss.

As set forth in Plaintiffs' Proposed Findings, Dr. Harris's modeling and analysis supplies damages calculations that apply should the Court find in Plaintiffs' favor on a subset of Plaintiffs' claims. Critically, Fidelity's negligence alone (without regard to timing or Fidelity's breached promises) caused $11,141,326.91 in harm to the Fairbairns: $8,303,536 to be restored to their

charitable account (their donor-advised fund), and $2,837,790.91 to be awarded as damages for the Fairbairns' tax loss. Plaintiffs refer the Court to the Proposed Findings for further specifics regarding damages scenarios. (Proposed Findings ¶¶ 245-258.)

## OVERARCHING ISSUES OF LAW

In light of Fidelity Charitable's misconduct, the Fairbairns have asserted claims for negligence, breach of contract, promissory estoppel, misrepresentation, and statutory violations. The specific legal standards governing those claims are detailed below. There are several legal issues, however, that inform multiple (or all) of those claims, which the Fairbairns address first.

## I. The Fairbairns may sue for restoration of losses to their DAF account.

Fidelity Charitable continues to argue that the Fairbairns cannot seek restoration of losses to their DAF account. This Court rejected that argument when it denied Defendant's motion to dismiss. Fidelity's arguments have not changed, and neither should the result.

### A. The Court got the law on "donor standing" right.

Fidelity Charitable's central argument was (and is) that because a donor gives up legal title to donated assets, the state attorney general is the only one that may sue for charitable mismanagement or failure to abide by the gift's terms. *See, e.g.*, Fidelity Charitable MTD Reply, ECF No. 32 at 6-7; *id.* at 7 ("The same features of Fidelity Charitable that made the Fairbairns eligible for the substantial tax deduction . . . are the ones that confer exclusive standing on the Attorney General to sue for mismanagement."). Its motion to dismiss made clear that what Fidelity Charitable termed "statutory standing" was a challenge to the validity of the Fairbairns' cause of action. Fidelity Charitable MTD, ECF No. 21 at 11 (seeking dismissal "under Rule 12(b)(1) and 12(b)(6)"); *id.* at 18 n.8 ("The court should dismiss Plaintiffs' claims on state statutory standing grounds . . . ."); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (explaining that statutory standing really refers to "the absence of a valid . . . cause of action"). Fidelity Charitable pressed this argument to the extent *any* claim sought restoration of losses to the DAF based on mismanagement of the donation. *See* Fidelity Charitable MTD, ECF No. 21 at 10-11. Fidelity Charitable's challenge thus

S T R I S   |   777 S FIGUEROA ST, STE 3850
M A H E R   |   LOS ANGELES, CA 90017

directly implicated whether the Fairbairns could pursue a cause of action to restore losses to their DAF account.

This Court correctly rejected Fidelity Charitable's position under both California and Massachusetts law, explaining that neither jurisdiction limits enforcement of charitable duties and obligations to the attorney general. On the contrary, in California, "[t]here is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity." MTD Order, ECF No. 39 at 10 (quoting *Holt v. College of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 756 (1964)) (citing *L.B. Research & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 17, 180-81 (2005)).

The same is true in Massachusetts. *Id.* at 11-12. As the Court explained: "[N]otwithstanding the Attorney General's exclusive and discretionary role as protector of the public interest in the efficient and lawful operation of charitable corporations, a private plaintiff possesses standing to assert interests in such organizations which are distinct from those of the general public." *Id.* at 12 (quoting *Lopez v. Medford Cmty. Ctr., Inc.*, 384 Mass. 163, 167 (1981)); *see also Maffei v. Roman Catholic Archbishop of Boston*, 449 Mass. 235, 245 (2007) ("[A] plaintiff who asserts an individual interest in the charitable organization distinct from that of the general public has standing to pursue her individual claims.").

These same cases, moreover, make clear that where donor standing is appropriate, the donor may remedy harm to the charity regardless of the type of misconduct that caused that harm. Standing extends, for example, both to remedying the charity's negligence and enforcing the terms of the gift. In fact, that is precisely what the California Court of Appeal held in *L.B. Research*: it permitted the donor to sue to enforce the terms of the gift, not simply for general charitable mismanagement.

> Had we concluded . . . that L.B. Research's gift created a charitable trust[], we would have reversed on the ground that the Attorney General's power to enforce charitable trusts does not in this type of case deprive the donor of standing to enforce the terms of the trust it created.

*L.B. Research*, 130 Cal. App. 4th at 180 (cited in MTD Order, ECF No. 39 at 10).

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

1    The same is true in cases from other jurisdictions. When a donor has standing to remedy harm

2    caused to the charity, it includes not just general mismanagement, but also failure to abide by the gift's

3    terms. *See, e.g.*, *Smithers v. St. Luke's-Roosevelt Hosp. Ctr.*, 281 A.D.2d 127, 128 (N.Y. App. Div.

4    2001) ("The issue before us is whether the estate of the donor of a charitable gift has standing to sue

5    the donee to *enforce the terms of the gift*. We conclude that in the circumstances here present plaintiff

6    estate does have the necessary standing." (emphasis added)); *Assoc. Alumni v. General Theological

7    Seminary*, 163 N.Y. 417, 422 (1900) ("as donor and possessor of the right to nominate to the

8    professorship, [the plaintiff] had sufficient standing to maintain an action to enforce the trust").

