**STRIS & MAHER LLP**
PETER K. STRIS
  peter.stris@strismaher.com
ELIZABETH BRANNEN
  elizabeth.brannen@strismaher.com
RACHANA A. PATHAK
  radha.pathak@strismaher.com
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017

BRIDGET ASAY (*pro hac vice*)
  bridget.asay@strismaher.com
28 Elm Street, Floor 2
Montpelier, VT 05602

T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
EMILY AND MALCOLM FAIRBAIRN

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>        Plaintiffs,<br><br>   v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>        Defendant. | Case No. 3:18-cv-04881-JSC<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial date:    October 19, 2020<br>Time:        8:30 a.m.<br>Courtroom:   E<br><br>Hon. Jacqueline Scott Corley |

Pursuant to this Court's Pretrial Order for a Bench Trial (Dkt. 184), Plaintiffs hereby submit their proposed findings of fact and conclusions of law.

# I. PLAINTIFFS' PROPOSED FINDINGS OF FACT

## A. Fidelity Charitable Is America's Largest Donor Advised Fund ("DAF") Sponsoring Organization.

1. Defendant Fidelity Investments Charitable Gift Fund ("Fidelity Charitable") is a 503(c)(3) public charity and the nation's largest donor advised fund ("DAF") sponsoring organization. Tr. Ex. 1707. Donors make donations of cash, stock, or other assets (donations other than cash are liquidated) to their individual DAF accounts at Fidelity Charitable that are immediately tax deductible and then later direct the funds to traditional charities. Tr. Exs. 0187, 1555, 1556, 1558, 1559, 1560, 1636, 1707. Donors may choose to invest their DAF account funds, which offers the potential for tax-free growth over time, thereby increasing the funds available to be directed to charity. *Id.* Fidelity Charitable holds over $31 billion dollars in its DAF accounts; it is the largest public charity, of any kind, in America. Tr. Ex. 1707.

2. Fidelity Charitable has no employees. Tr. Ex. 1700 at 4. It contracts with FMR LLC ("FMR"), a for-profit entity, to have all services (e.g., fundraising, investing) provided by employees of various other, for-profit, Fidelity entities. Tr. Exs. 0200, 0615. That contract is called the Master Services Agreement ("MSA"). Tr. Ex. 0200.

3. Approximately 300 individuals expressly identify themselves as representatives of "Fidelity Charitable." Tr. Ex. 0180. Those individuals are employed by a for-profit Fidelity entity called National Charitable Services. Tr. Ex. 0180; Tr. Ex. 1700 at 4. Other individuals, who do not identify themselves as representatives of "Fidelity Charitable," also conduct various core functions of the charity's business. For example:

    a. The MSA provides that Fidelity's "Family offices" will conduct "[f]undraising" on behalf of Fidelity Charitable. Tr. Ex. 0200 at FID-FRBN-0031154. Fidelity's Family Office Services ("FFOS") is a business unit of Fidelity Brokerage Services LLC that caters to ultra-high-net-worth individuals. Fidelity Brokerage Services LLC is a subsidiary of FMR. Tr. Ex. 0615 at FID-FRBN-0043266.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS
MAHER | 777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

b. The MSA provides that FMR will liquidate donated securities on behalf of Fidelity Charitable. Tr. Ex. 0200 at FID-FRBN-0031155. Such liquidation is done by traders from Fidelity Capital Markets, a business unit of National Financial Services LLC, which is also a subsidiary of FMR. Tr. Ex. 0615 at FID-FRBN-0043266.

4. Pursuant to the MSA, FMR profits from contributions to Fidelity Charitable DAF accounts in two ways. First, FMR earns a percentage of the funds held by Fidelity Charitable. Tr. Ex. 0200 at FID-FRBN-0031147−48. In other words, every dollar contributed to Fidelity Charitable increases the fee earned by FMR. In 2017, FMR's administrative fee reached $65 million. Tr. Ex. 0618 at FID-FRBN-0043450. But that amount is dwarfed by the second way FMR profits: from investment management fees, brokerage fees, and commissions Fidelity earns on DAF account funds that are invested in Fidelity products, such as mutual funds or money markets. Indeed, Fidelity Charitable's donors are offered a wide range of Fidelity's for-profit products in which to invest their charitable dollars, including index funds that track the U.S. total market and the S&P 500. Tr Ex. 0201 at FID-FRBN-0031174−75.

5. To attract large donations from its wealthiest donors, Fidelity Charitable heavily promotes its expertise accepting donations of complex, non-cash assets, which must be sold before their value can be used to support charitable causes. Tr. Exs. 1556, 1558, 1560. When appreciated assets are donated and Fidelity Charitable does the selling (rather than donor herself), donors both get more favorable tax treatment and maximize the dollars for charity. As one Fidelity advertisement illustrates:

| | Donate securities to DAF sponsor | Sell stock and donate cash proceeds to charity |
| --- | --- | --- |
| Asset value | $1,000,000 | $1,000,000 |
| Capital gains | $950,000 | $950,000 |
| Capital gains taxes paid | $0 | $226,100[5] |
| Amount available for charity | $1,000,000 | $773,900 |
| Charitable tax deduction | $1,000,000 | $773,900 |

Tr. Ex. 1556 at FID-FRBN-0031217.

S T R I S  777 S FIGUEROA ST, STE 3850
M A H E R  LOS ANGELES, CA 90017

S T R I S
M A H E R | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

**B.** **In 2014, the Fairbairns Put $20 Million into a Fidelity Charitable DAF.**

6. Emily and Malcolm Fairbairn are professional investors. From 1999 through 2018, they ran a successful hedge fund named Ascend Capital ("Ascend"). At its peak, Ascend had $3 billion in assets under management.

7. The Fairbairns are also major donors to charity. By the end of 2014, the Fairbairns had made large charitable donations totaling $55 million, consisting of (i) a $25 million cash donation to a charitable trust in 2010, (ii) a $10 million cash donation to a DAF at J.P. Morgan in 2013, and (iii) a $20 million cash donation to Fidelity Charitable in 2014.

**C.** **In 2015, Fidelity Charitable Pursues Another Donation from the Fairbairns— But the Fairbairns Add $10 Million to Their J.P. Morgan DAF Instead.**

8. On September 18, 2015, Colby Chaisson emailed Steve Brooks and Anna Mckeon. Tr. Ex. 0658. Ms. Chaisson worked directly for Mr. Brooks, who was and is the head of West Coast fundraising for Fidelity Charitable. Tr. Ex. 0620 at FID-FRBN-0043395; Tr. Ex. 0990 at FID-FRBN-0043408. At the time, Ms. Mckeon worked in Fidelity Charitable's Private Donor Group ("PDG"), a team dedicated to Fidelity Charitable's largest donors. Tr. Ex. 0620 at FID-FRBN-0043400; Tr. Ex 0990 at FID-FRBN-0043413. Ms. Mckeon was the PDG relationship manager assigned to the Fairbairns. Tr. Ex. 0010.

9. Ms. Chaisson wrote: "I received a call from Rob Sanders[,] . . . the representative that works with Emily Fairbairn. If you recall, Emily contributed $20M to CGF [Fidelity Charitable Gift Fund] on December 31st of last year. I believe Anna tried to reach out to her a few times with no success. [Ms. Fairbairn] is not yet aware of their 2015 tax situation but anticipates that is [sic] will be similar to last year (40M+ AGI). . . . Rob suggested that we propose a joint call with Emily to introduce ourselves and discuss year-end planning strategies." Tr. Ex. 0658.

10. Ms. Chaisson continued: "Rob also mentioned that [Ms. Fairbairn] has $3B with JP Morgan and is not happy with them. He has been in touch with Emily Damiano in FFOS to discuss potential options for the client." *Id.* FFOS stands for Fidelity Family Office Services, a business unit that provides concierge services to ultra-high-net-worth ("UHNW") clients and that is listed in the MSA as conducting "[f]undraising" on behalf of Fidelity Charitable. *See also* Tr. Ex. 1508 (August

3

28, 2015 email from Ms. Damiano to Ms. Fairbairn attaching FFOS brochure); Tr. Ex. 1509 (FFOS brochure attached to email).

11. On September 23, 2015, Ms. Chaisson messaged Justin Kunz, a relationship manager at FFOS. She wrote: "We are working with a branch rep who has a UHNW client. He thought that FFOS might be a good fit for the client." Tr. Ex. 1626. She added: "They have $20M with Charitable and run a hedge fund so we know they have additional funds elsewhere." *Id.* Mr. Kunz replied: "geez yeah thats a great one" and confirmed that Ms. Damiano, "is the starting point for prospects." *Id.* Mr. Kunz then emailed that message to Ms. Damiano who replied: "I know who this prospect is – Emily Fairbairn . . . . I have been trying to contact her for weeks. The Rep is Rob Sanders." *Id.*

12. The Fairbairns did not donate to Fidelity Charitable in 2015. They did, however, donate an additional $10 million to their DAF at J.P. Morgan. Tr. Ex. 1661.

**D.** **Fidelity Charitable Tries (Unsuccessfully) to Get the Fairbairns' J.P. Morgan DAF Assets by Promising "Additional Flexibility."**

13. On September 23, 2016, Mr. Kunz sent his first email to the Fairbairns responding to an email introduction from Mr. Sanders. Tr. Ex. 1507. On October 4, 2016, Mr. Kunz had his first meeting with the Fairbairns. Earlier that day, he emailed Keita Matsumoto, a fundraiser for Fidelity Charitable, copying Rob Sanders. Mr. Kunz wrote: "I am meeting with Emily & Malcolm Fairbairn later today who put in $20m into CGF last year . . . . I understand they own a DAF at JP Morgan private bank. Any competitive intelligence I should be aware of? Fees, flexibility, etc." Tr. Ex. 0009.

14. Mr. Matsumoto replied to Mr. Kunz: "I've copied Emily Fairbairn's PDG RM [Relationship Manager], Anna Mckeon . . . . For JP Morgan's Charitable Giving Fund, I am pretty sure they are set-up at National Philanthropic Trust (NPT) as the administrator of the DAF program. . . . I don't believe they have a Private Donor Group-like offering at NPT." Tr. Ex. 0010.

15. Ms. Mckeon responded and began an exchange with Mr. Kunz about whether and how Fidelity Charitable would handle a potential donation of the Fairbairns' LP hedge fund interests. That exchange culminated in Mr. Kunz writing "this could be a leg up on JPM's [J.P. Morgan's] DAF and reason to consolidate it here…" Tr. Ex. 1521 at FID-FRBN-0005222 (ellipses in original).

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

16.     On October 10, 2016, Mr. Sanders replied to the October 4, 2016 email chain. He wrote: "I'm meeting with the client for a few minutes on Weds. I want to mention moving the DAF at JPM. Is it required to be moved as cash or can it be moved in-kind." Tr. Ex. 1519 at FID-FRBN-0005166.

17.     On October 25, 2016, Mr. Kunz emailed Ms. Mckeon copying Mr. Sanders. He wrote: "Rob and I have spoken to Emily Fairbairn more recently about the possibility of consolidating her DAF at JP Morgan. *First things first, one of the selling points is the possibility of additional flexibility within her CGF account . . . .*" Tr. Ex. 0018 (emphasis added). Ms. Mckeon then coordinated with two other Fidelity Charitable colleagues (Ms. Chaisson and Mr. Brooks) to provide information to Mr. Kunz in his pursuit of the Fairbairns' DAF at J.P. Morgan. *See, e.g.*, Tr. Ex. 1625 at FID-FRBN-0041555 (Ms. Mckeon asking whether to disclose that at J.P. Morgan "Fees are negotiable for account balances over $20M"); Tr. Ex. 1632 at FID-FRBN-0042619 (Ms. McKeon discussing "competitor book" on J.P. Morgan's DAF).

18.     Fidelity Charitable continued to target the Fairbairn's J.P. Morgan DAF in 2017. For example, on January 26, 2017, Mr. Kunz emailed Mr. Sanders: "I'll circle up with [Emily Fairbairn] on that cgf account and win that biz." Tr. Ex. 0028. Mr. Kunz was responding to an email from Mr. Sanders stating, "Looks like my name is still on the CGF account, so hopefully the [J.P. Morgan] DAF moves as well." Tr. Ex. 0026.

19.     As late as the summer of 2017, Fidelity Charitable was still communicating internally about the possibility of obtaining the Fairbairns' J.P. Morgan DAF assets. Tr. Ex. 0251. On August 7, 2017, Mr. Sanders sent Mr. Brooks and Mr. Casserino an email titled "Donorflex Client: Fairbairn" in which he wrote: "She has a DAF at JP Morgan she mentioned that she might move over. Expected to be between 50-100M." *Id.* Mr. Brooks replied: "Thanks. I will call her after market close tomorrow." *Id.*

20.     The Fairbairns never transferred any assets from their J.P. Morgan DAF to Fidelity Charitable. At present, the Fairbairns have over $100 million in a donor-advised fund at J.P. Morgan.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

**E.    In Late 2016, Mr. Kunz Begins Encouraging the Fairbairns to Donate "Appreciated Assets" Per Fidelity Charitable's 457A Marketing Campaign.**

21.    On August 31, 2016, Ms. Chaisson emailed Ms. Mckeon and Mr. Brooks (and several other Fidelity Charitable colleagues) an email with the subject "457A California Opportunity Chain." Tr. Ex. 1631. She wrote "I've created this email chain to share information on 457A and opportunities within our territory. I've included an initial list of individuals/hedge funds/firms that come to mind." *Id.* The first bullet identified "Ascend Capital ‐ Emily Fairbairn . . . hedge fund manager." *Id.*

22.    On October 4, 2016, Ms. Mckeon emailed Mr. Kunz, writing that "[t]here's a lot of opportunity for us to better partner with Emily and Malcolm," and attaching a file labeled Hedge-Fund-White-Paper-Principals.pdf. Tr. Ex. 0661 at FID-FRBN-0005259. Mr. Kunz replied: "Thanks for the article, I've been speaking to a few other HF [hedge fund] clients recently about this…" Tr. Ex. 0013 at FID-FRBN-0005228. The "article" attached by Ms. Mckeon to her email was a Fidelity Charitable marketing white-paper with a first-page title that reads: "457A Drives a High-Income Year and Charitable Opportunity / Learn how sunsetting of offshore hedge fund fee deferral programs can turn into a win for charity." Tr. Ex. 0661 at FID-FRBN-0005261

23.    Page 1 of the white paper contains the following introductory text:

> With the enactment of Internal Revenue Code Section 457A in 2008, offshore hedge fund fee deferral programs were effectively ended. Functioning as nonqualified deferred compensation plans, these programs enabled hedge fund managers to defer fee income (or carried interest characterized as fees) using offshore vehicles. By the end of 2017, hedge fund managers with such offshore plans will need to repatriate these funds, often creating significant income tax issues. however, for those hedge fund managers who are philanthropic, the repatriation mandated by Section 457A can be a tremendous opportunity for high-impact charitable giving.

*Id.*

24.    The body of the white paper contains five sections: (1) "What is IRC Section 457A", (2) "Charitable opportunity", (3) "Where to give?", (4) "What to donate", and (5) "Conclusion". The "What to donate" section advises hedge fund managers to focus on two asset classes to maximize their tax benefit and dollars for charity: (i) appreciated securities and (ii) LP hedge fund

6

interests. It ends with "a hypothetical example showing the advantages of donating a long-term appreciated security as compared to selling the asset and donating the cash proceeds":



Tr. Ex. 0661 at FID-FRBN-0005261–64. Later that day, Mr. Kunz emailed Mr. Sanders alone on the same email chain asking, "Did you guys chat 457A and repatriation?" Tr. Ex. 1520 at FID-FRBN-0005215. Sanders replied, "No, over my head." *Id.* And Mr. Kunz wrote back: "Don't mention this to them [the Fairbairns]. We will follow up on the logistics. Good work." *Id.*

25.    Thereafter, Mr. Kunz began communicating with the Fairbairns about 457A, repatriation, and the benefits of donating appreciated assets to Fidelity Charitable.

**F.    Throughout 2017, Mr. Kunz Encourages the Fairbairns to Donate Appreciated Assets and Addresses Their Concerns About How Fidelity Charitable Would Liquidate Large Blocks of Public Stock Given the Nature of Their Holdings.**

26.    As he explained in an October 30, 2017 email to his superiors: Mr. Kunz spent 2017 "working with CGF [Fidelity Charitable Gift Fund] to further build out their [the Fairbairns'] account of $40m+." Tr. Ex. 0776 at FID-FRBN-0029938. Mr. Kunz had "met with them four times in the past year" and knew that "[t]hey want to contribute vastly in the next several years." *Id.*; *see also* Tr. Ex. 1517 (FFOS internal report on the Fairbairns, dated October 6, 2016, noting that Emily and Malcolm Fairbairn "have strong philanthropic interests (committed to giving away 1/3 of their estate to charity)" and estimating their net worth at "~[$]500M"); Tr. Ex. 1514 (October 20, 2016 email from Mr. Kunz indicating review and approval of internal report on Fairbairns).

