**STRIS & MAHER LLP**
PETER K. STRIS
  peter.stris@strismaher.com
ELIZABETH R. BRANNEN
  elizabeth.brannen@strismaher.com
RACHANA A. PATHAK
  radha.pathak@strismaher.com
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017

BRIDGET ASAY (*pro hac vice*)
  bridget.asay@strismaher.com
28 Elm Street, Floor 2
Montpelier, VT 05602

T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
EMILY AND MALCOLM FAIRBAIRN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>                    Defendant. | Case No. 3:18-cv-04881-JSC<br><br>**PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE BENJAMIN PIERCE**<br><br>Date:           October 1, 2020<br>Time:          2:00 pm<br>Courtroom:   E<br><br>Hon. Jacqueline Scott Corley |

S T R I S | M A H E R     777 S. FIGUEROA ST, STE 3850     LOS ANGELES, CA 90017

STRIS | 777 S. FIGUEROA ST., STE 3850
MAHER | LOS ANGELES, CA 90017

**INTRODUCTION**

Plaintiffs move to exclude from trial the expert testimony of Benjamin Pierce. Mr. Pierce offers five main opinions: (1) Donors to donor-advised funds ("DAFs") do not have advisory privileges with respect to the liquidation of donated assets, Report of Benjamin Pierce ¶ 14, Declaration of Thomas Rubinsky in Support of Plaintiffs' Motion *in Limine* No. 2 to Exclude Mr. Pierce) ("Rubinsky Decl.") ¶ 2, Ex. A (hereinafter "Pierce Report"); (2) DAFs are not "permitted" to make promises to donors about how they will liquidate donated assets, Pierce Report ¶ 32; (3) DAFs sell donated stock as quickly as possible, *id.* Subheader V(A); (4) "It is appropriate for DAFs to sell donated stock as soon as possible," *id.* Subheader V(B); and (5) The relationship between Fidelity Charitable and FMR, LLC is "entirely appropriate," *id.* Header VI. None of these opinions passes muster. *See* Fed. R. Evid. 702.

In rebuttal, Plaintiffs disclosed additional opinions from their expert Brian Galle. Rubinsky Decl. ¶ 3, Ex. B ("Galle Rebuttal"). Fidelity has indicated that it will move to exclude Professor Galle. Professor Galle's opinions regarding historical and current charitable practices are based on his specialized knowledge and are admissible under Rule 702. At minimum, if the Court allows Mr. Pierce to testify, Plaintiffs are entitled to present rebuttal testimony from Professor Galle.

**ARGUMENT**

**I.     The Court Should Exclude Mr. Pierce's Opinion That DAF Donors Do Not Have Advisory Privileges Over The Liquidation Of Donated Assets.**

Mr. Pierce first opines that donors "are ***only*** entitled to advise DAFs with respect to (1) investment of proceeds from donated assets, and (2) grants that DAFs, including Fidelity Charitable, will consider." Pierce Report ¶ 14 (emphasis added). Mr. Pierce bases his opinion on "a review of the current policies published by the eleven largest donor advised funds." *Id.* ¶ 20. After quoting extensively from public statements of six of those DAFs (*id.* ¶¶ 21-26), Mr. Pierce concludes that none of the policies "describes an advisory privilege for donors with respect to the liquidation of donated assets." *Id.* ¶ 27. He purports to find further support for his opinion in the tax code and in an industry group description of donors' privileges. *Id.* ¶¶ 28-29.

In short, Mr. Pierce concludes that donors do not have advisory privileges over liquidation by looking at some descriptions of donor privileges and observing that they do not mention liquidation.

1

The Court should exclude this opinion because (1) it not based on any scientific, technical, or other specialized knowledge, (2) it is a mere conduit for hearsay, and (3) it is not helpful to the jury.

**First**, Mr. Pierce's opinion is not based on any "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). By his own admission, Mr. Pierce reached this opinion by reading the public statements of certain DAFs and noting that they do not contain language about the liquidation of donated assets. *See* Pierce Report ¶¶ 21-28. Were this a relevant exercise (it is not), jurors could conduct such an "analysis" themselves. *See, e.g., JIPC Mgmt., Inc. v. Incredible Pizza Co, Inc.*, No. 2:08-cv-04310-MMM-PLA, 2009 WL 8591607, at *9 (C.D. Cal. July 14, 2009) (excluding expert testimony based on comment cards because "[j]urors are certainly capable of reading the comment cards and observing how consumers 'express the name of JIPC'"). Further, Mr. Pierce never explains the gaping hole in his logic: the documents he quotes use terms like "investment recommendations," "investment allocation," and choosing "investment options" (Pierce Report ¶¶ 24-25, 29), which can easily encompass input on holding or selling a donated asset. Mr. Pierce gives the term "liquidation" talismanic status, but there is no reason to do so.

Fidelity will likely argue that Mr. Pierce's discussion of the industry initiative to publish "Common Operating Procedures for Donor Advised Funds" reflects his specialized knowledge. But Mr. Pierce does not rely on anything he learned in that endeavor; he merely quotes the publication and observes that it contains "no reference to any privilege regarding input into the liquidation of a contributed asset." *Id.* ¶ 29. His participation in that group adds nothing to his analysis.

**Second**, and relatedly, Mr. Pierce's opinion is a mere conduit for hearsay. It is well-established that federal courts should "screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (brackets in original). Mr. Pierce's opinion here is exactly what the Supreme Court had in mind. It consists almost entirely of quotes from out-of-court statements offered to prove their truth. *See* Fed. R. Evid. 801 (definition of hearsay); Pierce Report ¶¶ 21-26 (selective quotations from other DAFs). Fidelity thus seeks to

STRIS & MAHER | 777 S. FIGUEROA ST., STE 3850 | LOS ANGELES, CA 90017

STRIS | 777 S. FIGUEROA ST, STE 3850
MAHER | LOS ANGELES, CA 90017

introduce otherwise inadmissible hearsay through the mouth of a supposed expert.

**Third,** Mr. Pierce's opinion is confusing, biased, and contradicted both by Fidelity's own practices and by a policy that Mr. Pierce conspicuously omits. Mr. Pierce says that DAFs do not let donors advise on stock liquidation, while simultaneously recognizing that donors do, in fact, advise DAFs on stock liquidation. *See, e.g.*, Pierce Report ¶ 32 (acknowledging that "a donor providing advice with respect to liquidation . . . may happen"); *id.* ¶ 31 (citing declaration of Dennis Hearst at JP Morgan as evidence that "some donors provide DAFs with a recommendation concerning the liquidation of donated assets, including publicly traded securities.").

Fidelity is no exception: it produced evidence in this very case showing that it accepts donor input on liquidation (evidence that Mr. Pierce does not address). Rubinsky Decl. ¶¶ 5-7, Exs. D-F. Mr. Pierce also omits JP Morgan's DAF from his analysis, which expressly allows donors to advise on "'the timing and rate at which the donated securities are liquidated.'" Galle Rebuttal ¶ 7 (citing JP Morgan Charitable Giving Fund Summary, JP Morgan Charitable Gift Fund Program Circular at 1). And when pressed at his deposition, Mr. Pierce agreed that none of the written policies prohibit donors from giving such advice. Rubinsky Decl. ¶ 4, Ex. C at 91-93.

It is not helpful to tell the jury that DAFs don't permit donor advice on liquidation—except when they do. That truism—it doesn't happen except when it does—could do nothing but cause confusion. Mr. Pierce's failure to confront these important counter-examples, moreover, reveals that his analysis is "'biased toward a particular conclusion' and therefore does not 'comport[] with the dictates of good science.'" *Perez v. State Farm Mut. Auto. Ins. Co.*, No. 5:06-cv-01962-JW, 2012 WL 3116355, at *6 (N.D. Cal. July 31, 2012) (quoting *Daubert*, 43 F.3d at 1317). His opinion regarding advice about liquidation should accordingly be excluded.

## II. The Court Should Exclude Mr. Pierce's Opinion That DAFs Are Not "Permitted" To Make Promises To Donors About How They Will Liquidate Donated Assets.

Mr. Pierce next opines that while a donor may provide unsolicited advice with respect to liquidation, it is "impermissible" for a donor to "extract[] from the DAF a *promise* with respect to liquidation." Pierce Report ¶ 32. He continues: "In fact, if a donor were able to dictate the terms by which the charity sold donated assets, that would jeopardize the donor's ability to take a tax deduction based on the donation." *Id.* The Court should exclude this opinion because (1) Mr. Pierce

3

is not qualified to render it, and (2) it invades the province of the Court to decide what the law is.

**First,** Mr. Pierce is not qualified to render this opinion. *See* Fed. R. Evid. 702. Mr. Pierce testified at deposition that he believes a promise about how the DAF will liquidate would be "impermissible" for three reasons:

> One, it's – as stated in the paragraph, it would potentially jeopardize the tax deduction for the donor; it's impermissible because it relinquishes control, it's impermissible based on the – the way these programs have run for 90 years.

Rubinsky Decl. ¶ 4, Ex. C at 105:1-6. But Mr. Pierce admitted that he is neither a legal expert nor a tax expert. *See, e.g.*, *id.* at 80:7 ("I'm not a tax lawyer."); *id.* at 104:8-9, 105:16-18, 106:7-9 (Pierce testifying he is not a "legal expert"). At deposition, he could not provide clear answers about what types of promises are permissible. *Id.* at 108-113. When asked whether it is "permissible" for DAFs to promise to follow a donor's investment recommendations, Mr. Pierce replied: "Yeah, I'm—I'm not sure. I'm not an attorney." *Id.* at 47:18-19. His suggestion that DAFs have run this way "for 90 years" is unsupported and says nothing about permissibility.

**Second,** Mr. Pierce improperly seeks to opine about supposed legal requirements for donor-advised funds. *Id.* at 105:13-15; Pierce Report ¶ 32. His opinions address the issue of "legal control" that the Court discussed in its summary judgment ruling. ECF No. 171 at 3-4. Fidelity cannot proffer an expert (and an unqualified one, at that) to dispute the Court's legal conclusions. *E.g., Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Experts 'interpret and analyze factual evidence. They do not testify about the law.'" (citation omitted)). To the extent the definition of "legal control" even remains an issue in this case, it is an issue for the Court to address.[1]

## III. The Court Should Exclude Mr. Pierce's Opinion That DAFs Sell Donated Stock As Quickly As Possible.

Next, Mr. Pierce revisits his survey of the public statements of certain DAFs and concludes that "the liquidation of marketable securities as soon as possible is a standard practice of DAFs." Pierce Report ¶ 37. The Court should exclude this opinion for largely the same reasons.

---

[1] Again, Professor Galle offered an opinion on this issue to rebut Mr. Pierce's incorrect statements about the law surrounding charitable giving. To the extent the Court permits Mr. Pierce to testify on this issue, Professor Galle's testimony is indispensable rebuttal that cannot be excluded. Professor Galle also explains an important point that Mr. Pierce ignores: the nature of an alleged promise is critical. Galle Rebuttal ¶ 15 (charity cannot promise to use assets for donor's personal benefit).

STRIS MAHER | 777 S. FIGUEROA ST, STE 3850 | LOS ANGELES, CA 90017

**First,** Mr. Pierce again bases his opinion exclusively on his reading of DAF policies. *See id.* ¶¶ 37-46. Mr. Pierce adds nothing to the out-of-court statements he offers to prove their truth. He again simply parrots hearsay, and that is impermissible. *See id.* ¶ 37. And even if these statements were relevant and admissible (a matter of serious doubt), the jury can read as well as Mr. Pierce can. *See JIPC Mgmt.*, 2009 WL 8591607, at *9.

**Second,** Mr. Pierce's opinion on this issue is also confusing and biased, and thus would not help the jury. He ignores record evidence that Fidelity liquidates stock positions over time, based on donor preferences. Rubinsky Decl. ¶ 7, Ex. F at '138 ("Like previous PZN orders, we can carry this….for months if we have to" (ellipsis in original); "this donor likes the order to be worked"). He pulls certain favorable quotes from DAF policies while omitting other material language from the same policies. *Compare* Pierce Report ¶ 42 (asserting that Schwab Charitable Fund "liquidates contributions as quickly as possible" *with* Galle Rebuttal ¶ 26 (quoting Schwab's further statement that "concentrated positions must be liquidated over time. . . . Each contribution of a concentrated position has its own timeline for diversification. . . . Thinly traded or illiquid securities generally take longer to liquidate"); Pierce Report ¶ 41 (asserting Vanguard Charitable sells donated assets "as quickly as possible, generally on the day following their receipt") *with* Galle Rebuttal ¶ 26 (Vanguard Charitable also states "Thinly traded, restricted, or illiquid securities may require special treatment and . . . also generally take longer to liquidate."). And again, the conspicuous absence of the JP Morgan DAF illustrates the problem: far from liquidating "as soon as possible," JP Morgan permits DAF account holders to specify how long the liquidation will take. Galle Rebuttal ¶ 7.

Once again, Mr. Pierce's opinion amounts to saying that DAFs liquidate immediately— except when they don't. That is not helpful. And his omission of evidence that does not support his desired conclusion demonstrates his bias. Further, even if it is true that DAFs typically sell donated stock quickly, that fact has no relevance to how Fidelity Charitable should have and did handle an atypical donation of a very large block of stock worth tens of millions of dollars. Mr. Pierce admits that large blocks of stock must be handled "carefully." Rubinsky Decl. ¶ 4, Ex. C at 176-77. The Court should thus exclude Mr. Pierce's opinion that DAFs liquidate stock "as soon as possible."

IV.     **The Court Should Exclude Mr. Pierce's Opinion That It Is "Appropriate" For DAFs To Sell Donated Stock As Soon As Possible.**

Mr. Pierce next opines that it is "appropriate" for DAFs to "seek to liquidate donated stock as quickly as possible," because (1) DAFs properly seek to minimize market risk, (2) DAFs are not investment advisors, (3) it would be too resource-intensive for DAFs to develop customized liquidation strategies for every donated asset, and (4) governance controls ensure that other investment options are prudent. Pierce Report ¶¶ 47-52. Again, his opinion should be excluded.

***First,*** Mr. Pierce is not a trader or investment adviser and is not qualified to opine that selling stocks quickly "is an effective strategy to minimize market risk and eliminate speculation." *Id.* ¶ 48. Mr. Pierce offers no basis for his opinion other than his "experience in leading a major national DAF and interacting with other national DAF leaders during that period." *Id.* ¶ 47. But that experience does not qualify him to opine about whether DAF practices are likely to result in successful and prudent stock liquidations. That is a question of trading strategy, not general DAF management. Nor does Mr. Pierce offer factual support of any kind for his remaining assertions.

***Second,*** Mr. Pierce's opinion is almost impossible to decipher, making it unhelpful to the jury. Most notably, Mr. Pierce offers no explanation of what "appropriate" means. *See id.* ¶¶ 47-52. If it means "an appropriate trading strategy," then it's not an opinion that Mr. Pierce can offer. If it means "appropriate" in some moral or ethical sense, then it has no bearing on this case and could only serve to confuse the jury.

The confusion doesn't end there, however. Mr. Pierce opines that DAFs are bad at trading stock, *id.* ¶ 49, yet he acknowledges in the next paragraph they regularly receive and liquidate stock donations, *id.* ¶ 50. If they are incompetent traders, then why do DAFs accept such donations? And Mr. Pierce's reliance on "governance controls" simply does not speak to whether DAFs can and do liquidate large blocks of stock over a period of time. *Id.* ¶ 51. The Court should not allow Mr. Pierce to present such ill-defined views.

V.      **The Court Should Exclude Mr. Pierce's Opinion That The Relationship Between Fidelity Charitable And FMR, LLC Is "Entirely Appropriate."**

Mr. Pierce renders yet another "expert" opinion on a normative question, this time on the propriety of the relationship between Fidelity Charitable and Fidelity. Pierce Report ¶ 61. ("Fidelity

S T R I S | 777 S. FIGUEROA ST., STE 3850
M A H E R | LOS ANGELES, CA 90017

S T R I S | 777 S. FIGUEROA ST. STE 3850
M A H E R | LOS ANGELES, CA 90017

Charitable's relationship with FMR is appropriately arms length and provides fair value to the DAF and its donors, while providing significant benefits to the ultimate recipient charities.").

**First**, Mr. Pierce is not qualified to render this opinion and provides no reliable methodology. Mr. Pierce dedicates much of his Report on this subject to analyzing whether the fees charged by FMR are a "fair value" to Fidelity Charitable. *See, e.g.*, *id.* ¶¶ 57-58. But Mr. Pierce claims no expertise at investment fee analysis. He reviewed a Powerpoint presentation shown to Fidelity's board, without independently verifying most of the information. Rubinsky Decl. ¶ 4, Ex. C at 211-15. Further, Mr. Pierce does not have access to full information about the revenues that Fidelity Charitable generates for FMR or the actual cost of the services that FMR provides. *Id.* at 224:10-20. Without that information, any opinion he offers is purely speculative and unreliable.

**Second**, Mr. Pierce's opinion is irrelevant to the questions before the jury. The *existence* of the relationship between FMR and Fidelity Charitable is relevant because it explains the agency/employment relationships and potential financial incentives for solicitations. But the vague question that Mr. Pierce addresses—whether Fidelity Charitable and FMR's relationship is "appropriate" or "arms length"—has no bearing on the claims or defenses at issue in this case.

Mr. Pierce's opinion, moreover, is based on nothing more than a comparison with other DAFs' relationships to their affiliated financial institutions. Thus, as Professor Galle explained, Mr. Pierce's opinion at most establishes that Fidelity Charitable's relationship with Fidelity is **no worse** than other relationships between charitable entities and for-profit corporate entities that share a brand name. Galle Rebuttal ¶ 36. That information is not helpful to the jury.[2]

## CONCLUSION

For the foregoing reasons, the Court should exclude the expert testimony of Mr. Pierce.

---

[2] Fidelity has indicated that it will move *in limine* to exclude evidence of Fidelity Charitable's payments to FMR LLC and its employees, on the ground that (1) such information might lead jurors to think the relationship is inappropriate, and (2) the appropriateness of Fidelity Charitable's relationship to FMR is not an appropriate factor for the jury to consider. In the face of that motion, it is unclear how Fidelity can offer Mr. Pierce's opinion on this very issue. (On the other hand, evidence of Fidelity Charitable's payments to FMR and its employees is relevant to any agency questions that might arise, and it bears on the financial incentives for Fidelity's actions.)

Dated: March 6, 2020

Respectfully submitted,

**STRIS & MAHER LLP**

/s/ *Thomas Rubinsky*

Peter K. Stris
Elizabeth Brannen
Bridget C. Asay
Rachana A. Pathak
Thomas Rubinsky

*Attorneys for Plaintiffs*
Emily and Malcolm Fairbairn

**STRIS & MAHER LLP**
PETER K. STRIS
  peter.stris@strismaher.com
ELIZABETH R. BRANNEN
  elizabeth.brannen@strismaher.com
RACHANA A. PATHAK
  radha.pathak@strismaher.com
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017

BRIDGET ASAY (*pro hac vice*)
  bridget.asay@strismaher.com
28 Elm Street, Floor 2
Montpelier, VT 05602

T: (213) 995-6800 | F: (213) 261-0299

*Attorneys for Plaintiffs*
EMILY AND MALCOLM FAIRBAIRN

STRIS | 777 S. FIGUEROA ST, STE 3850
MAHER | LOS ANGELES, CA 90017

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,<br><br>            Plaintiffs,<br><br>      v.<br><br>FIDELITY INVESTMENTS CHARITABLE GIFT FUND,<br><br>            Defendant. | Case No. 3:18-cv-04881-JSC<br><br>[Hon. Jacqueline Scott Corley]<br><br>**DECLARATION OF THOMAS RUBINSKY IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE BENJAMIN PIERCE** |

I, Thomas Rubinsky, declare as follows:

1.  I am counsel of record for Emily and Malcolm Fairbairn ("Plaintiffs") in this action. I submit this declaration in support of Plaintiffs' Motion *in Limine* No. 2 to Exclude Benjamin Pierce. I make this declaration based on personal knowledge, and could and would testify competently about its contents if called upon to do so.

2.  Attached hereto as **Exhibit A** is a true and accurate copy of the Expert Report of Benjamin Pierce.

3.  Attached hereto as **Exhibit B** is a true and accurate copy of the Rebuttal Expert Report of Brian Galle.

4.  Attached hereto as **Exhibit C** are true and accurate copies of excerpts from the deposition of Benjamin Pierce.

5.  Attached hereto as **Exhibit D** is a true and accurate copy, with redactions, of a document produced by Defendant in response to discovery request(s) in this action as FID-FRBN-0043666 and marked as exhibit 1077.

6.  Attached hereto as **Exhibit E** is a true and accurate copy, with redactions, of a document produced by Defendant in response to discovery request(s) in this action as FID-FRBN-0043677 and marked as exhibit 1096.

7.  Attached hereto as **Exhibit F** is a true and accurate copy, with redactions, of a document produced by Defendant in response to discovery request(s) in this action as FID-FRBN-0030137 and marked as exhibit 213.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 6, 2020

*/s/ Thomas Rubinsky*
Thomas Rubinsky

STRIS
MAHER

777 S. FIGUEROA ST., STE 3850
LOS ANGELES, CA 90017



Exhibit A

EMILY FAIRBAIRN and
MALCOLM FAIRBAIRN,

      Plaintiffs,

        v.

FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

      Defendant.

Case No. 3:18-cv-04881-JSC

**REPORT OF BENJAMIN PIERCE**

October 1, 2019

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

      A.      Professional Experience and Qualifications ...........................................1

      B.      Prior Expert Testimony.........................................................................3

      C.      Compensation ......................................................................................3

      D.      Materials Considered ...........................................................................3

II.     ASSIGNMENT...........................................................................................................3

III.    SUMMARY OF OPINIONS.........................................................................................4

IV.   THE ROLE OF "ADVICE" AND BEST PRACTICES WITH RESPECT TO DONOR ADVISED FUNDS....................................................................................................4

V.     FIDELITY CHARITABLE'S POLICIES AND PRACTICES REGARDING LIQUIDATION ARE CONSISTENT WITH OTHER LEADING DAFS .........................................................12

      A.      DAFs Sell Donated Stock As Quickly As Possible ..............................13

      B.      It Is Appropriate For DAFs To Sell Donated Stock As Soon As Possible............16

VI.   FIDELITY CHARITABLE'S RELATIONSHIP WITH FIDELITY IS ENTIRELY APPROPRIATE........18

VII.  CONCLUSION........................................................................................................22

## I.      INTRODUCTION

1.      I have been retained by Fidelity Investments Charitable Gift Fund ("Fidelity Charitable") to provide an expert opinion in this matter.   Based on my experience as the founding President of the Vanguard Charitable Endowment Program, as a leader of a group that developed a set of common operating standards for Donor Advised Funds ("DAFs"), as the co-founder of a philanthropic consulting organization (Acadia Squam Group LLC) focused on DAFs, and my review of the materials cited herein, I offer the opinions set forth below relating standards and best practices relating to DAFs, Fidelity Charitable's policies and practices regarding the liquidation of donated securities, and the relationship between Fidelity Charitable and FMR LLC.

### A.      Professional Experience and Qualifications

2.      I graduated from Harvard College in 1974 with a BA in Government.   After graduating, I joined the Philadelphia National Bank as a bank management trainee, where I worked in the multi-national and international divisions.   After three years at the bank, I joined a gas and chemical company as international credit manager.   In 1979, I was retained by a Fortune 500 chemical company, FMC Corporation, as credit manager.   In that capacity, I was responsible for supervising a team charged with collecting approximately $1 billion in annual worldwide revenues.   In 1985, I took on a new role as financial analyst in the Marine Colloids Division of FMC, with responsibility for budgeting, cost-accounting, and inventory controls.   In 1988, I earned my MBA from Villanova University.

3.      In 1990, I began my career in the non-profit sector by joining The College of Physicians of Philadelphia as its Chief Operating Officer.   Founded in 1787, The College of Physicians of Philadelphia is a not-for-profit medical, educational, and cultural institution dedicated to advancing the cause of health and educating medical professionals and the public

about medicine.  The College of Physicians of Philadelphia maintains one of the world's oldest medical libraries and operates the Mütter Museum, a museum of medical history.  As COO, I had responsibility for all internal functions of the institution, with oversight of accounting, finance, investments, technology, operations, and human resources.  I also served as Interim Executive Director between April 1997 and June 1998, with ultimate responsibility for the management of the institution while it searched for a permanent executive director.

4.      In 1998, I was hired as the first employee and President of the Vanguard Charitable Endowment Program ("Vanguard Charitable"), a 501(c)(3) public charity and DAF sponsor.  Vanguard Charitable is independent of The Vanguard Group, which is a for-profit global investment firm.  I helped launch this national charity, led it through its formative years, then oversaw its growth as it became one of the nation's top ten grant-makers.  Reporting to an independent Board of Trustees, I was responsible for overseeing all aspects of the operations of the charity.  This included establishing policies and guidelines, grant-making, fund-raising, financial matters, compliance, technology, contribution processing (including liquidation of donated securities), donor relations, government affairs, collaborations, and human resources.

5.      During my tenure at Vanguard Charitable, I met regularly with the leaders of other national DAFs, had numerous opportunities to speak publicly about DAFs, and participated in the development of industry guidelines related to donor advised funds.  In 1999, I was invited to meet with the United States House of Representatives Finance Sub-Committee on Taxation regarding DAFs, and spoke to members of Congress and their staff members about DAFs.  In 2002, I was a leader of a group that drafted a set of best practices for donor advised funds entitled "Common Operation Procedures for Donor Advised Funds."  I have also served on panels regarding DAFs hosted by the Council on Foundations and The Philanthropy Roundtable,

and have spoken at a wide variety of planned giving, estate and financial planning, and fund-raising executive conferences.

6.      After seventeen years as the President of Vanguard Charitable, I retired in July 2015.  At the time of my retirement, Vanguard Charitable had granted a total of $5 billion to charities across the country, and held $5 billion in assets for more than 12,000 accounts.

7.      In early 2019, I co-founded the Acadia Squam Group LLC, a consulting firm focused primarily on informing, advising and educating a wide variety of clients on DAFs.  Our mission is to help charities raise more money to support the public good of their missions.

8.      Further details on my background and qualifications are set out in my curriculum vitae, which is attached as **Exhibit A** to this report.

**B.      Prior Expert Testimony**

9.      I have never provided deposition and/or trial testimony as an expert in any litigation or arbitration proceeding.

**C.      Compensation**

10.     For my work in connection with this matter, I am being paid $300 per hour, as well as reimbursement of any work-related expenses.  My compensation is in no way dependent on my opinions rendered or the outcome of this matter.

