UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY FAIRBAIRN, et al., | Case No. 18-cv-04881-JSC |
| Plaintiffs, | |
| v. | **OPINION FOLLOWING BENCH TRIAL** |
| FIDELITY INVESTMENTS CHARITABLE GIFT FUND, | |
| Defendant. | |

Malcolm and Emily Fairbairn, a married couple, are financially successful former hedge fund managers.  This lawsuit arises out of their donation of Energous stock to their Fidelity Charitable Donor Advised Fund at the end of December 2017.  The Fairbairns allege that to induce them to transfer the stock, Fidelity Charitable made promises about how the donation would be liquidated.  They contend those promises were broken and that, in any event, Fidelity Charitable sold the stock in a negligent manner which harmed the Fairbairns by reducing the amount of their tax deduction and leaving less money in their donor advised fund to be distributed to charity. The Court held a bench trial by video on the liability questions on October 19, 20, 21, 23, 26, 27 and 28 and heard closing arguments on December 4, 2020.  This Opinion constitutes the Findings of Fact and Conclusions of Law required by Federal Rule of Civil Procedure 52.[1]

## BACKGROUND

Nearly 20 years ago the Fairbairns founded Ascend Capital where they managed over $3 billion in funds.  For the first seven years of the Fairbairns' hedge fund, they were able to avoid paying income tax on compensation earned from offshore funds.  In 2007, however, Congress

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 11 & 18.)

United States District Court
Northern District of California

changed the tax laws to require repatriation by December 31, 2017 of the income sheltered abroad. On their accountants' advice, the Fairbairns decided they had to recognize all of that off-shore income—approximately $250 million—in December 2017, which would lead to a very large tax bill.

To reduce their tax liability caused by the repatriation, they decided to make a very large charitable donation in 2017. In late 2016 they began discussing how they would make their large 2017 donation. Malcolm and Emily[2] had not always agreed on their method of giving to charity. Emily preferred to give cash, and in the past, they had only given cash. Malcolm, however, would have preferred to donate appreciated assets, such as stocks. He preferred to donate stocks because "if you bought a stock at a dollar and it's now worth $10, they [the government] will give you $10 worth of a tax donation if you donate it to a charity." (Dkt. 242 at 153.[3]) And by donating stock the charity receives more money than if the donor first sells the asset, pays the taxes, and then donates the remainder to the charity. Thus, with the donation of appreciated assets, the donor obtains a larger tax deduction and the charity receives more money.

The Fairbairns owned stock in a small company known as Energous which trades on the NASDAC as WATT. They invested in Energous before its initial public offering (IPO), as part of the IPO, and afterwards and paid from approximately $3 to $12 per share, depending on when purchased. Energous was developing technology that would allow for wireless charging of devices at a distance. Its management had told its investors that it expected WATT's technology to receive Federal Communications Commission (FCC) approval by the end of 2017; thus, around the time the Fairbairns were contemplating making a large donation because of the repatriation of their offshore income they were also expecting their WATT shares to appreciate "a little" in light of the anticipated FCC approval.

For the large 2017 donation Emily considered starting a family foundation that they could have controlled themselves, but she decided it would take too much of her time. The Fairbairns

---

[2] The Court uses the Fairbairns' first names when referring to each individually to avoid confusion.

[3] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

settled instead on giving to a donor advised fund.  A donor advised fund (DAF) is a special type of financial account that individual donors open at a 501(c)(3) nonprofit organization that has usually been created by a for-profit financial institution. When donors contribute to their DAF account, the nonprofit organization takes legal title to the assets, but the donors retain the right to advise how the donated funds are invested and ultimately distributed to charitable organizations. A DAF enables a donor to get an immediate tax deduction but defer the actual donation of the funds to individual charities until later.  Prior to 2017, the Fairbairns had made two $10 million donations to a JP Morgan Donor Advised Fund and a $20 million donation to a Fidelity Charitable Donor Advised Fund.  In 2017, the Fairbairns were particularly interested in having their donated funds support Lyme disease research.

During what the Fairbairns refer to as the "prospecting period," from late 2016 through February 2017 they communicated with Fidelity Charitable and JP Morgan about making a large donation of appreciated assets. Justin Kunz, of the Fidelity Family Office, had discussions with Emily in October 2016 and February 2017, and those discussions picked up again mid-way through December 2017.

On December 20, 2017, the FCC approved the Energous technology.  Emily was aware of the approval and in fact assisted with drafting the Energous press release.  After the market closed on December 26, 2017, the FCC approval became public. The price of WATT rose dramatically on the after-market trading.  The next morning Emily called Kunz to discuss donating WATT stock to the Fairbairns' Fidelity Charitable DAF.  The Fairbairns continued to communicate with Kunz over email and by telephone throughout December 27 and 28.  They then transferred approximately 700,000 shares from a Morgan Stanley account to their Fidelity Charitable DAF on the afternoon of December 28 and the remainder of the shares, approximately another 1.23 million, on December 29.  Fidelity Charitable sold all 1.93 million shares on the afternoon of December 29 for proceeds of approximately $44 million with a fair market value of $52 million, giving the Fairbairns a 2017 tax deduction of $52 million.  The average sale price was $22 per share.  Before December 27, WATT had never traded above $22 and since December 2017 has never traded above $23; indeed, as of the date of this opinion WATT is trading at around $5 per

United States District Court
Northern District of California

share.