9        At no point has Fidelity Charitable offered either new authority to the contrary or any other

10   reason for this Court to depart from its previous ruling. The Court got the law right.

11   **B.    The allegations that previously supported the Fairbairns' standing cannot be

12         seriously disputed.**

13       Nor have the facts that supported the Fairbairns' standing changed since the motion to dismiss.

14   Indeed, the allegations that formed the basis of the Court's motion-to-dismiss holding are not subject

15   to serious dispute. The Court found the following allegations dispositive of the "standing" question:

16       a.  Fidelity Charitable holds funds in a dedicated account—and ultimately donates them
           to charitable organizations—in the donor's name.

17

18       b.  The donor has exclusive advisory rights over the funds—Fidelity Charitable cannot
           allow anyone else to dictate where they are donated.

19       c.  Nor can Fidelity Charitable *itself* even make grants or otherwise take money out of an
           account without action from the donor.

20

21       d.  Fidelity Charitable retains only a veto power over a donor's decisions, which it will
           exercise only when the donor attempts to use the money for an improper or non-
           charitable purpose.

22

23   MTD Order, ECF 39 at 10. Fidelity Charitable cannot meaningfully challenge those facts—they come

24   directly from the Fidelity Charitable Policy Guidelines Program Circular. *See, e.g.*, Tr. Ex. 1134 at

25   FID-FRBN-0012356 (account naming); *id.* at FID-FRBN-0012370 (only account holders and

26   authorized individuals "have grant recommendation privileges," while Fidelity Charitable acts to

27   "review and approv[e]" donations to ensure proper purposes); *id.* at FID-FRBN-0012372 (discussing

28   only limited circumstance, in event that account holder fails to conduct minimum grant activity, when

Fidelity Charitable may make grants out of account); *id.* (grants made in account holder's name). The Fairbairns' express and undisputed advisory rights give them the type of interest that permits them to sue on the DAF's behalf.

Fidelity Charitable's standing arguments haven't changed. Neither have the relevant facts. There is no reason that this Court's ruling should change either. The Fairbairns may sue for restoration of losses to their DAF account under all causes of action.

## II. The Massachusetts charitable liability cap does not apply.

Fidelity Charitable has said that it will assert a Massachusetts statutory cap on charities' tort liability at trial. *See* Mass. Gen. Laws ch. 231, § 85K. That feature of Massachusetts law is irrelevant here for several reasons.

**A.** First, it is too late for Fidelity Charitable to assert that Massachusetts law applies. Although Fidelity Charitable argued in its motion to dismiss that "Massachusetts law governs the statutory standing inquiry" (Fidelity Charitable MTD, ECF No. 21 at 13 n.5), it has never disputed that California law governs the Fairbairns' substantive claims (*e.g.*, *id.* at 18-21 (relying solely on California law in discussing negligence and promise-based claims)). This Court stated its order denying Fidelity Charitable's motion to dismiss that "Plaintiffs' claims are brought under California law and the actions giving rise to this action all arose in California." MTD Order, ECF No. 39 at 8. Fidelity Charitable indeed has repeatedly cited California law—and never Massachusetts law—as governing the Fairbairns' claims (Fidelity Charitable MTD, ECF No. 21 at 18-21; Fidelity Charitable MSJ, ECF No. 134 at 10-11, 17-20); it exchanged jury instructions based on California law; and it has never disputed that the Fairbairns may assert claims under California's unfair competition law. Yet now, Fidelity Charitable appears to be contemplating an about-face, attempting to argue that Massachusetts law governs the Fairbairns' substantive claims in addition to "the statutory standing inquiry."

A party's assertion that non-forum law applies with respect to a given issue must be "timely." *JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012). And it is far too late for Fidelity Charitable to change its mind about the law that governs the Fairbairns'

substantive claims. *See id.* ("JMP has not timely invoked foreign law with respect to the extra-contractual claims. During the first round of briefing, JMP joined Altair in briefing these claims using California law, and JMP has done the same in briefing this motion. Therefore, the Court deems JMP to have acquiesced in the application of California law to the extra-contractual claims." (citing *Hatfield v. Halifax PLC*, 563 F.3d 1177, 1184 (9th Cir. 2009) (by relying on California law for a given issue, "the parties have acquiesced in the application of that law" on that issue))). Fidelity Charitable has repeatedly, at both the motion to dismiss and summary judgment stages, cited only California law as governing the Fairbairns' claims. Just as in *JMP Securities* and *Hatfield*, it "ha[s] acquiesced in the application of California law." *Id.*

**B.**      Even if it weren't too late, Fidelity Charitable cannot overcome the presumption that California law applies, primarily because the relevant conduct occurred in California. California's interest thus decisively outweighs that of any other state, including Massachusetts. *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 592 (9th Cir. 2012) (noting that California law acknowledges that a jurisdiction ordinarily has "predominant interest" in regulating conduct that occurs within its borders; *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders"). Fidelity Charitable wants to assert the protection of a liability cap that Massachusetts affords to charities in certain circumstances. But Fidelity Charitable has chosen to do business in other states, including California, that do not limit charities' liability. A decision by Massachusetts to limit tort liability for its local charities does not follow those charities into other states. As the U.S. Supreme Court, the Ninth Circuit, and the California Supreme Court have all recognized, "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory." *Mazza*, 666 F.3d at 592; *State Farm*, 538 U.S. at 422; *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 529-31 (Cal. 2010).