27.    In "working with CGF to further build out [the Fairbairns'] account," Mr. Kunz constantly emphasized the tax benefits of donating appreciated assets. For example, Mr. Kunz specifically promoted the "tax savings" of donating hedge fund holdings. *See, e.g.*, Tr. Ex. 0053

STRIS | 777 S FIGUEROA ST, STE 3850
MAHER | LOS ANGELES, CA 90017

(Mr. Kunz emailing Fairbairns claiming: "if you were to give your highly appreciated Ascend holdings instead of cash this year, it could potentially a significant tax savings.").

28.     Mr. Kunz also specifically promoted the "tax efficiencies" of donating public stock. *See, e.g.*, Tr. Ex. 0071 at FID-FRBN-0029406 (Mr. Brooks writing "Great. Thanks for pushing for the tax efficiencies with her Justin. . ." in response to Mr. Kunz writing "If nothing else, [Ms. Fairbairn] will do public securities next week."); Tr. Ex. 1524 (Mr. Kunz email asking the Fairbairns: "Any other securities you would like to contribute?" and attaching an article analyzing a senate proposal that would affect the tax treatment of publicly traded securities); Tr. Ex. 1525 (the senate proposal Mr. Kunz attached).

29.     Throughout all of 2017, Mr. Kunz was aware that the Fairbairns' personal public stock holdings were concentrated positions in a handful of small and micro-cap companies, including Energous Corporation (ticker WATT). The FFOS internal report noted, for example, that the Fairbairns "tend to make concentrated investments in fewer names. One of their largest positions is in Energous Group – Ticker: WATT." Tr. Ex. 1517 at FID-FRBN-0005081. And as Mr. Kunz wrote in October 2017: "From the onset of the relationship [*i.e.*, in 2016], the Fairbairn Family told me that the securities they trade in their personal accounts (small/micro cap stocks) are not the same as their hedge funds (large cap long/short)." Tr. Ex. 0776 at FID-FRBN-0029938.

30.     Mr. Kunz also knew that the Fairbairns had serious concerns about Fidelity's trading competence generally and the DAF's trading of donated stock in particular—given the nature of the Fairbairns' holdings (i.e., concentrated positions in small public companies):

    a.     <u>Fidelity's trading generally.</u> Even before he first met the Fairbairns, Mr. Kunz knew that trading sophistication was a priority. He wrote on September 27, 2016, for example, that the Fairbairns were "looking for an institutional trading desk" to make trades for them. Tr. Ex. 0003 at FID-FRBN-0042435. And he had invested significant time and effort to convince the Fairbairns that they could trust the traders within the Family Office to

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

S T R I S

M A H E R

777 S FIGUEROA ST, STE 3850

LOS ANGELES, CA 90017

handle trading with respect to the Fairbairns' "personal money." *Id.* On April 10, 2017, for example, Mr. Kunz wrote:

> "Thanks again for finding the best fit for Emily. She wired another $28m to us Friday. $53m relationship now. *She didn't 'trust' Fidelity when it comes to trading. Now she is sending our desk 10+ orders a day.* We are trading hard to get names and might even help out her hedge fund now. Thank you for realizing the client needed an institutional relationship. She is very pleased and we will continue to grow her assets."

Tr. Ex. 0042.

      b.   <u>The DAF's trading of donated stock in particular.</u> The FFOS traders, however, were not the same people who liquidate stock on behalf of Fidelity Charitable. So, when Mr. Kunz began pressing the Fairbairns for a significant donation of appreciated securities, the Fairbairns had concerns about how and who at Fidelity Charitable would handle the liquidation of any donated stock. Mr. Kunz personally discussed those concerns with the Fairbairns after learning in late February of 2017 that the Fairbairns were having their questions answered by others at Fidelity.

**February 2017 Communications**

31.    On February 22, 2017, Robert Sanders forwarded an email chain to Mr. Kunz indicating that members of the Private Donor Group at Fidelity Charitable were providing FFOS with answers to questions raised by the Fairbairns about how the DAF would liquidate their public stock if donated:

      a.   On February 13, FFOS Client Service Manager Kevin Debastos emailed a shared account for the Fidelity Charitable Private Donor Team, writing "Can you confirm our gifting process? Our client, Emily Fairbairn, wants to understand if shares are automatically sold when moved to her DAF or she needs to coordinate with your team. The security is thinly traded." Tr. Ex. 0567 at FID-FRBN-0000014.

      b.   On February 14, Brooke Awtry, a member of the Private Donor Group, replied: "for this account, shares are automatically sold once they arrive in the DAF." *Id.* at FID-FRBN-0000013.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

c.     On February 17, the email exchange between Mr. Debastos and Ms. Awtry was forwarded to Rob Sanders. *Id.*

d.     On February 22, Mr. Sanders replied "Brooke, you said 'for this account.' Does that mean there are other types of accounts with different flexibility? *I'm guessing based on conversations I've had with Emily for the last two years[,] [s]he's concerned about the DAF liquidating the stock and driving down her value in non donated shares.*" *Id.* (emphasis added).

e.     Later that day, Mr. Sanders forwarded the entire chain to Mr. Kunz adding "FYI on this chain that I was added to. *I think the CGF rep might be missing the point that she [Emily Fairbairn] does not want to immediately liquidate the shares.*" *Id.* (emphasis added)

32.     On February 23, 2017, Kevin DeBastos forwarded to Mr. Kunz the same email chain forwarded a day earlier by Mr. Sanders but now including three additional emails that had since been added to the thread. Specifically:

a.     On February 22, Anna Mckeon (writing from the shared Private Donor Group email account from which Ms. Awtry had earlier written) responded to Mr. Sanders writing: "We would never flood the market/drive down the share value. *When it comes to thinly-traded or large block gifts, we work with capital markets to be sure we never trade more than 10% of the daily trading volume. There have been times when we've had sell down strategies that have run the course of several months*." Tr. Ex. 0033 at FID-FRBN-0003641 (emphasis added).

b.     Later, on February 22, Mr. Sanders responded: "Is there any coordination on liquidating shares after they are donated (lump sum) or does she control that by donating in pieces?" *Id.*

c.     And on February 23, Ms. Mckeon replied, "Once a contribution is made to Fidelity Charitable – the sell down is at the sole discretion of the charity, meaning the donor can't dictate the liquidation due to IRS rules about donor control. That being said, *as a policy*, we do not flood the market in a way that would affect the share price." *Id.* (emphasis added).

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017
STRIS
MAHER

Indeed, the policy of "not flood[ing] the market" is directly included in Fidelity Charitable's own policy documents, which state that Fidelity Charitable will "[a]ct responsibly in liquidations so as not to adversely affect the market price of the security" and that "[a]n efficient liquidation is one that liquidates stock as quickly as possible, without having a detrimental effect on the stock price." Tr. Ex. 0205 at FID-FRBN-0042952.

33.      Later that day (February 23), Mr. Kunz forwarded the chain he received from Mr. Debastos both to Mr. Sanders and to the shared email account for the Fidelity Charitable Private Donor Team writing: "*I'm just being brought in now… is Emily aware of the fees by trading through Cap Markets? I believe it is $0.02/shares?*" Tr. Ex. 0036 at FID-FRBN-0003631 (emphasis added). The Private Donor Group team responded "It's actually 1.2 cents/share. So $1.20 for every hundred shares." *Id.* And then Mr. Sanders replied: "*So is there a next step with the client? How well does Emily understand the CGF offering? I never got into this with her and Anna said she hasn't been able to meaningfully connect with the client.*" *Id.* (emphasis added).

34.      About a week earlier, the Fairbairns had received two emails from FFOS answering their general questions about the DAF's liquidation of donated public stock:

a.      On February 14, Ms. Fairbairn was told by email: "After reviewing with our Private Donor Group, they were able to confirm that shares are automatically sold once they arrive in the DAF. For thinly traded shares it may take longer to liquidate all shares . . . ." Tr. Ex. 1504 at FID-FRBN-0002411.

b.      On February 15, Ms. Fairbairn was told by email: "My team came back to me with some additional information regarding your inquiry on gifting to DAF. According to Private Donor Group, when they receive thinly-traded securities their contributions team coordinates with the capital markets team to ensure that the market is not flooded. Private Donor generally trades about 10% of the daily volume. *If you have additional questions, we can definitely reach out to our team again if needed.*" Tr. Ex. 1504 at FID-FRBN-0002411 (emphasis added).

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

**Post-February 2017 prospecting by Mr. Kunz**

35. The Fairbairns did have additional questions, which they proceeded to raise with Mr. Kunz. Indeed, from that point on, Mr. Kunz became the single point of contact between the Fairbairns and Fidelity Charitable. As contemporaneous internal documents from Fidelity Charitable illustrate, Mr. Kunz assumed that role at his own urging. For example: as Mr. Kunz explained in an August 9, 2017 email to his colleagues (Mr. Sanders, Mr. Brooks, Ms. Mckeon, and Mr. Casserino) following their efforts to pitch Ms. Fairbairn on a new Fidelity Charitable program:

> I know everyone is trying to help and we all have a common goal but from the client's perspective, if she has Rob, Steve and myself all calling out to her [Emily Fairbairn] on the same subject, it simply doesn't feel like Fidelity is on the same page. . . . [L]et's try to channel our communication through a single point of contact. . . . Steve and I left it that I will email her some content and bring up at my next meeting at the end of August."

Tr. Ex. 0052 at FID-FRBN-0006804.

**G. On 12/19/17, Mr. Kunz Is Asked by the Fairbairns to "Compete" with J.P. Morgan for an Imminent $30 to $100 Million Donation.**

36. On December 12, 2017, Mr. Kunz emailed the Fairbairns encouraging them to donate to their Fidelity DAF before the end of 2017. Tr. Ex. 1524.

37. The next day, Dennis Hearst, the Fairbairns' J.P. Morgan contact, similarly emailed the Fairbairns encouraging them to donate to their J.P. Morgan DAF in 2017. Tr. Ex. 1669. Mr. Hearst attached a three-page brochure entitled "Introducing the J.P. Morgan Charitable Giving Fund." That brochure informed the Fairbairns that when donating securities to J.P. Morgan's DAF: "*You have the flexibility to: . . . Advise on the timing and rate at which the donated securities are liquidated, particularly with less liquid, complex assets (e.g., privately held stock)*." Tr. Ex. 1671 at FRBN00008670 (emphasis added). Because the Fairbairns' owned very large positions in small- and micro-cap companies, many of their public stock holdings were illiquid.

38. On December 19, 2017, Ms. Fairbairn spoke with Dan Hooper, a FFOS trader, who emailed Mr. Kunz: "Emily wants you to call her this morning. She said to make this a priority. 2 questions: 1) If she wires $30mm-100mm into Donor Advised Fund, what is the rate schedule? Wants to be very competitive. 2) Can they invest the $30-100mm back into their own fund?"

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

1  Mr. Kunz responded the next minute: "Dude I've only emailed her 30 times on this. Including last

2  week. Thanks." Tr. Ex. 1552.

3      39.    Less than an hour later, Mr. Kunz wrote Ms. Mckeon and Mr. Sanders: "Anna, call

4  me when you can at 415-445-7954. I'm competing for $30-100 [million] in CGF. All those emails

5  and vms in the summer and even 2 weeks ago and now she calls on the 19th." Tr. Ex. 1551 at FID-

6  FRBN-0030514.

7      40.    Minutes later, Mr. Kunz forwarded Ms. Mckeon a year-old email exchange between

8  the two of them (dated October 25, 2016) in which Mr. Kunz had written about competing against

9  J.P. Morgan's DAF on flexibility: "one of the selling points is the possibility of additional flexibility

10  within her [Ms. Fairbairns'] CGF account." Tr. Ex. 1550.

11      41.    Later in the day, Mr. Casserino, messaged Mr. Kunz to let him know "we are trying

12  to get a serious pricing exception for this to come through" and to ask him "1. do you know what

13  assets she's [Ms. Fairbairn's] considering contribution [sic] (cash, stock, hedge fund interests)? 2. is

14  she aware that we can hold up to 50% of the total portfolio in her hedge fund? What is she expecting

15  either way." Mr. Kunz replied: "i think just cash at the moment[.] i sent her the document 6 months

16  ago that says up to 50% in a HF." Tr. Ex. 0940.

17      42.    Mr. Kunz, Mr. Casserino, Ms. Mckeon, and Mr. Brooks prepared that day for a call

18  scheduled with Ms. Fairbairn to discuss the potential donation. Mr. Kunz circulated an electronic

19  calendar invitation to that group. In the invitation body he included a "Rough outline to prep for the

20  call," writing "She [Ms. Fairbairn] is very short and to the point. Appreciate the opportunity to earn

21  her business. . . ." Tr. Ex. 1574.

22      43.    When Ms. Fairbairn did not dial in to the call, Mr. Kunz emailed his team: "Thanks

23  all. I'm sorry she was unavailable. Unfortunately this is her pattern. Gives us one more bargaining

24  chip to win the business." Tr. Ex. 1544 at FID-FRBN-0029563. Minutes later, Ms. Fairbairn called

25  Mr. Kunz directly. Mr. Kunz emailed Ms. Fairbairn a recap of their conversation: "Hi Emily, I'm

26  glad we were able to connect this afternoon. . . . I went up the ladder and got you the absolute lowest

27  rate available. Administrative fee would be **0.08%**... JPM is typically 0.20%[.] Investment fees-

28

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

index funds are lower than JP Morgan AND Vanguard… for example Fidelity Total Market is only 0.015%." Tr. Ex. 0721 at FID-FRBN-0005792 (emphasis added).

44.     Mr. Kunz quickly forwarded that recap to Mr. Casserino, Mr. Mckeon, and Mr. Brooks, adding that "She just called me back. Acupuncture appointment was running over… here's what I sent her and I'll follow-up with her later this week. She seemed very keen on bringing us the business. She said she is considering Vanguard so I shot them down pretty quickly. Besides, she has no relationship there…" Tr. Ex. 0677 at FID-FRBN-0029522. Although Mr. Kunz was able to shoot down Vanguard, he was unable to shoot down J.P. Morgan (the only other competitor mentioned in his email) because Ms. Fairbairn did have a relationship there, about which Mr. Kunz was well aware.

45.     Mr. Kunz next emailed Ms. Mckeon and Mr. Brooks about the topic of carried interest: "Carried interest- still just giving it away? Nothing else they [the Fairbairns] can do as a HF manager, correct? Anything we have published?" Tr. Ex. 1546 at FID-FRBN-0030467. Mr. Brooks replied that evening: "I'll get you something on carried interest- it is heavily dependent on structure. I'll send you something shortly- Amy's colleague- Ryan Boland has the most knowledge on the matter and we can loop him in tomorrow morning if need be." *Id.*

46.     Three days later (on December 22), Mr. Kunz followed up with Ms. Fairbairn, writing "Emily, I left you a voicemail on your cell as a follow up. Year end is approaching so I wanted to see if we can be of help. If you are considering moving the carried interest that can take some time. Otherwise cash wires are accepted until December 29th, last business day of the year (prior to 1pm PST)." Tr. Ex. 0063 at FID-FRBN-0005776.

47.     The same day, Mr. Kunz, Ms. Fairbairn, and Mr. Boland had a phone call about how a donation of carried interest could potentially work. After the call, Mr. Kunz updated Mr. Brooks and Ms. Mckeon: "Ryan and I just spoke to her. She will talk to her husband and get back to us. *If nothing else, she will do public securities next week.*" Tr. Ex. 0071 at FID-FRBN-0029406 (emphasis added). Mr. Brooks responded, "Great. *Thanks for pushing for the tax efficiencies with her Justin* and being available Ryan. Hopefully, put seeds in place for more planning on giving side." *Id.* (emphasis added).

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

48. Also on December 22, Ms. Mckeon wrote Ms. Chaisson concerning Mr. Kunz's efforts to secure a donation of carried interest, expressing concern about Mr. Kunz's honesty. In the words of Ms. Mckeon "he seems a little smoke and mirrors." Ex. 0707 at FID-FRBN-0030875.

**H.** **On 12/27/17, the Fairbairns Begin Communicating with Fidelity Charitable About Potentially Donating Millions of Shares of WATT Stock.**

49. As Fidelity Charitable was well aware, one of the Fairbairns' major holdings in appreciated public securities was Energous Corporation (which trades under the ticker WATT), a wireless charging technology company in which they were early-stage investors. *See, e.g.*, Tr. Ex. 1517 at FID-FRBN-0005081 (internal report noting "[o]ne of their largest positions is in Energous Group – Ticker: WATT").