**D.      Materials Considered**

11.     In rendering the opinions and conclusions expressed in this report, I have considered the materials set forth in **Exhibit B** in addition to my own experience over the past several decades.

**II.     ASSIGNMENT**

12.     I have been asked by Fidelity Charitable to provide my opinion as to (1) certain standards and best practices relating to DAFs, (2) Fidelity Charitable's policies and practices

3

regarding the liquidation of donated securities; and (3) Fidelity Charitable's relationship with FMR LLC.

### III.   SUMMARY OF OPINIONS

13.     As set forth more fully below, it is my opinion, based on my experience and expertise in running a large national DAF for seventeen years, my consulting practice, and my review of the documents identified in Exhibit B, that:

14.     Donors are only entitled to advise DAFs with respect to (1) investment of proceeds from donated assets, and (2) grants that DAFs, including Fidelity Charitable, will consider.  To the extent donors seek to provide advice to DAFs regarding the sale of donated assets, DAFs nevertheless have exclusive authority to sell donated assets as they deem appropriate and in the best interests of the charity.

15.     Fidelity Charitable's policies and practices relating to the liquidation of donated securities are in accord with the IRS definition of a DAF, DAF standards and best practices, its own Circular, and its charitable mission.

16.     Fidelity Charitable's relationship with FMR LLC is appropriate.

### IV.   THE ROLE OF "ADVICE" AND BEST PRACTICES WITH RESPECT TO DONOR ADVISED FUNDS

17.     The philanthropic giving instrument entitled "donor advised fund" has been around for about 90 years.  With the advent and success of Fidelity Charitable in the early 1990s, DAFs became national in scope.  Over the last twenty-five years, they have become one of America's most favored ways to make charitable donations.

18.     The term donor advised fund aptly describes the instrument.  A **donor** gives assets (*e.g.*, cash, stock, real estate) to a DAF, unconditionally and irrevocably.  The donor then

is able to give **advice** on how the proceeds of the gift will be invested in, and granted out of, the **fund** into which those proceeds are placed. Hence "**donor advised fund.**"

19.     The publicly-available policies issued by a wide range of leading DAFs illuminate the nature of the advice that donors may provide. Each of these makes clear that contributions are irrevocable, the DAF's authority to control assets following their donation is exclusive, and, most relevant here, donors may provide advice with respect to (1) the investment of the proceeds of any donated assets among investment options, and (2) possible grants from the fund.

20.     Specifically, I have conducted a review of the current policies published by the eleven largest donor advised funds. (This is not my first time examining the published policies of other donor advised funds; during my tenure at Vanguard Charitable, from time to time, I had occasion to review the policy guidelines of other DAFs in force at the time. Generally speaking, the policies and guidelines in place today have not changed materially during the past several years.) In 2017, total assets held by DAFs exceeded $110 billion.[1] The eleven charities I discuss in this report account for approximately $70 billion of that total. What follows are specific written statements from the six largest of these eleven charities about the ownership and authority over contributed assets, and the donor's entitlement to provide advice.[2]

21.     The 2017 **Fidelity Charitable** Policy Guidelines: Program Circular state that "***Contributions to Fidelity Charitable are irrevocable***."[3] The Circular goes on to state: "Once Fidelity Charitable accepts a contribution, it is irrevocable and is owned and controlled by the Trustees. The Trustees have exclusive legal control over all contributed assets. Contributions to

---

[1] Alex Daniels, *Value of Donor-Advised Funds Soars Above $110 Billion*, The Chronicle Of Philanthropy (Nov. 13, 2018), https://www.philanthropy.com/article/Value-of-Donor-Advised-Funds/245074 (last visited Sept. 26, 2019).

[2] The policies and guidelines of the remaining five DAFs contain similar language to the statements I have identified in the paragraphs that follow.

[3] *Fidelity Charitable Policy Guidelines: Program Circular* at 1.

Fidelity Charitable are not refundable."[4]  The Circular also provides that "Account Holders, and certain authorized advisors and third-party individuals, may recommend how funds in a Giving Account are allocated among one or a combination of available investment options."[5]  Moreover, "Account Holders and certain authorized advisors or third-party individuals have grant recommendation privileges.  Grants may be recommended to qualified charitable organizations… Grant recommendations are not binding, and are subject to review and approval by the Trustees in their sole discretion."[6]

22.     The **Vanguard Charitable** Policies and Guidelines similarly provide: "Once Vanguard Charitable receives the contributed assets and all required paperwork in good order, the donor no longer has control over the assets."[7]  In addition, "Once accepted by Vanguard Charitable, contributions are unconditional and irrevocable."  "[W]hen contributing, the donor cannot impose any restrictions or conditions that prevent Vanguard Charitable from freely and effectively using the gift to further its mission." [8]  Donors to Vanguard Charitable may provide advice as to the investment and distribution of the proceeds of their giving accounts:  "After a contribution is liquidated, the net proceeds are invested, based on the recommendation of an account's advisor or interested party, in any combination of Vanguard Charitable's investment options,"[9] and "[o]nce an account is funded, account advisors and authorized interested parties may recommend grants at any time to qualified 501(c)(3) public charities."[10]  Of course,

---

[4] *Id.* at 4.
[5] *Id.* at 9.
[6] *Id.* at 15.
[7] Vanguard Charitable, *Policies and Guidelines* at 3.
[8] *Id.* at 7.
[9] *Id.* at 17.
[10] *Id.* at 19.

CONFIDENTIAL

"Vanguard Charitable's board of trustees maintains ultimate authority over all grant distributions."[11]

23.    The **Schwab Charitable Fund** Program Policies and Guidelines state that "All contributions are irrevocable."  In other words, "Donated assets are no longer counted among the account holder's personal investments and are, in fact, the property of Schwab Charitable." [12] The guidelines explain that "all contributions accepted by Schwab Charitable are both irrevocable and unconditional … [and are] subject to the exclusive legal authority and control of Schwab Charitable as to their use and distribution."[13]    Donors to Schwab Charitable "can recommend a name for their account,"[14] "may recommend that their account assets be allocated among a variety of investment pools selected and monitored on a continuing basis by Schwab Charitable,"[15] and "can recommend grants of $50 or more to charities at any time."[16]    Again, "Schwab Charitable may deny grant recommendations…"[17]

24.    The **Silicon Valley Community Foundation** Advised Fund Agreement states, "As required by law, all assets contributed to funds become irrevocable gifts to SVCF, and legal control and responsibility for the funds rest with SVCF."[18]    "In making a gift to SVCF, donors give up all right, title and interest to the assets contributed."[19]    SVCF describes the "advisory privileges" of a donor as "including grant recommendations, investment recommendations, naming the fund and appointment of other fund advisors and successor advisors."[20]

---

[11] *Id.*
[12] Schwab Charitable, *Program Policies and Guidelines* at 4.
[13] *Id.* at 14.
[14] *Id.* at 4.
[15] *Id.* at 20.
[16] *Id.* at 23.
[17] *Id.*
[18] Silicon Valley Community Foundation Advised Fund Agreement, *Appendix – Fund Terms and Conditions* at 1.
[19] *Id.*
[20] *Id.* at 2.

CONFIDENTIAL

25.     **National Philanthropic Trust**'s Guide To Your Donor Advised Fund declares, "Once NPT approves and accepts your contribution, it is irrevocable.  NPT retains exclusive legal control over the contributed asset and you may not impose any material restriction or condition on the gifts."[21]  With respect to the privileges of a donor, the Guide states that donors "have the opportunity to: Contribute the widest range of assets[;] Recommend grants to qualified charities in the U.S. and around the world[;] Choose from a wide range of investment options[;] [and] Establish a legacy in perpetuity by naming successors to your fund."[22]

26.     The **Goldman Sachs Philanthropy Fund** Program Circular states, "Once a contribution has been made to, and accepted by, the Goldman Sachs Philanthropy Fund, it is irrevovable and non-refundable.  Contributions and all related future earnings are no longer the donor's assets; they are the property of the Goldman Sachs Philanthropy Fund."[23]  With respect to the rights of donors, the Program Circular states that "donors can recommend that their irrevocable contributions to the Goldman Sachs Philanthropy Fund be allocated to specified investment options until such time as those funds are distributed by the Goldman Sachs Philanthropy Fund,"[24] and that "[o]nce the account is established, the donor can then make grant recommendations."[25]

27.     Not a single one of the policies of the eleven largest DAFs describes an advisory privilege for donors with respect to the liquidation of donated assets.  All of them make clear that the donor's legal right to control of the donated assets ceases at the moment of donation.

---

[21] National Philanthropic Trust, *Guide To Your Donor Advised Fund* at 1.
[22] *Id.*
[23] Goldman Sachs Philanthropy Fund, *Program Circular* at 2.
[24] *Id.* at 1.
[25] *Id.* at 2.

28.     IRS guidelines regarding donor advised funds bolster my conclusion that donors may provide advice to DAFs with respect to the investment of donated assets and grant-making. Specifically, in August 2006, donor advised funds were written into the IRS tax code for the first time through the Pension Protection Act.  The IRS definition of a donor advised fund states:

> . . . the term "donor advised fund" means a fund or account—(i) which is separately identified through reference to contributions of a donor or donors, (ii) which is owned and controlled by a sponsoring organization, and (iii) with respect to which a donor (or any person appointed or designated by such donor) has, or reasonably expects to have, **advisory privileges with respect to the distribution or investment of amounts held in such fund or account** by reason of the donor's status as a donor.

26 U.S.C. § 4966(d)(2) (emphasis added).  Notably, the statute does not reference any advisory privilege with respect to advice on the liquidation of donated assets.

29.     Several years before the enactment of this statute, leading DAFs evidenced a similar understanding of the role of donor advice.  In particular, a group of the largest DAFs convened in February 2002 to establish an agreed-upon framework of operating procedures and best practices for donor advised funds.  I participated in this effort on behalf of Vanguard Charitable, and Fidelity Charitable was one of the leading participants in this initiative.  Our goal was to set forth best practices for DAFs in order to document emerging industry standards and create a resource for DAFs.  Following meetings in Washington, D.C., we published "Common Operating Procedures for Donor Advised Funds" (the "Common Operating Procedures") in 2002, and distributed it to the group's participants which included Fidelity Charitable, Vanguard Charitable, Schwab Charitable and their respective legal counsel.  By 2004, the group expanded to include T. Rowe Price Charitable (then called T. Rowe Price Program for Charitable Giving), the Ayco Charitable Foundation, and the Greater Washington Jewish Federation.  Following 2004, the group was expanded further to include National Philanthropic Trust, the New York

9

Community Trust, and the Greater Kansas City Community Foundation.  One section of the Common Operating Procedures is entitled "Privileges of a Donor."  In its entirety, that section states:

> The donor makes charitable contributions to a donor advised fund account, and has the privilege of (i) naming the donor advised fund account, (ii) designating donor advisers and successor donor advisers, (iii) making recommendations regarding grants paid out of a donor advised fund account, and (iv) advising on the investment allocation of assets in a donor advised fund account.[26]

Again, there is no reference to any privilege regarding input into the liquidation of a contributed asset.

30.     To the extent donors provide advice to DAFs regarding grant-making, that advice is a suggestion or recommendation that the DAF considers and generally honors, subject to certain conditions.  For example, the Fidelity Charitable website explains that it can only make grants to IRS-qualified public charities, does not make grants to organizations that may be engaged in illegal or non-charitable activity, cannot make grants to private foundations, and cannot approve grants that confer a personal benefit to the donor.[27]

31.     As reflected in the July 18, 2019 Declaration of Dennis Hearst, a Managing Director of J. P. Morgan Chase Bank, N.A., from time to time, some donors provide DAFs with a recommendation concerning the liquidation of donated assets, including publicly traded securities.  But as Mr. Hearst recognizes in his Declaration, the liquidation of donated assets is a matter within the exclusive control of the charity.  There is nothing inherently wrong with a donor expressing a preference relating to the liquidation of donated securities; what is critical to

---

[26] Common Operating Procedures § III(B).
[27] *See, e.g.*, Fidelity Charitable, *Charities you can support*, https://www.fidelitycharitable.org/giving-account/supported-charities.html (last visited Sept. 26, 2019).

CONFIDENTIAL

understand is that, while a donor might provide "advice" regarding the liquidation of a donated asset, the DAF has total control of the liquidation.

32.     There is also an important difference between a donor providing advice with respect to liquidation and a donor extracting from the DAF a *promise* with respect to liquidation (as alleged here).  The former may happen; the latter is impermissible.  In fact, if a donor were able to dictate the terms by which the charity sold donated assets, that would jeopardize the donor's ability to take a tax deduction based on the donation.  This is because it would evidence donor control over the asset, rendering the donation incomplete.  The linchpin of a donor's ability to take a tax deduction based on the charitable gift is the relinquishment of donor control.  The DAF must make its own independent decision as to how to liquidate the donated asset, in the best interests of the charity.

33.     Relatedly, it is critical for a DAF to maintain a line between "advice" and "direction," because a donor is permitted only to advise, not to direct.  DAFs commonly maintain this distinction by establishing policies and procedures.  For example, the governing body of a DAF will typically pre-approve a number of investment pools for holding DAF assets.  The governing body **directs** that the DAF's assets shall be invested in those designated pools, all of which are approved as satisfactory choices for any DAF account.  When a donor then **advises** as between those pre-approved vehicles, it is clear that the direction has already been set by the DAF's governing body—the donor is not giving direction.

34.     Fidelity Charitable's written policies and procedures help maintain this boundary between advice and direction.  In particular, the Fidelity Charitable Code of Conduct provides:

> Donors cannot control their contributions once they're made, and we may never imply that donors have control.  It follows that donors may not impose restrictions or conditions on the assets in their donor-advised fund.

CONFIDENTIAL

Donors have recommendation and advisory privileges only.[28]

35. Finally, a DAF is a tax exempt public charity, not an investment organization. The charity, its overseeing board, and its management have a fiduciary duty to act in the best interests of the charity, not in the best interests of the donors to the charity. That duty includes following the charity's policies and guidelines that support its charitable status. As I have explained, DAFs accordingly adopt policies and guidelines that protect their tax-exempt status and comply with the IRS tax code by making clear that donated assets belong exclusively to the charity; that donations are irrevocable; and that the donor only retains the privilege to provide advice regarding the investment of and grantmaking from their cash donations, or in the event of non-cash donations, the post-liquidation proceeds of their donation. I am not aware of any support—in the tax code, in industry customs and practices, or in the written policies of leading donor advised funds—for the proposition that a donor enjoys any advisory right with respect to the liquidation of donated assets, and any promise between a DAF and a donor that provides the donor with control over the liquidation of a donated asset would put at risk the donor's ability to take advantage of the favorable tax treatment that Congress has provided for gifts to donor advised funds.

## V. FIDELITY CHARITABLE'S POLICIES AND PRACTICES REGARDING LIQUIDATION ARE CONSISTENT WITH OTHER LEADING DAFS

36. It is my opinion based on my experience and my review of the exhibits described herein that Fidelity Charitable's policies and practices regarding the liquidation of donated shares of stock are consistent with those of other leading DAFs.

---

[28] FID-FRBN-0031125.

CONFIDENTIAL

## A.    DAFs Sell Donated Stock As Quickly As Possible

37.    Importantly for this matter, the liquidation of marketable securities as soon as possible is a standard practice of DAFs and is clearly set forth in the Fidelity Charitable Program Circular and the equivalent documents published by other leading DAFs.

38.    As I noted above, I am familiar with and have reviewed the current publicly-available written program policies and guidelines of eleven of the largest DAFs.  All of them accept donations of publicly-traded securities.  All of them also publicly state that they sell donated assets as quickly as possible and/or maintain absolute control, authority, and discretion over the liquidation of those assets.  None of them invite donors to advise on liquidation or provide that they are bound to adhere to such advice, if offered by donors.

39.    The **Fidelity Charitable** Policy Guidelines: Program Circular state that Fidelity Charitable "will liquidate contributions as quickly as possible after all the requisite paperwork has been received, and after the assets have been received in good order."[29]  The Program Circular also states:  "Upon receiving the appropriate paperwork and the donated securities in good order, Fidelity Charitable will generally sell the securities at the earliest date possible, but reserves the right to sell at any time."[30]

40.    Notably here, given the Plaintiffs' allegations regarding J.P. Morgan in Paragraph 8 of their Complaint, the **National Philanthropic Trust** Guide To Your Donor Advised Fund states, "Certain assets, such as publicly-traded stock, may be liquidated immediately while other contributions will be liquidated as soon as practical."[31]  "NPT retains exclusive legal control over the contributed asset and you may not impose any material restriction or condition on the

---

[29] *Fidelity Charitable Policy Guidelines: Program Circular* at 5.
[30] *Id.* at 6.
[31] National Philanthropic Trust, *supra* note 21, at 1.

gift."[32]   The J.P. Morgan Charitable Giving Fund is administered by National Philanthropic Trust.   The July 18, 2019 Declaration of Dennis Hearst that I previously referenced is consistent with the National Philanthropic Trust Guide To Your Donor Advised Fund.   In his declaration, Mr. Hearst states that "[i]t was and is my understanding that a donor may recommend, but may not dictate, the terms of how the Fund and/or NPT liquidate donated assets such as publicly traded securities.   While donors may offer their recommendation with respect to liquidation, they are not permitted to dictate the timing, price or manner of the liquidation of publicly traded securities.   Those issues are solely in the control of the Fund."   The declaration is consistent with the guidance set out by National Philanthropic Trust and further supports my opinion that Fidelity Charitable's policies regarding liquidation are consistent with other leading DAFs. There is, however, additional support for my opinion from the other major DAFs, as indicated below.

41.   The **Vanguard Charitable** Policies and Guidelines similarly provide: "Once Vanguard Charitable receives both the appropriate donation documentation and the donated securities in good order, the securities will be sold as quickly as possible, generally on the day following their receipt."[33]

42.   The **Schwab Charitable Fund** Program Policies and Guidelines state that "Schwab Charitable typically liquidates contributions as quickly as possible after all required, completed paperwork and assets have been received."[34]

43.   The **National Christian Charitable Foundation** Essential Guide to NCF Giving Solutions states that "NCF generally tries to liquidate gifted assets as soon as possible, after both

---

[32] *Id.*
[33] Vanguard Charitable, *supra* note 7, at 9.
[34] Schwab Charitable Fund, *supra* note 12, at 10.

the necessary documentation and the assets are received in good order."[35] "It is the general policy of NCF to sell gifted securities received in good order the next business day after the shares are received in NCF's brokerage account."[36]

44.     The **Greater Kansas City Community Foundation** procedures state, "The general policy of the Community Foundation is to sell all contributed property as soon as practical after receipt so as to minimize market risk."[37]

45.     The **Bank of America Charitable Gift Fund** Program Guidelines state, "After all paperwork is received, in good order and has been approved by the Trustee of the Bank of America Chairtable Gift Fund, contributions (other than non-publicly traded) will generally be sold within two (2) business days (unless it is thinly traded stock which requires Trustee approval, a selling plan, and possible put option agreement) and the net proceeds will be invested according to the investment objective the Donor has recommended."[38]

46.     To the extent other leading DAFs do not state in their written policies and guidelines that they liquidate donated assets as soon as possible, they uniformly state that donated assets are the exclusive property of the DAF and that the DAF intends to liquidate the assets.  For example, the **Goldman Sachs Philanthropy Fund** Program Circular states that "Contributions and all related future earnings are no longer the donor's assets . . . . For contributions such as donated securities and mutual fund shares, the Goldman Sachs Philanthropy Fund expects to sell the shares to generate cash."[39]  The **Renaissance Charitable**

---

[35] National Christian Charitable Foundation, *Essential Guide to NCF Giving Solutions* at 11.
[36] *Id.* at 12.
[37] Greater Kansas City Community Foundation, *Procedures for Establishment and Operation of Funds and Supporting Organizations* at 3.
[38] Bank of America Charitable Gift Fund Program Guidelines at 2.

[39] Goldman Sachs Philanthropy Fund, *supra* note 23, at 2.

**Foundation** Donor Guide states, "In its sole discretion, RCF will determine the timing and execution of a sales strategy for any asset, including a contributed asset, and reserves the right to sell at any time."[40] The **American Endowment Foundation** Donor Advised Fund Gift Acceptance Policy states: "Upon AEF's acceptance of the gift…AEF maintains full discretion with respect to the gift, including but not limited to, any subsequent sale, redemption, transfer or other disposition."[41] And the **Silicon Valley Community Foundation** informs donors that "In order for a donor to take advantage of the tax benefits that flow from a charitable gift, the gift has to be complete—that is, the donor has to part control over the donated assets. The appearance of donor control could put the donor's tax deduction in jeopardy."[42] That foundation also states: "The board of directors and investment committee of SVCF have the right to make any or all investment decisions regarding gifts received, except that fund advisors have advisory privileges with respect to fund investments. All assets contributed to funds will be managed in the community foundation's investment pools…"

**B.    It Is Appropriate For DAFs To Sell Donated Stock As Soon As Possible**

47.    I am familiar with the typical practice of liquidating donated assets as quickly as possible not only from my review of the policies and guidelines of leading DAFs, but also from my seventeen years of experience in leading a major national DAF and interacting with other national DAF leaders during that period. There are several reasons why DAFs generally seek to liquidate donated stock as quickly as possible and why doing so is appropriate.

48.    *First*, DAFs seek to minimize market risk to the charity. By market risk, I am referring to the risk associated with exposure to an individual security and also to the broader

---

[40] Renaissance Charitable Foundation, *A Donor's Guide* at 9.
[41] American Endowment Foundation Donor Advised Fund Gift Acceptance Policy at 4.
[42] Silicon Valley Community Foundation, *supra* note 18, at 4.

market; for example, the market risk associated with holding any individual equity is that the price of that security—and the broader market—may decline over time. Accordingly, DAFs do not speculate in investment market conditions or specific stock values as that is not part of their charitable mission or their area of core competence. Selling donated assets quickly is an effective strategy to minimize market risk and eliminate speculation.

49. **_Second_**, DAFs are public charities, not registered investment advisors; their core competency is giving money away for the public good, and not analyzing and trading stocks. Selling donated assets (including stock and, notably, assets that may be less liquid) as quickly as possible allow DAFs to focus their resources on the "giving away" that is core to their missions.

50. **_Third,_** and relatedly, many DAFs receive donations of cash and non-cash assets of all kinds, including publicly-traded securities, non-traded securities like limited partnerships, real estate, cryptocurrency, and more. A DAF would need to retain investment advisors with a wide range of expertise just to analyze and develop a customized trading strategy for every stock that is donated, and the full array of non-cash assets. To be sure, some DAFs, including Fidelity Charitable, offer special programs (Fidelity Charitable's Charitable Investment Advisor Program – CIAP) that involve the retention of an investment advisor by the charity for purposes of making investment decisions about the assets in a particular account. To my knowledge, in all such cases, these accounts remain subject to certain guidelines and limitations imposed by the charity, governed by the interests of the charity exclusively (and not the interests of the donor), and subject to the aforementioned principles regarding donor control. It is my understanding that the Fairbairns were not enrolled in such a program. With the exception of programs like CIAP, in which investment advisors provide advice about specific accounts, I am not aware of any DAF

that utilizes this strategy or practice with respect to donations the proceeds of which will be allocated to a common investment pool.

51. **Fourth**, DAFs are subject to governance controls, which approve prudent investment options in which the charity's assets may be invested pending distribution. Prompt liquidation of the donated securities allows the proceeds from the sale of those shares to be invested in the prudent investment options approved by the charity in accordance with the DAF's governance structure. A prudent investment for this purpose is one that allows for both the potential growth of assets available over time and also the easy and prompt liquidation of the assets at the point when a grant is recommended, reviewed, and approved. The investment in approved, prudent vehicles increases the charity's ability to fulfill its mission to support the public good.

52. Thus, as a policy matter, it makes sense and is appropriate for a DAF to sell shares as soon as possible.

## VI.   FIDELITY CHARITABLE'S RELATIONSHIP WITH FIDELITY IS ENTIRELY APPROPRIATE

53. Plaintiffs' Complaint questions the relationship between Fidelity Charitable and for-profit Fidelity entities.

54. It is entirely appropriate and standard in the DAF charitable sector for sponsoring charities to have relationships with for-profit corporate entities including those that might have the same brand name. Like any other charitable enterprise, DAFs need a range of goods and services that are best provided by other entities. As illustrations, DAFs need to have technology platforms that operate securely and effectively, they need a brokerage house to execute trades, and they need to be able to invest their funds. Hence, for example, Vanguard Charitable executes its trading activity through Vanguard Brokerage Services, and most of the Vanguard

Charitable investment pools are invested in Vanguard mutual funds. As another example, The Goldman Sachs Philanthropy Fund receives administrative services from a wholly-owned subsidiary of The Goldman Sachs Group, Inc., and its investment manager is Goldman Sachs Asset Management, L.P. These contractual relationships are clearly disclosed in the DAF's written policies and guidelines.

55.    From my experience watching Fidelity Charitable over twenty years and from my review of the materials in Exhibit B, it is clear that Fidelity Charitable has continually offered a broad array of charitable services. This includes a website with wide-ranging functionality from a best-in-class donor-advisor experience, extensive education materials, access to Fidelity Charitable governance documents and clear articulation of how the DAF operates. Additionally, Fidelity Charitable provides expertise in how donors might contribute a wide variety of illiquid assets (real estate, LLC interests, etc). Yet another example is that the charity enables qualified and screened financial advisors to manage DAF accounts within carefully considered, prescribed guidelines. Finally, the charity has always been a leader in bringing new philanthropic tools to the DAF sector. Examples incude the grant "widget," the open investment platform, and the Charitable Investment Advisor Program (CIAP). All of these quality services are supported by the team from FMR LLC whose services the Trustees of Fidelity Charitable contracted. Not only are the services provided to the charity of high quality and great value to donors and the ultimate grant recipients, but they are provided at fair value or better (see below).

56.    Fidelity Charitable is governed by a Board of Trustees that includes nine members (plus one Trustee Emeritus), and, unlike some other DAFs, the trustees are not currently affiliated with FMR LLC in any way. This is strong evidence of the independence of Fidelity Charitable. Of course, the governing boards of all DAFs are required to make fiduciary

decisions in the best interests of their charities. Obtaining services from organizations that share the same brand can be consistent with that fiduciary duty. I understand that Fidelity Charitable conducts an annual review of its relationship with FMR LLC designed to ensure that it is receiving at least fair value for the services that FMR LLC provides. This review is similar to how Vanguard Charitable ensures it receives high value annually from its service providers. In the materials I have reviewed, the Treasurer of Fidelity Charitable has undertaken that analysis and concluded that the charity is receiving at least fair market value.[43] A chart in this analysis depicts in broad strokes the "people, market, technology and services" that FMR LLC provides to Fidelity Charitable.[44] To my knowledge, there is no other set of services provided in the DAF sector that approaches the extent of these services, and they are all provided to Fidelity Charitable at a "fair value (or better) for the fees it is paying FMR LLC."[45] This annual review process is a thorough means of ensuring that Fidelity Charitable's relationship with FMR LLC is overseen professionally and is fair and appropriate.