The Fairbairns filed this lawsuit on August 18, 2018. They insist that in liquidating their donated WATT shares Fidelity Charitable violated promises Kunz made to induce them to donate the shares to their Fidelity Charitable DAF. They also contend that Fidelity Charitable botched the selling of the WATT shares: by selling all 1.93 million donated shares in the last 2.5 hours of the last trading day of the year, Fidelity Charitable drove down the price of the stock, thus reducing the Fairbairns' tax deduction and the amount of money in their DAF. They bring state law claims for intentional misrepresentation, promissory estoppel, breach of contract, violation of the California Unfair Practices Act, and negligence.

## I.      THE PROMISE CLAIMS

The Fairbains allege that Fidelity Charitable representative Justin Kunz made four separate promises on December 27 or December 28, 2017 to entice them to donate 1.93 million-WATT shares to their Fidelity Charitable DAF:

- Fidelity Charitable would not trade more than 10% of the daily trading volume of Energous shares,

- Fidelity Charitable would employ sophisticated, state-of-the art methods for liquidating large blocks of stock,

- Fidelity Charitable would allow the Fairbairns to advise on a price limit (i.e., a point below which Fidelity would not sell shares without first consulting the Fairbairns), and

- Fidelity would not liquidate any of the donated Energous shares until the new year.

(Dkt. No. 1 at ¶ 65.) The Fairbairns contend that Fidelity Charitable did not do as Kunz promised and therefore Fidelity Charitable is liable for common law misrepresentation, breach of contract, promissory estoppel and violating California's unfair competition law.

Each of these claims requires the Fairbairns to prove by a preponderance of the evidence that Kunz made at least one of the alleged promises. If the promise was made, the Fairbairns must also prove that Fidelity Charitable did not do as promised, and finally that the Fairbairns relied on/ were harmed by the untrue/broken promise. *See* CACI 1900, Civ. Code, § 1710(1)

(misrepresentation claim); CACI  303 (contract claim); *Graham–Sult v. Clainos*, 756 F.3d 724, 749 (9th Cir. 2014) (promissory estoppel); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008) (UCL).

### *10% Daily Trading Volume*

Kunz affirmatively promised Emily Fairbairn that when Fidelity Charitable liquidated the donated shares it would not trade more than 10% of the Energous daily trading volume.

Kunz does not deny that he told the Fairbairns, or at least Emily, that Fidelity Charitable would trade only 10% of a donated stock's daily trading volume; instead, he maintains that he told them that "typically" Fidelity Charitable would trade no more than 10% of daily trading volume. The Court finds otherwise. When Kunz learned on January 2, 2018 that Fidelity had sold essentially all the Fairbairns' donated WATT shares on December 29, 2017, he asked in an internal Fidelity email: "I thought we didn't sell more than 10% trading volume."  (Ex. 119.001.[4]) His statement is consistent with his having represented to the Fairbairns—as he had been told— that as a policy matter and to avoid flooding the market Fidelity Charitable does not sell more than 10% of the daily trading volume. And in another internal January 18, 2018 email he admitted that he told Malcolm that Fidelity looks "to maintain no more than 10% of the daily trading volume. You guys confirmed this with me as well." (Ex. 149.)   His email makes no mention of the "typically" qualifier. When later in January the Fairbairns accused "the DAF" people of making several misrepresentations to them, he told others within Fidelity that he would respond to the Fairbairns by being "neutral as to the 10% statement." (Ex. 175.)  In other words, he would not deny the 10% daily trading volume policy because that is what he had represented.

While Kunz represented that that Fidelity Charity would not sell more than 10% of the daily trading volume, it is undisputed that on December 29, 2017 Fidelity Charitable sold less than 10% of WATT's trading volume for that day: approximately 28.4 million WATT shares were traded during the trading day and of those Fidelity Charitable sold 1,931,985 shares, amounting to approximately 6.7%—well below the promised 10%.

---

[4] Exhibits are referred to by their exhibit and page number where applicable, i.e., Ex. 45.002 refers to Exhibit 45 at page 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

The Fairbairns' attempt to characterize the 10% of daily trading volume representation as a promise to trade 10% of the volume trading during the period that Fidelity was actively trading the Fairbairns' donated WATT shares as opposed to the volume of the entire trading day is unpersuasive.  Before the Fairbairns realized that Fidelity had, in fact, traded less than 10% of the daily trading volume, they described Kunz's promise as, just that, 10% of the *daily* trading volume.  In a January 23, 2018 email Emily told Kunz that the DAF people represented that the shares would be "no more than 10% of the daily volume."  (Ex. 174.)  And in their complaint— filed less than nine months after the promise was allegedly made—the Fairbairns expressly and unequivocally alleged the promise was about not exceeding 10% *daily* trading volume.  (Dkt. No. 1 ¶ 65 (emphasis added).)  Further, at trial, when discussing the percentage of the volume sold while trading shares of a specific company, the Fairbairns and even their experts more comfortably referred to "participation rate" not "daily trading volume."  At the time this promise was made (in February 2017 at least), no one knew when the shares were going to land free and clear in Fidelity Charitable's legal possession so that "immediate" liquidation would begin.  The shares were also thinly traded at that time. Thus, it is not surprising that they would have been discussing "daily" trading volume.

### *The Sophisticated Means Promise*

The Fairbairns have not proved their sophisticated means promise by a preponderance of the evidence. While the complaint alleges that Kunz promised to use sophisticated means and "state of the art" methods for liquidating large blocks of stock, Malcolm testified that Kunz never used those words, and Emily did not recall Kunz using those words. And there is nothing in the documentary evidence that supports that promise having been made.  While the record supports a finding that Kunz told the Fairbairns that Fidelity Charitable would be "gentle" with their donation, that does not support a finding that he promised them Fidelity Charitable would use "state of the art" or sophisticated means; instead, in his January 16, 2018 email Malcolm stated that being gentle meant trading less than 10% of trading volume.  (Ex. 128.)  While Kunz certainly touted Fidelity's trading experience and processes to encourage the Fairbairns to donate to Fidelity Charitable, he did not make the specific promise the Fairbairns alleged in the complaint.