There is no basis to think that rule is any different with respect to charities doing business in California. Because Fidelity Charitable has not developed this argument in any meaningful way, it is unclear what exactly Fidelity Charitable will say on this score. It will presumably point to cases such

as *American Center for Education, Inc. v. Cavnar*, 80 Cal. App. 3d 476 (1978), which noted that "[c]haritable trusts are usually governed by the laws of the state in which the trust is administered." *Id.* at 486. But Fidelity Charitable takes such statements out of context. That rule, as the Restatement of Conflicts makes clear, applies to the construction, validity, and administration of the trust "*as to matters which can be controlled by the terms of the trust.*" Restatement (2d) of Conflict of Laws § 272 (emphasis added) ("The administration of an inter vivos trust . . . is governed as to matters which can be controlled by the terms of the trust . . . by the local law of the state to which the administration of the trust is most substantially related."); *see also id.* § 268 (construction of the trust); § 270 (validity of the trust).

The Fairbairns are aware of no authority for the proposition that a trust's terms can control the law that applies to the trust's torts committed in California against California plaintiffs. For one thing, a tort committed against a third party is not a matter of trust validity, construction, or administration. And it would be remarkable indeed if a charity could operate nationally, but insulate itself from all tort liability simply by choosing to incorporate in a state with charitable immunity. *Contra State Farm*, 538 U.S. at 422; *Mazza*, 666 F.3d at 592. Thus, the usual interest test should govern the choice of law inquiry here. And under that test, it is clear that the Fairbairns' claims are governed by California law.

**C.** In any event, a choice of law analysis would show that there is no conflict here, because the Massachusetts liability cap does not apply "if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes." Mass. Gen. Laws ch. 231, § 85K. And it is hard to imagine activities more obviously commercial in character than the solicitation of a donation and the related liquidation of the donated stock at issue in this case. *See* Restatement (2d) of Torts § 895E Reporter's Note 1 (1979) (explaining that § 85K "limits liability to $20,000 if the tort was committed while accomplishing charitable purposes. No limitation if committed during commercial activities, even if fundraising for charitable purposes."); *id.* at Reporter's Note 5 ("no limitation if committed during commercial activities, like fundraising, even if for charitable purposes.").

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

The key question is "whether the activity is a money-making enterprise merely designed to keep the charity afloat, in which case the limitation does not apply, or whether the revenue is generated by an activity accomplishing the purpose of the charity." *Conners v. Ne. Hosp. Corp.*, 789 N.E.2d 129, 136 (Mass. 2003) (citation omitted). "Thus, a charitable organization may not avail itself of the limitation by claiming that its revenue-generating activity has a general salutary effect" by bringing in additional money for the charity. *Id.* at 137.

The distinction is clearly illustrated by a pair of examples. On one hand, the cap did *not* apply where a tort was committed "in [the] course of [a] regular weekend dance opened to [the] general public that generated [the] bulk of [the] charity's general operating revenue." *Id.* (citing *Phipps v. Aptucxet Post #5988 V.F.W. Bldg. Ass'n*, 7 Mass. App. Ct. 928, 930 (1979)). The dance was not part of the charity's mission; it was how the charity obtained money. Thus, even though raising money was critical to the operation of the charity, the cap did not apply because the activity was primarily commercial in character. On the other hand, the cap *did* apply to a hospital's operation of a paid on-site parking lot. *See id.* at 135-37. Even though the parking lot incidentally generated some revenue, it existed as part of the hospital's operation as a charity—it was part of the "grounds for use as a medical office building housing physicians on the hospital's staff." *Id.* at 137. The parking lot thus directly accomplished the charity's goals and, despite generating some revenue, its operation was subject to the liability cap.

Here, both soliciting and liquidating donations are revenue-generating activities that are primarily commercial in character, not activities that directly accomplish a charitable purpose. The Fairbairns indeed could not locate a single case where a charity even *attempted* to assert the liability cap for torts committed in circumstances like this case. The only authority that the Fairbairns could locate, the Restatement, gives fundraising as the paradigmatic example of circumstances where the limitation does not apply. Restatement (2d) of Torts § 895E Reporter's Note 5 ("§ 85K limits liability to $20,000 if the tort was committed while accomplishing charitable purposes, but no limitation if committed during commercial activities, like fundraising, even if for charitable purposes.").

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

It's not hard to see why. If putting on a dance to generate revenue falls outside the cap, then activity related to *direct solicitations* would as well. Soliciting and selling donated stock is not part of the charity carrying out its charitable mission; it is (like a fundraising dance) what the charity does to generate money that can then be used for charitable purposes. That is exactly the circumstance when the cap, by its terms, does not apply. *See* Mass. Gen. Laws ch. 231, § 85K ("if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes"). Thus, even if Fidelity Charitable could show that Massachusetts law applies, the cap does not.