50. On December 26, 2017, after the close of trading for the day, the FCC approved Energous' primary product for sale to consumers.

51. The next day, the FCC approval caused its stock price to rise sharply. Around 4 p.m. ET on December 27, 2017, Ms. Fairbairn called Mr. Boland (with whom she had recently been discussing a potential donation of carried interest) and informed him of the Fairbairns' desire to donate their WATT shares. Tr. Ex. 0682 at FID-FRBN-0029421.

52. Shortly thereafter, Mr. Brooks updated the Fidelity Charitable team on this development: "she just called Ryan to donate shares of WATT[.] Ryan turned process to Kyle who is working on donation. They own 2mm shares and may be gifting all of it, will know how much shortly. It is a $24 stock." Tr. Ex. 0682 at FID-FRBN-0029421.

53. News of the potential donation generated tremendous excitement within Fidelity Charitable. Eileen Bird, the highest-ranking executive in Fidelity Charitable's fundraising department, for example, replied to Mr. Brooks' email in all caps: "WOWZA." Tr. Ex. 1540 at FID-FRBN-0029354.

54. As soon as Fidelity Charitable learned that the Fairbairns might donate their Energous shares, its employees jumped into overdrive, trying to get the Fairbairns to sign on the dotted line that same day. The Fairbairns, however, would not commit to making the donation until they were certain their donated stock would be handled as they wanted. Accordingly, building on

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

conversations from the preceding two years, the Fairbairns had a series of phone calls and email exchanges with Mr. Kunz to confirm that their expectations would be met. And the Fairbairns did not commit to donating *any* shares until the afternoon of the following day, December 28.

55. Most of the Fairbairns' concerns about donating appreciated stock had been raised in prior conversations with Mr. Kunz. Those issues were thus easy to address quickly. Because year-end was fast approaching and the share price of WATT was still skyrocketing, however, the Fairbairns had an additional concern that had not been previously discussed: how the precise timing of the donation would affect the fair market valuation of the shares for tax purposes. This issue thus became a central focus of discussion on December 27.

56. Shortly after Mr. Boland's call with Ms. Fairbairn, the donation process was turned over to Kyle Casserino, who in turn brought Mr. Kunz back into the loop. At 4:19 p.m. ET, Mr. Casserino messaged Mr. Kunz and asked if he had "a moment to chat about Fairbairn[.] wants to move over a decent chunk from a FFOS account or JPM." Mr. Kunz said "yes" and gave Mr. Casserino his phone number. Tr. Ex. 0947. The two then spoke about the WATT donation, and at 4:30 p.m. ET, Mr. Casserino sent Mr. Kunz instructions for transferring funds to the DAF to pass on to the Fairbairns. Tr. Ex. 0073.

57. Mr. Kunz then spoke with Ms. Fairbairn over the phone. As reflected in follow-up emails, Ms. Fairbairn explained her concern about donation timing to maximize the fair market value of the shares. In particular, it was not clear how the fair market value would be calculated under certain specific scenarios (*e.g.*, if the donation was made after hours). She was accordingly focused on how much she could control the timing of the donation to ensure the highest possible fair market value.

58. At 5:30 p.m. ET, Mr. Kunz emailed Ms. Fairbairn a preliminary answer to her questions about timing and fair market value: "Hi Emily, I included the deadlines in my Friday email below but our conversation quickly shifted from private security (carried interest) to public security after WATT's performance today. . . . For WATT shares already here at Fidelity, we can take the instructions all the way into the weekend. We can send you the form at any time for this. You can even send in the form after hours tomorrow or Friday and still receive the same day high/low FMV

777 S FIGUEROA ST, STE 3850

STRIS
MAHER

LOS ANGELES, CA 90017

1   for pricing." Tr. Ex. 0717 at FID-FRBN-0005768. He then had another phone call with Ms. Fairbairn

2   in which they discussed the donation further.

3        59.    Although he had not yet provided a complete answer to the Fairbairns' questions, Mr.

4   Kunz nonetheless continued trying to push the donation through on December 27. At 6:12 p.m. ET,

5   he emailed an employee of the Fairbairns' hedge fund (copying the Fairbairns) to provide

6   instructions on moving shares at other institutions to Fidelity Charitable: "*Per Emily's permission*

7   here are the DTC instructions to move the shares from JPM directly into the Fidelity DAF."

8   Tr. Ex. 0718 (emphasis added).

9        60.    Ms. Fairbairn replied to Mr. Kunz at 6:26 p.m. ET to reiterate that before moving

10  forward, she still had questions about the timing of the donation for tax purposes: "I would like

11  some control as to when it gets priced. Meaning which date it hits within a 1-2 day window. But it

12  means millions for us." *Id.*

13       61.    Shortly thereafter, at 6:42 p.m. ET, Ms. Mckeon escalated the question about timing

14  and fair market value to Elaine Martyn, the Managing Director of the Private Donor Group, (Tr. Ex.

15  0180 at FID-FRBN-0029223), saying: "Hi! Re: Fairbairn, she's very concerned about how we're

16  going to calculate the FMV for her gift. I explained to Justin how we calculate FMV for

17  contributions we receive paperwork for over the weekend (it's blended), but she's seeking something

18  more official then [sic] my reassurance. . . ." Tr. Ex. 0683.

19       62.    As the evening progressed, Fidelity Charitable continued trying to get the Fairbairns

20  to make the donation official that day. At 7:22 p.m. ET, Christian Fernandez, a Client Services

21  Manager at FFOS, emailed the Fairbairns (copying Mr. Kunz), writing "Hi Malcolm, I just emailed

22  you the charitable form to transfer All WATT shares from the Valley High account to the Charitable

23  account. Please complete by Docusign." Tr. Ex. 0719.

24       63.    Ms. Fairbairn replied two minutes later, at 7:24 p.m. ET, confirming that they would

25  not yet be making the donation: "We sign it and tomorrow we decide if it will happen tomorrow or

26  Friday. Just confirming this so there is no confusion." Tr. Ex. 0833. Mr. Fernandez emailed back to

27  confirm that he understood.

28

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

64.     The evening closed with another phone call between Mr. Kunz and Ms. Fairbairn.

65.     Despite Fidelity's pushing, the Fairbairns did not sign any contribution form or otherwise move any Energous shares to Fidelity Charitable on December 27.

**I.     On the Afternoon of 12/28/17, the Fairbairns Donate Nearly $61 Million of WATT Stock Relying on Representations Made by Mr. Kunz.**

66.     The donation discussions continued on the morning of December 28 with further phone calls between Mr. Kunz and Mr. Fairbairn.

67.     In the course of his conversations with the Fairbairns on the 27th and 28th, Mr. Kunz made four explicit promises about how Fidelity would handle the Fairbairns' donated stock: (1) Fidelity would use sophisticated, state-of-the-art methods for liquidating the shares, (2) Fidelity would not exceed 10% of trading volume, (3) Fidelity would allow Mr. Fairbairn to advise on the liquidation, including price; and (4) Fidelity would not sell any shares until the beginning of 2018.

68.     The first three promises simply reiterated points that the Fairbairns had previously discussed with Mr. Kunz. The final promise was designed to allay the Fairbairn's new concern about donation timing and fair market value.

69.     With respect to the final promise, Mr. Kunz testified under oath that, far from promising the Fairbairns that no trading would occur until the new year, he in fact told them "trading can ultimately begin immediately" when the shares are received. Kunz Dep. 251:17-21. When asked, "And how did Emily respond?" he testified that "[s]he – I don't quite recall how she responded." *Id.* at 251:23-24. And when pressed on the matter—"She didn't express any concern that the shares could be immediately liquidated?"—Mr. Kunz's sworn testimony was: "I told her that we typically don't exceed more than ten percent of daily volume and there wasn't a strong objection to that." *Id.* at 251:24-252:4.

70.     Mr. Kunz's testimony on this issue is simply not credible. The contemporaneous email record shows that Ms. Fairbairn would certainly have had a strong objection if Mr. Kunz had told her that the WATT shares might be fully liquidated upon their donation. *E.g.*, Tr. Ex. 0718 ("I would like some control as to when it gets priced. Meaning which date it hits within a 1-2 day window. But it means millions for us.").

18

71. Fidelity Charitable argues that the Fairbairns' recollection of the promises is insufficiently specific to establish that they were made. The Court disagrees. The Fairbairns' testimony establishes that Mr. Kunz made four specific promises, the meaning of which both the Fairbairns and Mr. Kunz understood.

a. To give just one passage of Mr. Fairbairns' testimony about the promises and the parties' shared understanding, consistent with his deposition:

> Justin Kunz told me that – and these are the representations that he made that I relied upon – you know, all these were commonsensical. They made sense. And I don't think they were inconsistent with what the objectives were and what the incentives were for anybody.
>
> So first was – is, is that he said that they wouldn't trade until the first of the year – trading wouldn't begin until the first of the year, which we were scrambling just to get shares in, and the entire emphasis was on just be able to get the donation. It made 100 percent sense to me that the dona- – that trading wouldn't start until the first of the year.
>
> The second one is, is that Fidelity Capital Markets is going to trade the stock. They trade for the mutual fund. They're expert traders. They use best-proven practices. They're – they're knowledgeable, expert traders; and that they know how to trade, utilize sophisticated programs; and they absolutely know what they're going to do.
>
> He promised, in this context, that they would be gentle with the stock. And those are the words, "I'll be gentle. You know, we're not going to damage the stock because we know you have existing holdings in there and we do not want to hurt your stock"; so –
>
> He also said that – you know, when we were going through it is, is that, you know, I know that – and I would come back, like, existing holdings, like, "Oh, you know we won't trade more than 10 percent. You know, our traders, specifically since the advent of all the high-frequency trading, have been recommending you have to go at 5 percent. You know, I prefer 5 percent." He goes, "You know we have to sell the stock?" And I go, "I know that." And he goes, "You know it's irrevocable?" I go, "I know that." And he told me that, "Yeah. Our policy is that we never sell more than 10 percent of volume."
>
> And then, you know, he – during the process earlier – and a lot of this is things that we'd talked about over the last couple of years when they were in prospecting mode, and we were just asking a lot of, you know, questions about how the trading is going to be done, what the resources were. And so a lot of this was just a confirmation of things that they'd already told us. And everything kind of made sense.
>
> So, you know, the last one – and how this came up is, is that during the prospecting meeting that they were having – is that – or, sorry, prospect – when they were prospecting us – and this was either calls

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS
MAHER

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

1    or meetings or in there – is that we were talking through, you know,
     all of – all of Fidelity's capabilities and what they can and can't do.
2    And I was becoming more familiar with what the DAFs are.

3    And so, you know, they said – and it's during these calls, you know, I
     – there's three things I remember early on about it. One is I go, you
4    know, Emily is a very passionate person, loves to have a lot of
     influence. And she does not want – if we donate stock, we don't want
5    to damage the price of the stock afterwards because she cares deeply
     about these companies.
6
     And, you know, it – so – and the response were – was that I
7    remembered, alleviated a lot of my concerns is, like, "Capital markets
     will trade for it. They're expert traders. They trade for the mutual
8    fund."

9    And that was, you know, like, to me makes sense. I mean, they would
     trade, like what we would do. They would be soft, gentle. They know
10   how to liquidate blocks.

11   And my expectation is that it may take a long period of time. And they
     offered up – and you can consult on what price would be or you can –
12   you can provide – you can consult. They go, you know, "We have
     control, but you can provide some consultation."
13
     So, you know, I just – then the last thing is, like, I go, you know, "If
14   necessary, you know" – and I never – I did not think we'd have the
     volume that we would have. And I always thought that this would a
15   month's sort of process in liquidation, yeah, but that we would end up
     – you know, there would be – I'd be kept in the loop and that we would
16   – could provide some advice on – on how it's being liquidated; but,
     you know, at least we'd – we would communicate – if – if you are
17   going off of and not trading at 10 percent of volume, we'd be kept in
     the loop. And it would – just wouldn't be done on a knee-jerk reaction
18   at the last minute. So what I said is, is that, "Keep me in the loop."
19
     On the last thing, I go – I go, "Keep me in the loop. If we need to make
20   a modification, let me know." "Okay."

21   All these are short. I – these are trading talks. These – these are short
22   conversations.

23   Malcolm Fairbairn Dep. 12:12-16:18.

24          b.      When asked specific follow-up questions regarding the advice promise, Mr.

25   Fairbairn testified, again consistent with his deposition:

26          It was either "consult" or "advise." . . . My – what my understanding
            was, is that the words "consult" and "advise" would be used – in
27          context of the DAF is, is that you consult on where the donations go.
            They're not technically yours, but it's a fine line between whether they
28          are or aren't.

                                          20
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
                    Case No. 3:18-cv-04881-JSC

STRIS
MAHER

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

1    You – you do have control, but you don't have control. And that you
2    can advise on where the money is going to be donated, and it is
     donated where you say it's going to be donated even though it is not
3    your money; and, you know, like, you can advise on where it is
     invested in even though it's not your money.

4    You can be in mutual funds. You can be in the market. You can be in
     indexes. And you then – you know, to me because – you know, I know
5    at JPMorgan, we had –you know, they told us that, you know, like,
     you can hold stuff for a reasonably long period of time and liquidate
6    at a later date.

7    You can also provide some advice. It's Fidelity's decision, but they
     can provide some advice on just, you know, the – how quickly things
8    are – are liquidated. They may or may not take it. And it's clear that it
     was going to be sold to me; but, you know, like, you're kept in the
9    loop and you can provide some advisement.

10   *Id.* at 18:18 - 19:21.

11         c.      When specifically asked whether Justin Kunz used the words "price limit,"

12   Mr. Fairbairn testified: "He said that we could consult. And I don't know whether it was

13   'price' or, you know, 'price limit,' but it was – that was my understanding, that he would

14   advise – advise, and that would include price, and I would be kept in the loop." *Id.* at 92:9-

15   24.

16         d.      When asked further questions about the sophistication promise, Mr. Fairbairn

17   explained:

18   I – there are certain words that I remember he said. I can tell you the
     meaning of what he said. But if you're asking for exact words, exact
19   words was, "We will be gentle with the stock. We're not going to harm
     your – your existing positions." Those were his words. And they trade
20   for Fidelity Capital Markets. I know those words. The rest of the
     words connotate meeting, and I cannot tell you exact words, tell you
21   what he said and what he – what I thought he meant. But those are his
     words.

22

23   . . . .

24   What I said was that all of the words that he used describes somebody
     that sophisticated using state-of-the-art system that is an expert. If you
25   are trading for Fidelity Capital Markets you are using the algorithms.
     You know how to use it. You have your institutional expertise on
26   liquidating blocks that is implicit in that. So can I tell you that he used
     the word "sophisticated"? He used things that described sophisticated
27   to me. Do I tell you like, "We only use state-of-the-art"? I can't say
     that he did that. But the words that he used described state-of-the-art
28   during the discussions. So, I mean, we're nuancing over like, you
     know, did he use an exact word. I know the meaning of the words, but

21

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

not the exact words that he would have used.

*Id.* at 47:16 - 49:2.

    e.    Ms. Fairbairn testified, consistent with her deposition: "He said that they would trade less than ten percent of volume; he also said that they would be sophisticated methodology, and they would be very careful; and lastly, they would not start trading until the new year." Emily Fairbairn Dep. 12:7-11.

    f.    When asked about why she did not feel the need to get Mr. Kunz's promises in writing, she explained: "They – they are common knowledge to investment professionals like us. . . . [I]t's common sense." *Id.* at 148:16-20.

    g.    And when pressed about whether it is common sense not to trade until the new year, Ms. Fairbairn explained:

> Okay. So I need to clarify. Thank you for bringing that up. I don't believe not trade till January is common sense, but given what we were doing to move shares, the speed of which we're moving stuff around, that would be intuitive to people that – no one would take almost two million shares of stock, unload it on the marketplace in a couple of hours in four different orders and crash the stock. So most people would not be suspicious of that type of activity and have to document that you wouldn't do this kind of preposterous thing to anyone's stock.

*Id.* at 149:13-24.

    h.    Ms. Fairbairn also further explained the shared understanding about Mr. Kunz's promise that Fidelity would not trade more than 10% of volume:

> Again, in my business, because we're professional investors, when you say "ten percent of the daily volume," you don't mean you're coming in the last two hours and 75 percent or 90 percent or 80 percent, any other percentage doesn't count. It means relative to the volume left. So you can't come in in the last ten minutes of a trading day and say, you know, "This is traded at a hundred million shares; surely I can trade ten million shares."

*Id.* at 174:5-14.