57. Additionally, it is important to understand that there are only two ongoing fees incurred by the donor advised fund in the course of its normal operation. First, there is an administrative fee charged at the account level that pays for the operations (people, technology, processing, etc.) of the charity. The administrative fee is the true revenue of the organization (not the amount of contributions). In the case of Fidelity Charitable, the administrative fee charged to the DAF accounts is the revenue of the charity and goes to pay for the expense of all the services provided by FMR LLC pursuant to the Master Services Agreement between the Trustees of Fidelity Charitable and FMR. The majority of these expenses are to compensate the

---

[43] Annual Review of the Master Services Agreement ("MSA Review") (2016-2018).
[44] MSA Review (2017) at slide 7.
[45] *Id.* at slide 3.

CONFIDENTIAL

hundreds of employees of FMR LLC that service the charity.[46]  Fidelity Charitable is able to provide a wide menu of valued services while charging administrative fees on individual accounts that are often the lowest in the DAF sector.  In all, Fidelity Charitable is offering the widest array of DAF products and services in the sector, of recognized high quality, at very low expenses to account holders, and at a fair, arms-length rate from FMR LLC.

58.     The second fee is the investment fee charged by the manager of the underlying investments of the pools.  The majority, but not all, of the investment pools offered by Fidelity Charitable invest in Fidelity mutual funds.  The fund expense ratios that Fidelity Charitable charges on these investments are a straight pass-through from FMR (*i.e.*, there is no incremental markup by either party).[47]  An example of the benefit that flows from this investment arrangement is that the fund expense ratios on the two most favored investment options at Fidelity Charitable (the Money Market Pool and the Total Market Index Pool, which represent about 39% of the charity's total pooled investment funds as of December 31, 2017)[48] are less than two-tenths of one percent (<.0020% per annum).[49]  That is very solid value for Fidelity Charitable and positive for the eventual recipient charities who receive grants.

59.     To the extent donors contribute publicly-traded securities to DAFs, DAFs charge commissions associated with the liquidation of those securities.  These fees are clearly disclosed in DAF policies and guidelines including the Fidelity Charitable Program Circular.[50]

---

[46] MSA Review (2016) at slide 7; (2017) at slide 8; (2018) at slide 8.

[47] *See* https://www.fidelitycharitable.org/giving-account/what-it-costs.html (last visited Sept. 26, 2019).

[48] Fidelity Investments Charitable Gift Fund Financial Statements For The Years Ended June 30, 2018 and 2017, https://www.fidelitycharitable.org/content/dam/fc-public/docs/fc-audited-financial-statements-2018-2017.pdf (last visited Sept. 26, 2019).

[49] *Fidelity Charitable Policy Guidelines: Program Circular* at 23.

[50] *Id.* at 22.

60.     Finally, considering that one of the primary functions that FMR LLC provides for Fidelity Charitable is management of billions of dollars of invested assets, I note that the fees paid to FMR LLC, and the returns achieved, are reasonable when compared to the fees and returns that other leading charities (such as colleges, universities, foundations and other leading national donor advised funds) pay for managing their investments.

61.     In sum, Fidelity Charitable's relationship with FMR is appropriately arms length and provides fair value to the DAF and its donors, while providing significant benefits to the ultimate recipient charities.

## VII.    CONCLUSION

62.     I reserve the right to supplement and modify this statement of my opinions in this matter, including in response to additional opinions advanced by experts retained by plaintiffs Malcolm and Emily Fairbairn.

CONFIDENTIAL

Date: 1 October 2019

Benjamin Pierce

# EXHIBIT A

**Benjamin R. Pierce**

120 County Line Road; Bryn Mawr, PA 19010 – 484-452-3952 – ben.pierce@acadiasquam.com

Proven philanthropic leader with executive level experience in growing organizations, teams and people.  Competencies include leadership, management, strategy, governance, finance, human resources, investments, and fund-raising. I'm one of America's foremost experts on donor-advised funds having launched, made financially stable, and then grown a leading national donor-advised fund over seventeen years. Known as a transparent, bridge-building, responsible executive.

---

## Professional Experience

**Co-Founder – Acadia Squam Group**                                    **2019 to present**

The Senior Partner in a philanthropic consulting firm with a mission to increase giving to charities across the United States. The pathway to success is two-fold: 1) inform, educate, assess and counsel various audiences on the details of donor-advised funds, and 2) make various audiences aware of the possibilities in increasing giving by converting illiquid assets to charitable dollars. Success will be measured by the incremental giving a charity receives from both opportunities.

**President - Vanguard Charitable Endowment Program**          **1998- retired July 2015**

One of the largest public charities in America today with over $9 billion in assets, granting in excess of $750 million per year, and receiving annual donations from individuals and organizations exceeding $1.5 billion.  My President's role and responsibilities included:

- Employee 0001; hired by Vanguard Charitable Board of Trustees to start, build and lead this independent national public charity with a mission to increase philanthropy in America through the administration of donor-advised funds.
- Grew the organization steadily over seventeen years, through various economic environments, to 15,000 donors, 70 employees and an operating budget of $15 million.
- The charitable mission was paramount but operating as a business was vital to the organization's long-term success. Superb financial stewardship was at the forefront.
- Developed a strong culture of client service, operational transparency, employee engagement, and a long-term horizon to guide the organization at all times.
- Prominent national advocate of donor-advised funds on Capitol Hill, in the media, and at conferences. Reshaped how donor-advised funds were perceived, positioned and used.
- Worked with high net worth individuals and families, and their advisors, in structuring their charitable contributions. Traveled extensively to cultivate relationships and donations.
- Close interaction with the Board of Trustees formulating and evolving strategy, driving financial stability, and making appropriate long-term technology investments.

**Interim Executive Director – The College of Physicians of Philadelphia   1997-1998**

The College, located in Center City Philadelphia, is a 250-year old honorary medical society, medical history library, and home of the Mutter Museum (world renown anatomical and pathological museum).

Oversaw all aspects of the organization as it was between medical leaders. I recommended and made major human resource and structural changes to insure the organization's future viability. Maintained fundraising initiatives, financial well-being, and team morale during the leadership transition.

**Chief Operating Officer – The College of Physicians of Philadelphia        1990-1997**
Managed all of the internal functions (accounting, finance, investments, technology, operations, human resources) of this venerable Philadelphia institution. Worked closely with the Council and its various Committees. I enhanced financial controls, introduced a major technological transformation, modernized the human resource programs and tightened investment decision-making.

**Financial Analyst/Credit Manager – FMC Corporation                1979-1990**
A Fortune 500 conglomerate with its Industrial Chemical Group headquarters in Philadelphia. As Credit Manager I oversaw a team responsible for collecting $1 billion in annual global revenues. Later served as Financial Analyst for its Marine Colloids Division. That role included analysis, budgeting, cost-accounting work and inventory controls.

**International Credit Manager – Air Products and Chemicals        1977-1979**

**Bank Management Trainee – The Philadelphia National Bank        1974-1977**

---

## Board Experience

**Board of Directors – Support Center for Child Advocates    Philadelphia, PA    Ongoing**
Serve on the Finance and Development Committees. Chairman of annual golf outing raising $125,000.

**Board of Directors – Mount Desert Island Historical Society Mount Desert, ME Ongoing**
Chairman of the Development Committee. Member of the Executive Committee. Essay author.

**Board of Directors – HelpHopeLive                Radnor, PA            2010-2013**
HelpHopeLive is a national philanthropic organization assisting individuals and families deal financially with organ transplants and other major medical challenges.

**Clerk of Session – Bryn Mawr Presbyterian Church  Bryn Mawr, PA        2001-2007**
Lay leader for one of America's foremost Presbyterian churches. Lead the Session of the church through several challenging congregational issues. Charged with feeling the pulse of the congregation and insuring that lay volunteers were effective and responsible. Between 1985-2007, I was an Elder on the Session, a Deacon on the Board of Deacons and a long-standing member of the Personnel Committee. Also served on several Pastor Nominating Committees.

---

## Personal Background
Born and raised in Lincoln, MA. Graduated from Milton Academy, Harvard College (BA in Government in 1974) and Villanova University (MBA in 1988). Enjoy Mount Desert Island in Maine, baseball, reading, crossword puzzles and being outdoors.

## <u>Publications</u>

Ben Pierce, "A Coffeepot: From the American Revolution to a Lasting Mount Desert Island Legacy," Chebacco Vol. XIX (2018) – a publication of the Mount Desert Island Historical Society

# EXHIBIT B

# EXHIBIT B

- Supplemental Written Expert Report of Professor Lawrence Harris

- Expert Report of Dr. Ian Domowitz

- Defendant's Supplemental Objections and Responses To Plaintiffs' First Set of Interrogatories (June 7, 2019)

- Defendant's Objections and Responses to Plaintiffs' Second Set of Interrogatories (June 7, 2019)

- Fidelity Charitable's 2016 Form 990

- Fidelity Charitable's 2017 Form 990

- FID-FRBN-0031146 – 31157

- Transcripts of the Depositions of Gerald Celano, Jacob Clauson, Josh Johnson, Michael McLean, Pamela Norley, Stefan Podvojsky

- Clauson Deposition Exhibits 180, 181, 182, 183, 189

- July 18, 2019 Declaration of Dennis Hearst

- Common Operating Procedures for Donor Advised Funds (February 2002)

- Victoria Bjorklund, "Current Developments For Charitable Giving To Donor-Advised Funds, Supporting Organizations And Donor-Managed Investment Accounts," Georgetown University Law Center Continuing Legal Education (April 28, 2005)

- Fidelity Investments Charitable Gift Fund Financial Statements For The Years Ended June 30, 2018 and 2017

- Annual Review of the Master Services Agreement (2016, 2017, 2018)

- Fidelity Charitable's website

- Publicly available policies and guidelines for Fidelity Investments Charitable Gift Fund, Vanguard Charitable Endowment Program, Schwab Charitable Fund, Silicon Valley Community Foundation, Goldman Sachs Philanthropy Fund, National Philanthropic Trust, National Christian Charitable Foundation, American Endowment Foundation, Renaissance Charitable Foundation, Bank of America Charitable Gift Fund, Greater Kansas City Community Foundation.



Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMILY FAIRBAIRN and MALCOLM FAIRBAIRN,

Plaintiffs,

v.

FIDELITY INVESTMENTS CHARITABLE GIFT FUND,

Defendant.

Case No. 3:18-cv-4881-JSC

Rebuttal Expert Report of Prof. Brian D. Galle

October 15, 2019

## Contents

Introduction ................................................................................................ 2

I. Brief Overview of Donor Advised Funds and Sponsoring Organizations ............... 2

II. DSOs Allow Donors a Substantial Degree of Control Over Donated Assets, Including the Power to Influence the Timing of Disposition ...................................... 4

III. Federal Tax Law Is Irrelevant ............................................................... 6

IV. Industry Liquidation Policies Are Inconsistent with Fidelity Charitable's Alleged Behavior ........................................................................................ 8

V. The Master Services Agreement Unfairly Favors FMR LLC at the Expense of Fidelity Charitable and its Donor-Advisors ............................................................. 11

VI. The Right to Advise Has Substantial Economic Value ........................................ 13

**Introduction**

1. My name is Brian David Galle. I am a Professor of Law at the Georgetown University Law Center, where I have taught since 2015. I have been retained by the plaintiffs, Emily and Malcolm Fairbairn ("plaintiffs") to provide expert testimony in the litigation captioned *Emily Fairbairn and Malcolm Fairbairn v. Fidelity Investments Charitable Gift Fund*, Case No. 3:18-cv-04881-JSC (N.D. Ca.) ("the litigation"). This report is offered as a rebuttal to the Report of Benjamin Pierce, dated October 1, 2019 ("Pierce Report").

2. As described more completely in my initial report, I teach and write on the subject of donor advised funds and charitable organizations more generally. Among other outlets, my work on donor advised funds has appeared in the Washington University Law Review, and my work on how nonprofits manage their investments was published in the Journal of Policy Analysis and Management, the top-ranked U.S. public policy journal. An article of mine on donor control over donee charities appears in the Journal of Law and Economics, the top-rated journal in that field. In addition, I have multiple works in progress on both those topics. "Giving in Time: Donor Advised Funds and Other Vehicles," a book chapter co-authored with Ray Madoff, is forthcoming in an edited volume from the Urban Institute Press. With Ben Marx, I am also the author of "How Do Nonprofits Manage Money?," a working paper. I co-founded the Boston College Forum on Philanthropy and the Public Good, and with the Forum have organized a series of conferences on donor advised fund regulation. I also have participated as an invited expert on the law of donor advised funds at conferences organized by others, such as at the Urban Institute and the NYU Center on Philanthropy and the Law.

3. I have reviewed the Pierce Report and supporting materials cited by Mr. Pierce. The Pierce Report asserts three main conclusions. First, that donors are "only entitled to advise DAFs with respect to (1) investment of proceeds from donated assets, and (2) grants that DAFs, including Fidelity Charitable, will consider." Pierce Report ¶ 14. Second, that if a DAF receives advice regarding the sale of donated assets, "DAFs nevertheless have exclusive authority to sell donated assets as they deem appropriate." *Id*. Third, that the relationship between defendant Fidelity Charitable and the for-profit entity known as FMR, LLC is "appropriate," which is undefined but which I take to mean satisfies the fiduciary and other legal obligations of Fidelity Charitable. In my opinion, the Pierce Report is mistaken in all of these conclusions.

**I. Brief Overview of Donor Advised Funds and Sponsoring Organizations**

4. A donor-advised fund ("DAF") is an investment account holding assets solely for charitable uses. These accounts are typically administered by a charitable

organization, sometimes referred to as a donor-advised fund sponsoring organization, or DSO.[1] U.S. Dep't of the Treasury, *Report to Congress on Supporting Organizations and Donor Advised Funds* ("Treasury Report") 44 (Dec. 2011). In some cases the DSO engages in charitable activity in addition to the sponsoring of DAF accounts; DSOs include churches, universities, and community organizations. *Id*. at 49. The largest DSOs, however, engage almost exclusively in DAF sponsoring activities. That is, they exist in order to collect money and other property from donors, convert contributed property to liquid assets, manage the investment of the resulting funds, and facilitate donations from the investment accounts to other charities. *Id*. These firms are often referred to as "commercial" DSOs. *Id*. Commercial DSOs now annually take in tens of billions of dollars in new contributions, and they distribute billions to charity. *Id*. at 49-50; National Philanthropic Trust, *The 2018 DAF Report*, https://www.nptrust.org/reports/daf-report/.

5. In a standard DAF arrangement, donors make tax-deductible contributions to the DSO, which in turn earmarks those funds for deposit into a DAF account. In order to qualify for a tax deduction, gifts must be irrevocable. However, the DSO allows donors to choose from a menu of available options for investing the funds in the DAF. Donors also "advise" the DSO on when and where to contribute DAF proceeds, with the DSO typically reserving the right to reject advice. In practice, DSOs rarely if ever reject "advice" unless a proposed donation would contravene U.S. tax or other law. Aside from the advisor, the DSO, and in some instances the advisor's designees, no other individual can direct the use of DAF funds. Many DSOs, including Fidelity Charitable, allow the right to provide advice with respect to a given DAF to be inherited or otherwise assignable by the original donor. DSOs do not initiate donations from DAFs on their own unless an individual account has been inactive for an extended period of years. Fidelity Charitable's policies provide a typical example: Fidelity Charitable prompts its account holders to make minimum grants if an account is inactive and only deems an account "abandoned" if there is no grant activity for 5 years. *Fidelity Charitable Program Guidelines* at 18, FID-FRBN-0039512.

6. Many commercial DSOs work in close partnership with a for-profit investment firm. In nearly all these cases, the DSO was itself established by (and often shares a name with) the for-profit firm with which it partners, but formally the two are separate entities. *See* Molly Sherlock & Jane Gravelle, Congressional Research Service, *An Analysis of Charitable Giving and Donor Advised Funds* ("Sherlock & Gravelle") 2 (July 2012), https://fas.org/sgp/crs/misc/R42595.pdf. The DSO contracts

---

[1] In common usage, commentators often use the term "DAF" to refer both to individual DAF accounts as well as to their sponsoring organization. For clarity, I will use the term DSO to refer to the sponsoring entity and DAF to refer to the individual accounts.

with the investment firm to help liquidate non-cash contributed assets. The menu of investment options offered by the DSO mostly comprises a subset of investment plans available through the investment firm, usually mutual funds or exchange-traded funds. The investment firm charges the DSO investment advising fees for funds deposited in these accounts, which often is the same fee charged to individual investors in those plans, and also imposes an added set of charges for other services. Both these sets of charges are usually assessed on and deducted from the funds available in individual DAF accounts.

## II. DSOs Allow Donors a Substantial Degree of Control Over Donated Assets, Including the Power to Influence the Timing of Disposition

7. The Pierce Report states that the large DSOs whose policies the author examined do not advertise in their printed promotional materials "an advisory privilege for donors with respect to the liquidation of donated assets." *Id*. at ¶ 27. This is semantics. As the Pierce Report recognizes, it is an industry-wide practice to allow donors to advise on the "investment allocation of assets." *Id*. at ¶29. Advice on whether to hold a contributed asset or instead to sell it is in fact advice on the "investment allocation of assets." Further, Pierce's summary conspicuously omits JP Morgan Charitable ("JPMC"). JPMC donors can specify "the timing and rate at which the donated securities are liquidated." JP Morgan Charitable Giving Fund Summary, FRBN00012506; JP Morgan Charitable Gift Fund Program Circular at 1 (Dec. 2017), CHASE000014 (offering "special handling" for sale of "certain concentrated positions"). JP Morgan Charitable's partner, National Philanthropic Trust, similarly states that it "may be able to hold" a donated asset "prior to sale for a period of time." National Philanthropic Trust, *Illiquid Asset Contribution Guidelines* 2 (Aug. 2019), https://www.nptrust.org/wp-content/uploads/2019/08/Illiquid-Asset-Contribution-Guidelines-NPT.pdf.

8. Even if the Pierce Report was correct in stating that DSOs do not widely advertise opportunities for donors to influence the timing of disposition of donated assets, that is of course not the same thing as proof that the DSOs do not in fact offer such services. Policies advertised to retail investors shed little light on the actual practices DSOs apply to their largest donors. Competition for the wealthiest donors is fierce. For instance, the Complaint alleges that Fidelity Charitable offered the Fairbairns a unique fee structure not open to the general public. Complaint ¶ 51.

9. Many DSOs provide individualized attention and special policies for large donors. For example, Fidelity Charitable requires most contributors to select an investment from among a menu of mutual funds managed by FMR LLC. But contributors of $5 million or more have a larger range of options under the so-called "DonorFlex" Program. Fidelity Charitable states that for DonorFlex contributors, investments in

hedge funds and other private equity will be "considered on a case-by-case basis." Fidelity DonorFlex Program Overview, FID-FRBN-0003370. Some organizations go further. The Silicon Valley Community Foundation, one of the country's largest DSOs, offers $1 million donors the opportunity to use an "individually managed fund." Under this program, the donor's personal investment advisor chooses the investment portfolio the donor can invest in, subject to review by the DSO, in effect continuing to manage the donor's money even after it has been contributed. Silicon Valley Community Foundation, *Individually Managed Funds*, https://siliconvalleycf.org/individually-managed-funds. National Philanthropic Trust offers a similar program. National Philanthropic Trust, *Donor Advised Funds— FAQ*, https://www.nptrust.org/donor-advised-funds/faq/.

10. Other large DSOs offer even greater degrees of control over donated assets. For instance, Donor's Trust publicly available materials state that donors may provide a list of approved giving principles, and that the organization will not allow subsequent gifts inconsistent with those principles. Donors Capital Fund, *How it Works*, http://donorscapitalfund.org/HowItWorks.aspx; Donors Capital Fund, *About Us—FAQs*, http://donorscapitalfund.org/AboutUs/FAQs.aspx (stating that donors can "rely on Donors Capital Fund to protect and enforce" the donor's "charitable intent statement").

11. The Pierce Report also quotes language from DSO sponsors to the effect that donated assets become the property of the DSO, as apparent support for the Report's conclusion that DSOs do not allow donors to advise on the timing of asset sales. Pierce Report ¶ 46. But a charity's title ownership of an asset has almost no relevance to whether the charity can or will agree to how that asset will be sold or otherwise employed. First, of course, an owner can make promises to another about how the owner will dispose of that asset.

12. More importantly, a charity can own a piece of property but still be legally obligated to comply with restrictions on the charity's use or disposition of that property. Few rules of charity law have longer standing or more thorough protections than a donor's right to control a donee organization's use of donated assets. Indeed, development of the concept of charity itself was closely intertwined with ongoing donor control. The Statute of Charitable Uses, adopted in the United Kingdom in 1601, is often considered the starting point of modern Anglo-American charity law. That statute was enacted exactly in order to allow donors to dictate the terms of use for contributed assets in perpetuity.

13. American charity law is similarly dedicated to preserving donor control over nearly every aspect of a charity's use of donated assets. For example, the *cy pres* rule, named from an antiquated French term meaning "as close as possible," generally requires that a charity adhere as nearly as practical to every term and

condition attached by donors when assets are contributed. A well-known example involves the Barnes Foundation, established in the early 20th Century by the inventor and art collector Albert Barnes. Albert developed his own highly detailed theory about how art should be presented, and he built a museum to house his collection and embody his theory. The document establishing the Barnes Foundation directed that the art never be sold, and that it continue on display exactly as Albert had originally directed unless that were to prove completely unsustainable. While ultimately economic circumstances forced a relocation of the collection, it continues to this day to hang in a facility that "replicates the dimensions and layout" of Albert's original vision. Barnes Foundation, *About Us*, https://www.barnesfoundation.org/about.

14. Today, donor control over the timing and manner of asset sales by the charity is widespread and routine. Most states have adopted the Uniform Prudent Management of Institutional Funds Act and the Uniform Prudent Investor Act. These provisions give donors the power to dictate the investment strategy that charities pursue with donated assets—when to sell, what to buy, how much to diversify. As the drafter of one of these model statutes summarizes, "law requires charities to comply with donors' restrictions." Susan N. Gary, *The Problems With Donor Intent: Interpretation, Enforcement, and Doing the Right Thing*, 85 Chi-Kent L. Rev. 977, 995 (2010).

15. Under these states' laws, as well as applicable federal tax law, the one thing that a donor may not do is to oblige a charity to use assets for the donor's personal benefit or the benefit of some third party, unless that benefit is merely incidental to some charitable purpose. A donor cannot, for example, oblige a charity to use donated funds to purchase inventory from the donor's business, or make donated real estate available for the donor to live in.

16. Therefore, the fact that a charity states that it owns an asset after donation in no way can be understood as a statement regarding the donor's ability to attach conditions to how the charity disposes of that asset.

17. In sum, the allegation in the Complaint that Fidelity Charitable sought and agreed to follow plaintiffs' preferences with respect to the timing of liquidation of WATT stock is consistent with industry practices and long-standing charity law.

## III. Federal Tax Law Is Irrelevant

18. At times, the Pierce Report appears to assert that Fidelity Charitable would have been legally prohibited from granting the Fairbairns power to dictate the timing of the WATT stock sale. In support of its argument, the Report cites a 2006 federal statute defining donor-advised funds, Pierce Report ¶28, and asserts without any supporting citation that such a grant would "jeopardize the donor's

ability to take a tax deduction," *id.* at ¶¶ 32, 35. Mr. Pierce does not appear to have any legal training or other evident qualifications to opine on legal matters. In any event, both these claims are mistaken.

19. First, the federal statute cited by the Pierce Report is irrelevant.[2] That provision was adopted in order to ensure that the DSO structure would not be used to avoid certain regulatory obligations that apply to grant-making "private foundations." It is not, and was never intended to be, an *exclusive* list of all the potential features of a DSO. Instead, the statute simply identifies those features that present the risk that an organization might be able to escape the private foundation regulations. Indeed, if the Pierce Report's assumption were correct, Fidelity Charitable would not be a "donor advised fund," because it offers services, such as individualized investment advice for large donors, that do not appear in the statute.

20. Next, the Pierce Report's suggestion that tax law prevents a charity from promising its donors to not sell too quickly or to otherwise exercise due care when selling large blocks of stock is baseless and verges on the absurd. As I described in paragraphs 12 through 16, above, U.S. law in general not only allows but vigorously supports a donor's power to restrict sale or other use of donated assets. If the Pierce Report were correct, thousands of well-known charities — including DSOs such as Donor's Trust — would be in danger of losing their legal entitlement to tax-deductible contributions.

21. Given the Pierce Report's failure to cite any relevant authority or other evidence, it is difficult to understand on what basis the author formed his tax-law opinions. I am aware of one non-precedential opinion, later vacated, that may form the basis for the Pierce Report's mistaken impression. In that case, *Fund for Anonymous Gifts v. IRS*, No. Civ. A. 95-1629(RCL) (unpublished) (D.D.C. Apr. 15, 1997), *vacated and remanded*, 194 F.3d 173 (D.C. Cir. 1999), the IRS challenged the tax exemption of a DSO-like organization. According to the Court, however, the entity allowed donors far more power than most large DSOs: "Under the Agreement, the [organization] is bound by *any* enforceable conditions subsequent

---

[2] The Pierce Report labels the quoted statutory text as "the IRS definition of a donor advised fund," Pierce Report ¶ 28, but of course statutes are written by Congress, not by the IRS or any other agency. 26 U.S.C. § 4966(d)(2)(A) reads as follows:

    (2) Donor advised fund.—

        (A) In general.--Except as provided in subparagraph (B) or (C), the term "donor advised fund" means a fund or account—

            (i) which is separately identified by reference to contributions of a donor or donors,

            (ii) which is owned and controlled by a sponsoring organization, and

            (iii) with respect to which a donor (or any person appointed or designated by such donor) has, or reasonably expects to have, advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor.

which a donor places on his donation. These conditions include who receives the donation, when the donation is received, and how the donation is managed." *Id.* at *4 (emph. added). Without explaining its reasoning in detail, the Court concluded that this "full control" retained by the donor was not consistent with a charitable purpose. *Id.*

22. The facts in *Fund for Anonymous Gifts* are far removed from this case. Most importantly, because it was an unpublished opinion from a district court that later was vacated, that decision is not controlling in any court, even the court that decided it.