United States District Court
Northern District of California

In any event, the Fairbairns also have not proved that Fidelity Charitable did not use sophisticated and "state-of-the art" trading methods in its liquidation of the 1.9 million shares of Energous stock.  Emily testified, and the documentary record confirms, that she wanted Capital Markets Group to liquidate the donated shares and a trader from Capital Markets Group did so. Further, the trader used time-weighted average price (TWAP) and volume-weighted average price (VWAP) algorithms to sell the shares, and the algorithms divided the parent orders into smaller child orders and took other steps to hide the trades from the market.  These steps are consistent with Emily's testimony that sophisticated trading would involve hiding the trades. Further, the Fairbairns' expert Dr. Harris testified that the algorithms Fidelity Charitable utilized "are a typical tool used by traders to sell large blocks of stock."  (Dkt. No. 245, 811:6-11.[5])  No expert testified that the algorithms were not sophisticated or state-of-the-art, only that they were not reasonably used.

### *The Advise on Price/Not Sell Until 2018 Promises*

The Fairbairns have not proved by a preponderance of the evidence that Kunz told the Fairbairns that they could advise on the price at which Fidelity Charitable would sell the donated WATT shares or that Fidelity Charitable would not sell a single share of WATT until January 2018.

There is no contemporaneous written record to support that Kunz made such promises. There are no Kunz emails in which he implies that he understood no trading would occur until 2018 or that the Fairbairns would have the opportunity to advise on the sell price. This omission is especially damaging to the Fairbairns' contention that they were specifically promised that no WATT shares would be sold until 2018 given that in February 2017 Emily was told that the shares would be liquidated automatically upon donation.  In response to an inquiry from Emily about the sale of donated shares, Christian Fernandez of the Fidelity Family Office emailed Emily on February 14, 2017:

---

[5] Trial transcript citations are to the trial transcript page, not the ECF header page.

United States District Court
Northern District of California

1  . . .

2  After reviewing with our Private Donor Group, they were able to
3  confirm that shares are automatically sold once they arrive in the
   DAF.  For thinly traded shares it may take longer to liquidate all
   shares if it is a large amount, but once shares are sold the proceeds
4  settle into the investment pools in the DAF. . . .

5  (Ex. 1504.001.)  Having been expressly told that Fidelity Charitable' s policy is to sell

6  automatically upon donation, it would have been unreasonable for Emily to later rely on an oral

7  promise that no shares would be sold until 2018 rather than automatically as is the policy.  Of

8  course, that policy was also in the written materials Fidelity Charitable provided to the Fairbairns.

9       Further, Emily failed to mention or even hint at either promise in writing even though she

10 confirmed by email Fidelity Charitable' s promise to give the Fairbairns a 20% discount on the

11 administrative fee for the entire block of donated shares.  Indeed, on December 29 she emailed

12 Kunz to confirm the discount was for all the shares, not just after they reached a certain threshold.

13 (Ex. 112.)  Emily also emailed Kunz on the evening of December 27 to confirm that she wanted

14 control as to when her donation got priced—meaning which day her shares were deemed

15 donated—because it would mean millions of dollars for the Fairbairns' tax deduction given that it

16 is computed based on the average share price of the stock on the day of donation.  (Ex. 718; Dkt.

17 No. 250 at 26 (confirming that Emily was referring to the timing of the donation).) Neither in that

18 email, nor any other email did Emily ask for control over the timing of the donation's liquidation

19 or suggest that such control had already been promised to her.  Nor did she ask for the opportunity

20 to advise on a price limit for the liquidation.

21      Malcolm also failed to make any contemporaneous record of the alleged promises.  Many

22 of the Fairbairns' Energous shares had been on loan and had to be recalled so that the Fairbairns

23 could donate them to Fidelity Charitable by December 29, 2017. When there was uncertainty

24 whether the recall could happen in sufficient time, Malcolm floated the idea of having the DAF

25 loan the shares back out.  Kunz responded to Malcolm on December 28: "I have several people

26 working on the inquiry of lending shares out in the DAF.  There is a stipulation regarding having

27 'strings attached' back to the donor which this could potentially fall under.  Please stand by." (Ex.

28 836.)  Malcolm responded: "No conditions. We just need to facilitate the transfer before year end."

United States District Court
Northern District of California

(*Id.*)  While Malcolm's comment was about no conditions on the transfer of shares, given Kunz's emphasis on the requirement that there be no strings be attached to the donation, if there existed other "strings" (especially "strings" that contradicted Fidelity Charitable's written policies), such as a condition that no shares would be sold until 2018 and that the donors had the right to advise on the liquidation price—one would reasonably expect Malcolm to highlight that condition.  He did not.

There is also no evidence from internal Fidelity Charitable communications that Kunz made such promises on December 27 or 28.  For example, on the morning of December 28, there are internal communications regarding Malcolm's request that the DAF loan out the shares following donation, as discussed above.  The request is described as a "stipulation" that Malcolm made about the donation, and Fidelity Family Office representative Kyle Casserino and Fidelity Charitable Director of Investments Mike McClean banter over a messaging app that such stipulation will never get approved.  (Ex. 948.)  There is no evidence that Kunz ever communicated to McClean or anyone else the Fairbairns' alleged other stipulations.