**D.** Finally, even if the cap applied, it would by no means limit all of the Fairbairns' claims. For one thing, the cap limits tort claims only, so in all events the Fairbairns' contract and promissory estoppel claims would fall outside of it. Moreover, § 85K is intended to limit charitable liability to third parties, not to allow a charity's trustees to mishandle the assets of the charity itself. *See Conners*, 789 N.E.2d at 132-33 (noting that by imposing a liability cap on tort claims, "[t]he Legislature . . . pursued the legitimate objective of preserving charitable assets," while also balancing "the interest of the person who is injured as a result of a tort for which the nonprofit corporation is responsible"). It would turn the cap on its head if it were used to permit a charity to *squander* charitable assets through incompetence. Thus, even if the cap applied with respect to the Fairbairns' claims as third parties, the Fairbairns could still seek restoration of losses on behalf of their DAF account.

## LEGAL STANDARDS APPLICABLE TO EACH CLAIM

The Court is undoubtedly familiar with the legal standards governing claims for negligence, breach of contract, promissory estoppel, misrepresentation, and California's Unfair Competition Law. And the Fairbairns have set out above how the evidence at trial will demonstrate Fidelity Charitable's liability. The Fairbairns accordingly do not provide a claim-by-claim application of law to fact in this brief. But for the Court's convenience, the Fairbairns offer (1) a brief overview of the legal standards for each claim and (2) a brief analysis of anticipated legal disputes with respect to each claim.

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

## I. Negligence

At the center of this case is Fidelity Charitable's mishandling of the Fairbairns' donated stock. The Fairbairns allege that in selling 1.93 million WATT shares in 154 minutes on December 29, 2017, Fidelity Charitable flooded the market and caused the share price to nosedive. This left significantly less money in the Fairbairns' DAF account for them to direct to charity, and it significantly reduced the Fairbairns' tax deduction. The Fairbairns accordingly seek relief in negligence both on behalf of their DAF account and on their own behalf.

### A. Claim elements

The elements of a negligence claim are familiar and mostly undisputed. "They are (a) legal duty to use due care; (b) a breach of such legal duty; and (c) the breach as the proximate or legal cause of the resulting injury." *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917 (1996) (citation, brackets, and internal quotation marks omitted).

A plaintiff may recover in negligence for harm that the defendant's conduct was "a substantial factor in bringing about." Restatement (2d) of Torts § 465 (1965). As discussed above (*supra* 21-22), Dr. Harris analyzed the harm caused by Fidelity Charitable's botched trading. The Fairbairns seek to recover both the DAF losses and to be made whole for their lost tax deduction.

### B. Anticipated legal issues

The parties' main disputes over the negligence claim involve (1) the standard of care that applied to Fidelity Charitable's liquidation and (2) whether Fidelity Charitable owed the Fairbairns a duty of care independent of its four promises. (Fidelity Charitable admits it owed a duty of care to the DAF and that it owed a duty to the Fairbairns individually to the extent it made the promises.)

#### 1. A professional standard of care applies.

Fidelity Charitable has suggested that it should be held to a basic "reasonable person" standard with respect to its liquidation of the WATT stock. That is, Fidelity Charitable thinks its liquidation should be judged against the standard of a reasonable layperson without any experience in stock trading. But it is a basic rule of negligence that an ordinary person who has—or holds herself out as having—superior knowledge or expertise will be compared to a reasonable person who possesses that

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

superior knowledge or expertise. *E.g.*, Restatement (3d) of Torts § 12 (2010) ("If an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person."). And "[t]hose undertaking to render expert services in the practice of a profession or trade are required to have and apply the skill, knowledge and competence ordinarily possessed by their fellow practitioners under similar circumstances, and failure to do so subjects them to liability for negligence." *LAOSD Asbestos Cases*, 5 Cal. App. 5th 1022, 1050 (2016) (citation and internal quotation marks omitted) (quoted in Judicial Council of California Civil Jury Instructions ("CACI") 600 Supporting Authority). The professional standard of care "is broad enough to encompass a wide range of specialized skills," *id.*, and it certainly encompasses the trading of stock.

Here, Fidelity Charitable held itself out as employing expert traders to liquidate shares on its behalf. And its own internal policy documents state that trading for DAF accounts will be done "in the same fashion as it would any other institutional account." Tr. Ex. 0205. That document goes on to state that Fidelity Charitable will "act responsibly in liquidations so as not to adversely affect the market price of the security," and that "[a]n efficient liquidation is one that liquidates stock as quickly as possible, without having a detrimental effect on the stock price." *Id.* Further, Michael McLean, who directed the WATT liquidation, testified that "Fidelity Charitable ha[d] an obligation to liquidate [stock] in a manner that does not adversely affect the price." McLean Dep. 64:14-20.

Fidelity Charitable, in other words, explicitly states that it will abide by a professional standard of care in liquidating donated stock. If that is the standard that Fidelity Charitable obliges itself to, this Court should do no less. It is clear that a professional standard of care applies.