72.    In reliance on Mr. Kunz's promises, the Fairbairns finally pulled the trigger on the donation on the afternoon of December 28. Mr. Fairbairn signed three letters authorizing WATT shares custodied at Morgan Stanley to be transferred to the Fairbairns' Fidelity Charitable DAF. The first letter was transmitted to Morgan Stanley at 2:00 p.m. ET, and the second two letters were

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017
S T R I S
M A H E R

transmitted to Morgan Stanley at 4:26 p.m. ET. And that evening, at 6:53 p.m. ET, Mr. Fairbairn signed a Fidelity Charitable Contribution Form and Letter of Instruction authorizing the WATT shares custodied at Fidelity to be transferred to the Fairbairns' Fidelity Charitable DAF. Tr. Ex. 0832 at FID-FRBN-0002812.

73.     Many of the Fairbairns' WATT shares were currently on loan, and it was necessary for Fidelity and Morgan Stanley to recall those shares before they could be donated. As a result, only 700,000 shares were actually donated on December 28, with the remaining shares received on December 29. Mr. Kunz memorialized the status of the donation in an email to Mr. Casserino and Ms. Mckeon at 4:06 p.m. ET on December 28, 2017, noting that as of market close on December 28, the total fair market value of the Fairbairns' shares was approximately $61 million:

> **WATT**
>
> 700,000 shares delivered today- Anna confirmed
>
> 918,123 shares to be delivered tomorrow from MS [Morgan Stanley]
>
> 313,862 shares to journal from FFOS account tomorrow
>
> ***TOTAL***: *1,931,985 shares at approximately $31.57 = $61m today*

Tr. Ex. 1541 at FID-FRBN-0029484 (emphasis added).

74.     Fidelity Charitable's employees were ecstatic that such a large donation had been landed. When the first 700,000 shares came in, for example, Ms. Mckeon and Mr. Casserino had the following exchange:

> Mckeon: 700,000 WATT in for Fairbairn!! - $22M
>
> Casserino: :)
>
> did that hit our account already?
>
> Mckeon: it's in the houzz account
>
> Casserino: nice!!

Tr. Ex. 0951 at FID-FRBN-0029467.

75.     Mr. Kunz similarly touted the achievement, writing at 7:26 p.m. ET [?] the next day: "You have no idea what I've done this week. Moved $100m . . . to cgf. All new $$ to Fido. It was insane. . . ." Tr. Ex. 0111 at FID-FRBN-0030074.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

**J.** **On 12/29/17, Fidelity Charitable Sells All the Fairbairns' Donated WATT Shares (8.6% of the Company) in 154 Minutes for $44 Million.**

76.    Once it became clear on December 28 that the donation was in fact coming, Fidelity Charitable's investment team began discussing how the shares would be liquidated. That afternoon, Daniel Bergschneider, a manager on the investments team, spoke with Mr. Brooks and Michael McLean, who would be instructing Fidelity Capital Markets on the liquidation of the WATT stock. After that call, at 3:48 p.m. ET, Mr. Bergschneider emailed senior Fidelity Charitable executive Stefan Podvojsky, copying Mr. McLean: "Stefan, Just wanted to give you an update from our call with Steve Brooks about those shares of WATT: . . . Upon receipt of shares by CGF, we would likely need to sell down over a few days due to liquidity. Steve understood." Tr. Ex. 0292 at FID-FRBN-0029325.

77.    In other words, as of market close on December 28, Fidelity Charitable believed the liquidation would take multiple days given the number of shares being donated compared to the trading volume. The Fidelity Charitable team thought so even though *42 million shares* of WATT were traded on December 27, 2017, and *44 million shares* of WATT were traded on December 28, 2017. Tr. Ex. 1356 (Fidelity's WATT volume summary); Tr. Ex. 1254 (volume data).

78.    Fidelity Charitable's belief on December 28 that the sell-down would need to occur over time due to liquidity concerns reflected its longstanding policy to "liquidate[] stock as quickly as possible, without having a detrimental effect on the stock price." Tr. Ex. 205 (2009 Fidelity Charitable liquidation policy document); *see also id.* (Fidelity Charitable will "act responsibly in liquidations so as not to adversely affect the market price of the security."); McLean Dep. 64:13-20 ("When stock is donated to Fidelity Charitable, in your view, does Fidelity Charitable have an obligation to liquidate it in a manner that does not adversely affect the price? A. Yes.").

79.    What actually happened on December 29, however, was something very different.

80.    At 9:25 a.m. ET on December 29, 2017, Michael McLean sent Gerry Celano, the trader who would be executing Mr. McLean's instructions, a message stating: "You may see a large block of WATT today. Please be nowhere [*i.e.*, do not sell the stock without contacting Mr. McLean

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

first]. Let me know when you see it." Tr. Ex. 0213 at FID-FRBN-0030138[1]; McLean Dep. 176:5-12. The message was sent in a Bloomberg chat session that Mr. McLean and Mr. Celano used to correspond that day. Josh Johnson, a senior analyst on the investments team, also participated in that chat.

81.     At 10:51 a.m. ET, Mr. Johnson emailed Mr. McLean, writing: "I don't think there's an immediate rush [to begin selling]. Getting sale approval or not shouldn't affect the gift being effective today." Tr. Ex. 0978 at FID-FRBN-0033192.

82.     Mr. Johnson's mention of "[g]etting sale approval" referenced Fidelity Charitable's belief that, before it could liquidate any WATT shares, it needed to confirm that the Fairbairns did not own 10% or more of WATT's total shares, in which case certain restrictions would apply to the selling. Tr. Ex. 0978 at FID-FRBN-0033192. Mr. Johnson was thus suggesting that the goal should be to ensure the gift was effective as of December 29, rather than "immediate[ly] rush[ing]" to sell the shares.

83.     At 12:59 p.m. ET, Mr. McLean messaged Mr. Celano: "WATT shares may be heading over soon." Tr. Ex. 0213 at FID-FRBN-0030140. Mr. Johnson added that the WATT shares "will probably come as two orders since we received the tranches on separate days. 700k and 525k." *Id*.

84.     At 1:18 p.m. ET Mr. Celano wrote: "I have the first 700K WATT." *Id*.

85.     A minute later, Mr. McLean instructed Mr. Celano, "Ok let's TWAP until 3:30," meaning that for the first 700,000 WATT shares Mr. Celano would seek to get a time-weighted average price (TWAP) from the time the order was given (1:19 p.m. ET) until 3:30 p.m. ET, half an hour before market close. *Id*. Mr. McLean instructed Mr. Celano to do the "[s]ame when you get the other tranche" of 525,000 shares—i.e., seek to get a time-weighted average price (TWAP) until 3:30 p.m. ET. *Id*.

---

[1] Except where otherwise noted through the use of brackets and ellipses, Plaintiffs have reproduced emails, chats, and other documents with any typos found in the original. Plaintiffs have not included [sic] indications to avoid distracting from the original text.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

86.     At 1:53 p.m. ET, Mr. Celano confirmed that he was selling both tranches, "1,275,000" shares. *Id.* at FID-FRBN-0030141. Mr. Johnson replied: "We believe there's another 318k coming, possibly 343k on top of that as well." *Id*. at FID-FRBN-0030142.

87.     One minute later, Mr. Celano warned Mr. McLean that their liquidation of the WATT shares could be driving down the stock price: "ok, we may be pressuring a bit." *Id*.

88.     When Mr. Johnson asked for clarification about whether Mr. Celano meant they were pressuring "[w]ith the current pace or if we were to try and add those extra tranches?," Mr. Celano replied: "curremtly a bit. [T]he added will not help." *Id*.

89.     In an attempt to alleviate some of the downward pressure, Mr. McLean then directed Mr. Celano to extend the time over which the shares were sold by 15 minutes. He messaged: "stretch our current [orders] to 3:45 then. Maybe ease some down pressure". *Id*.

90.     Shortly after Mr. Celano told Mr. McLean that their selling was affecting the stock price, at 2:11 p.m. ET, Mr. Brooks emailed Mr. McLean: "Seems like with this much- that is a big chunk of the volume on a pretty negative day, wonder how much of that negative is causal to our selling- are we trying to sell everything today? Not questioning anything. Just curious." Tr. Ex. 0320 at FID-FRBN-0033720.

91.     Despite Mr. Celano's warning that they were already pressuring the stock price and that adding more shares later in the day would exacerbate the problem, Mr. McLean responded to Mr. Brooks: "The stock was down 21% before we received the go ahead to sell so not caused by our selling. It recovered about half of that and *we're just selling in line with volume*. Our order will be about 6% of the volume. ***We will not hold these shares on the speculation that the price may improve next week.***" Tr. Ex. 0219 at FID-FRBN-0033097 (emphasis added). Mr. Brooks replied: "Got it. Makes sense. Just wondering what out volume cut would be." Tr. Ex. 1152 at FID-FRBN-0033535.

92.     In truth, Mr. McLean was not "selling in line with volume." Fidelity maintains a basic, two-page guide to using trading algorithms, which explains that if a trader wants "[t]o trade in line with volume when you are unsure about the stock's short-term direction" (i.e., when the trader does not want to speculate on price), then the trader should use an approach called "Percent

of Volume." Tr. Ex. 1563 at FID-FRBN-0031428.

93.     McLean, however, had directed Celano to use a strategy called "TWAP," or time-weighted average price, rather than Percent of Volume. The TWAP strategy simply divides the order up evenly over a set period of time and sells everything. *Id.* To avoid exceeding a certain volume threshold using the TWAP strategy (*i.e.*, to sell in line with volume), the trader would need to impose a "Max Participation Rate" limit. *Id.* Yet McLean did not instruct Celano to impose any such limit here.

94.     About an hour after Mr. McLean's exchange with Mr. Brooks, Mr. Bergschnider messaged Mr. McLean to tell him to stop emailing Mr. Brooks: "[I] spoke with stefan . . . he just asked no more back and forth . . . he is responding to our emails back and forth w/ brooks." Tr. Ex. 0993 at FID-FRBN-0033367. Mr. McLean replied: "we just won't respond." *Id.*

95.     At 3:31 p.m. ET, Mr. Celano told Mr. McLean that he had received a third tranche of 313,682 WATT shares. At this point, the first two orders still had 14 minutes until they were finished. Tr. Ex. 0216 at FID-FRBN-0030144. Two minutes later, Mr. McLean asked Mr. Celano: "Can you sell them all into the bell [*i.e.*, until the close of market 27 minutes later]?" *Id.*

96.     At 3:46 p.m. ET, Mr. Celano told Mr. McLean that "WATT got another 343,123," meaning he had received a fourth tranche of WATT shares. *Id.* at FID-FRBN-0030145.

97.     At 3:47 p.m. ET, with thirteen minutes until the close of market, Mr. McLean asked Mr. Celano "Can we sell into the bell? Is there volume?" *Id.* Before Mr. Celano could answer, Mr. McLean continued: "Hopefully we'll get a favorable pairing on the close." *Id.*

98.     One minute later, Mr. Celano responded: "nasdaq… we're flying blind. you want to put a chunk there anyway?" *Id.*

99.     Mr. McLean replied: "yes." *Id.*

100.    At 4:01 p.m. ET, immediately after the close of trading for the day, Mr. McLean messaged Mr. Celano that he was "afraid to ask for the WATT details. But we had to get it sold." *Id.*

101.    Celano replied: "ugly." *Id.*

102.    At 4:07 p.m. ET, Mr. McLean emailed Mr. Bergschneider, Mr. Johnson, and Mr. Podvojsky to tell them that he had sold all the WATT shares and that: "We were about 13% of the

27

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

volume from the time we received the first tranche." Tr. Ex. 0217 at FID-FRBN-0030951. In fact, Fidelity's sales represented 15.3% of the trading volume during the time it was selling. Tr. Ex. 1744 at p. 40. Mr. McLean admits that he did not instruct Mr. Celano to place any participation-rate limits on any of the orders even though he was familiar with such limits and had used them in the past. McLean Dep. 249:22-24 ("Q. Do you know what that means -- to place a participation rate on the VWAP? A. Yes."); *Id.* at 251:7-10 ("Do you ever use participation rates when Fidelity Capital Markets is trading stock on behalf of Fidelity Charitable? A. Yes."); *Id.* at 249:25-250:2 ("Q: And was there a participation rate on the VWAP orders that were entered for the WATT stock? A. No.").

103.     Mr. McLean and Mr. Celano sold the WATT shares in four separate orders using TWAP and VWAP trading algorithms. Between 1:31 p.m. ET and 3:30 p.m. ET, the first two of those orders were running simultaneously. At 3:30 p.m. ET, a third order was added, meaning that between 3:30 p.m. ET and 3:45 p.m. ET, three orders were running simultaneously. The first two orders were completed at 3:45 p.m. ET. At that time, a fourth order was added, meaning that between 3:45 p.m. ET and 4:00 p.m. ET, two orders were running simultaneously. Tr. Ex. 1744 at pp. 35-36.

104.     During Fidelity's selling, the share price of WATT decreased 30%, from $27.93 when Fidelity began selling to $19.45 when the final order was complete. Tr. Ex. 1744 at p. 8.

### K.     On the Same Day, Fidelity Charitable Honors Instructions from Another Donor About the Liquidation of Donated PZN Shares.

105.     On the same day that Mr. McLean and Mr. Celano sold all 1.93 million WATT shares in just 154 minutes, they were also trading shares in a donated security known as PZN. Unlike the with the WATT liquidation, however, they took pains to avoid selling an excessive amount of volume and to ensure they were abiding by the donor's wishes about how the stock would be liquidated.

106.     At 8:52 a.m. ET on December 29, on the same chat thread in which they would later discuss the WATT liquidation, Josh Johnson wrote to Mr. McLean and Mr. Celano: "Can we get some calls out on the PZN position?" Tr. Ex. 0213 at FID-FRBN-0030137-38.

107.     At 9:02 a.m. ET, Mr. Celano responded: Go[o]d morning Josh. Yes." *Id.* at FID-FRBN-0030138. This meant that Mr. Celano would look for opportunities to sell the PZN shares that had been donated to Fidelity Charitable.

108. At that point, Mr. McLean reminded Mr. Celano that "Like previous PZN orders, we can carry this…..for months if we have to." *Id.*

109. Mr. Celano then asked whether Mr. McLean "ha[d] an 'I would' price," meaning a price at which he would be willing to sell the PZN shares. *Id.*

110. Mr. McLean immediately responded: "I don't….this donor likes the order to be worked so the I would price would be a very very short haircuit." *Id.* In other words, Mr. McLean was basing his decision about the price he would accept for the PZN stock based on what he knew to be the donor's preferences. *Id.*

111. Mr. McLean also made clear that, because of his concerns about trading too much volume of the PZN stock, he was "hesit[a]nt to put the entire block out at once." *Id.*

112. The same donor had previously donated shares of PZN in 2013, and he had expressed displeasure with how much volume Fidelity had traded in its liquidation of the donated stock, writing to Ryan Boland, "I'm really surprised I haven't heard back from you. I really thought Fidelity would treat this relationship in the manner that you advised when we first made the contribution. Shown below is my analysis of the trading activity. . . ." Tr. Ex. 1070. The donor's email continued by detailing that Fidelity had traded 38% of the volume in the previous 10 days. *Id.* The donor closed by saying: "Our continuation in this program is contingent on your treating these assets with the care that you seemed to indicate when we originally made our contributions." *Id.*

113. Mr. Boland responded to that email by confirming that the donor's expectations would be met going forward: "*Our trader has been directed to sell no more than 10% of average trading volume on any given day*. At all times, however, if our trader is able to find a single buyer interested in buying ALL our remaining shares at a good price, they will look to accomplish that sale. This is the same scenario and strategy as our large single sale last year. If you are aware of an investor interested in a high volume purchase, please let us know and we will be able to accomplish that large sale." Tr. Ex. 1076 (emphasis added). Mr. Boland continued: "Again, I apologize for these issues but I am confident everyone is now on the same page and we will be able to proceed with these lesser daily sales as referenced above." *Id.* He also informed the donor that "we remain open to your thoughts and concerns." *Id.*

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 LOS ANGELES, CA 90017

S T R I S | 777 S FIGUEROA ST. STE 3850
M A H E R | LOS ANGELES, CA 90017

114.     At deposition, Mr. Boland admitted that he had changed the trading strategy in response to the donor's concerns:

> Q. So [the donor] sent you an email . . . and he says that Fidelity's activity was 38 percent of the total trading volume in PZN, right?
>
> A. That's what it reports, yes.
>
> Q. And then you got an approval from someone at Fidelity Charitable to only sell to 10 percent or less of average trading volume, right?
>
> A. Yeah. I relayed the information that—the concerns and the information that he had, and I think the team looked at that and came to a conclusion that they would back off on the trading for a short period of time.
>
> Q. Well, what you told him was, "I got approval to only sell to the 10 percent or less of average trading volume level," right?
>
> A. That is what I typed, yes.
>
> Q. And that's true, right?
>
> A. That's my memory of it.