23. Even if the decision had any legal force, it would not apply to Fidelity Charitable. Fidelity Charitable and other DSOs deny donors the formal authority to dictate when and where to donate, or how the individual fund accounts will be invested. This difference is highly significant. The *Fund for Anonymous Gifts* court expressly declared that, on that basis, "the Fidelity scheme is different than the scheme here" because it does not "contemplate any continuing control over the investment by the donor." *Id.* at 5; *see also National Foundation, Inc. v. U.S.*, 13 Cl. Ct. 486 (1987) (upholding exemption of DSO that reserved discretion for board to reject recommended donations). The increment of influence plaintiffs assert here, namely the power to hold the fund to the promises alleged in the Complaint — promises that amount to agreeing not to wastefully squander donated assets by selling large lots in short time periods—is vastly smaller than the comprehensive authority wielded by Fund for Anonymous Gifts donors. In my opinion this authority would raise no colorable concerns even for the court that decided *Fund for Anonymous Gifts.*

## IV. Industry Liquidation Policies Are Inconsistent with Fidelity Charitable's Alleged Behavior

24. The Pierce Report claims that most DSOs have policies of liquidating donated assets soon after receipt. Pierce Report at ¶¶ 47–52. Although the Report does not make clear what connection this claim has with its conclusions, I infer that it intends to suggest that Fidelity Charitable's decision to rapidly liquidate the WATT stock was not negligent, but instead in service of legitimate charitable goals. The Pierce Report does not appear to reach an express conclusion as to whether these generally-applicable policies were relevant to the events alleged in the Complaint. At no point does the Pierce Report state that it was reasonable for Fidelity Charitable to liquidate 1.93 million shares of WATT stock in 2.5 hours on the last trading day of the year. In any event, to the extent that the Report attempts to draw on general DSO policies to justify Fidelity Charitable's actions, that attempt is ill-founded.

25. As the Pierce Report itself concedes, other DSOs recognize that rapid liquidation is not always prudent, especially in the case of large blocks or thinly-traded assets. For example, Bank of America Charitable Gift Fund makes special provision for sale of "thinly traded stock." Pierce Report ¶ 45. National Philanthropic Trust does not liquidate all assets immediately, but instead sells "as soon as practical," *id.* ¶ 40, and in the case of illiquid assets, it is "able to hold" the asset for some period "prior to sale," National Philanthropic Trust, *Illiquid Asset Contribution Guidelines* 2 (Aug. 2019), https://www.nptrust.org/wp-content/uploads/2019/08/Illiquid-Asset-Contribution-Guidelines-NPT.pdf.

26. In other cases, the Pierce Report also selectively quotes from some DSO materials to give the misimpression that liquidation cannot be staggered over time. Pierce Report ¶ 42 states that Schwab Charitable Fund "liquidates contributions as quickly as possible." But Schwab also states that "concentrated positions must be liquidated over time….Each contribution of a concentrated position has its own timeline for diversification….Thinly traded or illiquid securities generally take longer to liquidate." Schwab Charitable, *2018 Program Policies* & Guidelines 13–14 (Apr. 2019), https://www.schwabcharitable.org/public/charitable/features/program_policies. Pierce Report ¶ 41 states that Vanguard Charitable sells donated assets "as quickly as possible, generally on the day following their receipt." However, Vanguard Charitable further provides that "Thinly traded, restricted, or illiquid securities may require special treatment and …. also generally take longer to liquidate." Vanguard Charitable, *Policies & Guidelines* 9 (2018 ), https://www.vanguardcharitable.org/sites/default/files/upload/2018%20Policies%20and%20Guidelines_112618_ABW.pdf.

27. The Pierce Report is similarly incomplete in its summary of the reasons DSOs may seek prompt liquidation. Specifically, the Report fails to mention that DSOs have a financial incentive to convert assets rapidly. DSOs charge donors fees for asset management and other services. These fees are calculated as a percentage of assets under management, assessed on a daily basis. *E.g.*, Ninth Amended and Restated Master Services Agreement §3(A)(i), FID-FRBN-0031152. Therefore, the longer donor assets are invested in investment options offered by the DSO, the larger the stream of income the DSO earns. Likewise, DSOs contract with asset management firms to invest donated funds. *Id.* A portion of the DSO management fee is paid to the asset manager in exchange for investment services. *Id.* The asset manager thus shares with the DSO the incentive to place assets under management as rapidly as possible.

28. The Pierce Report also offers supposed justifications for rapid liquidation that are nonsensical or inconsistent with prudent management of charitable assets. Paragraphs 47 and 48 claim that a DSO should sell contributed assets "as quickly

as possible" in order to "minimize market risk." The Pierce Report offers no supporting evidence to back up these assertions. As modern governing law recognizes, prudent investment managers can and should regularly invest in publicly-traded stock. Uniform Prudent Management of Institutional Funds Act § 3; *see* Max M. Schanzenbach & Robert H. Sitkoff, *Did Reform of Prudent Trust Investment Laws Change Trust Portfolio Allocation*, 50 J. L. & Econ. 681 (2007) (contrasting modern standard with predecessor law that prohibited holding of certain forms of investments). Stock traded publicly on an exchange poses no particular risk to the organization.

29. To be sure, rapid sales do minimize the period in which the firm is exposed to asset value fluctuations. But rapid sales also can have dramatic costs. As commentators recognize, the duty of prudent investment requires managers to consider both the costs and benefits of any investment strategy. *E.g.*, Edward C. Halbach, *Trust Investment Law in the Third Restatement*, 27 Real Property, Probate, and Trust J. 407, 437 (1992). No prudent manager would adopt an immediate-liquidation policy by considering only the benefits and not the costs. Consider, for example, the fact that most commercial DSOs accept real estate. A valuable real estate parcel can be sold in a day, but only by offering it at fire sale prices. Is this massive loss in value a worthwhile exchange for shielding the DSO from the risk of fluctuations in value? No, that would be absurd: one does not sell an asset for $10 in order to avoid the risk that it will fall in value from $20 to $15. Numerous judicial decisions have held that prudent management sometimes requires retaining an asset rather than selling it, particularly if a rapid sale would result in a lower sale price. *See* Trent E. Kiziah, *The Trustee's Duty to Diversify: An Examination of the Developing Case Law*, 36 ACTEC J. 357, 377-78 (2010) (summarizing cases).

30. Pierce Report ¶¶ 49 and 50 also suggest that rapid liquidation of donated assets conserves the charity's resources, allowing it to avoid the need to hire outside advisors or devote manager attention to investment management. Here again, these claims fail to reflect modern law by focusing only on costs and ignoring benefits. A prudent manager must be willing to incur the costs of expert advice where necessary in order to maximize the value of the assets under management. *Bogert's Trusts and Trustees* § 612. Fidelity Charitable, like other DSOs, already offers programs in which donor-advisors can recommend a wide range of non-standard investments, DonorFlex Program Overview, FID-FRBN-0003370, and presumably all of these are reviewed by Fidelity Charitable or its hired experts. The notion that Fidelity Charitable had to immediately liquidate a publicly-traded stock because the firm lacked the expertise to evaluate that stock is thus extraordinarily implausible.

31. Lastly, the Pierce Report suggests that liquidation serves the charity's interest in limiting investments to those deemed prudent by the DSO's "governance structure." Pierce Report ¶ 51. The Report does not explain why contributed assets cannot be evaluated individually for prudence by the relevant "structure." Indeed, Fidelity Charitable and other DSOs allow donors to recommend investments in private equity funds that can be reviewed on a "case by case basis." Fidelity DonorFlex Program Overview, FID-FRBN-0003370. Other DSOs even allow large donors to use their own investment advisor to select a portfolio. Silicon Valley Community Foundation, *Individually Managed Funds*, https://siliconvalleycf.org/individually-managed-funds; National Philanthropic Trust, *Donor Advised Funds—FAQ*, https://www.nptrust.org/donor-advised-funds/faq/

32. In short, the rationales offered in the Pierce Report do not justify Fidelity Charitable's decision to liquidate the WATT stock. DSOs do not have a uniform policy of immediately liquidating every donated asset, but instead recognize that it is prudent to hold some assets for a period in order to better balance risk against return. If such a policy existed, the supposed rationales the Pierce Report offers for it are unpersuasive.

## V. The Master Services Agreement Unfairly Favors FMR LLC at the Expense of Fidelity Charitable and its Donor-Advisors

33. The Pierce Report avers that "Fidelity Charitable's relationship with FMR is appropriately arms [sic] length and provides fair value to the DAF and its donors." ¶ 61. Although a full assessment of whether FMR LLC provides fair value for the fees charged is difficult with the available materials, at a minimum it is clear that the Pierce Report does not persuasively establish that the fees are in fact fair.

34. As an initial matter, two factors provide powerful reasons to doubt that the contract between Fidelity Charitable and FMR LLC is genuinely negotiated at arm's length in a fashion that ensures that Fidelity Charitable is not providing excess benefits to FMR LLC. The first is the market structure of the largest commercial DSOs. Each of these entities was established by a large, for-profit investment advisor. Since their inception, every one of these DSOs has contracted exclusively with the founding for-profit advisor for delivery of account management and related customer service, and nearly exclusively for provision of investment advice. Each for-profit offers different fee structures, and each has its own unique history of investment returns and customer satisfaction. Nonetheless, by a remarkable coincidence, no DSO has ever concluded that it can obtain a better deal for its donor-advisors by contracting with any entity other than its founder. That fact strongly suggests that DSO boards are not in fact genuinely weighing competing investment advisors, but instead are effectively controlled by or locked

into their relationship with the founding for-profit. If it is the case that any one combination of fees and investment performance is the best deal available, why aren't all commercial DSOs contracting with the firm offering that combination?

35. The second factor that suggests that DSOs are not treated fairly by their contracts with their investment advisors is the fact that most of them, including Fidelity Charitable, share a name and other "trade dress," such as logos and slogans, with the investment advisor. These rights are often negotiated together with other fee arrangements and embodied in a single agreement. *E.g.*, Ninth Amended and Restated Master Services Agreement §6(A), FID-FRBN-0031152. As a practical matter, then, the DSO is bound economically to its investment advisor. To walk away from an investment contract, the DSO would also have to abandon all its brand recognition, consumer recognition, and good will that accompany that recognition. By tying name and trade dress rights together with other contractual provisions, these agreements impose a massive exit tax on any DSO that attempts to negotiate with a rival advisor. Effectively, it is FMR LLC, not Fidelity Charitable, that decides whether Fidelity Charitable will continue to employ FMR LLC. IRS guidance suggests that, in a joint venture between a charity and for-profit entity, similar provisions tend to show that the charity is not eligible for tax-exempt status because the for-profit exerts excessive control. *See* Revenue Ruling 98-15, at 18 (stating that fact that for-profit management company had right to "unilaterally" renew contract tended to show that partnership did not further exempt purposes).

36. The Pierce Report states, at ¶ 56, that Fidelity Charitable's Board of Directors regularly reviews the fairness of its deal with FMR LLC, as law requires. After reviewing materials considered by the Board, I can confirm the Report's claim that the Board was presented with materials showing that Fidelity Charitable pays fees comparable to those of several of its competitors, and considerably lower than the fees paid by some others. This comparison, however, does not establish that the fees are fair to Fidelity Charitable. As I have explained, all of the major commercial DSOs are tightly bound to their founding for-profit, and none has ever shown any willingness to actively consider alternative service providers. Therefore, there is no reason to believe that the fees paid by other DSOs are fair. The fact that Fidelity Charitable pays fees comparable to other DSOs can therefore not demonstrate fairness; such a comparison can at best establish that Fidelity Charitable's relationship with FMR LLC is *no more unfair* than the relationships of other DSOs to their own respective founders.

37. The Pierce Report asserts without supporting evidence that Fidelity Charitable's fees are comparable to those paid by university endowments, ¶ 60, but the Report does not explain how Pierce was able to reach this conclusion. Among other charges, Fidelity Charitable pays annual "administrative service fees" of sixty basis points for Fidelity Charitable's assets in accounts of under $500,000. Ninth

Amended and Restated Master Services Agreement §3(A), FID-FRBN-0031152. These charges are in addition to the fees charged by the individual investment funds selected by donor-advisors. To my knowledge, there are no comparable administrative service fees charged to colleges and universities (other than those that are themselves DSOs), making direct apples-to-apples comparisons problematic. Further, institutions of higher education are highly resistant to disclosing their investment expenses, and this data is for the most part not publicly reported.

38. It is possible, though, to draw some inferences about fee structures from college tax returns. To take one prominent example, at Harvard University, fiscal year 2017 investment management fees totaled $130.3 million on investment assets of $38.8 billion. Presidents and Fellows of Harvard University Form 990, Tax Year 2017, https://projects.propublica.org/nonprofits/organizations/42103580/201931299349301 613/IRS990. By simple division, this suggests an average fee of about 33.5 basis points. Obviously, this is about half of the administrative service fee FMR LLC charges on top of the fees imposed by its individual funds.

## VI. The Right to Advise Has Substantial Economic Value

39. Although the Pierce Report does not offer a bottom-line assessment of the nature of a DAF donor's advisory privileges, various language in the Report can be taken to suggest that the opportunity to provide advice creates no cognizable rights for the donor-advisor. For example, the Report states repeatedly that a DSO has "exclusive" authority to make final decisions about how to invest and distribute donated funds, and that donor advice is not "binding." ¶¶19, 21, 30, 33.

40. It is widely recognized that following donor advice is a business necessity for a DSO. Roger Colinvaux, *Donor Advised Funds: Charitable Spending Vehicles for the 21st Century*, 92 Wash. L. Rev. 39, 52 (2018). If a DSO does not follow donor advice, future donors have no reason to contribute funds to the organization. Some DSOs do warn donors that they will not follow advice to make certain donations that would raise tax law issues for the DSO, such as donations to organizations that intervene in campaigns for elective office. Treasury Report at 69. But aside from these categories, no public evidence exists to suggest that DSOs ever decline to implement donor-advisor choices. *Id.* ("[I]n general, donor advice [i]s followed."); Sherlock & Gravelle 6 (same); Sherlock & Gravelle 3 ("Evidence suggests ... that donors to DAFs have effective control over grants."). The special privilege of donors to advise on the distribution of their donor-advised funds is unique to DSO sponsors. When the donor makes a contribution to a commercial DAF like Fidelity Charitable, the money has technically been donated to charity, but no decision has been made regarding the beneficiary of the funds or the charitable purpose to which the funds

will be put. The DSO will not direct the funds to be used for any charitable purpose unless the donor fails to make any recommendations for several consecutive years. The donor thus retains the most substantial interest in the DAF, because the donor will effectively decide on the ultimate beneficiaries and the intended charitable purposes.

41. Donors accordingly have a well-founded and reasonable expectation that the opportunity to "advise" on the investment and donation of a DAF account is economically meaningful. Indeed, donors are willing to pay handsomely for this opportunity. On average, commercial DSO management fees are as large or larger than the tax benefits their accounts offer, suggesting that the choice to donate is on net costly for the donor. John R. Brooks, *The Missing Tax Benefit of Donor-Advised Funds*, 150 Tax Notes 1013 (2016). In the 2017 Fiscal Year, FMR LLC earned $58.9 million in administrative fees from the services it provided to Fidelity Charitable. Fidelity Investments Charitable Gift Fund Form 990 for Tax Year 2017 Sched. O, https://www.fidelitycharitable.org/content/dam/fc-public/docs/fc/fc-990-fy-2017.pdf. Again, that reported administrative fee is only part of the revenue that FMR LLC receives, because additional fees are charged by individual investment funds and for services like selling stock. Many popular FMR LLC funds charge in excess of 70 annual basis points. Fidelity Charitable reported about $22 billion in investment assets in FY 2017, meaning that even a modest 10-basis-point average fee would be another $22 million in revenues. And the number could be much higher. .

42. As yet further evidence of the value of the advisory privilege, many DSOs allow donor-advisors to transfer the privilege by gift or devise. *E.g.*, *Fidelity Charitable Program Guidelines* 17–18, FRBN-0039512; National Philanthropic Trust, *Donor Advised Funds—FAQ*, https://www.nptrust.org/donor-advised-funds/faq/; *see* Treasury Report at 22.

43. While it is true that the terms of most DSO agreements state that the DSO retains the power to disregard donor advice, that should not be understood to mean that the DSO makes an unlimited reservation of the power to spend donations in any manner. Taken as a whole, DSO promotional materials clearly represent that contributed funds, less disclosed fees, will normally be transferred to a charity of the donor-advisor's choosing. The DSO is not free to convert contributions to other uses, such as employee salary, except to the extent that such conversion is necessary to cover fees described in the representations made to donors. If this were not the case, all DSO representations as to fee amounts would be empty promises. That outcome would not be in the best interests of donor-advisors *or DSOs*, as anti-fraud protections are generally a necessary component of any mass fundraising enterprise. Given the informational imbalance between funder and fundraiser, a rational funder will not contribute without knowing that misrepresentations are redressable. John C. Coffee, Jr., *Market Failure and the Economics Case for a*

*Mandatory Disclosure System*, 70 Va. L. Rev. 717 (1984). Accordingly, since the unlimited reservation interpretation would make both sides of the bargain worse off, the parties should not be understood to have agreed to such a position.

Dated: October 15, 2019

Brian Galle

# Appendix A: Materials Consulted

## Production Documents

- Fidelity Charitable Program Guidelines
  (FID-FRBN-0039512)

- Ninth Amended and Restated Master Services Agreement
  (FID-FRBN-0031152)

- Fidelity DonorFlex Program Overview
  (FID-FRBN-0003370)

- JP Morgan Charitable Giving Fund Summary
  (FRBN00012506)

- JP Morgan Charitable Gift Fund Program Circular (Dec. 2017)
  (CHASE000014)

## Primary & Secondary Legal Authorities

- U.S. Dep't of the Treasury, Report to Congress on Supporting Organizations
  and Donor Advised Funds 44 (Dec. 2011)

- Fund for Anonymous Gifts v. IRS, No. Civ. A. 95-1629(RCL) (unpublished)
  (D.D.C. Apr. 15, 1997), vacated and remanded, 194 F.3d 173 (D.C. Cir. 1999)

- National Foundation, Inc. v. U.S., 13 Cl. Ct. 486 (1987)

- Uniform Prudent Management of Institutional Funds Act § 3

- Bogert's Trusts and Trustees § 612

- IRS Revenue Ruling 98-15

## Academic Works

- Molly Sherlock & Jane Gravelle, Congressional Research Service, An Analysis of Charitable Giving and Donor Advised Funds (June 2012), https://fas.org/sgp/crs/misc/R42595.pdf.

- Susan N. Gary, The Problems With Donor Intent: Interpretation, Enforcement, and Doing the Right Thing, 85 Chi-Kent L. Rev. 977 (2010)

- Max M. Schanzenbach & Robert H. Sitkoff, Did Reform of Prudent Trust Investment Laws Change Trust Portfolio Allocation, 50 J. L. & Econ. 681 (2007)

- Edward C. Halbach, Trust Investment Law in the Third Restatement, 27 Real Property, Probate, and Trust J. 407 (1992)

- Trent E. Kiziah, The Trustee's Duty to Diversify: An Examination of the Developing Case Law, 36 ACTEC J. 357 (2010)

- Roger Colinvaux, Donor Advised Funds: Charitable Spending Vehicles for the 21st Century, 92 Wash. L. Rev. 39 (2018)

- John R. Brooks, The Missing Tax Benefit of Donor-Advised Funds, 150 Tax Notes 1013 (2016)

- John C. Coffee, Jr., Market Failure and the Economics Case for a Mandatory Disclosure System, 70 Va. L. Rev. 717 (1984)

## Websites

- National Philanthropic Trust, Donor Advised Funds FAQ https://www.nptrust.org/donor-advised-funds/faq/

- National Philanthropic Trust, The 2018 DAF Report, https://www.nptrust.org/reports/daf-report/

- National Philanthropic Trust, Illiquid Asset Contribution Guidelines (Aug. 2019), https://www.nptrust.org/wp-content/uploads/2019/08/Illiquid-Asset-Contribution-Guidelines-NPT.pdf.

- Donors Capital Fund, How It Works, http://donorscapitalfund.org/HowItWorks.aspx

- Donors Capital Fund, About Us—FAQs, http://donorscapitalfund.org/AboutUs/FAQs.aspx

- Silicon Valley, Individually Managed Funds, https://siliconvalleycf.org/individually-managed-funds

- Schwab Charitable, 2018 Program Policies & Guidelines (Apr. 2019), https://www.schwabcharitable.org/public/charitable/features/program_policies

- Vanguard Charitable, Policies & Guidelines (2018), https://www.vanguardcharitable.org/sites/default/files/upload/2018%20Policies%20and%20Guidelines_112618_ABW.pdf

- Presidents and Fellows of Harvard University Form 990, Tax Year 2017, https://projects.propublica.org/nonprofits/organizations/42103580/201931299349301613/IRS990

- Fidelity Investments Charitable Gift Fund Form 990 for Tax Year 2017 Sched. O, https://www.fidelitycharitable.org/content/dam/fc-public/docs/fc/fc-990-fy-2017.pdf



Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

- - -

EMILY FAIRBAIRN and    :  Case No.

MALCOLM FAIRBAIRN,    :  3:18-CV-4881

        Plaintiffs   :

        vs.      :

FIDELITY INVESTMENTS    :

CHARITABLE GIFT FUND,    :

        Defendants.   :

_____

Videotaped Deposition of BENJAMIN PIERCE,

taken at One Logan Square, 130 North 18th

Street, 11th Floor, Philadelphia, Pennsylvania,

commencing at 9:00 a.m., Wednesday, November 20,

2019, before Rose A. Tamburri, RPR, CM, CCR,

CRR, USCRA Speed and Accuracy Champion and

Notary Public.

JOB No. 3607925

PAGES 1 - 251

Page 1

```
 1              MR. DULBERG:  Objection.

 2    Incomplete hypothetical.

 3              THE WITNESS:  No.

 4    BY MS. PATHAK:

 5       Q.   It would be impermissible for a

 6    donor-advised fund to promise a donor that it

 7    will follow her recommendation to place funds

 8    into one of the available investment options?

 9              MR. DULBERG:  Objection to the

10    extent it calls for a legal conclusion.

11              THE WITNESS:  From my experience,

12    donor-advised funds do not make such promises.

13    BY MS. PATHAK:

14       Q.   My question, though, is whether such

15    a promise would be permissible?

16              MR. DULBERG:  Objection, calls for

17    a legal conclusion.

18              THE WITNESS:  Yeah, I'm -- I'm not

19    sure.  I'm not an attorney.

20    BY MS. PATHAK:

21       Q.   So as far as you know, the IRS might

22    be totally fine with a donor-advised fund

23    promising donors that it will honor their

24    recommendations; right?

25              MR. DULBERG:  Objection.
```

Veritext Legal Solutions
866 299-5127

```
 1                THE WITNESS:  I -- I don't know.
 2   BY MS. PATHAK:
 3        Q.   You're not sure whether a DAF's
 4   charitable status would somehow be threatened
 5   if it made the kind of promise I'm describing;
 6   right?
 7                MR. DULBERG:  Objection to the
 8   form.
 9                THE WITNESS:  Based on the
10   conversations I've had with expert counsel
11   at -- for Vanguard Charitable, that kind of
12   promise would be highly frowned upon.
13   BY MS. PATHAK:
14        Q.   But you don't have your own base of
15   knowledge from which to know whether such a
16   promise is permissible?
17                MR. DULBERG:  Objection.
18                THE WITNESS:  Other than what I've
19   spoken to expert counsel about in that regard.
20                MS. PATHAK:  Okay.
21                I was just about to start
22   something slightly new.  Do you want to take a
23   break or should we keep going?
24                MR. DULBERG:  We can keep going.
25                THE WITNESS:  Yeah, that's fine.
```

Veritext Legal Solutions
866 299-5127

```
1   right to do something means that the donor
2   doesn't have any recourse when the DAF behaves
3   that way; correct?
4             MR. DULBERG:  Objection, vague,
5   calls for a legal conclusion.
6             THE WITNESS:  As I stated before,
7   I'm not a tax lawyer.
8   BY MS. PATHAK:
9      Q.   You're not sure if a donor could sue
10  a DAF for ignoring a grant recommendation that
11  passed the due diligence process; right?
12            MR. DULBERG:  Objection.
13            THE WITNESS:  What I do -- right.
14  BY MS. PATHAK:
15     Q.   A donor might be allowed to sue a DAF
16  for refusing to follow a grant recommendation
17  that passed the due diligence process;
18  correct?
19            MR. DULBERG:  Objection.
20            THE WITNESS:  I don't know.
21  BY MS. PATHAK:
22     Q.   Have you ever encountered such a
23  lawsuit?
24            MR. DULBERG:  Objection, vague.
25            THE WITNESS:  I'm sorry, repeat
```

1   assets?

2       A.   That's my opinion.

3       Q.   Okay.

4            And one basis for your opinion is

5   your review of the policies of the 11 large

6   stack; is that right?

7       A.   Yes.

8       Q.   Okay.

9            Fidelity Charitable's program

10  circular doesn't explicitly prohibit donors

11  from providing advice about the liquidation of

12  donated assets, does it?

13      A.   No.

14      Q.   Do any of the DAF's written policies

15  explicitly prohibit donors from providing

16  advice about the liquidation of donated

17  assets?

18      A.   Donors to all the programs can say

19  whatever they want to say.

20      Q.   So your -- is your response to my

21  question no?

22      A.   I'm sorry, repeat the question.

23      Q.   Yeah.

24           Do any of the DAF's written

25  policies explicitly prohibit donors from

Veritext Legal Solutions
866 299-5127

1 providing advice about the liquidation of
2 donated assets?
3          MR. DULBERG:  Objection.
4          THE WITNESS:  No.
5 BY MS. PATHAK:
6     Q.   Is it your opinion that these written
7 policies, nonetheless, do prohibit donors from
8 providing advice about the liquidation of
9 donated assets?
10     A.   My opinion is that once the -- as I
11 believe I've stated, once the assets are
12 donated, they become owned by the charity and
13 they then retain all authority over those
14 assets, including the liquidation of those
15 assets.
16     Q.   Okay.  I'm going to ask my question
17 again because I'm not sure that I understood
18 your answer to it.
19          Is it your opinion that the
20 written policies of DAFs prohibit donors from
21 providing advice about the liquidation of
22 donated assets?
23     A.   Not specifically.
24     Q.   Do they prohibit such advice at all?
25     A.   Do "they" meaning donor-advised

Veritext Legal Solutions
866 299-5127

1  funds?