The Fairbairns' narrative appears to be that Kunz went rogue and made the promises without any basis for doing so, but they never explain why he would he make those promises when they would be discovered as fraudulent as soon as the liquidation concluded.  And they never explain why Kunz inquired as to whether the DAF could loan the donated shares, and told Malcolm that might not be possible, but yet apparently made no inquiry as to whether trading would not start until January 2018 and instead boldly made that promise without any basis for doing so.  As it turned out Fidelity Charitable was able to retrieve the loaned shares in sufficient time for the Fairbairns to donate them in 2017, but the discrepancy weighs against finding the advise on a price/not sell any shares until 2018 promises were made.

The Fairbairns' conduct after they learned that the shares had all been sold on December 29 also weighs against a finding that the promises were made.  When Malcolm learned on January 5, 2018 about the December 29 sale of the WATT shares, he did not confront Kunz by email or telephone about the alleged broken promises.  Indeed, it was not until January 15, 2018 that the Fairbairns even mentioned to Fidelity Charitable that the liquidation had violated promises made

United States District Court
Northern District of California

1   to them.  Malcolm's testimony that he was too angry and needed to cool off would make sense for

2   a few hours, or maybe a few days, but 10 days of silence is hard to understand.

3          Further, in January 2018, when the Fairbairns were communicating with Kunz about the

4   liquidation, they never asserted that Kunz had made those promises.  Instead, in their

5   communications with Kunz they stated they "were told," or "the DAF people" had told them,

6   without suggesting that Kunz was the DAF person who told them.  Emily's testimony that she said

7   "the DAF people" rather than "You" because she did not want to accuse Kunz of wrongdoing

8   while he was trying to rectify the situation within Fidelity Charitable is not persuasive. In the very

9   same communications Emily also tells Kunz: "I do want you to know how much I respect your

10  *integrity* and efforts."  (Ex. 174 (emphasis added).)  It is one thing to not directly accuse the

11  person who lied to you; it is another to gratuitously tell that person you respect their integrity.

12         As to the alleged promise to allow the Fairbairns to advise on a sale price limit, even the

13  email Malcolm wrote on January 15, 2018 in which he states for the first time that he was told

14  certain things, represents only that he was told (by some unidentified person) that the Fairbairns

15  could advise on a price limit "if necessary."  (Ex. 128.)  The email is consistent with Malcolm's

16  trial testimony: "if we run into a problem, or if there is something that's coming up, and if we're

17  having any sort of difficulty in selling the stock, that, you know, I would be called, advised, I

18  would be able to advise."  (Dkt. No. 242 at 371.)  Even accepting Malcolm's testimony, the ability

19  to advise on a price was only if Fidelity Charitable was having difficulty in selling the stock, as a

20  trader might encounter with a thinly-traded stock.  Fidelity Charitable was having no trouble

21  trading WATT on December 29, 2017 when it was trading at nearly historically high volume and

22  price.

23         The Court does not give any weight to the comments about Kunz made by Fidelity

24  Charitable representatives after the Fairbairns complained about the liquidation. While the Court

25  accepts the comments as statements of a party opponent, and therefore non-hearsay, the Court also

26  finds that the comments merely reflect that the employees were initially assuming "the customer is

27  always right," especially when the customers are as wealthy and sophisticated as the Fairbairns.

28  There is nothing in the record that these employees had any personal knowledge of what

representations Kunz made and therefore their comments are not probative.

*Reliance/Harm*

The Court also finds that even if the promises had been made at some point on December 27 or December 28, the Fairbairns could not have reasonably relied on those promises in deciding to donate the Energous stock to their Fidelity Charitable DAF.  Emily learned of the FCC approval on December 20 and two days later she made a note to herself to transfer the WATT shares from the Fairbairns' JP Morgan account to Fidelity Charitable—well before the promises were allegedly made.  Further, neither Emily nor Malcolm communicated with JP Morgan in December 2017, even when JP Morgan emailed them on December 13 to solicit a transfer of shares to their JP Morgan DAF.  December 27 or 28—the dates when the promises were allegedly made—was too late to facilitate the donation of the shares to JP Morgan, especially since the only evidence as to JP Morgan in the record is that it recommended that the transfer of shares be initiated by December 22 to ensure that the shares were donated by December 29.  And as the Fairbairns had to make the donation because of their looming tax bill in light of the repatriation of their off-shore income, not making any donation of the Energous shares was not an option.

For all the above reasons, judgment will be entered in favor of Fidelity Charitable and against the Fairbairns on their claims for misrepresentation, breach of contract, promissory estoppel, and violation of California's Unfair Business Practices Act.

***

The Court cautions that it has not found that either Fairbairn did not tell what they believed to be the truth about the alleged promises.  The Court need only decide whether it is more likely than not that Kunz made the promises alleged in the complaint.  Other than the 10% daily trading volume promise, a promise that was kept, the Fairbairns have not satisfied that burden.

## II. The Negligence Claim

The Fairbairns also contend that apart from the alleged promises, Fidelity Charitable's liquidation of the donated WATT shares violated the duty of care Fidelity Charitable owed to them.  They insist that a reasonably prudent investor in Fidelity Charitable's position would not have sold all 1.93 million donated WATT shares in the last 2.5 hours of the last trading day of

11

2017.  By engaging in such unreasonable trading, the Fairbairns' argument goes, Fidelity Charitable caused the price of WATT shares to decrease, thereby lowering the December 29, 2017 average WATT share price and thus the amount of the Fairbairns' tax deduction, as well as the money available for donation in their DAF account.

i.