    **2.**    **Fidelity Charitable owed both the DAF and the Fairbairns a duty of care in connection with the stock liquidation, independent of the four promises.**

Fidelity Charitable has also taken the position that it owed the Fairbairns no duty of ordinary care in connection with the stock liquidation, unless it made the promises alleged in the complaint. That is incorrect. Regardless of whether Fidelity Charitable made those specific representations to the

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

Fairbairns, it owed a duty of care to liquidate the stock competently, and it owed that duty both with respect to the DAF and with respect to the Fairbairns.

With respect to the DAF, Fidelity Charitable owed a duty of care to liquidate the stock competently in its capacity as trustee and fiduciary of the charity. Fidelity Charitable does not dispute this. But it does dispute whether the Fairbairns are an appropriate party to enforce that duty. As discussed above, however, the Court specifically held that the Fairbairns "have alleged a special relationship sufficient to confer standing to sue regarding the disposition of their donation." MTD Order, ECF No. 39 at 10. There is accordingly no question that the Fairbairns may pursue a negligence claim for the loss to their DAF.

With respect to the Fairbairns, Fidelity Charitable ignores a basic tenet of California law: that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights." California Civil Code § 1708. Fidelity Charitable owes everyone with whom it interacts a duty of ordinary care—including the Fairbairns. And in this case, that duty extended to Fidelity's liquidation of the WATT stock.

Fidelity Charitable specifically solicited the Fairbairns' donation by holding itself out as having trading expertise that would allow it to maximize both the Fairbairns' tax deduction and the amount of money in their DAF account. That solicitation is completely independent of the specific promises alleged in the complaint. It is embodied, for example, in the numerous emails and marketing materials that Mr. Kunz sent the Fairbairns. By holding itself out as having the competence to handle the liquidation—and maximize both the Fairbairns' tax deduction and the amount available for them to direct to charity—Fidelity Charitable incurred a duty to the Fairbairns with respect to the liquidation. Restatement (2d) of Torts § 299A (1965) ("[O]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."); *LAOSD Asbestos Cases*, 5 Cal. App. 5th at 1050 (same).

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

That conclusion follows from the basic tort law standard governing when a duty to another is incurred: whether the person harmed was within the foreseeable scope of risk resulting from the defendant's conduct.

> In order for the actor to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individually, or to a class of persons—as, for example, all persons within a given area of danger—of which the other is a member.

Restatement (2d) of Torts § 281 (1965).

When an entity tells someone to hand over their stock because it will competently liquidate that stock and thereby obtain for them ample proceeds to direct to charity and a significant tax deduction, harm to both the stock and the tax deduction are certainly within the foreseeable scope of the risk. That is why courts routinely entertain suits for negligence in "financial transaction[s] meant to benefit the plaintiff." *S. Cal. Gas Leak Cases*, 441 P.3d 881, 889 (Cal. 2019) (recognizing a duty in negligence to avoid economic losses "from a financial transaction meant to benefit the plaintiff (and which is later botched by the defendant)"); *see, e.g., Union Oil Co. v. Oppen*, 501 F.2d 558, 566 (9th Cir. 1974) ("[D]efendants engaged in certain professions, businesses, or trades have been held liable for economic losses resulting from the negligent performance of tasks within the course of their callings. . . . There are numerous cases indicating that economic losses may be recovered for the negligence of pension consultants, accountants, architects, attorneys, notaries public, test hole drillers, title abstractors, termite inspectors, soil engineers, surveyors, real estate brokers, drawers of checks, directors of corporations, trustees, bailees and public weighers."); *id* at 566 n.9 (collecting nearly two-dozen examples).

Because Fidelity Charitable specifically undertook to liquidate the stock competently in order to maximize the Fairbairns' charitable dollars and tax deduction, it owed the Fairbairns a duty of care with respect to the liquidation.

## II.    Breach of contract

In addition to negligence, the Fairbairns allege that Justin Kunz made four promises to them about how Fidelity Charitable would treat their donated stock. Fidelity Charitable, however, broke each of the promises, leading to its botched liquidation and significant losses to both the DAF account

and the Fairbairns' tax deduction. This harm forms the basis of four separate promise-based claims: breach of contract, promissory estoppel, misrepresentation (intentional and negligent), and violation of California's Unfair Competition Law.

The simplest of those, and the starting point on the Fairbairns' promise-based claim, is breach of contract. In exchange for the Fairbairns' donation, Fidelity Charitable agreed to handle the donated stock in accordance with the four promises—promises that were the result of years of discussion between Fidelity Charitable and the Fairbairns. Fidelity Charitable breached that contract when it liquidated the entire 1.9 million shares in a matter of hours on December 29, 2017, accounting for 15+% of volume, using entirely inadequate trading practices and methodologies, and without even telling the Fairbairns what it was doing.

### A. Claim elements

To establish their breach of contract claim, the Fairbairns will show the following at trial:

1. the contract's terms were clear enough that the parties could understand what each was required to do (*i.e.*, that the Fairbairns would donate stock and Fidelity Charitable would abide by the promises);

2. the exchange of donated stock for the promises constituted valid consideration;

3. the parties agreed to the contract's terms;

4. Fidelity Charitable breached the contract (*i.e.*, failed to comply with at least one of the four promises); and

5. this breach was a substantial factor in causing harm to the Fairbairns.