Boland Dep. 354:14-355:11; *see also id.* 353:21-354:4 ("Q. He was concerned that Fidelity Charitable was selling too much PZN, right? A. Yeah, selling too much—too many shares. Q. And then, after you received his email, you got an approval to only sell to the 10 percent right? A. . . . yes.").

115.     The same thing had not happened, however, with respect to the WATT liquidation. Contrary to Mr. Kunz's promises to the Fairbairns, Mr. McLean had liquidated all 1.93 million shares of WATT on December 29, accounting for more than 15% of the trading volume, misusing basic trading tools, and without even telling the Fairbairns the sale was happening.

**L.      On 1/2/18, the Fairbairns Ask About the WATT Liquidation but Are Stonewalled Until Mr. Fairbairn Politely Accuses Fidelity Charitable of Incompetence and Misrepresentation in a 1/15/18 Email.**

116.     On the first trading day of the new year, the Fairbairns had no idea the WATT shares had been liquidated on December 29. They knew, however, that Fidelity Charitable might have begun selling on January 2. They asked Mr. Kunz for an update.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

**January 2, 2018 (Tuesday)**

117. At 3:47pm ET, Mr. Kunz sent Mr. Brooks and Ms. Mckeon an email entitled "Fairbairn follow up." In it, he asked: "Do we have any updates for the selling of WATT and AGFS? They have both been volatile and client was wondering if we are able to determine." Tr. Ex. 0117 at FID-FRBN-0037372.

118. At 4:02pm ET, Mr. Brooks responded: "The selling was completed on Friday I believe. Anna [Mckeon] or Kyle [Casserino] will be able to send over net figure shortly." Tr. Ex. 0118 at FID-FRBN-0037368. It was true that the liquidation of WATT had been completed on Friday, December 29. None of the AGFS stock donated by the Fairbairns, however, had been sold on Friday, December 29. Tr. Ex. 0123 at FID-FRBN-0037240.

119. This was the first time anyone had communicated to Mr. Kunz that any of the WATT stock donated by the Fairbairns had been liquidated on December 29th.

120. At 4:05pm ET Mr. Kunz responded: "Great, thanks. *I thought we didn't sell more than 10% trading volume.*" Tr. Ex. 0119 at FID-FRBN-0037335 (emphasis added). Mr. Kunz was expressing his belief about Fidelity Charitable's policies and practices in liquidating donated stock. His use of the phrase "10% trading volume" was not qualified by the word "daily" and is best understood as meaning "10% of volume during the period when a donated stock is being liquidated by Fidelity Charitable." In this email, Mr. Kunz was expressing skepticism that the WATT and AGFS stock donated by the Fairbairns could have been liquidated on December 29, 2017 without exceeding 10% trading volume.

**January 3, 2018 (Wednesday)**

121. The next day, Ms. Mckeon sent Mr. Kunz details (in a simple chart) about the December 29th WATT liquidation and, in response to his asking, told him: "You can share this with the clients – thanks!" Tr. Ex. 0123 at FID-FRBN-0037240.

122. Mr. Kunz did not, however, share this information with the Fairbairns for another two weeks, claiming in his eventual email to Mr. Fairbairn (on January 17) that he had not sent the information sooner because he "was stuck to my bed with the flu." Tr. Ex. 0129. In the meantime,

S T R I S  777 S FIGUEROA ST, STE 3850
M A H E R  LOS ANGELES, CA 90017

777 S FIGUEROA ST, STE 3850
STRIS
MAHER
LOS ANGELES, CA 90017

1    he continued to communicate extensively with Fidelity Charitable colleagues to determine what had

2    happened with the WATT liquidation.

3    **January 5, 2018 (Friday)**

4         123.     Two days later, Mr. Fairbairn called FFOS and spoke with Christian Fernandez. His

5    1 minute 11 second call was recorded. Tr. Ex. 1539. The call recording makes clear that Mr. Fairbairn

6    had no idea that all of the WATT donated shares had been liquidated. Mr. Kunz simply had not told

7    him. *Id.*

8         124.     At 12:32 pm ET, Mr. Christesen (one of Mr. Fernandez's superiors) emailed Keita

9    Matsumoto and others within Fidelity Charitable: "We have a quick question on behalf of one of

10    our clients. The Fairbairns' donated shares of ticker: WATT to above referenced account on or about

11    12/31. Can you please confirm when and at what price the shares were sold?" Tr. Ex. 0528.

12         125.     At 12:44 pm ET, Mr. Kunz emailed Ms. Mckeon telling her to "disregard that email

13    [from Mr. Christesen]. Sorry for the duplicate, I was away just now when the client called so all

14    good." Tr. Ex. 0127 at FID-FRBN-0036950.

15         126.     Mr. Kunz did not forward the chart provided by Ms. Mckeon two days earlier or

16    provide any other details in writing to the Fairbairns. Instead, he called Mr. Fairbairn and had a brief

17    phone call about the WATT liquidation. At 1:44 pm ET, Mr. Kunz emailed Ms. Mckeon (ccing Mr.

18    Brooks) about that conversation. He wrote:

19
20             Also, he [Mr. Fairbairn] wasn't too pleased with the sell side. Said
            Charitable gave them a bad price by selling it at the end. I know we
            keep it under 10% but I thought we would at least extend it out. He
21             isn't pissed and said whats done is done but any further commentary
            here?

22 *Id.*

23         127.     At 1:50 pm ET, Ms. Mckeon forwarded Mr. Kunz's email to Mr. McLean and the

24    entire Fidelity Charitable investments team (ccing Mr. Brooks) writing: "Hi Mike (and investments

25    team) – for the sale of WATT last Friday for the Fairbairns, can you offer any additional commentary

26    about the liquidation?" Tr. Ex. 0588 at FID-FRBN-0033032.

27         128.     At 1:58 pm ET, Mr. McLean forwarded Ms. Mckeon's email to Mr. Bergschneider

28    writing: "Anna is asking for more detail. I know Stefan didn't want us sharing too much." *Id.* Mr.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

McLean was referring to an instruction from Stefan Podvojsky on 12/29/17, relayed by Mr. Bergschneider, to "stop sending execution/sell info to sales and PDG," including specifically "[Steve] brooks," Tr. Ex. 0993 at FID-FRBN-0033367, after Mr. Brooks had emailed Mr. McLean earlier on December 29 to explore whether Fidelity Charitable's aggressive selling was driving down the WATT share price. *See* Tr. Ex. 0320 at FID-FRBN-0033720.

129.    At 2:06 pm ET, Mr. Brooks forwarded Mr. Kunz's email (that Mr. Fairbairn "wasn't too pleased with the sell side," Tr. Ex. 0127 at FID-FRBN-0036950) to Mr. Casserino writing only "I knew this would come around." Tr. Ex. 0337 at FID-FRBN-0033730. Mr. Casserino responded to Brooks less than 20 minutes later: "Had to see this coming…" Tr. Ex. 0959 at FID-FRBN-0033689.

**January 8, 2018 (Monday)**

130.    The trend continued the following Monday, with Fidelity Charitable employees continuing to scramble for an explanation of what happened with respect to the WATT liquidation, but not sharing any information with the Fairbairns.

131.    At 9:31 am ET, Mr. Bergschneider emailed Mr. Kunz, Mr. Brooks, and Ms. Mckeon, copying Mr. McLean, asking: "Do you have a few minutes at noon ET (9am PT) for a quick call to discuss WATT?" Tr. Ex. 0590.

132.    Before noon, Mr. Bergschneider emailed Mr. McLean to ask: "Can you re-confirm the % of volume our 1.9M shares represented from the time we were able to start selling at 1:30 as opposed to when we received the first tranche on 12/28? I think we said 6.8%." Tr. Ex. 0221.

133.    Mr. McLean responded: "12/29 volume over the day was 28,413,632 which would have made us about 7%. If we look at the volume from the time we confirmed with WATT that the donor was not a control person (1:30), the volume was 11,923,959 making us 16% of the volume in the afternoon." *Id*.

134.    The group appears to have decided to tell Mr. Fairbairn that Fidelity Charitable traded less than 10% of WATT's volume on 12/29/17 when measured against the full day (including the several hours when Fidelity Charitable wasn't trading) rather than against the relevant period.

S T R I S | 777 S FIGUEROA ST. STE 3850
M A H E R | LOS ANGELES, CA 90017

**January 15, 2018 (Monday)**

135.    A week passed and Mr. Kunz had still not provided the Fairbairns details about the WATT liquidation. Based on the little Mr. Fairbairn had been told, however, he strongly suspected that Fidelity Charitable had incompetently liquidated the donated WATT stock. And if the stock had been liquidated on 12/29/17, Mr. Fairbairn knew that Fidelity Charitable had not honored at least the promises to all him to consult and to refrain from trading until the new year.

136.    Mr. Fairbairn was furious. But rather than write something nasty, he composed and send the following email to Mr. Kunz at 10:51 pm ET on January 15:

> Subject: Watt
>
> Hi Justin,
>
> Could you provide a recap of the transactions involving our donated shares for all securities. To me it seems aggressive to liquidate 9.9 percent of a company's shares in a half day of trading. Please include number of shares and orders given and at what times.
>
> I was told that the selling would begin after the first of the year, you guys would be gentle with the stock (less than 10% of trading volume) and we could advise on price limit if necessary. So I was surprised to hear that it was liquidated on the last day of December.
>
> Best Regards
>
> Malcolm

Tr. Ex. 0128 at FID-FRBN-0005404.

**M.    Mr. Fairbairn's Email Prompts an Internal Investigation That Produces Numerous Written Admissions of Incompetence and Misrepresentation.**

137.    Mr. Fairbairn's January 15 email caused Mr. Kunz to push Fidelity Charitable to investigate its liquidation of the donated WATT stock. That investigation resulted in numerous written admissions that Fidelity Charitable's liquidation was grossly incompetent.

138.    At the same time, Mr. Fairbairn's January 15 email prompted others at Fidelity Charitable to investigate what representations had been made to the Fairbairns regarding how their WATT stock would be liquidated. And that investigation resulted in numerous written admissions that Mr. Kunz made a serious of empty promises to the Fairbairns.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

139.    The internal investigation proceeded as follows:

**January 17, 2018 (Wednesday)**

140.    When Mr. Kunz received Mr. Fairbairn's January 15 email, he did not forward it to anyone else at Fidelity Charitable. Instead, on January 17, he emailed Mr. Fairbairn the WATT liquidation chart from Ms. Mckeon that he had been sitting on for two weeks and told Mr. Fairbairn: "The trading desk within our Charitable Group stuck to under the 10% of the volume, right around 7% from what they told me. They can't take discretion on the trades and when they saw liquidity in the stock, they took advantage of it." Tr. Ex. 0129.

141.    Although Fidelity Charitable had sold 15.3% of WATT's volume during the time it was trading on 12/29/17, Mr. Kunz was referencing Fidelity Charitable's selling as a proportion of the entire day's trading volume [~7%]. This was the defense that Mr. Brooks and the investment team had crafted in early January after Mr. Kunz had written that he "thought we didn't sell more than 10% trading volume." Tr. Ex. 0119 at FID-FRBN-0037335.

142.    After receiving Mr. Kunz's email with the WATT trading chart, Mr. Fairbairn and Mr. Kunz spoke on the phone. And after that conversation, Mr. Kunz forwarded the email from Mr. Fairbairn and Mr. Kunz's response to Mr. Brooks and Ms. Mckeon, adding "He's still unhappy with those trades..." Tr. Ex. 1613 at FID-FRBN-0036904.

143.    Mr. Brooks responded: "I can understand that. If he wants any more explanation than what you provided, let Anna or myself know and we'll work on getting more detail." Tr. Ex. 0341 at FID-FRBN-0036899. Mr. Kunz replied: "Can we start with getting he trade tickets- the exact times of the trades? Thx." Tr. Ex. 1575 at FID-FRBN-0033741. After Mr. Brooks said, "Will obtain and forward to you," Mr. Kunz clarified:

> He's looking for the time they were entered and time marked completed. Also, were they all part of one big VWAP or were they broken out into tranches? He is having his trading desk gather information. Again, he has the right attitude and isn't pissed, it would "just make him feel better".

*Id.*

144.    Given that Mr. Kunz was seeking further information about the trading execution, Ms. Mckeon forwarded the email chain to Mr. McLean, saying "Here's some additional information

35

that Malcolm Fairbairn is looking for as it relates to his WATT contribution. I appreciate your help pulling this all together, thanks!" *Id.*

145.    When Ms. Mckeon's email came in, however, Mr. McLean immediately zeroed in on the alleged representations that had been made to the Fairbairns, not the question about trading. He wrote separately to Daniel Bergschneider: "more emails from Anna on WATT / the picture is becoming more clear / looks like empty promises from someone to the donor." Tr. Ex. 0228.

146.    Mr. Bergschneider responded: "can you please find out who told him those things? ping Anna, Brooks, and Kyle." Tr. Ex. 0228.

147.    Mr. McLean then wrote an email to Anna Mckeon, Steve Brooks, and Kyle Casserino, copying Mr. Bergschneider. He did not answer Ms. Mckeon's question about the trading details, asking instead about the promises that had been made to the Fairbairns: "Can someone please tell me who told the donor (per his email below): 1. We would wait to start selling after the first of the year? 2. He could advise on price limits? 3. We would be less than 10% of the trading volume?" Tr. Ex. 1575 at FID-FRBN-0033741.

148.    Mr. McLean then wrote back separately to Mr. Bergschneider, saying: "emailed them, cc'd you / they will all point fingers elsewhere / could have been Justin as well but if that was the expectation set, I can understand the questions now." Tr. Ex. 0228.

149.    Mr. Bergschneider responded: "not our problem." *Id.* Mr. McLean responded: "it becomes our problem / that's what's infuriating….I want to help guide them but they just all turn on us." *Id.*

150.    Mr. Bergschneider then again directed Mr. McLean to investigate: "get the facts. we will go to Eileen and Matt after speaking with Stefan." *Id.* Mr. McLean responded: "I'd prefer to just talk to the donor myself…he would understand / but he's getting mixed messages because they ONLY want to deliver good news, positive stories." *Id.*

151.    Shortly thereafter, Mr. Brooks responded to Mr. McLean's email asking who had made the representations to the Fairbairns. Although Mr. Brooks denied having *personally* made the representations, he said he was aware that "a discussion akin to" them had occurred. Tr. Ex. 0348 at FID-FRBN-0033738.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

152. Two minutes after responding to Mr. McLean's email, Mr. Brooks wrote to Mr. Kunz separately: "Justin, Do you know who told Malcolm per his email below that selling wouldn't begin until new year and that he could have say in price limits or where 'gentle' on the stock came from?" Tr. Ex. 0349 at FID-FRBN-0036863.

153. Mr. Kunz responded to Mr. Brooks, writing: "Nobody told him that and all I said is what you told me – 10% daily volume. Based on previous volume that probably would have been the case" Tr. Ex. 0136 at FID-FRBN-0036848. Mr. Brooks responded: "Ok. Just clarifying as eyes are on this. Take care." Tr. Ex. 1612 at FID-FRBN-0036855. And Mr. Kunz replied: "Yup, I know better ☺." Tr. Ex. 1611 at FID-FRBN-0036833.

154. Despite denying that he made any representations besides "10% daily volume," at no point did Mr. Kunz ever tell Mr. Fairbairn of his supposed belief that nobody made the other representations—or even ask Mr. Fairbairn for any additional information about what he had been told or who had told it to him.

**January 18, 2018 (Thursday)**

155. The next day, Mr. Bergschneider and Mr. McLean continued to investigate who told Mr. Fairbairn that the trading would not begin until the new year, that Fidelity Charitable would stay below 10% of volume, and that Mr. Fairbairn could advise on the liquidation. At 10:36 a.m. ET, Mr. Bergschneider emailed Mr. Kunz, Mr. Casserino, Mr. Brooks, Mr. Mckeon, and Eileen Bird (a senior executive at Fidelity Charitable), asking Mr. Kunz to "Please call me to discuss further, including the donor's expectations that were set at the bottom of this email." Tr. Ex. 0597 at FID-FRBN-0039927.

156. According to Mr. Kunz's sworn testimony, he did speak with Mr. Bergschneider. But Mr. Kunz claims that they did not discuss "whether or not Malcolm was promised that he could advise on price limits." Kunz Dep. 320:21-24. And Mr. Kunz cannot recall if they discussed "whether there was a promise to wait to start selling until after the first of the year." Kunz Dep. 320:14-20.

157. After Mr. Bergschnider spoke with Mr. Kunz, however, he sent an ominous email to his superiors, Eileen Bird and Stefan Podvojsky. In that 1:50 pm ET email, Mr. Bergschneider wrote:

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

"Hi Eileen, *We may need some air-cover*, perhaps a call into Andy Fay. *Mike and I called Justin Kunz*. If you have a few minutes, we'd like to discuss in person." Tr. Ex. 0597 at FID-FRBN-0039927 (emphasis added). In other words, he and Mr. McLean might need protection from higher-ups in light of what they had learned from Mr. Kunz.