2    Q.   No, the written policies.

3    A.   I'm sorry, repeat the question.

4    Q.   I'm going to -- yeah, let's go with a

5  cleaner question.

6         Is it your opinion that the

7  written policies of DAFs prohibit donors from

8  providing advice about the liquidation of

9  donated assets?

10   A.   The written policies do not prohibit

11 advice.

12   Q.   Okay.

13        Does the Pension Protection Act,

14 the provision that -- of it that you cite, 26

15 USC 4966(d)(2), does that provision prohibit

16 donors from providing advice about the

17 liquidation of donated assets?

18   A.   I'm sorry, you're referring to

19 Section 28 of my report?

20   Q.   I'm look -- yes, I'm referring to the

21 statutory provision that you quote in

22 paragraph 28 of your report.

23   A.   And I'm sorry, and now repeat your

24 question --

25   Q.   Um-hmm.

Veritext Legal Solutions
866 299-5127

```
 1      A.    Yes.
 2      Q.    But it's not based on your knowledge
 3   of any law; correct?
 4              MR. DULBERG:  Objection.
 5              THE WITNESS:  Again, as I've
 6   spoken before, had many conversations with
 7   outside expert legal resources, so I have -- I
 8   have information in this regard, but I'm not a
 9   legal expert.
10              MS. PATHAK:  Okay.
11   BY MS. PATHAK:
12      Q.    I guess I'm just trying to understand
13   your opinion though.
14      A.    Right.
15      Q.    And I can't tell whether you believe
16   that it is permissible for a DAF to promise a
17   donor that it will liquidate assets in a
18   certain way?
19              MR. DULBERG:  Objection.
20              THE WITNESS:  So I stand by my
21   opinion in paragraph 32.
22   BY MS. PATHAK:
23      Q.    A promise is impermissible?
24      A.    Correct.
25      Q.    And it's impermissible because why?
```

```
 1       A.    One, it's -- as stated in the
 2   paragraph, it would potentially jeopardize the
 3   tax deduction for the donor, it's
 4   impermissible because it relinquishes control,
 5   it's impermissible based on the -- the way
 6   these programs have run for 90 years.
 7       Q.    So you just gave three reasons why a
 8   promise would be impermissible, so let's go
 9   through each of them.  It's impermissible
10   because it would potentially jeopardize the
11   tax deduction; correct?
12       A.    Yes.
13       Q.    That -- whether a donor can take a
14   tax deduction is determined by law; correct?
15       A.    Yes.
16       Q.    But you're not a legal expert;
17   correct?
18       A.    Yes.
19       Q.    Okay.
20             A promise by a DAF to a donor that
21   it will liquidate assets in a certain way is
22   also impermissible because it relinquishes
23   control; correct?
24             MR. DULBERG:  Objection.
25             THE WITNESS:  Correct.
```

```
 1   BY MS. PATHAK:
 2       Q.   That concept of relinquishing control
 3   is a legal concept; correct?
 4                MR. DULBERG:  Objection.
 5                THE WITNESS:  I don't know.
 6   BY MS. PATHAK:
 7       Q.   Because you're not a legal expert;
 8   right?
 9       A.   Yes.
10       Q.   And the last reason why it's
11   impermissible for a DAF to make a promise to a
12   donor that it will liquidate assets in a
13   certain way is because that's just not what
14   DAFs do; right?
15                MR. DULBERG:  Objection.
16                THE WITNESS:  Right.
17   BY MS. PATHAK:
18       Q.   That's based on your experience
19   running a DAF for 17 years; right?
20       A.   Yes.
21       Q.   And your observation about how DAFs
22   actually operate; correct?
23       A.   Yes.
24       Q.   So in your experience, DAFs don't
25   ever promise donors how they're going to
```

Veritext Legal Solutions
866 299-5127

BY MS. PATHAK:

Q. Would it be permissible for a DAF to promise donors that it will liquidate donated assets in a manner that is consistent with their policies?

MR. DULBERG: Objection.

THE WITNESS: I don't know.

BY MS. PATHAK:

Q. Would it be permissible for a DAF to promise a donor that it will liquidate donated assets in a manner that is consistent with its standard of practice?

MR. DULBERG: Objection, vague, calls for a legal conclusion.

THE WITNESS: I'm again struggling on the word promise. We never used promises at Vanguard Charitable.

BY MS. PATHAK:

Q. So it's impermissible for a DAF to promise that it will abide by its liquidation policies?

MR. DULBERG: Objection.

THE WITNESS: Repeat the question, please. I'm sorry.

BY MS. PATHAK:

1      Q.   I'll ask a slightly different version
2   of the question that I asked.
3            Is it permissible for a DAF to
4   promise is donor that it will abide by the
5   policies that the DAF has regarding a
6   liquidation of donated assets?
7            MR. DULBERG:  Objection.
8            THE WITNESS:  Sounds permissible.
9   BY MS. PATHAK:
10     Q.   But might not be permissible?
11     A.   I don't know, but it sounds
12  permissible.
13     Q.   Okay.
14          If a -- if a DAF's policies say
15  that it will liquidate donated assets
16  carefully, then could a DAF promise a donor
17  that it will be careful in how it liquidates
18  the donated asset?
19            MR. DULBERG:  Objection.
20            THE WITNESS:  I don't know.  I can
21  speak to my experience, which is, again, we
22  never did that kind of -- we never made those
23  kinds of promises.
24  BY MS. PATHAK:
25     Q.   You never made those kinds of

Veritext Legal Solutions
866 299-5127

1    promises because you didn't think they were
2    permissible?
3        A.    No, because we wanted to retain and
4    needed to retain control of our assets, and
5    therefore, making a promise of any sort like
6    that might create a conflict with the -- with
7    the donor's deduction.
8        Q.    It was your understanding that the
9    donor's tax deduction would be threatened if
10   you promised to stick with your own policies?
11              MR. DULBERG:  Objection.  It
12   misstates his testimony.
13              THE WITNESS:  We laid out our
14   policies and we, you know -- I think they're
15   very clear and transparent, and so we never
16   made further promises to say that we would do
17   so.  They are what they are.
18   BY MS. PATHAK:
19       Q.    But if somebody had asked you, do you
20   promise that you'll abide by these policies
21   that are written here, what would you have
22   said?
23              MR. DULBERG:  Objection.
24              THE WITNESS:  I would have said
25   this is what -- this is the way we operate.

Page 110

```
 1   It's laid out right here.  This is the way we
 2   operate.
 3   BY MS. PATHAK:
 4        Q.   If I was a high net worth individual
 5   who wanted to -- who was considering where to
 6   set up a DAF and I was concerned that a DAF
 7   might, you know, not stick with -- might not
 8   abide by its own written policies and I came
 9   to you as president of Vanguard Charitable and
10   I asked you, do you abide by your policies,
11   you would have said yes; right?
12              MR. DULBERG:  Objection.
13              THE WITNESS:  I -- I would state
14   here are the policies and guidelines, there
15   are lots of factors related to a particular
16   situation.  Could be the stock, could be the
17   timing, it could be any number of things, but
18   this is the way we generally operate.  And
19   most of the time, this is what we do.
20              So -- and Vanguard Charitable has
21   a reputation, and you know the reputation of
22   Vanguard Charitable, but I would not make that
23   promise.
24   BY MS. PATHAK:
25        Q.   You wouldn't say, I promise, we abide
```

Veritext Legal Solutions
866 299-5127

```
 1   by our own policies?
 2       A.   No.
 3       Q.   Do you think a donor might be
 4   concerned if you refused to make such a
 5   promise?
 6               MR. DULBERG:  Objection.
 7               THE WITNESS:  I don't know.
 8               MS. PATHAK:  Okay.
 9   BY MS. PATHAK:
10       Q.   If a DAF has a general policy of
11   selling no more than 10 percent of volume in a
12   single day of a publicly traded security that
13   has been donated, would it be permissible for
14   the DAF to promise the donor that it will stay
15   below 10 percent for her particular donated
16   stock?
17               MR. DULBERG:  Objection, vague,
18   incomplete hypothetical.
19               THE WITNESS:  It's not the
20   practice certainly that I'm familiar with of
21   any donor-advised fund to make that sort of a
22   promise, but does that make it permissible?  I
23   don't know.
24   BY MS. PATHAK:
25       Q.   Such a promise could be permissible?
```

Veritext Legal Solutions
866 299-5127

```
 1                MR. DULBERG:  Objection.
 2                THE WITNESS:  In my experience,
 3    donor-advised funds don't make promises about
 4    the liquidation of marketable securities.
 5    BY MS. PATHAK:
 6        Q.   But are such promises permissible?
 7                MR. DULBERG:  Objection.
 8                THE WITNESS:  I'd say no.
 9                MS. PATHAK:  Okay.
10    BY MS. PATHAK:
11        Q.   Can a DAF promise that it will
12    consider the donor's advice about liquidation?
13        A.   As I stated before, donors can say
14    anything they want.
15        Q.   Right.  But can a DAF promise to
16    consider the donor's advice about the
17    liquidation of a donated asset?
18        A.   I suppose they can.  I'd be very
19    shocked if they would do that.
20        Q.   Okay.
21                So, for example, if a -- if a
22    donor is a real estate agent and donates real
23    estate that's located in a market that she's
24    familiar with, could the DAF promise to have a
25    phone call with her and hear what she has to
```

                    Veritext Legal Solutions
                        866 299-5127

1  as there's a willing buyer?

2              MR. DULBERG:  Objection to the

3  form.

4              THE WITNESS:  I don't know.

5              MR. DULBERG:  Incomplete

6  hypothetical.

7  BY MS. PATHAK:

8      Q.   Do you have an opinion about what

9  constitutes sufficient volume to sell a

10 publicly traded security?

11     A.   It depends on the security.

12     Q.   What does it -- when -- when you say

13 it depends on the security, what do you mean?

14     A.   Well, Apple, I don't know what

15 Apple -- how many shares of Apple trade every

16 day, but if we got a gift of 50,000 shares of

17 Apple, I suspect Apple is trading -- there are

18 buyers of millions of shares.

19              So you could take another stock

20 that we get a donation of, you know, 10,000

21 shares and there are only 20,000 shares being

22 traded.  So it depends on the -- on the stock

23 and the volume of that particular ticker.

24     Q.   So in the example that you gave where

25 there is a block of 10,000 shares donated, but

                              Page 176

```
 1  there are only 20,000 shares being traded,
 2  Vanguard Charitable would not sell all 10,000
 3  shares in one day; right?
 4              MR. DULBERG:  Objection, calls for
 5  speculation, incomplete hypothetical.
 6              THE WITNESS:  We would -- we would
 7  look at that transaction very carefully.
 8  BY MS. PATHAK:
 9      Q.   Do you know how that transaction
10  would be handled?
11              MR. DULBERG:  Objection,
12  incomplete hypothetical.
13              THE WITNESS:  Not specifically.
14  BY MS. PATHAK:
15      Q.   Do you have experience in selling
16  publicly traded securities?
17              MR. DULBERG:  Objection, vague.
18              THE WITNESS:  I'm not a broker, a
19  stockbroker.
20  BY MS. PATHAK:
21      Q.   Do you consider yourself an expert in
22  liquidating publicly traded securities?
23      A.   No.
24      Q.   Do you consider yourself an expert in
25  how DAFs liquidate publicly traded securities?
```

Veritext Legal Solutions
866 299-5127

BY MS. PATHAK:

Q. Fidelity Charitable's expenses, on the other hand, stem, at least in part, if not largely, from the fee paid to FMR; correct?

A. Can you --

MR. DULBERG: Objection to the form.

THE WITNESS: Not the way I describe it. I would describe it as the -- Fidelity Charitable, I don't know the number in 2016 or '17, you know, had 250, 300 FMR people contracted to work for them. So it's their expenses plus these other expenses, some of which are further outlined, I believe, in an additional chart here.

So you add all that up and that's the operating expense of Fidelity Charitable.

MS. PATHAK: Okay.

BY MS. PATHAK:

Q. You reviewed this Annual Review document; correct?

A. Yes.

Q. And you reviewed this document for 2016, 2017 and 2018; is that right?

A. I believe that's correct. I just

Veritext Legal Solutions
866 299-5127

1  want to double check.

2           Yes, that's correct.

3     Q.   Did you independently verify any of

4  the numbers that were in any of these annual

5  reviews?

6           MR. DULBERG:  Objection to the

7  form.

8           THE WITNESS:  I looked at the

9  Vanguard Charitable numbers, just to make sure

10  they seemed correct, but I did not check

11  specific other numbers, no.

12           MS. PATHAK:  That make -- that

13  makes sense.

14  BY MS. PATHAK:

15     Q.   You eye-balled the Vanguard

16  Charitable numbers, compared them against your

17  experience; correct?

18     A.   Correct.

19     Q.   But didn't have a basis to

20  independently verify any of the other numbers;

21  correct?

22           MR. DULBERG:  Objection to the

23  form.

24           THE WITNESS:  There potentially

25  was a basis to do it by looking at the 990s

```
 1    that I think are referred to here.  I did not
 2    do that.
 3                    MS. PATHAK:  Okay.
 4    BY MS. PATHAK:
 5        Q.   And you didn't attempt to recreate
 6    any of the analyses done in these annual
 7    reviews; correct?
 8                    MR. DULBERG:  Objection to the
 9    form.
10                    THE WITNESS:  Just as a note of
11    clarification, on the previous page,
12    FID-FRBN-631, those -- that's the
13    administrative fee chart, I looked at those.
14    I'm familiar with those.  That's where it
15    talks about the different asset tiers and the
16    different administrative fees.  I checked
17    those.
18    BY MS. PATHAK:
19        Q.   How did you check those?
20        A.   By looking at the policies and
21    guidelines.
22        Q.   You compared -- these numbers -- you
23    compared these -- the numbers that are here on
24    page 43631 against the policies of the 11
25    biggest DAFs?
```

Veritext Legal Solutions
866 299-5127

1      A.   Or these four, yes.

2      Q.   Okay.

3           Other than that, was there any

4   recreate -- recreation of any of the analysis

5   conducted?

6      A.   Somewhat -- somewhat similarly on

7   0043633, Program Comparison, in terms of

8   minimums, services, again, I had familiarity

9   from my previous 17 years and also had access

10  to the policy -- policies and guidelines,

11  circulars and so forth.  So yes, I was able to

12  validate one of these and must admit, so yes.

13     Q.   And this page 43633 outlines the, I

14  guess, details of these different -- some of

15  the details of these different donor-advised

16  funds; right?  It outlines the administrative

17  fees, the minimum grant, the minimum initial

18  contribution.

19          So those are the kinds of numbers

20  that you can verify by looking at the

21  policies; correct?

22     A.   Correct.

23     Q.   Okay.

24          Is there any other independent

25  verification that you did?

Veritext Legal Solutions
866 299-5127

```
 1        A.    No.
 2        Q.    Okay.
 3              If there had been an error in
 4   taking information from a published policy and
 5   then putting it into this annual review, you
 6   might have caught that error because you did
 7   some comparison between this document and the
 8   published policies; right?
 9        A.    Right.
10        Q.    But there's no other type of error
11   that you would have been able to catch; right?
12              MR. DULBERG:  Objection.
13              THE WITNESS:  I'm -- I'm not sure.
14   BY MS. PATHAK:
15        Q.    Well, since you didn't recreate
16   the -- any of the analysis here, you wouldn't
17   be able to tell whether there -- there might
18   have been a mistake in any of the analysis;
19   right?
20              MR. DULBERG:  Objection.
21              THE WITNESS:  Right.
22              MS. PATHAK:  Okay.
23   BY MS. PATHAK:
24        Q.    In paragraph 56 on page 20 of your
25   report --
```

Veritext Legal Solutions
866 299-5127

```
 1    Interestingly, the weighted investment fee for
 2    the $5 billion, most of which was in Vanguard
 3    funds, was nine basis points, .09, less than
 4    one-tenth of one percent.
 5              So from a governance perspective,
 6    the board seemed to have made a very prudent
 7    decision in terms of how to invest its funds.
 8              MS. PATHAK:  I understand.
 9    BY MS. PATHAK:
10        Q.   Do you know the percentage of
11    Fidelity Charitable assets that are invested
12    in FMR products?
13        A.   No.
14        Q.   Do you know the total number of
15    dollars that are invested in FMR products?
16        A.   No.
17        Q.   Do you know how much profit FMR earns
18    from Fidelity Charitable assets that are
19    invested in FMR products?
20        A.   No.
21        Q.   Okay.
22              Let's return to paragraph 56 on
23    page 20.
24        A.   Yes.
25        Q.   And I'm actually going to continue
```

```
 1              C E R T I F I C A T E

 2

 3              I do hereby certify that I am a

 4    Notary Public in good standing, that the

 5    aforesaid testimony was taken before me,

 6    pursuant to notice, at the time and place

 7    indicated; that said deponent was by me duly

 8    sworn to tell the truth, the whole truth, and

 9    nothing but the truth; that the testimony of

10    said deponent was correctly recorded in

11    machine shorthand by me and thereafter

12    transcribed under my supervision with

13    computer-aided transcription; that the

14    deposition is a true and correct record of the

15    testimony given by the witness; and that I am

16    neither of counsel nor kin to any party in

17    said action, nor interested in the outcome

18    thereof.

19              WITNESS by hand and official seal

20    this 3rd day of December, 2019.

21

22

23

24

25              Notary Public
```

Page 251



Exhibit D

| From: | ████████ ████@pzena.com> |
|---|---|
| Sent: | Thursday, April 25, 2013 12:41 PM |
| To: | Boland, Ryan <ryan.boland@fmr.com> |
| Cc: | ████████ ████@pzena.com>; ████████████ @pzena.com> |
| Subject: | Re: More Data |

Ok. Thanks. I assumed the trades reported were for the prior week.

Sent from my iPad

On Apr 25, 2013, at 12:22 PM, "Boland, Ryan" <ryan.boland@fmr.com> wrote:

> Hi ████ -
>
> The dispositions into your accounts are reflective of earlier trading volume (from trades made before our conversations of a little more than a week ago). I just confirmed that since we spoke the trading volumes are back in line with the 10% or less of average trading volume. Our sales last week were in the 2K to 4K share range per day. I don't have the precise percentage but I think it is probably around 8% or so of average trading volume.
>
> All that said, I am perfectly open to talking this over in greater detail if you want.
>
> My direct line is 617-392-2655.
>
> Ryan
>
> -----Original Message-----
> From: ████████████ ████████@pzena.com]
> Sent: Thursday, April 25, 2013 12:04 PM
> To: Boland, Ryan
> Cc: ████████ ; ████████████
> Subject: Re: More Data
>
> FYI, according to my calculations, The dispositions in our accounts last week amounted to 62% of the trading volume. It doesn't appear that your traders are doing as they said.
>
> Sent from my iPad
>
> On Apr 15, 2013, at 11:22 AM, "Boland, Ryan" <ryan.boland@fmr.com<mailto:ryan.boland@fmr.com>> wrote:
>
> Hi ████ -
>
> I left you a message and would like an opportunity to discuss this with you further but I can now provide an outline for how we will proceed going forward.
>
> Our trader has been directed to sell no more than 10% of average trading volume on any given day. At all times, however, if our trader is able to find a single buyer interested in buying ALL our remaining shares at a good price, they will look to accomplish that sale. This is the same scenario and strategy as our large single sale last year. If you are aware of an investor interested in a high volume purchase, please let us know and we will be able to accomplish that large sale.
>



> Again, I apologize for these issues but I am confident everyone is now on the same page and we will be able to proceed with these lesser daily sales as referenced above.
>
> While the above reflects our current plans going forward, we remain open to your thoughts and concerns.
>
> Please let me know if you'd like to discuss this further.
>
> I will be in the office for the remainder of today but will be out for the rest of the week.
>
> I will have some email access while away.
>
> Ryan
>
> From: ████████ ████████@pzena.com]
> Sent: Monday, April 15, 2013 10:09 AM
> To: Boland, Ryan
> Cc: ████████; ████████
> Subject: More Data
>
> Ryan,
>
> I'm really surprised I haven't heard back from you. I really thought Fidelity would treat this relationship in the manner that you advised when we first made the contribution. Shown below is my analysis of the trading activity
>
>
>
> Shares Sold from My Account Week Ending 4/5 10,590
> Shares Sold from My Account Week Ending 4/12 96,013
> Total 106,603
>
> Implied Volume Including ████ and ████ 284,275
>
> Actual 10 Day Trading Volume 740,600
>
> Normal 10 Day Trading Volume 300,000
>
> Fidelity Activity as a Percentage of Total 38%
>
> Fidelity Activity as a Percentage of Normal 95%
>
>
> Our continuation in this program is contingent on your treating these assets with the care that you seemed to indicate when we originally made our contributions.
>
> I'd like to hear back from you as soon as possible.
>
> Thank you,
>
> ████████
> CONFIDENTIALITY NOTICE: The information contained in this message, and in any accompanying documents, may be proprietary, confidential and/or privileged information which belongs to Pzena Investment Management, LLC. This information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient of this email, or a person who is responsible for delivering

emails to such intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this message in error, please immediately notify the sender by email and delete the original message. Thank you
> CONFIDENTIALITY NOTICE: The information contained in this message, and in any accompanying documents, may be proprietary, confidential and/or privileged information which belongs to Pzena Investment Management, LLC. This information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient of this email, or a person who is responsible for delivering emails to such intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this message in error, please immediately notify the sender by email and delete the original message. Thank you
CONFIDENTIALITY NOTICE: The information contained in this message, and in any accompanying documents, may be proprietary, confidential and/or privileged information which belongs to Pzena Investment Management, LLC. This information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient of this email, or a person who is responsible for delivering emails to such intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this message in error, please immediately notify the sender by email and delete the original message. Thank you



Exhibit E

| From: | Boland, Ryan </O=FIDELITY/OU=NORTHEAST1/CN=RECIPIENTS/CN=A496922> |
|---|---|
| Sent: | Monday, April 15, 2013 10:12 AM |
| To: | ▮▮▮▮▮▮ ▮▮ @pzena.com> |
| Cc: | ▮▮▮▮▮▮ @pzena.com>; ▮▮▮▮▮▮▮ /@pzena.com> |
| Subject: | RE: More Data |

Hi –

I apologize for any delay.  The person who handles the sale end of the transactions was out last week.  In the interim I got approval to only sell to the 10% or less of average trading volume level.  With him back in the office, I will be meeting with him this morning to discuss any further trading.

I will aim to be back to you later today with a further update.

In the meantime, if you, ▮▮▮ or ▮▮ have any questions or concerns, please let me know.

My direct number is 617-392-2655.

Ryan

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮ @pzena.com]
**Sent:** Monday, April 15, 2013 10:09 AM
**To:** Boland, Ryan
**Cc:** ▮▮▮▮▮ ; ▮▮▮▮▮▮
**Subject:** More Data

Ryan,

I'm really surprised I haven't heard back from you.  I really thought Fidelity would treat this relationship in the manner that you advised when we first made the contribution.  Shown below is my analysis of the trading activity

| | |
|---|---|
| Shares Sold from My Account Week Ending 4/5 | 10,590 |
| Shares Sold from My Account Week Ending 4/12 | 96,013 |
| Total | 106,603 |
| | |
| Implied Volume Including ▮▮▮▮ and ▮▮▮▮▮ | 284,275 |
| | |
| Actual 10 Day Trading Volume | 740,600 |
| | |
| Normal 10 Day Trading Volume | 300,000 |
| | |
| Fidelity Activity as a Percentage of Total | 38% |
| | |
| Fidelity Activity as a Percentage of Normal | 95% |

Our continuation in this program is contingent on your treating these assets with the care that you seemed to indicate when we originally made our contributions.

I'd like to hear back from you as soon as possible.

Thank you,

███████

CONFIDENTIALITY NOTICE: The information contained in this message, and in any accompanying documents, may be proprietary, confidential and/or privileged information which belongs to Pzena Investment Management, LLC. This information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient of this email, or a person who is responsible for delivering emails to such intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this message in error, please immediately notify the sender by email and delete the original message. Thank you



Exhibit F

| From: | CRAIG MCLAREN (FIDELITY CAPITAL MKT) <CMCLAREN@bloomberg.fmr.com> |
|---|---|
| Sent: | Friday, December 29, 2017 12:28 PM |
| To: | GERRY CELANO (FIDELITY CAPITAL MKT) <GCELANO@bloomberg.fmr.com>; MICHAEL MCLEAN (NATIONAL CHARITABLE) <MMCLEAN27@bloomberg.fmr.com>; JOSHUA JOHNSON (NATIONAL CHARITABLE) <JJOHNSON555@bloomberg.fmr.com> |
| Subject: | PCHAT-0x3000001E78064 |

RoomID: PCHAT-0x3000001E78064

Start Time: 12/29/2017 12:28:06

Participant Entered: 12/29/2017 12:28:06 CRAIG MCLAREN (FIDELITY CAPITAL MKT) <CMCLAREN@Bloomberg.net>; ConversationID PCHAT-0x3000001E78064
Message: 12/29/2017 12:28:06 CRAIG MCLAREN (FIDELITY CAPITAL MKT) <CMCLAREN@Bloomberg.net>

*** FIDELITY CAPITAL MKT (213877) Disclaimer: This communication is prepared by Fidelity Capital Markets (FCM), a division of National Financial Services LLC, Member NYSE, SIPC. It is for your information only and is not an offer or solicitation for the purchase or sale of any security or a recommendation or endorsement of any security or issuer. FCM makes no representation about the accuracy, completeness, or timeliness of this information. FCM may from time to time underwrite, hold a position in, and buy or sell as principal the securities of any issuer mentioned. This e-mail may contain information that is proprietary or is otherwise confidential in nature. Any dissemination or copying of this e-mail is prohibited.

Participant Entered: 12/29/2017 12:40:09 GERRY CELANO (FIDELITY CAPITAL MKT) <GCELANO@Bloomberg.net>; ConversationID PCHAT-0x3000001E78064
Message: 12/29/2017 12:40:09 GERRY CELANO (FIDELITY CAPITAL MKT) <GCELANO@Bloomberg.net>

*** FIDELITY CAPITAL MKT (213877) Disclaimer: This communication is prepared by Fidelity Capital Markets (FCM), a division of National Financial Services LLC, Member NYSE, SIPC. It is for your information only and is not an offer or solicitation for the purchase or sale of any security or a recommendation or endorsement of any security or issuer. FCM makes no representation about the accuracy, completeness, or timeliness of this information. FCM may from time to time underwrite, hold a position in, and buy or sell as principal the securities of any issuer mentioned. This e-mail may contain information that is proprietary or is otherwise confidential in nature. Any dissemination or copying of this e-mail is prohibited.