Recovery on a negligence claim depends as a threshold matter on whether the defendant had "a duty to use due care toward an interest of [the plaintiff's] that enjoys legal protection against unintentional invasion." *S. California Gas Leak Cases*, 7 Cal. 5th 391, 397 (2019) (internal quotation marks and citation omitted).  Under California law, the "'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *Id.* at 397-98.  However, liability in negligence for purely economic losses is "the exception, not the rule." *Id.* at 400. The primary exception to the general rule of no-recovery for negligently inflicted purely economic losses is where the plaintiff and the defendant have a "special relationship." *Id.*

A special relationship exists where "the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." *Id.*  For example, the California Supreme Court has held that the intended beneficiary of a will could recover for assets she would have received if the notary had not been negligent in preparing the document. *Biakanja v. Irving*, 49 Cal.2d 647, 650-651 (1958).  "Discerning whether there is a special relationship justifying liability of this sort can nonetheless be a subtle enterprise." *S. California Gas Leak Cases*, 7 Cal. 5th at 401.   In addition to whether the transaction was intended to benefit the plaintiff, courts should consider

> (ii) "the foreseeability of harm to the plaintiff," (iii) "the degree of certainty that the plaintiff suffered injury," (iv) "the closeness of the connection between the defendant's conduct and the injury suffered," (v) "the moral blame attached to the defendant's conduct," and (vi) "the policy of preventing future harm."

*Id.* at 400–01.  "Deciding whether to impose a duty of care turns on a careful consideration of 'the sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." *Id.* at 401.

United States District Court
Northern District of California

United States District Court
Northern District of California

1        The first two factors weigh in favor of finding the requisite special relationship here.  The

2  agreement to transfer the WATT shares to the Fairbairns' Fidelity Charitable DAF was intended to

3  benefit the Fairbairns by giving them an immediate tax deduction while retaining the right to defer

4  until a later date transferring the liquidated assets to the charities of their choice. They also had the

5  right to pass on their DAF to their children.  Further, Fidelity Charitable's solicitation of the

6  Fairbairns' donation, and Kunz's testimony that he wanted the Fairbairns to know how Fidelity

7  Charitable's services could benefit them, show that the transaction was designed to benefit the

8  Fairbairns in addition to those charities that ultimately might receive the proceeds of the

9  Fairbairns' DAF.  It was certainly foreseeable that how Fidelity Charitable handled the liquidation

10  could affect the Fairbairns by reducing their tax deduction and the amount of money in their DAF

11  available for giving.  But, as described above, those two factors, alone, are not sufficient to find a

12  duty of care.  In any event, the Court need not finally resolve whether Fidelity Charitable owed the

13  Fairbains a duty of care under California law because, as described below, they have not

14  persuaded the Court that even if a duty was owed, that it was breached.

15                       ii.

16        Assuming Fidelity Charitable owed a duty of care to the Fairbairns, the next questions are

17  what is that duty and whether it was breached.  The Fairbairns argue that Fidelity Charitable's

18  duty was to act as a reasonably prudent investor would have acted under the circumstances. Those

19  circumstances, of course, include that Fidelity Charity is a 501(c)(3) corporation and that it was

20  trading shares to which it owned legal title, albeit subject to the donors' advisory rights, including

21  rights to advise on how the donated assets are invested.  *See Bullis v. Sec. Pac. Nat. Bank*, 21 Cal.

22  3d 801, 809 (1978) (noting that the courts must decide the standard of care required under the

23  particular circumstances of the case); *see also* CACI 600 Standard of Care ("A/An] [insert type of

24  professional] is negligent if [he/she/nonbinary pronoun] fails to use the skill and care that a

25  reasonably careful [insert type of professional] would have used in similar circumstances"). The

26  Fairbairns' theory is that Fidelity Charitable breached the standard of care of a prudent investor by

27  liquidating all 1.93 million donated shares of WATT in the last 2.5 hours of trading on December

28  29, 2017.  While they do not contend it was unreasonable for Fidelity Charitable to begin

13

liquidation of the WATT shares on December 29, they contend the trading should have been spread out over several days, although they do not posit how many days were required to make the liquidation non-negligent.

iii.

At around 10:48 a.m. on December 28, 2017, Kyle Casserino advised Fidelity Charitable's Director of Investments, Mike McClean, that Fidelity Charitable would receive several large blocks of WATT stock, exceeding $100 million in value. McClean observed that the stock was not thinly traded and, indeed, on December 27 had traded 42 million shares.  Casserino responded that the stock price had risen 170% that day. McClean then noted that prior to December 27, it had only been trading at around 300,000 shares per day.  (Ex. 948.)

On December 28 and 29, 2017, Fidelity Charitable received the Fairbairns' 1.93 million-WATT shares in four separate transfers, each known as a "tranche."  The first tranche of 700,000 shares arrived from Morgan Stanley on December 28.  The other three arrived on December 29 (two from Morgan Stanley and one from the Fairbairns' account with the Fidelity Family Office).

At McClean's direction, Fidelity Charitable began selling the first tranche of 700,000 shares at 1:26 p.m. ET.  Shortly before 2:00 p.m. McClean messaged Gerald Celano, the Fidelity Capital Markets trader executing the trades, that there might be two additional tranches of WATT coming: 318,000 and possibly another 343,000.  Celano responded that with their current WATT selling they were pressuring the price "a bit," and that adding additional tranches would not help. (Ex. 213.006.)  McClean replied that they could always sell the last two tranches in the last two hours of the day and estimated that the daily trading volume of WATT would be 25 million shares.  McClean suggested extending the trading of the first two tranches to 3:45 p.m. (they had initially decided to sell through 3:30 p.m.) to ease the pressure.  Celano agreed it might "ease some down pressure."  McClean then advised Celano that Fidelity Charitable would have the paperwork for another approximately 313,000 shares by 3:30 p.m.; Celano responded that the lows of the day for WATT were "ugh."   (Ex. 213.007.)