*See* CACI 302, 303 (collecting cases).

A contract's terms can be written, oral, or both. *See* CACI 304; *Lande v. S. Cal. Freight Lines*, 85 Cal. App. 2d 416, 420-21 (1948) ("A so-called partly written and partly oral contract is in legal effect a contract, the terms of which may be proven by both written and oral evidence."). And because neither the Circular nor any other relevant document contained an integration clause, nothing prevented Mr. Kunz from entering Fidelity Charitable into an oral contract with the Fairbairns encompassing the four promises. *See Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968). Indeed, Malcolm

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

Fairbairn will testify that oral promises like Mr. Kunz's are the norm in the financial industry, and that he has relied on such promises literally thousands of times in his career.

Breach of contract damages are measured by "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." *Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 29 Cal. App. 5th 1, 9 (2018) (citation omitted). Damages will be determined based on the extent that Fidelity Charitable's breach of each promise harmed the sale price and, in turn, the Fairbairns' tax deduction.

## B. Anticipated legal issues

There are no legal issues specific to breach of contract that the Fairbairns would like to raise before trial. This claim will simply turn, as discussed above, on whether the Court believes the Fairbairns or Justin Kunz. And the Fairbairns submit that the evidence will overwhelmingly establish that Mr. Kunz made the promises, entering Fidelity Charitable into a contract it immediately broke.

## III. Promissory estoppel

The doctrine of promissory estoppel is designed to provide a remedy for a party who took action to her detriment in reliance on another's promises. *See U.S. Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 901-02 (2005). It is an equitable doctrine that steps in when no contract was formed, but where it would be unfair for a party's promise not to be enforced. *Id.* The Fairbairns have thus asserted a promissory estoppel claim in the alternative to their contract claim.

## A. Claim elements

To establish their claim for promissory estoppel, the Fairbairns will prove at trial that:

1. Fidelity Charitable made at least one of the four promises;

2. the Fairbairns reasonably relied on that promise;

3. the Fairbairns' reliance was foreseeable to Fidelity Charitable; and

4. the Fairbairns suffered harm, for which their reliance on Fidelity Charitable's promise was a substantial cause.

*See U.S. Ecology*, 129 Cal. App. 4th at 901-02 (cited with approval by *W. Oilfields Supply Co. v. Goodwin*, 461 F. App'x 624, 625 (9th Cir. 2011)).

STRIS
MAHER | 777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

The same remedies are available for promissory estoppel as for breach of contract. *See U.S. Ecology*, 129 Cal. App. 4th at 903-04.

### B.     Anticipated legal issues

There are no legal issues specific to promissory estoppel that the Fairbairns would like to raise before trial.

## IV.   Misrepresentation

Fidelity Charitable's empty promises also give rise to claims for intentional and negligent misrepresentation. Although these claims do not provide the Fairbairns additional and separate damages from the contract and promissory estoppel claims, they provide a different path to reach those same damages.

### A.     Claim elements

The elements of a misrepresentation claim depend on whether the misrepresentation at issue was made intentionally or recklessly (intentional misrepresentation), or whether it was made negligently (negligent misrepresentation). Here, the Fairbairns allege intentional and negligent misrepresentation in the alternative: Mr. Kunz and Fidelity Charitable either (1) knew Mr. Kunz was giving the Fairbairns false information, (2) recklessly disregarded whether Mr. Kunz was providing accurate information, or (3) believed Mr. Kunz was telling the truth but had no reasonable basis for that belief. In all events, Fidelity Charitable is liable for misrepresentation.

To establish intentional misrepresentation, a plaintiff must prove that:

1.     the defendant made a false representation, either orally, in writing, or through nonverbal conduct;

2.     the defendant knew the representation was false or recklessly disregarded the truth;

3.     the defendant intended that the plaintiff rely on the representation;

4.     the plaintiff reasonably relied on the representation; and

5.     the plaintiff's reliance was a substantial factor in causing harm to the plaintiff.

*See* CACI 1900 (collecting cases).

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

Negligent misrepresentation requires the same elements, except that the defendant will be liable despite its honest belief that the representation was true unless it had reasonable grounds for believing the representation's truth. *See* CACI 1903; *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407-08 (1992).

Misrepresentation damages are measured in essentially the same way as negligence damages: The question is what harm Fidelity Charitable's misrepresentations proximately caused to the stock liquidation and the Fairbairns' tax deduction. *See, e.g.*, *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1252-54 (1991) (holding that "a plaintiff must have sustained damages proximately caused by the misrepresentation," including "consequential damages" flowing from the misrepresentation); Restatement (2d) of Torts § 548A (1977) ("In general the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. There is an analogy here to the legal causation of physical harm resulting from negligent conduct."); *cf. id.* § 549 cmt. e (even where the plaintiff seeks rescission, he may "recover[] from the other any loss that he has suffered in consequence of any use which, in reliance upon the misrepresentation, he has made of the article prior to his discovery of the fraud").