158. Mr. Bergschneider and Mr. McLean also followed up regarding Mr. Kunz's trading execution questions. Mr. Bergschneider responded to the previous day's email chain to tell Mr. Kunz: "There were 4 separate VWAPS for each of the 4 tranches of WATT received, and each with 4 separate average prices." Tr. Ex. 0143 at FID-FRBN-0036802.

159. Mr. Kunz immediately recognized that this was a problem. In fact, he forwarded Mr. Bergschneider's email to Mr. Brooks saying: "This is amateur hour. You can't have 4 separate vwaps going, they are all working against each other." Tr. Ex. 0144 at FID-FRBN-0036791.

160. Mr. Brooks agreed and ordered further investigation. He replied to Mr. Kunz: "Agreed. Can you ask why it was done that way because the client is going to ask…." Tr. Ex. 0145 at FID-FRBN-0036780.

161. To implement Mr. Brooks' instruction, Mr. Kunz emailed Mr. Christesen. Mr. Kunz wrote: "So the charitable team sold their WATT using 4 separate VWAP orders. Isn't it better to use one VWAP instead of 4? Otherwise they start to work against each other and can create somewhat of an artificial volume. Please just respond to this, don't forward to the charitable team." Tr. Ex. 0146 at FID-FRBN-0038044.

162. Mr. Christesen responded immediately, confirming Mr. Kunz's fears: "Ive been talking with the trading team there [i.e., the Fidelity Charitable investments group]. I will talk about this as they have asked me about our approach on these things. But to answer your point, yes this is not productive." Tr. Ex. 0147 at FID-FRBN-0038039.

163. Mr. Christesen then sent an email to Mr. McLean and Mr. Bergschneider in which he asked: "Also, question about WATT. Did you sell that in 4 different VWAP orders during the day? If so, why would you do that as opposed to one VWAP? If, you are concerned with volume then you should just place a participation rate on the VWAP." Tr. Ex. 0534 at FID-FRBN-0037681.

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

S T R I S  777 S FIGUEROA ST. STE 3850

M A H E R  LOS ANGELES, CA 90017

164. Mr. McLean responded: "RE: WATT 4 separate VWAP's – we received 4 separate tranches of contributions throughout the day." Tr. Ex. 0535 at FID-FRBN-0037677.

165. Mr. Christesen then replied to Mr. McLean and Mr. Bergschneider, bcc'ing Mr. Kunz:

> Ok thanks for the info. I would have just added those amounts to the original vwap, increasing the size of the single order so they are not competing with each other (assuming I knew it was the same end client). Obviously this is hindsight and maybe this is not your procedure.

Tr. Ex. 0151 at FID-FRBN-0036772 (emphasis added).

166. Mr. McLean responded not by attempting to justify his actions, but with agreement: "I agree and I assumed that's what would happen. I was surprised to hear from FCM that they were 4 separate vwap orders." Tr. Ex. 0595 at FID-FRBN-0037672.

167. Around the same time, Mr. Kunz took the email on which he was bcced and replied only to Mr. Christesen writing: "Thanks. So Charitable botched the trades then." Tr. Ex. 0152 at FID-FRBN-0036768. And in response to Mr. Kunz, Mr. Christesen simply forwarded Mr. McLean's email admitting his surprise that there were four separate orders. Tr. Ex. 1610.

168. Finally, Mr. Kunz emailed Mr. Bergschneider and Mr. McLean, copying Mr. Casserino, Mr. Brooks, Ms. Mckeon Mr. Christesen, and Ms. Bird to follow up on the ongoing investigation into Mr. Fairbairn's assertions of misrepresentation and incompetence. Tr. Ex. 0149 at FID-FRBN-0036749. With respect to the alleged promises, Mr. Kunz wrote:

> Pertaining to his [Mr. Fairbairn's] original comments, as we discussed, what I mentioned to him is what charitable told me that we look to maintain no more than 10% of the daily volume. You guys confirmed this with me as well. Where is this written that is your policy? The client would like some reassurance here. As far as the rest of his comments, I'm not certain what he is referring to. My only thought around going 'easy' on the stock is an obvious one- don't put downward pressure on it on the same day of his grant into the fund that could give him a worse price for tax purposes. I'm not suggesting this happened, just putting myself in his shoes.

Id.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

169. Again, although Mr. Kunz claimed that he was "not certain what [Mr. Fairbairn] is referring to," he never once denied the representations to Mr. Fairbairn or asked Mr. Fairbairn where he had heard these things. With respect to the liquidation concerns, Mr. Kunz wrote:

> You aren't certain about the communication between Charitable and Capital Markets. It was entered in as 4 separate VWAPs instead of one order being added to another. The client's concern is that the trades were fighting for volume and working against one another. I'm assuming he would want some level of explanation to this, hopefully your team is willing to provide this to him over the phone.

*Id.*

**January 19, 2018 (Friday)**

170. The next morning, Mr. Bergschneider responded to Mr. Kunz's summary email, copying the same group: "Thanks for the follow up on your call. Sounds like a few additional data points on the chart below (showing the 4 tranches). Mike is pulling this info from FCM and will reply." Tr. Ex. 1607 at FID-FRBN-0036521.

171. After Mr. McLean provided some initial follow-up information, Mr. Kunz asked, again copying the whole group: "Thanks for this. What about the entry details, meaning 10% volume, etc like he mentioned below or did we not specify those limitations?" *Id.*

172. Mr. McLean then responded to Mr. Kunz only: "We did not specify those limits. I'd defer to FCM on how the algo works with the liquidity but we keep an eye on it as it's working and we were 6.7% over the day and about 15% from 1:30-4." *Id.* at FID-FRBN-0036520.

173. At that point, Mr. Kunz forwarded the chain to Mr. Brooks, asking: "Why is it so difficult to get this information? It's such a struggle. I'll ask if I need more help but it's impossible. The reality is I'm trying to set them up for success, otherwise they are bringing a knife to a gun fight." *Id.* Mr. Brooks responded: "It seems that way Justin. I have been instructed to let FCM handle any info or explanation and they are supposed to be working with the Investments group here on any inquiry. *Hopefully they realize they need to be transparent and accurate.*" *Id.* (emphasis added).

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

**January 22, 2018 (Monday)**

174. By January 22, Mr. Fairbairn still had not received the tranche-by-tranche breakdown of the WATT liquidation that he had requested. So he followed up again:

> Justin, Any luck in pulling the trade records. Clearly, not a good sign when 4 or 5 electronic trade entries can not be forwarded in a week's time. *Also, I was told that the DAF group internally does not exceed at 10% VWAP and is 'gentle' with stocks because donors still own them. Is that an internal policy? Also, we are told that the selling would not start until after the new year, because we are still donating. Hopefully we can get a call to review soon.*

Tr. Ex. 1523 at FID-FRBN-0005333 (emphasis added).

175. About an hour later, Mr. Kunz responded:

> I had a call at 9am PST with the Charitable group and the traders there. If Family Office had done the trades, we would have gotten you the details that day. In working through other departments, sometimes can take extra time but this is excessive so I apologize. I've escalated this several levels and will be getting the details of the trades this afternoon. I can address the other concerns during our next conversation.

Tr. Ex. 1522 at FID-FRBN-0005324.

176. This was the second email in which Mr. Fairbairn had asserted that specific representations had been made about the WATT liquidation. But despite Mr. Kunz's internal denials, he yet again neither expressed his disagreement with Mr. Fairbairn nor had any discussion with him seeking to gather more information about what Mr. Fairbairn had been told and who had said it.

177. Later that day, Mr. McLean finally decided what information to "share" with Mr. Kunz about the tranche by tranche breakdown of the WATT liquidation, and he passed that information to Mr. Kunz. Tr. Ex. 0225 at FID-FRBN-0042745.

178. That evening, Mr. Kunz sent Mr. Fairbairn the details of how each tranche of WATT had been liquidated. He wrote to the Fairbairns, copying Mr. Christesen and Mr. Hooper:

> Again, I apologize for the delay in getting these details to you. Please note the first two trades were actually TWAPs and not VWAPs as originally reported. Please let me know if this suffices. Based on your convenience, I am happy to coordinate a call with my charitable team tomorrow.

Tr. Ex. 1503.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS MAHER | 777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

179. Mr. Fairbairn was stunned when he saw the trading details. He responded: "Justin, Let's set up a meeting. Wow." Tr. Ex. 0843 at FID-FRBN-0005316.

180. Mr. Kunz then set up a call between Mr. Fairbairn and several Fidelity Charitable representatives including Mr. Christesen for the next day. To prepare for that phone call, Mr. Kunz had a call with Mr. Christesen and Mr. Podvojsky. The calendar invitation for that phone call read: "Objective is to rewind the process of what happened, identify charitable's P&P on transactions like this and formulate a plan for the conversation with Malcolm @ 2PM PST." Tr. Ex. 1605.

**January 23, 2018 (Tuesday)**

181. As planned, Mr. Fairbairn spoke with representatives of Fidelity Charitable about the WATT liquidation at 2 pm PT on January 23. Ms. Fairbairn was not on the call, but after getting a debrief from Mr. Fairbairn, she wrote to Mr. Kunz:

> I could not be on the call because I am in Boston, meeting a world famous researcher at Harvard who is working on Lyme disease. . . . Even though I was unable to be on this call, I really do appreciate that you stood up for what is right. The DAF people did represent they would handle large blocks with care, be no more than 10% of the daily volume and would not even begin trading until the new year. . . . I know in this day and age it is hard to stand up to what is just, against politics and the institutional imperative. I do want you to know how much I respect your integrity and efforts.

Tr. Ex. 0175.

182. At 7:52 pm ET, Mr. Kunz forwarded Ms. Fairbairn's message to Mr. Christesen and several others, writing:

> Although CGF could have handled a few parts of the call better, I think this is a good sign that they trust me and appreciate me advocating for them as a FFOS client. Not sure I could ask for more. Nice complements from what otherwise has been a challenging situation and a not easily impressed client. *(I'll send back a quick response which will be neutral to the 10% statement).*

*Id.* (emphasis added).

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

STRIS
MAHER

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

183.     At 8 pm ET, Mr. Christesen responded to Mr. Kunz by confirming that he believed both that misrepresentations had been made and that the trading had not been handled competently.

> a.     With respect to the promises, he wrote:

> Thanks, Justin. Separate from resolving this issue, and based on what I heard on the call (and from Emily below) we really need to look at who is communicating with our clients and what. *As far as I can see a process was represented that doesn't appear to ever be followed.*

Tr. Ex. 0549 (emphasis added).

> b.     And with respect to the trading, he said:

> I have been helping this team recently with their approach to handling orders (separate from this issue). They are clearly just starting to get their arms around large, complex trading items. I think I may recommend that we handle our client orders even after contribution, for the time being.

*Id.*

184.     Mr. McLean and his Fidelity Charitable investments group, in other words, had performed so poorly that they could no longer be trusted to liquidate any stock donated by FFOS clients.

185.     Finally, at 9:26 pm ET, Mr. Kunz responded to Ms. Fairbairn's message. Tr. Ex. 0177. Yet again, his response said absolutely nothing about any of the representations alleged by Ms. Fairbairn.

**January 24, 2020 (Wednesday)**

186.     The next morning, Mr. Christesen exchanged emails with Andy Fay, a top executive at FFOS who was in communication with Stefan Podvojsky about the situation with the Fairbairns. Mr. Christesen's emails explained his role in the investigation into the trading and communications regarding the Fairbairns' WATT donation as the investigation continued. Tr. Ex. 0782.

187.     In his first message, Mr. Christesen told Mr. Fay that he "was on the call yesterday" with Mr. Fairbairn, and attached his email to Mr. Kunz from the day before, where he had said that "[a]s far as I can see a process was represented that doesn't appear to ever be followed" and that "[t]hey are clearly just starting to get their arms around large, complex trading items." Tr. Ex. 0779 at FID-FRBN-0034976; Tr. Ex. 0780 at FID-FRBN-0034978.

43

188.    In the second email, Mr. Christesen further explained his role in the process both to date and going forward. He wrote:

> I assisted with this contribution back on 12/28 when it was happening while I was on vacation. I was not involved in any trading or communication around the trading. This is CGF's issue and we are trying to advocate for the client while being careful not throw anyone under the bus. As the manager of the team I am usually asked to be involved around trading issues (even if not caused or placed by us). I got involved yesterday after monitoring the situation the two days prior. . . . As I said, I am attending an in person meeting with the client today as well. It was not about this but this will likely come up. . . .

Tr. Ex. 0782 at FID-FRBN-0034960.

**February 2018**

189.    In February 2018, Fidelity Charitable continued to make inculpatory admissions regarding both the trading and the promises. For example:

190.    On February 2, Ms. Mckeon emailed Mr. Casserino to ask if he had spoken with Steve Brooks about the Fairbairn situation recently. She said that "[t]here was a call on Wednesday between Tom Bridge, Justin, Dan B, Malcolm and Emily. There's a call today (the time has not been finalized) to recap. I'll forward you the dial in." Tr. Ex. 0934 at FID-FRBN-0043098.

191.    Mr. Casserino responded by confirming that Fidelity had lost $10 million "due to how much volume we sold." Tr. Ex. 0934 at FID-FRBN-0043098. He wrote:

> Yes, I am going to send an email to the larger group to recap the conversation and discuss next steps. I guess Emily freaked out on Dan B. over the phone this week about trading execution of WATT. *They might be looking to take some type of legal action on how we sold out of this asset and recoup the $10M difference that we lost due to how much volume we sold*.

*Id.* (emphasis added).

192.    Ms. Mckeon responded by noting: "Dan admitted he thought her feelings were justified." *Id.*

193.    On February 14, Mr. Kunz summarized his view of where things stood, and although he was more oblique, the implication is clear. He was asked by FFOS colleague Greg Fisher, "Curious..is Fairbairn seeking damages on the WATT trades – via FCS?" Tr. Ex. 0787. Mr. Kunz responded: "Would you? Charitable has been an awful biz partner throughout all this. That's all I

44

know for certain." *Id*. The colleague responded: "Just curious if they've asked. That could be a big #." *Id*.

194. And finally, on February 20, Fidelity Charitable employee Kyle Casserino summarized the situation in a conversation with Ms. Chaisson. Tr. Ex. 0939. This one exchange, set forth below in its entirety and without any alterations, captures essentially the full picture of Fidelity Charitable's incompetent trading and broken promises.

Chaisson: no idea the Fairbairn thing got so bad

Casserino: oh it's horrible

Chaison: Anna is in WTC today and she told me the latest

Casserino: you should see some of these email chains

Chaisson: you think Justin is screwed

Casserino: ehh idk, he's not in a good place right now

but that's what happens when you shoot from the hip on these types of accounts

do I think he'll get fired? depends on how far the donors take this

Chaisson: do you think he slipped up and wasn't honest about the sale on teh front end?

Casserino: but if I was out $20M on proceeds and $10M on FMV, I'd be pretty pissed as well

you know, it was basically the stars aligning horribly on this one

Chaisson: Anna said that you and her and Steve were all on the same page abotu how we handle- he must have been too loose lipped when relaying

Casserino: for some reason, we sold ~16% of the volume on a day that the stock was getting punished

which is well over our norm

the stock had some cray movement when they gifted it combined with the fact that they were lending a huge portion of the shares they ended up contributing

I'm sure you've worked with Justin before. he works hard and is responsive but is one of those guys that might take it too far

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

<u>Chaisson</u>: I agree- I can see him fluffing things where he shouldn't

also this is exactly the problem with FFOS- they want to handle everything and not include us on calls and then messaging gets convoluted and here we are

<u>Casserino</u>: exactly

*Id.* at FID-FRBN-0043027.

195.    Casserino punctuated the conversation with the following:

<u>Casserino</u>: we sold a majority of the shares at under $20 on 12/29

<u>Chaisson</u>: got it

<u>Casserino</u>: that's why they are pissed combined with an FMV of ~$30/share on 12/28 versus what we were giving them of $25/share on 12/29

<u>Chaisson</u>: so, do you think capital markets might have made a bit of a mistake or do you think the issue is that Justin may have said we would hold shares if it makes sense or something else completely

yuck this is such a mess

<u>Casserino</u>: both

trading was bad, we had 4 separate VWOPs competing with one another on this asset.

*Id.* at FID-FRBN-0043028.

## **March 2018**

196.    The investment team's efforts to evaluate Mr. Fairbairns' allegations of incompetent trading culminated in their preparation of "a full analysis and charting of WATT," which Mr. Bergschneider emailed to Mr. Podvojsky on March 21, 2018. It included a "[p]rice chart focused on 2 weeks prior to trading w/ notes" and a "[p]rice chart focused on 2 weeks following trading w/ notes." Tr. Ex. 0997 at FID-FRBN-0033410. Notably, it did not focus on the historical prices of WATT in the months preceding or following the trading.