Participant Entered: 12/29/2017 13:07:39 MICHAEL MCLEAN (NATIONAL CHARITABLE) <MMCLEAN27@Bloomberg.net>; ConversationID PCHAT-0x3000001E78064
Participant Entered: 12/29/2017 13:49:24 JOSHUA JOHNSON (NATIONAL CHARITABLE) <JJOHNSON555@Bloomberg.net>; ConversationID PCHAT-0x3000001E78064
Message: 12/29/2017 13:52:38 JOSHUA JOHNSON (NATIONAL CHARITABLE) <JJOHNSON555@Bloomberg.net>
Good morning Gerry!

Message: 12/29/2017 13:52:48 JOSHUA JOHNSON (NATIONAL CHARITABLE) <JJOHNSON555@Bloomberg.net>
Can we get some calls out on the PZN position?

Message: 12/29/2017 13:53:00 JOSHUA JOHNSON (NATIONAL CHARITABLE) <JJOHNSON555@Bloomberg.net>



EXHIBIT 213
WIT: Mc Lean
DATE: 5-3-19
Tori Pittman, RDR, CVR-CM-M

If anyone's answering phones today

Message: 12/29/2017 14:02:17 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
Gopod morning Josh. Yes.

Message: 12/29/2017 14:03:01 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Like previous PZN orders, we can carry this....for months if we have to

Message: 12/29/2017 14:03:49 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
do you have an "I would" price?

Participant Left: 12/29/2017 14:03:54 CRAIG MCLAREN (FIDELITY CAPITAL MKT)
<CMCLAREN@Bloomberg.net> PCHAT-0x3000001E78064
Message: 12/29/2017 14:10:41 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
I don't...this donor likes the order to be worked so the I would price would be a very very short haircut

Message: 12/29/2017 14:12:10 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
So for purposes of finding the other side. what quantity/price would you want to get to the tape?

Message: 12/29/2017 14:13:09 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
It only trades about 25-30K per day

Message: 12/29/2017 14:13:32 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
I'm hesitent to put the entire block out at once

Message: 12/29/2017 14:14:01 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
I look to you for some guidance but know the decision is ultimately ours

Message: 12/29/2017 14:26:34 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Gerry

Message: 12/29/2017 14:26:50 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
You may see a large block of WATT today. Please be nowehere. Let me know when you see it

Message: 12/29/2017 14:26:57 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
If you can't get me on BBG, you can call my cell

Message: 12/29/2017 14:27:00 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
will do

Message: 12/29/2017 14:27:01 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>

Message: 12/29/2017 14:27:08 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ty

Message: 12/29/2017 14:28:09 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
looks like up big yesterday. lower today pre-open

Message: 12/29/2017 14:28:22 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Yes, massive volume the last 2 days

Message: 12/29/2017 15:14:26 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
HNGR have 350K to go

Message: 12/29/2017 15:14:30 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Saw that

Message: 12/29/2017 15:14:42 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
We may have to look for bids

Message: 12/29/2017 15:14:51 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
We can show the full order on that one

Message: 12/29/2017 15:14:56 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ty

Message: 12/29/2017 17:53:03 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
We've gotten approval on selling those WATT shares

Message: 12/29/2017 17:53:35 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Up to 1,275,000 shares

Message: 12/29/2017 17:53:38 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Possibly more to come

Message: 12/29/2017 17:54:02 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
The order should be coming shortly

Message: 12/29/2017 17:54:23 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ok

Message: 12/29/2017 17:54:27 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
josh, ty

Message: 12/29/2017 17:59:29 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
WATT shares may be heading over soon

Message: 12/29/2017 18:00:21 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
It will probably come as two orders since we received the tranches on separate days. 700k and 525k

Message: 12/29/2017 18:01:59 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
do they need to be pro-rated

Message: 12/29/2017 18:02:08 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
No, it's the same person

Message: 12/29/2017 18:02:10 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Donor*

Message: 12/29/2017 18:02:20 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
They were just coming from different sources

Message: 12/29/2017 18:02:21 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
thought so, just wanted to check, ty

Message: 12/29/2017 18:02:52 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
We'll prob stretch those out until 3:50

Message: 12/29/2017 18:18:48 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
I have the first 700K WATT

Message: 12/29/2017 18:19:09 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Ok let's TWAP until 3:30

Message: 12/29/2017 18:19:16 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Same when you get the other tranche

Message: 12/29/2017 18:21:03 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
understood

Message: 12/29/2017 18:22:31 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>

Side question, are you working any MRSN orders for us?

Message: 12/29/2017 18:22:53 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Or possibly worked any today?

Message: 12/29/2017 18:22:58 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
YES

Message: 12/29/2017 18:23:11 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
What do/did you have?

Message: 12/29/2017 18:23:29 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
1460 shares

Message: 12/29/2017 18:23:44 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
I'm realizing now what name that ticker goes to

Message: 12/29/2017 18:23:49 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
And now I know why this person asked me

Message: 12/29/2017 18:29:48 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Did you get one specific order of 834 shares?

Message: 12/29/2017 18:30:33 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
One of our reps apparently inadvertently marked those as rec'd for trading but we didn't actually have the shares

Message: 12/29/2017 18:30:59 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
just one order Josh. the 1,460

Message: 12/29/2017 18:31:40 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
Ah, that's all in one, got it

Message: 12/29/2017 18:52:50 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Gerry - can you confirm the total number of WATT shares you received

Message: 12/29/2017 18:53:05 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
1,275,000

Message: 12/29/2017 18:53:29 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Ok, great

Message: 12/29/2017 18:53:42 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
We believe there's another 318k coming, possibly 343k on top of that as well

Message: 12/29/2017 18:53:46 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Maybe one more smaller tranche coming but not confirmed

Message: 12/29/2017 18:54:02 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ok, we may be pressuring a bit

Message: 12/29/2017 18:54:27 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
With the current pace or if we were to try and add those extra tranches?

Message: 12/29/2017 18:55:10 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
curremtly a bit. the added will not help

Message: 12/29/2017 18:55:57 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
We can always sell the last 2 in the last hour of the day

Message: 12/29/2017 18:56:05 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Should be ~25mm on the day

Message: 12/29/2017 18:56:10 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
volume

Message: 12/29/2017 18:56:15 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
that will help

Message: 12/29/2017 18:59:17 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Let stretch our current to 3:45 then

Message: 12/29/2017 18:59:28 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
Maybe ease some down pressure

Message: 12/29/2017 18:59:32 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ty, better I think

Message: 12/29/2017 19:09:52 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
bbr on the WATT lots. checking with OPS manager but he's off the desk for a minute

Message: 12/29/2017 19:10:11 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>

i'm fairly certain we can get this

Message: 12/29/2017 19:11:50 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
I know I've seen a report of what we're looking for once before, but I'm not sure if it was from your team or the
FBSI tech team

Message: 12/29/2017 19:23:43 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
we can get you the lots

Message: 12/29/2017 19:24:25 MICHAEL MCLEAN (NATIONAL CHARITABLE)
<MMCLEAN27@Bloomberg.net>
awesome

Message: 12/29/2017 20:24:31 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
313,862 WATT coming, probably at 3:30

Message: 12/29/2017 20:24:54 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ok. lows of the day here...ugh

Message: 12/29/2017 20:25:18 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
As we pointed out to our sales guy earlier though... It's still up 200% from tuesday

Message: 12/29/2017 20:26:12 JOSHUA JOHNSON (NATIONAL CHARITABLE)
<JJOHNSON555@Bloomberg.net>
The other 343,123 shares are here too. Just waiting to confirm these are definitely from the same donor before
sending the trade since they came from outside Fid

Message: 12/29/2017 20:26:22 GERRY CELANO (FIDELITY CAPITAL MKT)
<GCELANO@Bloomberg.net>
ok, ty


End Time: 12/29/2017 20:26:22

*** Metadata ***
From: CRAIG MCLAREN (FIDELITY CAPITAL MKT) <CMCLAREN@bloomberg.fmr.com>
To: GERRY CELANO (FIDELITY CAPITAL MKT) <GCELANO@bloomberg.fmr.com>,MICHAEL
MCLEAN (NATIONAL CHARITABLE) <MMCLEAN27@bloomberg.fmr.com>,JOSHUA JOHNSON
(NATIONAL CHARITABLE) <JJOHNSON555@bloomberg.fmr.com>
Sent: 12/29/2017 5:28:06 PM
Subject: PCHAT-0x3000001E78064
X-KVS-MessageType: Bloomberg

David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Andrew Dulberg (*admitted pro hac vice*)
andrew.dulberg@wilmerhale.com
Sarah R. Frazier (*admitted pro hac vice*)
sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

*Attorneys for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

EMILY FAIRBAIRN and
MALCOLM FAIRBAIRN,

Plaintiffs,

v.

FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

Defendant.

Case No. 3:18-cv-04881-JSC

**DEFENDANT FIDELITY INVESTMENTS
CHARITABLE GIFT FUND'S OPPOSITION
TO PLAINTIFFS' MOTION *IN LIMINE* NO.
2 TO EXCLUDE BENJAMIN PIERCE**

## I.    INTRODUCTION

It is understandable that plaintiffs do not want the Court to hear the expert testimony of

Benjamin Pierce, who has more than two decades of experience with donor advised funds.  But

having accused Fidelity Charitable, a national donor advised fund sponsor, of negligence,

plaintiffs cannot avoid testimony concerning the customs and practices of other national donor

advised funds.  And it is difficult to imagine a more credible expert on that subject than Mr.

Pierce.  Mr. Pierce served as President of Vanguard Charitable for 17 years, explained DAFs to

members of Congress, and led the documentation and publication of a statement of best practices

for national DAFs.

Plaintiffs' attacks on Mr. Pierce miss the mark.  ***First***, they ignore the reality that Mr.

Pierce's opinions ***are*** based on specialized knowledge—knowledge derived from his leadership

of a national DAF for 17 years.  ***Second***, they ignore that experts routinely rely on hearsay, and

that there is no reasonable way ***other*** than relying on hearsay to summarize the policies and

practices of other national DAFs, evidence that is plainly relevant to the defense of a negligence

claim.  ***Third***, to the extent plaintiffs deride Mr. Pierce's opinions as "confusing" and

"contradictory," such attacks may be fodder for cross-examination, but do not support excluding

his testimony.

## II.    ARGUMENT

### A.    Mr. Pierce May Provide An Overview Of DAFs

At the outset of his expert report, Mr. Pierce provides a primer regarding donor advised

funds.  In that primer, Mr. Pierce explains the meaning of the word "advised" in the phrase

"donor advised fund."  In Mr. Pierce's succinct formulation, donors may "give advice on how

the proceeds of the gift will be ***invested in***, and ***granted out of*** the fund into which those

proceeds are placed."  Ex. A[1], Pierce Rpt. ¶ 18 (emphasis added).  He also explains that it is

critical for DAFs to maintain a line between advice and direction, and he explains how they

maintain that line.  *Id.* ¶ 33.  Mr. Pierce bases his opinions not only on his experience, but also on

---

[1] All exhibits cited in this Motion are attached to the accompanying Declaration of
Nicholas G. Purcell.

a range of authorities, including publicly-available policies issued by leading national DAFs (¶¶ 19-27), Fidelity Charitable's Code of Conduct (¶ 34), and the description of the advisory privileges set forth in a document that Mr. Pierce and other national DAF leaders helped create in order "to document emerging industry standards" (¶ 29).

Plaintiffs are wrong to insist that these opinions are not based upon Mr. Pierce's specialized knowledge. Mr. Pierce's report explains that his opinions are based not merely upon his review of documents, but also "on my experience and expertise in running a large national DAF for seventeen years" and his ongoing consulting practice. *Id.* ¶ 13. As President of Vanguard Charitable, Mr. Pierce routinely met with the leaders of other national DAFs, and met with hundreds of donors to Vanguard Charitable, including many who held giving accounts at other DAFs, from whom he learned about practices at other DAFs. *See id.* ¶ 5; Ex. B, Pierce Tr. 87:14-88:8; 138:2-140:23; 146:3-25. His ongoing consulting work includes an engagement on behalf of a donor advised fund, and on behalf of other charities working to establish donor advised funds. *See* Ex. B at 26:1-19.

To be sure, the heart of Mr. Pierce's expertise is experience. But the Federal Rules themselves recognize that experience not only ***can*** "provide a sufficient foundation for expert testimony," but that in certain fields, "experience ***is*** the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 Advisory Committee Notes (emphasis added). Courts within the Ninth Circuit have embraced this formulation. *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (no abuse of discretion for trial court to allow expert testimony of witness with 25 years of "experience working for insurance companies and as an independent consultant" in light of his "significant knowledge of and experience within the insurance industry"). If Mr. Pierce is not qualified to offer expert testimony regarding donor advised funds, it is difficult to conceive of anyone who could.

Plaintiffs also are wrong to insist that Mr. Pierce is little more than a conduit for hearsay. As an initial matter, it is entirely appropriate for experts to rely upon—and present at trial— evidence that otherwise would be inadmissible hearsay. *Paddack v. Dave Christensen, Inc.*, 745

DEFENDANT'S OPPOSITION TO MOTION *IN LIMINE* NO. 2

F.2d 1254, 1261–62 (9th Cir. 1984) (Rule 703 "permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion").  In this case, plaintiffs have accused Fidelity Charitable of negligence, and one of Fidelity Charitable's defenses is that it sold the shares at issue in accordance with its policy, and that its policy is consistent with those of other DAFs.  It is black-letter law that customs and practices of a defendant's peers are relevant in evaluating a negligence claim.  *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856–57 (9th Cir. 2001) (evidence of compliance with custom or industry practice is a relevant, but not determinative, factor in determining compliance with the standard of care).  To show the Court the policies and practices of Fidelity Charitable's peers, Mr. Pierce's report includes quotes from the policies themselves.  That cannot be improper.

Plaintiffs grossly mischaracterize Mr. Pierce's report when they accuse it of being "confusing, biased, and contradicted."  Mot. 3.  Thus, they claim that "Mr. Pierce says that DAFs do not let donors advise on stock liquidation," but cite nothing in support.  *Id.*  What Mr. Pierce actually says is that donors do not have an "advisory privilege" to advise on liquidation.  *See, e.g.*, Ex. A ¶ 27.  In fact, as plaintiffs acknowledge, Mr. Pierce recognized in both his report and his testimony that there is no way to prevent donors from offering advice on any subject at all. *Id.* ¶ 31 ("from time to time, some donors provide DAFs with a recommendation concerning the liquidation of donated assets, including publicly traded securities"); Ex. B at 97:25-99:4 ("donors can say anything they want to the charities").  Mr. Pierce's point is quite simple: "what is critical to understand is that, while a donor might provide 'advice' regarding the liquidation of a donated asset, the DAF has total control of the liquidation."  Ex. A ¶ 31.

Plaintiffs' suggestion that Mr. Pierce "omits JP Morgan's DAF from his analysis" is flatly wrong.  Mr. Pierce explicitly discusses the J.P. Morgan Charitable Giving Fund in Paragraph 40 of his report.  Even more important, Mr. Pierce quotes (in Paragraph 31) from the sworn declaration of Dennis Hearst, who served as the Fairbairns' relationship manager for the J.P. Morgan Charitable Giving Fund, and who plaintiffs describe as "the catalyst for the Fairbairns establishing a $20 million DAF account with JP Morgan."  Compl. ¶ 48.  Mr. Hearst's declaration corroborates Mr. Pierce's opinion, stating that "donors . . . are not permitted to

dictate the timing, price or manner of the liquidation of publicly traded securities," and describing those issues as "solely in the control of the [J.P. Morgan Charitable Giving] Fund." Ex. C (Declaration of Dennis Hearst). At any rate, the fact that a party may have fodder with which to cross-examine the other party's expert does not mean that the expert's opinion is inadmissible. *See, e.g.*, *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, 2015 WL 12712288, at *22 (C.D. Cal. July 10, 2015) (fact that plaintiff "clearly disagrees" with defendant's expert's analysis "does not demonstrate that [expert] is unqualified or unable to testify competently to the opinions he offers," and provides "fodder for cross-examination" but no "basis for exclusion").

### B. Mr. Pierce's Opinion About The Scope Of The Advisory Privilege Is Not A Legal Opinion

In seeking to exclude Mr. Pierce's "opinion that DAFs are not 'permitted' to make promises to donors about how they will liquidate donated assets," plaintiffs mischaracterize what Mr. Pierce says. Mr. Pierce's point is simpler: DAFs may not make promises to donors at all. As Mr. Pierce puts it, "there is . . . an important difference between a donor providing ***advice*** . . . and a donor extracting from the DAF a ***promise***." Ex. A ¶ 32 (emphasis in original). He explains that "it is critical for a DAF to maintain a line between 'advice' and 'direction,'" and that "DAFs commonly maintain this distinction by establishing policies and procedures," which he describes. *Id.* ¶¶ 33-34. Mr. Pierce's 17 years leading a national charity provide more than sufficient basis to discuss these policies.

Unlike Professor Galle, and contrary to plaintiffs' accusation, Mr. Pierce does not seek to opine about "supposed legal requirements for donor-advised funds," Mot. 4, and readily disclaims any legal expertise. *See, e.g.*, Ex. B at 41:11-24; 106:2-9. All he seeks to do is provide factual testimony about how DAFs operate. Professor Galle's opinions provide a stark contrast. By plaintiffs' own admission, "Professor Galle offered an opinion . . . ***about the law*** surrounding charitable giving." Mot. 4 n.1 (emphasis added). This is fatal to large swaths of Professor Galle's report: plaintiffs' own case confirms that in the Ninth Circuit, experts "do not testify ***about the law***." Mot. 4 (citing *Crow Tribe of Indian v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996)) (emphasis added); *see also* Fidelity Charitable's Motion In Limine No. 3. But the

critique of Professor Galle does not apply to Mr. Pierce, who does not intend to testify "about the law" at all.

## C. Mr. Pierce Is Plainly Entitled To Explain That DAFs Sell Donated Stock As Quickly As Possible

Plaintiffs offer no good reason to prevent Mr. Pierce from telling the Court that Fidelity Charitable's policies and practices regarding the liquidation of donated stock are consistent with those of other leading DAFs. First, they argue that Mr. Pierce's opinion is based "exclusively" on his analysis of the published policies of other DAFs. Mot. 5. Not true; Mr. Pierce expressly states that he is "familiar with the typical practice of liquidating donated assets as quickly as possible **not only** from my review of the policies and guidelines of leading DAFs, **but also** from my seventeen years of experience in leading a major national DAF and interacting with other national DAF leaders during that period." Ex. A ¶ 47 (emphasis added); *see also id.* ¶ 36 (listing his experience as a basis for this opinion).

Second, the claim that Mr. Pierce's opinion is "confusing and biased" is little more than an effort in misdirection. Plaintiffs do not accuse Mr. Pierce of misquoting the liquidation policies of the largest national DAFs; instead, they point out that those policies *also* provide that thinly-traded or illiquid securities are not always liquidated immediately. As Fidelity Charitable has repeatedly explained in other contexts, that is a non sequitur: Mr. Pierce's report discusses the policies that are applicable in this case, where Fidelity Charitable received shares of WATT stock on a day when more than 28 million shares of that stock traded hands. Policies relating to thinly-traded stock are inapposite. To the extent plaintiffs wish to cross-examine Mr. Pierce with irrelevant policies that are distinct from those he describes in his report, they may do so; the fact that he did not describe policies relating to thinly-traded securities in his report is not a basis to exclude his testimony altogether. *See, e.g.*, *Farrow v. Contra Costa Cty.*, No. 12-CV-06495-JCS, 2019 WL 78839, at *23 (N.D. Cal. Jan. 2, 2019) ("Evidence should be excluded as unreliable if it suffers from serious methodological flaws" or fails to fit "the issues to be decided") (punctuation and citation omitted).

Third, plaintiffs' protest that how other DAFs sell donated stock is not relevant ignores

basic tenets of negligence law.  As noted above, the Ninth Circuit has confirmed that the customs and practices of a defendant's peers are relevant in an action for negligence.  That is what Mr. Pierce seeks to introduce.

### D.    Mr. Pierce Should Be Permitted To Explain Why DAFs Sell As Quickly As Possible

Plaintiffs' litany of attacks on Mr. Pierce's explanation of *why* national DAFs sell donated stock as quickly as possible provides no basis for exclusion.  First, they point out that Mr. Pierce is not a trader.  That is true, but it hardly renders him incapable of explaining that national DAFs sell donated securities "to minimize market risk and eliminate speculation."  Again, he *ran* a national DAF for 17 years.  The policy of that DAF is to sell donated securities "as quickly as possible."  Ex. A ¶ 41.  Mr. Pierce is plainly entitled to explain why a policy that he put in place— the standard among national DAFs—makes sense.  Next, plaintiffs claim that Mr. Pierce's report is "almost impossible to decipher," and take issue with his use of the word "appropriate."  Mot. 6. If plaintiffs were genuinely confused, they could have asked Mr. Pierce what he meant by "appropriate" during his deposition; they never did.  Their speculation as to what he may have meant provides no basis to exclude his opinion.  Nor does their flagrant mischaracterization— clearly, Mr. Pierce does not opine "that DAFs are bad at trading stock."  Mot. 6.  Instead, he explains that selling stock as quickly as possible allows charities to focus on their "area of core competence," which is "the 'giving away' that is core to their missions."  Ex. A ¶¶ 48-49.

### E.    Mr. Pierce's Opinion Regarding The Relationship Between Fidelity Charitable and FMR Is Appropriate Rebuttal

Fidelity Charitable hopes that it will be unnecessary for Mr. Pierce to explain that all donor advised funds require service providers, that it is a common practice among national DAFs to contract for services with an entity that shares the same trade name as the charity, and that the fees FMR charges Fidelity Charitable are considerably lower than the fees that Fidelity Charitable's peers pay.  None of this will be relevant if the Court grants Fidelity Charitable's Motion in Limine No. 2.  Yet it is the plaintiffs who have put this issue in play, suggesting as early as their Complaint that Fidelity Charitable exists in order to "generate enormous profits" for FMR.  Compl. ¶¶ 4, 32,

33. Indeed, Professor Galle has opined that the relationship with FMR "unfairly favors FMR LLC at the expense of Fidelity Charitable and its donor-advisors." Ex. D, Galle Reply Rpt. at 11. If Plaintiffs are permitted to present that narrative at trial, they cannot dismiss Fidelity Charitable's response as "irrelevant." Mot. 7.

Plaintiffs falsely insist that Mr. Pierce is unqualified to testify regarding "the propriety of the relationship between Fidelity Charitable and Fidelity." Mot. 6-7. Given his experience, Mr. Pierce is well-positioned to explain that it is "standard in the DAF charitable sector for sponsoring charities to have relationships with for-profit corporate entities including those that might have the same brand name." Ex. A ¶ 54. Plaintiffs' critique of Mr. Pierce's statements about the value FMR provides Fidelity Charitable is misguided; Mr. Pierce observes that "the Treasurer of Fidelity Charitable has . . . concluded that the charity is receiving at least fair value" for the services FMR provides, *id.* ¶ 56, and then goes on to explain the range of services FMR provides and the nature of the fees that Fidelity Charitable charges. *Id.* ¶¶ 57-59. Again, plaintiffs are free to point out at cross-examination that Mr. Pierce only verified some, but not all, of the data in the PowerPoint presentations he reviewed (Mot. 7), or lacked "full information" (Mot. 7) about FMR's revenues (which, at any rate, are irrelevant to any analysis of the *fees* that Fidelity Charitable pays). But these critiques of minor points contained in a large section of Mr. Pierce's expert report provide no basis to exclude the opinion entirely.

## III.   CONCLUSION

Plaintiffs' motion to exclude Mr. Pierce from trial should be denied.


DATED: July 31, 2020                                  Respectfully submitted,


                                                     By: */s/ David. C. Marcus*
                                                     DAVID C. MARCUS
                                                     CHRISTOPHER T. CASAMASSIMA
                                                     WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP
                                                     350 South Grand Avenue, Suite 2100
                                                     Los Angeles, CA 90071
                                                     Telephone: +1 213 443 5300
                                                     Facsimile: +1 213 443 5400

ANDREW S. DULBERG (*pro hac vice*)
SARAH R. FRAZIER (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

*Attorneys for Defendant*
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND

David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
Nicholas G. Purcell (SBN 313632)
nick.purcell@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

Andrew Dulberg (*admitted pro hac vice*)
andrew.dulberg@wilmerhale.com
Sarah R. Frazier (*admitted pro hac vice*)
sarah.frazier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

*Attorneys for Defendant*
FIDELITY INVESTMENTS CHARITABLE
GIFT FUND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EMILY FAIRBAIRN and MALCOLM FAIRBAIRN, | Case No. 3:18-cv-04881-JSC |
| Plaintiffs, | **DECLARATION OF NICHOLAS G. PURCELL IN SUPPORT OF DEFENDANT FIDELITY INVESTMENTS CHARITABLE GIFT FUND'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE BENJAMIN PIERCE** |
| v. | |
| FIDELITY INVESTMENTS CHARITABLE GIFT FUND, | |
| Defendant. | |

## Declaration of Nicholas G. Purcell In Support of Defendant's Opposition to Plaintiffs' Motion *In Limine* No. 2

I, Nicholas G. Purcell, declare as follows:

1.      I am a member of the California Bar and am admitted to practice before this Court. I am an attorney at Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), counsel to Fidelity Investments Charitable Gift Fund ("Fidelity Charitable"). I have personal knowledge of each of the matters set forth below, and, if called as a witness, I could and would testify to each of them under oath.

2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the Expert Report of Benjamin Pierce, dated October 1, 2019.

3.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the November 20, 2019 deposition transcript of Benjamin Pierce.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the signed declaration of Dennis Hearst, dated July 18, 2019.

5.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the Reply Report of Brian Galle, dated October 15, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 31, 2020.

/s/ *Nicholas G. Purcell*
NICHOLAS G. PURCELL

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

EMILY FAIRBAIRN and
MALCOLM FAIRBAIRN,

    Plaintiffs,

       v.

FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

    Defendant.