About 15 minutes before the market close, Fidelity Charitable had the last tranche of 343,000-WATT shares available to sell.  McClean asked Celano if there was available volume to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    sell the shares before market close and that he hoped to get a favorable pairing on the close of the

2    market. Celano responded: "nasdaq . . . we're flying blind.  you want to put a chunk there

3    anyway?"  McClean told him to go ahead.  (Ex. 216.002.)

4          Fifteen minutes later, when the market closed, McClean and Celano engaged in the

5    following messaged chat:

6          McClean: "I'm afraid to ask for the WATT details.  But we had to get it sold."

7          Celano:    "ugly. do you want the individual averages or the combined."

8    (Ex. 216.002.)

9          In the end, Fidelity Charitable sold the 1.93 million shares on December 29 at an average

10   price of $22.82 per share, approximately 30% less than its closing price the previous day.  Its sale

11   of 1.93 million shares was 6.7% of the WATT daily trading volume for December 29, and its

12   participation rate (percentage of sales during the period Fidelity Charitable was selling WATT

13   (1:26 p.m. to 4:00 p.m.)) was 15.3%.

14                                              iv.

15         The Court finds that assuming Fidelity Charitable owed the Fairbairns a duty of care in the

16   liquidation of the donated WATT stock, the Fairbains have not proved that Fidelity Charitable's

17   liquidation violated that duty.

18         First, Fidelity Charitable's December 29, 2017 liquidation was consistent with its

19   published policies.  *See Bullis v. Security Pac. Nat. Bank*, 21 Cal. 3d 801, 809 (1978) (considering

20   the defendant's published policies in evaluating whether it breached the standard of care). Fidelity

21   Charitable's Policy Guidelines: Program Circular states: "Fidelity Charitable processes

22   contributions periodically throughout the day and will liquidate contributions as quickly as

23   possible after all the requisite paperwork has been received, and after the assets have been

24   received in good order."  (Ex. 183.007.)   For publicly traded securities in particular, it discloses:

25   "Upon receiving the appropriate paperwork and the donated securities in good order, Fidelity

26   Charitable will generally sell the securities at the earliest date possible, but reserves the right to

27   sell at any time."  (Ex. 183.008.)  Further, again with respect to publicly traded securities, its

28   policy at the time was to sell donated shares as soon as possible provided the volume in the market

is sufficient.  A draft internal Trading Procedures manual states that Fidelity Charitable's "trading objectives are to liquidate stock contributions as quickly as possible, in line with market volume at the time of trading activity, in an effort to reduce financial risk and to make funds available in the Giving Account." (Ex. 198.003.)  For Mike McClean, that policy generally meant selling less than 10% of the daily trading volume with a participation rate of less than 20%.

Fidelity Charitable's trading decisions on December 29 were consistent with these policies. Upon learning that neither Emily nor Malcolm were control persons on December 29, Daniel Bergschneider, Fidelity Charitable VP of Investments, wrote to a whole team of Fidelity Charitable employees, including Mike McClean: "we should then be free to sell shares of WATT upon receipt." (Ex. 219.004.)  Mclean then began to sell the stock "as quickly as possible" after all the paperwork had been received; he was aware of the explosion in WATT volume and specifically checked the volume before initiating the trading.  At around 2 p.m., while the first two tranches were being sold and Fidelity Charitable was awaiting the last two tranches to become available for sale, Steve Brooks, Fidelity Charitable Vice-President, asked McClean, Bergschneider, and Josh Johnson, a Fidelity Charitable Senior Analyst, whether it made sense to sell the entire donation that day, especially since WATT was having "a pretty negative day." McClean responded that Fidelity Charitable was "selling in line with volume," that the Fairbairns' donated WATT shares would be about 6% of the volume, and that Fidelity Charitable would "not hold these shares on the speculation that the price may improve next week." (*Id.*)  Before proceeding with selling the last two tranches he estimated the volume on the day would be 25 million shares and decided that was sufficient to continue selling.  As it turns out, the daily trading volume of WATT shares was even greater.  An hour after concluding the trades he estimated Fidelity Charitable's participation rate was 13%, showing that he was paying attention to that metric as well.

The Fairbains' insistence that Fidelity Charitable's policy was to liquidate in such a way as to avoid any price impact on the stock price is not persuasive.  Notwithstanding McClean's message to Celano at the close of the market on December 29 that he "had to sell all the shares," Fidelity Charitable's written policies gave it room to make judgments as to how and when to sell

16

United States District Court
Northern District of California

1    publicly traded shares.  (*See e.g.,* Ex. 183.008 ("Fidelity Charitable will generally sell the

2    securities at the earliest date possible, *but reserves the right to sell at any time*.") (emphasis

3    added).)  That discretion coupled with Fidelity Charitable's goal of selling in line with market

4    volume means it was concerned with price impact, but it does not mean *any* adverse price impact.

5    Fidelity Charity needed to balance its objective of liquidating donated shares without speculating

6    about price with responsibly selling the shares; to not, in other words, sell at just any price.

7    McClean's testimony about a Fidelity Charitable objective of acting "responsibly in liquidations

8    so as not to adversely affect the market price of the security" (Ex. 205.001, Dkt. No. 242 at 315),

9    does not mean that Fidelity Charitable's policy was to not adversely affect price at all.  McClean

10   explained that the policy meant that Fidelity Charitable uses algorithms to sell large blocks of

11   stock in line with the volume.  There is no dispute that it used such algorithms on December 29 for

12   the WATT trades.

13        Second, the Fairbairns have not met their burden of proving through other evidence that a

14   reasonably prudent DAF would not have sold all 1.93 million-WATT shares under the December

15   29, 2017 market conditions and instead would have spread out the liquidation over several days.