As discussed above (*supra* 21-22), the Fairbairns' damages expert has analyzed the consequential harm flowing from each of Fidelity Charitable's misrepresentations. The Fairbairns seek to recover both the DAF damages and the lost value of their tax deduction.

## B. Anticipated legal issues

There are two anticipated legal disputes on the misrepresentation claim to which the Fairbairns would alert the Court. First, Fidelity Charitable has said it will argue that the Fairbairns could not reasonably have relied on anything Mr. Kunz told them that was inconsistent with the Circular. Second, Fidelity Charitable has also said it will argue that the four promises at issue here cannot legally form the basis of a negligent misrepresentation claim. Both of Fidelity Charitable's arguments are wrong.

S T R I S
M A H E R | 777 S FIGUEROA ST. STE 3850 | LOS ANGELES, CA 90017

**1.     The Circular directed the Fairbairns to rely on Mr. Kunz, but reliance does not turn on the Circular in any event.**

Fidelity Charitable departs from both fact and law in arguing that the Fairbairns could not have reasonably relied on Mr. Kunz's promises—for example, that Fidelity Charitable would delay trading until 2018 and would not trade more than 10% of volume—because they were inconsistent with the Circular.

As a factual matter, Fidelity Charitable has attempted to find an inconsistency between the promises and the Circular by pointing to a line in the Circular saying that "Fidelity Charitable will *generally* sell the securities at the earliest date *possible*." Tr. Ex. 1134 at FID-FRBN-0012361 (emphasis added). To begin with, both "generally" and "possible" mean something—and at a minimum, "possible" must mean "possible consistent with the exercise of due care and Fidelity's own policy to avoid adverse price impact." Again, Fidelity's own practices show for *other* donated securities, it sells over time to avoid the kind of price impact it caused here.

Further, that statement is not the Circular's only word on this issue. The Circular goes on to tell customers to "contact a Fidelity Charitable representative" for information about how Fidelity Charitable will liquidate "restricted stock, or non-publicly traded assets (assets that are not readily liquid)." *Id.* at FID-FRBN-0012362. There were significant questions about whether the WATT stock was restricted, and it was certainly "not readily liquid." The Fairbairns accordingly did exactly what the Circular told them to do: rely on "a Fidelity Charitable representative" to tell them how this particular donation would work.

But Fidelity Charitable is also wrong as a legal matter. The law readily accepts reasonable reliance on oral promises that are contrary to written documents. This is not a controversial principle; it can be found directly in the Sources and Authority for the model jury instruction on reasonable reliance:

> It is well established that the kind of disclaimers and exculpatory documents—such as the "estoppel" attached to the lease and signed by [plaintiff] that disavowed any representations made by landlord or its agents to him—do not operate to insulate defrauding parties from liability or preclude [plaintiff] from demonstrating justifiable reliance on misrepresentations.

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

*Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 393 (2019); *see* CACI 1908 Sources and Authority. In other words, reasonable reliance on a misrepresentation is not necessarily defeated by contrary written terms. That is particularly true where, as here, the supposedly contrary document contains no integration clause. In such cases, the written terms do not even constitute the entirety of the parties' agreement and could be amended orally. *Masterson*, 68 Cal. 2d at 225. This Court should accordingly reject any attempt by Fidelity Charitable to argue that some inconsistency with the Circular necessarily renders the Fairbairns' reliance unreasonable.

### 2. The Fairbairns' negligent misrepresentation claim is legally sufficient.

Fidelity Charitable has also said it will argue that the Fairbairns cannot establish a negligent misrepresentation claim, because the promises here involved future events, not present or existing facts. Fidelity Charitable is correct, as far as it goes, about the general rule that "statements regarding future events are merely deemed opinions," and thus cannot form the basis of a negligent misrepresentation claim. *Pub. Emps' Ret. Sys. v. Moody's Inv'rs Serv., Inc.*, 226 Cal. App. 4th 643, 662 (2014). But there is a well-recognized exception to that rule for professionals, "when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise." *Id.* In such circumstances, "the defendant's representation may be treated as one of material fact." *Id.* The point of this rule is that when someone is a professional, that person has an obligation in dealing with his clients to ensure he has a reasonable basis for what he is saying. In that context, "[w]hen a statement, although in the form of an opinion, constitutes a deliberate affirmation of the matters stated . . . it may be regarded as a positive assertion of fact." *Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1477 (1997) (citations omitted).

Here, it is clear that Mr. Kunz was not expressing a mere opinion about how the Fairbairns' donation would be treated. He was not making a prediction. He was, rather, stating facts about how the donation would be handled. And he was doing so in his capacity as a professional relationship advisor for a highly sophisticated financial institution—*i.e.*, with superior knowledge and special information about Fidelity Charitable's policies and practices and how they would apply to the

Fairbairns' donation. That circumstance—a finance professional explaining how a financial institution would handle donated assets—is precisely where the exception to the general rule is meant to apply. *Cf., e.g.*, *Pub. Emps'. Ret. Sys.*, 225 Cal. App 4th at 662 (applying rule to ratings agency and collecting cases and other authority applying rule in other contexts); *Anderson*, 56 Cal. App. 4th at 1472 (applying rule to accounting firm making economic forecasts); *Gagne v. Bertran*, 275 P.2d 15, 20-21 (1954) (Traynor, J.) (applying rule to contractor evaluating foundation). Mr. Kunz was a professional advisor obligated to have a reasonable basis for what he told the Fairbairns. Thus, to the extent Mr. Kunz made the promises *without* a reasonable basis for believing they were true, Fidelity Charitable is liable for negligent misrepresentation.