197.    The notes on the former chart stated: "FCC approval of WATT's wireless charging caused the spike in price on December 27." *Id.* at FID-FRBN-0033411.

198.    The notes on the latter chart, which included arrows highlighting the WATT stock price increase on January 2 (the first trading day following December 29) that lasted until January 10, stated: "Only news story on BBG is the CTO stepping down but that wouldn't explain an

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

increase in price. S&P was up 3% between 1/2-1/10. After Jan 10th, this is when the story broke about WATT raising new equity, which promptly pummeled the stock." *Id.* In other words, nearly three months after the WATT liquidation, Fidelity Charitable had been unable to identify any explanation (despite its efforts to come up with one) for the 14.9% increase in WATT stock price on January 2, 2018 that would counter Mr. Fairbairns' claim that Fidelity Charitable's trading had harmed the stock.

199.    Mr. Bergschneider had sent this chart to Mr. Podvojsky because Mr. Podvojsky had taken the lead on investigating the Fairbairns' claims of incompetence and broken promises. In addition to reviewing the trading activity (and being unable to come up with a plausible defense), Mr. Podvojsky had ostensibly performed an investigation into the representations set out in Mr. Fairbairn's January 15, 2018 email.

200.    What's remarkable about that investigation, however, is that at no point did Mr. Podvojsky either (1) ask the Fairbairns who had made the representations in Mr. Fairbairn's email, or (2) ask Justin Kunz whether he had made any of the representations. Podvojsky Dep. 127:1-20; 127:25-28:3. Instead, Mr. Podvojsky testified under oath that he was comfortable the promises had not been made based solely on a conversation he had with Eileen Byrd. Podvojsky Dep. 127:16-127:24.

201.    Ms. Byrd, however, had told Mr. Podvojsky that she had spoken only with Mr. Brooks and Mr. Casserino about the representations alleged by Mr. Fairbairn. Podvojsky Dep. 115:24-116:8; 116:17-117:17.

202.    Mr. Brooks had written an email acknowledging that a discussion akin to the promises had been had with the Energous CEO, and had received an email from Mr. Kunz acknowledging that he had made the 10% promise. Mr. Casserino had written that Mr. Kunz was "one of those guys that might take things too far" and agreed he could "see him fluffing things where he shouldn't." Mr. McLean and Mr. Bergschneider, moreover, had reported to Mr. Podvojsky that they "might need some air cover" based on a conversation they had had with Mr. Kunz about the representations he had made to Mr. Fairbairn.

203. Yet Mr. Podvojsky claimed that he did not need to speak with Mr. Kunz about the representations, and that he could rely on the word of Mr. Brooks and Mr. Casserino, allegedly relayed through Ms. Byrd, that no representations had been made. Mr. Podvojsky either turned a blind eye to finding out the truth of what happened or his testimony is not credible.

**N.** **Plaintiffs' experts provide persuasive, credible evidence that further confirms Fidelity's liability and its obligation to remedy the harm caused by the botched liquidation.**

204. Dr. Ian Domowitz is a Fellow of the Program in the Law and Economics of Capital Markets at Columbia University. Dr. Domowitz was, until his retirement in April 2018, Vice Chairman and Managing Director at Investment Technology Group, Inc. (NYSE: ITG). Dr. Domowitz was CEO of ITG Solutions Network, Inc., a leading trading analytics and workflow subsidiary of ITG, from 2006 to 2017.

205. Dr. Domowitz earned his Ph.D in Economics from the University of California at San Diego. Prior to joining ITG in 2001, Dr. Domowitz was the Mary Jean and Frank P. Smeal Professor of Finance at Pennsylvania State University, and previously was the Household International Research Professor of Economics at Northwestern University.

206. During his nineteen years in academia and seventeen years on Wall Street, Dr. Domowitz has published over 100 papers in refereed journals, books, and industry trade journals on topics including econometric theory, industrial organization, financial economics, trading market structure and costs, and financial regulation. Dr. Domowitz has served as chair of the Economic Advisory Board of the National Association of Securities Dealers (NASD), and was formerly a member of NASD's Bond Market Transparency Committee. Dr. Domowitz has also held positions at Northwestern University's Kellogg Graduate School of Management, the Commodity Futures Trading Commission, the International Monetary Fund, and the World Bank.

207. In this case, Dr. Domowitz evaluated how a promise to stay under ten percent of daily trading volume would be understood by a person familiar with trading, including the relationship between percentage of daily volume and participation rate; analyzed whether Fidelity Charitable exceeded 10% of the daily trading volume and/or a 10% participation rate when it liquidated the

STRIS
MAHER

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

donated WATT shares; and examined whether the WATT liquidation complied with the standard of care in the industry and with Fidelity Charitable's own policies.

208. Dr. Domowitz's knowledge, skill, experience, training, and education qualify him to offer these expert opinions, and his specialized knowledge assisted this Court in understanding the evidence and determining facts in issue. Dr. Domowitz's opinions are based on sufficient facts and data, his opinions are the product of reliable principles and methods, and he reliably applied those principles and methods to the facts of this case.

209. Dr. Domowitz opined that a promise to remain under 10% of daily trading volume is understood in the industry to refer to refraining from exceeding a 10% participation rate. The purpose of such a promise is to ensure an appropriate participation rate, and where the actual period during which trading is possible is less than one day, such a promise would be understood to refer to the percentage of the order relative to volume in the market over the period during which the order can be traded, or to the intervals when the order is actually traded.

210. Dr. Domowitz measured Fidelity Charitable's trading and determined that Fidelity Charitable breached its promise to stay below 10% of daily trading volume, as that promise would be understood in the industry, because Fidelity Charitable exceeded a 10% participation rate under the measures of participation the industry would apply (i.e. over the period during which trading was possible or over the intervals when trading occurred).

211. Dr. Domowitz evaluated Fidelity Charitable's trading behavior and concluded that Fidelity Charitable failed to meet a reasonable standard of care in the industry when it liquidated the WATT stock on the afternoon of December 29, 2017.

212. Based on Dr. Domowitz's testimony, the Court finds that Fidelity Charitable flooded the market and traded imprudently when it sold the WATT shares on the afternoon of December 29, 2017. Among other things, Fidelity Charitable was imprudent because (1) Fidelity Charitable traded at an excessively high participation rate; (2) Fidelity Charitable did not appropriately take volatility into account; and (3) Fidelity Charitable incompetently ran multiple instances of trading algorithms simultaneously.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST. STE 3850
LOS ANGELES, CA 90017

213. Dr. Domowitz conducted a transaction cost analysis of Fidelity Charitable's liquidation. A transaction cost analysis is a standard measure in the industry to determine whether a trade was completely executed. For a stock like WATT, the typical total cost ranges from 0.83 percent to 1.02 percent, based on institutional trading in the fourth quarter of 2017. Fidelity Charitable's WATT liquidation cost was 14.72 percent, almost 15 times the industry averages for the relevant time period and trading in micro-cap securities. Although minor deviations from industry standards can be expected for a particular stock, no responsible trader would consider this to be a small deviation. The results of the transaction cost analysis confirm that Fidelity's trading was negligent.

214. Dr. Domowitz also found that Fidelity Charitable failed to comply with its own trading policies. The Court so finds.

215. Plaintiffs' expert Dr. Lawrence Harris is Professor of Finance and Business Economics at the University of Southern California (USC) Marshall School of Business, where he holds the Fred V. Keenan Chair in Finance.

216. Dr. Harris earned his Ph.D in Economics from the University of Chicago in 1982, and since then has conducted research, taught, and consulted on regulatory and practitioner topics in investment management and trading including trading rules, transaction costs, index markets, and market regulation.

217. Dr. Harris served as the Chief Economist of the United States Securities and Exchange Commission (SEC) from 2002 to 2004. He directed the SEC Office of Economic Analysis, in which 35 economists, analysts, and support staff engaged in regulatory analysis, litigation support, and basic economic research. While at the SEC, Dr. Harris was one of two principal architects of "Reg NMS," the regulation that ultimately switched most U.S. equity trading from floor-based trading systems to electronic trading systems.

218. Dr. Harris has worked as a practitioner in the securities industry for the New York Stock Exchange (NYSE); UNX, Inc., an electronic pure agency institutional equity broker; and Madison Tyler, LLC, a broker-dealer engaged in proprietary electronic trading in various markets.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

In these roles, Dr. Harris examined program trading, designed transaction cost measurement systems, and designed proprietary trading algorithms.

219.    Dr. Harris has authored several books including *Trading and Exchanges: Market Microstructures for Practitioners* (Oxford University Press: 2003), which has become the standard treatment of the practice and economics of trading, and *Trading and Electronic Markets: What Investment Professionals Need to Know* (CFA Institute Research Foundation: 2015), which addresses electronic trading issues. He has authored hundreds of scholarly articles, and has edited several scholarly journals including the *Journal of Finance*, the *Review of Financial Studies*, and the *Journal of Financial and Quantitative Analysis*.

220.    Dr. Harris currently serves as a director or trustee of three mutual funds: The Clipper Fund, Inc. (ticker CFIMX), Selected American Shares (SLASX and SLADX), and Selected International Fund (SLSSX and SLSDX). He also serves as lead independent director of, and chair the audit committee for, Interactive Brokers Group, Inc. (IBKR), the world's largest electronic broker. He is the research coordinator of the Institute for Quantitative Research in Finance (the Q-Group), whose members manage about one-half of all institutional money in the world, including many mutual funds, pension funds, and endowments. And he is the executive director of the Financial Economists Roundtable, a self-appointing organization of highly accomplished senior financial economists interested in public policy issues.

221.    Dr. Harris has served as an expert witness in over twenty (20) cases involving securities trading issues.

222.    In this case, Dr. Harris evaluated whether Fidelity Charitable's trading met the standard of care in the industry when liquidating the donated WATT shares and conducted analyses to determine the price impact of Fidelity Charitable's trading. Specifically, he calculated the total amount Fidelity Charitable would have earned if it had traded competently and honored its alleged promises to the Fairbairns, and he calculated the price impact, if any, that Fidelity Charitable's trading had on the high, low, and average prices of WATT on December 29, 2017.

223.    Dr. Harris's knowledge, skill, experience, training, and education qualify him to offer these expert opinions, and his specialized knowledge assisted this Court in understanding the

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

evidence and determining facts in issue. Dr. Harris's opinions are based on sufficient facts and data, his opinions are the product of reliable principles and methods, and he reliably applied the principles and methods to the facts of this case.

224. Dr. Harris evaluated Fidelity Charitable's trading on December 29, 2017. He concluded that the liquidation of donated WATT shares did not meet the standard of care in the industry, and the Court so finds. Fidelity Charitable's conduct was below the standard of care because it sold too large a quantity of shares over too short a period of time, used overlapping algorithms to sell the donated WATT shares, and failed to look for a large counterparty (natural buyer) for the block of WATT shares.

225. Dr. Harris also concluded that Fidelity Charitable's improper trading adversely and detrimentally impacted the price of WATT, and the Court so finds. Dr. Harris's opinion is appropriately based on his experience and judgment, including his familiarity with the well-established body of scholarly literature about the negative price impact of large block sales, and on several reliable quantitative analyses, including a length of line analysis, random walk analysis, and volume multiplier analysis.

226. Finally, Dr. Harris quantified the negative price impact of Fidelity Charitable's trading on the price of WATT. He evaluated every WATT trade by Fidelity Charitable during the time period in question, as well as every WATT trade by market participants other than Fidelity Charitable during the trading window.

227. Dr. Harris utilized a robust, reliable and highly-respected model (the Kyle Obizhaeva model) to calculate the total price impact of Fidelity Charitable's trading. He analyzed several different counterfactual scenarios: (1) a scenario in which Fidelity Charitable did not begin trading until January 2, 2018; (2) a scenario in which Fidelity Charitable began trading on December 29, 2017 but traded responsibly instead of negligently; and (3) a scenario in which Fidelity Charitable was required to comply with a promise not to trade more than 10% of the volume. In each of these scenarios, Dr. Harris concluded that Fidelity Charitable would have obtained a higher total price for the WATT liquidation than it actually obtained. These analyses are reliable and persuasive evidence

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

of the extent of the harm caused by Fidelity Charitable's botched liquidation of the donated WATT shares.

228. Dr. Harris also utilized robust and reliable methods to calculate the impact of Fidelity Charitable's trading on the average price of WATT on December 29, 2017. He carefully analyzed the price movement of WATT on December 29, 2017, controlled for other possible causes of the price movement, and quantified the price impact attributable to Fidelity Charitable's trading. Dr. Harris analyzed several different counterfactual scenarios: (1) a scenario in which Fidelity Charitable did not begin trading until January 2, 2018; (2) a scenario in which Fidelity Charitable began trading on December 29, 2017 but traded responsibly instead of negligently; and (3) a scenario in which Fidelity Charitable was required to comply with a promise not to trade more than 10% of the volume. In each of these scenarios, Dr. Harris concluded that the average price of WATT on December 29, 2017 would have been higher. The Court so finds.

229. Professor Brian Galle is a Professor of Law at the Georgetown University Law Center. Previously, he was an associate professor of law at Boston College Law School and an assistant professor of law at Florida State University College of Law. He has been a visiting professor at the George Washington University and University of San Diego Law Schools.

230. Professor Galle earned his J.D. from Columbia Law School and his LL.M. in Taxation from the Georgetown University Law Center, where he was a Graduate Tax Scholarship Program Fellow.

231. Professor Galle was an attorney in the Tax Division of the U.S. Department of Justice (DOJ), Criminal Appeals and Tax Enforcement Policy Section, from 2003 to 2006, where he litigated several cases related to the proper legal treatment of charitable contributions.

232. Professor Galle has testified on the relationship between tax law and charitable organizations before the House Committee on Oversight and the National Advisory Committee on Institutional Quality and Integrity. He consults regularly with state attorneys general regarding the enforcement of nonprofit law, including by aiding in the drafting of legislation that was recently introduced in three states. He also consults with other state government officials on state and local taxation, and is currently engaged in a research project with the California Franchise Tax Board to

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

study the California income tax. He is also currently working with researchers at the IRS Statistics of Income Division to analyze and better understand the reliability of tax information reported by nonprofit organizations.

233. A major focus of Professor Galle's academic scholarship is the law of charitable organizations, tax law, and the relations between those two fields. He has published more than thirty scholarly articles and book chapters, of which roughly half are in that area. His work has been published in leading journals in the fields of law, economics, and public policy, and Professor Galle has been repeatedly recognized as one of the most-cited legal scholars working in taxation. He is an associate editor of the *International Review of Law and Economics*, and has also served as a referee for a number of other journals and highly selective conferences including the *Stanford Law Review*, the *Journal of Legal Studies*, and the Conference on Empirical Legal Studies. He has been a Visiting Scholar at the Urban-Brookings Tax Policy Center.

234. Professor Galle has written, spoken, and taught extensively on the specific topic of donor advised funds. Among other outlets, his work on donor advised funds has appeared in the *Washington University Law Review*, and his work on how nonprofits manage their investments was published in the *Journal of Policy Analysis and Management*, the top-ranked U.S. public policy journal. Professor Galle published an article on donor control over donee charities in the *Journal of Law and Economics*, the top-rated journal in that field. Professor Galle co-authored "Giving in Time: Donor Advised Funds and Other Vehicles," a book chapter forthcoming in an edited volume from the Urban Institute Press, and co-authored "How Do Nonprofits Manage Money?," a working paper. Professor Galle co-founded the Boston College Forum on Philanthropy and the Public Good, and with the Forum has organized a series of conferences on donor advised fund regulation. Professor Galle has also participated as an invited expert on the law of donor advised funds at conferences organized by others, including conferences at the Urban Institute and the NYU Center on Philanthropy and the Law.

235. In this case, Professor Galle evaluated the Fairbairns' income tax filings and related work papers and determined the amount of charitable contribution deduction the Fairbairns could have claimed if not for Fidelity Charitable's conduct; computed the actual dollars of tax savings

54

these deductions would have generated for the Fairbairns; and calculated the amount of damages that would make the Fairbairns whole for the lost deductions, considering that any award of damages in this litigation will be considered taxable income on which the Fairbairns will have to pay additional taxes.

236.     Professor Galle's knowledge, skill, experience, training, and education qualify him to offer these opinions and his specialized knowledge assisted this Court in understanding the evidence and determining facts in issue. His opinions are based on sufficient facts and data, his opinions are the product of reliable principles and methods, and he reliably applied the principles and methods to the facts of this case.