Case No. 3:18-cv-04881-JSC

# REPORT OF BENJAMIN PIERCE

October 1, 2019

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

     A.    Professional Experience and Qualifications .........................................1

     B.    Prior Expert Testimony.......................................................................3

     C.    Compensation .....................................................................................3

     D.    Materials Considered ..........................................................................3

II.    ASSIGNMENT...................................................................................................3

III.   SUMMARY OF OPINIONS..................................................................................4

IV.   THE ROLE OF "ADVICE" AND BEST PRACTICES WITH RESPECT TO DONOR ADVISED FUNDS..........................................................................................................4

V.    FIDELITY CHARITABLE'S POLICIES AND PRACTICES REGARDING LIQUIDATION ARE CONSISTENT WITH OTHER LEADING DAFS ....................................................12

     A.    DAFs Sell Donated Stock As Quickly As Possible ...............................13

     B.    It Is Appropriate For DAFs To Sell Donated Stock As Soon As Possible ............16

VI.   FIDELITY CHARITABLE'S RELATIONSHIP WITH FIDELITY IS ENTIRELY APPROPRIATE........18

VII.  CONCLUSION..................................................................................................22

## I.  INTRODUCTION

1.      I have been retained by Fidelity Investments Charitable Gift Fund ("Fidelity Charitable") to provide an expert opinion in this matter.  Based on my experience as the founding President of the Vanguard Charitable Endowment Program, as a leader of a group that developed a set of common operating standards for Donor Advised Funds ("DAFs"), as the co-founder of a philanthropic consulting organization (Acadia Squam Group LLC) focused on DAFs, and my review of the materials cited herein, I offer the opinions set forth below relating standards and best practices relating to DAFs, Fidelity Charitable's policies and practices regarding the liquidation of donated securities, and the relationship between Fidelity Charitable and FMR LLC.

### A.      Professional Experience and Qualifications

2.      I graduated from Harvard College in 1974 with a BA in Government.  After graduating, I joined the Philadelphia National Bank as a bank management trainee, where I worked in the multi-national and international divisions.  After three years at the bank, I joined a gas and chemical company as international credit manager.  In 1979, I was retained by a Fortune 500 chemical company, FMC Corporation, as credit manager.  In that capacity, I was responsible for supervising a team charged with collecting approximately $1 billion in annual worldwide revenues.  In 1985, I took on a new role as financial analyst in the Marine Colloids Division of FMC, with responsibility for budgeting, cost-accounting, and inventory controls.  In 1988, I earned my MBA from Villanova University.

3.      In 1990, I began my career in the non-profit sector by joining The College of Physicians of Philadelphia as its Chief Operating Officer.  Founded in 1787, The College of Physicians of Philadelphia is a not-for-profit medical, educational, and cultural institution dedicated to advancing the cause of health and educating medical professionals and the public

about medicine.  The College of Physicians of Philadelphia maintains one of the world's oldest medical libraries and operates the Mütter Museum, a museum of medical history.  As COO, I had responsibility for all internal functions of the institution, with oversight of accounting, finance, investments, technology, operations, and human resources.  I also served as Interim Executive Director between April 1997 and June 1998, with ultimate responsibility for the management of the institution while it searched for a permanent executive director.

4.     In 1998, I was hired as the first employee and President of the Vanguard Charitable Endowment Program ("Vanguard Charitable"), a 501(c)(3) public charity and DAF sponsor.  Vanguard Charitable is independent of The Vanguard Group, which is a for-profit global investment firm.  I helped launch this national charity, led it through its formative years, then oversaw its growth as it became one of the nation's top ten grant-makers.  Reporting to an independent Board of Trustees, I was responsible for overseeing all aspects of the operations of the charity.  This included establishing policies and guidelines, grant-making, fund-raising, financial matters, compliance, technology, contribution processing (including liquidation of donated securities), donor relations, government affairs, collaborations, and human resources.

5.     During my tenure at Vanguard Charitable, I met regularly with the leaders of other national DAFs, had numerous opportunities to speak publicly about DAFs, and participated in the development of industry guidelines related to donor advised funds.  In 1999, I was invited to meet with the United States House of Representatives Finance Sub-Committee on Taxation regarding DAFs, and spoke to members of Congress and their staff members about DAFs.  In 2002, I was a leader of a group that drafted a set of best practices for donor advised funds entitled "Common Operation Procedures for Donor Advised Funds."  I have also served on panels regarding DAFs hosted by the Council on Foundations and The Philanthropy Roundtable,

and have spoken at a wide variety of planned giving, estate and financial planning, and fund-raising executive conferences.

6.      After seventeen years as the President of Vanguard Charitable, I retired in July 2015.  At the time of my retirement, Vanguard Charitable had granted a total of $5 billion to charities across the country, and held $5 billion in assets for more than 12,000 accounts.

7.      In early 2019, I co-founded the Acadia Squam Group LLC, a consulting firm focused primarily on informing, advising and educating a wide variety of clients on DAFs.  Our mission is to help charities raise more money to support the public good of their missions.

8.      Further details on my background and qualifications are set out in my curriculum vitae, which is attached as **Exhibit A** to this report.

**B.      Prior Expert Testimony**

9.      I have never provided deposition and/or trial testimony as an expert in any litigation or arbitration proceeding.

**C.      Compensation**

10.      For my work in connection with this matter, I am being paid $300 per hour, as well as reimbursement of any work-related expenses.  My compensation is in no way dependent on my opinions rendered or the outcome of this matter.

**D.      Materials Considered**

11.      In rendering the opinions and conclusions expressed in this report, I have considered the materials set forth in **Exhibit B** in addition to my own experience over the past several decades.

**II.      ASSIGNMENT**

12.      I have been asked by Fidelity Charitable to provide my opinion as to (1) certain standards and best practices relating to DAFs, (2) Fidelity Charitable's policies and practices

3

regarding the liquidation of donated securities; and (3) Fidelity Charitable's relationship with FMR LLC.

### III. SUMMARY OF OPINIONS

13. As set forth more fully below, it is my opinion, based on my experience and expertise in running a large national DAF for seventeen years, my consulting practice, and my review of the documents identified in Exhibit B, that:

14. Donors are only entitled to advise DAFs with respect to (1) investment of proceeds from donated assets, and (2) grants that DAFs, including Fidelity Charitable, will consider. To the extent donors seek to provide advice to DAFs regarding the sale of donated assets, DAFs nevertheless have exclusive authority to sell donated assets as they deem appropriate and in the best interests of the charity.

15. Fidelity Charitable's policies and practices relating to the liquidation of donated securities are in accord with the IRS definition of a DAF, DAF standards and best practices, its own Circular, and its charitable mission.

16. Fidelity Charitable's relationship with FMR LLC is appropriate.

### IV. THE ROLE OF "ADVICE" AND BEST PRACTICES WITH RESPECT TO DONOR ADVISED FUNDS

17. The philanthropic giving instrument entitled "donor advised fund" has been around for about 90 years. With the advent and success of Fidelity Charitable in the early 1990s, DAFs became national in scope. Over the last twenty-five years, they have become one of America's most favored ways to make charitable donations.

18. The term donor advised fund aptly describes the instrument. A **donor** gives assets (*e.g.*, cash, stock, real estate) to a DAF, unconditionally and irrevocably. The donor then

is able to give **advice** on how the proceeds of the gift will be invested in, and granted out of, the **fund** into which those proceeds are placed. Hence "**donor advised fund.**"

19.    The publicly-available policies issued by a wide range of leading DAFs illuminate the nature of the advice that donors may provide. Each of these makes clear that contributions are irrevocable, the DAF's authority to control assets following their donation is exclusive, and, most relevant here, donors may provide advice with respect to (1) the investment of the proceeds of any donated assets among investment options, and (2) possible grants from the fund.

20.    Specifically, I have conducted a review of the current policies published by the eleven largest donor advised funds. (This is not my first time examining the published policies of other donor advised funds; during my tenure at Vanguard Charitable, from time to time, I had occasion to review the policy guidelines of other DAFs in force at the time. Generally speaking, the policies and guidelines in place today have not changed materially during the past several years.) In 2017, total assets held by DAFs exceeded $110 billion.[1] The eleven charities I discuss in this report account for approximately $70 billion of that total. What follows are specific written statements from the six largest of these eleven charities about the ownership and authority over contributed assets, and the donor's entitlement to provide advice.[2]

21.    The 2017 **Fidelity Charitable** Policy Guidelines: Program Circular state that "***Contributions to Fidelity Charitable are irrevocable***."[3] The Circular goes on to state: "Once Fidelity Charitable accepts a contribution, it is irrevocable and is owned and controlled by the Trustees. The Trustees have exclusive legal control over all contributed assets. Contributions to

---

[1] Alex Daniels, *Value of Donor-Advised Funds Soars Above $110 Billion*, The Chronicle Of Philanthropy (Nov. 13, 2018), https://www.philanthropy.com/article/Value-of-Donor-Advised-Funds/245074 (last visited Sept. 26, 2019).

[2] The policies and guidelines of the remaining five DAFs contain similar language to the statements I have identified in the paragraphs that follow.

[3] *Fidelity Charitable Policy Guidelines: Program Circular* at 1.

CONFIDENTIAL

Fidelity Charitable are not refundable."[4]  The Circular also provides that "Account Holders, and certain authorized advisors and third-party individuals, may recommend how funds in a Giving Account are allocated among one or a combination of available investment options."[5]  Moreover, "Account Holders and certain authorized advisors or third-party individuals have grant recommendation privileges.  Grants may be recommended to qualified charitable organizations… Grant recommendations are not binding, and are subject to review and approval by the Trustees in their sole discretion."[6]

22.    The **Vanguard Charitable** Policies and Guidelines similarly provide: "Once Vanguard Charitable receives the contributed assets and all required paperwork in good order, the donor no longer has control over the assets."[7]  In addition, "Once accepted by Vanguard Charitable, contributions are unconditional and irrevocable."  "[W]hen contributing, the donor cannot impose any restrictions or conditions that prevent Vanguard Charitable from freely and effectively using the gift to further its mission."[8]  Donors to Vanguard Charitable may provide advice as to the investment and distribution of the proceeds of their giving accounts:  "After a contribution is liquidated, the net proceeds are invested, based on the recommendation of an account's advisor or interested party, in any combination of Vanguard Charitable's investment options,"[9] and "[o]nce an account is funded, account advisors and authorized interested parties may recommend grants at any time to qualified 501(c)(3) public charities."[10]  Of course,

---

[4] *Id.* at 4.
[5] *Id.* at 9.
[6] *Id.* at 15.
[7] Vanguard Charitable, *Policies and Guidelines* at 3.
[8] *Id.* at 7.
[9] *Id.* at 17.
[10] *Id.* at 19.

CONFIDENTIAL

"Vanguard Charitable's board of trustees maintains ultimate authority over all grant distributions."[11]

23.     The **Schwab Charitable Fund** Program Policies and Guidelines state that "All contributions are irrevocable."  In other words, "Donated assets are no longer counted among the account holder's personal investments and are, in fact, the property of Schwab Charitable."[12] The guidelines explain that "all contributions accepted by Schwab Charitable are both irrevocable and unconditional … [and are] subject to the exclusive legal authority and control of Schwab Charitable as to their use and distribution."[13]   Donors to Schwab Charitable "can recommend a name for their account,"[14] "may recommend that their account assets be allocated among a variety of investment pools selected and monitored on a continuing basis by Schwab Charitable,"[15] and "can recommend grants of $50 or more to charities at any time."[16]   Again, "Schwab Charitable may deny grant recommendations…"[17]

24.     The **Silicon Valley Community Foundation** Advised Fund Agreement states, "As required by law, all assets contributed to funds become irrevocable gifts to SVCF, and legal control and responsibility for the funds rest with SVCF."[18]   "In making a gift to SVCF, donors give up all right, title and interest to the assets contributed."[19]   SVCF describes the "advisory privileges" of a donor as "including grant recommendations, investment recommendations, naming the fund and appointment of other fund advisors and successor advisors."[20]

---

[11] *Id.*
[12] Schwab Charitable, *Program Policies and Guidelines* at 4.
[13] *Id.* at 14.
[14] *Id.* at 4.
[15] *Id.* at 20.
[16] *Id.* at 23.
[17] *Id.*
[18] Silicon Valley Community Foundation Advised Fund Agreement, *Appendix – Fund Terms and Conditions* at 1.
[19] *Id.*
[20] *Id.* at 2.

CONFIDENTIAL

25.     **National Philanthropic Trust**'s Guide To Your Donor Advised Fund declares, "Once NPT approves and accepts your contribution, it is irrevocable.  NPT retains exclusive legal control over the contributed asset and you may not impose any material restriction or condition on the gifts."[21]  With respect to the privileges of a donor, the Guide states that donors "have the opportunity to: Contribute the widest range of assets[;] Recommend grants to qualified charities in the U.S. and around the world[;] Choose from a wide range of investment options[;] [and] Establish a legacy in perpetuity by naming successors to your fund."[22]

26.     The **Goldman Sachs Philanthropy Fund** Program Circular states, "Once a contribution has been made to, and accepted by, the Goldman Sachs Philanthropy Fund, it is irrevovable and non-refundable.  Contributions and all related future earnings are no longer the donor's assets; they are the property of the Goldman Sachs Philanthropy Fund."[23]  With respect to the rights of donors, the Program Circular states that "donors can recommend that their irrevocable contributions to the Goldman Sachs Philanthropy Fund be allocated to specified investment options until such time as those funds are distributed by the Goldman Sachs Philanthropy Fund,"[24] and that "[o]nce the account is established, the donor can then make grant recommendations."[25]

27.     Not a single one of the policies of the eleven largest DAFs describes an advisory privilege for donors with respect to the liquidation of donated assets.  All of them make clear that the donor's legal right to control of the donated assets ceases at the moment of donation.

---

[21] National Philanthropic Trust, *Guide To Your Donor Advised Fund* at 1.
[22] *Id.*
[23] Goldman Sachs Philanthropy Fund, *Program Circular* at 2.
[24] *Id.* at 1.
[25] *Id.* at 2.

CONFIDENTIAL

28. IRS guidelines regarding donor advised funds bolster my conclusion that donors may provide advice to DAFs with respect to the investment of donated assets and grant-making. Specifically, in August 2006, donor advised funds were written into the IRS tax code for the first time through the Pension Protection Act. The IRS definition of a donor advised fund states:

> . . . the term "donor advised fund" means a fund or account—(i) which is separately identified through reference to contributions of a donor or donors, (ii) which is owned and controlled by a sponsoring organization, and (iii) with respect to which a donor (or any person appointed or designated by such donor) has, or reasonably expects to have, **advisory privileges with respect to the distribution or investment of amounts held in such fund or account** by reason of the donor's status as a donor.

26 U.S.C. § 4966(d)(2) (emphasis added). Notably, the statute does not reference any advisory privilege with respect to advice on the liquidation of donated assets.

29. Several years before the enactment of this statute, leading DAFs evidenced a similar understanding of the role of donor advice. In particular, a group of the largest DAFs convened in February 2002 to establish an agreed-upon framework of operating procedures and best practices for donor advised funds. I participated in this effort on behalf of Vanguard Charitable, and Fidelity Charitable was one of the leading participants in this initiative. Our goal was to set forth best practices for DAFs in order to document emerging industry standards and create a resource for DAFs. Following meetings in Washington, D.C., we published "Common Operating Procedures for Donor Advised Funds" (the "Common Operating Procedures") in 2002, and distributed it to the group's participants which included Fidelity Charitable, Vanguard Charitable, Schwab Charitable and their respective legal counsel. By 2004, the group expanded to include T. Rowe Price Charitable (then called T. Rowe Price Program for Charitable Giving), the Ayco Charitable Foundation, and the Greater Washington Jewish Federation. Following 2004, the group was expanded further to include National Philanthropic Trust, the New York

9

CONFIDENTIAL

Community Trust, and the Greater Kansas City Community Foundation. One section of the Common Operating Procedures is entitled "Privileges of a Donor." In its entirety, that section states:

> The donor makes charitable contributions to a donor advised fund account, and has the privilege of (i) naming the donor advised fund account, (ii) designating donor advisers and successor donor advisers, (iii) making recommendations regarding grants paid out of a donor advised fund account, and (iv) advising on the investment allocation of assets in a donor advised fund account.[26]

Again, there is no reference to any privilege regarding input into the liquidation of a contributed asset.

30. To the extent donors provide advice to DAFs regarding grant-making, that advice is a suggestion or recommendation that the DAF considers and generally honors, subject to certain conditions. For example, the Fidelity Charitable website explains that it can only make grants to IRS-qualified public charities, does not make grants to organizations that may be engaged in illegal or non-charitable activity, cannot make grants to private foundations, and cannot approve grants that confer a personal benefit to the donor.[27]

31. As reflected in the July 18, 2019 Declaration of Dennis Hearst, a Managing Director of J. P. Morgan Chase Bank, N.A., from time to time, some donors provide DAFs with a recommendation concerning the liquidation of donated assets, including publicly traded securities. But as Mr. Hearst recognizes in his Declaration, the liquidation of donated assets is a matter within the exclusive control of the charity. There is nothing inherently wrong with a donor expressing a preference relating to the liquidation of donated securities; what is critical to

---

[26] Common Operating Procedures § III(B).
[27] *See, e.g.*, Fidelity Charitable, *Charities you can support*, https://www.fidelitycharitable.org/giving-account/supported-charities.html (last visited Sept. 26, 2019).

CONFIDENTIAL

understand is that, while a donor might provide "advice" regarding the liquidation of a donated asset, the DAF has total control of the liquidation.

32.     There is also an important difference between a donor providing advice with respect to liquidation and a donor extracting from the DAF a *promise* with respect to liquidation (as alleged here).  The former may happen; the latter is impermissible.  In fact, if a donor were able to dictate the terms by which the charity sold donated assets, that would jeopardize the donor's ability to take a tax deduction based on the donation.  This is because it would evidence donor control over the asset, rendering the donation incomplete.  The linchpin of a donor's ability to take a tax deduction based on the charitable gift is the relinquishment of donor control. The DAF must make its own independent decision as to how to liquidate the donated asset, in the best interests of the charity.

33.     Relatedly, it is critical for a DAF to maintain a line between "advice" and "direction," because a donor is permitted only to advise, not to direct.  DAFs commonly maintain this distinction by establishing policies and procedures.  For example, the governing body of a DAF will typically pre-approve a number of investment pools for holding DAF assets.  The governing body **directs** that the DAF's assets shall be invested in those designated pools, all of which are approved as satisfactory choices for any DAF account.  When a donor then **advises** as between those pre-approved vehicles, it is clear that the direction has already been set by the DAF's governing body—the donor is not giving direction.

34.     Fidelity Charitable's written policies and procedures help maintain this boundary between advice and direction.  In particular, the Fidelity Charitable Code of Conduct provides:

> Donors cannot control their contributions once they're made, and we may never imply that donors have control.  It follows that donors may not impose restrictions or conditions on the assets in their donor-advised fund.

Donors have recommendation and advisory privileges only.[28]

35.     Finally, a DAF is a tax exempt public charity, not an investment organization. The charity, its overseeing board, and its management have a fiduciary duty to act in the best interests of the charity, not in the best interests of the donors to the charity. That duty includes following the charity's policies and guidelines that support its charitable status. As I have explained, DAFs accordingly adopt policies and guidelines that protect their tax-exempt status and comply with the IRS tax code by making clear that donated assets belong exclusively to the charity; that donations are irrevocable; and that the donor only retains the privilege to provide advice regarding the investment of and grantmaking from their cash donations, or in the event of non-cash donations, the post-liquidation proceeds of their donation. I am not aware of any support—in the tax code, in industry customs and practices, or in the written policies of leading donor advised funds—for the proposition that a donor enjoys any advisory right with respect to the liquidation of donated assets, and any promise between a DAF and a donor that provides the donor with control over the liquidation of a donated asset would put at risk the donor's ability to take advantage of the favorable tax treatment that Congress has provided for gifts to donor advised funds.

## V.     FIDELITY CHARITABLE'S POLICIES AND PRACTICES REGARDING LIQUIDATION ARE CONSISTENT WITH OTHER LEADING DAFs

36.     It is my opinion based on my experience and my review of the exhibits described herein that Fidelity Charitable's policies and practices regarding the liquidation of donated shares of stock are consistent with those of other leading DAFs.

---

[28] FID-FRBN-0031125.

**A.       DAFs Sell Donated Stock As Quickly As Possible**

37.       Importantly for this matter, the liquidation of marketable securities as soon as possible is a standard practice of DAFs and is clearly set forth in the Fidelity Charitable Program Circular and the equivalent documents published by other leading DAFs.

38.       As I noted above, I am familiar with and have reviewed the current publicly-available written program policies and guidelines of eleven of the largest DAFs.  All of them accept donations of publicly-traded securities.  All of them also publicly state that they sell donated assets as quickly as possible and/or maintain absolute control, authority, and discretion over the liquidation of those assets.  None of them invite donors to advise on liquidation or provide that they are bound to adhere to such advice, if offered by donors.

39.       The **Fidelity Charitable** Policy Guidelines: Program Circular state that Fidelity Charitable "will liquidate contributions as quickly as possible after all the requisite paperwork has been received, and after the assets have been received in good order."[29]  The Program Circular also states:  "Upon receiving the appropriate paperwork and the donated securities in good order, Fidelity Charitable will generally sell the securities at the earliest date possible, but reserves the right to sell at any time."[30]

40.       Notably here, given the Plaintiffs' allegations regarding J.P. Morgan in Paragraph 8 of their Complaint, the **National Philanthropic Trust** Guide To Your Donor Advised Fund states, "Certain assets, such as publicly-traded stock, may be liquidated immediately while other contributions will be liquidated as soon as practical."[31]  "NPT retains exclusive legal control over the contributed asset and you may not impose any material restriction or condition on the

---

[29] *Fidelity Charitable Policy Guidelines: Program Circular* at 5.
[30] *Id.* at 6.
[31] National Philanthropic Trust, *supra* note 21, at 1.

gift."[32]   The J.P. Morgan Charitable Giving Fund is administered by National Philanthropic Trust.  The July 18, 2019 Declaration of Dennis Hearst that I previously referenced is consistent with the National Philanthropic Trust Guide To Your Donor Advised Fund.  In his declaration, Mr. Hearst states that "[i]t was and is my understanding that a donor may recommend, but may not dictate, the terms of how the Fund and/or NPT liquidate donated assets such as publicly traded securities.  While donors may offer their recommendation with respect to liquidation, they are not permitted to dictate the timing, price or manner of the liquidation of publicly traded securities.  Those issues are solely in the control of the Fund."  The declaration is consistent with the guidance set out by National Philanthropic Trust and further supports my opinion that Fidelity Charitable's policies regarding liquidation are consistent with other leading DAFs.  There is, however, additional support for my opinion from the other major DAFs, as indicated below.

41.     The **Vanguard Charitable** Policies and Guidelines similarly provide: "Once Vanguard Charitable receives both the appropriate donation documentation and the donated securities in good order, the securities will be sold as quickly as possible, generally on the day following their receipt."[33]

42.     The **Schwab Charitable Fund** Program Policies and Guidelines state that "Schwab Charitable typically liquidates contributions as quickly as possible after all required, completed paperwork and assets have been received."[34]

43.     The **National Christian Charitable Foundation** Essential Guide to NCF Giving Solutions states that "NCF generally tries to liquidate gifted assets as soon as possible, after both

---

[32] *Id.*
[33] Vanguard Charitable, *supra* note 7, at 9.
[34] Schwab Charitable Fund, *supra* note 12, at 10.

CONFIDENTIAL

the necessary documentation and the assets are received in good order."[35] "It is the general policy of NCF to sell gifted securities received in good order the next business day after the shares are received in NCF's brokerage account."[36]

44. The **Greater Kansas City Community Foundation** procedures state, "The general policy of the Community Foundation is to sell all contributed property as soon as practical after receipt so as to minimize market risk."[37]

45. The **Bank of America Charitable Gift Fund** Program Guidelines state, "After all paperwork is received, in good order and has been approved by the Trustee of the Bank of America Chairtable Gift Fund, contributions (other than non-publicly traded) will generally be sold within two (2) business days (unless it is thinly traded stock which requires Trustee approval, a selling plan, and possible put option agreement) and the net proceeds will be invested according to the investment objective the Donor has recommended."[38]

46. To the extent other leading DAFs do not state in their written policies and guidelines that they liquidate donated assets as soon as possible, they uniformly state that donated assets are the exclusive property of the DAF and that the DAF intends to liquidate the assets. For example, the **Goldman Sachs Philanthropy Fund** Program Circular states that "Contributions and all related future earnings are no longer the donor's assets . . . . For contributions such as donated securities and mutual fund shares, the Goldman Sachs Philanthropy Fund expects to sell the shares to generate cash."[39] The **Renaissance Charitable**

---

[35] National Christian Charitable Foundation, *Essential Guide to NCF Giving Solutions* at 11.
[36] *Id.* at 12.
[37] Greater Kansas City Community Foundation, *Procedures for Establishment and Operation of Funds and Supporting Organizations* at 3.
[38] Bank of America Charitable Gift Fund Program Guidelines at 2.

[39] Goldman Sachs Philanthropy Fund, *supra* note 23, at 2.

**Foundation** Donor Guide states, "In its sole discretion, RCF will determine the timing and execution of a sales strategy for any asset, including a contributed asset, and reserves the right to sell at any time."[40] The **American Endowment Foundation** Donor Advised Fund Gift Acceptance Policy states: "Upon AEF's acceptance of the gift…AEF maintains full discretion with respect to the gift, including but not limited to, any subsequent sale, redemption, transfer or other disposition."[41] And the **Silicon Valley Community Foundation** informs donors that "In order for a donor to take advantage of the tax benefits that flow from a charitable gift, the gift has to be complete—that is, the donor has to part control over the donated assets. The appearance of donor control could put the donor's tax deduction in jeopardy."[42] That foundation also states: "The board of directors and investment committee of SVCF have the right to make any or all investment decisions regarding gifts received, except that fund advisors have advisory privileges with respect to fund investments. All assets contributed to funds will be managed in the community foundation's investment pools…"

### B. It Is Appropriate For DAFs To Sell Donated Stock As Soon As Possible

47. I am familiar with the typical practice of liquidating donated assets as quickly as possible not only from my review of the policies and guidelines of leading DAFs, but also from my seventeen years of experience in leading a major national DAF and interacting with other national DAF leaders during that period. There are several reasons why DAFs generally seek to liquidate donated stock as quickly as possible and why doing so is appropriate.

48. *First*, DAFs seek to minimize market risk to the charity. By market risk, I am referring to the risk associated with exposure to an individual security and also to the broader

---

[40] Renaissance Charitable Foundation, *A Donor's Guide* at 9.
[41] American Endowment Foundation Donor Advised Fund Gift Acceptance Policy at 4.
[42] Silicon Valley Community Foundation, *supra* note 18, at 4.

market; for example, the market risk associated with holding any individual equity is that the price of that security—and the broader market—may decline over time. Accordingly, DAFs do not speculate in investment market conditions or specific stock values as that is not part of their charitable mission or their area of core competence. Selling donated assets quickly is an effective strategy to minimize market risk and eliminate speculation.