16   The Fairbairns focus on two metrics to prove a violation of the standard of care: (1) that Fidelity

17   Charitable sold 8.6% of WATT's outstanding shares, and (2) that Fidelity Charitable's

18   participation rate for the WATT sales was 15.3%.  The 8.6% of outstanding shares amounted to

19   less than 7% of the daily trading volume; the Fairbairns do not claim that it violated the standard

20   of care to trade at that percentage of daily trading volume. Their expert Dr. Harris never explained

21   why the percentage of outstanding shares—as opposed to participation rate—mattered and, in any

22   event, did not opine that trading 8.6% of WATT's outstanding shares violated the standard of care.

23        The Fairbairns' focus on the participation rate fares no better.  McClean testified that to

24   trade "in line with volume" he aims for a participation rate below 20%.  The Fairbairns insist that

25   such an approach and, in particular, Fidelity Charitable's December 29 WATT participation rate

26   of 15.3%, violated the standard of care.  For this argument they rely on their expert Dr. Domowitz.

27   He opined that studies have shown that approximately 80% of traders have participation rates of

28   less than 5%, and that maybe only 1% of the orders had participation rates greater than 10%.

17

1    Dr. Domowitz's testimony does not satisfy the Fairbairns' burden of proof.  First, and

2   dispositively, at the time he prepared his expert report he was not aware that Fidelity Charitable

3   was a 501(c)(3) corporation that had legal title to the WATT shares at the time of liquidation; he

4   apparently believed that the Fairbairns had contracted with Fidelity the for-profit institution to sell

5   shares that the Fairbairns legally owned.  He was also not familiar with Fidelity Charitable's stated

6   Program Circular policy that it sells donated shares as soon as possible; indeed, even at the time of

7   his trial testimony he appeared wholly unfamiliar with the Circular.  And he did not know that

8   Fidelity Charitable is not regulated by the SEC. That lack of understanding helps explain why

9   when testifying to what he believes is the standard of care "in the industry" he quoted from an

10   SEC report stating that "[a]n adviser must execute securities transactions for clients in such a way

11   that the client's total costs or proceeds in each transaction are the most favorable under the

12   circumstances." (Dkt. No. 244 at 633.)  That report is inapposite as Fidelity Charity was not the

13   Fairbairns' advisor—Fidelity Charity was the client vis-à-vis the trading as it owned the WATT

14   shares at the time of liquidation.  While it still may have had some duty to the Fairbairns given

15   their ongoing advisory rights, that duty is not the same as the duty an advisor owes a client,

16   especially given that Fidelity Charitable's published policy was to liquidate donated publicly

17   traded stock "as soon as possible."  Thus, Dr. Domowitz's testimony is not probative of the

18   standard of care for a DAF.

19    Apart from his lack of relevant expertise, Dr. Domowitz testified that even in the for-profit

20   world there is no industry standard for an acceptable participation rate when liquidating stock not

21   owned by the liquidator.  Further, his testimony about participation rates generally being less than

22   5% when trading according to a VWAP algorithm was based on his own study from 2004 when

23   very few traders were using algorithms.  And while he augmented his opinion with his own

24   experience (which was not as a trader), he explained that he had a variety of conversations and

25   sessions with institutional traders and learned that for institutional traders the participation rate

26   would rarely exceed 10%.  Putting aside that his testimony was based on institutional traders, not

27   DAFs, he said "rarely" exceed 10%, not "never".  And he never addressed the anomalous

28   circumstances on December 29 when WATT was trading at unprecedented volume and price.

United States District Court
Northern District of California

1    Indeed, Emily testified that she had expected WATT's price would increase "a little" upon FCC

2    approval; even she apparently had not anticipated its exponential growth in volume and price.  In

3    summary, Dr. Domowitz's testimony is not persuasive that a participation rate of 15.3% is

4    unreasonably high for a DAF which does not speculate on price when the share price, while

5    falling, is still more than twice as high as it was trading just three days earlier and the volume

6    more than 90 times greater.

7        Third, the Court disagrees with the Fairbairns' assertion that Fidelity Charitable (other than

8    McClean) believed that the December 29 WATT volume was not sufficient to liquidate all 1.93

9    million shares of donated WATT stock.  They rely on a December 28 email from Daniel

10   Bergschneider, Fidelity Charitable Vice-President, Investments (Ex. 292), but they did not call

11   him as a witness.  Bergschneider was not suggesting that the liquidation of WATT would need to

12   be sold over a few days even if volume was trading at over 25 million daily shares; it is more

13   probable he was referring to the WATT volume reverting to its historical norm of 300,000 shares

14   per day in the new year, as McClean testified.  And the Fairbairns misinterpret a December 29

15   email from Josh Johnson, a Fidelity Charitable Senior Analyst (whom the Fairbairns also did not

16   call as a witness).  (Ex. 978.)  Johnson did not suggest that the shares should not be sold

17   immediately once the paperwork was all in good order. He merely expressed that there was no

18   rush to get the paperwork all in order; that is, there was no urgency in having the control person

19   issue resolved because as long as the shares were transferred to Fidelity Charitable by December

20   29 the gift would be effective as of that day (and thus the Fairbairns would obtain their tax

21   deduction).

22       The Fairbairns also contend that Fidelity Charitable breached the required standard of care

23   by submitting four separate parent orders (the four tranches) to four separate trading algorithms,

24   and for much of the 2.5 hours of trading having two or three algorithms trading at the same time.