In any event, three of the promises were not about future events at all, but about Fidelity Charitable's existing policies as applied to the Fairbairns' donation. The sophistication promise was about Fidelity Charitable's capabilities and tools for liquidating stock. The 10% promise addressed Fidelity Charitable's existing policies regarding the liquidation of donated stock. *See, e.g.*, Tr. Ex. 0033 (noting that "[w]hen it comes to thinly-traded or large block gifts, we work with capital markets to be sure that we never trade more than 10% of the daily trading volumes."). And the promise that Mr. Fairbairn could advise on a price limit was about the scope of Fidelity Charitable donors' advisory rights. All of those representations addressed existing facts about how Fidelity Charitable's DAF worked. Thus, those promises could support a claim for negligent misrepresentation even if Mr. Kunz is otherwise permitted to make representations without a reasonable basis for doing so.

## V.    California Unfair Competition Law

Lastly, Fidelity Charitable's conduct violated California's unfair competition law. The UCL is broadly drawn to prohibit "any unlawful, unfair or fraudulent business act or practice" in order "to protect . . . consumers . . . by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Sup. Ct.*, 246 P.3d 877, 883 (Cal. 2011). To that end, courts have "broad equitable powers to remedy violations" of the UCL. *Id.*

The Fairbairns assert claims under the "unlawful" and "fraudulent" prongs of the UCL. The unlawful prong provides a remedy for "any practices forbidden by law," including "court-made" law

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

such as the tort of misrepresentation. *Saunders v. Sup. Ct.*, 27 Cal. App. 4th 832, 838-39 (1994); *see also CRST Van Expedited, Inc. v. Werner Ents. Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (UCL unlawful prong covers "tortious violation[s] of duties imposed by law"). Accordingly, to the extent the Fairbairns establish their claim for misrepresentation, they also may obtain a remedy under the UCL.

The "fraudulent . . . prong of the UCL has been understood to be distinct from common law fraud." *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). It requires only that the defendant made a representation "likely to . . . deceive[]" a member of the public, *id.*, and that the representation was "a substantial factor" in the plaintiff's decision to act (*i.e.*, here, to donate the WATT shares), *id.* at 40. Thus, even if the Fairbairns do not establish negligent or intentional misrepresentation, they may obtain a remedy under the UCL to the extent Fidelity Charitable's conduct was likely to deceive and played a substantial role in inducing their donation.

At summary judgment, Fidelity Charitable also pressed the argument that DAF account holders have no binding rights over their DAF accounts. That argument is contrary to Fidelity Charitable's representations to consumers in advertising and promotional material, which tout donors' significant ongoing control over their accounts. *See supra* 5-6. To the extent Fidelity Charitable continues to press its argument that these representations are, in fact, meaningless, the Fairbairns will contend that Fidelity Charitable's advertising and promotional material is also "likely to . . . deceive[]" and thus violates the UCL. *In re Tobacco II Cases*, 207 P.3d at 29.

To remedy these violations, the Fairbairns seek restitution and, if necessary, injunctive relief. Restitution is necessary to prevent Fidelity Charitable from holding onto its ill-gotten gains—assets obtained from the Fairbairns based on deceptive and unlawful business practices. And injunctive relief may be necessary to prevent Fidelity Charitable from continuing to make false representations to the public about donors' rights over their DAF accounts. Finally, at the appropriate stage, the Fairbairns intend to seek attorneys' fees under the UCL. *See, e.g.*, *Conservatorship of Whitley*, 241 P.3d 840, 846-47 (Cal. 2010).

# CONCLUSION

For the foregoing reasons and the reasons set forth in the Fairbairns' Proposed Findings of Fact and Conclusions of law, the Fairbairns will prove at trial both Fidelity Charitable's liability and that its conduct caused the Fairbairns millions of dollars in harm.

Dated: September 11, 2020

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Peter K. Stris*
Peter K. Stris
Elizabeth Brannen
Bridget C. Asay
Rachana A. Pathak

*Attorneys for Plaintiffs*
Emily and Malcolm Fairbairn

PLAINTIFFS' TRIAL BRIEF
CASE NO. 3:18-CV-04881-JSC

S T R I S | 777 S FIGUEROA ST. STE 3850
M A H E R | LOS ANGELES, CA 90017

**ATTORNEY ATTESTATION**

    I, Thomas Rubinsky, hereby attest, pursuant to N.D. Cal. Local Rule 5-1(i)(3), that the concurrence to the filing of this document has been obtained from each signatory hereto.


Dated: September 11, 2020

                          /s/ *Thomas Rubinsky*
                          Thomas Rubinsky