237.     Professor Galle concluded that the Fairbairns were legally entitled to take the deductions they took based on their donation of, *inter alia*, the WATT stock, and that no limitations would apply to prevent the Fairbairns from having claimed the higher deductions he calculated. The Court so finds.

238.     Professor Galle provided a series of formulae that use the counterfactual high and low prices of WATT on December 29, 2017 under each of Professor Harris's price impact scenarios to calculate tax damages. The Court finds that these formulae provide a reliable and accurate basis for calculating the Fairbairns' tax-related damages and further finds that in each of these scenarios, the Fairbairns were entitled to larger deductions than the ones actually taken.

**O.     <u>The fact and expert evidence show that Fidelity's liquidation was negligent and inconsistent with each of the representations made to the Fairbairns.</u>**

239.     Fidelity's conduct in liquidating the WATT shares on December 29, 2017 did not meet the standard of care in the industry and was negligent.

240.     Fidelity's conduct in liquidating the WATT shares on December 29, 2017 did not meet the standard of care in the industry and did not utilize sophisticated, state-of-the-art methods for liquidating large blocks of stock.

241.     Fidelity's own policies for liquidating stock required it to avoid adversely impacting price, and Fidelity's liquidation did not comply with this aspect of its policies.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S
M A H E R
777 S FIGUEROA ST, STE 3850
LOS ANGELES, CA 90017

242.     Fidelity's promise that it would not trade more than 10% of the daily trading volume of WATT was intended to ensure a maximum participation rate of 10% while trading. Fidelity did not stay below 10% of trading volume during the time it traded the WATT shares.

243.     Fidelity did not wait until 2018 to sell the WATT shares.

244.     Fidelity did not allow Malcolm Fairbairn to advise on a price limit. Fidelity did not consult with Malcolm Fairbairn about any aspect of the liquidation.

**P.     Damages and Remedies**

**Plaintiffs' Requested Damages and Remedies**

245.     If, instead of dumping the stock in 154 minutes before the markets closed on December 29, Fidelity Charitable had waited until January 2, 2018 to begin an orderly liquidation, then it would have earned a higher total price when it liquidated the WATT shares. In addition, the average price of WATT on December 29, 2017 would have been higher.

     a.     The total price of the liquidation would have been $9,558,972 higher.

     b.     The high price of WATT on December 29, 2017 would have been $30.71; the low price would have been $25.00; and the average price would have been $27.86.

246.     Because the average price of WATT on December 29, 2017 would have been higher if Fidelity Charitable had refrained from selling any WATT that day, the Fairbairns' deduction for the 1,233,585 WATT shares they donated on December 29, 2017 would have been $3,528,053.10 higher. This would have caused the Fairbairns' state and federal tax bill to be $1,659,215.15 lower.

247.     Because an award of damages in this case would be taxable income on which the Fairbairns will be required to pay additional taxes, the Fairbairns are entitled to recover $3,272,613.71 in order to make them whole for their lost state and federal tax deductions.

248.     In total, the Fairbairns are entitled to have $9,558,972.00 restored to their donor-advised fund, and to receive a damages award of $3,272,613.71 to compensate for the additional tax obligations. The total loss suffered by the Fairbairns is $12,831,585.71.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S | 777 S FIGUEROA ST, STE 3850
M A H E R | LOS ANGELES, CA 90017

**Alternate Measure of Relief Based on Negligence Only, Without Regard to Timing**

249.    Even if Fidelity Charitable had not been obligated to wait until January 2, 2018 to begin selling, its negligence alone caused significant harm. If Fidelity Charitable had begun selling WATT on December 29, 2017 but had not traded negligently, then it would have earned a higher total price when it liquidated the WATT shares. In addition, the average price of WATT on December 29, 2017 would have been higher.

a.    The total price of the liquidation would have been $8,303,536 higher.

b.    The high price of WATT would have been $30.56; the low price would have been $24.39; and the average price would have been $27.48.

250.    Because the average price of WATT on December 29, 2017 would have been higher if Fidelity Charitable had begun selling WATT on December 29but had not traded negligently, the Fairbairns' deduction for the 1,233,585 WATT shares they donated on December 29, 2017 would have been $3,059,290.80 higher. This would have caused the Fairbairns' state and federal tax bill to be $1,438,759.99 lower.

251.    Because an award of damages in this case would be taxable income on which the Fairbairns will be required to pay additional taxes, the Fairbairns are entitled to recover $2,837,790.91 in order to make them whole for their lost state and federal tax deductions.

252.    In total, under this alternate scenario, the Fairbairns are entitled to have $8,303,536.00 restored to their donor advised fund, and to receive a damages award of $2,837,790.91 to compensate for the additional tax obligations. Under this alternate scenario, the total loss suffered by the Fairbairns is $11,141,326.91.

**Alternate Measure of Relief Solely for Fidelity's Failure to Trade No More Than 10% of the Volume in WATT**

253.    Even if Fidelity Charitable's only obligation had been to sell no more than 10% of volume, its conduct caused significant harm. If Fidelity Charitable had begun selling WATT on December 29, 2017 but sold no more than 10% of the volume in WATT during the time period when

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

it was selling, then it would have earned a higher total price when it liquidated the WATT shares. In addition, the average price of WATT on December 29, 2017 would have been higher.

       a.     The total price of the liquidation would have been $3,310,663 higher.

       b.     The high price of WATT on December 29, 2017 would have been $30.56; the low price would have been $22.48; and the average price would have been $26.52.

254.    Because the average price would have been higher if Fidelity Charitable had begun selling WATT on December 29, 2017 but sold no more than 10% of the volume in WATT during the time period when it was selling, the Fairbairns' deduction for the 1,233,585 WATT shares they donated on December 29, 2017 would have been $1,875,049.20 higher. This would have caused the Fairbairns' state and federal tax bill to be $881,820.64 lower.

255.    Because an award of damages in this case would be taxable income on which the Fairbairns will be required to pay additional taxes, the Fairbairns are entitled to recover $1,739,291.20 in order to make them whole for their lost state and federal tax deductions.

256.    In total, under this alternate scenario, the Fairbairns are entitled to have $3,310,663.00 restored to their donor advised fund, and to receive a damages award of $1,739,291.20 to compensate for the additional tax obligations. Under this alternate scenario, the total loss suffered by the Fairbairns is $5,049,954.20.

## Other Bases for Awarding Plaintiffs' Requested Remedies

257.    A finding that Fidelity breached its promise to trade the WATT shares using sophisticated, state-of-the-art methods for trading large blocks provides an independent basis for awarding the damages and relief set forth under negligence, supra ¶¶ 249-252.

258.    The evidence shows that had Fidelity consulted with Malcolm Fairbairn, the trading would not have begun until 2018. At a minimum, had Fidelity consulted with Malcolm Fairbairn, it would have stayed under 10% of trading volume on December 29, 2017. Thus, a finding that Fidelity breached its promise to allow Malcolm Fairbairn to advise on the liquidation, including price, provides an independent basis for awarding the full measure of damages and relief set forth, supra ¶¶ 245-248, or alternately, the damages and relief for Fidelity's failure to trade under 10% of volume, supra ¶¶ 253-256.

## II.  PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW[2]

### A.  Standing

259.  Plaintiffs Malcolm and Emily Fairbairn have standing to seek and recover their requested relief from Fidelity Charitable.

260.  The Fairbairns have standing to assert their claims for misrepresentation, breach of contract, promissory estoppel, negligence, and violation of the UCL against Fidelity Charitable.

261.  The Fairbairns have standing to sue for the lost value of their donor-advised fund and this Court has legal and equitable authority to enter relief to restore the value of the donor-advised fund.

262.  The Fairbairns have standing to sue for damages to remedy the loss they suffered from the reduced value of their 2019 charitable tax deduction.

### B.  Agency

263.  The following Fidelity employees acted as agents and employees of Fidelity Charitable for purposes of the events at issue in this case: Justin Kunz, Michael McLean, Daniel Bergschneider, Stefan Podvojsky, Josh Johnson, Anna McKeon, Kyle Casserino, Colby Chaisson, Steve Brooks, Pamela Norley, Gerald Celano, Eric Christesen.

264.  Justin Kunz was acting as agent for Fidelity Charitable when he made representations to Emily and Malcolm Fairbairn in connection with their contributions to Fidelity Charitable, including but not limited to representations he made in late December 2017.

### C.  Choice of Law

265.  The Fairbairns' claims are governed by California law.

266.  The Massachusetts charitable liability cap (Mass. Gen. Laws ch.231 § 85K) does not apply to the Fairbairns' claims.

### D.  Count 1: Misrepresentation

267.  Justin Kunz, as agent for Fidelity Charitable, made the following false

---

[2] Plaintiffs have collected legal authority supporting the below conclusions of law in their concurrently filed trial brief.

S T R I S
M A H E R

777 S FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

representations to Emily and/or Malcolm Fairbairn:

      a.     That Fidelity Charitable would liquidate the Fairbairns' donated WATT shares using sophisticated, state-of-the-art methods for liquidating large blocks of stock;

      b.     That Fidelity Charitable's trading of the Fairbairns' donated WATT shares would not exceed 10% of trading volume;

      c.     That Fidelity Charitable would keep Malcolm Fairbairn in the loop and allow him to advise on the liquidation, including price; and

      d.     That Fidelity Charitable would not sell the WATT shares until 2018.

268.    These representations were knowingly false, made recklessly and without regard for their truth, or made without a reasonable basis for believing that they were true.

269.    In making these representations, Justin Kunz was a professional advisor obligated to have a reasonable basis for what he told the Fairbairns.

270.    These representations were made with the intent that the Fairbairns rely on them.

271.    The Fairbairns reasonably relied on the representations in deciding to donate the WATT shares to Fidelity Charitable.

272.    The Fairbairns' reliance was a substantial factor in causing them harm.

273.    Fidelity's mishandling of the donated WATT shares obtained through the misrepresentations harmed the Fairbairns in two ways:

      a.     The Fairbairns' donated WATT shares would have sold for a higher total price if Fidelity had not mishandled the liquidation. The Fairbairns are entitled to have that lost value restored to their donor-advised fund.

      b.     The average price of WATT on December 29, 2017 would have been higher if Fidelity had not mishandled the liquidation, which would have increased the Fairbairns' charitable deduction and decreased their federal and state tax obligations.

274.    The Fairbairns are entitled to their requested relief for such harm.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

S T R I S    777 S FIGUEROA ST, STE 3850
M A H E R    LOS ANGELES, CA 90017

**E.** **Count 2: Breach of Contract**

275.   Fidelity Charitable and the Fairbairns entered into a valid contract regarding the donation and liquidation of shares of Energous stock.

276.   The terms of the contract provided:

a.   That Fidelity Charitable would liquidate the Fairbairns' donated WATT shares using sophisticated, state-of-the-art methods for liquidating large blocks of stock;

b.   That Fidelity Charitable's trading of the Fairbairns' donated WATT shares would not exceed 10% of trading volume;

c.   That Fidelity Charitable would keep Malcolm Fairbairn in the loop and allow him to advise on the liquidation, including price; and

d.   That Fidelity Charitable would not sell the WATT shares until 2018.

277.   Fidelity Charitable breached the contract, and Fidelity Charitable's breach of contract was a substantial factor in causing the following harm to the Fairbairns:

a.   The Fairbairns' donated WATT shares would have sold for a higher total price if Fidelity Charitable had not breached the contract, and thus the Fairbairns are entitled to have that lost value restored to their donor-advised fund.

b.   The average price of WATT on December 29, 2017 would have been higher if Fidelity Charitable had not breached the contract, which would have increased the Fairbairns' charitable tax deduction and decreased their federal and state tax obligations.

278.   Breach of contract damages are measured by the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

279.   The harm suffered by the Fairbairns was reasonably foreseeable by the parties when entering into the contract.

280.   The Fairbairns are entitled to their requested relief for such harm.

**F.** **Count 3: Promissory Estoppel**

281.   Fidelity Charitable, through its agent Justin Kunz, made the representations set forth in Count 1 (Misrepresentation).

S T R I S    777 S FIGUEROA ST. STE 3850
M A H E R    LOS ANGELES, CA 90017

282. It would be unfair not to enforce the representations made by Fidelity Charitable to the Fairbairns.

283. The Fairbairns reasonably relied on Fidelity Charitable's representations in deciding to donate their WATT shares to Fidelity Charitable, and their reliance was foreseeable.

284. The Fairbairns suffered harm, and their reliance on Fidelity Charitable's representations was a substantial factor in causing the harm.

285. Fidelity Charitable's failure to honor the representations described in Count 1 (Misrepresentation) harmed the Fairbairns in two ways:

    a. The Fairbairns' donated WATT shares would have sold for a higher total price, and thus the Fairbairns are entitled to have that lost value restored to their donor-advised fund.

    b. The average price of WATT on December 29, 2017 would have been higher, which would have increased the Fairbairns' charitable deduction and decreased their federal and state tax obligations.

286. The Fairbairns are entitled to their requested relief for such harm.

### G. Count 4: Negligence

287. Fidelity owed a duty of care to competently liquidate the stock donated by the Fairbairns, and it owed that duty both with respect to the Fairbairns' donor-advised fund and with respect to the Fairbairns.

288. Fidelity Charitable is held to a professional standard of care with respect to its duty to competently liquidate the stock donated by the Fairbairns.

289. Fidelity Charitable failed to meet the relevant standard of care when it liquidated 1.93 million shares of WATT stock in 154 minutes at the close of trading on December 29, 2017, on the same day the majority of the shares were received.

290. The Fairbairns suffered harm to themselves and their donor-advised fund because a non-negligent liquidation of WATT would have yielded a higher total price and thus greater proceeds for the Fairbairns' donor-advised fund. Fidelity Charitable's breach of the duty of care was a substantial factor in causing that harm.

S T R I S   777 S FIGUEROA ST, STE 3850
M A H E R   LOS ANGELES, CA 90017

S T R I S | 777 S FIGUEROA ST. STE 3850
M A H E R | LOS ANGELES, CA 90017

291.     The Fairbairns suffered harm because Fidelity Charitable's negligent trading caused the average price of WATT to be lower on December 29, 2017, which decreased the Fairbairns' charitable tax deduction and increased their federal and state tax obligations. Fidelity Charitable's breach of the duty of care was a substantial factor in causing that harm.

292.     The Fairbairns are entitled to their requested relief for such harm.

293.     Defendant Fidelity Charitable has not shown that any percentage of fault is attributable to the Fairbairns in this matter. The Fairbairns were accordingly not comparatively negligent.

**H.     Count 5: UCL**

294.     Fidelity Charitable made the representations set forth in Count 1 (Misrepresentation). One or more of those representations was a representation likely to deceive a member of the public.

295.     Those representations were a substantial factor in influencing the Fairbairns' decision to donate the WATT shares to Fidelity Charitable.

296.     Fidelity Charitable obtained the Fairbairns' WATT shares through its false representations, and then caused harm to the Fairbairns through its mishandling of that ill-gotten stock.

297.     The Fairbairns are entitled to appropriate relief for such harm, including restitution, injunctive relief, and other equitable relief to prevent harm to the public and to prevent Fidelity Charitable from profiting from its ill-gotten gains.

298.     The Fairbairns have acted as private attorneys general in bringing this litigation for the benefit of the donor-advised charitable fund.

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-cv-04881-JSC

## I. **Attorneys' Fees**

299.     Plaintiffs' actions in prosecuting this case have resulted in the enforcement of an important right affecting the public interest, and have conferred a significant benefit on the general public and a large class of persons.

300.     Most of the money recovered in this case will not go to the Fairbairns themselves, but rather will go to their donor-advised fund to be given away to other charities for the public good.

301.     This action has been aggressively litigated by both parties, including through two rounds of dispositive motions, over fifteen fact depositions and six expert depositions, lengthy expert reports, and trial. Plaintiffs' success in this action is representative of a significant investment of time and money.

302.     This action is not the type of case likely to have come to the attention of, or been selected for prosecution by, the California Attorney General. Even if the California Attorney General had been interested in litigating the matter, the resources required—including to retain expert witnesses—make the case difficult to litigate.

303.     The financial burden placed on Plaintiffs as a result of prosecuting this action exceeds their individual financial stake in this matter, and that burden, together with the necessity of private enforcement in order to vindicate the rights at issue, make a fee award appropriate in this case.

Dated: September 11, 2020                    **STRIS & MAHER LLP**

                                             */s/ Peter K. Stris*
                                             Peter K. Stris

                                             Attorneys for Plaintiffs
                                             EMILY AND MALCOLM FAIRBAIRN

# **ATTORNEY ATTESTATION**

I, Thomas Rubinsky, hereby attest, pursuant to N.D. Cal. Local Rule 5-1(i)(3), that the concurrence to the filing of this document has been obtained from each signatory hereto.


Dated: September 11, 2020

/s/ *Thomas Rubinsky*

Thomas Rubinsky