49. **Second**, DAFs are public charities, not registered investment advisors; their core competency is giving money away for the public good, and not analyzing and trading stocks. Selling donated assets (including stock and, notably, assets that may be less liquid) as quickly as possible allow DAFs to focus their resources on the "giving away" that is core to their missions.

50. **Third,** and relatedly, many DAFs receive donations of cash and non-cash assets of all kinds, including publicly-traded securities, non-traded securities like limited partnerships, real estate, cryptocurrency, and more. A DAF would need to retain investment advisors with a wide range of expertise just to analyze and develop a customized trading strategy for every stock that is donated, and the full array of non-cash assets. To be sure, some DAFs, including Fidelity Charitable, offer special programs (Fidelity Charitable's Charitable Investment Advisor Program – CIAP) that involve the retention of an investment advisor by the charity for purposes of making investment decisions about the assets in a particular account. To my knowledge, in all such cases, these accounts remain subject to certain guidelines and limitations imposed by the charity, governed by the interests of the charity exclusively (and not the interests of the donor), and subject to the aforementioned principles regarding donor control. It is my understanding that the Fairbairns were not enrolled in such a program. With the exception of programs like CIAP, in which investment advisors provide advice about specific accounts, I am not aware of any DAF

that utilizes this strategy or practice with respect to donations the proceeds of which will be allocated to a common investment pool.

51. **Fourth**, DAFs are subject to governance controls, which approve prudent investment options in which the charity's assets may be invested pending distribution. Prompt liquidation of the donated securities allows the proceeds from the sale of those shares to be invested in the prudent investment options approved by the charity in accordance with the DAF's governance structure. A prudent investment for this purpose is one that allows for both the potential growth of assets available over time and also the easy and prompt liquidation of the assets at the point when a grant is recommended, reviewed, and approved. The investment in approved, prudent vehicles increases the charity's ability to fulfill its mission to support the public good.

52. Thus, as a policy matter, it makes sense and is appropriate for a DAF to sell shares as soon as possible.

## VI. FIDELITY CHARITABLE'S RELATIONSHIP WITH FIDELITY IS ENTIRELY APPROPRIATE

53. Plaintiffs' Complaint questions the relationship between Fidelity Charitable and for-profit Fidelity entities.

54. It is entirely appropriate and standard in the DAF charitable sector for sponsoring charities to have relationships with for-profit corporate entities including those that might have the same brand name. Like any other charitable enterprise, DAFs need a range of goods and services that are best provided by other entities. As illustrations, DAFs need to have technology platforms that operate securely and effectively, they need a brokerage house to execute trades, and they need to be able to invest their funds. Hence, for example, Vanguard Charitable executes its trading activity through Vanguard Brokerage Services, and most of the Vanguard

CONFIDENTIAL

Charitable investment pools are invested in Vanguard mutual funds. As another example, The Goldman Sachs Philanthropy Fund receives administrative services from a wholly-owned subsidiary of The Goldman Sachs Group, Inc., and its investment manager is Goldman Sachs Asset Management, L.P. These contractual relationships are clearly disclosed in the DAF's written policies and guidelines.

55. From my experience watching Fidelity Charitable over twenty years and from my review of the materials in Exhibit B, it is clear that Fidelity Charitable has continually offered a broad array of charitable services. This includes a website with wide-ranging functionality from a best-in-class donor-advisor experience, extensive education materials, access to Fidelity Charitable governance documents and clear articulation of how the DAF operates. Additionally, Fidelity Charitable provides expertise in how donors might contribute a wide variety of illiquid assets (real estate, LLC interests, etc). Yet another example is that the charity enables qualified and screened financial advisors to manage DAF accounts within carefully considered, prescribed guidelines. Finally, the charity has always been a leader in bringing new philanthropic tools to the DAF sector. Examples incude the grant "widget," the open investment platform, and the Charitable Investment Advisor Program (CIAP). All of these quality services are supported by the team from FMR LLC whose services the Trustees of Fidelity Charitable contracted. Not only are the services provided to the charity of high quality and great value to donors and the ultimate grant recipients, but they are provided at fair value or better (see below).

56. Fidelity Charitable is governed by a Board of Trustees that includes nine members (plus one Trustee Emeritus), and, unlike some other DAFs, the trustees are not currently affiliated with FMR LLC in any way. This is strong evidence of the independence of Fidelity Charitable. Of course, the governing boards of all DAFs are required to make fiduciary

decisions in the best interests of their charities. Obtaining services from organizations that share the same brand can be consistent with that fiduciary duty. I understand that Fidelity Charitable conducts an annual review of its relationship with FMR LLC designed to ensure that it is receiving at least fair value for the services that FMR LLC provides. This review is similar to how Vanguard Charitable ensures it receives high value annually from its service providers. In the materials I have reviewed, the Treasurer of Fidelity Charitable has undertaken that analysis and concluded that the charity is receiving at least fair market value.[43] A chart in this analysis depicts in broad strokes the "people, market, technology and services" that FMR LLC provides to Fidelity Charitable.[44] To my knowledge, there is no other set of services provided in the DAF sector that approaches the extent of these services, and they are all provided to Fidelity Charitable at a "fair value (or better) for the fees it is paying FMR LLC."[45] This annual review process is a thorough means of ensuring that Fidelity Charitable's relationship with FMR LLC is overseen professionally and is fair and appropriate.

57. Additionally, it is important to understand that there are only two ongoing fees incurred by the donor advised fund in the course of its normal operation. First, there is an administrative fee charged at the account level that pays for the operations (people, technology, processing, etc.) of the charity. The administrative fee is the true revenue of the organization (not the amount of contributions). In the case of Fidelity Charitable, the administrative fee charged to the DAF accounts is the revenue of the charity and goes to pay for the expense of all the services provided by FMR LLC pursuant to the Master Services Agreement between the Trustees of Fidelity Charitable and FMR. The majority of these expenses are to compensate the

---

[43] Annual Review of the Master Services Agreement ("MSA Review") (2016-2018).
[44] MSA Review (2017) at slide 7.
[45] *Id.* at slide 3.

CONFIDENTIAL

hundreds of employees of FMR LLC that service the charity.[46]  Fidelity Charitable is able to

provide a wide menu of valued services while charging administrative fees on individual

accounts that are often the lowest in the DAF sector.  In all, Fidelity Charitable is offering the

widest array of DAF products and services in the sector, of recognized high quality, at very low

expenses to account holders, and at a fair, arms-length rate from FMR LLC.

58.     The second fee is the investment fee charged by the manager of the underlying

investments of the pools.  The majority, but not all, of the investment pools offered by Fidelity

Charitable invest in Fidelity mutual funds.  The fund expense ratios that Fidelity Charitable

charges on these investments are a straight pass-through from FMR (*i.e.*, there is no incremental

markup by either party).[47]  An example of the benefit that flows from this investment

arrangement is that the fund expense ratios on the two most favored investment options at

Fidelity Charitable (the Money Market Pool and the Total Market Index Pool, which represent

about 39% of the charity's total pooled investment funds as of December 31, 2017)[48] are less

than two-tenths of one percent (<.0020% per annum).[49]  That is very solid value for Fidelity

Charitable and positive for the eventual recipient charities who receive grants.

59.     To the extent donors contribute publicly-traded securities to DAFs, DAFs charge

commissions associated with the liquidation of those securities.  These fees are clearly disclosed

in DAF policies and guidelines including the Fidelity Charitable Program Circular.[50]

---

[46] MSA Review (2016) at slide 7; (2017) at slide 8; (2018) at slide 8.
[47] *See* https://www.fidelitycharitable.org/giving-account/what-it-costs.html (last visited Sept. 26, 2019).
[48] Fidelity Investments Charitable Gift Fund Financial Statements For The Years Ended June 30, 2018 and 2017, https://www.fidelitycharitable.org/content/dam/fc-public/docs/fc-audited-financial-statements-2018-2017.pdf (last visited Sept. 26, 2019).
[49] *Fidelity Charitable Policy Guidelines: Program Circular* at 23.
[50] *Id.* at 22.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

4    EMILY FAIRBAIRN and        :   Case No.

5    MALCOLM FAIRBAIRN,         :   3:18-CV-4881

6              Plaintiffs       :

7              vs.              :

8    FIDELITY INVESTMENTS       :

9    CHARITABLE GIFT FUND,      :

10             Defendants.      :

11   _____

12

13

14

15        Videotaped Deposition of BENJAMIN PIERCE,

16        taken at One Logan Square, 130 North 18th

17        Street, 11th Floor, Philadelphia, Pennsylvania,

18        commencing at 9:00 a.m., Wednesday, November 20,

19        2019, before Rose A. Tamburri, RPR, CM, CCR,

20        CRR, USCRA Speed and Accuracy Champion and

21        Notary Public.

22

23

24   JOB No. 3607925

25   PAGES 1 - 251

                                          Page 1

```
1                    I N D E X

2

3   TESTIMONY OF  BENJAMIN PIERCE

4       BY MS. PATHAK............................6

5       BY MR. DULBERG........................248

6

7

8

9                  E X H I B I T S

10   EXHIBIT NO.      DESCRIPTION         PAGE NO.

11

12   Exhibit 2000    Policies and Guidelines   161

13                   of Vanguard Charitable

14   Exhibit 2001    Annual Review of the      209

15                   Master Services

16                   Agreement - Bates Nos.

17                   FID-FRBN-0043628 - 35

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1      Q.   Without breaching any confidentiality
 2   obligation that you might have, can you
 3   describe your sixth client; is it a donor or
 4   advisor or a family or --
 5      A.   Yes.  Oh, I'd have to amend my
 6   answer, seven clients.  You just reminded me
 7   of one.  So one family, that's the one I
 8   omitted in my thinking earlier, one very --
 9   actually two very well known global -- U.S.
10   public charities, but they do have global
11   scope, one donor-advised fund and a char --
12   another one is a charity that works
13   specifically with a -- a group of like-minded
14   charities, and another one is a for-profit
15   company.
16      Q.   Do you help these clients set up
17   donor-advised funds?
18      A.   That potentially is one of the things
19   we do.
20      Q.   Do you help your clients determine
21   ways in which they might be recipients of
22   grants from donor-advised funds?
23      A.   Yes.
24      Q.   What other kinds of services do you
25   provide?
```

Veritext Legal Solutions
866 299-5127

```
 1   investment options; right?
 2        A.   Yes.
 3        Q.   And if a donor-advised fund ignores
 4   the recommendation, does the donor have any
 5   recourse?
 6             MR. DULBERG:  Same objections.
 7             THE WITNESS:  They can make
 8   another recommendation to put into a different
 9   investment, approved investment.
10   BY MS. PATHAK:
11        Q.   If a donor makes -- if the donor's
12   original recommendation was to place the money
13   into one of the approved investment options
14   and the DAF ignored that recommendation, does
15   the donor have any recourse?
16             MR. DULBERG:  Objection.  Calls
17   for a legal conclusion, incomplete
18   hypothetical.
19             THE WITNESS:  Yes, I'm not -- I'm
20   sorry.  I'm not an attorney, so I can't render
21   an opinion on that.
22   BY MS. PATHAK:
23        Q.   You don't have a JD; right?
24        A.   Correct.
25        Q.   And do you have any legal training?
```

Veritext Legal Solutions
866 299-5127

1    Q.   What would be the basis of the IRS's
2    concern?
3    A.   I'm not entirely sure.
4    Q.   Okay.
5         Do donors have an expectation that
6    their grant recommendations will be followed,
7    as long as they meet the due diligence
8    process?
9         MR. DULBERG:  Objection, calls for
10   speculation.
11        THE WITNESS:  I don't know about
12   what the donors speculate.
13   BY MS. PATHAK:
14   Q.   So you're not sure whether donors
15   think that as long as they make a legitimate
16   grant recommendation, that they're going to be
17   able to see those charities receive monies
18   from their accounts?  You just don't know what
19   donors expect; is that right?
20   A.   So what I do know is I have had
21   conversations with donors over the years in my
22   17 years leading Vanguard Charitable, and that
23   is a question that gets asked and -- because
24   there can -- you know, they want to know and
25   -- and so if -- if everything is in good

Veritext Legal Solutions
866 299-5127

```
 1   order, the ones I've talked to I think have
 2   confidence that their charitable work will be
 3   fulfilled through these donor-advised funds.
 4   BY MS. PATHAK:
 5       Q.   About how many donors did you speak
 6   to at your time as president of Vanguard
 7   Charitable?
 8       A.   Several hundred.
 9       Q.   And you said the question was asked a
10   lot; is that accurate?
11       A.   Asked -- asked periodically.
12       Q.   And you felt that the donors had some
13   confidence that as long as they followed the
14   rules about grant recommendations, that those
15   would be followed?
16              MR. DULBERG:  Objection, vague.
17              THE WITNESS:  Yes.
18              MS. PATHAK:  Okay.
19   BY MS. PATHAK:
20       Q.   Do you expect that the same would be
21   true of donors who set up accounts with
22   Fidelity Charitable?
23              MR. DULBERG:  Same objection.
24              THE WITNESS:  I don't -- don't
25   know.
```

Veritext Legal Solutions
866 299-5127

```
 1              MR. DULBERG:  Objection.  His
 2   report speaks for itself.
 3              THE WITNESS:  The report provides
 4   lots of information around how donor-advised
 5   funds operate, their guidelines.
 6   BY MS. PATHAK:
 7       Q.   So all of the bases for your opinion
 8   that a donor is not allowed to provide advice
 9   about liquidation, all of those bases are in
10   your report; right?
11       A.   Right.
12       Q.   Okay.
13              So even though -- even though it's
14   your opinion that donors are not allowed to
15   provide advice about the liquidation of
16   donated assets, in paragraph 31, you agree
17   that, in fact, and this is just a second line,
18   some donors provide DAFs with a recommendation
19   concerning a liquidation of donated assets.
20       A.   I'm sorry, where are you, counselor?
21       Q.   I'm in paragraph 31.
22       A.   Yeah, okay.  Okay.  And now may you
23   please repeat that?
24       Q.   Of course, yeah.
25              So you agree that donors, in fact,
```

```
1    do provide DAFs with a recommendation
2    regarding the liquidation of donated assets;
3    right?
4              MR. DULBERG:  Objection.
5              THE WITNESS:  I think I stated
6    previously that donors can say anything they
7    want to the charities.
8    BY MS. PATHAK:
9        Q.   You write in this paragraph, "There
10   is nothing inherently wrong with a donor
11   expressing a preference related to the
12   liquidation of donated securities"; right?
13       A.   Right.
14       Q.   So you said earlier that a donor may
15   not provide advice about the liquidation of a
16   donated asset?
17       A.   I don't -- I don't believe I said
18   that.  I believe I said donors can give advice
19   about anything, whether it's liquidation or
20   about the name of their account or about any
21   number of things.
22       Q.   So they can give advice -- a donor
23   can give advice about whatever they want,
24   including liquidation --
25       A.   Um-hmm.
```

Veritext Legal Solutions
866 299-5127

1     Q.   -- but in your opinion, the donor
2  cannot direct how a donated asset is
3  liquidated; right?
4     A.   Correct.
5     Q.   And your basis for your opinion that
6  a donor is not allowed to direct the
7  liquidation of a donated asset, one basis is
8  your review of the policies --
9     A.   Um-hmm.
10    Q.   -- that DAFs maintain; correct?
11    A.   Correct.
12    Q.   And is another basis for your opinion
13 the statutory provision that we were looking
14 at a few moments ago?
15    A.   Yes.
16    Q.   That's in paragraph --
17    A.   Yes.
18    Q.   So in your view, this statutory
19 provision prohibits a donor from directing how
20 a liquid -- a donated asset is liquidated;
21 correct?
22    A.   This provision, as I said before,
23 very specifically speaks to the advisory
24 privileges that account advisors would have
25 and it does not mention advisory privileges on

Veritext Legal Solutions
866 299-5127

```
 1   BY MS. PATHAK:
 2       Q.    That concept of relinquishing control
 3   is a legal concept; correct?
 4               MR. DULBERG:  Objection.
 5               THE WITNESS:  I don't know.
 6   BY MS. PATHAK:
 7       Q.    Because you're not a legal expert;
 8   right?
 9       A.    Yes.
10       Q.    And the last reason why it's
11   impermissible for a DAF to make a promise to a
12   donor that it will liquidate assets in a
13   certain way is because that's just not what
14   DAFs do; right?
15               MR. DULBERG:  Objection.
16               THE WITNESS:  Right.
17   BY MS. PATHAK:
18       Q.    That's based on your experience
19   running a DAF for 17 years; right?
20       A.    Yes.
21       Q.    And your observation about how DAFs
22   actually operate; correct?
23       A.    Yes.
24       Q.    So in your experience, DAFs don't
25   ever promise donors how they're going to
```

Veritext Legal Solutions
866 299-5127

BY MS. PATHAK:

Q.   So, Mr. Pierce, you've said that DAFs
don't -- in your experience, DAFs don't make
promises, they don't make promises about how
an asset will be liquidated; right?

A.   Right.

Q.   And they don't make promises to
follow a grant recommendation even if due
diligence has been satisfied; right?

A.   Right.

Q.   They don't make promises about
following an investment recommendation even if
it's a recommendation to invest in one of the
available options; right?

A.   Right.

Q.   And this is based on your experience
as president of Vanguard Charitable; right?

          MR. DULBERG:   Objection, asked and
answered.

          THE WITNESS:   Right.

BY MS. PATHAK:

Q.   Is it also based on the experience
that you've had with Acadia?

A.   Not Acadia so much, but conversations
with the other heads of the various national

1    programs over the last 20 years.

2        Q.    Can you tell me more about those

3    conversations?

4        A.    Yes.

5        Q.    Can you do that now?

6             MR. DULBERG:  Objection, vague.

7    You can answer.

8             THE WITNESS:  So in my 17 years as

9    head of Vanguard Charitable, I purposely would

10   reach out to other donor-advised fund leaders,

11   community foundation leaders, federation

12   leaders, national programs, met with -- and to

13   build bridges.  The goal is to raise all boats

14   charitably and get more money to the public

15   good.

16             So I met with the various

17   presidents of Vanguard Charitable.  I have not

18   met Pam Norley, I guess is her name, the

19   current one, but met all the other ones, spoke

20   with them.  Lorie Slutsky at the New York

21   Community Trust, Anne Boyce Cetaro {ph}, Kim

22   Wright-Violich and Kim Lawghton at Schwab

23   Charitable, Emmitt Carson at Silicon Valley

24   and one -- and Eileen Heisman at NPT and would

25   talk about the state of the donor-advised fund

Veritext Legal Solutions
866 299-5127

1  sector.  So wide-ranging conversations with

2  them.

3      Q.  And those conversations --

4          (Brief interruption.)

5          MR. DULBERG:  Let's go off the

6  record for a moment.

7          MS. PATHAK:  The time is 12:07.

8  Going off the video record.

9          (Brief pause.)

10         THE VIDEOGRAPHER:  The time is

11  12:08.  On the video record.

12 BY MS. PATHAK:

13     Q.  Did you have conversations about

14 whether promises were made to donors about any

15 of the topics we discussed?

16         MR. DULBERG:  Objection, vague.

17         THE WITNESS:  Over the years, a

18 variety of conversations around investment

19 options of the development of advisor

20 programs, about granting practices and about

21 IRS and legislative concerns, regulatory

22 concerns around donor-advised funds.  So yes,

23 a number of those topics generally.

24 BY MS. PATHAK:

25     Q.  About how many conversations did you

```
 1                MS. PATHAK:  Okay.
 2    BY MS. PATHAK:
 3       Q.   Other than your conversations with
 4    some presidents of Fidelity Charitable, what
 5    is your basis for believing that Fidelity
 6    Charitable acts in the same way that you acted
 7    at Vanguard Charitable?
 8                MR. DULBERG:  Objection, vague.
 9                THE WITNESS:  As I believe I
10    stated, there are a very good number of donors
11    to Vanguard Charitable who also had
12    donor-advised accounts at Fidelity Charitable,
13    and I had occasion to speak to a number of
14    those.
15    BY MS. PATHAK:
16       Q.   Was it -- when you were president of
17    Vanguard, did -- did donors ever ask you about
18    the liquidation of donated assets?
19                MR. DULBERG:  Objection to the
20    form.
21                THE WITNESS:  Yes.
22    BY MS. PATHAK:
23       Q.   How many times?
24       A.   To me personally?
25       Q.   Yes.
```

```
 1         A.    A rough guess would be 50 times.
 2         Q.    And did donors ask other individuals
 3    at Vanguard Charitable, people who worked
 4    below you, did donors ask those individuals
 5    about the liquidation of donated assets?
 6                   MR. DULBERG:  Objection,
 7    foundation.
 8                   THE WITNESS:  Yes.
 9    BY MS. PATHAK:
10         Q.    About how many times?
11                   MR. DULBERG:  Objection.
12                   THE WITNESS:  I have no idea.
13    BY MS. PATHAK:
14         Q.    Do you think it was common?
15                   MR. DULBERG:  Objection, vague.
16                   THE WITNESS:  I really can't -- I
17    don't know.
18    BY MS. PATHAK:
19         Q.    Was it common for donors to express
20    preferences about the liquidation of donated
21    assets?
22                   MR. DULBERG:  Objection.
23                   THE WITNESS:  No.
24    BY MS. PATHAK:
25         Q.    So of the 50 times that donors asked
```

Veritext Legal Solutions
866 299-5127

```
 1                C E R T I F I C A T E

 2

 3            I do hereby certify that I am a

 4   Notary Public in good standing, that the

 5   aforesaid testimony was taken before me,

 6   pursuant to notice, at the time and place

 7   indicated; that said deponent was by me duly

 8   sworn to tell the truth, the whole truth, and

 9   nothing but the truth; that the testimony of

10   said deponent was correctly recorded in

11   machine shorthand by me and thereafter

12   transcribed under my supervision with

13   computer-aided transcription; that the

14   deposition is a true and correct record of the

15   testimony given by the witness; and that I am

16   neither of counsel nor kin to any party in

17   said action, nor interested in the outcome

18   thereof.

19            WITNESS by hand and official seal

20   this 3rd day of December, 2019.

21

22

23

24

25            Notary Public
```

Page 251

EXHIBIT C

5983109.1

1
2
3
4
5
6
7
8
9
10
11
12
13

**UNITED STATES DISTRICT COURT**

14

**NORTHERN DISTRICT OF CALIFORNIA**

15

**SAN FRANCISCO DIVISION**

16
17
18

EMILY FAIRBAIRN and
MALCOLM FAIRBAIRN,

Case No. 3:18-cv-04881-JSC

19

Plaintiffs,

**DECLARATION OF DENNIS HEARST**

20

v.

21

FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

22
23

Defendant.

24
25
26
27
28

1    I, Dennis Hearst, declare as follows:

2    1.    I am a Managing Director at JPMorgan Chase Bank, N.A. In my role as a

3  Managing Director, I work as a private banker in one of the bank's San Francisco offices.  I have

4  personal knowledge of each of the matters set forth below, and, if called as a witness, I could and

5  would testify to each of them under oath.

6    2.    The J.P. Morgan Charitable Giving Fund (the "Fund") is a donor-advised fund.

7  The Fund is administered by the National Philanthropic Trust ("NPT").

8    3.    It was and is my understanding that a donor may recommend, but may not dictate,

9  the terms of how the Fund and/or NPT liquidate donated assets such as publicly traded securities.

10    4.    While donors may offer their recommendation with respect to liquidation, they

11  are not permitted to dictate the timing, price or manner of the liquidation of publicly traded

12  securities.  Those issues are solely in the control of the Fund.  NPT conducts the administration

13  of the Fund, including liquidation of securities, in the best interests of the Fund.

14    I declare under penalty of perjury that the foregoing is true and correct.

15

16

17  Executed on ___July 18___, 2019.        s/ _____
                                            Dennis Hearst

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


EMILY FAIRBAIRN and MALCOLM
FAIRBAIRN,

                Plaintiffs,
        v.
FIDELITY INVESTMENTS
CHARITABLE GIFT FUND,

                Defendant.

Case No. 3:18-cv-4881-JSC


REBUTTAL EXPERT REPORT OF PROF. BRIAN D. GALLE

October 15, 2019

31. Lastly, the Pierce Report suggests that liquidation serves the charity's interest in limiting investments to those deemed prudent by the DSO's "governance structure." Pierce Report ¶ 51. The Report does not explain why contributed assets cannot be evaluated individually for prudence by the relevant "structure." Indeed, Fidelity Charitable and other DSOs allow donors to recommend investments in private equity funds that can be reviewed on a "case by case basis." Fidelity DonorFlex Program Overview, FID-FRBN-0003370. Other DSOs even allow large donors to use their own investment advisor to select a portfolio. Silicon Valley Community Foundation, *Individually Managed Funds*, https://siliconvalleycf.org/individually-managed-funds; National Philanthropic Trust, *Donor Advised Funds—FAQ*, https://www.nptrust.org/donor-advised-funds/faq/

32. In short, the rationales offered in the Pierce Report do not justify Fidelity Charitable's decision to liquidate the WATT stock. DSOs do not have a uniform policy of immediately liquidating every donated asset, but instead recognize that it is prudent to hold some assets for a period in order to better balance risk against return. If such a policy existed, the supposed rationales the Pierce Report offers for it are unpersuasive.

## V. The Master Services Agreement Unfairly Favors FMR LLC at the Expense of Fidelity Charitable and its Donor-Advisors

33. The Pierce Report avers that "Fidelity Charitable's relationship with FMR is appropriately arms [sic] length and provides fair value to the DAF and its donors." ¶ 61. Although a full assessment of whether FMR LLC provides fair value for the fees charged is difficult with the available materials, at a minimum it is clear that the Pierce Report does not persuasively establish that the fees are in fact fair.

34. As an initial matter, two factors provide powerful reasons to doubt that the contract between Fidelity Charitable and FMR LLC is genuinely negotiated at arm's length in a fashion that ensures that Fidelity Charitable is not providing excess benefits to FMR LLC. The first is the market structure of the largest commercial DSOs. Each of these entities was established by a large, for-profit investment advisor. Since their inception, every one of these DSOs has contracted exclusively with the founding for-profit advisor for delivery of account management and related customer service, and nearly exclusively for provision of investment advice. Each for-profit offers different fee structures, and each has its own unique history of investment returns and customer satisfaction. Nonetheless, by a remarkable coincidence, no DSO has ever concluded that it can obtain a better deal for its donor-advisors by contracting with any entity other than its founder. That fact strongly suggests that DSO boards are not in fact genuinely weighing competing investment advisors, but instead are effectively controlled by or locked