25   Their theory is that these four separate orders were competing against each other in the market and

26   driving down the price of the WATT stock because each algorithm does not know what the other

27   is doing.  While the Fairbairns rely on Dr. Domowitz to support this contention (Dkt. No. 250 at

28   88-89), Dr. Domowitz, disclaimed any such opinion:

United States District Court
Northern District of California

1    Q: And you have not offered an opinion that the algorithms in this case were, quote,

2    competing; correct?

3    A: That is right.

4    (Dkt. No. 244, 707:21-23.)  In contrast, Fidelity Charitable's expert Mr. Zarcu testified that the

5    separate algorithms did not compete. While the Fairbairns offer attorney argument as to why Mr.

6    Zarcu's opinion is "a non-sequitur" (Dkt. No. 250 at 89), they have not submitted expert evidence

7    on this issue to meet their burden of proof.

8    Instead, the Fairbairns rely primarily on Fidelity Charitable's own hindsight reaction to the

9    use of four separate trading algorithms.  On January 27, 2018—after the Fairbairns had

10   complained about the liquidation—Eric Christensen, the Fidelity Family Office's head trader, told

11   McLean that he would have added the subsequent tranches to the original algorithm, "increasing

12   the size of the single order so they are not competing with each other (assuming I knew it was the

13   same end client)." (Ex. 595.002.)  McClean responded: "I agree and I assumed that's what would

14   happen.  I was surprised to hear from [Fidelity Capital Markets] that they were in 4 separate

15   tranches." (Ex. 595.001.)  Casserino also told another Fidelity Charitable employee in February

16   2018 regarding the December 2019 WATT litigation: "trading was bad, we had 4 separate

17   VWOPs competing with one another on this asset plus they submitted he paperwork to FFOS on

18   Thursday when the shares were ideal for gifting, and hey didn't move them over until Friday due

19   to the lending situation."  (Ex. 939.007.)

20   The Court treats these statements as a party admission and therefore non-hearsay.  *See* Fed.

21   R. Evid. 801(d)(2).  These statements, however, do not satisfy the Court that it was a breach of the

22   standard of care for Fidelity Charitable to liquidate the WATT shares in four separate algorithms

23   (or that it was a breach to not ensure that Fidelity Capital Markets place them in a single parent

24   order). Christensen followed up his opinion with "[o]bviously this is hindsight and maybe that is

25   not your procedure." (Ex. 151.001.)  He did not believe it was below the standard of care to trade

26   simultaneously with separate algorithms, otherwise how could Fidelity Charitable have a different

27   procedure?  In any event, the Fairbairns chose not to call Christensen as a witness.  While they

28   called Casserino as a witness, and questioned him about exhibit 939, they did not question him

20

1   about his competing VWOP remark so it impossible to know the basis for his statement.  For all

2   the Court knows he was merely parroting what the Fairbairns—wealthy, successful hedge fund

3   managers—were saying.  These statements fail to persuade.

4       The Fairbairns also take issue with Fidelity Charitable's failure to "take a break" during the

5   liquidation by using price limits so that they could at least stop and reassess after the price dropped

6   a certain amount.  However, the "child orders" which the parent orders were broken into did have

7   price limits.  Dr. Harris's testimony that he found it surprising that the parent orders did not also

8   have price limits does persuade the Court that it was a breach of the duty of care for Fidelity

9   Charitable not to do so.  There was no evidence presented at trial that placing price limits on

10   parent orders is standard practice for a DAF when liquidating shares of stock in line with volume

11   and under circumstances similar to those that existed on December 29. The same absence of

12   evidence exists for the Fairbairns' insistence that Fidelity Charitable should have sought a natural

13   buyer for the large block of shares by utilizing a block broker.  There is no evidence that this is a

14   practice that DAFs follow when liquidating high volume publicly traded securities in accordance

15   with their stated policy to sell as soon as possible after the paperwork is in good order.  The

16   Fairbairns' reference to PZN is inapposite.  PZN was a thinly-traded stock, not a stock trading at

17   historically high volume and price as was WATT.  It is not that Fidelity Charitable could not have

18   consulted a block trader—it could—it is that the Fairbairns have not demonstrated that it was a

19   breach of the duty of care to not do so.

20       Finally, much of the expert trial testimony focused on whether Fidelity Charitable's

21   liquidation of 1.93 million-WATT shares on December 29, 2017 had an adverse effect on the

22   market price.  Based on the expert testimony, the trading more likely than not did have such an

23   effect. Even Celano, the Capital Markets trader liquidating the shares, believed the trading was

24   exerting some downward pressure on market price.  But that price impact matters only if Fidelity

25   Charitable did something, or failed to do something, that breached the standard of care for a

26   DAF's liquidation of a donated publicly traded stock under the circumstances present on

27   December 29, 2017.  It did not.

28

United States District Court
Northern District of California

21

*\*\*\**

When insisting that Fidelity Charity owed them a duty of care, the Fairbairns repeatedly argued that Fidelity Charitable could not simply "throw away the WATT stock certificates."  And their expert Professor Galle testified that a soup kitchen charity with a donated golf course could not sell the golf course for pennies on the dollar just because the charity does not speculate on price.  Agreed.  But the evidence as to what happened with Fidelity Charity's liquidation of the WATT stock on December 29, 2017 is leagues away from these examples. While Fidelity Charitable did not the sell the shares to which it held legal title in the manner the Fairbairns—sophisticated hedge fund managers—would have done, and while in hindsight Fidelity Charitable might have handled the donation differently, the Fairbairns have not come close to proving that what Fidelity Charitable did violated the standard of care for a DAF under the anomalous circumstances of late December 2017.  Judgment is entered in Fidelity Charitable's favor on the negligence claim as well.

**IT IS SO ORDERED.**

Dated: February 26, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge